No. 00-56404
United States Court of Appeals, Ninth Circuit

# Gardner v. Nike, Inc.

279 F.3d 774 (9th Cir. 2002)
Decided Jan 31, 2002

No. 00-56404.

Argued and Submitted December 11, 2001.

775 Filed January 31, 2002. *775

Herbert Hafif, Larry Sackey and Michael G. Dawson, Law Office of Herbert Hafif, Claremont, CA, for the plaintiffs-appellants.

C. Dennis Loomis, Los Angeles, CA, for the defendants-appellees.

Appeal from the United States District Court for the Central District of California; Lourdes G. Baird, District Judge, Presiding. D.C. No. 99-12700 LGB (Ex).

Before: FERGUSON, T.G. NELSON, and W. FLETCHER, Circuit Judges.

776 *776

## OPINION

FERGUSON, Circuit Judge.

Appellants Michael Gardner ("Gardner") and Bien Licensing Agency, Inc. ("Bien") (collectively referred to as "Appellants") appeal the District Court's grant of summary judgment to Appellee Nike, Inc. ("Nike"). The District Court held that Appellants lacked standing because the licensee, Sony Music Entertainment Corporation ("Sony"), did not have the right to transfer its rights to Gardner under the exclusive license with the licensor, Nike, under the Copyright Act of 1976. Although we have previously addressed this issue under the Copyright Act of 1909, this is a case of first impression under the Copyright Act of 1976.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291, and we AFFIRM.

[1] The other issue in this appeal is disposed of in a separate memorandum disposition.

## BACKGROUND

### A. Factual History

In 1992, Nike and Sony entered into a licensing agreement involving a Nike-created cartoon character called MC Teach. In exchange for fifteen percent (15%) of profits earned from any use of MC Teach in merchandise other than records,[2] Nike transferred the exclusive, perpetual, worldwide right to Sony to use MC Teach:

[2] Under the agreement, Sony paid the amount specified above directly to the United Negro College Fund.

> on and in the packaging of phonograph records (the `Records'), in publicity, advertising and allied exploitation of the Records, in television programs or motion pictures embodying the musical compositions embodied on the records, on educational materials and on clothing. . . .

The agreement also stated that Nike "shall own the copyright in the Material and any published copy of the Material . . . shall bear the following notice: 1992 Nike, Inc." It is undisputed that the agreement contemplated an exclusive license. *Gardner v. Nike, Inc.,* 110 F.Supp.2d 1282, 1283



1

(C.D.Cal. 2000). The agreement was silent as to Sony's right to assign its rights under the exclusive license.

In June 1996, Sony assigned all its rights in the exclusive license to Gardner, on a quitclaim basis, in exchange for a share of the proceeds derived from MC Teach. As a result of Appellants' use of MC Teach,[3] Nike threatened legal action against Sony, Appellants, and Appellants' licensees. In response to these threats, Appellants filed suit in state court seeking declaratory relief.

> [3] Appellants contend that Nike was kept apprised of their efforts to license and promote MC Teach in a variety of educational materials from 1992 thru 1996.

## B. Procedural History

Appellants originally filed suit in state court for declaratory relief, alleging slander *777 of title and intentional interference with economic relations. Appellants voluntarily agreed to dismiss both tort causes of action, leaving only the request for declaratory relief. Appellants filed a motion for summary judgment, asserting that under either New York or California law, Sony was permitted to transfer its rights to use the MC Teach character. The state court denied Appellants' motion for summary judgment. Nike then filed a motion to dismiss for lack of subject matter jurisdiction, contending that the Copyright Act of 1976 governed the transfer of rights under the licensing agreement. After both parties had filed trial briefs in the state court, Nike removed the action to District Court. The District Court remanded the action to state court because Nike's removal petition was untimely. On November 29, 1999, the state court dismissed the action without prejudice for lack of subject matter jurisdiction.

On December 3, 1999, Appellants filed the present action in District Court against Nike and Sony, seeking declaratory relief that the transfer of rights from Sony to Gardner was valid. On February 29, 2000, Sony was deemed an involuntary plaintiff, and it consented to be bound by any decisions by the court, subject to its opportunity to be noticed and heard. On June 5, 2000, Nike filed a motion for summary judgment, claiming that the Appellants lacked standing to sue. On the same day, Appellants filed a motion for summary adjudication.

On August 1, 2000, the District Court entered an order granting Nike's motion for summary judgment and denying Appellant's motion for summary adjudication. The District Court determined that both motions hinged on the issue of whether the Copyright Act of 1976 allowed Sony to transfer its rights under the exclusive license, absent the original licensor's consent. In particular, if the transfer was not valid, Appellants lacked standing to bring the action. The District Court found that the Copyright Act of 1976 did not allow Sony to transfer its rights under the exclusive license without Nike's consent. Thus, the District Court held that the Appellants lacked standing to bring the action because they had no legally cognizable interest in the suit. Appellants filed their timely notice of appeal on August 21, 2000.

## ANALYSIS

The District Court's grant of summary judgment is reviewed de novo. *Delta Sav. Bank v. United States,* 265 F.3d 1017, 1021 (9th Cir. 2001) (citations omitted). We are governed by the same standard used by the District Court under Rule 56(c) of the Federal Rules of Civil Procedure. *Id.* (citation omitted). Thus, we must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the District Court correctly applied the relevant substantive law. *Id.* (citation omitted).

In the present appeal, Appellants argue that the District Court erred in holding that the Copyright Act of 1976 ("1976 Act") does not permit an exclusive licensee to transfer its rights without the original licensor's consent, absent contractual

provisions to the contrary. Because the transferability of an exclusive license under the 1976 Act is a question of first impression, the state of the law prior to 1976 is pertinent to our inquiry.

## A. Copyright Act of 1909

Under the Copyright Act of 1909 ("1909 Act"), copyright licenses (whether exclusive or not) were "not transferable as a matter of law." *Harris v. Emus Records Corp.,* 734 F.2d 1329, 1333 (9th Cir. *778 1984). Unlike an assignee, a licensee "had no right to resell or sublicense the rights acquired unless he had been expressly authorized so to do." 3 Melville B. Nimmer David Nimmer, *Nimmer on Copyright* § 10.01[C][4] (2001). The distinction between licenses and assignments was based on both the doctrine of indivisibility and the policy concerns underlying the 1909 Act.

Under the doctrine of indivisibility, a copyright owner possessed an indivisible "bundle of rights," which were "incapable of assignment in parts." *Id.* § 10.01[A]. Thus, an assignment included "the totality of rights commanded by copyright." *Id.* Anything less than an assignment was considered a license. *Id.* The purpose of the doctrine was "to protect alleged infringers from the harassment of successive law suits. This result was achieved because only the copyright proprietor (which would include an assignee but not a licensee) had standing to bring an infringement action." *Id.* As discussed in *Nimmer on Copyright* and reiterated by the District Court, the doctrine of indivisibility created many problems for copyright licensees, including the licensee's lack of standing to bring an infringement action and the exclusive licensee's inability to register his license. *Id.* § 10.01[C]; see Gardner, 110 F.Supp.2d at 1285.

In addition, the distinction between assignments and licenses as to transferability under the 1909 Act was also based on policy considerations. In particular, the licensee's inability to resell or sublicense the rights acquired without the express consent of the original licensor struck a balance between two competing interests — "[the] strong reluctance to allow a monopolization of works or compositions" and "the necessity of preserving the rights of authors and composers in order to stimulate creativity." *Harris,* 734 F.2d at 1334.

In *Harris,* we addressed the question of whether a copyright license was transferable under the 1909 Act. *Id.* at 1333. We held that a copyright license was not transferable, relying on the legislative history, underlying policy concerns, and analogous rules in patent law. *Id.* at 1333-34 ("Where precedent in copyright cases is lacking, it is appropriate to look for guidance to patent law `because of the historic kinship between patent law and copyright law.'") (citation omitted). We emphasized that, "[b]y licensing rather than assigning his interest in the copyright, the owner reserves certain rights, including that of collecting royalties. His ability to monitor use would be jeopardized by allowing sublicensing without notice." *Id.* at 1334.

## B. Copyright Act of 1976

The 1976 Act eradicated much of the doctrine of indivisibility as it applied to exclusive licenses. Nimmer, *supra,* § 10.02[A]. First, § 101 defines the "transfer of copyright ownership" as "an assignment, mortgage, **exclusive license,** or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101 (emphasis added). This definition calls into question the distinctions that were previously drawn between an assignment and an exclusive license under the indivisibility doctrine. Nimmer, *supra,* § 10.02[A] ("An exclusive license . . . is equated with an assignment. . . ."). Second, § 201(d)(2) provides that "[a]ny of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred . . . and owned *779 separately." 17 U.S.C. § 201(d)(2). *779 Section 201(d)(2) constitutes "the first explicit statutory

recognition of the principle of divisibility of copyright." 17 U.S.C.A § 201 note (West 1996) (Notes of Comm. on Judiciary, H. Rep. No. 94-1476).

The 1976 Act addressed many of the aforementioned problems faced by exclusive licensees under the doctrine of indivisibility. Nimmer, *supra,* § 10.02[B]. For example, an exclusive licensee now has the right to sue for infringement of the assigned right in his own name. *Id.* § 10.02[B][1]. Despite the explicit changes in the 1976 Act, this case presents the issue of whether the 1976 Act eliminates the limitation on an exclusive licensee's right to re-sell or sublicense under our interpretation of the 1909 Act.

## C. The Effect of the Copyright Act of 1976 on an Exclusive Licensee's Right to Transfer

Appellants contend that the language in the 1976 Act places an exclusive licensee on par with an owner or assignee with the full rights of an owner or assignee, including the right to transfer without the explicit consent of the copyright owner.

Initially, Appellants point to 17 U.S.C. § 101, which states that a "transfer of copyright ownership is an assignment, mortgage, exclusive license, or any other conveyance . . . of any of the exclusive rights comprised in a copyright." Thus, Appellants argue that Sony, as exclusive licensee, was the owner of MC Teach with all of the rights afforded to a copyright owner.

Appellants then assert that, under 17 U.S.C. § 201, Sony could freely transfer these rights because there were no contractual restrictions requiring Nike's consent. In support of this argument, Appellants cite § 201(d)(1), which states that "ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law. . . ." Appellants next cite to § 201(d)(2) for support that an owner of an exclusive right must have the right to transfer it.

As discussed by the District Court, the crux of this case is the appropriate interpretation of 17 U.S.C. § 201. *Gardner,* 110 F.Supp.2d at 1284. The District Court rejected Appellants' argument, finding that § 201(d)(1) did not apply to the present case and that § 201(d)(2) only conferred the "protections and remedies" explicitly included in the 1976 Act, but not the rights. *Gardner,* 110 F.Supp.2d at 1286-87. We agree with the conclusions reached by the District Court for the reasons discussed below.

### 1. 17 U.S.C. § 201(d)(1)

Section 201(d)(1) provides:

> (1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

17 U.S.C. § 201(d)(1).

The District Court correctly determined that § 201(d)(1) addresses the apportionability of the copyright owner's interest in the totality of the copyright. Section 201(d)(1) enables the owner to transfer any fraction of his or her ownership interest to another party, thereby making that party a whole or joint owner. *Gardner,* 110 F.Supp.2d at 1282. Read apart from § 201(d)(2), § 201(d)(1) could be interpreted as extending this right of transfer to exclusive licensees such as Sony, especially since § 101 defines "transfer of copyright ownership" to include exclusive licenses. However, the limiting language in § 201(d)(2), as discussed next, indicates that this section does not, in fact, *780 cover transfers by exclusive licensees or owners of a particular exclusive right.

780

### 2. 17 U.S.C. § 201(d)(2)

The plain language of § 201(d)(2) limits the rights of an exclusive licensee to those "protections and remedies" afforded in the 1976 Act. Section

201(d)(2) provides:

> (2) Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

17 U.S.C. § 201(d)(2).

Appellants contend that, if a licensee of exclusive rights under the copyright is characterized by the 1976 Act as an "owner" of those rights under § 201(d)(2), then it must follow that such "ownership" carries with it an unrestricted right to freely transfer the license. However, Appellants' argument ignores the plain language of § 201(d)(2), which states that the owner of such exclusive rights is entitled only to "the protection and remedies" accorded the copyright owner under the 1976 Act. This explicit language limits the rights afforded to an owner of exclusive rights. Based on basic principles of statutory construction, the specific language of § 201(d)(2) is given precedence over the more general language of § 101 and § 201(d)(1). *See, e.g., Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980); *Fourco Glass Co. v. Transmirra Prods. Corp.,* 353 U.S. 222, 228-29, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling.") (citation and internal quotation marks omitted).

Further, as stated by the District Court, "Congress was aware that prior to the 1976 Act, licensees could not sublicense their right in an exclusive license [without the express consent of the licensor]. With that knowledge in hand, however, Congress chose to limit exclusive licensees `benefits' under the 1976 Act to `protection and remedies.'"[4] *Gardner,* 110 F.Supp.2d at 1287 (internal citation omitted).

> [4] The "protection and remedies" language of § 201(d)(2) includes, among other things, the right for an exclusive licensee to sue in his own name under Chapter 5 of the 1976 Act. *See* 17 U.S.C.A. § 201 note (West 1996); *see also* 17 U.S.C. § 501 *et seq.*

In sum, both parties contend that the plain language of the 1976 Act supports their view. There are weaknesses in both of their arguments because neither the 1909 Act nor the 1976 Act explicitly address an exclusive licensee's right to transfer, absent the consent of the licensor. Although neither party's plain language arguments is dispositive, the fact that Congress chose not to explicitly address this issue in the 1976 Act and the limiting "protection and remedies" language of § 201(d)(2) indicates that the state of the law remains unchanged. Thus, we hold that the 1976 Act does not allow a copyright licensee to transfer its rights under an exclusive license, without the consent of the original licensor.

### 3. Policy Considerations

Moreover, the policy considerations, which influenced this Circuit's decision under the 1909 Act, counsel the same conclusion in the present case, especially since neither the 1909 or 1976 Act explicitly addresses this issue. In *Harris,* we relied on the legislative history of the 1909 Act, patent law, and policy considerations. 734 F.2d at 1333-34; *see also In re CFLC,* *781 *Inc.,* 89 F.3d 673, 679 (9th Cir. 1996) (relying on the federal patent policy concern that the patent holder have the ability to control the identity of licensees and holding that nonexclusive patent licenses are not assignable).

As discussed in *Harris,* there are strong policy reasons to place the burden on the licensee to get the licensor's explicit consent either during or after contract negotiations. Placing the burden on the

licensee assures that the licensor will be able to monitor the use of the copyright. *Harris,* 734 F.2d at 1334 ("[The licensor's] ability to monitor use would be jeopardized by allowing sublicensing without notice."). In this case, Nike, the copyright owner, agreed to allow Sony the use of MC Teach in a broad range of products. Sony assigned this right to Gardner without receiving the consent of Nike. Consequently, Nike had no role in determining whether Gardner would be an appropriate sublicensee.

It is easy to imagine the troublesome and potentially litigious situations that could arise from allowing the original licensor to be excluded from the negotiations with a sublicensee. For example, what if the sublicensee was on the verge of bankruptcy or what if the original licensor did not agree that the sublicensee's materials use of the copyright fell within the original exclusive license?

Requiring the licensee to get explicit consent from the licensor strikes the balance between the competing interests that underlie the 1976 Act and copyright law in general. On the one hand, the 1976 Act reflects Congress' growing awareness of the need for free alienability and divisibility. Yet, both Congress and this Circuit have always been aware of the necessity to preserve the rights and control of the owners and creators. In order to reach the balance between these interests, we hold that, under the 1976 Act, an exclusive licensee has the burden of obtaining the licensor's consent before it may assign its rights, absent explicit contractual language to the contrary.[5]

> [5] Appellants also argue that state law, not federal law, governs this case because the applicable state law is consistent with federal copyright law. Both parties agree that state law controls issues of contractual interpretation, including agreements that pertain to copyrighted material, unless state law interferes with federal copyright law or

policy. *See S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1088 (9th Cir. 1989) ("We rely on state law to provide the canons of contractual construction, but only to the extent such rules do not interfere with federal copyright law or policy."). Assuming arguendo that Sony had the right to transfer its exclusive rights to Gardner under state law, the issue before us is whether this state law interpretation interferes with federal law. Because we hold that the Copyright Act of 1976 prohibits the transfer of an exclusive license without the consent of the original licensor, Appellants' interpretation of state law is inconsistent with federal law. Thus, federal law, not state law, governs this action.

## CONCLUSION

Because the 1976 Act did not change the law as to the assignability of exclusive licenses, we hold that federal law governs the present case and that exclusive licenses are only assignable with the consent of the licensor. Thus, we affirm the District Court's grant of summary judgment and its determination that Appellants lacked standing to bring this declaratory relief action. The other issue in this appeal is disposed of in a separate memorandum disposition.

AFFIRMED.

782 *782



