# EXHIBIT D

# STC INTERPRETING



## Certification of Translation Accuracy

I attest that the following document:

**Finlex'Case law'Market Court'2018'MAO:302/18**

Has been translated from the languages:

**Finnish to English**

On behalf of STC Interpreting, by certified translator,

**Ayse Cosan**

I, the abovementioned translator, hereby certify that I am fluent & conversant in the **Finnish** and **English** languages, and that the translation attached to this certificate, is an accurate and complete translation of the above document to be best of my abilities.

This is to certify the correctness of the translation only. STC Interpreting assumes no liability for the way in which the translation is used by the customer or any third party, including end users of the translation.

A copy of the translation is attached to this certification.

I attest the preceding statements to be true.

_____

Translator's Signature
Translator: **Ayse Cosan**

_____

By: Silene Conceicao
STC Interpreting
Date: January 7, 2024

9854 National Blvd. # 359
Los Angeles, CA 90034
www.stcinterpreting.com

Phone: 310-287-0405
Fax:     310-943-2747
support@stcinterpreting.com

VALVE_001

# Finlex®

Finlex'Case law'Market Court'2018'MAO:302/18

## MAO:302/18

### A, B, C, D, and E > Blind Spot Pictures Oy and Iron Sky Universe Oy - copyright - work - copyright transfer

**File number:** 2017/588

**File number:** 2017/701

**Date of adoption:**
31.5.2018

**CAUSE** Copyright dispute

**KANNE (ref. 2017/588)**

**Claims**

A, B, C, D, and E have requested that the Market Court:

1) Confirms that A, B, C, D, and E have copyrights in the film Iron Sky and its Director's or Dictator's Cut;

2) Confirm that A, B, D, and E hold the copyright to the works used in Iron Sky as follows:

a. A to the vessels Götterdämmerung including the interior, Liberty Capsule, Rheingold, and Zeppelin, and to the vessel of the Japanese representatives at the moon base
(Schwarze Sonne) and the Helium 3 train,

b. B to the vessels Götterdämmerung, including the interior, Rheingold, George W. Bush, Valkyrie, and to the vessel of the Australian representatives, at the moon base
(Schwarze Sonne), including the interior and the lunar module (Landing Module),

c. D for the vessel Götterdämmerung including the interior, Zeppelin, George W. Bush, Mir, and

d. With E to the ships Götterdämmerung, including the interior and Zeppelin, as well as to the Landing Module and the Moon base
(Schwarze Sonne) including the inside;

3) Confirm that A, B, C, D, or E have not transferred the rights in the works they have created under claims 1 and 2 for use in the Iron Sky film or the Director's Cut version of the film as a cinematographic work, unaltered, for exhibition as such, or for normal distribution to the public;

4) Confirm that Blind Spot Pictures Ltd and Iron Sky Universe Ltd have infringed on their copyright by unauthorized use and/or reproduction and making available to the public material based on the Iron Sky film or its Director's or Dictator's Cut;

5) Prohibit Blind Spot Pictures and Iron Sky Universe from continuing or repeating the copyright infringement referred to in claim 4;

6) Prohibit Blind Spot Pictures Ltd and Iron Sky Universe Ltd from further assigning the rights to the Iron Sky film or its Director's or Dictator's Cut other than as a cinematographic work, unaltered, for exhibition as such and for normal distribution to the public, and in any respect to the individual works of the plaintiffs appearing in the films.

In addition, A, B, C, D, and E have requested that the Market Court order Blind Spot Pictures Oy and Iron Sky Universe Oy to pay their costs of EUR 901.20 regarding costs and EUR 49,243.60 regarding fees, i.e., a total of EUR 50,144.80 plus default interest.

**Criteria**

*Validity and scope of the assignment of rights*

A and his/her co-owners (hereinafter also referred to as "the staff members") have not assigned their copyrights to Tuotantoyhtiö Energia Oy other than, or in addition to, the Iron Sky film. Any other use, modified or unmodified, infringes on the copyright of the claimants. The works created by the applicants are subject to the prohibition of modification and sub-licensing laid down in Section 28 of the Copyright Act, as no other agreement has been made. The agreement has been for limited use, for example, to show a film to the public. Blind Spot Pictures Oy and Iron Sky Universe Oy (hereinafter also referred to as the production companies) could not have obtained more rights from Tuotantoyhtiö Energia Oy than it has itself.

The action is based on the authors' copyright and they have legal standing. The mere assertion of copyright establishes standing. The authors' copyright is disputed, and they have a legal interest in having the case ultimately resolved on the basis of their moral rights under Section 3 of the Copyright Act.

The arbitration provision in section 29 of the Copyright Act must be applied where appropriate and applicable, and any agreements must be interpreted narrowly, because the compensation received by the staff for their services was substantially small and therefore could not have concerned anything other than a limited transfer of the Iron Sky film.

*Copyright of copyright holders in the entire film and individual works*

VALVE_002

The staff is professionals in visual effects (VFX) and computer animation. The copyright in the entire film is based on the creative and substantial contribution of all the staff members to the spacecraft and moon base and numerous scenes in the film. The staff created the background environment details for numerous scenes and the actual visual content of the scenes in computer-animated form. Three-dimensional modeling requires independent and creative solutions. Looking at the film as a whole, the original and independent contributions of the plaintiffs are significant. The content of the scenes must have been created independently by the filmmakers because the film's shooting plan and the so-called "shot series" have not revealed the desired or intended content and details. If the creative input of the staff were removed from the film, what would remain would not be the film at hand, but only a kind of frame. In addition, the staff members have individual copyrights to certain independent and original spacecraft and other individual works they create for use in the film. Staff have been involved in creating the animations, environments, and scenes. These works alone, as part of the cinematic whole and the story, are essential and creative in moving the story of the film forward.

A has made the Liberty Capsule, Rheingold, and Zeppelin ships, and the exterior and interior of the Helium 3 train and the moon base for the film. For many of the visual effects, A had to improvise and use creativity to complete the tasks assigned. A has also created, among other things, the interiors of the Götterdämmerung with B, as well as a very elaborate Japanese representative ship built alone.

B has created, alone or with others, several scenes for the film, including the moon landing ship explosion scene, the Rheingold UFO crane scene, the Götterdämmerung engine room, the Rheingold landing gear animations, and George W. Bush's main weapons. B has been primarily responsible for the creation of Götterdämmerung, a vessel that contains a large amount of detailed artistic input. B also created the exterior and interior of the moon base, the Valkyrie and moon landing craft, and a highly detailed Australian delegate ship.

C has been responsible for leading the VFX team and compositing the images seamlessly into one credible whole. He has been brought into the project as an experienced visual effects specialist under the title of CGI supervisor and has acted as a creative supervisor for other staff and production line supervisor. C has been involved in the creation, design, and production of several scenes, including battle scenes between spacecraft.

D has created animations, 3D models, and so-called previsualization models for the film. Over the course of the project, D adopted a compositing program, which he used to construct many of the scenes that ended up in the film as they were. D created Götterdämmerung, Zeppelin, and George W. Bush ships, as well as the highly detailed Mir ship alone.

E is a highly experienced professional in the field and has been extensively involved in the creation of film scenes. E has acted as a supervisor for other workers and as an approver responsible for the production line. For example, E created the Zeppelin ship-blasting in space combat and was involved in the creation of the Götterdämmerung and Zeppelin ships as well as the moon landing ship and the moon base.

Director TV has not had a meaningful influence on the direction of the VFX team's work and the creation of the works it has produced. All of this has been the independent and creative work of the VFX team members and, in this case, the staff. TV and ST have been abroad doing the last actual filming while the VFX team has been finalizing certain individual pieces and related animations and scenes. The storyboard did not contain any instructions or description of the content of the scene, only the text "Full CGI". The retrospective acceptance of works as part of a film does not imply the creation of works or the creation of works under fixed direction or guidelines.

As stated above, the copyright of the staff members has not been transferred to the employer in the contested part.

*Criteria for copyright infringement claims 4-6*

Blind Spot Pictures Ltd has infringed on the copyright of staff members by licensing a company called Reality Pump Studios to produce and make available to the public the computer game Iron Sky Invasion, which infringes on the copyright of staff members. The game uses a significant amount of audiovisual material from the film, including spaceships. The production companies are also releasing Iron Sky, based on the film: The Roleplaying Game, in which, according to pre-release marketing, copyright-infringing material will be used, at least on the Götterdämmerung platform.

The content of the film's sequels is not yet known to the staff at this stage, and requirements 4 and 5 do not apply to the film's sequels. However, the production companies, or at least Iron Sky Universe Ltd, have used the Iron Sky film and the works of its characters in the marketing of sequels to the film and in seeking crowdfunding for the unauthorized use of scenes from the film and at least the following individual works: Götterdämmerung, Mir, a ship of the Japanese representatives and a moon base (Schwarze Sonne). This infringes on the copyright of the staffers, as the production companies have not been assigned rights more broadly or otherwise than just to Iron Sky, and the staffers, as authors of the original film, have not given their consent.

Claims are not premature. The Market Court must enjoin the defendants in the main action from continuing or repeating such copyright infringements, including sub-licensing.

What is relevant in assessing infringement is the external manifestation, not whether the original digital files or similar technical aids were used to produce the final product. It is irrelevant for production companies to invoke the normal practice of the industry, and this is particularly the case in this instance because the Iron Sky film project has been very amateurish , carried out in a way that is different from the normal practice of the film industry, including interaction with the public. In addition, Article 46a of the Copyright Act does not create a legal basis for conducting business in the manner proposed by production companies.

**RESPONSE**

**Requirements**

Blind Spot Pictures Oy and Iron Sky Universe Oy have requested that the Market Court dismiss the application as inadmissible or reject it.

Blind Spot Pictures Oy and Iron Sky Universe Oy have also requested that the Market Court order A, B, C, D, and E jointly and severally to pay their VAT-free legal costs of EUR 2,050 for costs and EUR 54,000 for fees, i.e., a total of EUR 56,050, and the costs of the parties of EUR 10,500, both amounts plus default interest.

**Criteria**

*No copyright has been created or all rights have been assigned exclusively to individuals without legal standing or need legal protection*

No copyright has accrued to employers or has been assigned in its entirety and exclusively to the employer. Therefore, they do not have standing to bring copyright claims based on the film or its materials, and the action must be dismissed as inadmissible. In the light of the foregoing, the action must also be dismissed as inadmissible on the grounds of lack of interest in bringing proceedings, since only the economic rights and alleged infringements of the Copyright Act have been relied on.

Implicitly, and at the latest with employment contracts, all possible rights have been transferred exclusively to the employer and then to the production companies for a lump sum. Therefore, there are no rights left for the persons who have given them. The transfer of rights has not been limited to the Iron Sky film.
but all the material and the film, and the right to sub-license the rights. C has agreed to the mandate on the same terms. The agreement must be interpreted in accordance with the intent of the parties, the prevailing practice in the sector, and the wording. The contributors were aware of the extent of the disclosure and the general practice of using the material for business purposes. There is no justification for contract arbitration.

*Claim that claims 4 and 5 are premature and that the action is not individualized*

Iron Sky: The Coming Race is not yet fully finalized, and Iron Sky: Footage for The Ark is still being prepared. Neither film has been made available to the public in its final form. The alleged copyrights have not been infringed upon by making them available to the public or otherwise. The films have not, as the staff claim, made unauthorized use of material or elements from previous films, either as such or in an adapted form. For sequels or other unreleased material, such as The Coming Race, The Ark films, and role-playing games, a copyright assessment cannot yet be made, and claims 4 and 5 must be dismissed as inadmissible or premature on those grounds.

The claims are not sufficiently identified on a claimant-by-claimant basis. With respect to claim 4, the infringement of copyright is not identified, and the copyright at issue in claim 6 is not sufficiently specified.

*No copyright in the film or parts of the film has accrued to the copyright holders*

No copyright in the film has accrued to the copyright holders under copyright law or film business practice. Their contribution to the film or its materials has not been so creative, independent, or original as to give them copyright even in the individual elements identified in Claim 2. No independent copyright has been created for visual effects that are separate or distinct from the cinematographic work. Visual effects are not a part of the film that would give the staffers the copyright to the entire film as a collective work.

Any copyright in a single, separable part of the film, for example, the vessels identified in Claim 2, would not create a copyright in the entire film. The contributors have only been involved in individual parts of the film, not the entire film.

Staff members have been involved in film production in various performing and assisting roles and at different levels. Participation and expertise are mixed. The crew members worked under the guidance of key people in the film, such as the director TV, the effects and visual designers ST and JL, and according to written instructions and videos. In the closing credits of the film, the filmmakers are named as contributors to the film, but this does not create a presumption of authorship. The end credits list the many people involved in the making of the film. Filmmakers include the director, actors, and screenwriter of the film. The film is not a collective work within the meaning of Section 5 of the Copyright Act or a collective work within the meaning of Section 6.

D has been a work experience student since joining the project. C signed the contract in March 2011. B joined the film as a professionally inexperienced trainee, working on the film's pre-designed three-dimensional models in a carefully instructed mechanical manner. B has assisted in the production of the material in accordance with the employer's instructions, with the help of the director's and effect producer's instructions, the script, the concept art and concept art images, and other instructions. B's work has been part of a larger picture. B's role has been small, non-creative, and mechanical, and his contribution has not exceeded the so-called "theatrical threshold". B has not identified the elements identified in the application for a writ of summons and on which his copyright is based.

*Persons have no rights to other business activities*

The film business is based on the transfer of rights, sub-licensing, making, and commissioning sequels and supporting material, including images, characters, and storylines. The requested prohibition would prevent the normal continuation of the production companies' business, including the rights that the production companies undisputedly hold under Section 46a of the Copyright Act. The claim is therefore unfounded, unjustified, and unspecified and, as a chicanery, contrary to the legal rights of the production companies.

**REPLY (dnro 2017/701)**

**Requirements**

Blind Spot Pictures Oy and Iron Sky Universe Oy have requested that the Market Court:

1) confirms that B, C, E, D, or A does not own a copyright in Iron Sky or Iron Sky under section 2, 6 or 46a of the Copyright Act Director's or Dictator's Cut film or any of the material they have made for those films;

2) confirm that B, C, E, D, or A do not hold a copyright in Iron Sky under section 1, section 2, 6, or 46a of the Copyright Act: The Coming Race film;

3) confirms that B, C, E, D, or A does not have the right to use any Iron Sky or Iron Sky Director's or Dictator's Cut material that they have made;

VALVE_004

4) prohibit B and D from further infringing on the copyright of Blind Spot Pictures Oy and Iron Sky Universe Oy and order them to stop making the infringing material available to the public, under penalty of a fine of 50.000 euros.

Blind Spot Pictures Oy and Iron Sky Universe Oy have also requested that the Market Court order A, B, C, D, and E jointly and severally to pay their VAT-free legal costs of EUR 3,050 for costs and EUR 6,000 for fees, i.e., a total of EUR 9,050, and the costs of the parties of EUR 4,000, both amounts plus default interest.

**Criteria**

The principals have assigned their copyright, if any, under Section 2 of the Copyright Act in the materials and individual elements of the Iron Sky and Iron Sky Director's or Dictator's Cut films to their employer on an exclusive basis for a lump sum. These rights have been transferred from the employer to the production companies. Copyright holders do not even have standing to bring claims based on these copyrights. Production companies have used the material and elements in accordance with agreements, industry practices, and the wishes of the parties.

Since the claims for confirmation of main claims 1–3 must be rejected, claim 1 of the counterclaim must be granted for the sake of legal certainty and security. Employers do not even have jurisdiction in this regard. The plaintiffs, in particular B, have made allegations concerning the plaintiffs' business, films, and copyright. B has been in contact with business partners of production companies, Iron Sky licensees, film financiers, and others, and has made unfounded allegations of illegality on the internet. In practice, a judgment dismissing the main action is not as effective and unambiguous as the present express confirmatory judgment, which makes it possible to prove the legal position to third parties.

Any copyright in a single, separable part of a film, such as spaceships, does not give copyright in the entire film. The provisions of Articles 5 and 6 of the Copyright Act referred to by the authors do not apply to the film as a whole.

Confirmation request 2 concerns the upcoming, still unfinished film Iron Sky: The Coming Race, the final version of which has not yet been made. The film in question does not contain any material from previous films or elsewhere that the respondents have been involved in making, producing, or even conceiving. The authors therefore have no legal authority over the film.

Even if a copyright had been created, it would have been assigned in its entirety on an exclusive basis, leaving no right for the copyright holders to use the material themselves. This state of affairs must be established in accordance with confirmation requirement 3.

B has also announced on the Internet that he has set up a company with D to produce Iron Sky games and has used copyrighted material to promote his game production. B also promotes 3D prints with "Iron Sky 2012" and using unauthorized footage from the Iron Sky movie. As stated above, staff do not have or have not retained the right to use the material themselves. The Market Court should prohibit B and D from continuing to infringe copyright.

**RESPONSE**

**Requirement**

s

A, B, C, D, and E have requested that the Market Court dismiss the counterclaim as inadmissible or reject it.

In addition, A, B, C, D, and E have requested that the Market Court order Blind Spot Pictures Oy and Iron Sky Universe Oy to pay their legal costs in the amount of EUR 901.20 for costs and EUR 21,104.40 for fees, i.e., a total of EUR 22,005.60 plus default interest.

**Criteria**

*Claims cannot be dealt with because of the lis pendens effect of the main action or because they are premature or unfounded*

Requests for confirmation 1 and 3 concern the requested rejection of the main action and the consequent alleged need for confirmation of the reverse result. A negative confirmatory action is not possible on the same issue as the one for which a positive confirmatory action has been taken. No better or broader legal protection can be obtained through a counterclaim than by opposing the main action. The pendency of the main action prevents such a counterclaim, and the claim must be dismissed or dismissed immediately. Confirmation requirement 3 is also completely unspecified.

Confirmation request 2 concerns the Iron Sky sequel The Coming Race, which has not yet been released and is not publicly available. The claim is therefore premature and cannot be further considered or decided in this context. The claim cannot be decided until the work that is the subject of the claim exists and can be evaluated. It is also not possible to take a position on the matter, as no explanation has been provided regarding the content of this extension. There is no comprehensive explanation to be presented in the main action. The claim for corroboration is also unfounded because the defendants have not even claimed to have been involved in the making of the sequel. The claim must therefore be dismissed as inadmissible or rejected immediately.

The copyright basis and validity of the claims in the main action are clear.

*Prohibition requirements for production companies*

If B and D had used any Iron Sky-related material in their activities, they would have been entitled to use it as alleged in the main action. With the agreement of the other authors, B has re-modeled the Valkyrie from scratch. In any case, the alleged transaction or use would not have been relevant from a copyright point of view and therefore could not be prohibited. The claim is unspecified, unfounded, and unsubstantiated.

**CERTIFICATION**

**Documentary**

**evidence** *Persons*

*providing* evidence

1. Screen grabs from Iron Sky with comments from the filmmakers (also documentary evidence 1 from the production companies)

2. Screenshots from Iron Sky with comments on the filmmakers (also documentary evidence from the production companies 2)

3. Screenshots from Iron Sky with comments from the filmmakers (also documentary evidence 3 from the production companies)

4. Screenshots from Iron Sky with comments from the filmmakers (also production companies' documentary evidence 4)

5. Screenshots from Iron Sky with comments from the filmmakers (also production companies' documentary evidence 5)

6. Excerpt from the shooting script and storyboard of Iron Sky and screenshots of Iron Sky (also production companies' documentary evidence 6)

7. Wikipedia article "Iron Sky: Invasion" (10.8.2017)

8. SF Studios and Iron Sky Universe press release "Iron Sky: The Coming Race movie to hit screens in February" (25.4.2017)

9. "Iron Sky: The Ark" article from ironsky.net (4.9.2017)

10. "Iron Sky: The Roleplaying Game" screenshots from kickstarter.com (21.8.2017)

11. Picture of the Australian representative vessel

12. Picture of the Mir ship

13. Photos of Japanese representatives' vessel

14. Photos of the monospot (Schwarze Sonne)

15. Screenshot from the Facebook page of Troll VFX (20.6.2013) regarding the AACTA award for visual effects

16. Invoice from Pi Computer Solutions (19.5.2010)

17. Screenshot of copyright notice for Iron Sky Invasion computer game

18. Screenshots from the end of the Iron Sky film and Iron Sky: Trailer for The Coming Race

19. Screenshots of film scenes against a green background, the so-called green screen shooting

20. Screenshots from the Iron Sky

21. Excerpts and screenshots from the Iron Sky storyboard

22. Iron Sky 2012 Director's Cut video clip

23. Making of Iron Sky video recording (a. "How It All Started", b. "Making of" and c. "The Story and the Characters")

24. C's Commentary Video Recording

25. Zeppelin Kaboom video recording

26. Be a Moon Trooper in Iron Sky: The Coming Race video recording

27. Be a Moonbase Citizen in Iron Sky: The Coming Race video recording

28. The evidence has been waived.

29. Iron Sky: The Coming Race official trailer 1 video clip

30. Iron Sky Shooting Script III

31. Iron Sky Storyboards photo script (21.10.2010)

32. Joint AuthorshipDemo video recording

33. Iron Sky Signal: Creating VFX for the Iron Sky videotape

34. Iron Sky Signal S02 Episode 5: Making an Iron Sky video recording

35. D's Portfolio December 2011 video recording

36. E's Iron Sky reel 2011 video recording

37. A's Showreel video recording

38. A:n - CGI/VFX work for Iron Sky  composite

39. B's Iron Sky showreel video recording

40. Iron Sky: Video of the Invasion computer game

41. Images from the gd_full_model_shaded_2011.mb file

42. Images from the gd_machineroom_assembled_scene_shaded_2012_02.mb file

43. Images from the gwb_front_section_with_weapons_rights.mb file

44. Images from the park_hangar_master_scene_v57.mb file extension

45. Images from the sh_052A_0030_GWB_Zep_Exp.mb file

46. Images from the seb_rheingold_lambert.mb file extension

47. B's request for an opinion from the Copyright Council

*Production companies*

1. Screen grabs from Iron Sky with comments from the filmmakers (also staff documentary 1)

2. Screen grabs from Iron Sky with comments from the filmmakers (also staff documentary evidence 2)

3. Screenshots from Iron Sky with comments from the filmmakers (also staff documentary evidence 3)

4. Screenshots from Iron Sky with comments from the filmmakers (also staff documentary evidence 4)

5. Screenshots from Iron Sky with comments from the filmmakers (also staff documentary evidence 5)

6. Excerpt from the shooting script and storyboard of Iron Sky and screenshots of the film (including staff documentary 6)

7. Contracts of employment of Mr D (18 May 2010, 4 November 2010 and 13 August 2011), Mr E (11 February 2010 and 16 September 2010), Mr A (4 November 2010) and Mr B (4 May 2011, 28 October 2011 and 28 November 2011)

8. B's Twitter message 22.4.2017

9. B's Twitter message (2017)

10. Screenshot of the "Valkyrie UFO from Iron Sky 2012" sale announcement from shapeways.com

11. B's email concerning his job application (27.9.2010)

12. YouTube video Iron Sky Teaser 2 - First Footage (13.5.2010)

13. Emails about B's work life coaching 8.11.2010–8.5.2011 (29.3.2016–1.4.2016)

14. Commissioning Agreement between Energia Productions Ltd. and Declaration Pictures Inc. for C (22.3.2011)

15. Footage of making the films (confidential)

16. TV's email to C (12.8.2011)

18. Video recording of the making of the film

19. Footage of making the films (confidential)

20. TV email (2.8.2011)

21. Email from ST with attachments (16.7.2009)

22. Two Götterdämmerung VFX video recordings

23. B's emails (22.2.2018)

24. B's Twitter message (22.3.2018)

**Proof of identity**

*Employers*

1. B, for evidence

2. C, for evidential purposes

3. E, for evidential purposes

4. D, for evidential purposes

5. A, for evidential purposes

*Production companies*

1. B, for evidence

2. C, for evidential purposes

3. E, for evidential purposes

4. D, for evidential purposes

5. A, for evidential purposes

6. TV, film director, member of the board of directors of Iron Sky Universe Oy, evidence

7. TK, film producer and member of the board of directors of Iron Sky Universe Oy and Blind Spot Pictures Oy, in evidence

8. ST, VFX supervisor

9. JP, Community Manager

10. JL, Creative Director, MARKET,

ruling reasons

*1 Background*

1. In accordance with the decision of the preparatory hearing of the Market Court, the original application (dnro 2017/588, hereinafter also referred to as the main application) and the counterclaim (dnro 2017/701) will be dealt with in the same proceedings.

2. At the heart of these cases is the issue of copyright in the entire film, as well as in the individual spaceships and other works, held by the authors of the three-dimensional computer-generated visual effects and animation for Iron Sky, including the contributors. These are subject to confirmation and denial requirements.

3. According to the consistent evidence presented in the cases, the film in question has been conceived, scripted, and prepared since 2005. The employees have joined the film projects of Blind Spot Pictures Oy and Iron Sky Universe Oy (hereinafter also the production companies) to work on behalf of the visual effects subcontractor Tuotantoyhtiö Energia Oy in different ways and in stages, mainly during the end of 2010 and early 2011. The film was released in February 2012, with a slightly expanded Director's Cut (also known as Dictator's Cut) version apparently released in 2013. It has been declared undisputed that the rights to the film and the version mentioned are determined in the same way.

4. Most staff members' employment contracts provide for the transfer of rights to the employer on the terms in dispute, but in all cases, the employment and transfer of rights are not agreed in writing. The conditions under which the copyrights may have been transferred to Tuotantoyhtiö Energia Oy and/or the right of use granted to the production companies may therefore also have to be assessed.

*2 Inadmissibility and prematurity of certain claims*

5. The production companies have claimed that the main action should be dismissed as inadmissible because no copyright has accrued to the staff and in any case any copyright has been exclusively assigned to the employer, leaving no rights for the staff. Thus, staff members have no need for legal protection or standing to bring claims under copyright law.

6. The legal literature (Jokela, Parties and Preparation of Proceedings, 2012, p. 253) states that an action for confirmation is inadmissible unless the plaintiff has a sufficient legal interest in the confirmation sought. This presupposes that there is legal uncertainty about the legal relationship or right in question and that the claimant is prejudiced by the status quo. In addition, the alleged interest in confirmation must be current and related to an otherwise enforceable right, which must not depend on the fulfillment of a condition that may arise in the future.

7. It has also been stated in case law (Harenko, et al., Copyright, 2016, pp. 623 and 624) that the right holder whose rights are infringed has standing to bring a claim. Exclusive economic rights in a work always accrue to the natural person who created the work. If he has transferred his rights to another party, for example a company, the extent to which and which rights have been transferred must be examined. If all economic rights have been exclusively assigned to an undertaking, the person to whom the economic rights belong is entitled to claim compensation for the infringement.

8. The Market Court considers that claims 1-3 of the main action and the other claims based on them concern first the question of whether copyright has accrued to the authors and only second the extent to which it may have been assigned. In such a situation, where there is also a dispute about whether copyright has accrued to the contributors in the first place, the contributors who allegedly created the works have standing and sufficient legal interest.

VALVE_008

9. The production companies have also requested that claims 4 and 5 be dismissed as premature insofar as they relate to unpublished material. The producers also considered that claims 4 and 6 were insufficiently specified or disaggregated. In their statement of March 2, 2018, the authors stated for the sake of clarity, without limiting or substantially specifying their claims, that requirement 5 does not apply to a sequel to a film that has not yet been released. In their statement of 20 March 2018 and in the main hearing that started on the same day, the staff members further stated that claims 4 and 5 do not apply to the unreleased sequels of the film or, according to the main hearing, to the unreleased role-playing game.

10. The Market Court considers that claims 4 and 5 in the main action are not directed against unreleased films or role-playing games, in accordance with the specified pleas in law. The case has not revealed any grounds for the inadmissibility or premature rejection of those claims, as requested by the production companies. Furthermore, claims 4 and 6 cannot be considered to be so unspecific as to render the action inadmissible on those points.

11. The staff members, for their part, have requested that claims 1 and 3 of the counterclaim be dismissed as inadmissible or dismissed as lis pendens because, according to the staff members, they concern the same subject matter as the main action. In addition, the staff members requested that claim 2 of the counterclaim be dismissed as inadmissible or dismissed as premature or uncontested.

12. According to legal literature (Frände, et al., Procedural Law, 2017, pp. 524-525), a counterclaim is not the same as a main claim if, if successful, it could provide broader legal protection than a mere successful response to the main claim. Legal interest is satisfied if the defendant can achieve something more with his action than the dismissal of the action against him.

13. The Market Court finds that claims 1–3 for declaratory relief in the main action concern copyright in the Iron Sky film and the identified works and, in part, the scope of the creation and assignment of rights. This is also largely what the counterclaim for confirmation 1 is about. However, due to the layering of confirmation requirements 1-3, the requirements are not counterproductive. In addition, the counterclaim sought a declaration that the staff members do not own the copyright in any of the material they have made for the film in question, including any works other than those identified in claim 2 of the main claim. Thus, the scope of Counterclaim 1 is broader than that of the main claim concerning the material made for the film, and there is no obstacle to the examination of Counterclaim 1.

14. The totality of claims 1 to 3 in the main action concerns the creation of a copyright and that there has been no assignment of rights other than or higher than the scope of claim 3. Claim 3 of the counterclaim, on the other hand, is essentially about whether the staff members have the right to use the material they have made, which is not the issue in the main action. Consequently, this claim for confirmation also differs from the claims in the main action in such a way that there is no obstacle to its examination.

15. The Market Court also notes that claims 4 and 5 of the main action are described in a rather general manner and without further specifying the infringing conduct. The arguments put forward in support of the claims have changed during the preparatory phase and, most recently, at the start of the main hearing. As a result, it may have been unclear to production companies which procedure the claims were directed at, and in particular whether they were directed at material that had not yet been published. The copyright owners have not described claim 4 in such a way that it explicitly addresses only the allegedly infringing conduct and facts. In these circumstances, the Market Court considers that there is sufficient legal interest in itself for claim 2 of the counterclaim.

16. Counterclaim 2 seeks a declaration that the staff does not own a copyright to Iron Sky under certain provisions of the Copyright Act: The Coming Race. What is not in dispute is that the staffers were not involved in the making of the sequel. This film has not yet been released or finalized. There have been few submissions about the film or the issues affecting its copyright, and no explanation of the final film has been made available. For the reasons set out above, the Market Court finds that Counterclaim 2 must be dismissed as premature. As stated above, there is no other obstacle to further hearing of the cases.

*3 Copyright claims by copyright holders in Iron Sky*

17. According to Section 1(1) of the Copyright Act, the person who has created a literary or artistic work has copyright in the work, whether it is a literary or explanatory written or oral performance, a composition or stage work, a cinematographic work, a photographic or other work of visual art, a product of architecture, craftsmanship or art, or whether it is manifested in any other way.

18. With regard to cinematographic works, the preamble to the Copyright Act (Committee Report 1953:5, p. 45) states that in practice, it can be difficult to determine who is considered to own the copyright in a cinematographic work. According to the legal literature (Salokannel, Losing Filmmakers, 1990, p. 28), the Nordic drafting documents distinguish, in the definition of copyright holders in a film, between authors who hold the copyright in the whole cinematographic work on the one hand and authors who hold the copyright only in the individual works or performances contained in the film on the other. In the Nordic drafting documents, the persons who may be entitled to the copyright in the whole film work are usually the writer and the director of the film. Whether other persons who contributed artistically to the making of the film acquire a copyright in the whole film or only in their part depends on the importance of their contribution to the film as a whole. These can include the composer of the film music, the cinematographer, the editor, the set designer, the architect, and the choreographer.

19. In the latter work, it is further stated (pp. 28 and 29) that the crucial question in defining the rights holders of a film has become the clarification of the boundary between creative work and technical skill. The (artistic) independence of the work and its original expression are considered decisive factors. The independence of work in filmmaking is usually judged by how independently a person works in relation to the director of the film. This refers to creative work that can be considered independent of artistic criteria. The artistic contribution of the individual author would thus be determined by the script and direction of each film work, and ultimately only during the practical production process.

20. According to the consistent evidence presented in the case, the idea for the film came from JP, the script was written by at least F and G, and the film was directed by TV. The film was directed by H and, especially for the digital sets, by JL, who was also the artistic director of the film. Among other tasks, ST was responsible for visual effects. In total, hundreds of people were involved in the making of the film.

21. The contributors created computer-generated three-dimensional models and animations, mainly of different spacecraft, for the film. Based on the evidence presented in the case, C has mainly acted as one of the supervisors of computer animation in the role of CGI supervisor. A, D, and B have been mainly involved in modeling and some animation. E has at least guided the modelers and animators in the use of the Maya program, and B has also combined and coordinated parts made by different people for the outer shell of the Götterdämmerung. A and D have not been shown to have directed the work of others, nor did they have extensive experience in creating visual effects when they joined the project.
There were at least a dozen key people involved in the visual effects, and in total, at least 30 people were involved in the creation of the effects.

22. The contributors have argued that their creative and independent contribution to the film and its story has been so significant that it gives rise to a copyright in the film as a whole. The Market Court notes that the work of the staff members can be considered relevant to the film. The Market Court considers that, on the basis of the evidence presented in the case, the computer-generated visual effects in the film were in themselves central, and there are several scenes in the film created entirely in this way, but narratively and temporally, they did not play a leading role in the film or define the film in such a way as to be of material importance in the copyright assessment of the author of the film work as a whole.

23. The Market Court notes that, as stated above, the number of persons who can be considered authors of a cinematographic work is not very large. For example, even the main responsible director of a film cannot necessarily be considered the author of the film. The Market Court considers that the staff members have essentially played different roles in assisting in the creation of digital visual effects for certain aspects of the film, which in many respects can be likened to staging. It has not been shown that the role of the crew members is typically comparable to that of the filmmakers or even the main director.

24. For the reasons set out above, the Market Court considers that the staff members cannot be considered authors for the entire film, regardless of whether their work on the visual effects would have been independent and original as presented by them and whether they would have separately copyrighted the vessels appearing in the film or other alleged individual works. Consequently, claim 1 must be rejected on this basis alone.

*4 Copyright claims by individual authors with respect to identified works*

*4.1 Requirements and legal basis for the review*

25. Claim 2 seeks a declaration that the staff hold copyright, as specified, in the spaceships used in the film Iron Sky or in other specified works. Claim 2 must be considered, considering the grounds put forward in support of that claim and legal interest and claim 3 relating to the assignment of rights, to be a confirmation that a copyright has accrued to the authors, irrespective of whether that copyright may have been assigned in any part.

26. The so-called collective works are regulated in Section 6 of the Copyright Act. According to this provision, if two or more persons have jointly created a work without their contributions constituting independent works, they are jointly entitled to copyright. Claim 2 concerns the fact that at least the authors of the identified works would be the authors, regardless of whether other persons could be considered as authors of the works.

27. Under Chapter 17, Section 2 of the Code of Procedure, the staff members have the burden of proving that the vessels and other alleged works identified in Claim 2 are works within the meaning of copyright law and that the staff members are to be regarded as their authors.

28. In the preparation of the case, the Market Court paid attention to the pleas in law and arguments and consequently asked the questions necessary for the clarification of the case. The requirements and criteria were refined during the preparation and in some respects since then. In accordance with the principle of determination under Chapter 24, Article 3, of the Code of Procedure, the parties have defined the subject matter of the proceedings with their claims and the grounds put forward in support of them.

29. The Market Court notes that Claim 2 as such identifies the spacecraft and other alleged works. However, the grounds of the action do not explicitly state what kind of work within the meaning of Article 1 of the Copyright Act is at issue and, consequently, what exactly is covered by the confirmation requirements.

30. The ambiguity and lack of specificity of the abovementioned claim and the grounds put forward in support of it are particularly emphasized in so far as some of the crew members have claimed that the copyright in the vessel Götterdämmerung and in the sixth deck 'including the interior' should be confirmed.

31. The latter must be regarded as referring to the background against which the performances of the actors appear in all the interior scenes of the Götterdämmerung ship and the moon landing site in the film. The evidence suggests that these backgrounds have been very diverse and have been present in the film for quite a long time, and that the filmmakers have not even claimed or given evidence that they have created more than a few isolated parts of them. The Market Court considers that not all the backgrounds of the said interiors can be considered sufficiently identified and distinguishable from the film as separate works for the purposes of the action, and that the authorship of the characters can be established. In any event, the claim must be rejected in this respect.

32. For the rest, the staff must be considered to have meant the visual appearance of the outside of the vessel, the moon landing, or the train, with any characteristic animations. On the other hand, in view of the grounds put forward in support of the claim, the claim must not be considered to refer, for example, to copyright in the three-dimensional computer models or files of the vessels in question as such.

33. As noted below, the authors have also submitted in support of their copyright in the ships, for example, animation of the loss of the flags of the ships or the destruction of the ships. The Market Court considers that these animated scenes are more a matter of filming scenes than of something that could give rise to a copyright in the vessels themselves within the meaning of Claim 2 and as stated in paragraph 32 above. Therefore, claim 2 is also not a question of copyright in all or even certain scenes of the film as such, containing the identified works.

34. In its opinion 2014:6, the Copyright Council has, among other things, stated that a work is the product of intellectual creation. An artistic product, like other works, is protected by copyright if it can be considered an independent and original result of the creative work of its author. In this case, it exceeds the threshold of a work, that is, it reaches the level of a work of art. There are no other requirements for protection. Further, the Court of Justice of the European Union (judgment of 1 November 2011, Painer, C-145/10, EU:C:2011:798) has held that a work can be protected by copyright if it is the result of the intellectual creation of its author, so that it reflects the personality of the author and reflects the author's free and creative choices in making the work.

35. It has also been argued in the legal literature (Harenko et al., Copyright, 2016, p. 17) that originality means that no one other than the author could be expected to arrive at a similar result if the other were to undertake a similar creative work independently. The artistic or qualitative assessment of the work or other similar factors is irrelevant for the purposes of obtaining protection under the Act.

Nor does it matter what quality, how much work, or how much time the author has invested in the work. It is also clear from the case law (Haarmann, Copyright and Related Rights, 2005, p. 67) that no matter how much work and skill may have gone into a product, it cannot be considered a work to be protected under copyright law on that basis alone.

VALVE_010

36. The Market Court finds that, on the basis of the above, the knowledge of the software required implementing a three-dimensional model, the technical details of the modeling, or the laboriousness of the modeling are irrelevant in the present copyright assessment. The highly accurate and guided modeling of two-dimensional images into three-dimensional models cannot be considered as such an independent and original creation.

*4.2 General evidence and preliminary assessment*

37. TV has testified that he was the director and scriptwriter of the film. The idea for the film came from JP and was developed as a team. ST brought visual flair to the film, and JL built concreteness from ideas and acted as the film's digital set designer. Before shooting, he had almost daily discussions with ST and JL about the elements of the film. During and after the shoot, he had daily or weekly discussions with ST about the effects, accessed the effects made via Dropbox, and reviewed on screen what was being done at the time.

38. During his testimony, ST said, among other things, that he was involved in the conceptualization and scripting of the film and that he was a VFX supervisor on the film. Her tasks included recruiting the visual effects team, defining and coordinating their workload, and communicating the director's vision to the team. On the visual side, he approved and delegated things to people like JL, I, J, and C, and they were also given responsibilities or accountability to implement and monitor. ST also said that he evaluated the technical aspects of the modeling and JL the visual aspects and that ultimately the director decided what would go into the film, that some of the tasks were outsourced to the art director, JL, and that the decisions on the ships were made by JL and finally by TV.

39. JL has testified that he was the art director of the film and visual effects, and that he designed all the spaceships in the film and conceived them with TV and ST. In 2008, he made the first concept drawings of flying saucers, space battles, and lunar module interiors. He carefully designed the Valkyrie and began designing the George W. Bush ship. According to JL, he accepted three-dimensional models. He instructed on what to model, provided drawings, simple three-dimensional model sketches, and reference images, guided the work, and decided when the model was ready. The model was good when things were in place and when it respected the essence and spirit of the plan with the precision that will be seen in the film. In addition , a lot of extra work was also done
detailed work. When making the models, there was also a line to be drawn as to when a model was good enough for a film, and ST or J would sometimes say that it was not worth making any more. JL has also said that he has created concept images and simple designs and commented on the designs. Making the actual models was a big job, which is why it was delegated to the modelers.

40. When questioned, JP said that he was involved in the creation of the film and acted as a community manager, telling the story of the making of the film from the sidelines. According to him, JL started with rough drafts slapped on paper, which JL, TV and ST "spun". These were followed by concept drawings, rough three-dimensional models, and often drawings that were the basis for the actual modeling. At most, around 20 people were modeling at the same time, for a total of 30-40 people. JL was very careful to ensure that the ships looked right, and JL played a crucial role in shaping the visual look of the film. JP also said that JL's coming on board was a turning point in the project because his visual style matched the vision, and JL's vision and taste could be trusted. According to JP, the choreography of the space battles was almost designed by ST, and rough three-dimensional models (animatic) were made.

41. The Market Court finds that the staffers have not identified in their pleadings much detail relevant to the copyright assessment as to why they should be considered the authors of the vessels and other alleged works in question. To some extent, these elements have emerged from the evidence. For their part, the production companies have, among other evidence, submitted as documentary evidence several conceptual and reference drawings of the various vessels and their interiors, some of them quite detailed, purporting to be drawn up by JL.

42. The Market Court considers it to have been credibly established, within the meaning of Chapter 17 2 of the Code of Procedure, in particular on the basis of the evidence concerning the role of JL, that the tasks of the staff members were, at least almost without exception, guided by various conceptual or reference pictures, drawings on the pictures, and verbal instructions, both as general and detailed guidance. According to some staff members, JL's guidance may have been
even go into excessive or unnecessary detail. At least C, E, and B would have preferred to work more independently, according to what can be inferred from their reports. The Market Court also considers that it has been established that ST and JL were, in turn, directed by Director TV.

43. To succeed in their claims, the authors must, in principle, also prove that their creative work, although it has been guided at various stages, has had a copyright significance, as stated above.

44. A number of documentary evidence provided by the crew members, in particular the screenshots of the vessels (such as 1-5, 11-14 and 20-21) and the video recordings of the crew members' own work (24, 35-37 and 39), generally present the vessels as a whole, without detailing their own contribution. Nor do they reveal much about the input given to the authors, the steps they took to arrive at the final result, or the exact intellectual creation that gave rise to their copyright, given that, as stated above, the amount of work or technical solutions used for modeling are not in themselves of copyright significance. Similarly, in view of what has been stated in paragraphs 32 and 36 above, the model files or screenshots submitted by the staff as documentary evidence 41-46 are of limited relevance for the assessment of the case. Likewise, in the documentary evidence of staff members 38 and
47 B and A have presented their views on the process of creating the vessels, which, inter alia, in view of the fact that they were heard in evidence, have only limited independent value as evidence in the case.

*4.3 Staff Evidence and Evaluation*

*4.3.1 A*

45. A has applied for a declaration that he holds the copyright to the vessels Götterdämmerung, including the interior, Liberty Capsule, Rheingold, and Zeppelin and the Japanese representatives' ship, the Moon Base (Schwarze Sonne), and the Helium 3 train.

46. A has told the witness that he has performed three-dimensional modeling and texturing, i.e., texturing and coloring the surfaces of the models. He said the work was creative and independent. There were concept models, ideas, and other images, but they had to be turned into three-dimensional models
and it required creativity. As shown in documentary evidence, 38 of the staff members, despite the conceptual models and guidance, had to improvise and use his artistic skills to perform the tasks, but a lot of time was spent on the unnecessary fine-tuning of small details.

47. A said that before coming to Finland, he had made three versions of the Rheingold model with JL in the UK. This took a long time, because JL kept asking for more changes and finally A considered that the ship was already finished. JL, on the other hand, said that A was provided with concept drawings and a simple three-dimensional model and that the production companies' documentary evidence 19 shows the daily changes to the model. JP and TV have reported that Rheingold was a traditional flying saucer. Staff Documentary Evidence 38 shows that, in modeling the conceptual model, A felt that "the pieces did not fit together' and used his talents to coordinate.

48. The Market Court considers that it is established that JL created a very detailed conceptual design and a simple model of the Rheingold vessel, as shown in Exhibits 15 and 19 of the production companies' documents, visible from two different directions, on the basis of which A proceeded to conduct the vessel modeling in accordance with JL's instructions. A has not further specified what kind of original and independent creation he would have made, and the market court considers that it has not been proven that A should be considered as the author of the vessel in question.

49. A has also said that he was honored to "get the first shot of the film", which showed the Liberty Capsule ship. In documentary evidence 38, A stated that he built the vessel using models and references he found on the internet and using his creativity to put details in the right places to make the model look realistic. TV reported that the ship was designed to provide a realistic image of the US National Aeronautics and Space Administration's (NASA) orbital module. The Market Court considers that the vessel in question has been modeled precisely on the basis of existing pictures and models, without further specifying what copyright-relevant creative work A would have done. The Market Court considers that it has not been proven that A should be considered the author of the vessel.

50. A has also said that he made parts of the Götterdämmerung according to the instructions of B and E. Staff Documentary Evidence 38 highlights the texturing and detailing of both the interior parts. He designed the columns and archways visible in the bridge background; the roof parts were based on neoclassical architectural models found on the internet. The present claim is based only on the said work on the interior of the vessel, for which, as stated above, the claim must be rejected, and the Market Court considers that it has not been shown that A should be regarded as the author of the vessel in question.

51. A further said that ST asked for the simplest possible square armored plates for the Zeppelin, and he did this, but nothing else or other elements. In staff documentary evidence 38, A claims to have carried out work on the entrance to the moon base and details of the Helium 3 train. The Market Court considers that it has not been proven that A should be considered the author of the Zeppelin, the Helium 3 train, or the moon landing.

52. A has also said that he made, modeled, and completely textured the Japanese representatives' vessel. According to staff documentary evidence 38, the vessel was entirely his creation and modeling with some of the details he created inspired by NASA reference images. The main parts and panels were from a concept model, but he used creativity in layout to make the result realistic. According to A, the study was approved by C.

53. The Market Court notes that the production companies have referred to concept images in general, but have not provided concept images or any other evidence specifically and concretely concerning the Japanese agents' platform and, in particular, the role of JL or other persons in its creation. The overall impression is that the design of the vessel was original. On the basis of the evidence submitted, the Market Court finds that A has acquired a copyright in the vessel in question, as is clear from the operative part of the judgment. The remainder of claim 2, which concerns A, must be rejected.

*4.3.2 B*

54. B has requested that it be confirmed that it holds the copyright to the vessels Götterdämmerung including interior, Rheingold, George W. Bush, Valkyrie, and the vessel of the Australian representatives, the moon base (Schwarze Sonne) including interior, and the moon landing module (Landing Module).

55. E has told the witness that he acted as a "supervisor" when B animated Götterdämmerung and that B acted as a modeling supervisor. According to him, Mr. B had a strong vision of how to do the vessel within the schedule, and Mr. B acted independently and did a good job. There was a technical drawing of the vessel from the side and the front by JL, which E used as a basis for the modeling.

56. B has testified that, among other things, he made animations of the rotating engine, the engine room, the hangar, and the destruction of the ship. B has referred to B's submission to the Copyright Board as documentary evidence 47. According to the request for an opinion, the vessel was complex and required a whole team to complete its construction. Furthermore, according to the statement, the modeling of the vessel was done in a detailed and imaginative way. There are no image plans or other useful references available. Close-ups of the ship were also shown in the film, which meant that work had to be done to fine-tune the details. According to this documentary evidence, B assembled the rear part of the vessel independently on the basis of his own solutions and did not even discuss the structures in question with JL.

57. D has told him in evidence that B was in charge of the modeling of the Götterdämmerung and that it was distributed in pieces to the modelers. D was one of the main designers of the vessel, and the entire top, engine, and bottom were his handiwork. B and JL had different visions of the vessel, which ended up looking different from the original design. The design was not yet complete and, as the ship would not otherwise have been finished on time, the quarter of the ship already made was copied for other parts. B took the lead here and told the other modelers what to do. It took 5-8 people three months to model the ship. The material produced by D was approved by JL and B, and usually JL checked that the result looked good.

58. JL stated that B was given a three-dimensional sketch plan, as shown in paragraph 15 of the production companies' documentary evidence 'gotterdammerung30', and the vessel was assembled from pieces made by several people. B was tasked with the "layout" of the ship, putting it together, and preparing it for animation. According to JL, the first sketches of the engine room came from the main stevedore, and one component was modeled on the Titanic. JL
has also said that he has gone through problem situations with modelers. TV, for his part, has said that several versions of the ship were made with JL and TV wanted it to have lots of moving parts, like "the guts of a pocket watch in space", and on this basis JL went on to define the ship, also suggesting, for example, that the ship should have a "beating heart", and that a central piston and rotating cogs were built into the ship. JP has told us that the ship was to be a combination of a clock and a diesel engine, and JL's idea was that of a clock in constant motion.

59. The Market Court considers that it has not been shown that, with regard to the internal parts of the Götterdämmerung, B should be regarded as the author of the vessel and its internal parts within the meaning of claim 2. The Market Court also considers that, considering what has been stated in paragraph 33 above, it has not been established that B should be regarded as the author of the vessel in question within the meaning of Claim 2 on the basis of the scene of the destruction of the vessel.

60. The Market Court finds that it is clear from the evidence that a vast number of different tracks and other details have been modeled on the exterior of the vessel, which were not present in the original model referred to above. However, on the basis of what has been presented, the characteristics of the vessel at a coarse level already existed. There is little explanation of the implementation of these details by B and the steps and instructions involved. In these circumstances, it is not necessary to assess further whether the details in question involve an intellectual creation of sufficient originality to justify copyright in the vessel in question. The Market Court considers that it has not been proven that B can be considered the author of the vessel in question.

61. B also said that the legs of the Rheingold were not working, and he animated them. According to documentary evidence 47 of the staff, there was a preliminary animation (rigging) of the landing gear, which was started by E and completed by B, and the legs and hull were made by other persons. The Market Court considers that it has not been proven that B should be considered as the author of the vessel in question on the basis of the foot animation.

62. According to documentary evidence 39 and 47 of the staff, B modeled and animated the main weapons of George W. Bush ship. This weapon, which is similar in all respects, is also evident from the images in Documentary Evidence 15 of the production companies, at least some of which, according to JL, were drawn up or provisionally modeled by him, and that several people modeled "them" and B at least prepared the animation. According to J, the main features of the weapon had been defined in the concept artwork back in 2008. He had an idea for the weapon before the Iron Sky project started, as a very similar weapon had been used in a game. He also designed the movement of the weapon and instructed the modelers. The Market Court considers that, on the basis of the above, B's copyright could be attributed mainly to the animation of the weapon, which, however, cannot be considered particularly original. The Market Court considers that it has not been shown that B's actions in relation to the vessel's weapon, and in particular its animation, were original and independent in such a way that he could be regarded as the author of the vessel in question.

63. B also stated that the Valkyrie had to be largely re-modeled because it was one of the first models and was used extensively in production. However, B has not said what he himself would have done, nor has it been revealed what copyright-relevant creative work would have been done in the remodeling. Documentary evidence 47 of the persons who provided it shows that the different versions of the vessel were also made by other persons. The Market Court considers that it has not been proven that B should be considered the author of the vessel in question.

64. B further stated that for the Australian agents' vessel, all animations and movements were part of his job and the vessels were made in cooperation. Documentary evidence 15 from the production companies shows conceptual and other images of the vessel at various stages of design by JL. The Market Court notes that it has not specified in detail what copyright-relevant creative work B would have done on the vessel in question. The Market Court considers that it has not been proven that B should be considered the author of the vessel in question.

65. B has also told us that he made a complex interior view of the hexagonal point used in the crane scenes. According to documentary evidence 47 of the staff, B worked alone on the creation of the hangar scene for Valkyrie, based on verbal instructions and very rudimentary sketches by JL, and on the Rheingold crane scene by animating the crane. The Market Court finds that B's claims are based only on the interior of the sixth floor and considers that it has not been proven that B should be considered as the author of the sixth floor.

66. B also said that he made a second model of the lunar lander for blowing it up. In documentary evidence, 39 and 47 civil servants B claims that he alone was responsible for the geometry of the lunar lander when it exploded. According to TV, the ship was conventional and of NASA design. In light of what has been stated in paragraph 33 above, the Market Court considers that it has not been shown that B should be regarded as the author of the vessel in question on the basis of the blasting animation alone.

67. Consequently, claim 2 against B must be rejected.

*4.3.3 D*

68. D has requested confirmation that he holds the copyright to the vessels Götterdämmerung including the interior, Zeppelin, and George W. Bush and Mir.

69. D said that there were 1-2 concept photos of the vessels, which conveyed the mood and "general feeling", not the details. Among other things, JL gave him a folder of photos from the Second World War. According to Mr D, 95% of the time the modeling was done on his own. Occasionally, JL would check whether the work conformed to his view, in which case JL would accept it or ask for minor corrections. This was particularly the case for modeling the Mir ship.

70. D has also testified, as stated in paragraph 57 above, that he was one of the main designers of the Götterdämmerung and that the entire top, engine, and bottom of the vessel were his work. The material produced by D was approved by JL and B, and usually JL checked that the result looked good.

71. D further testified that, as shown in staff documentary evidence 35, the Zeppelin had a model on the bottom that showed its shape. The opening of the massive metal doors and the rear of the vessel had to be modeled, with the engine part being made by another person. There was a lot of self-directed work, especially on metal structures. JP has said that JL's first concept images showed George W. Bush ship shooting through the Zeppelin.

72. D has further said that he made the front shell and smaller weapons of George W. Bush vessel, as shown in Staff Documentary Evidence 35, as well as details of the "rinkula" and the central area. JP has said that there were many versions of the craft, inspired by the ISS space station and including a rotating part to create gravity. Documentary evidence 15 from the production companies shows several dozen very detailed conceptual drawings of the vessel, apparently prepared by JL, and references.

73. The Market Court notes that it has not been further specified what copyright-relevant creative work D would have done for Götterdämmerung, Zeppelin, and George W. Bush ships. The Market Court considers that it has not been proven that D should be considered the author of the vessels in question.

74. D has also said that he modeled the Mir ship entirely himself from JL's concept drawings, that it was the most complex and accurate model, and that a lot of time, effort, and thought went into it. Modeling a two-dimensional image in three dimensions requires creativity. Comparing his revisualisation model with the conceptual image drawn by JL, the shape remained the same, but everything else evolved. Textures were later added to the model by another person based on JL's concept.

75. The Market Court notes that documentary evidence 15 from the production companies shows that some very different conceptual designs of the Mir vessel had been produced, the most recent of which, however, at least in their main aspects, correspond very closely in form to the final vessel. The Market Court considers that it has not been shown what independent and original creative work of copyright significance D would have done on the vessel to be considered the author of the vessel.

76. Consequently, claim 2 must be rejected with regard to D.

*4.3.4 E*

77. E has asked for a declaration that he is the copyright owner of the ships Götterdämmerung, including the interior, Zeppelin, the moon landing module, and the moon base (Schwarze Sonne), including the interior.

78. E said that he brought to the project an approach that allows the pieces of the bigger picture to be divided up between different people and that in practice he acted as a pre-production planner and supervisor, checking daily what had been done and correcting or advising on corrections where necessary. According to him, "supervising" in the creative process means that the result also looks good and works artistically and that the pieces fit together. On the other hand, E also told us that he was excluded from any kind of decision making at a very early stage and was forbidden from giving feedback on the modeling.

79. E also testified, as stated in paragraph 55 above, that he was B's instructor when he modeled the Götterdämmerung. The Market Court considers that it has not been shown that, by virtue of that position or otherwise, E should be regarded as the author of the vessel in question.

80. E also said that he and L had worked out the interior of the Zeppelin and that as a supervisor he had "completed" the ship. According to E, for example, the duration of the explosion was not specified, and he was planning the explosion by determining the necessary details step by step. JP has said that JL's first concept images showed George W. Bush ship shooting through the Zeppelin and, as noted above, ST planned the space battles.

81. The Market Court considers that, in view of what has been stated in paragraph 33 above, it has not been shown that the explosion of the Zeppelin vessel would lead to E being considered the author of the vessel. Otherwise, the criteria for the requirements have remained largely unspecified and limited mainly to the guidance and coordination of other people's work. In these respects, too, it has not been shown that E should be regarded as the author of the vessel.

82. E has also said that he has made an animation of presidential election flags coming down from a lunar lander. TV has reported that the ship was conventional and of NASA design and that the flags were special. The Market Court considers that, considering what is stated in paragraph 32 above, it has not been shown that E should be considered as the author of the vessel in question.

83. E has also said that he only modeled one lift for the moon landing and that there was a drawing of the lift by a German set designer, but he was not satisfied with it and was asked to use his imagination and make another or a more graceful one. The Market Court considers that it has not been shown that, on the basis of the modeling of the interior space in question, E should be considered to be a moonshiner.

84. Consequently, claim 2 must be rejected with regard to E.

*5 Have staff members surrendered their potential copyright?*

85. Claim 3 seeks confirmation that the authors have not assigned the rights to the works they created in Claims 1 and 2 beyond the scope or use specified in the claim in connection with the Iron Sky film.

86. According to Section 27(1) of the Copyright Act, copyright may, subject to the restrictions set out in Section 3, be transferred in whole or in part. No dispute has arisen concerning the so-called moral rights provided for in Article 3 of the Copyright Act. In view of the nature of the case and the grounds put forward in support of the claim, the claim must be considered to concern economic rights within the meaning of Article 2 of the Copyright Act.

87. As stated above, Claim 1 must be rejected and Claim 2 must also be rejected, except if A must be considered as the author of the Japanese agents' vessel. Consequently, claim 3 only needs to be assessed in relation to the work mentioned by A.

88. Documentary evidence 7 of the production companies shows the employment contract of Mr. A., which covered the period from March 21, 2011 to October 31, 2011. A said that he started working on the interior of the Japanese representatives' ship, Götterdämmerung. The Market Court considers that it has been proven that A has made the Japanese agents' ship within the framework of the said agreement.

89. The contract in question mentions "Project: Iron sky" and under "Rights" the following is stated:

"The employee shall give the employer exclusive rights to any material created during work as well as the motion picture itself, including but not limited to unlimited rights to produce, distribute, perform, and promote the film in any form, via any distribution method, in all countries. Such rights are transferable to a third party (such as Blind Spot Pictures) without hearing the employee. The compensation agreed upon in this contract includes compensation for any such rights."

90. The Market Court finds that the wording of the agreement "any material created during work" indicates that by the agreement, A has transferred to the employer the exclusive rights referred to in 2 of the Copyright Act to all the material he has created. Furthermore, on the basis of the wording "including but not limited to unlimited rights to", the Market Court considers that the assignment of rights covered all forms of exploitation and that the forms of exploitation explicitly listed in the contract were only exemplary. The employer's right to sub-license is also explicitly agreed upon.

91. According to Section 28 of the Copyright Act, unless otherwise agreed, the person to whom the copyright has been assigned may not modify the work or transfer the right to another person.

92. With regard to the rights of sub-licensing and modification provided for in these provisions, the literature (Harenko et al., Tekijänoikeus, 2016, p. 351) it has been argued that if the parties intend the transfer to include a right to modify or sub-delegate, this right must be expressly stated in the contract of transfer. However, the absence of such a mention does not mean that the transferee could not also have benefited from these rights. It has

also been stated in the legal literature (Haarmann, Copyright and Related Rights, 2005, p. 309) that a contract within the meaning of a statutory provision need not be express; it may be inferred from the circumstances and the purpose of the transfer that certain modifications are permitted. For example, the publisher of a magazine is considered entitled to make so-called editorial changes to the articles it accepts for publication. With regard to the employment relationship, the latter work states (p. 323) that it is nowadays common to think that, in the absence of contracts, the employer has the right to use the work created by his employee for the purposes of his normal activities. The right that an employer has to exploit his or her employee's work in the absence of a contract is usually exclusive.

93. The Market Court notes that in the present case, the employment contract does not expressly mention the right to modify. However, the Market Court has held that the contract has transferred rights to all material created in the employment relationship and that the transfer applies without restriction to all forms of exploitation. The Market Court also considers that in the film industry, the right of use required by the employer in the normal course of its business must typically be considered quite broad and to include the right to a certain degree of modification. In the present case, for technical reasons, it was necessary to create vessels for the film in several successive stages, one of which was modeling. Different people have been responsible for some of the work steps, and several people may have been involved in a single work step, such as modeling, for the same vessel. The Market Court considers that the digital visual effects in the film, including the ships, were of such a nature that they needed and intended to be further modified if necessary, and that A must have understood this. On the basis of the above, the Market Court assessed that in the present case, A must in any event be considered to have granted an exclusive right to modification.

94. According to the authors, the arbitration provision in Section 29 of the Copyright Act should be applied where appropriate and relevant, and any agreements should be interpreted narrowly because the compensation the applicants received for their performances was substantially low.

95. According to Section 29(1) of the Copyright Act, if a term of a contract concluded by the original author for the assignment of copyright in a work is contrary to fair practice in the field or otherwise unfair or its application would lead to unfairness, the term may be adjusted or disregarded. According to paragraph 2 of the article, the assessment of unfairness must consider the entire content of the contract, the position of the parties, the circumstances prevailing at the time the contract was concluded and afterwards, and other factors.

96. A said that he initially worked on the Rheingold ship from the UK without payment because he wanted to work on the Iron Sky film and that he kept saying that he wanted to be part of the project because it was his first film. A also said that he wanted a new career and accepted the contract even though he felt he was underpaid. A's salary under his employment contract was €2,200 per month.

97. The Market Court finds that the wording of the aforementioned agreement on the assignment of rights is unambiguous and that A knowingly accepted the agreement. In view of A's report, there are no grounds for interpreting the agreement on the basis of Article 29 of the Copyright Act other than as stated in paragraphs 90 and 93 above. Consequently, claim 3 must also be rejected as it relates to A.

98. Since claim 1 for confirmation of copyright in the film must be rejected and claim 2 for confirmation of copyright in the materials made for the film must be rejected for the most part, and since the other assignable copyrights in the materials, including the right of adaptation, have been assigned exclusively to the employer and were assignable, the production companies could not have infringed the copyright of the staff members within the meaning of claim 4; therefore, this claim must also be rejected. Claims 5 and 6 based on the above-mentioned requests for confirmation or their success must also be rejected.

*6 Forms of order sought by production companies in the counterclaim*

99. Counterclaim 1 seeks a declaration that the staff members do not have a copyright in the Iron Sky film and its versions under certain provisions of the Copyright Act or a right to any of the material they have made for those films. The production companies have based their claim on the fact that the staff members have transferred their copyright, if any, under Section 2 of the Copyright Act to their employer on an exclusive basis.

100. According to Chapter 24, Section 3(2) of the Code of Judicial Procedure, in a case where a settlement is permitted, the judgment may not be based on a fact that has not been relied on by the party in support of his claim or defense. The co-appellants have requested that the application be inadmissible or dismissed, opposing the application only on the grounds that there is no counterclaim on the same issue and that the counterclaim would not provide a better or broader remedy than the main action. The Market Court has held in paragraph 13 above that there is no such obstacle.

101. As stated above regarding claims 1 to 3 of the main action, the staff members are not deemed to have acquired copyright in the film in question, nor copyright in the vessels identified by them or in the other alleged works, except the vessel of the Japanese agents of A, regarding which the rights referred to in Article 2 of the Copyright Act have nevertheless been exclusively assigned. In support of their opposition, the authors have not even argued that they have created other works, but on the contrary, they have argued that the counterclaim concerns the same issue as the main action and that the counterclaim does not provide any broader legal protection than the opposition to the main action. Accordingly, the staff members shall not be deemed to have a copyright in any material within the meaning of Confirmation Request 1.

102. The as-yet unreleased film Iron Sky, as mentioned in paragraph 16 above: Confirmation claim 2 against The Coming Race must be rejected as premature.

103. Counterclaim 3 seeks a declaration that the staff members are not entitled to use any of the Iron Sky material they have made. Production companies have based their claim on the fact that even if copyright had accrued to the staff, it would have been transferred in its entirety on an exclusive basis, leaving the staff with no right to use the material themselves. Among other things, employers have objected to the requirement on the grounds that it does not identify them.

104. The Market Court notes that the claim or arguments put forward in support of it do not specify the ways in which staff members should not use the materials in question. The production companies must be considered to have insisted that staff members should not use the materials under any circumstances. The production companies have thus, by their general request for confirmation, in effect asked the market court to rule in advance that any use of the material would infringe the copyright transferred to the production companies. The authors must consider that the lack of specificity of the claim meant that the claim for confirmation could not be accepted because of its general nature. On the basis of the above, the Market Court considers that claim 3 must be rejected.

105. Claim 4 of the counterclaim asks the Market Court to prohibit B and D from continuing to infringe the copyright of the production companies and to order them to stop making the infringing material available to the public, on the basis of a fine. The production companies have based their claim on the fact that they have used copyrighted material to promote their game productions and that B has used the film footage in the 3D prints and does not have or has not retained the right to use the material themselves. The authors objected to the claim on the grounds that it is unspecified, unsubstantiated, and unproven and that the use would not have been copyright relevant.

106. Documentary evidence 8 and 10 from the production companies show a picture of the spacecraft and a model for 3D printing. B stated that it is a rebuilt and modified model of the Valkyrie from scratch, and the picture in Exhibit 8 is based on this model.

107. The production companies' claim has been based on the unauthorized use of the film's footage, but has failed to specify, among other things, which copyright in the work was infringed and how it was allegedly infringed by the conduct in question. On the one hand, the Market Court considers that it has not been shown that the images in question infringed the production companies' copyright in the Iron Sky film. On the other hand, the claim may be intended to mean that copies of the copyrighted Valkyrie ship made for the film have been produced or made available to the public in this way.

108. As stated above, B and D have not been held to have acquired a copyright in Valkyrie. However, the production companies have not argued or presented any evidence to establish who, if anyone, has acquired the copyright in the vessel and whether the copyright in the vessel has been exclusively transferred to the production companies, or any other arguments as to how the conduct of B and D has infringed their copyright. The Market Court considers that this infringement of copyright has not been proven and that there is no need to make a further statement on the procedure. Consequently, the conditions for the imposition of the requested prohibition and cessation of the infringement are not met, and claim 4 must be rejected.

*7 Legal and other costs*

109. According to Chapter 21, Section 1 of the Code of Judicial Procedure, a party who loses a case is liable to pay all reasonable costs incurred by his opponent because of necessary measures, unless otherwise provided by law. Under Article 3(1) of the Chapter, where several claims are made in the same case, some of which are decided in favor of one party and some in favor of the other, they may retain their costs, unless there is reason to order the party to pay part of them to the other party. If what a party has lost is of only minor importance in the case, he or she must be fully compensated for the costs.

110. With regard to the main action, the production companies have won the case, except for the very minor part of A's copyright in one of the vessels, for which the copyright has nevertheless been deemed to have been assigned exclusively. The Market Court considers that production companies are therefore, in principle, entitled to full compensation for their reasonable legal costs incurred because of the necessary measures.

111. On the counterclaim, the production companies' claim for confirmation 1 was successful, but the other claims were dismissed in favor of the inadmissibility of most of the staff's claims. The Market Court notes that the counterclaim and the grounds put forward in support of it are, on the one hand, rather imprecise in some respects and, on the other hand, the grounds put forward in support of the opposition are rather thin. On that basis, the actual costs incurred in the counterclaim alone must be considered relatively low compared with the amount of the main action. In these circumstances, the Market Court considers that the parties are entitled to keep the costs of the counterclaim against them. There is no reason to assess the matter differently, as the staff members have done, on the basis of Chapter 21, Articles 4 and 5 of the Code of Procedure.

112. In the main action, the production companies' VAT-free legal claim was EUR 2,050 for costs and EUR 54,000 for fees, making a total of EUR 56,050 and EUR 10,500 for legal costs. With regard to the main action, the staff members' claim for legal costs was EUR 50 144.80, to which they added the amount of VAT.

113. In the main action, the staff challenged the production companies' demand for payment for hours over 100, arguing that they had the burden of proof and an inherently more interventionist role in the process. For production companies, the fee claim for the main action involved measures for around 277 hours, while for staff members, this has been around 175 hours.

114. Among other things, the production companies have argued that they have had to spend a lot of time on vague and unspecified claims in the application for a writ of summons, with loosely related grounds and errors. It was only toward the end of the trial that the defenders dropped their claim of infringement against the unreleased film and focused on the marketing of the film. The number of measures taken by the production companies was proportionate.

115. The Market Court finds that, with regard to the main action, the staff members have defined the subject matter of the proceedings as it was. The claims and arguments put forward in support of them in many respects became rather vague, and the matter has only gradually become more concrete, partly only in evidence. The Market Court considers that in these circumstances there is no reason to consider that the measures taken by the production companies were not necessary and that the legal costs incurred were not reasonable in relation to the nature and scope of the case. No comments have been made on the costs of the main action. Accordingly, order the administrators to pay the costs of the main action in the amount claimed.

116. According to Chapter 21, Section 8(1) of the Code of Judicial Procedure, compensation is also paid for work and loss directly related to the proceedings. According to the preamble to the provision (HE 107/1998 vp p. 18), the compensation of legal costs to the party must be exceptional. It must not be compensation for the normal effort involved in attending or preparing for the trial. The compensation for the work of the party himself should be limited mainly to situations where the party himself, by virtue of his professional skills or specialized knowledge, has carried out time-consuming activities that are necessary for the proceedings and which, if carried out by someone else, would also be charged to the agent or assistant.

117. The claim for reimbursement of legal costs was EUR 14,500, including 150 h for TK, 100 hours for TV, and 20 h for K at an hourly rate of EUR 50, and EUR 1,000 for TK's travel expenses, of which the undifferentiated share of the main action was EUR 10,500. No further explanation of these costs or their justification has been provided. In this respect, the staff have argued that there are no special reasons for reimbursement of the parties' costs, except for the personal interviews of TV and TK at an hourly rate of EUR 30 for 1.5 hours, i.e., a total of EUR 90. The production companies, for their part, have stated that, with regard to the costs of the case, TK has been particularly involved in the business and licensing of the defendant companies and that TV's role as a facilitator has been central and its specific expertise has been important. K's presence has also been necessary. The hourly rate claimed as a legal fee has been standard.

118. The Market Court finds that, given the nature of the case and the extent and detail of the evidence, the production companies may have suffered a loss because of the time-consuming measures taken by TK and TV in the context of their specific expertise. In the absence of further clarification, the market court considers the reasonable compensation to be EUR 1,500 for TK and EUR 1,000 for TV. No evidence has been submitted concerning TK's travel expenses or, in the case of K, the costs of the parties, which would allow the costs to be awarded.

**Summary of judgment**

The Market Court confirms that A has a copyright in the Japanese representative vessel used in Iron Sky.

The Market Court confirms that B, C, E, D or A do not hold a copyright under section 2, section 6 or section 46a of the Copyright Act in Iron Sky or Iron Sky Director's or Dictator's Cut or any of the material he made for those films.

The Market Court orders B, C, E, D, and A jointly and severally to pay Blind Spot Pictures Oy and Iron Sky Universe Oy EUR 2,050 in costs and EUR 54,000 in fees, making a total of EUR 56,050 and EUR 2,500 in legal costs, both sums together with default interest. Interest on arrears shall be payable at the rate provided for in Article 4(1) of the Interest Act from the end of the month following the date of this judgment.

The Market Court dismisses the remainder of the application, counterclaim, and claims for reimbursement of legal and other costs.

**APPLICATION FOR CHANGE**

An appeal against this decision may be lodged with the Supreme Court only if it grants leave to appeal on the specific grounds set out in the attached notice of appeal.

The deadline for requesting permission to appeal and for filing an appeal is 30.7.2018.

The case was decided unanimously by Market Court Judges Anne Ekblom-Wörlund, Markus Mattila, and Pekka Savola.

**Legality**

Legally binding
 Finlex ›  Oikeuskäytäntö ›  Markkinaoikeus ›  2018 › MAO:302/18

Finlex ® is a public and free Internet service of legal material owned by the Ministry of Justice.
Finlex content was produced and maintained by Edita Publishing Oy. Neither the Ministry of Justice nor Edita shall be liable for any errors in the content of the databases, any direct or indirect damage caused to the user by their use, or any interruption or other malfunction of the Internet network.

# Finlex ®

## MAO:302/18

### A, B, C, D ja E > Blind Spot Pictures Oy ja Iron Sky Universe Oy - tekijänoikeus - teos - tekijänoikeuden siirtyminen

**Diaarinumero:** 2017/588
**Diaarinumero:** 2017/701
**Antopäivä:** 31.5.2018

**ASIA** Tekijänoikeutta koskeva riita

**KANNE (dnro 2017/588)**

**Vaatimukset**

A, B, C, D ja E ovat vaatineet, että markkinaoikeus:

1) vahvistaa, että A:lle, B:lle, C:lle, D:lle ja E:lle on syntynyt tekijänoikeus Iron Sky elokuvaan ja sen Director's tai Dictator's Cut -versioon;

2) vahvistaa, että A:lla, B:llä, D:llä ja E:llä on tekijänoikeus Iron Sky -elokuvassa käytettyihin teoksiin seuraavasti:

a. A:lla aluksiin Götterdämmerung mukaan lukien sisäpuoli, Liberty Capsule, Rheingold ja Zeppelin sekä Japanin edustajien alukseen, kuutukikohtaan (Schwarze Sonne) ja Helium 3 -junaan,

b. B:llä aluksiin Götterdämmerung mukaan lukien sisäpuoli, Rheingold, George W. Bush, Valkyrie sekä Australian edustajien alukseen, kuutukikohtaan (Schwarze Sonne) mukaan lukien sisäpuoli ja kuuhunlaskeutumisalukseen (Landing Module),

c. D:llä aluksiin Götterdämmerung mukaan lukien sisäpuoli, Zeppelin, George W. Bush ja Mir ja

d. E:llä aluksiin Götterdämmerung mukaan lukien sisäpuoli ja Zeppelin sekä kuuhunlaskeutumisalukseen (Landing Module) ja kuutukikohtaan (Schwarze Sonne) mukaan lukien sisäpuoli;

3) vahvistaa, että A, B, C, D tai E eivät ole luovuttaneet oikeuksia luomiinsa vaatimuksissa 1 ja 2 tarkoitettuihin teoksiin laajemmin tai muutoin kuin käytettäväksi Iron Sky elokuvassa tai sen Director's Cut versiossa elokuvateoksena muuttamattomana, sellaisenaan esitettäväksi tai tavanmukaisesti levitettäväksi yleisölle;

4) vahvistaa, että Blind Spot Pictures Oy ja Iron Sky Universe Oy ovat loukanneet heidän tekijänoikeutta luvattomasti käyttämällä ja/tai valmistamalla kappaleita ja saattamalla yleisön saataviin Iron Sky elokuvaan tai sen Director's tai Dictator's Cut -versioon perustuvaa materiaalia;

5) kieltää Blind Spot Pictures Oy:tä ja Iron Sky Universe Oy:tä jatkamasta tai toistamasta vaatimuksessa 4 tarkoitettua tekijänoikeuden loukkausta;

6) kieltää Blind Spot Pictures Oy:tä ja Iron Sky Universe Oy:tä edelleen luovuttamasta oikeuksia Iron Sky elokuvaan tai sen Director's tai Dictator's Cut -versioon muutoin kuin elokuvateoksena muuttamattomana, sellaisenaan esitettäväksi ja tavanmukaisesti levitettäväksi yleisölle, sekä miltään osin elokuvissa esiintyvien kantajien yksittäisiin teoksiin.

Lisäksi A, B, C, D ja E ovat vaatineet, että markkinaoikeus velvoittaa Blind Spot Pictures Oy:n ja Iron Sky Universe Oy:n korvaamaan niiden oikeudenkäyntikulut kulujen osalta 901,20 eurolla ja palkkion osalta 49.243,60 eurolla eli yhteensä 50.144,80 eurolla viivästyskorkoineen.

**Perusteet**

*Asiavaltuudesta ja oikeuksien luovutuksen laajuudesta*

A myötäpuolineen (jäljempänä myös henkilökantajat) eivät ole luovuttaneet tekijänoikeuksiaan Tuotantoyhtiö Energia Oy:lle muutoin tai laajemmalti kuin Iron Sky elokuvaan. Kaikenlainen muu käyttö muunneltuna tai sellaisenaan loukkaa kantajien tekijänoikeutta. Kantajien luomia teoksia koskee tekijänoikeuslain 28 §:ssä säädetty muuttamis- ja edelleenluovutuskielto, koska muusta ei ole sovittu. Sopiminen on koskenut rajoitettua käyttöä, esimerkiksi elokuvan yleisölle esittämistä. Blind Spot Pictures Oy ja Iron Sky Universe Oy (jäljempänä myös tuotantoyhtiöt) eivät ole voineet saada Tuotantoyhtiö Energia Oy:ltä enempää oikeuksia kuin mitä se on itse saanut.

Kanne perustuu henkilökantajien tekijänoikeuksiin ja heillä on asiassa asiavaltuus. Jo yksin väite tekijänoikeudesta perustaa asiavaltuuden. Henkilökantajien tekijänoikeus on kiistetty ja heillä on oikeudellinen intressi saada asiaan ratkaisu viime kädessä tekijänoikeuslain 3 §:ssä tarkoitettujen moraalisten oikeuksien perusteella.

Asiassa tulee tarpeen mukaan ja soveltuvin osin soveltaa tekijänoikeuslain 29 §:ssä säädettyä sovittelusäännöstä ja tulkita mahdollisia sopimuksia suppeasti myös sen johdosta, että henkilökantajien suorituksistaan saama korvaus on ollut olennaisen pieni, eikä siten ole voinut senkään johdosta koskea muuta kuin suppeaa luovutusta Iron Sky -elokuvaan.

*Henkilökantajien tekijänoikeus koko elokuvaan ja yksittäisiin teoksiin*

Henkilökantajat ovat visuaalisten tehosteiden (VFX) ja tietokoneanimoinnin ammattilaisia. Henkilökantajien tekijänoikeus koko elokuvaan perustuu kaikkien henkilökantajien luovaan ja merkittävään osuuteen elokuvassa ilmenevien avaruusalusten ja kuutukikohdan sekä lukuisten kohtausten

VALVE_018

tekemisessä. Henkilökantajat ovat tehneet lukuisiin kohtauksiin liittyviä taustaympäristöjen yksityiskohtia ja luoneet kohtausten varsinaiset visuaaliset pääsisällöt tietokoneanimoidulta osin. Kolmiulotteinen mallinnus vaatii tekijältään itsenäisiä ja luovia ratkaisuja. Elokuvateosta kokonaisuutena tarkasteltaessa kantajien omaperäinen ja itsenäinen panos on ollut merkittävä. Henkilökantajien on tullut itsenäisesti luoda kohtausten sisällöt, koska elokuvan kuvaussuunnitelmasta ja niin sanotusta kuvasarjasta ei ole ilmennyt haluttuja tai tarkoitettuja sisältöjä yksityiskohtineen. Mikäli henkilökantajien luova panos poistettaisiin elokuvasta, jäljelle ei jäisi käsillä olevaa elokuvateosta vaan vain eräänlainen kehikko. Lisäksi henkilökantajilla on erikseen tekijänoikeus tiettyihin heidän luomiinsa elokuvassa käytettyihin itsenäisiin ja omaperäisiin avaruusaluksiin ja muihin yksilöityihin teoksiin. Henkilökantajat ovat olleet mukana luomassa näihin liittyviä animaatioita, ympäristöjä ja kohtauksia. Nämä teokset yksin ja elokuvakuvakokonaisuuden ja tarinan osana vievät olennaisella ja luovalla tavalla elokuvan tarinaa eteenpäin.

A on tehnyt elokuvaan Liberty Capsule, Rheingold ja Zeppelin alukset ja Helium 3 -junan sekä kuutukikohdan ulko- ja sisäosat. Monien visuaalisten tehosteiden osalta A on joutunut improvisoimaan ja käyttämään luovuutta annettujen tehtävien viimeistelemiseksi. A on myös luonut muun ohessa Götterdämmerung-aluksen sisustuksia B:n kanssa sekä yksin erittäin yksityiskohtaisesti rakennetun Japanin edustajien aluksen.

B on luonut yksin tai muiden kanssa useita elokuvan kohtauksia, kuten kuuhunlaskeutumisaluksen räjähdyskohtauksen, Rheingold UFO nostokurkikohtauksen, Götterdämmerungin konehuoneen, Rheingoldin laskutelineanimaatiot ja George W. Bushin tärkeimmät aseet. B on ollut pääasiallisessa vastuussa Götterdämmerung-aluksen luomistyöstä, ja kyseinen alus sisältää erittäin suuren määrän yksityiskohtaista taiteellista panosta. B on myös luonut kuutukikohdan ulko- ja sisäosat, Valkyrie- ja kuuhunlaskeutumisalukset sekä erittäin yksityiskohtaisesti rakennetun Australian edustajien aluksen.

C:n tehtävänä on ollut VFX-tiimin johtaminen ja kompositointi eli kuvien liittäminen yhteen saumattomaksi yhdeksi uskottavaksi kokonaisuudeksi. Hänet on otettu projektiin mukaan kokeneena visuaalisten tehosteiden osaajana nimikkeellä CGI supervisor ja hän on toiminut muiden työntekijöiden luomistyön ohjaajana ja tuotantolinjasta vastuullisena hyväksyjänä. C on ollut luomassa, suunnittelemassa ja toteuttamassa useita kohtauksia, esimerkiksi avaruusalusten välisiä taistelukohtauksia.

D on tehnyt elokuvaan animointeja, 3D-malleja ja niin sanottuja previsualisointimalleja. Projektin kuluessa D on omaksunut kompositointiohjelman, jonka avulla hän on rakentanut monia elokuvaan sellaisenaan päätyneitä kohtauksia. D on ollut luomassa Götterdämmerung, Zeppelin ja George W. Bush -aluksia sekä yksin erittäin yksityiskohtaisesti rakennetun Mir-aluksen.

E on ollut merkittävän kokenut alan osaaja ja on osallistunut laajasti elokuvan kohtausten luomiseen. E on toiminut muiden työntekijöiden luomistyön ohjaajana ja tuotantolinjasta vastuullisena hyväksyjänä. E on esimerkiksi luonut Zeppelin-alusten räjäyttämisen avaruustaistelussa ja ollut luomassa Götterdämmerung ja Zeppelin -aluksia sekä kuuhunlaskeutumisalusta ja kuutukikohtaa.

Ohjaaja TV ei ole merkityksellisellä tavalla vaikuttanut VFX-tiimin töiden ohjaamiseen ja siinä syntyneiden teosten luomiseen. Kaikki nämä ovat olleet VFX-tiimin jäsenten ja tässä tapauksessa henkilökantajien omaa, itsenäistä ja luovaa työtä. TV ja ST ovat olleet ulkomailla tekemässä viimeisiä varsinaisia kuvauksia sinä ajankohtana, kun VFX-tiimi on viimeistellyt tiettyjä yksittäisiä teoksia ja näihin liittyviä animaatioita ja kohtauksia. Kuvakäsikirjoitus (storyboard) ei ole tältä osin sisältänyt ohjetta tai kohtauksen sisällön kuvausta, ainoastaan tekstin "Full CGI". Teosten jälkikäteinen hyväksyminen osaksi elokuvaa ei tarkoita teosten luomista tai teosten syntymistä kiinteän ohjauksen tai ohjeistuksen mukaisesti.

Edellä todetulla tavalla henkilökantajien tekijänoikeuksia ei ole riidanalaisella osin luovutettu työnantajalle.

*Perusteet tekijänoikeutta loukkausta koskeville vaatimuksille 4–6*

Blind Spot Pictures Oy on loukannut henkilökantajien tekijänoikeutta luovuttamalla lisenssin Reality Pump Studios nimiselle yhtiölle, joka on valmistanut ja saattanut yleisön saataviin henkilökantajien tekijänoikeutta loukkaavan Iron Sky Invasion tietokonepelin. Kyseisessä pelissä on hyödynnetty merkittävää määrää elokuvan audiovisuaalista aineistoa, muun ohella avaruusaluksia. Tuotantoyhtiöt ovat myös elokuvan pohjalta julkistamassa Iron Sky: The Roleplaying Game -peliä, jossa ennakkomarkkinoinnin perusteella tullaan käyttämään henkilökantajien tekijänoikeutta loukkaavaa aineistoa, ainakin Götterdämmerung-alusta.

Elokuvan jatko-osien sisältö ei ole vielä tässä vaiheessa henkilökantajien tiedossa, eivätkä vaatimukset 4 tai 5 koske elokuvan jatko-osia. Tuotantoyhtiöt tai ainakin Iron Sky Universe Oy ovat kuitenkin hyödyntäneet Iron Sky elokuvaa ja siinä henkilökantajien teoksia tekeillä olevissa kyseisen elokuvan jatko-osien markkinoinnissa ja joukkorahoitusta hakiessaan käyttäessään luvatta Iron Sky elokuvan kohtauksia ja ainakin seuraavia yksittäisiä teoksia: Götterdämmerung, Mir, Japanin edustajain alus ja kuutukikohta (Schwarze Sonne). Tämä loukkaa henkilökantajien tekijänoikeutta, koska tuotantoyhtiöille ei ole siirtynyt oikeuksia laajemmin tai muutoin kuin vain Iron Sky -elokuvaan eikä henkilökantajilta alkuperäisen elokuvan tekijöinä ole saatu tähän suostumusta.

Vaatimukset eivät ole ennenaikaisia. Markkinaoikeuden tulee kieltää pääkanteen vastaajia jatkamasta tai toistamasta kyseisiä tekijänoikeuden loukkauksia, mukaan lukien oikeuksien edelleen luovuttamisia.

Loukkausarvioinnissa merkityksellistä on ulkoinen ilmenemismuoto, ei se, onko alkuperäisiä digitaalisia tiedostoja tai vastaavia teknisiä apuvälineitä mahdollisesti käytetty lopputuloksen valmistamisessa. Tuotantoyhtiöiden vetoaminen alalla vallitsevaan normaalikäytäntöön on merkityksetöntä ja tässä tapauksessa näin on erityisesti siksi, että Iron Sky elokuvaprojekti on ollut varsin amatöörimäinen ja sitä on toteutettu elokuva-alan normaalista toimintatavasta poiketen muun ohessa vuorovaikutuksessa yleisön kanssa. Myöskään tekijänoikeuslain 46 a § ei luo oikeudellista perustetta harjoittaa liiketoimintaa tuotantoyhtiöiden esittämällä tavalla.

**VASTAUS**

**Vaatimukset**

Blind Spot Pictures Oy ja Iron Sky Universe Oy ovat vaatineet, että markkinaoikeus jättää kanteen tutkimatta tai hylkää sen.

Blind Spot Pictures Oy ja Iron Sky Universe Oy ovat lisäksi vaatineet, että markkinaoikeus velvoittaa A:n, B:n, C:n, D:n ja E:n yhteisvastuullisesti korvaamaan niiden arvonlisäverottomat oikeudenkäyntikulut kulujen osalta 2.050 eurolla ja palkkion osalta 54.000 eurolla eli yhteensä 56.050 eurolla sekä asianosaiskulut 10.500 eurolla, molemmat määrät viivästyskorkoineen.

VALVE_019

**Perusteet**

*Henkilökantajille ei ole syntynyt tekijänoikeutta tai kaikki oikeudet on luovutettu yksinoikeudella eikä heillä ole asiavaltuutta tai oikeussuojan tarvetta*

Henkilökantajille ei ole syntynyt tekijänoikeuksia tai mahdolliset tekijänoikeudet on luovutettu kokonaisuudessaan yksinoikeudella työnantajalle. Tämän vuoksi heillä ei ole asiavaltuutta esittää elokuvaan tai sen materiaaleihin perustuvia tekijänoikeuksiin perustuvia vaatimuksia ja kanne tulee jättää tutkimatta. Todetun johdosta kanne tulee jättää tutkimatta myös oikeussuojan tarpeen puuttumisen vuoksi, koska asiassa on vedottu vain tekijänoikeuslain taloudellisiin oikeuksiin ja niiden väitettyihin loukkauksiin.

Konkludenttisesti ja viimeistään työsopimuksilla kaikki mahdolliset oikeudet on kertakorvausta vastaan luovutettu yksinoikeudella työnantajalle ja siltä edelleen tuotantoyhtiöille. Henkilökantajille ei näin ollen ole jäänyt mitään oikeuksia. Oikeuksien luovutus ei ole koskenut vain Iron Sky elokuvaa, vaan kaikkea materiaalia ja elokuvaa sekä oikeutta siirtää oikeudet edelleen. C on sopinut toimeksiannon samoilla ehdoilla. Sopimusta tulee tulkita osapuolten tarkoituksen, alalla vallitsevan tavan ja sanamuodon mukaisesti. Henkilökantajat ovat olleet tietoisia luovutuksen laajuudesta ja yleisestä tavasta hyödyntää materiaalia liiketoiminnassa. Sopimusten sovittelulle ei ole perusteita.

*Vaatimus kannevaatimusten 4 ja 5 ennenaikaisuudesta ja kanteen yksilöimättömyydestä*

Iron Sky: The Coming Race ei ole vielä valmistunut täysin lopulliseen muotoonsa ja Iron Sky: The Ark -elokuvan materiaalia vasta valmistellaan. Kumpaakaan elokuvaa ei ole lopullisessa muodossaan saatettu yleisön saataviin. Väitettyjä tekijänoikeuksia ei ole loukattu yleisön saataviin saattamalla tai muutoin. Elokuvissa ei ole käytetty henkilökantajien väitteiden mukaisesti luvattomasti aiempien elokuvien materiaalia tai elementtejä sellaisenaan tai muokattuna. Jatko-osien tai muun julkaisemattoman materiaalin, kuten The Coming Race ja The Ark -elokuvien ja roolipelin, osalta ei voida vielä tehdä tekijänoikeudellista arviointia ja kannevaatimukset 4 ja 5 tulee jättää tutkimatta tai hylätä ennenaikaisina kyseisiltä osin.

Vaatimuksia ei ole yksilöity riittävästi kantajakohtaisesti. Vaatimuksen 4 osalta tekijänoikeuden loukkausta ei ole yksilöity eikä vaatimuksen 6 kohteena olevaa tekijänoikeutta ei ole riittävästi eritelty.

*Henkilökantajille ei ole syntynyt tekijänoikeutta elokuvaan tai sen osiin*

Henkilökantajille ei ole tekijänoikeuslain tai elokuva-alan liiketoimintakäytännön perusteella syntynyt tekijänoikeutta elokuvaan. Heidän panoksensa elokuvaan tai sen materiaaleihin ei ole ollut niin luovaa, itsenäistä ja omaperäistä, että heille olisi syntynyt tekijänoikeus edes yksittäisiin kannevaatimuksessa 2 yksilöityihin elementteihin. Visuaalisten tehosteiden osalta ei ole syntynyt elokuvateoksesta erotettavaa tai erottuvaa itsenäistä tekijänoikeutta kenellekään. Visuaaliset tehosteet eivät ole sellainen osa elokuvaa, että henkilökantajat saisivat tekijänoikeuden koko elokuvaan yhteisteokseena.

Mahdollinen tekijänoikeus johonkin elokuvan yksittäiseen, erotettavissa olevaan osaan, esimerkiksi kannevaatimuksessa 2 yksilöityihin aluksiin, ei saisi aikaan tekijänoikeutta koko elokuvaan. Henkilökantajat ovat osallistuneet vain elokuvan yksittäisten kohtien, eivät koko elokuvan tekemiseen.

Henkilökantajat ovat osallistuneet elokuvatuotantoon eri suorittavissa ja avustavissa työrooleissa ja eritasoisina toimijoina. Osallistuminen ja osaaminen on ollut erilaista. Henkilökantajat ovat tehneet työtään elokuvan keskeisimpien henkilöiden kuten ohjaaja TV:n, tehosteista sekä visuaalisesta ilmeestä vastanneiden henkilöiden ST:n ja JL:n ohjauksessa ja kirjallisten ohjeiden ja videoiden mukaan. Henkilökantajat on nimetty elokuvan lopputeksteissä osalliseksi elokuvan tekoon, mikä ei kuitenkaan luo olettamaa tekijäasemasta. Lopputeksteissä luetellaan useat elokuvan tekemiseen osallistuneet tahot. Elokuvan tekijöinä pidetään esimerkiksi elokuvan ohjaajaa, näyttelijöitä ja käsikirjoittajaa. Elokuvassa ei ole kysymys tekijänoikeuslain 5 §:ssä tarkoitetusta kokoomateoksesta tai 6 §:ssä tarkoitetusta yhteisteoksesta.

D on ollut työelämään tutustua projektiin tullessaan. C on tehnyt sopimuksen vasta maaliskuussa 2011. B on liittynyt elokuvan tekoon ammatillisesti kokemattomana työharjoittelijana, ja hän on tehnyt tarkkaan ohjeistettua mekaanista työtä elokuvan ennalta suunniteltujen kolmiulotteisten mallien parissa. B on avustanut materiaalin tekemisessä työnantajan ohjeiden mukaisesti apunaan ohjaajan ja tehostetuottajan ohjeistukset, käsikirjoitus, kuvakäsikirjoitus ja konseptitaidekuvat sekä muut ohjeet. B:n työvaiheet ovat olleet osa suurempaa kokonaisuutta. B:n rooli on ollut pieni, ei-luova ja mekaaninen, eikä hänen panoksensa ole ylittänyt niin sanottua teoskynnystä. B ei ole tehnyt haastehakemuksessa yksilöityjä ja hänen tekijänoikeuden perusteina olevia elementtejä.

*Henkilökantajilla ei ole oikeuksia muuhun liiketoimintaan*

Elokuvaliiketoiminta perustuu elokuvien ja niihin sisältyvän materiaalin, eli kuvat, hahmot ja juoni, oikeuksien siirtämiseen, edelleen lisensointiin sekä jatko-osien ja oheismateriaalin tekemiseen ja teetättämiseen. Vaadittu kielto estäisi tuotantoyhtiöiden normaalin liiketoiminnan jatkamisen sisältäessään myös tuotantoyhtiöiltä kiistatta olevan tekijänoikeuslain 46 a §:n mukaisia oikeudet. Täten vaatimus on perusteeton, aiheeton, yksilöimätön ja shikaaninomaisena tuotantoyhtiöiden oikeusturvan vastainen.

**VASTAKANNE (dnro 2017/701)**

**Vaatimukset**

Blind Spot Pictures Oy ja Iron Sky Universe Oy ovat vaatineet, että markkinaoikeus:

1) vahvistaa, että B:llä, C:llä, E:llä, D:llä tai A:lla ei ole tekijänoikeuslain 2 §:n, 6 §:n tai 46 a §:n mukaista tekijänoikeutta Iron Sky tai Iron Sky Director's tai Dictator's Cut elokuvaan taikka mihinkään kyseisiin elokuviin tekemäänsä materiaaliin;

2) vahvistaa, että B:llä, C:llä, E:llä, D:llä tai A:lla ei ole tekijänoikeuslain 1 §:n, 2 §:n, 6 §:n tai 46 a §:n mukaista tekijänoikeutta Iron Sky: The Coming Race -elokuvaan;

3) vahvistaa, että B:llä, C:llä, E:llä, D:llä tai A:lla ei ole oikeutta käyttää mitään tekemäänsä Iron Sky tai Iron Sky Director's tai Dictator's Cut elokuvaan liittyvää materiaalia;

4) kieltää B:tä ja D:tä jatkamasta Blind Spot Pictures Oy:n ja Iron Sky Universe Oy:n tekijänoikeuksien loukkaamista sekä määrää 50.000 euron sakon uhalla heidät lopettamaan loukkaavan aineiston yleisön saataviin saattamisen.

Blind Spot Pictures Oy ja Iron Sky Universe Oy ovat lisäksi vaatineet, että markkinaoikeus velvoittaa A:n, B:n, C:n, D:n ja E:n yhteisvastuullisesti korvaamaan niiden arvonlisäverottomat oikeudenkäyntikulut kulujen osalta 3.050 eurolla ja palkkion osalta 6.000 eurolla eli yhteensä 9.050 eurolla sekä asianosaiskulut 4.000 eurolla, molemmat määrät viivästyskorkoineen.

**Perusteet**

Pääkanteen henkilökantajat ovat luovuttaneet Iron Sky ja Iron Sky Director's tai Dictator's Cut elokuvien materiaaleihin ja yksittäisiin elementteihin liittyvät mahdolliset tekijänoikeuslain 2 §:n mukaiset tekijänoikeutensa työnantajalleen yksinoikeudella kertakorvauksella. Työnantajalta nämä oikeudet ovat siirtyneet tuotantoyhtiöille. Henkilökantajilla ei ole edes asiavaltuutta esittää kyseisiin tekijänoikeuksiin perustuvia vaatimuksia. Tuotantoyhtiöt ovat käyttäneet materiaalia ja elementtejä sopimuksien, alan käytännön ja osapuolten tahtojen mukaisesti.

Koska pääkanteen vahvistusvaatimukset 1–3 tulee hylätä, oikeusturvan ja oikeusvarmuuden vuoksi vastakanteen vahvistusvaatimus 1 tulee hyväksyä. Henkilökantajilla ei ole edes asiavaltuutta tältä osin. Henkilökantajat, erityisesti B, ovat esittäneet kantajien liiketoimintaa, elokuvia ja tekijänoikeutta koskevia väitteitä. B on ollut yhteydessä tuotantoyhtiöiden liikekumppaneihin, Iron Sky -lisenssin saajiin, elokuvien rahoittajiin ja muihin tahoihin sekä esittänyt internetissä perättömiä syytöksiä laittomuuksista. Pääkanteen hylkäävä tuomio ei ole käytännössä yhtä tehokas ja yksiselitteinen kuin käsillä oleva nimenomainen vahvistustuomio, jolla vallitseva oikeudellinen asiantila on mahdollista todistaa myös kolmansille osapuolille.

Mahdollinen tekijänoikeus elokuvan yksittäiseen, erotettavissa olevaan osaan, esimerkiksi avaruusaluksiin, ei tuota tekijänoikeutta koko elokuvaan. Henkilökantajien viittaamat tekijänoikeuslain 5 §:n ja 6 §:n säännökset eivät päde koko elokuvaan.

Vahvistusvaatimus 2 koskee tulevaa, vielä keskeneräistä elokuvaa Iron Sky: The Coming Race, jonka lopullista versiota ei ole vielä tehty. Kyseisessä elokuvassa ei ole mitään sellaista materiaalia aiemmista elokuvista tai muualta, jonka tekemisessä, valmistamisessa tai edes ideoinnissa vastaajat ovat olleet mukana tai osallisina. Henkilökantajilla ei siten ole asiavaltuutta kyseisen elokuvan suhteen.

Vaikka tekijänoikeus olisikin syntynyt, se olisi luovutettu kokonaisuudessaan yksinoikeudella, eikä henkilökantajille olisi jäänyt oikeutta käyttää materiaalia itse. Tämä asiantila tulee todeta vahvistusvaatimuksen 3 mukaisesti.

B on lisäksi ilmoittanut Internetissä perustaneensa yrityksen yhdessä D:n kanssa tekemään Iron Sky pelituotantoa ja on käyttänyt tekijänoikeudella suojattua materiaalia pelituotantonsa markkinoinnissa. B myös markkinoi 3D-tulosteita "Iron Sky 2012" -kuvauksella ja käyttäen luvatta Iron Sky -elokuvan kuvamateriaalia. Edellä todetusti henkilökantajilla ei ole tai ole jäänyt oikeutta käyttää materiaalia itse. Markkinaoikeuden tulee kieltää B:tä ja D:tä jatkamasta tekijänoikeuksien loukkaamista.

**VASTAUS**

**Vaatimukset**

A, B, C, D ja E ovat vaatineet, että markkinaoikeus jättää vastakanteen tutkimatta tai hylkää sen.

Lisäksi A, B, C, D ja E ovat vaatineet, että markkinaoikeus velvoittaa Blind Spot Pictures Oy:n ja Iron Sky Universe Oy:n korvaamaan heidän oikeudenkäyntikulut kulujen osalta 901,20 eurolla ja palkkion osalta 21.104,40 eurolla eli yhteensä 22.005,60 eurolla viivästyskorkoineen.

**Perusteet**

*Vaatimuksia ei voi käsitellä pääkanteen lis pendens -vaikutuksen vuoksi tai ne ovat ennenaikaisia taikka perusteettomia*

Vahvistusvaatimukset 1 ja 3 koskevat pääkanteen vaadittua hylkäämistä ja siitä seuraavaa väitettyä vahvistustarvetta käänteisestä lopputuloksesta. Negatiivinen vahvistuskanne ei ole mahdollinen samasta kysymyksestä kuin mistä on nostettu positiivinen vahvistuskanne. Vastakanteella ei ole saavutettavissa parempaa tai laajempaa oikeussuojaa kuin vastustamalla pääkannetta. Pääkanteen vireilläolo estää tällaisen vastakanteen ajamisen ja vaatimus tulee jättää tutkimatta tai hylätä heti. Vahvistusvaatimus 3 on myös täysin yksilöimätön.

Vahvistusvaatimus 2 koskee Iron Sky -elokuvan jatko-osaa The Coming Race, jota ei ole julkaistu vielä eikä se ole yleisesti saatavilla. Vaatimus on näin ollen ennenaikainen, eikä vaatimus ole enemmälti käsiteltävissä tai ratkaistavissa tässä yhteydessä. Vaatimusta ei voida ratkaista ennen kuin vaatimuksen kohteena oleva teos on olemassa ja arvioitavissa. Asiaan ei ole myöskään mahdollista ottaa kantaa, koska kyseisestä jatko-osan sisällöstä ei ole esitetty selvitystä. Kattavaa selvitystä ei ole myöskään esitettävissä pääkanteen käsittelyn yhteydessä. Vahvistusvaatimus on aiheeton myös siksi, että vastaajat eivät ole väittäneet itse olleensa tekemässä kyseistä jatko-osaa. Näin ollen vaatimus tulee jättää tutkimatta tai hylätä heti.

Pääkanteen vaatimusten tekijänoikeudellinen perusta ja asiavaltuus on selvä.

*Tuotantoyhtiöiden kieltovaatimus*

Sikäli kuin B ja D olisivat käyttäneet toiminnassaan mitään Iron Sky -elokuvaan liittyvää aineistoa, heillä olisi ollut käyttöön pääkanteessa esitetyllä tavalla oikeus. B on muiden tekijöiden suostumuksella mallintanut alusta asti uudelleen Valkyrie-aluksen. Joka tapauksessa väitetty liiketoiminta tai käyttö ei pitäisi olla tekijänoikeudellisessa mielessä relevanttia eikä siksi voisi tulla kiellettäväksi. Vaatimus on yksilöimätön, perusteeton ja toteen näyttämätön.

**TODISTELU**

**Asiakirjatodistelu**

*Henkilökantajat*

1. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös tuotantoyhtiöiden asiakirjatodiste 1)

VALVE_021

2. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös tuotantoyhtiöiden asiakirjatodiste 2)

3. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös tuotantoyhtiöiden asiakirjatodiste 3)

4. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös tuotantoyhtiöiden asiakirjatodiste 4)

5. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös tuotantoyhtiöiden asiakirjatodiste 5)

6. Ote Iron Sky -elokuvan käsikirjoituksesta (shooting script) ja kuvasarjasta (storyboard) sekä kuvaruutukaappauksia Iron Sky elokuvasta (myös tuotantoyhtiöiden asiakirjatodiste 6)

7. Wikipedia-artikkeli "Iron Sky: Invasion" (10.8.2017)

8. SF Studios ja Iron Sky Universen lehdistötiedote "Iron Sky: The Coming Race -elokuva valkokankaille helmikuussa" (25.4.2017)

9. "Iron Sky: The Ark" -artikkeli ironsky.net-verkkosivulta (4.9.2017)

10. "Iron Sky: The Roleplaying Game" -kuvaruutukaappauksia kickstarter.com-verkkosivulta (21.8.2017)

11. Kuva Australian edustajien aluksesta

12. Kuva Mir-aluksesta

13. Kuvat Japanin edustajien aluksesta

14. Kuvia kuutukikohdasta (Schwarze Sonne)

15. Kuvaruutukaappaus Troll VFX -yhtiön Facebook-sivusta (20.6.2013) visuaalisille tehosteille myönnettyä AACTA-palkintoa koskien

16. A:n Pi Computer Solutions -yhtiön lasku (19.5.2010)

17. Kuvaruutukaappaus Iron Sky Invasion -tietokonepelin tekijänoikeusmerkinnöistä

18. Kuvaruutukaappaukset Iron Sky -elokuva lopusta ja Iron Sky: The Coming Race -elokuvan trailerista

19. Kuvaruutukaappauksia elokuvan kohtauksien tekemisestä vihreää taustaa vasten eli niin sanotusta green screen -kuvauksesta

20. Kuvaruutukaappauksia Iron Sky -elokuvasta

21. Iron Sky -elokuvan storyboardin otteita ja kuvaruutukaappauksia

22. Iron Sky 2012 Director's Cut -videotallenne

23. Making of Iron Sky -videotallenne (a. "How It All Started", b. "Making of" ja c. "The Story and the Characters")

24. C:n Commentary -videotallenne

25. Here Zeppelin Kaboom -videotallenne

26. Be a Moon Trooper in Iron Sky: The Coming Race -videotallenne

27. Be a Moonbase Citizen in Iron Sky: The Coming Race -videotallenne

28. Todisteesta on luovuttu.

29. Iron Sky: The Coming Race -elokuvan virallinen traileri 1 videotallenne

30. Iron Sky Shooting Script III -käsikirjoitus

31. Iron Sky Storyboards -kuvakäsikirjoitus (21.10.2010)

32. JointAuthorshipDemo -videotallenne

33. Iron Sky Signal: Creating VFX for Iron Sky -videotallenne

34. Iron Sky Signal S02 Episode 5: Making of Iron Sky videotallenne

35. D:n Portfolio December 2011 -videotallenne

36. E:n Iron Sky reel 2011 -videotallenne

37. A:n Showreel -videotallenne

38. A:n – CGI/VFX work for Iron Sky -kooste

39. B:n Iron Sky showreel -videotallenne

VALVE_022

40. Iron Sky: Invasion -tietokonepelistä tehty videotallenne

41. Kuvia gd_full_model_shaded_2011.mb -tiedostosta

42. Kuvia gd_machineroom_assembled_scene_shaded_2012_02.mb -tiedostosta

43. Kuvia gwb_front_section_with_weapons_rights.mb -tiedostosta

44. Kuvia park_hangar_master_scene_v57.mb -tiedostoststa

45. Kuvia sh_052A_0030_GWB_Zep_Exp.mb -tiedostosta

46. Kuvia seb_rheingold_lambert.mb -tiedostoststa

47. B:n lausuntopyyntö tekijänoikeusneuvostolle

*Tuotantoyhtiöt*

1. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös henkilökantajien asiakirjatodiste 1)

2. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös henkilökantajien asiakirjatodiste 2)

3. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös henkilökantajien asiakirjatodiste 3)

4. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös henkilökantajien asiakirjatodiste 4)

5. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös henkilökantajien asiakirjatodiste 5)

6. Ote Iron Sky -elokuvan käsikirjoituksesta (shooting script) ja kuvasarjasta (storyboard) sekä kuvaruutukaappauksia elokuvasta (myös henkilökantajien asiakirjatodiste 6)

7. D:n (18.5.2010, 4.11.2010 ja 13.8.2011), E:n (11.2.2010 ja 16.9.2010), A:n (4.11.2010) ja B:n (4.5.2011, 28.10.2011 ja 28.11.2011) työtehtäviin liittyvät sopimukset

8. B:n Twitter-viesti 22.4.2017

9. B:n Twitter-viesti (2017)

10. Kuvaruutukaappaus "Valkyrie UFO from Iron Sky 2012" -myynti-ilmoituksesta shapeways.com -verkkosivustolta

11. B:n työnhakua koskeva sähköposti (27.9.2010)

12. YouTube-video Iron Sky Teaser 2 – The First Footage (13.5.2010)

13. Sähköpostit B:n työelämävalmennuksesta 8.11.2010–8.5.2011 (29.3.2016–1.4.2016)

14. Energia Productions Ltd ja Declaration Pictures Inc:n välinen C:tä koskeva toimeksiantosopimus (22.3.2011)

15. Kuvamateriaalia elokuvien tekemisestä (salassa pidettävä)

16. TV:n sähköposti C:lle (12.8.2011)

18. Videotallenne elokuvan tekemisestä

19. Kuvamateriaalia elokuvien tekemisestä (salassa pidettävä)

20. TV:n sähköposti (2.8.2011)

21. ST:n sähköposti liitteineen (16.7.2009)

22. Kaksi Götterdämmerung VFX-videotallennetta

23. B:n sähköpostit (22.2.2018)

24. B:n Twitter-viesti (22.3.2018)

**Henkilötodistelu**

*Henkilökantajat*

1. B, todistelutarkoituksessa

2. C, todistelutarkoituksessa

3. E, todistelutarkoituksessa

VALVE_023

4. D, todistelutarkoituksessa

5. A, todistelutarkoituksessa

*Tuotantoyhtiöt*

1. B, todistelutarkoituksessa

2. C, todistelutarkoituksessa

3. E, todistelutarkoituksessa

4. D, todistelutarkoituksessa

5. A, todistelutarkoituksessa

6. TV, elokuvaohjaaja, Iron Sky Universe Oy:n hallituksen jäsen, todistelutarkoituksessa

7. TK, elokuvatuottaja, Iron Sky Universe Oy:n ja Blind Spot Pictures Oy:n hallituksen jäsen, todistelutarkoituksessa

8. ST, VFX supervisor

9. JP, yhteisöpäällikkö

10. JL, luova johtaja

**MARKKINAOIKEUDEN RATKAISU**

**Perustelut**

*1 Asioiden taustaa*

1. Markkinaoikeuden valmisteluistunnossa päätetyn mukaisesti alkuperäinen kanne (dnro 2017/588, jäljempänä myös pääkanne) ja vastakanne (dnro 2017/701) käsitellään samassa oikeudenkäynnissä.

2. Asioissa on keskeisesti kysymys Iron Sky -elokuvaan kolmiulotteisia tietokoneella luotuja visuaalisia tehosteita ja animaatioita tehneiden A myötäpuolineen (jäljempänä myös henkilökantajat) tekijänoikeudesta koko elokuvaan sekä yksilöityihin avaruusaluksiin ja muihin teoksiin. Näistä on esitetty vahvistus- ja kieltovaatimuksia.

3. Asioissa esitetyn yhdenmukaisen todistelun perusteella kyseistä elokuvaa on ideoitu, käsikirjoitettu ja valmisteltu vuodesta 2005 alkaen. Henkilökantajat ovat tulleet mukaan Blind Spot Pictures Oy:n ja Iron Sky Universe Oy:n (jäljempänä myös tuotantoyhtiöt) elokuvaprojektiin työskentelemään visuaalisista tehosteista vastanneen alihankkijan Tuotantoyhtiö Energia Oy:n lukuun vaiheittain ja erilaisin tavoin pääosin loppuvuoden 2010 ja alkuvuoden 2011 kuluessa. Elokuva on julkaistu helmikuussa 2012 ja sen hieman laajempi Director's Cut (toiselta nimeltään Dictator's Cut) -versio ilmeisesti vuonna 2013. Riidattomaksi on ilmoitettu, että oikeudet elokuvaan ja mainittuun versioon määräytyvät samalla tavalla.

4. Useimpien henkilökantajien työsopimuksissa on sovittu oikeuksien luovutuksesta työnantajalle riidanalaisilla ehdoilla, mutta kaikilta osin työskentelystä ja oikeuksien luovutuksesta ei ole sovittu kirjallisesti. Arviotavaksi voi näin ollen tulla myös se, millaisin ehdoin tekijänoikeudet on mahdollisesti luovutettu Tuotantoyhtiö Energia Oy:lle ja/tai millaisen käyttöoikeuden tuotantoyhtiöt ovat saaneet.

*2 Eräiden vaatimusten tutkimatta jättämisestä ja ennenaikaisuudesta*

5. Tuotantoyhtiöt ovat vaatineet, että pääkanne tulee jättää tutkimatta, koska henkilökantajille ei ole syntynyt tekijänoikeutta ja joka tapauksessa mahdolliset tekijänoikeudet on luovutettu yksinoikeudella työnantajalle, eikä henkilökantajille ole näin ollen jäänyt mitään oikeuksia. Siten henkilökantajilla ei ole oikeussuojan tarvetta tai asiavaltuutta esittää tekijänoikeuslakiin perustuvia vaatimuksia.

6. Oikeuskirjallisuudessa (Jokela, Oikeudenkäynnin asianosaiset ja valmistelu, 2012, s. 253) on todettu, että vahvistuskannetta ei oteta tutkittavaksi, ellei kantajalla ole riittävää oikeudellista intressiä vaadittuta vahvistamisesta. Tämä edellyttää, että kyseisestä oikeussuhteesta tai oikeudesta on olemassa oikeudellista epävarmuutta ja että kantaja kärsii haittaa vallitsevasta tilanteesta. Lisäksi väitetyn vahvistusintressin tulee olla ajankohtainen ja liittyä muutoin toteutettavissa olevaan oikeuteen, joka ei saa jäädä riippumaan jonkin tulevaisuudessa mahdollisesti toteutuvan ehdon täyttymisestä.

7. Oikeuskirjallisuudessa (Harenko, ym., Tekijänoikeus, 2016, s. 623 ja 624) on myös todettu, että vaatimusten esittämiseen vaadittava asiavaltuus on sillä oikeudenhaltijalla, jonka oikeuksia käyttö loukkaa. Taloudelliset yksinoikeudet teokseen syntyvät aina teoksen luoneelle luonnolliselle henkilölle. Jos hän on siirtänyt oikeutensa toiselle, esimerkiksi yritykselle, on tarkasteltava, missä laajuudessa ja mitkä oikeudet ovat siirtyneet. Mikäli kaikki taloudelliset oikeudet on siirretty yksinoikeudella yritykselle, on oikeus hyvitysvaatimuksen esittämiseen loukkauksen johdosta sillä, jolle taloudelliset oikeudet kuuluvat.

8. Markkinaoikeus katsoo, että pääkanteen kannevaatimukset 1–3 ja niihin perustuvat muut vaatimukset koskevat ensiksi kysymystä siitä, onko henkilökantajille syntynyt tekijänoikeutta ja vasta toiseksi sitä, miltä osin se on mahdollisesti luovutettu. Tällaisessa tilanteessa, kun riitaista on myös se, onko henkilökantajille alun perinkään syntynyt tekijänoikeutta, teokset väitetysti luoneilla henkilökantajilla on asiavaltuus ja riittävä oikeudellinen intressi.

9. Tuotantoyhtiöt ovat myös vaatineet kannevaatimusten 4 ja 5 tutkimatta jättämistä ennenaikaisina siltä osin kuin ne kohdistuvat vielä julkaisemattomaan materiaaliin. Tuotantoyhtiöt ovat myös pitäneet kannevaatimuksia 4 ja 6 riittämättömästi yksilöityinä tai eriteltyinä. Henkilökantajat ovat 2.3.2018 annetussa lausumassaan selvyyden vuoksi todenneet, kannevaatimuksia kuitenkaan rajaamatta tai olennaisesti täsmentämättä, että

VALVE_024

vaatimus 5 ei koske elokuvan vielä julkaisematonta jatko-osaa. Lausumassaan 20.3.2018 ja samana päivänä aloitetussa pääkäsittelyssä henkilökantajat ovat edelleen todenneet, että vaatimukset 4 ja 5 eivät koske elokuvan vielä julkaisematonta jatko-osia tai pääkäsittelyssä esitetyn perusteella myöskään vielä julkaisematonta roolipeliä.

10. Markkinaoikeus katsoo, että pääkanteessa esitetyt vaatimukset 4 ja 5 eivät täsmennettyjen kanneperusteiden mukaisesti kohdistu vielä julkaisemattomiin elokuviin tai roolipeliin. Asiassa ei ole ilmennyt perustetta tuotantoyhtiöiden vaatimalla tavalla jättää kyseisiä vaatimuksia tutkimatta tai hylätä niitä ennenaikaisina. Vaatimuksia 4 ja 6 ei voi myöskään pitää sellaisella tavalla yksilöimättöminä, että kannetta ei näiltä osin voisi ottaa tutkittavaksi.

11. Henkilökantajat ovat puolestaan vaatineet vastakanteen vaatimusten 1 ja 3 jättämistä tutkimatta tai hylkäämistä pääkanteen vireilläolovaikutuksen (lis pendens) vuoksi, koska henkilökantajien mukaan niissä on kysymys samasta asiasta kuin pääkanteessa. Lisäksi henkilökantajat ovat vaatineet vastakanteen vaatimuksen 2 tutkimatta jättämistä tai hylkäämistä ennenaikaisena tai riidattomana.

12. Oikeuskirjallisuuden (Frände, ym., Prosessioikeus, 2017, s. 524–525) mukaan vastasuuntaisessa kanteessa ei ole kysymys samasta asiasta kuin pääkanteessa, jos se menestyessään voisi tuoda laajempaa oikeussuojaa kuin pelkkä menestyksekäs vastaaminen pääkanteeseen. Oikeudellinen intressi täyttyy, jos vastaaja voi omalla kanteella saavuttaa jotain enemmän kuin häntä vastaan ajettavan kanteen hylkäämisen.

13. Markkinaoikeus toteaa, että pääkanteen vahvistusvaatimusten 1–3 muodostama kokonaisuus koskee tekijänoikeutta Iron Sky elokuvaan ja yksilöityihin teoksiin ja osaltaan myös oikeuksien syntymisen ja luovuttamisen laajuuden vahvistamista. Tästä myös vastakanteen vahvistusvaatimuksessa 1 on pitkälti kysymys. Vahvistusvaatimusten 1–3 kerroksittaisuuden vuoksi vaatimukset eivät ole kuitenkaan sellaisenaan vastasuuntaisia. Lisäksi vastakanteen kyseisessä vaatimuksessa on osaltaan myös vahvistettavaksi, että henkilökantajilla ei ole tekijänoikeutta mihinkään kyseiseen elokuvan tekemäänsä materiaaliin, mikä kattaa myös mahdolliset muut kuin pääkanteen vahvistusvaatimuksessa 2 yksilöidyt teokset. Näin ollen vastakanteen vahvistusvaatimus 1 on elokuvaa varten tehdyn materiaalin osalta pääkannetta laajempi, eikä vastakanteen vaatimuksen 1 tutkimiselle ole estettä.

14. Pääkanteen vahvistusvaatimusten 1–3 muodostamassa kokonaisuudessa on kysymys tekijänoikeuden syntymisestä ja siitä, että oikeuksia ei ole luovutettu muutoin kuin vaatimuksesta 3 ilmenee. Vastakanteen vaatimuksessa 3 on sen sijaan kysymys keskeisesti siitä, onko henkilökantajilla oikeus käyttää tekemäänsä materiaalia, mistä pääkanteessa ei ole kysymys. Näin ollen myös kyseinen vahvistusvaatimus poikkeaa pääkanteen vaatimuksista sellaisella tavalla, ettei sen tutkimiselle ole estettä.

15. Markkinaoikeus katsoo myös, että pääkanteen vaatimukset 4 ja 5 on muotoiltu varsin yleisellä tasolla ja tekijänoikeutta loukkaavaa menettelyä lähemmin yksilöimättä. Vaatimusten tueksi esitetyt perusteet ovat muuttuneet valmistelun kuluessa ja viimeisimmin vielä pääkäsittelyä aloitettaessa. Siten tuotantoyhtiöille on voinut olla epäselvää, mihin menettelyyn vaatimukset kohdistuvat ja erityisesti ovatko ne kohdistuneet vielä julkaisemattomaan materiaaliin. Henkilökantajat eivät ole muotoilleet vahvistusvaatimusta 4 siten, että se yksiselitteisesti koskisi vain tekijänoikeutta väitetysti loukkaavaa menettelyä ja seikkoja. Markkinaoikeus katsoo, että näissä olosuhteissa vastakanteen vaatimuksella 2 on esitetty sinänsä riittävä oikeudellinen intressi.

16. Vastakanteen vaatimuksessa 2 on vaadittu vahvistettavaksi, että henkilökantajilla ei ole tekijänoikeuslain tiettyjen säännösten mukaista tekijänoikeutta Iron Sky: The Coming Race -elokuvaan. Riidatonta on, että henkilökantajat eivät ole olleet tekemässä kyseistä jatko-osaa. Kyseistä elokuvaa ei ole vielä julkaistu tai saatettu lopulliseen muotoonsa. Elokuvasta tai sen tekijänoikeuksiin vaikuttavista seikoista ei ole juurikaan esitetty eikä lopullisesta elokuvasta ole ollut esitettävissä selvitystä. Mainituilla perusteilla markkinaoikeus katsoo, että vastakanteen vaatimus 2 on hylättävä ennenaikaisena. Edellä todetusti asioiden enemmälle käsittelylle ei ole muilta osin ilmennyt estettä.

*3 Henkilökantajien vaatimus tekijänoikeudesta Iron Sky -elokuvaan*

17. Tekijänoikeuslain 1 §:n 1 momentin mukaan sillä, joka on luonut kirjallisen tai taiteellisen teoksen, on tekijänoikeus teokseen, olkoonpa se kaunokirjallinen tahi selittävä kirjallinen tai suullinen esitys, sävellys- tai näyttämöteos, elokuvateos, valokuvateos tai muu kuvataiteen teos, rakennustaiteen, taidekäsityön tai taideteollisuuden tuote taikka ilmetköönpä se muulla tavalla.

18. Elokuvateosten osalta tekijänoikeuslain esitöissä (Komiteanmietintö 1953:5, s. 45) on todettu, että käytännössä voi olla vaikeata todeta, kenelle tekijänoikeuden elokuvateokseen on katsottava kuuluvan. Oikeuskirjallisuuden (Salokannel, Häviävät elokuvat tekijät, 1990, s. 28) mukaan pohjoismaisissa lainvalmisteluasiakirjoissa tehdään elokuvan tekijänoikeuden haltijoiden määrittelyssä ero toisaalta niiden välillä, joilla on tekijänoikeus koko elokuvateokseen ja toisaalta niiden tekijöiden välillä, joilla on tekijänoikeus ainoastaan elokuvaan sisältyviin yksittäisiin teoksiin tai suorituksiin. Pohjoismaisissa lainvalmisteluasiakirjoissa mainitaan henkilöistä, joille voi syntyä tekijänoikeus koko elokuvateokseen, yleensä käsikirjoittaja ja ohjaaja. Syntyykö muille elokuvan valmistukseen taiteellisella panoksella osallistuville henkilöille tekijänoikeus koko elokuvaan vai vain omaan osuuteensa, riippuu heidän osuutensa merkityksestä elokuvalle kokonaisuutena. Tällaisia tekijöitä voivat olla muun muassa elokuvamusiikin tekijä, kuvaaja, leikkaaja, lavastaja, arkkitehti ja koreografi.

19. Viimeksi mainitussa teoksessa on edelleen todettu (s. 28 ja 29), että elokuvan oikeudenhaltijoiden määrittelyssä on ratkaisevaksi kysymykseksi muodostunut luovan työn ja teknisen taidon välisen rajan selvittäminen. Määräävin seikkoina on pidetty työn (taiteellista) itsenäisyyttä ja omaperäistä ilmaisua. Työn itsenäisyyttä arvostellaan elokuvan tekemisessä yleensä sen perusteella, kuinka itsenäisesti henkilö työskentelee suhteessa elokuvan ohjaajaan. Tällä tarkoitetaan taiteellisten kriteerein itsenäiseksi katsottavaa luovaa työtä. Yksittäisen tekijän taiteellinen luova panos määräytyisi näin kunkin elokuvateoksen käsikirjoituksen ja ohjauksen perusteella, ja viime kädessä vasta käytännön valmistusprosessissa.

20. Asiassa esitetyn yhdenmukaisen todistelun perusteella idea elokuvaan on tullut JP:ltä, käsikirjoittajina ovat toimineet ainakin F ja G ja elokuvan ohjaajana on toiminut TV. Elokuvan lavastajina ovat toimineet H ja erityisesti digitaalisten lavasteiden osalta JL, joka on myös ollut elokuvan taiteellinen johtaja. Visuaalista tehosteista on muiden tehtävien ohella vastannut ST. Elokuvan tekemiseen on osallistunut kaiken kaikkiaan satoja henkilöitä.

21. Henkilökantajat ovat tehneet elokuvaan tietokoneella luotuja kolmiulotteisia pääosin eri avaruusaluksia koskevia malleja ja animaatioita. Asiassa esitetyn todistelun perusteella C on toiminut lähinnä tietokoneanimoinnin yhtenä esimiehenä CGI supervisor tehtävässä. A, D ja B ovat toimineet pääsääntöisesti mallintamisen ja osin animointiin liittyvien tehtävien parissa. E on ainakin ohjannut mallintajia ja animoijia Maya-ohjelman käytössä, ja B on myös yhdistänyt ja yhteensovittanut Götterdämmerung-aluksen ulkokuoreen eri henkilöiden tekemiä osia. A:n ja D:n ei ole näytetty ohjanneen muiden työskentelyä, eikä heillä ollut projektiin tullessaan kovin laajaa kokemusta visuaalisten tehosteiden tekemisestä. Tietokoneella luotujen

VALVE_025

visuaalisten tehosteiden kannalta keskeisiä henkilöitä on ollut ainakin kymmenkunta ja kaiken kaikkiaan tehosteiden tekemiseen on osallistunut ainakin noin 30 henkilöä.

22. Henkilökantajat ovat esittäneet, että heidän luovan ja itsenäisen työn osuus elokuvassa ja sen tarinassa on ollut niin merkittävä, että se tuottaa tekijänoikeuden koko elokuvaan. Markkinaoikeus toteaa, että henkilökantajien työtä voidaan sinänsä pitää elokuvan kannalta merkityksellisenä. Markkinaoikeus katsoo, että asiassa esitetyn todistelun perusteella elokuvassa tietokoneella luodut visuaaliset tehosteet ovat olleet sinänsä keskeisiä ja elokuvassa on useita kokonaan näin luotuja kohtauksia, mutta kerronnallisesti ja ajallisesti ne eivät ole kuitenkaan olleet elokuvassa pääosassa tai määrittäneet kyseistä elokuvaa sellaisella tavalla, jolla olisi olennaista merkitystä koko elokuvateoksen tekijää koskevassa tekijänoikeudellisessa arvioinnissa.

23. Markkinaoikeus toteaa, että edellä todetulla tavalla elokuvateoksen tekijöinä pidettävien henkilöiden joukko ei ole kovin laaja. Esimerkiksi edes elokuvan päävastuullista lavastajaa ei välttämättä voida pitää elokuvateoksen tekijänä. Markkinaoikeus katsoo, että henkilökantajat ovat olennaisesti ottaen toimineet erilaisissa rooleissa avustaen elokuvan tiettyjen osa-alueiden digitaalisten visuaalisten tehosteiden luomisessa, jota voidaan näiltä osin monilta osin rinnastaa lavastamiseen. Näyttämättä on jäänyt, että henkilökantajien rooli olisi ollut tyypillisesti elokuvan tekijöinä pidettäviin henkilöihin tai edes päävastuulliseen lavastajaan rinnastettavissa.

24. Edellä todetuilla perusteilla markkinaoikeus katsoo, ettei henkilökantajia voida pitää koko elokuvateoksen osalta tekijöinä riippumatta siitä, olisiko heidän visuaalisiin tehosteisiin liittyvä työnsä ollut heidän esittämällään tavalla itsenäistä ja omaperäistä ja olisiko heillä erikseen tekijänoikeus elokuvassa ilmeneviin aluksiin tai muihin yksittäisiin teoksiin. Näin ollen vahvistusvaatimus 1 on jo tällä perusteella hylättävä.

*4 Henkilökantajien vaatimukset tekijänoikeudesta yksilöityihin teoksiin*

*4.1 Vaatimukset ja tarkastelun oikeudelliset lähtökohdat*

25. Käsillä olevassa kannevaatimuksessa 2 on vaadittu vahvistettavaksi, että henkilökantajilla on eritellyllä tavalla tekijänoikeus Iron Sky elokuvassa käytettyihin avaruusaluksiin tai muihin yksilöityihin teoksiin. Kannevaatimuksella 2 on katsottava tarkoitetun vaatimuksen ja oikeudellisen intressin tueksi esitetyt perusteet sekä oikeuksien luovuttamiseen liittyvä kannevaatimus 3 huomioon ottaen sen vahvistamista, että henkilökantajille on syntynyt tekijänoikeus riippumatta siitä, onko tämä tekijänoikeus mahdollisesti joltakin osin sittemmin luovutettu.

26. Niin sanotuista yhteisteoksista säädetään tekijänoikeuslain 6 §:ssä. Säännöksen mukaan jos kaksi tai useammat ovat yhdessä luoneet teoksen heidän osuuksiensa muodostamatta itsenäisiä teoksia, on tekijänoikeus heillä yhteisesti. Kannevaatimuksessa 2 on kysymys siitä, että ainakin henkilökantajat olisivat yksilöityjen teosten tekijöitä riippumatta siitä, olisiko teosten tekijöinä mahdollisesti pidettävä muitakin henkilöitä.

27. Henkilökantajilla on oikeudenkäymiskaaren 17 luvun 2 §:n mukaisesti näyttötaakka siitä, että kannevaatimuksessa 2 yksilöidyt alukset ja muut väitetyt teokset ovat tekijänoikeuslaissa tarkoitettuja teoksia ja että henkilökantajia on pidettävä niiden tekijöinä.

28. Markkinaoikeus on asian valmistelussa kiinnittänyt huomiota kannevaatimuksiin ja -perusteisiin ja tämän johdosta esittänyt asian selvittämistä varten tarpeelliset kysymykset. Vaatimukset ja perusteet ovat valmistelun kuluessa ja eräiltä osin tämän jälkeenkin täsmentyneet. Henkilökantajat ovat oikeudenkäymiskaaren 24 luvun 3 §:stä ilmenevän niin sanotun määräämisperiaatteen mukaisesti määrittäneet vaatimuksillaan ja niiden tueksi esitetyillä perusteilla oikeudenkäynnin kohteen.

29. Markkinaoikeus toteaa, että kannevaatimuksessa 2 on sinänsä yksilöity avaruusalukset ja muut väitetyt teokset. Kanteen perusteissa ei ole kuitenkaan nimenomaisesti tuotu esiin sitä, millaisesta tekijänoikeuslain 1 §:ssä tarkoitetusta teoksesta on kysymys ja näin ollen sitä, mitä vahvistusvaatimukset tarkalleen ottaen koskevat.

30. Edellä mainittu vaatimuksen ja sen tueksi esitettyjen perusteiden epäselvyys ja yksilöimättömyys korostuu erityisesti siltä osin kuin eräät henkilökantajat ovat vaatineet tekijänoikeuden vahvistamista alukseen Götterdämmerung ja kuutukikohtaan "mukaan lukien sisäpuoli".

31. Viimeksi mainitulla on katsottava tarkoitetun kaikissa elokuvan Götterdämmerung-alusta ja kuutukikohtaa koskevissa sisäpuolisissa kohtauksissa ilmenevää taustaa, jota vasten näyttelijöiden suoritukset näkyvät. Todistelun perusteella näitä taustoja on ollut hyvin monenlaisia ja ne ovat näkyneet elokuvassa varsin pitkän ajan, eivätkä henkilökantajat ole edes väittäneet tai todistelussa tuoneet ilmi tehneensä niistä kuin joitakin yksittäisiä osia. Markkinaoikeus katsoo, ettei mainittujen sisäosien kaikkia taustoja voida pitää sellaisina kanteen kannalta riittävästi yksilöityinä ja elokuvasta erotettavissa olevina omina teoksinaan, joidenka tekijöiksi henkilökantajat voitaisiin vahvistaa. Näin ollen vaatimus on joka tapauksessa hylättävä näiltä osin.

32. Muilta osin henkilökantajien on katsottava tarkoittaneen alusten, kuutukikohdan tai junan ulkopuolista visuaalista ilmettä mahdollisine ominaispiirteisine animointeineen. Sen sijaan vaatimuksen tueksi esitetyt perusteet huomioon ottaen vaatimuksella ei ole katsottava tarkoitetun esimerkiksi tekijänoikeutta kyseisten alusten kolmiulotteisiin tietokonemalleihin tai tiedostoihin sellaisenaan.

33. Henkilökantajat ovat jäljempänä todetusti esittäneet aluksia koskevan tekijänoikeutensa tueksi myös esimerkiksi aluksen lippujen valahtamista tai alusten tuhoutumista koskevan animoinnin. Markkinaoikeus katsoo, että näissä animaatiokohtauksissa on pikemminkin kysymys elokuvakohtausten tekemisestä kuin jostakin sellaisesta, minkä perusteella voisi syntyä tekijänoikeus kannevaatimuksessa 2 tarkoitetulla ja edellä kohdassa 32 todetulla tavalla itse aluksiin. Käsillä olevassa kannevaatimuksessa 2 ei ole siten myöskään kysymys tekijänoikeudesta yksilöityjä teoksia sisältäviin kaikkiin tai edes tiettyihin elokuvan kohtauksiin sellaisenaan.

34. Tekijänoikeusneuvosto on muun ohessa lausunnossaan 2014:6 todennut, että teoksella tarkoitetaan henkisen luomistyön tuotetta. Taiteellinen tuote kuten muutkin teokset on tekijänoikeudella suojattu, jos sitä voidaan pitää tekijänsä luovan työn itsenäisenä ja omaperäisenä tuloksena. Tällöin se ylittää teoskynnyksen eli saavuttaa teostason. Suojan edellytyksenä ei ole muita vaatimuksia. Edelleen lausunnon mukaan Euroopan unionin tuomioistuin (tuomio 1.11.2011, Painer, C-145/10, EU:C:2011:798) on katsonut, että teos voi saada tekijänoikeussuojaa, jos se on tekijänsä henkisen luomistyön tulos siten, että se kuvastaa tekijän persoonaa ja siitä käyvät ilmi tekijän vapaat ja luovat valinnat teosta tehtäessä.

35. Oikeuskirjallisuudessa on vielä muun ohessa esitetty (Harenko ym., Tekijänoikeus, 2016, s. 17), että omaperäisyydellä tarkoitetaan sitä, että kenenkään toisen kuin tekijän ei voitaisi olettaa päätyvän samankaltaiseen lopputulokseen, jos toinen ryhtyisi itsenäisesti vastaavaan luomistyöhön. Lain mukaisen suojan saamisen kannalta teoksen taiteellisella tai laadullisella arvioinnilla tai muillakaan vastaavilla seikoilla ei ole merkitystä.

VALVE_026

Merkitystä ei myöskään ole sillä, minkä laatuista ja miten paljon työtä tai aikaa tekijä on teokseensa käyttänyt. Niin ikään oikeuskirjallisuudesta ilmenee (Haarmann, Tekijänoikeus ja lähioikeudet, 2005, s. 67), että vaikka tuote olisi vaatinut kuinka paljon työtä ja taitoa tahansa, sitä ei pelkästään tällä perusteella voida pitää tekijäoikeuslaissa tarkoitettuna suojattavana teoksena.

36. Markkinaoikeus toteaa, että kolmiulotteisen mallin toteuttamisessa tarvittavan ohjelmiston osaaminen tai mallinnuksen tekniset yksityiskohdat taikka mallinnuksen työläys ovat edellä todetun perusteella käsillä olevassa tekijänoikeudellisessa arvioinnissa sellaisenaan merkityksettömiä. Myöskään kaksiulotteisten kuvien mahdollisimman tarkkaa ja ohjauksessa tapahtuvaa mallintamista kolmiulotteisiksi malleiksi ei sellaisenaan voida pitää itsenäisenä ja omaperäisenä luomistyönä.

*4.2 Yleistä todistelua ja alustavaa arviointia*

37. TV on häntä todistelutarkoituksessa kuultaessa kertonut toimineensa elokuvan ohjaajana ja käsikirjoittajana. Idea elokuvaan tuli JP:ltä ja sitä kehiteltiin porukalla. ST toi elokuvaan visuaalista ilmettä ja JL rakensi konkretiaa ideoiden perusteella ja toimi elokuvan digitaalisena lavastajana. Ennen kuvauksia hän keskusteli lähes päivittäin ST:n ja JL:n kanssa siitä, millaisista elementeistä elokuva koostuu. Kuvausten aikana ja niiden jälkeen hän keskusteli päivittäin tai viikoittain ST:n kanssa tehosteista ja tutustui tehtyihin tehosteisiin Dropbox-kansion kautta sekä kävi valkokankaalta läpi sitä, mitä kulloinkin tehtiin.

38. ST on häntä todistajana kuultaessa kertonut muun ohella osallistuneensa elokuvan ideointiin ja käsikirjoittamiseen ja toimineensa elokuvassa VFX supervisor -tehtävässä. Hänen tehtävänään oli muun ohessa visuaalista tehosteita tekevän tiimin rekrytointi ja työtehtävien määrittäminen ja yhteensovittaminen sekä ohjaajan vision välittäminen tiimille. Visuaalisen puolen osalta hän hyväksyi asioita ja delegoi niitä esimerkiksi JL:lle, I:lle, J:lle ja C:lle ja heille myös annettiin vastuuta tai vastuualueita toteutettaviksi ja valvottaviksi. ST on kertonut myös, että hän arvioi mallinnusta tekniseltä ja JL puolestaan visuaalisilta osin ja viime kädessä ohjaaja päätti mitä menee elokuvaan, että osa tehtävistä oli ulkoistettu taiteelliselle johtajalle eli JL:lle ja että aluksia koskevat päätökset teki JL ja lopullisesti TV.

39. JL on häntä todistajana kuultaessa kertonut toimineensa elokuvan ja visuaalisten tehosteiden taiteellisena johtajana ja suunnitteleena kaikki elokuvan avaruusalukset ja ideoineensa niitä TV:n ja ST:n kanssa. Vuonna 2008 hän teki ensimmäiset konseptikuvat lentävistä lautasista, avaruustaisteluista ja kuukaukikohdan sisäosista ja suunnitteli kartasti Valkyrie-aluksen ja aloitti George W. Bush -aluksen suunnittelun. JL:n mukaan hän hyväksyi kolmiulotteiset mallit. Hän ohjeisti mitä mallinnetaan ja antoi piirustukset, yksinkertaiset kolmiulotteiset malliluonnokset ja referenssikuvat ja ohjasi työskentelyä ja päätti siitä, milloin malli oli valmis. Malli oli hyvä silloin kun asiat olivat paikallaan ja kun se kunnioitti suunnitelman olemusta ja henkeä sillä tarkkuudella, millä se tullaan elokuvassa näkemään. Tämän lisäksi paljon tehtiin myös ylimäärästä yksityiskohtiin liittyvää työtä. Malleja tehdessä olikin tehtävä myös rajanvetoa sen suhteen, milloin malli on tarpeeksi hyvä elokuvaa varten, ja ST tai J joskus sanoivat, että mallia ei kannata tehdä enempää. JL on myös kertonut tehneensä konseptikuvia, yksinkertaisia malleja ja kommentoineensa malleja. Varsinaisten mallien tekeminen oli suuri työ, jonka vuoksi tämä jaettiin mallintajien tehtäväksi.

40. JP on häntä todistajana kuultaessa kertonut olleensa luomassa elokuvaa ja toimineensa yhteisöpäällikkönä, joka kertoi sivusta katsoen tarinaa elokuvan tekemisestä. Hänen mukaansa JL aloitti karkeilla paperille sutaistuilla luonnoksilla, joita JL, TV ja ST "pyörittelivät". Näitä seurasivat konseptikuvat, karkeat kolmiulotteiset mallit ja usein piirustukset, joiden pohjalta varsinainen mallinnus toteutettiin. Mallinnusta teki yhtä aikaa enimmillään noin 20, yhteensä 30–40 henkilöä. JL seurasi hyvin tarkkaan sitä, että aluksista tulee oikeannäköisiä ja JL oli hyvin tärkeässä osassa elokuvan visuaalisen ilmeen luomisessa. JP on myös kertonut, että JL:n mukaan tulo oli käännekohta projektissa, koska hänen visuaalinen tyyli vastasi visioita, ja JL:n näkemyksiin ja makuun voitiin luottaa. JP:n mukaan avaruustaisteluiden koreografia oli aika pitkälti ST:n suunnittelemaa ja niistä tehtiin karkeat kolmiulotteiset mallit (animatic).

41. Markkinaoikeus toteaa, että henkilökantajat eivät ole kanteen perusteissa juurikaan tarkemmin yksilöineet sellaisia tekijänoikeudellisessa arvioinnissa merkityksellisiä seikkoja, joiden perusteella heitä olisi pidettävä yksiteisten alusten ja muiden väitettyjen teosten tekijöinä. Näitä seikkoja on jossakin määrin tullut ilmi todistelusta. Tuotantoyhtiöt ovat puolestaan muun todistelun ohella esittäneet asiakirjatodisteinaan runsaasti JL:n laatimiksi esitettyjä osin varsin yksityiskohtaisia konsepti- ja viittauskuvia eri aluksista ja niiden sisätiloista.

42. Markkinaoikeus katsoo oikeudenkäymiskaaren 17 luvun 2 §:ssä tarkoitetulla tavalla erityisesti JL:n roolia koskevan todistelun perusteella uskottavasti näytetyksi, että henkilökantajien tehtäviä on ainakin lähes poikkeuksetta ohjattu erilaisin konsepti- tai viittauskuvin, kuvien päälle piirretyin ja suullisin ohjein sekä yleispiirteisenä että yksityiskohtaisena ohjauksena. Osan henkilökantajistakin mukaan JL:n ohjaus on voinut ajoittain jopa mennä liiallisuuksiin tai tarpeettomiin detaljeihin. Henkilökantajista ainakin C, E ja B olisivat ilmeisesti halunneet työskennellä itsenäisemmin sen perusteella, mitä heidän kertomuksistaan on pääteltävissä. Markkinaoikeus katsoo niin ikään selvitetyksi, että ohjaaja TV on puolestaan ohjannut ST:tä ja JL:ää.

43. Jotta henkilökantajien vaatimukset voisivat menestyä, heidän on edellä todettu huomioon ottaen lähtökohtaisesti näytettävä myös se, että heidän luomistyönsä on ollut tekijänoikeudellisesti merkityksellistä siitä huolimatta, että sitä on edellä todetusti eri vaiheissa ohjattu.

44. Useissa henkilökantajien esittämissä asiakirjatodisteissa, erityisesti aluksia esittävissä kuvaruutukaappauksissa (kuten 1–5, 11–14 ja 20–21) ja henkilökantajien omasta työstään kertovissa videotallenteissa (24, 35–37 ja 39) pääsääntöisesti esitetään alukset kokonaisuutena, henkilökantajien omaa panosta yksityiskohtaisesti erittelemättä. Niistä ei myöskään juurikaan ilmene, millaisia lähtötietoja henkilökantajille on annettu ja millaisten vaiheiden kautta he ovat lopputulokseen päätyneet taikka sitä, mikä on tarkalleen ottaen ollut heille tekijänoikeuden synnyttävää henkinen luomistyö, kun otetaan huomioon, että edellä todetusti mallintamiseen käytetty työmäärä tai tekniset ratkaisut eivät ole sellaisenaan tekijänoikeudellisesti merkityksellisiä. Vastaavasti edellä kohdissa 32 ja 36 todettu huomioon ottaen henkilökantajien asiakirjatodisteina 41–46 esittämillä mallinnustiedostoilla tai kuvaruutukappauksilla on vain rajallisesti merkitystä asian arvioinnissa. Niin ikään henkilökantajien asiakirjatodisteissa 38 ja 47 B ja A ovat esittäneet näkemyksiään alusten luomisprosessista, millä on muun ohella kyseisten henkilöiden todistelutarkoituksessa kuulemisen huomioon ottaen vain rajallisesti itsenäistä merkitystä näyttönä asiassa.

*4.3 Henkilökantajakohtainen todistelu ja sen arviointi*

*4.3.1 A*

45. A on vaatinut vahvistettavaksi, että hänellä on tekijänoikeus aluksiin Götterdämmerung mukaan lukien sisäpuoli, Liberty Capsule, Rheingold ja Zeppelin sekä Japanin edustajien alukseen, kuutukikohtaan (Schwarze Sonne) ja Helium 3 -junaan.

VALVE_027

46. A on häntä todistelutarkoituksessa kuultaessa kertonut, että hän on tehnyt kolmiulotteista mallinnusta ja teksturointia eli mallien pintojen kuviointia ja väritystä. Hänen mukaansa työ oli luovaa ja itsenäistä. Konseptimalleja, ideoita ja muita kuvia oli, mutta ne piti muuttaa kolmiulotteisiksi malleiksi ja se edellytti luovuutta. Henkilökantajien asiakirjatodisteesta 38 ilmenevin tavoin konseptimalleista ja ohjauksesta huolimatta hänen piti improvisoida ja käyttää tehtävien toteuttamisessa taiteellista kykyjään, mutta paljon aikaa kului tarpeettomaan pienten yksityiskohtien hiomiseen.

47. A on kertonut tehneensä Yhdistyneestä kuningaskunnasta käsin ennen Suomeen tuloaan Rheingold-aluksen mallin kolmea versiota JL:n kanssa. Tämä kesti kauan, koska JL halusi koko ajan lisää muutoksia ja lopulta A katsoi, että alus oli jo valmis. JL on puolestaan kertonut, että A sai käyttöönsä konseptikuvat ja yksinkertaisen kolmiulotteisen mallin ja että tuotantoyhtiöiden asiakirjatodisteesta 19 käyvät ilmi päivittäiset muutokset malliin. JP ja TV ovat kertoneet, että Rheingold oli perinteinen lentävä lautanen. Henkilökantajien asiakirjatodisteesta 38 ilmenee, että A:n mielestä konseptimallia mallinnettaessa "palaset eivät sopineet yhteen" ja hän käytti kykyjään yhteensovittamiseen.

48. Markkinaoikeus katsoo näytetyksi, että JL on luonut tuotantoyhtiöiden asiakirjatodisteista 15 ja 19 ilmenevän Rheingold-aluksen kahdesta eri suunnasta näkyvän varsin yksityiskohtaisen konseptikuvan ja yksinkertaisen mallin, joiden pohjalta A ryhtyi JL:n ohjeiden mukaisesti toteuttamaan aluksen mallinnusta. A ei ole lähemmin yksilöinyt millaista omaperäistä ja itsenäistä luomistyötä hän olisi tehnyt ja markkinaoikeus katsoo jääneen näyttämättä, että A:ta olisi pidettävä kyseisen aluksen tekijänä.

49. A on myös kertonut, että hänellä oli kunnia "saada elokuvan ensimmäinen kuva", jossa näkyi Liberty Capsule -alus. Henkilökantajien asiakirjatodisteessa 38 A on esittänyt tehneensä kyseisen aluksen käyttäen internetistä löytämiään malleja ja referensseja ja käyttäen luovuuttaan laittamalla yksityiskohdat oikeille paikoille, jotta malli näyttäisi realistiselta. TV on kertonut, että aluksella pyrittiin realistiseen Yhdysvaltojen National Aeronautics and Space Administrationin (NASA) kiertoratamoduulin kuvaamiseen. Markkinaoikeus katsoo, että kysymyksessä oleva alus on pyritty mallintamaan tarkasti olemassa olevien kuvien ja mallien perusteella ja lähemmin yksilöimättä on jäänyt, mitä tekijänoikeudellisesti merkityksellistä luomistyötä A olisi tehnyt. Markkinaoikeus katsoo jääneen näyttämättä, että A:ta olisi pidettävä aluksen tekijänä.

50. A on lisäksi kertonut tehneensä B:n ja E:n ohjeiden perusteella osia Götterdämmerung-aluksesta. Henkilökantajien asiakirjatodisteessa 38 on tuotu esiin teksturointi ja yksityiskohtien tekeminen sekä sisäosien osalta, että hän suunnitteli komentosillan taustalla näkyvät pilarit ja holvikaaret; katto-osat perustuivat uusklassisiin internetistä löytyneisiin arkkitehtuurimalleihin. Käsillä oleva vaatimus perustuu vain mainittuun aluksen sisätiloja koskevaan työhön, jolta osin vaatimus on edellä todetusti hylättävä, ja markkinaoikeus katsoo jääneen näyttämättä, että A:ta olisi pidettävä kyseisen aluksen tekijänä.

51. A on edelleen kertonut ST:n pyytäneen mahdollisimman yksinkertaisia neliönmuotoisia panssaroituja levyjä Zeppelin-alukseen ja hän teki tämän, mutta ei mitään muuta tai muita elementtejä. Henkilökantajien asiakirjatodisteessa 38 A on esittänyt tehneensä kuutiokohdan sisäänkäyntiin liittyviä töitä ja Helium 3 -junaan yksityiskohtia. Markkinaoikeus katsoo jääneen näyttämättä, että A:ta olisi pidettävä Zeppelin-aluksen, Helium 3 junan tai kuutiokohdan tekijänä.

52. A on vielä kertonut tehneensä, mallintaneensa ja kokonaan teksturoineensa Japanin edustajien aluksen. Henkilökantajien asiakirjatodisteen 38 mukaan alus oli kokonaan hänen tekemä ja mallintama ja jossa eräät luodut yksityiskohdat olivat NASA-viittauskuvien inspiroimia, ja pääosat ja paneelit olivat konseptimallista, mutta hän käytti luovuutta sijoittelussa, jotta lopputulos olisi realistinen. A:n kertoman mukaan työn hyväksyi C.

53. Markkinaoikeus toteaa, että tuotantoyhtiöt ovat viitanneet konseptikuviin yleisesti ottaen, mutta eivät ole esittäneet konseptikuvia tai muutakaan todistelua nimenomaan a konkreettisesti Japanin edustajien alusta koskien ja erityisesti JL:n tai muiden henkilöiden roolista sen tekemisessä. Kokonaisvaikutelman perusteella aluksen suunnitteluun voidaan katsoa sisältyneen omaperäisiä valintoja. Esitetyn näytön perusteella markkinaoikeus katsoo, että A:lle on syntynyt tekijänoikeus kyseiseen alukseen tuomiolauselmasta ilmenevin tavoin. Muilta A:ta koskevilta osin kannevaatimus 2 on hylättävä.

*4.3.2 B*

54. B on vaatinut vahvistettavaksi, että hänellä on tekijänoikeus aluksiin Götterdämmerung mukaan lukien sisäpuoli, Rheingold, George W. Bush, Valkyrie sekä Australian edustajien alukseen, kuutiokohtaan (Schwarze Sonne) mukaan lukien sisäpuoli ja kuuhunlaskeutumisalukseen (Landing Module).

55. E on häntä todistelutarkoituksessa kuultaessa kertonut toimineensa "supervisorina" B:n animoidessa Götterdämmerung-alusta ja B:n puolestaan toimineen aluksen mallinnuksen ohjaajana. Hänen mukaansa B:llä oli vahva näkemys siitä, miten alus tehdään aikataulun puitteissa, ja B toimi itsenäisesti ja teki hyvää työtä. Aluksesta oli olemassa sivusta ja edestä JL:n tekninen piirustus, joiden pohjalta E suunnitteli mallinnusta.

56. B on häntä todistelutarkoituksessa kuultuna kertonut tehneensä muun ohessa aluksen pyörivän moottorin, konehuoneen ja hangaarin ja aluksen tuhoutumisanimaatiot. B on viitannut henkilökantajien asiakirjatodisteenaan 47 esittämään B:n lausuntopyyntöön tekijänoikeusneuvostolle. Lausuntopyynnön mukaan alus oli monimutkainen ja se valmiiksi rakentamiseen tarvittiin kokonainen työryhmä. Lisäksi lausuntopyynnön mukaan aluksen mallintamista tehtiin yksityiskohtaisesti ja mielikuvituksellisesti. Kuvasuunnitelmia tai muita käyttökelpoisia referensseja ei ollut tarjolla. Aluksesta näkyi elokuvassa myös lähikuvia, jonka vuoksi yksityiskohtien hiomiseen oli tehtävä työtä. Kyseisen asiakirjatodisteen mukaan B kokosi itsenäisesti aluksen takaosan omin ratkaisuihin pohjautuen, eikä hän varsinaisesti edes keskustellut kyseisestä rakenteista JL:n kanssa.

57. D on häntä todistelutarkoituksessa kuultuna kertonut, että B johti Götterdämmerung-aluksen mallintamista ja se jaettiin paloittain mallintajille. D oli yksi aluksen päämallintajista ja koko aluksen yläosa, moottoriosa ja pohja olivat hänen käsialaansa. B:llä ja JL:llä oli eri näkemyksiä aluksesta ja siitä tuli eri näköinen kuin alun perin oli suunniteltu. Suunnittelu ei ollut vielä valmis ja koska alus ei olisi muutoin valmistunut ajoissa, jo tehty neljäsosa aluksesta kopioitiin muihin osiin. B otti tässä johtajan paikan ja kertoi muille mallintajille mitä heidän pitäisi tehdä. Aluksen mallintaminen vei 5–8 henkilöltä kolme kuukautta. D:n valmistaman materiaalin hyväksyivät JL ja B, ja yleensä JL:ltä tarkistettiin, että tulos näytti hyvältä.

58. JL on kertonut, että B:lle annettiin tuotantoyhtiöiden asiakirjatodisteen 15 kohdasta "gotterdammerung30" ilmenevä kolmiulotteinen luonnossuunnitelma ja alus koottiin useiden henkilöiden tekemistä palasista. B sai tehtäväksi aluksen "layoutin", hän kokosi sen yhteen ja valmisteli sen animointia varten. JL:n mukaan ensimmäiset luonnokset konehuoneesta tulivat päälavastajalta ja yksi komponentti oli saanut mallin Titanicista. JL on lisäksi kertonut käyneensä läpi ongelmatilanteita mallintajien kanssa. TV on puolestaan kertonut, että aluksesta tehtiin JL:n kanssa useita versioita ja TV halusi siihen paljon liikkuvia osia, kuin "taskukellon sisuskalut avaruudessa", ja tämän pohjalta JL lähti määrittelemään alusta esittäen myös esimerkiksi, että aluksessa pitäisi olla "sydän joka sykkii", ja aluksen rakennettiin keskusmäntä ja pyörivää rataksia. JP on kertonut, että aluksen oli tarkoitus olla yhdistelmä kelloa ja dieselmoottoria ja JL:n ideaan mukaan kuin koko ajan liikkeessä olevan kellon koneisto.

59. Markkinaoikeus katsoo jääneen näyttämättä, että Götterdämmerung-aluksen sisäosien osalta B:tä olisi pidettävä kannevaatimuksessa 2 tarkoitetulla tavalla aluksen ja sen sisäosien tekijänä. Markkinaoikeus katsoo niin ikään edellä kohdassa 33 todettu huomioon ottaen jääneen näyttämättä, että B:tä olisi aluksen tuhoutumista koskevan kohtauksen perusteella pidettävä kannevaatimuksessa 2 tarkoitetulla tavalla kyseisen aluksen tekijänä.

60. Markkinaoikeus toteaa todistelun perusteella olevan selvää, että aluksen ulkomuotoon on mallinnettu hyvin suuri määrä erilaisia rataksia ja muita yksityiskohtia, joita edellä mainitussa alkuperäisessä mallissa ei ole ollut. Esitetyn perusteella karkealla tasolla havaittavat aluksen ominaispiirteet ovat kuitenkin jo olleet olemassa. Kyseisten yksityiskohtien toteuttamisesta B:n toimesta ja tähän liittyvistä työvaiheista ja ohjeistuksesta ei ole esitetty juurikaan selvitystä. Näissä olosuhteissa ei ole tarpeen lähemmin arvioida sitä, onko kyseisiin yksityiskohtiin liittynyt sellaista riittävän omaperäistä henkistä luomistyötä, että ne perustaisivat tekijänoikeuden kyseiseen alukseen. Markkinaoikeus katsoo jääneen näyttämättä, että B:tä voitaisiin pitää kyseisen aluksen tekijänä.

61. B on myös kertonut, että Rheingold-aluksen jalakset eivät toimineet ja hän animoi ne. Henkilökantajien asiakirjatodisteen 47 mukaan laskutelineille oli alustava animointirunko (riggaus), jonka oli aloittanut E, ja B teki sen valmiiksi ja että jalakset ja aluksen rungon tekivät toiset henkilöt. Markkinaoikeus katsoo jääneen näyttämättä, että B:tä olisi jalasten animoinnin perusteella pidettävä kyseisen aluksen tekijänä.

62. Henkilökantajien asiakirjatodisteiden 39 ja 47 mukaan B on mallintanut ja animoinut George W. Bush -aluksen tärkeimmät aseet. Kyseinen, päällisin puolin samankaltainen ase ilmenee myös tuotantoyhtiöiden asiakirjatodisteessa 15 ilmenevistä kuvista, joissa ainakin erät ovat JL:n kertoman mukaan hänen laatimiaan tai alustavasti mallintamiaan ja että useampi henkilö mallinsi "niitä" ja B ainakin valmisteli animointia. J:n mukaan aseen keskeisimmät piirteet oli määritelty konseptikuvissa jo vuonna 2008, hänellä oli ollut idea aseesta jo ennen Iron Sky projektin alkamista, sillä eräässä pelissä oli ollut hyvin samankaltainen ase, ja hän suunnitteli myös aseen liikkumisen ja ohjeisti mallintajia. Markkinaoikeus katsoo, että esitetyn perusteella B:n tekijänoikeus voisi kohdistua lähinnä aseen animointiin, jota ei voi kuitenkaan pitää ainakaan erityisen omaperäisenä. Markkinaoikeus katsoo jääneen näyttämättä, että B:n toimet aluksen aseeseen ja erityisesti sen animointiin liittyen olisivat olleet sellaisella tavalla omaperäisiä ja itsenäisiä, että häntä voitaisiin pitää kyseisen aluksen tekijänä.

63. B on lisäksi kertonut, että Valkyrie-alus täytyi mallintaa pitkälti uudestaan, koska se oli ensimmäisiä malleja ja sitä käytettiin runsaasti tuotannossa. B ei ole kuitenkaan kertonut, mitä hän olisi itse tehnyt, eikä ilmi ole tullut mitä tekijänoikeudellisesti merkityksellistä luomistyötä uudelleen mallintamisessa olisi tehty. Henkilökantajien asiakirjatodisteesta 47 on pääteltävissä, että aluksen eri versiot ovat hänenkin mukaan olleet toisten henkilöiden tekemiä. Markkinaoikeus katsoo jääneen näyttämättä, että B:tä olisi pidettävä kyseisen aluksen tekijänä.

64. B on edelleen kertonut, että Australian edustajien aluksen osalta kaikki animaatiot ja liikkeet kuuluivat hänen työtehtäviinsä ja aluksia tehtiin yhteistyössä. Tuotantoyhtiöiden asiakirjatodisteessa 15 on esitetty JL:n laatimia konsepti- ja muita eri suunnitteluvaiheen kuvia aluksesta. Markkinaoikeus toteaa, että lähemmin yksilöimättä on jäänyt, mitä tekijänoikeudellisesti merkityksellistä luomistyötä B olisi kyseiseen alukseen tehnyt. Markkinaoikeus katsoo jääneen näyttämättä, että B:tä olisi pidettävä kyseisen aluksen tekijänä.

65. B on vielä kertonut tehneensä kuutukikohtaan nostokurkikohtauksissa käytetyn monimutkaisen sisätilanäkymän. Henkilökantajien asiakirjatodisteen 47 mukaan B työskenteli Valkyrien hangaarikohtauksen luomiseksi yksin suullisen ohjeen ja JL:n hyvin alkeellisten luonnosten pohjalta, ja Rheingold-nostokurkikohtauksen parissa animoimalla nostokurkea. Markkinaoikeus toteaa, että B:n vaatimukset ovat perustuneet vain kuutukikohdan sisätiloihin ja katsoo jääneen näyttämättä, että B:tä olisi pidettävä kuutukikohdan tekijänä.

66. B on edelleen kertonut tehneensä kuuhunlaskeutumisaluksesta toisen mallin sen räjäyttämistä varten. Henkilökantajien asiakirjatodisteissa 39 ja 47 B on esittänyt vastanneensa yksin kuuhunlaskeutumisaluksen geometriasta sen räjähtäessä. TV:n mukaan alus oli tavanomainen ja NASA-mallin mukainen. Markkinaoikeus katsoo edellä kohdassa 33 todettu huomioon ottaen jääneen näyttämättä, että B:tä olisi pidettävä kyseisen aluksen tekijänä pelkästään räjäyttystä koskevan animoinnin perusteella.

67. Näin ollen B:n osalta kannevaatimus 2 on hylättävä.

*4.3.3 D*

68. D on vaatinut vahvistettavaksi, että hänellä on tekijänoikeus aluksiin Götterdämmerung mukaan lukien sisäpuoli, Zeppelin, George W. Bush ja Mir.

69. D on kertonut, että aluksista oli 1–2 konseptikuvaa, joista välittyi tunnelma ja "yleisfiilis", ei yksityiskohtia. JL antoi hänelle muun ohessa kansion toisen maailmansodan aikaisista kuvista. D:n mukaan mallinnusta tehtiin 95 prosenttia ajasta omatoimisesti. Välillä tarkistettiin JL:ltä vastaisiko työ hänen näkemystään, jolloin JL hyväksyi sen tai pyysi tekemään pieniä korjauksia. Näin tehtiin erityisesti Mir-aluksen mallintamisen osalta.

70. D on myös kertonut edellä kohdassa 57 todetulla tavalla olleensa yksi Götterdämmerung-aluksen päämallintajista ja että koko aluksen yläosa, moottoriosa ja pohja olivat hänen käsialaansa. D:n valmistaman materiaalin hyväksyivät JL ja B, ja yleensä JL:ltä tarkistettiin, että tulos näytti hyvältä.

71. D on lisäksi kertonut, että henkilökantajien asiakirjatodisteesta 35 ilmenevästi Zeppelin-aluksen pohjalla oli malli, josta ilmeni muoto. Aluksen tuli mallintaa massiivisten metalliovien avautuminen ja takaosat, joista moottoriosan teki toinen henkilö. Etenkin metallirakenteiden osalta työssä oli paljon omatoimisuutta. JP on kertonut, että JL:n ensimmäisissä konseptikuvissa näkyi se, kun George W. Bush -alus ampuu läpi Zeppelin-aluksesta.

72. D on edelleen kertonut tehneensä henkilökantajien asiakirjatodisteesta 35 ilmenevästi George W. Bush -aluksen etuosan kuorta ja pienempiä aseita sekä "rinkulan" yksityiskohtia ja keskusta-aluetta. JP on kertonut, että aluksesta oli monia versioita ja se oli saanut vaikutteita ISS-avaruusasemasta ja siihen sisältyi pyörivä osa painovoiman luomiseksi. Tuotantoyhtiöiden asiakirjatodisteessa 15 ilmenee useita kymmeniä ilmeisesti JL:n laatimia hyvin yksityiskohtaisia konseptikuvia alukseta sekä referenssejä.

73. Markkinaoikeus toteaa, että lähemmin yksilöimättä on jäänyt, mitä tekijänoikeudellisesti merkityksellistä luomistyötä D olisi Götterdämmerung-, Zeppelin- ja George W. Bush -aluksiin tehnyt. Markkinaoikeus katsoo jääneen näyttämättä, että D:tä olisi pidettävä kyseisten alusten tekijänä.

74. D on vielä kertonut, että hän mallinsi Mir-aluksen kokonaan itse JL:n konseptikuvien perusteella ja se oli monimutkaisin ja tarkin malli, ja että tähän kului paljon aikaa, vaivaa ja ajatusta. Kaksiulotteisen kuvan mallintaminen kolmiulotteiseksi edellyttää luovuutta. Verrattaessa hänen previsualisointimallin perusteella JL:n tekemään konseptikuvaan, muoto pysyi samana, mutta kaikki muu kehittyi. Mallin myöhemmin toisen henkilön toimesta tekittiin tekstuurit JL:n konseptin perusteella.

VALVE_029

75. Markkinaoikeus toteaa, että tuotantoyhtiöiden asiakirjatodisteesta 15 ilmenee, että Mir-aluksesta oli laadittu useita hyvin erilaisia konseptikuvia, joista kuitenkin viimeisimmät vastaavat ainakin päällisin puolin muodoiltaan hyvin pitkälti lopullista alusta. Markkinaoikeus katsoo jääneen näyttämättä, mitä sellaista tekijänoikeudellisesti merkityksellistä itsenäistä ja omaperäistä luomistyötä D olisi alukseen tehnyt, että häntä olisi pidettävä aluksen tekijänä.

76. Näin ollen D:n osalta kannevaatimus 2 on hylättävä.

*4.3.4 E*

77. E on vaatinut vahvistettavaksi, että hänellä on tekijänoikeus aluksiin Götterdämmerung mukaan lukien sisäpuoli ja Zeppelin sekä kuuhunlaskeutumisalukseen (Landing Module) ja kuutukikohtaan (Schwarze Sonne) mukaan lukien sisäpuoli.

78. E on kertonut tuoneensa projektiin toimintamallin, jolla isomman kokonaisuuden palasia voidaan jakaa eri henkilöiden tehtäväksi ja käytännössä toimineensa esituotannon suunnittelijana ja supervisor-tehtävässä tarkastaneensa päivittäin mitä on tehty ja tarvittaessa korjanneensa tai neuvoneensa korjauksissa. Hänen mukaansa "supervising" luovassa prosessissa tarkoittaa sitä, että lopputulos myös näyttää taiteellisesti hyvältä ja toimii ja että palaset sopivat yhteen kokonaisuuteen. E on toisaalta myös kertonut, että hänet syrjäytettiin hyvin aikaisessa vaiheessa kaikenlaisesta päätöksenteosta ja häntä kiellettiin antamasta palautetta mallintamisesta.

79. E on myös kertonut edellä kohdassa 55 todetulla tavalla toimineensa B:n ohjaajana tämän mallintaessa Götterdämmerung-alusta. Markkinaoikeus katsoo jääneen näyttämättä, että mainitun aseman johdosta tai muutoin E:tä olisi pidettävä kyseisen aluksen tekijänä.

80. E on lisäksi kertonut miettineensä L:n kanssa Zeppelinin sisätilat ja supervisorina "saatelleensa" kyseisen aluksen alusta loppuun. E:n mukaan esimerkiksi aluksen räjähtämisen kestoa ei ollut määritelty ja hän räjähdystä suunnitellessaan määritteli vaihe vaiheelta tarvittavat yksityiskohdat. JP on kertonut, että JL:n ensimmäisissä konseptikuvissa näkyi se, kun George W. Bush -alus ampuu läpi Zeppelin-aluksesta ja edellä todetusti sen, että ST suunnitteli avaruustaistelut.

81. Markkinaoikeus katsoo edellä kohdassa 33 todettu huomioon ottaen jääneen näyttämättä, että Zeppelin-aluksen räjähdyksen perusteella E:tä olisi pidettävä kyseisen aluksen tekijänä. Muilta osin perusteet vaatimuksille ovat jääneet pitkälti yksilöimättä ja rajoittuneet lähinnä muiden henkilöiden työn ohjaukseen ja yhteensovittamiseen. Näiltäkin osin on jäänyt näyttämättä, että E:tä olisi pidettävä aluksen tekijänä.

82. E on edelleen kertonut tehneensä animaation, jossa kuuhunlaskeutumisaluksesta laskeutuvat alas presidentinvaaleja koskevat liput. TV on kertonut, että alus oli tavanomainen ja NASA-mallin mukainen ja erityistä olivat liput. Markkinaoikeus katsoo edellä kohdassa 32 todettu huomioon ottaen jääneen näyttämättä, että E:tä olisi pidettävä kyseisen aluksen tekijänä.

83. E on vielä kertonut kuuaseman osalta mallintaneensa vain yhtä hissiä ja että hississä oli olemassa saksalaisen lavastussuunnittelijan piirustus, joka ei kuitenkaan tyydyttänyt, vaan häntä pyydettiin käyttämään mielikuvitusta ja tekemään toisenlainen tai sirompi. Markkinaoikeus katsoo jääneen näyttämättä, että kyseistä sisätiloja koskevan mallinnuksen perusteella E:tä olisi pidettävä kuuaseman tekijänä.

84. Näin ollen E:n osalta kannevaatimus 2 on hylättävä.

*5 Ovatko henkilökantajat luovuttaneet mahdollisia tekijänoikeuksiaan*

85. Vahvistusvaatimuksella 3 on vaadittu vahvistettavaksi, että henkilökantajat eivät ole luovuttaneet oikeuksia luomiinsa vaatimuksissa 1 ja 2 tarkoitettuihin teoksiin laajemmin tai muutoin kuin käytettäväksi vaatimuksessa yksilöidyin tavoin Iron Sky -elokuvaan liittyen.

86. Tekijänoikeuslain 27 §:n 1 momentin mukaan tekijänoikeus voidaan, 3 §:n säännöksistä johtuvin rajoituksin, luovuttaa kokonaan tai osittain. Asiassa ei ole ilmennyt riitaisuutta tekijänoikeuslain 3 §:ssä säädetyistä niin sanotuista moraalisista oikeuksista. Asian luonne ja vaatimuksen tueksi esitetyt perusteet huomioon ottaen vaatimuksen on katsottava koskevan tekijänoikeuslain 2 §:ssä tarkoitettuja taloudellisia oikeuksia.

87. Edellä todetusti kannevaatimus 1 on hylättävä ja myös kannevaatimus 2 on hylättävä muutoin kuin siltä osin, että A:ta on pidettävä Japanin edustajien aluksen tekijänä. Näin ollen kannevaatimusta 3 on tarpeen arvioida vain A:n mainitun teoksen osalta.

88. Tuotantoyhtiöiden asiakirjatodisteena 7 on esitetty A:n työsopimus, joka on koskenut aikaa 21.3.2011–31.10.2011. A on kertonut, että hän aloitti työnsä Japanin edustajien aluksen tai Götterdämmerung-aluksen sisätilojen parissa. Markkinaoikeus katsoo näytetyksi, että A on tehnyt Japanin edustajien aluksen mainitun sopimuksen puitteissa.

89. Kyseisessä sopimuksessa on mainittu "Project: Iron sky" ja kohdassa "Rights" on todettu seuraavaa:

"The employee shall give the employer exclusive rights to any material created during work as well as the motion picture itself, including but not limited to unlimited rights to produce, distribute, perform and promote the film in any form, via any distribution method, in all countries. Such rights are transferable to a third party (such as Blind Spot Pictures) without hearing the employee. The compensation agreed on in this contract includes compensation for any such rights."

90. Markkinaoikeus toteaa mainitun sopimuksen sanamuodosta "any material created during work" ilmenevän, että sopimuksella A on luovuttanut työnantajalle yksinoikeudella tekijänoikeuslain 2 §:ssä tarkoitetut oikeudet kaikkeen tekemäänsä aineistoon. Edelleen sanamuotona "including but not limited to unlimited rights to" perusteella markkinaoikeus katsoo, että oikeuksien luovutus on koskenut kaikkia hyödyntämismuotoja ja sopimuksessa erikseen luetellut hyödyntämismuodot ovat olleet vain esimerkinomaisia. Myös työnantajan oikeudesta luovuttaa oikeudet edelleen on sovittu nimenomaisesti.

91. Tekijänoikeuslain 28 §:n mukaan ellei toisin ole sovittu, ei se, jolle tekijänoikeus on luovutettu, saa muuttaa teosta eikä luovuttaa oikeutta toiselle.

92. Kyseiseissä säännöksessä säädettyjen edelleenluovutus- ja muunteluoikeuksien osalta oikeuskirjallisuudessa (Harenko ym., Tekijänoikeus, 2016, s. 351) on esitetty, että jos osapuolten tarkoituksena on, että luovutus pitää sisällään myös muuntelu- tai edelleenluovutusoikeuden, on tämä mainittava nimenomaisesti luovutussopimuksessa. Maininnan puuttuminen ei toisaalta merkitse sitä, ettei luovutuksensaaja olisi voinut saada hyväkseen myös

VALVE_030

näitä oikeuksia. Oikeuskirjallisuudessa on myös todettu (Haarmann, Tekijänoikeus ja lähioikeudet, 2005, s. 309), että lainkohdassa tarkoitetun sopimuksen ei tarvitse olla nimenomainen; olosuhteista ja luovutuksen tarkoituksesta voidaan päätellä tiettyjen muutosten olevan sallittuja. Esimerkiksi lehden julkaisijan katsotaan olevan oikeutettu tekemään julkaistavakseen ottamiinsa kirjoituksiin niin sanottuja toimituksellisia muutoksia. Työsuhteen osalta viimeksi mainitussa teoksessa on todettu (s. 323), että yleisenä voitaneen nykyään pitää ajattelumallia, jonka mukaan työnantaja saa sopimusten puuttuessa työntekijänsä luomaan teokseen normaalin toimintansa edellyttämän käyttöoikeuden. Se oikeus, jonka työnantaja kuvatun ajattelumallin mukaan sopimuksen puuttuessa työntekijänsä teoksesta saa, on yleensä eksklusiivinen.

93. Markkinaoikeus toteaa, että käsillä olevassa asiassa työsopimuksessa ei ole nimenomaisesti erikseen mainittu muunteluoikeutta. Markkinaoikeus on kuitenkin edellä katsonut, että sopimuksella on luovutettu oikeudet kaikkeen työsuhteessa luotuun aineistoon ja luovutus koskee rajoituksetta kaikkia hyödyntämistapoja. Markkinaoikeus katsoo lisäksi, että elokuva-alalla työnantajan normaalin toiminnan edellyttämän käyttöoikeuden on tyypillisesti katsottava olevan varsin laajan ja sisältävän myös oikeuden tietynasteiseen muunteluun. Nyt käsillä olevassa asiassa alukset on teknisistä syistä ollut välttämätöntä luoda elokuvaa varten useissa eri perättäisissä työvaiheissa, joista yksi on ollut mallinnus. Työvaiheista ovat vastanneet osin eri henkilöt ja myös yksittäiseen työvaiheeseen, kuten mallinnukseen, on voinut osallistua samankin aluksen osalta useita henkilöitä. Markkinaoikeus katsoo, että elokuvan digitaaliset visuaaliset tehosteet alukset mukaan lukien ovat olleet sen luonteisia, että niitä on ollut tarpeen ja tarkoituskin vielä tarvittaessa muunnella ja että A:n on tullut ymmärtää tämä. Edellä todetun perusteella markkinaoikeus arvioi kokonaisuutena, että nyt käsillä olevassa asiassa A:n on katsottava joka tapauksessa luovuttaneen yksinoikeudella myös muunteluoikeuden.

94. Henkilökantajien mukaan asiassa tulee tarpeen mukaan ja soveltuvin osin soveltaa tekijänoikeuslain 29 §:ssä säädettyä sovittelusäännöstä ja tulkita mahdollisia sopimuksia suppeasti myös sen johdosta, että kantajien suoritukisstaan saama korvaus on ollut olennaisen pieni.

95. Tekijänoikeuslain 29 §:n 1 momentin mukaan, jos teoksen alkuperäisen tekijän tekijänoikeuden luovutuksesta tekemän sopimuksen ehto on alalla vallitsevan hyvän sopimustavan vastaisella tavalla tai muutoin kohtuuton tai sen soveltaminen johtaisi kohtuuttomuuteen, ehtoa voidaan sovitella tai se voidaan jättää huomioon ottamatta. Pykälän 2 momentin mukaan kohtuuttomuutta arvioitaessa on otettava huomioon sopimuksen koko sisältö, osapuolten asema, sopimusta tehtäessä ja sen jälkeen vallinneet olosuhteet sekä muut seikat.

96. A on kertonut työskennelleensä Rheingold-aluksen parissa aluksi Yhdistyneestä kuningaskunnasta käsin ilman korvausta, koska hän halusi työskennellä Iron Sky -elokuvassa ja tällöin koko ajan tienteensä haluavansa tulla projektiin, koska kysymyksessä oli hänen ensimmäinen elokuvansa. A on niin ikään kertonut toivoneensa uutta uraa ja hyväksyneensä sopimuksen, vaikka olikin mielestään alipalkattu. A:n työsopimuksen mukainen palkka oli 2.200 euroa kuukaudessa.

97. Markkinaoikeus toteaa edellä mainitun oikeuksien luovutusta koskevan sopimuksen olevan sanamuodoltaan yksiselitteinen ja A:n tietoisesti hyväksyneen sopimuksen, eikä A:n kertomus huomioon ottaen asiassa ole ilmennyt perusteita tulkita sopimusta myöskään tekijänoikeuslain 29 §:n perusteella muutoin kuin edellä kohdissa 90 ja 93 todetulla tavoin. Kannevaatimus 3 on näin ollen hylättävä myös A:n edellä mainituilta osin.

98. Koska tekijänoikeutta elokuvaa koskeva vahvistusvaatimus 1 on hylättävä ja tekijänoikeutta elokuvaa varten tehtyihin materiaaleihin koskeva vahvistusvaatimus 2 on pääosin hylättävä ja muilta osin materiaaleja koskevat luovutettavissa olleet tekijänoikeudet muunteluoikeus mukaan luettuna on luovutettu yksinoikeudella työnantajalle ja ollet luovutettavissa eteenpäin, eivät tuotantoyhtiöt ole voineet vahvistusvaatimuksessa 4 tarkoitetulla tavalla loukata henkilökantajien tekijänoikeutta ja siten kyseinen vaatimuskin on hylättävä. Niin ikään edellä mainittuihin vahvistusvaatimuksiin tai niiden menestymiseen perustuvat kieltovaatimukset 5 ja 6 on hylättävä.

*6 Tuotantoyhtiöiden vastakanteessa esittämät vaatimukset*

99. Vastakanteen vahvistusvaatimuksessa 1 on vaadittu vahvistettavaksi, että henkilökantajilla ei ole tekijänoikeuslain eräiden säännösten mukaista tekijänoikeutta Iron Sky -elokuvaan versioineen tai oikeutta mihinkään kyseisiin elokuviin tekemäänsä materiaaliin. Tuotantoyhtiöt ovat perustaneet vaatimuksen siihen, että henkilökantajat ovat luovuttaneet elokuviin ja niihin tekemiinsä materiaaleihin liittyvät mahdolliset tekijänoikeuslain 2 §:n mukaiset tekijänoikeutensa työnantajalleen yksinoikeudella.

100. Oikeudenkäymiskaaren 24 luvun 3 §:n 2 momentin mukaan asiassa, jossa sovinto on sallittu, tuomiota ei saa perustaa seikkaan, johon asianosainen ei ole vaatimuksensa tai vastustamisensa tueksi vedonnut. Henkilökantajat ovat vaatineet vaatimuksen tutkimatta jättämistä tai hylkäämistä vastustaen kyseistä vaatimusta ainoastaan sillä perusteella, ettei samasta kysymyksestä ole nostettavissa vastakannetta eikä vastakanteella olisi saavutettavissa parempaa tai laajempaa oikeussuojaa kuin vastustamalla pääkannetta. Markkinaoikeus on edellä kohdassa 13 katsonut, ettei kyseistä estettä vaatimuksen käsittelylle ole.

101. Edellä pääkanteen vahvistusvaatimusten 1–3 osalta todetusti henkilökantajille ei ole katsottava syntyneen tekijänoikeutta kyseiseen elokuvaan eikä tekijänoikeutta heidän yksilöimiinsä aluksiin tai muihin väitettyihin teoksiin A:n Japanin edustajien alusta lukuun ottamatta, miltä osin tekijänoikeuslain 2 §:ssä tarkoitetut oikeudet on kuitenkin yksinoikeudella luovutettu. Henkilökantajat eivät ole vastustamisensa tueksi edes väittäneet, että he olisivat luoneet muita teoksia, vaan päinvastoin katsoneet, että vastakanteessa on kyse samasta kysymyksestä kuin pääkanteessa ja ettei vastakanteella ole saavutettavissa laajempaa oikeussuojaa kuin vastustamalla pääkannetta. Näin ollen henkilökantajilla ei ole katsottava olevan vahvistusvaatimuksessa 1 tarkoitettua tekijänoikeutta mihinkään materiaaliin.

102. Edellä kohdassa 16 todetusti vielä julkaisemattomaan elokuvaan Iron Sky: The Coming Race kohdistuva vahvistusvaatimus 2 on hylättävä ennenaikaisena.

103. Vastakanteen vahvistusvaatimuksessa 3 on vaadittu vahvistettavaksi, että henkilökantajilla ei ole oikeutta käyttää mitään tekemäänsä Iron Sky -elokuviin liittyvää materiaalia. Tuotantoyhtiöt ovat perustaneet vaatimuksen siihen, että vaikka henkilökantajille olisikin syntynyt tekijänoikeus, se olisi luovutettu kokonaisuudessaan yksinoikeudella, eikä henkilökantajille olisi jäänyt oikeutta käyttää materiaalia itse. Henkilökantajat ovat vastustaneet vaatimusta muun ohella yksilöimättöminä.

104. Markkinaoikeus toteaa, ettei vaatimuksessa tai sen tueksi esitetyissä perusteissa ole yksilöity sitä, millä tavoin henkilökantajat eivät saisi käyttää kyseisiä materiaaleja. Tuotantoyhtiöiden on katsottava vaatineen, että henkilökantajat eivät saisi käyttää materiaaleja missään olosuhteissa. Tuotantoyhtiöt ovat siten yleisluontoisella vahvistusvaatimuksellaan käytännössä vaatineet markkinaoikeutta ennakollisesti ratkaisemaan sen, että kaikenlainen materiaalin käyttö loukkaisi tuotantoyhtiöille siirtynyttä tekijänoikeutta. Henkilökantajien on katsottava vaatimuksen yksilöimättömyydellä tarkoittaneen sitä, ettei vahvistusvaatimusta voi sen yleisluonteisuuden vuoksi hyväksyä. Markkinaoikeus edellä todetun perusteella katsoo, että vahvistusvaatimus 3 on hylättävä.

105. Vastakanteen vaatimuksessa 4 on vaadittu, että markkinaoikeus kieltää B:tä ja D:tä jatkamasta tuotantoyhtiöiden tekijänoikeuden loukkaamista ja määrää heidät sakon uhalla lopettamaan loukkaavan aineiston yleisön saataviin saattamisen. Tuotantoyhtiöt ovat perustaneet vaatimuksen siihen, että kyseiset henkilöt ovat käyttäneet tekijänoikeudella suojattua materiaalia pelituotantonsa markkinoinnissa ja B on käyttänyt 3D-tulosteissa elokuvan kuvamateriaalia, eikä heillä ole tai ole jäänyt oikeutta käyttää materiaalia itse. Henkilökantajat ovat vastustaneet vaatimusta sillä perusteella, että vaatimus on yksilöimätön, perusteeton ja toteen näyttämätön ja että käyttö ei olisi ollut tekijänoikeudellisessa mielessä relevanttia.

106. Tuotantoyhtiöiden asiakirjatodisteista 8 ja 10 ilmenee kuva avaruusaluksesta ja malli kolmiulotteista tulostamista varten. B on kertonut, että kyse on alusta alkaen uudelleen tehdystä ja muokatusta Valkyrie-aluksen mallista ja todisteen 8 kuva perustuu tähän malliin.

107. Tuotantoyhtiöiden vaatimus on perustunut elokuvan kuvamateriaalin luvattomaan käyttöön, mutta yksilöimättä on muun ohella jäänyt, mihin teokseen liittyvää tekijänoikeutta ja miten sitä on kyseisellä menettelyllä väitetty loukatun. Markkinaoikeus katsoo yhtäältä jääneen näyttämättä, että kyseisillä kuvilla olisi loukattu tuotantoyhtiöiden tekijänoikeutta Iron Sky elokuvateokseen. Toisaalta vaatimuksella on mahdollisesti tarkoitettu sitä, että elokuvaa varten tehdystä tekijänoikeuslailla suojatusta Valkyrie-aluksesta on tällä tavoin valmistettu kappaleita tai saatettu sitä yleisön saataviin.

108. Edellä todetusti B:lle ja D:lle ei ole katsottu syntyneen tekijänoikeutta Valkyrie-alukseen. Tuotantoyhtiöt eivät ole kuitenkaan väittäneet tai esittäneet sellaista selvitystä, jonka perusteella olisi todettavissa kenelle, jos kenellekään, tekijänoikeus kyseiseen alukseen olisi syntynyt ja onko tätä koskeva tekijänoikeus siirtynyt yksinoikeudella tuotantoyhtiöille taikka esittäneet muitakaan perusteita sille, miten B:n ja D:n menettely olisi loukannut niiden tekijänoikeuksia. Markkinaoikeus katsoo, että kyseisen tekijänoikeuden loukkaus on jäänyt näyttämättä eikä menettelystä ole tarpeen enemmälti lausua. Näin ollen edellytyksiä vaaditun kiellon ja loukkauksen lopettamisen määräämiselle ei ole ja kieltovaatimus 4 on hylättävä.

*7 Oikeudenkäynti- ja asianosaiskulut*

109. Oikeudenkäymiskaaren 21 luvun 1 §:n mukaan asianosainen, joka häviää asian, on velvollinen korvaamaan kaikki vastapuolensa tarpeellisista toimenpiteistä johtuvat kohtuulliset oikeudenkäyntikulut, jollei muualla laissa toisin säädetä. Luvun 3 §:n 1 momentin mukaan, jos samassa asiassa on esitetty useita vaatimuksia, joista osa ratkaistaan toisen ja osa toisen hyväksi, he saavat pitää oikeudenkäyntikulunsa vahinkonaan, jollei ole syytä velvoittaa asianosaista korvaamaan niitä osaksi vastapuolelle. Jos sillä, minkä asianosainen on hävinnyt, on vain vähäinen merkitys asiassa, hänen tulee saada täysi korvaus kuluistaan.

110. Pääkanteen osalta tuotantoyhtiöt ovat voittaneet asian lukuun ottamatta kokonaisuuden kannalta hyvin vähäiseksi jäänyttä osuutta A:n tekijänoikeuden syntymisestä yhteen alukseen, miltä osin tekijänoikeus on kuitenkin katsottu luovutetuksi yksinoikeudella. Markkinaoikeus katsoo, että tuotantoyhtiöillä on näin ollen lähtökohtaisesti oikeus saada täysi korvaus tarpeellisista toimenpiteistä johtuneista kohtuullisista oikeudenkäyntikuluistaan.

111. Vastakanteen osalta tuotantoyhtiöiden vahvistusvaatimus 1 on menestynyt, mutta muut vaatimukset on hylätty henkilökantajien pääosin vaatiman tutkimatta jättämisen asemesta. Markkinaoikeus toteaa, että yhtäältä vastakanteen vaatimukset ja niiden tueksi esitetyt perusteet ovat jääneet osin varsin epätäsmällisiksi ja toisaalta vastustamisen tueksi esitetyt perusteet varsin ohuiksi. Tämän perusteella pelkästään vastakannetta koskevat tosiasiassa aiheutuneet oikeudenkäyntikulut on katsottava määrältään puolin ja toisin pääkanteeseen verrattuna varsin vähäisiksi. Näissä olosuhteissa markkinaoikeus katsoo, että asianosaiset saavat pitää vastakannetta aiheutuneet oikeudenkäyntikulut vahinkonaan. Asiaa ei ole syytä arvioida henkilökantajien esittämin tavoin toisin oikeudenkäymiskaaren 21 luvun 4 tai 5 §:ssä säädetyn perusteella.

112. Pääkanteen osalta tuotantoyhtiöiden arvonlisäveroton oikeudenkäyntikuluvaatimus on ollut kulujen osalta määrältään 2.050 euroa ja palkkion osalta 54.000 euroa eli yhteensä 56.050 euroa sekä asianosaiskulujen osalta 10.500 euroa. Pääkanteen osalta henkilökantajien oikeudenkäyntikuluvaatimukseksi on puolestaan ilmoitettu yhteensä 50.144,80 euroa, johon on heidän mukaan vielä tullut lisätä arvonlisäveron määrä.

113. Pääkanteen osalta henkilökantajat ovat paljoksuneet tuotantoyhtiöiden palkkiovaatimusta 100 tuntia ylittävältä osin ja esittäneet, että heillä on ollut näyttötaakka ja lähtökohtaisesti enemmän toimenpiteitä vaativa asema prosessissa. Tuotantoyhtiöiden palkkiovaatimus pääkanteen osalta on käsittänyt toimenpiteitä noin 277 tunnilta, kun taas henkilökantajien osalta tämä on ollut noin 175 tuntia.

114. Tuotantoyhtiöt ovat esittäneet muun ohella, että ne ovat joutuneet käymään paljon aikaa haastehakemuksen epämääräisiin ja yksilöimättömiin vaatimuksiin ja niihin löyhästi liittyviin perusteluihin sekä virheellisyyksiin. Henkilökantajat ovat vasta oikeudenkäynnin loppuvaiheessa luopuneet vielä julkaisemattomaan elokuvaan liittyvästä loukkausväitteestään ja kohdistaneet sen vain elokuvan markkinointiin. Tuotantoyhtiöiden toimenpiteiden määrä on ollut asiaan nähden tarpeellinen.

115. Markkinaoikeus toteaa, että henkilökantajat ovat pääkanteen osalta määrittäneet oikeudenkäynnin kohteen sellaiseksi kuin se on ollut. Vaatimukset ja niiden tueksi esitetyt perusteet ovat olleet monilta osin varsin väljät ja asia on konkretisoitunut vasta vähitellen ja osittain vasta todistelussa. Markkinaoikeus katsoo, että näissä olosuhteissa ei ole ilmennyt perusteita sille, että tuotantoyhtiöiden toimenpiteet eivät olisi olleet tarpeellisia ja niistä aiheutuneet oikeudenkäyntikulut asian laatuun ja laajuuteen nähden kohtuullisia. Pääkanteesta johtuvien kulujen osalta ei ole esitetty huomautuksia. Henkilökantajat on näin ollen velvoitettava korvaamaan pääkanteen oikeudenkäyntikulut vaaditun määräisinä.

116. Oikeudenkäymiskaaren 21 luvun 8 §:n 1 momentin mukaan korvausta suoritetaan myös oikeudenkäynnin asianosaiselle aiheuttamasta työstä ja oikeudenkäyntiin välittömästi liittyvästä menetyksestä. Säännöksen esitöiden (HE 107/1998 vp s. 18) mukaan asianosaiselle itselleen suoritettavan oikeudenkäyntikulujen korvauksen tulee olla poikkeuksellista. Se ei saa olla korvaus oikeudenkäyntiin osallistumisesta tai siihen valmistautumisesta aiheutuvasta tavanomaisesta vaivannäöstä. Asianosaiselle itselleen työstä määrättävä korvaus tulee rajoittaa lähinnä tilanteisiin, joissa asianosainen itse on ammattitaitonsa tai erityisosaamisensa perusteella tehnyt sellaisia oikeudenkäynnin kannalta välttämättömiä paljon aikaa vaatineita toimenpiteitä, jotka jonkun muun suorittamina olisivat myös asiamiehen tai avustajan laskuttamia kulueriä.

117. Asianosaiskuluja on vaadittu korvattavaksi 14.500 eurolla, sisältäen TK:lta 150 tuntia, TV:ltä 100 tuntia ja K:lta 20 tuntia 50 euron tuntiveloituksella sekä TK:n matkakuluina 1.000 euroa, joista pääkanteen erittelemätön osuus on ollut 10.500 euroa. Kyseisistä kuluista tai niiden perusteista ei ole esitetty tarkempaa selvitystä. Henkilökantajat ovat tältä osin esittäneet, että tuotantoyhtiöiden asianosaiskulujen korvaamiseen ei ole erityisiä syitä, lukuun ottamatta TV:n ja TK:n henkilökohtaisen kuulemisen osalta 1,5 tunnilta 30 euron tuntitaksan mukaisesti, eli yhteensä 90 euroa. Tuotantoyhtiöt ovat tästä puolestaan lausuneet, että asianosaiskulujen osalta TK on ollut erityisesti tekemisissä vastaajayhtiöiden liiketoiminnan ja lisensoinnin kanssa ja TV:n rooli ohjaajana on ollut keskeinen ja hänen erityisosaamisensa on ollut tärkeää. Myös K:n läsnäolo on ollut tarpeen. Asianosaiskuluna vaadittu tuntiveloitus on ollut tavanomainen.

VALVE_032

118. Markkinaoikeus toteaa, että asian laatu ja todistelun laajuus ja yksityiskohtaisuus huomioon ottaen tuotantoyhtiöille on voinut aiheutua menetystä TK:n ja TV:n erityisosaamisensa puitteissa tekemistä paljon aikaa vaativista toimenpiteistä. Tarkemman selvityksen puuttuessa markkinaoikeus harkitsee kohtuulliseksi korvaukseksi TK:n osalta 1.500 euroa ja TV:n osalta 1.000 euroa. TK:n matkakuluista tai K:n osalta asianosaiskuluista ei ole esitetty sellaista selvitystä, että kuluja voitaisiin määrätä korvattaviksi.

**Tuomiolauselma**

Markkinaoikeus vahvistaa, että A:lle on syntynyt tekijänoikeus Iron Sky -elokuvassa käytettyyn Japanin edustajien alukseen.

Markkinaoikeus vahvistaa, että B:llä, C:llä, E:llä, D:llä tai A:lla ei ole tekijänoikeuslain 2 §:n, 6 §:n tai 46 a §:n mukaista tekijänoikeutta Iron Sky tai Iron Sky Director's tai Dictator's Cut elokuvaan taikka mihinkään kyseisiin elokuviin tekemäänsä materiaaliin.

Markkinaoikeus velvoittaa B:n, C:n, E:n, D:n ja A:n yhteisvastuullisesti korvaamaan Blind Spot Pictures Oy:n ja Iron Sky Universe Oy:n oikeudenkäyntikulut kulujen osalta 2.050 eurolla ja palkkion osalta 54.000 eurolla eli yhteensä 56.050 eurolla sekä asianosaiskulut 2.500 eurolla, molemmat määrät viivästyskorkoineen. Viivästyskorkoa on maksettava korkolain 4 §:n 1 momentissa säädetyn korkokannan mukaisesti siitä lukien, kun kuukausi on kulunut tämän tuomion antamisesta.

Markkinaoikeus hylkää muilta osin kanteen ja vastakanteen sekä vaatimukset oikeudenkäynti- ja asianosaiskulujen korvaamisesta.

**MUUTOKSENHAKU**

Muutosta tähän ratkaisuun saa hakea korkeimmalta oikeudelta valittamalla vain, jos korkein oikeus niillä erityisillä perusteilla, jotka ilmenevät oheisesta valitusosoituksesta, myöntää valitusluvan.

Määräaika valitusluvan pyytämiseen ja valituksen tekemiseen päättyy 30.7.2018.

Asian ovat yksimielisesti ratkaisseet markkinaoikeustuomarit Anne Ekblom-Wörlund, Markus Mattila ja Pekka Savola.

**Lainvoimaisuus**

Lainvoimainen
Finlex › Oikeuskäytäntö › Markkinaoikeus › 2018 › MAO:302/18

Finlex ® on oikeusministeriön omistama oikeudellisen aineiston julkinen ja maksuton Internet-palvelu.
Finlexin sisällön tuottaa ja sitä ylläpitää Edita Publishing Oy. Oikeusministeriö tai Edita eivät vastaa tietokantojen sisällössä mahdollisesti esiintyvistä virheistä, niiden käytöstä käyttäjälle aiheutuvista välittömistä tai välillisistä vahingoista tai Internet-tietoverkossa esiintyvistä käyttökatkoista tai muista häiriöistä.

# Attachment 1

| | | |
|---|---|---|
| **MARKKINAOIKEUS** | **TUOMIO** | Nro 302/18 |
| | **31.5.2018** | Dnrot 2017/588 ja 2017/701 |

**Diaarinumero 2017/588**

**KANTAJAT**          Sebastian Barquin
                     Trevor Baylis
                     Kelly Myers
                     Pyry Parkkola
                     Risto Puukko


**VASTAAJAT**         Blind Spot Pictures Oy
                     Iron Sky Universe Oy


**Diaarinumero 2017/701**

**KANTAJAT**          Blind Spot Pictures Oy
                     Iron Sky Universe Oy

**VASTAAJAT**         Sebastian Barquin
                     Trevor Baylis
                     Kelly Myers
                     Pyry Parkkola
                     Risto Puukko


**ASIA**              Tekijänoikeutta koskeva riita


**KANNE (dnro 2017/588)**

**Vaatimukset**

Sebastian Barquin, Trevor Baylis, Kelly Myers, Pyry Parkkola ja Risto Puukko ovat vaatineet, että markkinaoikeus:

1) vahvistaa, että Barquinille, Baylisille, Myersille, Parkkolalle ja Puukolle on syntynyt tekijänoikeus Iron Sky -elokuvaan ja sen Director's tai Dictator's Cut -versioon;
2) vahvistaa, että Barquinilla, Baylisilla, Parkkolalla ja Puukolla on tekijänoikeus Iron Sky -elokuvassa käytettyihin teoksiin seuraavasti:
   a. Sebastian Barquinilla aluksiin Götterdämmerung mukaan lukien sisäpuoli, Liberty Capsule, Rheingold ja Zeppelin sekä Japanin edustajien alukseen, kuutukikohtaan (Schwarze Sonne) ja Helium 3 -junaan,

      b. Trevor Baylisillä aluksiin Götterdämmerung mukaan lukien sisäpuoli, Rheingold, George W. Bush, Valkyrie sekä Australian edustajien alukseen, kuutukikohtaan (Schwarze Sonne) mukaan lukien sisäpuoli ja kuuhunlaskeutumisalukseen (Landing Module),

      c. Pyry Parkkolalla aluksiin Götterdämmerung mukaan lukien sisäpuoli, Zeppelin, George W. Bush ja Mir ja

      d. Risto Puukolla aluksiin Götterdämmerung mukaan lukien sisäpuoli ja Zeppelin sekä kuuhunlaskeutumisalukseen (Landing Module) ja kuutukikohtaan (Schwarze Sonne) mukaan lukien sisäpuoli;

3) vahvistaa, että Barquin, Baylis, Myers, Parkkola tai Puukko eivät ole luovuttaneet oikeuksia luomiinsa vaatimuksissa 1 ja 2 tarkoitettuihin teoksiin laajemmin tai muutoin kuin käytettäväksi Iron Sky -elokuvassa tai sen Director's Cut -versiossa elokuvateoksena muuttamattomana, sellaisenaan esitettäväksi tai tavanmukaisesti levitettäväksi yleisölle;

4) vahvistaa, että Blind Spot Pictures Oy ja Iron Sky Universe Oy ovat loukanneet heidän tekijänoikeutta luvattomasti käyttämällä ja/tai valmistamalla kappaleita ja saattamalla yleisön saataviin Iron Sky -elokuvaan tai sen Director's tai Dictator's Cut -versioon perustuvaa materiaalia;

5) kieltää Blind Spot Pictures Oy:tä ja Iron Sky Universe Oy:tä jatkamasta tai toistamasta vaatimuksessa 4 tarkoitettua tekijänoikeuden loukkausta;

6) kieltää Blind Spot Pictures Oy:tä ja Iron Sky Universe Oy:tä edelleen luovuttamasta oikeuksia Iron Sky -elokuvaan tai sen Director's tai Dictator's Cut -versioon muutoin kuin elokuvateoksena muuttamattomana, sellaisenaan esitettäväksi ja tavanmukaisesti levitettäväksi yleisölle, sekä miltään osin elokuvissa esiintyvien kantajien yksittäisiin teoksiin.

Lisäksi Barquin, Baylis, Myers, Parkkola ja Puukko ovat vaatineet, että markkinaoikeus velvoittaa Blind Spot Pictures Oy:n ja Iron Sky Universe Oy:n korvaamaan niiden oikeudenkäyntikulut kulujen osalta 901,20 eurolla ja palkkion osalta 49.243,60 eurolla eli yhteensä 50.144,80 eurolla viivästyskorkoineen.

**Perusteet**

*Asiavaltuudesta ja oikeuksien luovutuksen laajuudesta*

Barquin myötäpuolineen (jäljempänä myös henkilökantajat) eivät ole luovuttaneet tekijänoikeuksiaan Tuotantoyhtiö Energia Oy:lle muutoin tai laajemmalti kuin Iron Sky -elokuvaan. Kaikenlainen muu käyttö muunneltuna tai sellaisenaan loukkaa kantajien tekijänoikeutta. Kantajien luomia teoksia koskee tekijänoikeuslain 28 §:ssä säädetty muuttamis- ja edelleenluovutuskielto, koska muusta ei ole sovittu. Sopiminen on koskenut rajoitettua käyttöä, esimerkiksi elokuvan yleisölle esittämistä. Blind Spot Pictures Oy ja Iron Sky Universe Oy (jäljempänä myös

tuotantoyhtiöt) eivät ole voineet saada Tuotantoyhtiö Energia Oy:ltä enempää oikeuksia kuin mitä se on itse saanut.

Kanne perustuu henkilökantajien tekijänoikeuksiin ja heillä on asiassa asiavaltuus. Jo yksin väite tekijänoikeudesta perustaa asiavaltuuden. Henkilökantajien tekijänoikeus on kiistetty ja heillä on oikeudellinen intressi saada asiaan ratkaisu viime kädessä tekijänoikeuslain 3 §:ssä tarkoitettujen moralisten oikeuksien perusteella.

Asiassa tulee tarpeen mukaan ja soveltuvin osin soveltaa tekijänoikeuslain 29 §:ssä säädettyä sovitteluäännöstä ja tulkita mahdollisia sopimuksia suppeasti myös sen johdosta, että henkilökantajien suorituksistaan saama korvaus on ollut olennaisen pieni, eikä siten ole voinut senkään johdosta koskea muuta kuin suppeaa luovutusta Iron Sky -elokuvaan.

*Henkilökantajien tekijänoikeus koko elokuvaan ja yksittäisiin teoksiin*

Henkilökantajat ovat visuaalisten tehosteiden (VFX) ja tietokoneanimoinnin ammattilaisia. Henkilökantajien tekijänoikeus koko elokuvaan perustuu kaikkien henkilökantajien luovaan ja merkittävään osuuteen elokuvassa ilmenevien avaruusalusten ja kuutukikohdan sekä lukuisten kohtausten tekemisessä. Henkilökantajat ovat tehneet lukuisiin kohtauksiin liittyviä taustaympäristöjen yksityiskohtia ja luoneet kohtausten varsinaiset visuaaliset pääsisällöt tietokoneanimoidulta osin. Kolmiulotteinen mallinnus vaatii tekijältään itsenäisiä ja luovia ratkaisuja. Elokuvateosta kokonaisuutena tarkasteltaessa kantajien omaperäinen ja itsenäinen panos on ollut merkittävä. Henkilökantajien on tullut itsenäisesti luoda kohtausten sisällöt, koska elokuvan kuvaussuunnitelmasta ja niin sanotusta kuvasarjasta ei ole ilmennyt haluttuja tai tarkoitettuja sisältöjä yksityiskohtineen. Mikäli henkilökantajien luova panos poistettaisiin elokuvasta, jäljelle ei jäisi käsillä olevaa elokuvateosta vaan vain eräänlainen kehikko. Lisäksi henkilökantajilla on erikseen tekijänoikeus tiettyihin heidän luomiinsa elokuvassa käytettyihin itsenäisiin ja omaperäisiin avaruusaluksiin ja muihin yksilöityihin teoksiin. Henkilökantajat ovat olleet mukana luomassa näihin liittyviä animaatioita, ympäristöjä ja kohtauksia. Nämä teokset yksin ja elokuvakuvakokonaisuuden ja tarinan osana vievät olennaisella ja luovalla tavalla elokuvan tarinaa eteenpäin.

Sebastian Barquin on tehnyt elokuvaan Liberty Capsule, Rheingold ja Zeppelin -alukset ja Helium 3 -junan sekä kuutukikohdan ulko- ja sisäosat. Monien visuaalisten tehosteiden osalta Barquin on joutunut improvisoimaan ja käyttämään luovuutta annettujen tehtävien viimeistelemiseksi. Barquin on myös luonut muun ohessa Götterdämmerung-aluksen sisustuksia Trevor Baylisin kanssa sekä yksin erittäin yksityiskohtaisesti rakennetun Japanin edustajien aluksen.

Trevor Baylis on luonut yksin tai muiden kanssa useita elokuvan kohtauksia, kuten kuuhunlaskeutumisaluksen räjähdyskohtauksen, Rheingold UFO -nostokurkikohtauksen, Götterdämmerungin

konehuoneen, Rheingoldin laskutelineanimaatiot ja George W. Bushin tärkeimmät aseet. Baylis on ollut pääasiallisessa vastuussa Götterdämmerung-aluksen luomistyöstä, ja kyseinen alus sisältää erittäin suuren määrän yksityiskohtaista taiteellista panosta. Baylis on myös luonut kuutukikohdan ulko- ja sisäosat, Valkyrie- ja kuuhunlaskeutumisalukset sekä erittäin yksityiskohtaisesti rakennetun Australian edustajien aluksen.

Kelly Myersin tehtävänä on ollut VFX-tiimin johtaminen ja kompositointi eli kuvien liittäminen yhteen saumattomaksi yhdeksi uskottavaksi kokonaisuudeksi. Hänet on otettu projektiin mukaan kokeneena visuaalisten tehosteiden osaajana nimikkeellä CGI supervisor ja hän on toiminut muiden työntekijöiden luomistyön ohjaajana ja tuotantolinjasta vastuullisena hyväksyjänä. Myers on ollut luomassa, suunnittelemassa ja toteuttamassa useita kohtauksia, esimerkiksi avaruusalusten välisiä taistelukohtauksia.

Pyry Parkkola on tehnyt elokuvaan animointeja, 3D-malleja ja niin sanottuja previsualisointimalleja. Projektin kuluessa Parkkola on omaksunut kompositointiohjelman, jonka avulla hän on rakentanut monia elokuvaan sellaisenaan päätyneitä kohtauksia. Parkkola on ollut luomassa Götterdämmerung, Zeppelin ja George W. Bush -aluksia sekä yksin erittäin yksityiskohtaisesti rakennetun Mir-aluksen.

Risto Puukko on ollut merkittävän kokenut alan osaaja ja on osallistunut laajasti elokuvan kohtausten luomiseen. Puukko on toiminut muiden työntekijöiden luomistyön ohjaajana ja tuotantolinjasta vastuullisena hyväksyjänä. Puukko on esimerkiksi luonut Zeppelin-alusten räjäyttämisen avaruustaistelussa ja ollut luomassa Götterdämmerung ja Zeppelin -aluksia sekä kuuhunlaskeutumisalusta ja kuutukikohtaa.

Ohjaaja Timo Vuorensola ei ole merkityksellisellä tavalla vaikuttanut VFX-tiimin töiden ohjaamiseen ja siinä syntyneiden teosten luomiseen. Kaikki nämä ovat olleet VFX-tiimin jäsenten ja tässä tapauksessa henkilökantajien omaa, itsenäistä ja luovaa työtä. Vuorensola ja Samuli Torssonen ovat olleet ulkomailla tekemässä viimeisiä varsinaisia kuvauksia sinä ajankohtana, kun VFX-tiimi on viimeistellyt tiettyjä yksittäisiä teoksia ja näihin liittyviä animaatioita ja kohtauksia. Kuvakäsikirjoitus (storyboard) ei ole tältä osin sisältänyt ohjetta tai kohtauksen sisällön kuvausta, ainoastaan tekstin "Full CGI". Teosten jälkikäteinen hyväksyminen osaksi elokuvaa ei tarkoita teosten luomista tai teosten syntymistä kiinteän ohjauksen tai ohjeistuksen mukaisesti.

Edellä todetulla tavalla henkilökantajien tekijänoikeuksia ei ole riidanalaiselta osin luovutettu työnantajalle.

*Perusteet tekijänoikeuden loukkausta koskeville vaatimuksille 4–6*

Blind Spot Pictures Oy on loukannut henkilökantajien tekijänoikeutta luovuttamalla lisenssin Reality Pump Studios -nimiselle yhtiölle, joka on

valmistanut ja saattanut yleisön saataviin henkilökantajien tekijänoikeutta loukkaavan Iron Sky Invasion -tietokonepelin. Kyseisessä pelissä on hyödynnetty merkittävää määrää elokuvan audiovisuaalista aineistoa, muun ohella avaruusaluksia. Tuotantoyhtiöt ovat myös elokuvan pohjalta julkistamassa Iron Sky: The Roleplaying Game -peliä, jossa ennakkomarkkinoinnin perusteella tullaan käyttämään henkilökantajien tekijänoikeutta loukkaavaa aineistoa, ainakin Götterdämmerung-alusta.

Elokuvan jatko-osien sisältö ei ole vielä tässä vaiheessa henkilökantajien tiedossa, eivätkä vaatimukset 4 tai 5 koske elokuvan jatko-osia. Tuotantoyhtiöt tai ainakin Iron Sky Universe Oy ovat kuitenkin hyödyntäneet Iron Sky -elokuvaa ja siinä henkilökantajien teoksia tekeillä olevissa kyseisen elokuvan jatko-osien markkinoinnissa ja joukkorahoitusta hakiessaan käyttäessään luvatta Iron Sky -elokuvan kohtauksia ja ainakin seuraavia yksittäisiä teoksia: Götterdämmerung, Mir, Japanin edustajien alus ja kuutukikohta (Schwarze Sonne). Tämä loukkaa henkilökantajien tekijänoikeutta, koska tuotantoyhtiöille ei ole siirtynyt oikeuksia laajemmin tai muutoin kuin vain Iron Sky -elokuvaan eikä henkilökantajilta alkuperäisen elokuvan tekijöinä ole saatu tähän suostumusta.

Vaatimukset eivät ole ennenaikaisia. Markkinaoikeuden tulee kieltää pääkanteen vastaajia jatkamasta tai toistamasta kyseisiä tekijänoikeuden loukkauksia, mukaan lukien oikeuksien edelleen luovuttamisia.

Loukkausarvionnissa merkityksellistä on ulkoinen ilmenemismuoto, ei se, onko alkuperäisiä digitaalisia tiedostoja tai vastaavia teknisiä apuvälineitä mahdollisesti käytetty lopputuloksen valmistamisessa. Tuotantoyhtiöiden vetoaminen alalla vallitsevaan normaalikäytäntöön on merkityksetöntä ja tässä tapauksessa näin on erityisesti siksi, että Iron Sky -elokuvaprojekti on ollut varsin amatöörimäinen ja sitä on toteutettu elokuva-alan normaalista toimintatavasta poiketen muun ohessa vuorovaikutuksessa yleisön kanssa. Myöskään tekijänoikeuslain 46 a § ei luo oikeudellista perustetta harjoittaa liiketoimintaa tuotantoyhtiöiden esittämällä tavalla.

## VASTAUS

### Vaatimukset

Blind Spot Pictures Oy ja Iron Sky Universe Oy ovat vaatineet, että markkinaoikeus jättää kanteen tutkimatta tai hylkää sen.

Blind Spot Pictures Oy ja Iron Sky Universe Oy ovat lisäksi vaatineet, että markkinaoikeus velvoittaa Barquinin, Baylisin, Myersin, Parkkolan ja Puukon yhteisvastuullisesti korvaamaan niiden arvonlisäverottomat oikeudenkäyntikulut kulujen osalta 2.050 eurolla ja palkkion osalta 54.000 eurolla eli yhteensä 56.050 eurolla sekä asianosaiskulut 10.500 eurolla, molemmat määrät viivästyskorkoineen.

**Perusteet**

*Henkilökantajille ei ole syntynyt tekijänoikeutta tai kaikki oikeudet on
luovutettu yksinoikeudella eikä heillä ole asiavaltuutta tai oikeussuojan
tarvetta*

Henkilökantajille ei ole syntynyt tekijänoikeuksia tai mahdolliset
tekijänoikeudet on luovutettu kokonaisuudessaan yksinoikeudella
työnantajalle. Tämän vuoksi heillä ei ole asiavaltuutta esittää elokuvaan
tai sen materiaaleihin perustuvia tekijänoikeuksiin perustuvia vaatimuksia
ja kanne tulee jättää tutkimatta. Todetun johdosta kanne tulee jättää
tutkimatta myös oikeussuojan tarpeen puuttumisen vuoksi, koska asiassa
on vedottu vain tekijänoikeuslain taloudellisiin oikeuksiin ja niiden
väitettyihin loukkauksiin.

Konkludenttisesti ja viimeistään työsopimuksilla kaikki mahdolliset
oikeudet on kertakorvausta vastaan luovutettu yksinoikeudella
työnantajalle ja siltä edelleen tuotantoyhtiöille. Henkilökantajille ei näin
ollen ole jäänyt mitään oikeuksia. Oikeuksien luovutus ei ole koskenut
vain Iron Sky -elokuvaa, vaan kaikkea materiaalia ja elokuvaa sekä
oikeutta siirtää oikeudet edelleen. Kelly Myers on sopinut toimeksiannon
samoilla ehdoilla. Sopimusta tulee tulkita osapuolten tarkoituksen, alalla
vallitsevan tavan ja sanamuodon mukaisesti. Henkilökantajat ovat olleet
tietoisia luovutuksen laajuudesta ja yleisestä tavasta hyödyntää
materiaalia liiketoiminnassa. Sopimusten sovittelulle ei ole perusteita.

*Vaatimus kannevaatimusten 4 ja 5 ennenaikaisuudesta ja kanteen
yksilöimättömyydestä*

Iron Sky: The Coming Race ei ole vielä valmistunut täysin lopulliseen
muotoonsa ja Iron Sky: The Ark -elokuvan materiaalia vasta
valmistellaan. Kumpaakaan elokuvaa ei ole lopullisessa muodossaan
saatettu yleisön saataviin. Väitettyjä tekijänoikeuksia ei ole loukattu
yleisön saataviin saattamalla tai muutoin. Elokuvissa ei ole käytetty
henkilökantajien väitteiden mukaisesti luvattomasti aiempien elokuvien
materiaalia tai elementtejä sellaisenaan tai muokattuna. Jatko-osien tai
muun julkaisemattoman materiaalin, kuten The Coming Race ja The Ark
-elokuvien ja roolipelin, osalta ei voida vielä tehdä tekijänoikeudellista
arviointia ja kannevaatimukset 4 ja 5 tulee jättää tutkimatta tai hylätä
ennenaikaisina kyseisiltä osin.

Vaatimuksia ei ole yksilöity riittävästi kantajakohtaisesti. Vaatimuksen 4
osalta tekijänoikeuden loukkausta ei ole yksilöity eikä vaatimuksen 6
kohteena olevaa tekijänoikeutta ei ole riittävästi eritelty.

*Henkilökantajille ei ole syntynyt tekijänoikeutta elokuvaan tai sen osiin*

Henkilökantajille ei ole tekijänoikeuslain tai elokuva-alan
liiketoimintakäytännön perusteella syntynyt tekijänoikeutta elokuvaan.
Heidän panoksensa elokuvaan tai sen materiaaleihin ei ole ollut niin

luovaa, itsenäistä ja omaperäistä, että heille olisi syntynyt tekijänoikeus edes yksittäisiin kannevaatimuksessa 2 yksilöityihin elementteihin. Visuaalisten tehosteiden osalta ei ole syntynyt elokuvateoksesta erotettavaa tai erottuvaa itsenäistä tekijänoikeutta kenellekään. Visuaaliset tehosteet eivät ole sellainen osa elokuvaa, että henkilökantajat saisivat tekijänoikeuden koko elokuvaan yhteisteoksena.

Mahdollinen tekijänoikeus johonkin elokuvan yksittäiseen, erotettavissa olevaan osaan, esimerkiksi kannevaatimuksessa 2 yksilöityihin aluksiin, ei saisi aikaan tekijänoikeutta koko elokuvaan. Henkilökantajat ovat osallistuneet vain elokuvan yksittäisten kohtien, eivät koko elokuvan tekemiseen.

Henkilökantajat ovat osallistuneet elokuvatuotantoon eri suorittavissa ja avustavissa työrooleissa ja eritasoisina toimijoina. Osallistuminen ja osaaminen on ollut erilaista. Henkilökantajat ovat tehneet työtään elokuvan keskeisimpien henkilöiden kuten ohjaaja Vuorensalon, tehosteista sekä visuaalisesta ilmeestä vastanneiden henkilöiden Torssosen ja Lehtiniemen ohjauksessa ja kirjallisten ohjeiden ja videoiden mukaan. Henkilökantajat on nimetty elokuvan lopputeksteissä osalliseksi elokuvan tekoon, mikä ei kuitenkaan luo olettamaa tekijäasemasta. Lopputeksteissä luetellaan useat elokuvan tekemiseen osallistuneet tahot. Elokuvan tekijöinä pidetään esimerkiksi elokuvan ohjaajaa, näyttelijöitä ja käsikirjoittajaa. Elokuvassa ei ole kysymys tekijänoikeuslain 5 §:ssä tarkoitetusta kokoomateoksesta tai 6 §:ssä tarkoitetusta yhteisteoksesta.

Parkkola on ollut työelämään tutustuja projektiin tullessaan. Myers on tehnyt sopimuksen vasta maaliskuussa 2011. Baylis on liittynyt elokuvan tekoon ammatillisesti kokemattomana työharjoittelijana, ja hän on tehnyt tarkkaan ohjeistettua mekaanista työtä elokuvan ennalta suunniteltujen kolmiulotteisten mallien parissa. Baylis on avustanut materiaalin tekemisessä työnantajan ohjeiden mukaisesti apunaan ohjaajan ja tehostetuottajan ohjeistukset, käsikirjoitus, kuvakäsikirjoitus ja konseptitaidekuvat sekä muut ohjeet. Baylisin työvaiheet ovat olleet osa suurempaa kokonaisuutta. Baylisin rooli on ollut pieni, ei-luova ja mekaaninen, eikä hänen panoksensa ole ylittänyt niin sanottua teoskynnystä. Baylis ei ole tehnyt haastehakemuksessa yksilöityjä ja hänen tekijänoikeuden perusteina olevia elementtejä.

*Henkilökantajilla ei ole oikeuksia muuhun liiketoimintaan*

Elokuvaliiketoiminta perustuu elokuvien ja niihin sisältyvän materiaalin, eli kuvat, hahmot ja juoni, oikeuksien siirtämiseen, edelleen lisensointiin sekä jatko-osien ja oheismateriaalin tekemiseen ja teetättämiseen. Vaadittu kielto estäisi tuotantoyhtiöiden normaalin liiketoiminnan jatkamisen sisältäessään myös tuotantoyhtiöiltä kiistatta olevan tekijänoikeuslain 46 a §:n mukaiset oikeudet. Täten vaatimus on perusteeton, aiheeton, yksilöimätön ja shikaaninomaisena tuotantoyhtiöiden oikeusturvan vastainen.

## VASTAKANNE (dnro 2017/701)

**Vaatimukset**

Blind Spot Pictures Oy ja Iron Sky Universe Oy ovat vaatineet, että markkinaoikeus:

1) vahvistaa, että Trevor Baylisillä, Kelly Myersilla, Risto Puukolla, Pyry Parkkolalla tai Sebastian Barquinilla ei ole tekijänoikeuslain 2 §:n, 6 §:n tai 46 a §:n mukaista tekijänoikeutta Iron Sky tai Iron Sky Director's tai Dictator's Cut -elokuvaan taikka mihinkään kyseisiin elokuviin tekemäänsä materiaaliin;

2) vahvistaa, että Baylisillä, Myersilla, Puukolla, Parkkolalla tai Barquinilla ei ole tekijänoikeuslain 1 §:n, 2 §:n, 6 §:n tai 46 a §:n mukaista tekijänoikeutta Iron Sky: The Coming Race -elokuvaan;

3) vahvistaa, että Baylisillä, Myersilla, Puukolla, Parkkolalla tai Barquinilla ei ole oikeutta käyttää mitään tekemäänsä Iron Sky tai Iron Sky Director's tai Dictator's Cut -elokuvaan liittyvää materiaalia;

4) kieltää Baylisiä ja Parkkolaa jatkamasta Blind Spot Pictures Oy:n ja Iron Sky Universe Oy:n tekijänoikeuksien loukkaamista sekä määrää 50.000 euron sakon uhalla heidät lopettamaan loukkaavan aineiston yleisön saataviin saattamisen.

Blind Spot Pictures Oy ja Iron Sky Universe Oy ovat lisäksi vaatineet, että markkinaoikeus velvoittaa Barquinin, Baylisin, Myersin, Parkkolan ja Puukon yhteisvastuullisesti korvaamaan niiden arvonlisäverottomat oikeudenkäyntikulut kulujen osalta 3.050 eurolla ja palkkion osalta 6.000 eurolla eli yhteensä 9.050 eurolla sekä asianosaiskulut 4.000 eurolla, molemmat määrät viivästyskorkoineen.

**Perusteet**

Pääkanteen henkilökantajat ovat luovuttaneet Iron Sky ja Iron Sky Director's tai Dictator's Cut -elokuvien materiaaleihin ja yksittäisiin elementteihin liittyvät mahdolliset tekijänoikeuslain 2 §:n mukaiset tekijänoikeutensa työnantajalleen yksinoikeudella kertakorvauksella. Työnantajalta nämä oikeudet ovat siirtyneet tuotantoyhtiöille. Henkilökantajilla ei ole edes asiavaltuutta esittää kyseisiin tekijänoikeuksiin perustuvia vaatimuksia. Tuotantoyhtiöt ovat käyttäneet materiaalia ja elementtejä sopimuksien, alan käytännön ja osapuolten tahtojen mukaisesti.

Koska pääkanteen vahvistusvaatimukset 1–3 tulee hylätä, oikeusturvan ja oikeusvarmuuden vuoksi vastakanteen vahvistusvaatimus 1 tulee hyväksyä. Henkilökantajilla ei ole edes asiavaltuutta tältä osin. Henkilökantajat, erityisesti Baylis, ovat esittäneet kantajien liiketoimintaa, elokuvia ja tekijänoikeutta koskevia väitteitä. Baylis on ollut yhteydessä tuotantoyhtiöiden liikekumppaneihin, Iron Sky -lisenssin saajiin, elokuvien rahoittajiin ja muihin tahoihin sekä esittänyt internetissä

perättömiä syytöksiä laittomuuksista. Pääkanteen hylkäävä tuomio ei ole käytännössä yhtä tehokas ja yksiselitteinen kuin käsillä oleva nimenomainen vahvistustuomio, jolla vallitseva oikeudellinen asiantila on mahdollista todistaa myös kolmansille osapuolille.

Mahdollinen tekijänoikeus elokuvan yksittäiseen, erotettavissa olevaan osaan, esimerkiksi avaruusaluksiin, ei tuota tekijänoikeutta koko elokuvaan. Henkilökantajien viittaamat tekijänoikeuslain 5 §:n ja 6 §:n säännökset eivät päde koko elokuvaan.

Vahvistusvaatimus 2 koskee tulevaa, vielä keskeneräistä elokuvaa Iron Sky: The Coming Race, jonka lopullista versiota ei ole vielä tehty. Kyseisessä elokuvassa ei ole mitään sellaista materiaalia aiemmista elokuvista tai muualta, jonka tekemisessä, valmistamisessa tai edes ideoinnissa vastaajat ovat olleet mukana tai osallisina. Henkilökantajilla ei siten ole asiavaltuutta kyseisen elokuvan suhteen.

Vaikka tekijänoikeus olisikin syntynyt, se olisi luovutettu kokonaisuudessaan yksinoikeudella, eikä henkilökantajille olisi jäänyt oikeutta käyttää materiaalia itse. Tämä asiantila tulee todeta vahvistusvaatimuksen 3 mukaisesti.

Baylis on lisäksi ilmoittanut Internetissä perustaneensa yrityksen yhdessä Parkkolan kanssa tekemään Iron Sky -pelituotantoa ja on käyttänyt tekijänoikeudella suojattua materiaalia pelituotantonsa markkinoinnissa. Baylis myös markkinoi 3D-tulosteita "Iron Sky 2012" -kuvauksella ja käyttäen luvatta Iron Sky -elokuvan kuvamateriaalia. Edellä todetusti henkilökantajilla ei ole tai ole jäänyt oikeutta käyttää materiaalia itse. Markkinaoikeuden tulee kieltää Baylistä ja Parkkolaa jatkamasta tekijänoikeuksien loukkaamista.

**VASTAUS**

**Vaatimukset**

Sebastian Barquin, Trevor Baylis, Kelly Myers, Pyry Parkkola ja Risto Puukko ovat vaatineet, että markkinaoikeus jättää vastakanteen tutkimatta tai hylkää sen.

Lisäksi Barquin, Baylis, Myers, Parkkola ja Puukko ovat vaatineet, että markkinaoikeus velvoittaa Blind Spot Pictures Oy:n ja Iron Sky Universe Oy:n korvaamaan heidän oikeudenkäyntikulut kulujen osalta 901,20 eurolla ja palkkion osalta 21.104,40 eurolla eli yhteensä 22.005,60 eurolla viivästyskorkoineen.

**Perusteet**

*Vaatimuksia ei voi käsitellä pääkanteen lis pendens -vaikutuksen vuoksi tai ne ovat ennenaikaisia taikka perusteettomia*

Vahvistusvaatimukset 1 ja 3 koskevat pääkanteen vaadittua hylkäämistä ja siitä seuraavaa väitettyä vahvistustarvetta käänteisestä lopputuloksesta. Negatiivinen vahvistuskanne ei ole mahdollinen samasta kysymyksestä kuin mistä on nostettu positiivinen vahvistuskanne. Vastakanteella ei ole saavutettavissa parempaa tai laajempaa oikeussuojaa kuin vastustamalla pääkannetta. Pääkanteen vireilläolo estää tällaisen vastakanteen ajamisen ja vaatimus tulee jättää tutkimatta tai hylätä heti. Vahvistusvaatimus 3 on myös täysin yksilöimätön.

Vahvistusvaatimus 2 koskee Iron Sky -elokuvan jatko-osaa The Coming Race, jota ei ole julkaistu vielä eikä se ole yleisesti saatavilla. Vaatimus on näin ollen ennenaikainen, eikä vaatimus ole enemmälti käsiteltävissä tai ratkaistavissa tässä yhteydessä. Vaatimusta ei voida ratkaista ennen kuin vaatimuksen kohteena oleva teos on olemassa ja arvioitavissa. Asiaan ei ole myöskään mahdollista ottaa kantaa, koska kyseisestä jatko-osan sisällöstä ei ole esitetty selvitystä. Kattavaa selvitystä ei ole myöskään esitettävissä pääkanteen käsittelyn yhteydessä. Vahvistusvaatimus on aiheeton myös siksi, että vastaajat eivät ole edes väittäneet itse olleensa tekemässä kyseistä jatko-osaa. Näin ollen vaatimus tulee jättää tutkimatta tai hylätä heti.

Pääkanteen vaatimusten tekijänoikeudellinen perusta ja asiavaltuus on selvä.

*Tuotantoyhtiöiden kieltovaatimus*

Sikäli kuin Baylis ja Parkkola olisivat käyttäneet toiminnassaan mitään Iron Sky -elokuvaan liittyvää aineistoa, heillä olisi ollut käyttöön pääkanteessa esitetyllä tavalla oikeus. Baylis on muiden tekijöiden suostumuksella mallintanut alusta asti uudelleen Valkyrie-aluksen. Joka tapauksessa väitetty liiketoiminta tai käyttö ei olisi ollut tekijänoikeudellisessa mielessä relevanttia eikä siksi voisi tulla kiellettäväksi. Vaatimus on yksilöimätön, perusteeton ja toteen näyttämätön.

**TODISTELU**

**Asiakirjatodistelu**

*Henkilökantajat*

1. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös tuotantoyhtiöiden asiakirjatodiste 1)

2. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös tuotantoyhtiöiden asiakirjatodiste 2)
3. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös tuotantoyhtiöiden asiakirjatodiste 3)
4. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös tuotantoyhtiöiden asiakirjatodiste 4)
5. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös tuotantoyhtiöiden asiakirjatodiste 5)
6. Ote Iron Sky -elokuvan käsikirjoituksesta (shooting script) ja kuvasarjasta (storyboard) sekä kuvaruutukaappauksia Iron Sky -elokuvasta (myös tuotantoyhtiöiden asiakirjatodiste 6)
7. Wikipedia-artikkeli "Iron Sky: Invasion" (10.8.2017)
8. SF Studios ja Iron Sky Universen lehdistötiedote "Iron Sky: The Coming Race -elokuva valkokankaille helmikuussa" (25.4.2017)
9. "Iron Sky: The Ark" -artikkeli ironsky.net-verkkosivulta (4.9.2017)
10. "Iron Sky: The Roleplaying Game" -kuvaruutukaappauksia kickstarter.com-verkkosivulta (21.8.2017)
11. Kuva Australian edustajien aluksesta
12. Kuva Mir-aluksesta
13. Kuvat Japanin edustajien aluksesta
14. Kuvia kuutukikohdasta (Schwarze Sonne)
15. Kuvaruutukaappaus Troll VFX -yhtiön Facebook-sivusta (20.6.2013) visuaalisille tehosteille myönnettyä AACTA-palkintoa koskien
16. Sebastian Barquinin Pi Computer Solutions -yhtiön lasku (19.5.2010)
17. Kuvaruutukaappaus Iron Sky Invasion -tietokonepelin tekijänoikeusmerkinnöistä
18. Kuvaruutukaappaukset Iron Sky -elokuva lopusta ja Iron Sky: The Coming Race -elokuvan trailerista
19. Kuvaruutukaappauksia elokuvan kohtauksien tekemisestä vihreää taustaa vasten eli niin sanotusta green screen -kuvauksesta
20. Kuvaruutukaappauksia Iron Sky -elokuvasta
21. Iron Sky -elokuvan storyboardin otteita ja kuvaruutukaappauksia
22. Iron Sky 2012 Director's Cut -videotallenne
23. Making of Iron Sky -videotallenne (a. "How It All Started", b. "Making of" ja c. "The Story and the Characters")
24. KellyMyersCommentary -videotallenne
25. Here Zeppelin Kaboom -videotallenne
26. Be a Moon Trooper in Iron Sky: The Coming Race -videotallenne
27. Be a Moonbase Citizen in Iron Sky: The Coming Race -videotallenne
28. Todisteesta on luovuttu.
29. Iron Sky: The Coming Race -elokuvan virallinen traileri 1 -videotallenne
30. Iron Sky Shooting Script III -käsikirjoitus
31. Iron Sky Storyboards -kuvakäsikirjoitus (21.10.2010)
32. JointAuthorshipDemo -videotallenne
33. Iron Sky Signal: Creating VFX for Iron Sky -videotallenne
34. Iron Sky Signal S02 Episode 5: Making of Iron Sky -videotallenne
35. Pyry Parkkola Portfolio December 2011 -videotallenne
36. Risto Puukko Iron Sky reel 2011 -videotallenne
37. Sebastian Barquin Showreel -videotallenne

38. Sebastian Barquin – CGI/VFX work for Iron Sky -kooste
39. Trevor Baylis Iron Sky showreel -videotallenne
40. Iron Sky: Invasion -tietokonepelistä tehty videotallenne
41. Kuvia gd_full_model_shaded_2011.mb -tiedostosta
42. Kuvia gd_machineroom_assembled_scene_shaded_2012_02.mb -tiedostosta
43. Kuvia gwb_front_section_with_weapons_rights.mb -tiedostosta
44. Kuvia park_hangar_master_scene_v57.mb -tiedostostosta
45. Kuvia sh_052A_0030_GWB_Zep_Exp.mb -tiedostosta
46. Kuvia seb_rheingold_lambert.mb -tiedostostosta
47. Trevor Baylisin lausuntopyyntö tekijänoikeusneuvostolle

*Tuotantoyhtiöt*

1. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös henkilökantajien asiakirjatodiste 1)
2. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös henkilökantajien asiakirjatodiste 2)
3. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös henkilökantajien asiakirjatodiste 3)
4. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös henkilökantajien asiakirjatodiste 4)
5. Kuvaruutukaappauksia Iron Sky -elokuvasta tekijöitä koskevin kommentein (myös henkilökantajien asiakirjatodiste 5)
6. Ote Iron Sky -elokuvan käsikirjoituksesta (shooting script) ja kuvasarjasta (storyboard) sekä kuvaruutukaappauksia elokuvasta (myös henkilökantajien asiakirjatodiste 6)
7. Parkkolan (18.5.2010, 4.11.2010 ja 13.8.2011), Puukon (11.2.2010 ja 16.9.2010), Barquinin (4.11.2010) ja Baylisin (4.5.2011, 28.10.2011 ja 28.11.2011) työtehtäviin liittyvät sopimukset
8. Baylisin Twitter-viesti 22.4.2017
9. Baylisin Twitter-viesti (2017)
10. Kuvaruutukaappaus "Valkyrie UFO from Iron Sky 2012" -myynti-ilmoituksesta shapeways.com -verkkosivustolta
11. Baylisin työnhakua koskeva sähköposti (27.9.2010)
12. YouTube-video Iron Sky Teaser 2 – The First Footage (13.5.2010)
13. Sähköpostit Baylisin työelämävalmennuksesta 8.11.2010–8.5.2011 (29.3.2016–1.4.2016)
14. Energia Productions Ltd ja Declaration Pictures Inc:n välinen Myersiä koskeva toimeksiantosopimus (22.3.2011)
15. Kuvamateriaalia elokuvien tekemisestä (salassa pidettävä)
16. Timo Vuorensolan sähköposti Kelly Myersille (12.8.2011)
18. Videotallenne elokuvan tekemisestä
19. Kuvamateriaalia elokuvien tekemisestä (salassa pidettävä)
20. Timo Vuorensolan sähköposti (2.8.2011)
21. Samuli Torssosen sähköposti liitteineen (16.7.2009)
22. Kaksi Götterdämmerung VFX-videotallennetta
23. Trevor Baylisin sähköpostit (22.2.2018)
24. Trevor Baylisin Twitter-viesti (22.3.2018)

**Henkilötodistelu**

*Henkilökantajat*

1. Trevor Baylis, todistelutarkoituksessa
2. Kelly Myers, todistelutarkoituksessa
3. Risto Puukko, todistelutarkoituksessa
4. Pyry Parkkola, todistelutarkoituksessa
5. Sebastian Barquin, todistelutarkoituksessa

*Tuotantoyhtiöt*

1. Trevor Baylis, todistelutarkoituksessa
2. Kelly Myers, todistelutarkoituksessa
3. Risto Puukko, todistelutarkoituksessa
4. Pyry Parkkola, todistelutarkoituksessa
5. Sebastian Barquin, todistelutarkoituksessa
6. Timo Vuorensola, elokuvaohjaaja, Iron Sky Universe Oy:n hallituksen jäsen, todistelutarkoituksessa
7. Tero Kaukomaa, elokuvatuottaja, Iron Sky Universe Oy:n ja Blind Spot Pictures Oy:n hallituksen jäsen, todistelutarkoituksessa
8. Samuli Torssonen, VFX supervisor
9. Jarmo Puskala, yhteisöpäällikkö
10. Jussi Lehtiniemi, luova johtaja

**MARKKINAOIKEUDEN RATKAISU**

**Perustelut**

*1 Asioiden taustaa*

1. Markkinaoikeuden valmisteluistunnossa päätetyn mukaisesti alkuperäinen kanne (dnro 2017/588, jäljempänä myös pääkanne) ja vastakanne (dnro 2017/701) käsitellään samassa oikeudenkäynnissä.

2. Asioissa on keskeisesti kysymys Iron Sky -elokuvaan kolmiulotteisia tietokoneella luotuja visuaalisia tehosteita ja animaatioita tehneiden Sebastian Barquinin myötäpuolineen (jäljempänä myös henkilökantajat) tekijänoikeudesta koko elokuvaan sekä yksilöityihin avaruusaluksiin ja muihin teoksiin. Näistä on esitetty vahvistus- ja kieltovaatimuksia.

3. Asioissa esitetyn yhdenmukaisen todistelun perusteella kyseistä elokuvaa on ideoitu, käsikirjoitettu ja valmisteltu vuodesta 2005 alkaen. Henkilökantajat ovat tulleet mukaan Blind Spot Pictures Oy:n ja Iron Sky Universe Oy:n (jäljempänä myös tuotantoyhtiöt) elokuvaprojektiin työskentelemään visuaalisista tehosteista vastanneen alihankkijan Tuotantoyhtiö Energia Oy:n lukuun vaiheittain ja erilaisin tavoin pääosin loppuvuoden 2010 ja alkuvuoden 2011 kuluessa. Elokuva on julkaistu helmikuussa 2012 ja sen hieman laajempi Director's Cut (toiselta

nimeltään Dictator's Cut) -versio ilmeisesti vuonna 2013. Riidattomaksi on ilmoitettu, että oikeudet elokuvaan ja mainittuun versioon määräytyvät samalla tavalla.

4. Useimpien henkilökantajien työsopimuksissa on sovittu oikeuksien luovutuksesta työnantajalle riidanalaisilla ehdoilla, mutta kaikilta osin työskentelystä ja oikeuksien luovutuksesta ei ole sovittu kirjallisesti. Arvioitavaksi voi näin ollen tulla myös se, millaisin ehdoin tekijänoikeudet on mahdollisesti luovutettu Tuotantoyhtiö Energia Oy:lle ja/tai millaisen käyttöoikeuden tuotantoyhtiöt ovat saaneet.

*2 Eräiden vaatimusten tutkimatta jättämisestä ja ennenaikaisuudesta*

5. Tuotantoyhtiöt ovat vaatineet, että pääkanne tulee jättää tutkimatta, koska henkilökantajille ei ole syntynyt tekijänoikeutta ja joka tapauksessa mahdolliset tekijänoikeudet on luovutettu yksinoikeudella työnantajalle, eikä henkilökantajille ole näin ollen jäänyt mitään oikeuksia. Siten henkilökantajilla ei ole oikeussuojan tarvetta tai asiavaltuutta esittää tekijänoikeuslakiin perustuvia vaatimuksia.

6. Oikeuskirjallisuudessa (Jokela, Oikeudenkäynnin asianosaiset ja valmistelu, 2012, s. 253) on todettu, että vahvistuskannetta ei oteta tutkittavaksi, ellei kantajalla ole riittävää oikeudellista intressiä vaadittuun vahvistamiseen. Tämä edellyttää, että kyseisestä oikeussuhteesta tai oikeudesta on olemassa oikeudellista epävarmuutta ja että kantaja kärsii haittaa vallitsevasta tilanteesta. Lisäksi väitetyn vahvistusintressin tulee olla ajankohtainen ja liittyä muutoin toteutettavissa olevaan oikeuteen, joka ei saa jäädä riippumaan jonkin tulevaisuudessa mahdollisesti toteutuvan ehdon täyttymisestä.

7. Oikeuskirjallisuudessa (Harenko, ym., Tekijänoikeus, 2016, s. 623 ja 624) on myös todettu, että vaatimusten esittämiseen vaadittava asiavaltuus on sillä oikeudenhaltijalla, jonka oikeuksia käyttö loukkaa. Taloudelliset yksinoikeudet teokseen syntyvät aina teoksen luoneelle luonnolliselle henkilölle. Jos hän on siirtänyt oikeutensa toiselle, esimerkiksi yritykselle, on tarkasteltava, missä laajuudessa ja mitkä oikeudet ovat siirtyneet. Mikäli kaikki taloudelliset oikeudet on siirretty yksinoikeudella yritykselle, on oikeus hyvitysvaatimuksen esittämiseen loukkauksen johdosta sillä, jolle taloudelliset oikeudet kuuluvat.

8. Markkinaoikeus katsoo, että pääkanteen kannevaatimukset 1–3 ja niihin perustuvat muut vaatimukset koskevat ensiksi kysymystä siitä, onko henkilökantajille syntynyt tekijänoikeutta ja vasta toiseksi sitä, miltä osin se on mahdollisesti luovutettu. Tällaisessa tilanteessa, kun riitaista on myös se, onko henkilökantajille alun perinkään syntynyt tekijänoikeutta, teokset väitetysti luoneilla henkilökantajilla on asiavaltuus ja riittävä oikeudellinen intressi.

9. Tuotantoyhtiöt ovat myös vaatineet kannevaatimusten 4 ja 5 tutkimatta jättämistä ennenaikaisina siltä osin kuin ne kohdistuvat vielä julkaisemattomaan materiaaliin. Tuotantoyhtiöt ovat myös pitäneet

kannevaatimuksia 4 ja 6 riittämättömästi yksilöityinä tai eriteltyinä. Henkilökantajat ovat 2.3.2018 annetussa lausumassaan selvyyden vuoksi todenneet, kannevaatimuksia kuitenkaan rajaamatta tai olennaisesti täsmentämättä, että vaatimus 5 ei koske elokuvan vielä julkaisematonta jatko-osaa. Lausumassaan 20.3.2018 ja samana päivänä aloitetussa pääkäsittelyssä henkilökantajat ovat edelleen todenneet, että vaatimukset 4 ja 5 eivät koske elokuvan vielä julkaisemattomia jatko-osia tai pääkäsittelyssä esitetyn perusteella myöskään vielä julkaisematonta roolipeliä.

10. Markkinaoikeus katsoo, että pääkanteessa esitetyt vaatimukset 4 ja 5 eivät täsmennettyjen kanneperusteiden mukaisesti kohdistu vielä julkaisemattomiin elokuviin tai roolipeliin. Asiassa ei ole ilmennyt perustetta tuotantoyhtiöiden vaatimalla tavalla jättää kyseisiä vaatimuksia tutkimatta tai hylätä niitä ennenaikaisina. Vaatimuksia 4 ja 6 ei voi myöskään pitää sellaisella tavalla yksilöimättöminä, että kannetta ei näiltä osin voisi ottaa tutkittavaksi.

11. Henkilökantajat ovat puolestaan vaatineet vastakanteen vaatimusten 1 ja 3 jättämistä tutkimatta tai hylkäämistä pääkanteen vireilläolovaikutuksen (*lis pendens*) vuoksi, koska henkilökantajien mukaan niissä on kysymys samasta asiasta kuin pääkanteessa. Lisäksi henkilökantajat ovat vaatineet vastakanteen vaatimuksen 2 tutkimatta jättämistä tai hylkäämistä ennenaikaisena tai riidattomana.

12. Oikeuskirjallisuuden (Frände, ym., Prosessioikeus, 2017, s. 524–525) mukaan vastasuuntaisessa kanteessa ei ole kysymys samasta asiasta kuin pääkanteessa, jos se menestyessään voisi tuoda laajempaa oikeussuojaa kuin pelkkä menestyksekäs vastaaminen pääkanteeseen. Oikeudellinen intressi täyttyy, jos vastaaja voi omalla kanteella saavuttaa jotain enemmän kuin häntä vastaan ajettavan kanteen hylkäämisen.

13. Markkinaoikeus toteaa, että pääkanteen vahvistusvaatimusten 1–3 muodostama kokonaisuus koskee tekijänoikeutta Iron Sky -elokuvaan ja yksilöityihin teoksiin ja osaltaan myös oikeuksien syntymisen ja luovuttamisen laajuuden vahvistamista. Tästä myös vastakanteen vahvistusvaatimuksessa 1 on pitkälti kysymys. Vahvistusvaatimusten 1–3 kerroksittaisuuden vuoksi vaatimukset eivät ole kuitenkaan sellaisenaan vastasuuntaisia. Lisäksi vastakanteen kyseisessä vaatimuksessa on vaadittu vahvistettavaksi, että henkilökantajilla ei ole tekijänoikeutta mihinkään kyseiseen elokuvaan tekemäänsä materiaaliin, mikä kattaa myös mahdolliset muut kuin pääkanteen vahvistusvaatimuksessa 2 yksilöidyt teokset. Näin ollen vastakanteen vahvistusvaatimus 1 on elokuvaa varten tehdyn materiaalin osalta pääkannetta laajempi, eikä vastakanteen vaatimuksen 1 tutkimiselle ole estettä.

14. Pääkanteen vahvistusvaatimusten 1–3 muodostamassa kokonaisuudessa on kysymys tekijänoikeuden syntymisestä ja siitä, että oikeuksia ei ole luovutettu muutoin tai laajemmin kuin vaatimuksesta 3 ilmenee. Vastakanteen vaatimuksessa 3 on sen sijaan kysymys keskeisesti siitä, onko henkilökantajilla oikeus käyttää tekemäänsä materiaalia, mistä

pääkanteessa ei ole kysymys. Näin ollen myös kyseinen vahvistusvaatimus poikkeaa pääkanteen vaatimuksista sellaisella tavalla, ettei sen tutkimiselle ole estettä.

15. Markkinaoikeus toteaa myös, että pääkanteen vaatimukset 4 ja 5 on muotoiltu varsin yleisellä tasolla ja tekijänoikeutta loukkaavaa menettelyä lähemmin yksilöimättä. Vaatimusten tueksi esitetyt perusteet ovat muuttuneet valmistelun kuluessa ja viimeisimmin vielä pääkäsittelyä aloitettaessa. Siten tuotantoyhtiöille on voinut olla epäselvää, mihin menettelyyn vaatimukset kohdistuvat ja erityisesti ovatko ne kohdistuneet vielä julkaisemattomaan materiaaliin. Henkilökantajat eivät ole muotoilleet vahvistusvaatimusta 4 siten, että se yksiselitteisesti koskisi vain tekijänoikeutta väitetysti loukkaavaa menettelyä ja seikkoja. Markkinaoikeus katsoo, että näissä olosuhteissa vastakanteen vaatimukselle 2 on esitetty sinänsä riittävä oikeudellinen intressi.

16. Vastakanteen vaatimuksessa 2 on vaadittu vahvistettavaksi, että henkilökantajilla ei ole tekijänoikeuslain tiettyjen säännösten mukaista tekijänoikeutta Iron Sky: The Coming Race -elokuvaan. Riidatonta on, että henkilökantajat eivät ole olleet tekemässä kyseistä jatko-osaa. Kyseistä elokuvaa ei ole vielä julkaistu tai saatettu lopulliseen muotoonsa. Elokuvasta tai sen tekijänoikeuksiin vaikuttavista seikoista ei ole juurikaan esitetty eikä lopullisesta elokuvasta ole ollut esitettävissä selvitystä. Mainituilla perusteilla markkinaoikeus katsoo, että vastakanteen vaatimus 2 on hylättävä ennenaikaisena. Edellä todetusti asioiden enemmälle käsittelylle ei ole muilta osin ilmennyt estettä.

*3 Henkilökantajien vaatimus tekijänoikeudesta Iron Sky -elokuvaan*

17. Tekijänoikeuslain 1 §:n 1 momentin mukaan sillä, joka on luonut kirjallisen tai taiteellisen teoksen, on tekijänoikeus teokseen, olkoonpa se kaunokirjallinen tahi selittävä kirjallinen tai suullinen esitys, sävellys- tai näyttämöteos, elokuvateos, valokuvateos tai muu kuvataiteen teos, rakennustaiteen, taidekäsityön tai taideteollisuuden tuote taikka ilmetköönpä se muulla tavalla.

18. Elokuvateosten osalta tekijänoikeuslain esitöissä (Komiteanmietintö 1953:5, s. 45) on todettu, että käytännössä voi olla vaikeata todeta, kenelle tekijänoikeuden elokuvateokseen on katsottava kuuluvan. Oikeuskirjallisuuden (Salokannel, Häviävät elokuva tekijät, 1990, s. 28) mukaan pohjoismaisissa lainvalmisteluasiakirjoissa tehdään elokuvan tekijänoikeuden haltijoiden määrittelyssä ero toisaalta niiden tekijöiden välillä, joilla on tekijänoikeus koko elokuvateokseen ja toisaalta niiden tekijöiden välillä, joilla on tekijänoikeus ainoastaan elokuvaan sisältyviin yksittäisiin teoksiin tai suorituksiin. Pohjoismaisissa lainvalmisteluasiakirjoissa mainitaan henkilöistä, joille voi syntyä tekijänoikeus koko elokuvateokseen, yleensä käsikirjoittaja ja elokuvan ohjaaja. Syntyykö muille elokuvan valmistukseen taiteellisella panoksella osallistuville henkilöille tekijänoikeus koko elokuvaan tai vain omaan osuuteensa, riippuu heidän osuutensa merkityksestä elokuvalle kokonaisuutena. Tällaisia tekijöitä voivat olla muun muassa

elokuvamusiikin tekijä, kuvaaja, leikkaaja, lavastaja, arkkitehti ja koreografi.

19. Viimeksi mainitussa teoksessa on edelleen todettu (s. 28 ja 29), että elokuvan oikeudenhaltijoiden määrittelyssä on ratkaisevaksi kysymykseksi muodostunut luovan työn ja teknisen taidon välisen rajan selvittäminen. Määräävinä seikkoina on pidetty työn (taiteellista) itsenäisyyttä ja omaperäistä ilmaisua. Työn itsenäisyyttä arvostellaan elokuvan tekemisessä yleensä sen perusteella, kuinka itsenäisesti henkilö työskentelee suhteessa elokuvan ohjaajaan. Tällä tarkoitetaan taiteellisin kriteerein itsenäiseksi katsottavaa luovaa työtä. Yksittäisen tekijän taiteellinen luova panos määräytyisi näin kunkin elokuvateoksen käsikirjoituksen ja ohjauksen perusteella, ja viime kädessä vasta käytännön valmistusprosessissa.

20. Asiassa esitetyn yhdenmukaisen todistelun perusteella idea elokuvaan on tullut Jarmo Puskalalta, käsikirjoittajina ovat toimineet ainakin Johanna Sinisalo ja Michael Kalesniko ja elokuvan ohjaajana on toiminut Timo Vuorensola. Elokuvan lavastajina ovat toimineet Ulrika von Vegesack ja erityisesti digitaalisten lavasteiden osalta Jussi Lehtiniemi, joka on myös ollut elokuvan taiteellinen johtaja. Visuaalisista tehosteista on muiden tehtäviensä ohella vastannut Samuli Torssonen. Elokuvan tekemiseen on osallistunut kaiken kaikkiaan satoja henkilöitä.

21. Henkilökantajat ovat tehneet elokuvaan tietokoneella luotuja kolmiulotteisia pääosin eri avaruusaluksia koskevia malleja ja animaatioita. Asiassa esitetyn todistelun perusteella Kelly Myers on toiminut lähinnä tietokoneanimoinnin yhtenä esimiehenä CGI supervisor -tehtävässä. Sebastian Barquin, Pyry Parkkola ja Trevor Baylis ovat toimineet pääsääntöisesti mallintamisen ja osin animointiin liittyvien tehtävien parissa. Risto Puukko on ainakin ohjannut mallintajia ja animoijia Maya-ohjelman käytössä, ja Baylis on myös yhdistänyt ja yhteensovittanut Götterdämmerung-aluksen ulkokuoreen eri henkilöiden tekemiä osia. Barquinin ja Parkkolan ei ole näytetty ohjanneen muiden työskentelyä, eikä heillä ollut projektiin tullessaan kovin laajaa kokemusta visuaalisten tehosteiden tekemisestä. Tietokoneella luotujen visuaalisten tehosteiden kannalta keskeisiä henkilöitä on ollut ainakin kymmenkunta ja kaiken kaikkiaan tehosteiden tekemiseen on osallistunut ainakin noin 30 henkilöä.

22. Henkilökantajat ovat esittäneet, että heidän luovan ja itsenäisen työn osuus elokuvassa ja sen tarinassa on ollut niin merkittävä, että se tuottaa tekijänoikeuden koko elokuvaan. Markkinaoikeus toteaa, että henkilökantajien työtä voidaan sinänsä pitää elokuvan kannalta merkityksellisenä. Markkinaoikeus katsoo, että asiassa esitetyn todistelun perusteella elokuvassa tietokoneella luodut visuaaliset tehosteet ovat olleet sinänsä keskeisiä ja elokuvassa on useita kokonaan näin luotuja kohtauksia, mutta kerronnallisesti ja ajallisesti ne eivät ole kuitenkaan olleet elokuvassa pääosassa tai määrittäneet kyseistä elokuvaa sellaisella tavalla, jolla olisi olennaista merkitystä koko elokuvateoksen tekijää koskevassa tekijänoikeudellisessa arvioinnissa.

23. Markkinaoikeus toteaa, että edellä todetulla tavalla elokuvateoksen tekijöinä pidettävien henkilöiden joukko ei ole kovin laaja. Esimerkiksi edes elokuvan päävastuullista lavastajaa ei välttämättä voida pitää elokuvateoksen tekijänä. Markkinaoikeus katsoo, että henkilökantajat ovat olennaisesti ottaen toimineet erilaisissa rooleissa avustaen elokuvan tiettyjen osa-alueiden digitaalisten visuaalisten tehosteiden luomisessa, jota voidaan näiltä osin monilta osin rinnastaa lavastamiseen. Näyttämättä on jäänyt, että henkilökantajien rooli olisi ollut tyypillisesti elokuvan tekijöinä pidettäviin henkilöihin tai edes päävastuulliseen lavastajaan rinnastettavissa.

24. Edellä todetuilla perusteilla markkinaoikeus katsoo, ettei henkilökantajia voida pitää koko elokuvateoksen osalta tekijöinä riippumatta siitä, olisiko heidän visuaalisiin tehosteisiin liittyvä työnsä ollut heidän esittämällään tavalla itsenäistä ja omaperäistä ja olisiko heillä erikseen tekijänoikeus elokuvassa ilmeneviin aluksiin tai muihin väitettyihin yksittäisiin teoksiin. Näin ollen vahvistusvaatimus 1 on jo tällä perusteella hylättävä.

*4 Henkilökantajien vaatimukset tekijänoikeudesta yksilöityihin teoksiin*

*4.1 Vaatimukset ja tarkastelun oikeudelliset lähtökohdat*

25. Käsillä olevassa kannevaatimuksessa 2 on vaadittu vahvistettavaksi, että henkilökantajilla on eritellyllä tavalla tekijänoikeus Iron Sky -elokuvassa käytettyihin avaruusaluksiin tai muihin yksilöityihin teoksiin. Kannevaatimuksella 2 on katsottava tarkoitetun vaatimuksen ja oikeudellisen intressin tueksi esitetyt perusteet sekä oikeuksien luovuttamiseen liittyvä kannevaatimus 3 huomioon ottaen sen vahvistamista, että henkilökantajille on syntynyt tekijänoikeus riippumatta siitä, onko tämä tekijänoikeus mahdollisesti joltakin osin sittemmin luovutettu.

26. Niin sanotuista yhteisteoksista säädetään tekijänoikeuslain 6 §:ssä. Säännöksen mukaan jos kaksi tai useammat ovat yhdessä luoneet teoksen heidän osuuksiensa muodostamatta itsenäisiä teoksia, on tekijänoikeus heillä yhteisesti. Kannevaatimuksessa 2 on kysymys siitä, että ainakin henkilökantajat olisivat yksilöityjen teosten tekijöitä riippumatta siitä, olisiko teosten tekijöinä mahdollisesti pidettävä muitakin henkilöitä.

27. Henkilökantajilla on oikeudenkäymiskaaren 17 luvun 2 §:n mukaisesti näyttötaakka siitä, että kannevaatimuksessa 2 yksilöidyt alukset ja muut väitetyt teokset ovat tekijänoikeuslaissa tarkoitettuja teoksia ja että henkilökantajia on pidettävä niiden tekijöinä.

28. Markkinaoikeus on asian valmistelussa kiinnittänyt huomiota kannevaatimuksiin ja -perusteisiin ja tämän johdosta esittänyt asian selvittämistä varten tarpeelliset kysymykset. Vaatimukset ja perusteet ovat valmistelun kuluessa ja eräiltä osin tämän jälkeenkin täsmentyneet. Henkilökantajat ovat oikeudenkäymiskaaren 24 luvun 3 §:stä ilmenevän niin sanotun määräämisperiaatteen mukaisesti määrittäneet

vaatimuksillaan ja niiden tueksi esitetyillä perusteilla oikeudenkäynnin kohteen.

29. Markkinaoikeus toteaa, että kannevaatimuksessa 2 on sinänsä yksilöity avaruusalukset ja muut väitetyt teokset. Kanteen perusteissa ei ole kuitenkaan nimenomaisesti tuotu esiin sitä, millaisesta tekijänoikeuslain 1 §:ssä tarkoitetusta teoksesta on kysymys ja näin ollen sitä, mitä vahvistusvaatimukset tarkalleen ottaen koskevat.

30. Edellä mainittu vaatimuksen ja sen tueksi esitettyjen perusteiden epäselvyys ja yksilöimättömyys korostuu erityisesti siltä osin kuin eräät henkilökantajat ovat vaatineet tekijänoikeuden vahvistamista alukseen Götterdämmerung ja kuutukikohtaan "mukaan lukien sisäpuoli".

31. Viimeksi mainitulla on katsottava tarkoitetun kaikissa elokuvan Götterdämmerung-alusta ja kuutukikohtaa koskevissa sisäpuolisissa kohtauksissa ilmenevää taustaa, jota vasten näyttelijöiden suoritukset näkyvät. Todistelun perusteella näitä taustoja on ollut hyvin monenlaisia ja ne ovat näkyneet elokuvassa varsin pitkän ajan, eivätkä henkilökantajat ole edes väittäneet tai todistelussa tuoneet ilmi tehneensä niistä kuin joitakin yksittäisiä osia. Markkinaoikeus katsoo, ettei mainittujen sisäosien kaikkia taustoja voida pitää sellaisina kanteen kannalta riittävästi yksilöityinä ja elokuvasta erotettavissa olevina omina teoksinaan, joidenka tekijöiksi henkilökantajat voitaisiin vahvistaa. Näin ollen vaatimus on joka tapauksessa hylättävä näiltä osin.

32. Muilta osin henkilökantajien on katsottava tarkoittaneen alusten, kuutukikohdan tai junan ulkopuolista visuaalista ilmettä mahdollisine ominaispiirteisine animointeineen. Sen sijaan vaatimuksen tueksi esitetyt perusteet huomioon ottaen vaatimuksella ei ole katsottava tarkoitetun esimerkiksi tekijänoikeutta kyseisten alusten kolmiulotteisiin tietokonemalleihin tai tiedostoihin sellaisenaan.

33. Henkilökantajat ovat jäljempänä todetusti esittäneet aluksia koskevan tekijänoikeutensa tueksi myös esimerkiksi aluksen lippujen valahtamista tai alusten tuhoutumista koskevan animoinnin. Markkinaoikeus katsoo, että näissä animaatiokohtauksissa on pikemminkin kysymys elokuvakohtausten tekemisestä kuin jostakin sellaisesta, minkä perusteella voisi syntyä tekijänoikeus kannevaatimuksessa 2 tarkoitetulla ja edellä kohdassa 32 todetulla tavalla itse aluksiin. Käsillä olevassa kannevaatimuksessa 2 ei ole siten myöskään kysymys tekijänoikeudesta yksilöityjä teoksia sisältäviin kaikkiin tai edes tiettyihin elokuvan kohtauksiin sellaisenaan.

34. Tekijänoikeusneuvosto on muun ohessa lausunnossaan 2014:6 todennut, että teoksella tarkoitetaan henkisen luomistyön tuotetta. Taiteellinen tuote kuten muutkin teokset on tekijänoikeudella suojattu, jos sitä voidaan pitää tekijänsä luovan työn itsenäisenä ja omaperäisenä tuloksena. Tällöin se ylittää teoskynnyksen eli saavuttaa teostason. Suojan edellytyksenä ei ole muita vaatimuksia. Edelleen lausunnon mukaan Euroopan unionin tuomioistuin (tuomio 1.11.2011, Painer, C-145/10,

EU:C:2011:798) on katsonut, että teos voi saada tekijänoikeussuojaa, jos se on tekijänsä henkisen luomistyön tulos siten, että se kuvastaa tekijän persoonaa ja siitä käyvät ilmi tekijän vapaat ja luovat valinnat teosta tehtäessä.

35. Oikeuskirjallisuudessa on vielä muun ohessa esitetty (Harenko ym., Tekijänoikeus, 2016, s. 17), että omaperäisyydellä tarkoitetaan sitä, että kenenkään toisen kuin tekijän ei voitaisi olettaa päätyvän samankaltaiseen lopputulokseen, jos toinen ryhtyisi itsenäisesti vastaavaan luomistyöhön. Lain mukaisen suojan saamisen kannalta teoksen taiteellisella tai laadullisella arvioinnilla tai muillakaan vastaavilla seikoilla ei ole merkitystä. Merkitystä ei myöskään ole sillä, minkä laatuista ja miten paljon työtä tai aikaa tekijä on teokseensa käyttänyt. Niin ikään oikeuskirjallisuudesta ilmenee (Haarmann, Tekijänoikeus ja lähioikeudet, 2005, s. 67), että vaikka tuote olisi vaatinut kuinka paljon työtä ja taitoa tahansa, sitä ei pelkästään tällä perusteella voida pitää tekijäoikeuslaissa tarkoitettuna suojattavana teoksena.

36. Markkinaoikeus toteaa, että kolmiulotteisen mallin toteuttamisessa tarvittavan ohjelmiston osaaminen tai mallinnuksen tekniset yksityiskohdat taikka mallinnuksen työläys ovat edellä todetun perusteella käsillä olevassa tekijänoikeudellisessa arvioinnissa sellaisenaan merkityksettömiä. Myöskään kaksiulotteisten kuvien mahdollisimman tarkkaa ja ohjauksessa tapahtuvaa mallintamista kolmiulotteisiksi malleiksi ei sellaisenaan voida pitää itsenäisenä ja omaperäisenä luomistyönä.

*4.2 Yleistä todistelua ja alustavaa arviointia*

37. Timo Vuorensola on häntä todistelutarkoituksessa kuultaessa kertonut toimineensa elokuvan ohjaajana ja käsikirjoittajana. Idea elokuvaan tuli Jarmo Puskalalta ja sitä kehiteltiin porukalla. Samuli Torssonen toi elokuvaan visuaalista ilmettä ja Jussi Lehtiniemi rakensi konkretiaa ideoiden perusteella ja toimi elokuvan digitaalisena lavastajana. Ennen kuvauksia hän keskusteli lähes päivittäin Torssosen ja Lehtiniemen kanssa siitä, millaisista elementeistä elokuva koostuu. Kuvausten aikana ja niiden jälkeen hän keskusteli päivittäin tai viikoittain Torssosen kanssa tehosteista ja tutustui tehtyihin tehosteisiin Dropbox-kansion kautta sekä kävi valkokankaalta läpi sitä, mitä kulloinkin tehtiin.

38. Samuli Torssonen on häntä todistajana kuultaessa kertonut muun ohella osallistuneensa elokuvan ideointiin ja käsikirjoittamiseen ja toimineensa elokuvassa VFX supervisor -tehtävässä. Hänen tehtävänään oli muun ohessa visuaalisia tehosteita tekevän tiimin rekrytointi ja työtehtävien määrittäminen ja yhteensovittaminen sekä ohjaajan vision välittäminen tiimille. Visuaalisen puolen osalta hän hyväksyi asioita ja delegoi niitä esimerkiksi Lehtiniemelle, Juuso Kaarelle, Lee Stringerille ja Kelly Myersille ja heille myös annettiin vastuuta tai vastuualueita toteutettaviksi ja valvottaviksi. Torssonen on kertonut myös, että hän arvioi mallinnusta tekniseltä ja Lehtiniemi puolestaan visuaalisilta osin ja viime kädessä ohjaaja päätti mitä menee elokuvaan, että osa tehtävistä oli

ulkoistettu taiteelliselle johtajalle eli Lehtiniemelle ja että aluksia koskevat päätökset teki Lehtiniemi ja lopullisesti Vuorensola.

39. Jussi Lehtiniemi on häntä todistajana kuultaessa kertonut toimineensa elokuvan ja visuaalisten tehosteiden taiteellisena johtajana ja suunnitelleensa kaikki elokuvan avaruusalukset ja ideoineensa niitä Vuorensolan ja Torssosen kanssa. Vuonna 2008 hän teki ensimmäiset konseptikuvat lentävistä lautasista, avaruustaisteluista ja kuutukikohdan sisäosista ja suunnitteli tarkasti Valkyrie-aluksen ja aloitti George W. Bush -aluksen suunnittelun. Lehtiniemen mukaan hän hyväksyi kolmiulotteiset mallit. Hän ohjeisti mitä mallinnetaan ja antoi piirustukset, yksinkertaiset kolmiulotteiset malliluonnokset ja referenssikuvat ja ohjasi työskentelyä ja päätti siitä, milloin malli oli valmis. Malli oli hyvä silloin kun asiat olivat paikallaan ja kun se kunnioitti suunnitelman olemusta ja henkeä sillä tarkkuudella, millä se tullaan elokuvassa näkemään. Tämän lisäksi paljon tehtiin myös ylimääräistä yksityiskohtiin liittyvää työtä. Malleja tehdessä olikin tehtävä myös rajanvetoa sen suhteen, milloin malli on tarpeeksi hyvä elokuvaa varten, ja Torssonen tai Lee Stringer joskus sanoivat, että mallia ei kannata tehdä enempää. Lehtiniemi on myös kertonut tehneensä konseptikuvia, yksinkertaisia malleja ja kommentoineensa malleja. Varsinaisten mallien tekeminen oli suuri työ, jonka vuoksi tämä jaettiin mallintajien tehtäväksi.

40. Jarmo Puskala on häntä todistajana kuultaessa kertonut olleensa luomassa elokuvaa ja toimineensa yhteisöpäällikkönä, joka kertoi sivusta katsoen tarinaa elokuvan tekemisestä. Hänen mukaansa Lehtiniemi aloitti karkeilla paperille sutaisuilla luonnoksilla, joita Lehtiniemi, Vuorensola ja Torssonen "pyörittelivät". Näitä seurasivat konseptikuvat, karkeat kolmiulotteiset mallit ja usein piirustukset, joiden pohjalta varsinainen mallinnus toteutettiin. Mallinnusta teki yhtä aikaa enimmillään noin 20, yhteensä 30–40 henkilöä. Lehtiniemi seurasi hyvin tarkkaan sitä, että aluksista tulee oikeannäköisiä ja Lehtiniemi oli hyvin tärkeässä osassa elokuvan visuaalisen ilmeen luomisessa. Puskala on myös kertonut, että Lehtiniemen mukaan tulo oli käännekohta projektissa, koska hänen visuaalinen tyyli vastasi visioita, ja Lehtiniemen näkemyksiin ja makuun voitiin luottaa. Puskalan mukaan avaruustaisteluiden koreografia oli aika pitkälti Torssosen suunnittelemaa ja niistä tehtiin karkeat kolmiulotteiset mallit (animatic).

41. Markkinaoikeus toteaa, että henkilökantajat eivät ole kanteen perusteissa juurikaan tarkemmin yksilöineet sellaisia tekijänoikeudellisessa arvioinnissa merkityksellisiä seikkoja, joiden perusteella heitä olisi pidettävä kyseisten alusten ja muiden väitettyjen teosten tekijöinä. Näitä seikkoja on jossakin määrin tullut ilmi todistelusta. Tuotantoyhtiöt ovat puolestaan muun todistelun ohella esittäneet asiakirjatodisteinaan runsaasti Lehtiniemen laatimiksi esitettyjä osin varsin yksityiskohtaisia konsepti- ja viittauskuvia eri aluksista ja niiden sisätiloista.

42. Markkinaoikeus katsoo oikeudenkäymiskaaren 17 luvun 2 §:ssä tarkoitetulla tavalla erityisesti Lehtiniemen roolia koskevan todistelun

perusteella uskottavasti näytetyksi, että henkilökantajien tehtäviä on ainakin lähes poikkeuksetta ohjattu erilaisin konsepti- tai viittauskuvin, kuvien päälle piirretyin ja suullisin ohjein sekä yleispiirteisenä että yksityiskohtaisena ohjauksena. Osan henkilökantajistakin mukaan Lehtiniemen ohjaus on voinut ajoittain jopa mennä liiallisuuksiin tai tarpeettomiin detaljeihin. Henkilökantajista ainakin Myers, Puukko ja Baylis olisivat ilmeisesti halunneet työskennellä itsenäisemmin sen perusteella, mitä heidän kertomuksistaan on pääteltävissä. Markkinaoikeus katsoo niin ikään selvitetyksi, että ohjaaja Vuorensola on puolestaan ohjannut Torssosta ja Lehtiniemeä.

43. Jotta henkilökantajien vaatimukset voisivat menestyä, heidän on edellä todettu huomioon ottaen lähtökohtaisesti näytettävä myös se, että heidän luomistyönsä on ollut tekijänoikeudellisesti merkityksellistä siitä huolimatta, että sitä on edellä todetusti eri vaiheissa ohjattu.

44. Useissa henkilökantajien esittämissä asiakirjatodisteissa, erityisesti aluksia esittävissä kuvaruutukaappauksissa (kuten 1–5, 11–14 ja 20–21) ja henkilökantajien omasta työstään kertovissa videotallenteissa (24, 35–37 ja 39) pääsääntöisesti esitetään alukset kokonaisuutena, henkilökantajien omaa panosta yksityiskohtaisesti erittelemättä. Niistä ei myöskään juurikaan ilmene, millaisia lähtötietoja henkilökantajille on annettu ja millaisten vaiheiden kautta he ovat lopputulokseen päätyneet taikka sitä, mikä on tarkalleen ottaen ollut heille tekijänoikeuden synnyttävä heikinen luomistyö, kun otetaan huomioon, että edellä todetusti mallintamiseen käytetty työmäärä tai tekniset ratkaisut eivät ole sellaisenaan tekijänoikeudellisesti merkityksellisiä. Vastaavasti edellä kohdissa 32 ja 36 todettu huomioon ottaen henkilökantajien asiakirjatodisteina 41–46 esittämillä mallinnustiedostoilla tai kuvaruutukaappauksilla on vain rajallisesti merkitystä asian arvioinnissa. Niin ikään henkilökantajien asiakirjatodisteissa 38 ja 47 Baylis ja Barquin ovat esittäneet näkemyksiään alusten luomisprosessista, millä on muun ohella kyseisten henkilöiden todistelutarkoituksessa kuuleminen huomioon ottaen vain rajallisesti itsenäistä merkitystä näyttönä asiassa.

*4.3 Henkilökantajakohtainen todistelu ja sen arviointi*

*4.3.1 Sebastian Barquin*

45. Sebastian Barquin on vaatinut vahvistettavaksi, että hänellä on tekijänoikeus aluksiin Götterdämmerung mukaan lukien sisäpuoli, Liberty Capsule, Rheingold ja Zeppelin sekä Japanin edustajien alukseen, kuutukikohtaan (Schwarze Sonne) ja Helium 3 -junaan.

46. Sebastian Barquin on häntä todistelutarkoituksessa kuultaessa kertonut, että hän on tehnyt kolmiulotteista mallinnusta ja teksturointia eli mallien pintojen kuviointia ja väritystä. Hänen mukaansa työ oli luovaa ja itsenäistä. Konseptimalleja, ideoita ja muita kuvia oli, mutta ne piti muuttaa kolmiulotteisiksi malleiksi ja se edellytti luovuutta. Henkilökantajien asiakirjatodisteesta 38 ilmenevin tavoin konseptimalleista ja ohjauksesta huolimatta hänen piti improvisoida ja

käyttää tehtävien toteuttamisessa taiteellisia kykyjään, mutta paljon aikaa kului tarpeettomaan pienten yksityiskohtien hiomiseen.

47. Barquin on kertonut tehneensä Yhdistyneestä kuningaskunnasta käsin ennen Suomeen tuloaan Rheingold-aluksen mallin kolmea versioita Lehtiniemen kanssa. Tämä kesti kauan, koska Lehtiniemi halusi koko ajan lisää muutoksia ja lopulta Barquin katsoi, että alus oli jo valmis. Lehtiniemi on puolestaan kertonut, että Barquin sai käyttöönsä konseptikuvat ja yksinkertaisen kolmiulotteisen mallin ja että tuotantoyhtiöiden asiakirjatodisteesta 19 käyvät ilmi päivittäiset muutokset malliin. Puskala ja Vuorensola ovat kertoneet, että Rheingold oli perinteinen lentävä lautanen. Henkilökantajien asiakirjatodisteesta 38 ilmenee, että Barquinin mielestä konseptimallia mallinnettaessa "palaset eivät sopineet yhteen" ja hän käytti kykyjään yhteensovittamisessa.

48. Markkinaoikeus katsoo näytetyksi, että Lehtiniemi on luonut tuotantoyhtiöiden asiakirjatodisteista 15 ja 19 ilmenevän Rheingold-aluksen kahdesta eri suunnasta näkyvän varsin yksityiskohtaisen konseptikuvan ja yksinkertaisen mallin, joiden pohjalta Barquin ryhtyi Lehtiniemen ohjeiden mukaisesti toteuttamaan aluksen mallinnusta. Barquin ei ole lähemmin yksilöinyt millaista omaperäistä ja itsenäistä luomistyötä hän olisi tehnyt ja markkinaoikeus katsoo jääneen näyttämättä, että Barquinia olisi pidettävä kyseisen aluksen tekijänä.

49. Barquin on myös kertonut, että hänellä oli kunnia "saada elokuvan ensimmäinen kuva", jossa näkyi Liberty Capsule -alus. Henkilökantajien asiakirjatodisteessa 38 Barquin on esittänyt tehneensä kyseisen aluksen käyttäen internetistä löytämiään malleja ja referenssejä ja käyttäen luovuuttaan laittamalla yksityiskohdat oikeille paikoille, jotta malli näyttäisi realistiselta. Vuorensola on kertonut, että aluksella pyrittiin realistiseen Yhdysvaltojen National Aeronautics and Space Administrationin (NASA) kiertoratamoduulin kuvaamiseen. Markkinaoikeus katsoo, että kysymyksessä oleva alus on pyritty mallintamaan tarkasti olemassa olevien kuvien ja mallien perusteella ja lähemmin yksilöimättä on jäänyt, mitä tekijänoikeudellisesti merkityksellistä luomistyötä Barquin olisi tehnyt. Markkinaoikeus katsoo jääneen näyttämättä, että Barquinia olisi pidettävä aluksen tekijänä.

50. Barquin on lisäksi kertonut tehneensä Trevor Baylisin ja Risto Puukon ohjeiden perusteella osia Götterdämmerung-aluksesta. Henkilökantajien asiakirjatodisteessa 38 on tuotu esiin teksturointi ja yksityiskohtien tekeminen sekä sisäosien osalta, että hän suunnitteli komentosillan taustalla näkyvät pilarit ja holvikaaret; katto-osat perustuivat uusklassisiin internetistä löytyneisiin arkkitehtuurimalleihin. Käsillä oleva vaatimus perustuu vain mainittuun aluksen sisätiloja koskevaan työhön, jolta osin vaatimus on edellä todetusti hylättävä, ja markkinaoikeus katsoo jääneen näyttämättä, että Barquinia olisi pidettävä kyseisen aluksen tekijänä.

51. Barquin on edelleen kertonut Torssosen pyytäneen mahdollisimman yksinkertaisia neliönmuotoisia panssaroituja levyjä Zeppelin-alukseen ja hän teki tämän, mutta ei mitään muuta tai muita elementtejä.

Henkilökantajien asiakirjatodisteessa 38 Barquin on esittänyt tehneensä kuutukikohdan sisäänkäyntiin liittyviä töitä ja Helium 3 -junaan yksityiskohtia.    Markkinaoikeus katsoo jääneen näyttämättä, että Barquinia olisi pidettävä Zeppelin-aluksen, Helium 3 -junan tai kuutukikohdan tekijänä.

52. Barquin on vielä kertonut tehneensä, mallintaneensa ja kokonaan teksturoineensa Japanin edustajien aluksen. Henkilökantajien asiakirjatodisteen 38 mukaan alus oli kokonaan hänen tekemä ja mallintama ja jossa eräät luodut yksityiskohdat olivat NASA-viittauskuvien inspiroimia, ja pääosat ja paneelit olivat konseptimallista, mutta hän käytti luovuutta sijoittelussa, jotta lopputulos olisi realistinen. Barquinin kertoman mukaan työn hyväksyi Myers.

53. Markkinaoikeus toteaa, että tuotantoyhtiöt ovat viitanneet konseptikuviin yleisesti ottaen, mutta eivät ole esittäneet konseptikuvia tai muutakaan todistelua nimenomaan ja konkreettisesti Japanin edustajien alusta koskien ja erityisesti Lehtiniemen tai muiden henkilöiden roolista sen tekemisessä. Kokonaisvaikutelman perusteella aluksen suunnitteluun voidaan katsoa sisältyneen omaperäisiä valintoja. Esitetyn näytön perusteella markkinaoikeus katsoo, että Barquinille on syntynyt tekijänoikeus kyseiseen alukseen tuomiolauselmasta ilmenevin tavoin. Muilta Barquinia koskevilta osin kannevaatimus 2 on hylättävä.

### 4.3.2 Trevor Baylis

54. Trevor Baylis on vaatinut vahvistettavaksi, että hänellä on tekijänoikeus aluksiin Götterdämmerung mukaan lukien sisäpuoli, Rheingold, George W. Bush, Valkyrie sekä Australian edustajien alukseen, kuutukikohtaan (Schwarze Sonne) mukaan lukien sisäpuoli ja kuuhunlaskeutumisalukseen (Landing Module).

55. Risto Puukko on häntä todistelutarkoituksessa kuultaessa kertonut toimineensa "supervisorina" Baylisin animoidessa Götterdämmerung-alusta ja Bayliksen puolestaan toimineen aluksen mallinnuksen ohjaajana. Hänen mukaansa Baylisillä oli vahva näkemys siitä, miten alus tehdään aikataulun puitteissa, ja Baylis toimi itsenäisesti ja teki hyvää työtä. Aluksesta oli olemassa sivusta ja edestä Lehtiniemen tekninen piirustus, joiden pohjalta Puukko suunnitteli mallinnusta.

56. Baylis on häntä todistelutarkoituksessa kuultuna kertonut tehneensä muun ohessa aluksen pyörivän moottorin, konehuoneen ja hangaarin ja aluksen tuhoutumisanimaatiot.    Baylis on viitannut henkilökantajien asiakirjatodisteenaan 47 esittämään Baylisin lausuntopyyntöön tekijänoikeusneuvostolle.    Lausuntopyynnön mukaan alus oli monimutkainen ja sen valmiiksi rakentamiseen tarvittiin kokonainen työryhmä. Lisäksi lausuntopyynnön mukaan aluksen mallintamista tehtiin yksityiskohtaisesti ja mielikuvituksellisesti. Kuvasuunnitelmia tai muita käyttökelpoisia referenssejä ei ollut tarjolla. Aluksesta näkyi elokuvassa myös lähikuvia, jonka vuoksi yksityiskohtien hiomiseen oli tehtävä työtä. Kyseisen asiakirjatodisteen mukaan Baylis kokosi itsenäisesti aluksen

takaosan omiin ratkaisuihin pohjautuen, eikä hän varsinaisesti edes keskustellut kyseisistä rakenteista Lehtiniemen kanssa.

57. Parkkola on häntä todistelutarkoituksessa kuultuna kertonut, että Baylis johti Götterdämmerung-aluksen mallintamista ja se jaettiin paloittain mallintajille. Parkkola oli yksi aluksen päämallintajista ja koko aluksen yläosa, moottoriosa ja pohja olivat hänen käsialaansa. Baylisillä ja Lehtiniemellä oli eri näkemyksiä aluksesta ja siitä tuli eri näköinen kuin alun perin oli suunniteltu. Suunnittelu ei ollut vielä valmis ja koska alus ei olisi muutoin valmistunut ajoissa, jo tehty neljäsosa aluksesta kopioitiin muihin osiin. Baylis otti tässä johtajan paikan ja kertoi muille mallintajille mitä heidän pitäisi tehdä. Aluksen mallintaminen vei 5–8 henkilöltä kolme kuukautta. Parkkolan valmistaman materiaalin hyväksyivät Lehtiniemi ja Baylis, ja yleensä Lehtiniemeltä tarkistettiin, että tulos näytti hyvältä.

58. Lehtiniemi on kertonut, että Baylisille annettiin tuotantoyhtiöiden asiakirjatodisteen 15 kohdasta "gotterdammerung30" ilmenevä kolmiulotteinen luonnossuunnitelma ja alus koottiin useiden henkilöiden tekemistä palasista. Baylis sai tehtäväksi aluksen "layoutin", hän kokosi sen yhteen ja valmisteli sen animointia varten. Lehtiniemen mukaan ensimmäiset luonnokset konehuoneesta tulivat päälavastajalta ja yksi komponentti oli saanut mallin Titanicista. Lehtiniemi on lisäksi kertonut käyneensä läpi ongelmatilanteita mallintajien kanssa. Vuorensola on puolestaan kertonut, että aluksesta tehtiin Lehtiniemen kanssa useita versioita ja Vuorensola halusi siihen paljon liikkuvia osia, kuin "taskukellon sisuskalut avaruudessa", ja tämän pohjalta Lehtiniemi lähti määrittelemään alusta esittäen myös esimerkiksi, että aluksessa pitäisi olla "sydän joka sykkii", ja alukseen rakennettiin keskusmäntä ja pyöriviä rataksia. Puskala on kertonut, että aluksen oli tarkoitus olla yhdistelmä kelloa ja dieselmoottoria ja Lehtiniemen idean mukaan kuin koko ajan liikkeessä olevan kellon koneisto.

59. Markkinaoikeus katsoo jääneen näyttämättä, että Götterdämmerung-aluksen sisäosien osalta Baylisia olisi pidettävä kannevaatimuksessa 2 tarkoitetulla tavalla aluksen ja sen sisäosien tekijänä. Markkinaoikeus katsoo niin ikään edellä kohdassa 33 todettu huomioon ottaen jääneen näyttämättä, että Baylisiä olisi aluksen tuhoutumista koskevan kohtauksen perusteella pidettävä kannevaatimuksessa 2 tarkoitetulla tavalla kyseisen aluksen tekijänä.

60. Markkinaoikeus toteaa todistelun perusteella olevan selvää, että aluksen ulkomuotoon on mallinnettu hyvin suuri määrä erilaisia rataksia ja muita yksityiskohtia, joita edellä mainitussa alkuperäisessä mallissa ei ole ollut. Esitetyn perusteella karkealla tasolla havaittavat aluksen ominaispiirteet ovat kuitenkin jo olleet olemassa. Kyseisten yksityiskohtien toteuttamisesta Baylisin toimesta ja tähän liittyvistä työvaiheista ja ohjeistuksesta ei ole esitetty juurikaan selvitystä. Näissä olosuhteissa ei ole tarpeen lähemmin arvioida sitä, onko kyseisiin yksityiskohtiin liittynyt sellaista riittävän omaperäistä henkistä luomistyötä, että ne perustaisivat tekijänoikeuden kyseiseen alukseen.

Markkinaoikeus katsoo jääneen näyttämättä, että Baylisiä voitaisiin pitää kyseisen aluksen tekijänä.

61. Baylis on myös kertonut, että Rheingold-aluksen jalakset eivät toimineet ja hän animoi ne. Henkilökantajien asiakirjatodisteen 47 mukaan laskutelineille oli alustava animointirunko (riggaus), jonka oli aloittanut Puukko, ja Baylis teki sen valmiiksi ja että jalakset ja aluksen rungon tekivät toiset henkilöt. Markkinaoikeus katsoo jääneen näyttämättä, että Baylisiä olisi jalasten animoinnin perusteella pidettävä kyseisen aluksen tekijänä.

62. Henkilökantajien asiakirjatodisteiden 39 ja 47 mukaan Baylis on mallintanut ja animoinut George W. Bush -aluksen tärkeimmät aseet. Kyseinen, päällisin puolin samankaltainen ase ilmenee myös tuotantoyhtiöiden asiakirjatodisteessa 15 ilmenevistä kuvista, joista ainakin eräät ovat Lehtiniemen kertoman mukaan hänen laatimiaan tai alustavasti mallintamiaan ja että useampi henkilö mallinsi "niitä" ja Baylis ainakin valmisteli animointia. Lehtiniemen mukaan aseen keskeisimmät piirteet oli määritelty konseptikuvissa jo vuonna 2008, hänellä oli ollut idea aseesta jo ennen Iron Sky -projektin alkamista, sillä eräässä pelissä oli ollut hyvin samankaltainen ase, ja hän suunnitteli myös aseen liikkumisen ja ohjeisti mallintajia. Markkinaoikeus katsoo, että esitetyn perusteella Baylisin tekijänoikeus voisi kohdistua lähinnä aseen animointiin, jota ei voi kuitenkaan pitää ainakaan erityisen omaperäisenä. Markkinaoikeus katsoo jääneen näyttämättä, että Baylisin toimet aluksen aseeseen ja erityisesti sen animointiin liittyen olisivat olleet sellaisella tavalla omaperäisiä ja itsenäisiä, että häntä voitaisiin pitää kyseisen aluksen tekijänä.

63. Baylis on lisäksi kertonut, että Valkyrie-alus täytyi mallintaa pitkälti uudestaan, koska se oli ensimmäisiä malleja ja sitä käytettiin runsaasti tuotannossa. Baylis ei ole kuitenkaan kertonut, mitä hän olisi itse tehnyt, eikä ilmi ole tullut mitä tekijänoikeudellisesti merkityksellistä luomistyötä uudelleen mallintamisessa olisi tehty. Henkilökantajien asiakirjatodisteesta 47 on pääteltävissä, että aluksen eri versiot ovat hänenkin mukaan olleet toisten henkilöiden tekemiä. Markkinaoikeus katsoo jääneen näyttämättä, että Baylisiä olisi pidettävä kyseisen aluksen tekijänä.

64. Baylis on edelleen kertonut, että Australian edustajien aluksen osalta kaikki animaatiot ja liikkeet kuuluivat hänen työtehtäviinsä ja aluksia tehtiin yhteistyössä. Tuotantoyhtiöiden asiakirjatodisteessa 15 on esitetty Lehtiniemen laatimia konsepti- ja muita eri suunnitteluvaiheen kuvia aluksesta. Markkinaoikeus toteaa, että lähemmin yksilöimättä on jäänyt, mitä tekijänoikeudellisesti merkityksellistä luomistyötä Baylis olisi kyseiseen alukseen tehnyt. Markkinaoikeus katsoo jääneen näyttämättä, että Baylisiä olisi pidettävä kyseisen aluksen tekijänä.

65. Baylis on vielä kertonut tehneensä kuutukikohtaan nostokurkikohtauksissa käytetyn monimutkaisen sisätilanäkymän. Henkilökantajien asiakirjatodisteen 47 mukaan Baylis työskenteli

Valkyrien hangaarikohtauksen luomiseksi yksin suullisen ohjeen ja Lehtiniemen hyvin alkeellisten luonnosten pohjalta, ja Rheingold-nostokurkikohtauksen parissa animoimalla nostokurkea. Markkinaoikeus toteaa, että Baylisin vaatimukset ovat perustuneet vain kuutukikohdan sisätiloihin ja katsoo jääneen näyttämättä, että Baylisiä olisi pidettävä kuutukikohdan tekijänä.

66. Baylis on edelleen kertonut tehneensä kuuhunlaskeutumisaluksesta toisen mallin sen räjäyttämistä varten. Henkilökantajien asiakirjatodisteissa 39 ja 47 Baylis on esittänyt vastanneensa yksin kuuhunlaskeutumisaluksen geometriasta sen räjähtäessä. Vuorensolan mukaan alus oli tavanomainen ja NASA-mallin mukainen. Markkinaoikeus katsoo edellä kohdassa 33 todettu huomioon ottaen jääneen näyttämättä, että Baylisiä olisi pidettävä kyseisen aluksen tekijänä pelkästään räjäytystä koskevan animoinnin perusteella.

67. Näin ollen Baylisin osalta kannevaatimus 2 on hylättävä.

*4.3.3 Pyry Parkkola*

68. Pyry Parkkola on vaatinut vahvistettavaksi, että hänellä on tekijänoikeus aluksiin Götterdämmerung mukaan lukien sisäpuoli, Zeppelin, George W. Bush ja Mir.

69. Parkkola on kertonut, että aluksista oli 1–2 konseptikuvaa, joista välittyi tunnelma ja "yleisfiilis", ei yksityiskohtia. Lehtiniemi antoi hänelle muun ohessa kansion toisen maailmansodan aikaisista kuvista. Parkkolan mukaan mallinnusta tehtiin 95 prosenttia ajasta omatoimisesti. Välillä tarkistettiin Lehtiniemeltä vastasiko työ hänen näkemystään, jolloin Lehtiniemi hyväksyi sen tai pyysi tekemään pieniä korjauksia. Näin tehtiin erityisesti Mir-aluksen mallintamisen osalta.

70. Parkkola on myös kertonut edellä kohdassa 57 todetulla tavalla olleensa yksi Götterdämmerung-aluksen päämallintajista ja että koko aluksen yläosa, moottoriosa ja pohja olivat hänen käsialaansa. Parkkolan valmistaman materiaalin hyväksyivät Lehtiniemi ja Baylis, ja yleensä Lehtiniemeltä tarkistettiin, että tulos näytti hyvältä.

71. Parkkola on lisäksi kertonut, että henkilökantajien asiakirjatodisteesta 35 ilmenevästi Zeppelin-aluksen pohjalla oli malli, josta ilmeni muoto. Alukseen tuli mallintaa massiivisten metalliovien avautuminen ja takaosat, joista moottoriosan teki toinen henkilö. Etenkin metallirakenteiden osalta työssä oli paljon omatoimisuutta. Puskala on kertonut, että Lehtiniemen ensimmäisissä konseptikuvissa näkyi se, kun George W. Bush -alus ampuu läpi Zeppelin-aluksesta.

72. Parkkola on edelleen kertonut tehneensä henkilökantajien asiakirjatodisteesta 35 ilmenevästi George W. Bush -aluksen etuosan kuorta ja pienempiä aseita sekä "rinkulan" yksityiskohtia ja keskusta-aluetta. Puskala on kertonut, että aluksesta oli monia versioita ja se oli saanut vaikutteita ISS-avaruusasemasta ja siihen sisältyi pyörivä osa

painovoiman luomiseksi. Tuotantoyhtiöiden asiakirjatodisteesta 15 ilmenee useita kymmeniä ilmeisesti Lehtiniemen laatimia hyvin yksityiskohtaisia konseptikuvia aluksesta sekä referenssejä.

73. Markkinaoikeus toteaa, että lähemmin yksilöimättä on jäänyt, mitä tekijänoikeudellisesti merkityksellistä luomistyötä Parkkola olisi Götterdämmerung-, Zeppelin- ja George W. Bush -aluksiin tehnyt. Markkinaoikeus katsoo jääneen näyttämättä, että Parkkolaa olisi pidettävä kyseisten alusten tekijänä.

74. Parkkola on vielä kertonut, että hän mallinsi Mir-aluksen kokonaan itse Lehtiniemen konseptikuvien perusteella ja se oli monimutkaisin ja tarkin malli, ja että tähän kului paljon aikaa, vaivaa ja ajatusta. Kaksiulotteisen kuvan mallintaminen kolmiulotteiseksi edellyttää luovuutta. Verrattaessa hänen previsualisointimallin perusteella Lehtiniemen tekemään konseptikuvaan, muoto pysyi samana, mutta kaikki muu kehittyi. Malliin myöhemmin toisen henkilön toimesta lisättiin tekstuurit Lehtiniemen konseptin perusteella.

75. Markkinaoikeus toteaa, että tuotantoyhtiöiden asiakirjatodisteesta 15 ilmenee, että Mir-aluksesta oli laadittu useita hyvin erilaisia konseptikuvia, joista kuitenkin viimeisimmät vastaavat ainakin päällisin puolin muodoiltaan hyvin pitkälti lopullista alusta. Markkinaoikeus katsoo jääneen näyttämättä, mitä sellaista tekijänoikeudellisesti merkityksellistä itsenäistä ja omaperäistä luomistyötä Parkkola olisi alukseen tehnyt, että häntä olisi pidettävä aluksen tekijänä.

76. Näin ollen Parkkolan osalta kannevaatimus 2 on hylättävä.

*4.3.4 Risto Puukko*

77. Risto Puukko on vaatinut vahvistettavaksi, että hänellä on tekijänoikeus aluksiin Götterdämmerung mukaan lukien sisäpuoli ja Zeppelin sekä kuuhunlaskeutumisalukseen (Landing Module) ja kuutukikohtaan (Schwarze Sonne) mukaan lukien sisäpuoli.

78. Puukko on kertonut tuoneensa projektiin toimintamallin, jolla isomman kokonaisuuden palasia voidaan jakaa eri henkilöiden tehtäväksi ja käytännössä toimineensa esituotannon suunnittelijana ja supervisor-tehtävässä tarkastaneensa päivittäin mitä on tehty ja tarvittaessa korjanneensa tai neuvoneensa korjauksissa. Hänen mukaansa "supervising" luovassa prosessissa tarkoittaa sitä, että lopputulos myös näyttää taiteellisesti hyvältä ja toimii ja että palaset sopivat yhteen kokonaisuuteen. Puukko on toisaalta myös kertonut, että hänet syrjäytettiin hyvin aikaisessa vaiheessa kaikenlaisesta päätöksenteosta ja häntä kiellettiin antamasta palautetta mallintamisesta.

79. Puukko on myös kertonut edellä kohdassa 55 todetulla tavalla toimineensa Baylisin ohjaajana tämän mallintaessa Götterdämmerung-alusta. Markkinaoikeus katsoo jääneen näyttämättä, että mainitun aseman johdosta tai muutoin Puukkoa olisi pidettävä kyseisen aluksen tekijänä.

80. Puukko on lisäksi kertonut miettineensä Sami Vaittinen kanssa Zeppelinin sisätilat ja supervisorina "saatelleensa" kyseisen aluksen alusta loppuun. Puukon mukaan esimerkiksi aluksen räjähtämisen kestoa ei ollut määritelty ja hän räjähdystä suunnitellessaan määritteli vaihe vaiheelta tarvittavat yksityiskohdat. Puskala on kertonut, että Lehtiniemen ensimmäisissä konseptikuvissa näkyi se, kun George W. Bush -alus ampuu läpi Zeppelin-aluksesta ja edellä todetusti sen, että Torssonen suunnitteli avaruustaistelut.

81. Markkinaoikeus katsoo edellä kohdassa 33 todettu huomioon ottaen jääneen näyttämättä, että Zeppelin-aluksen räjähdyksen perusteella Puukkoa olisi pidettävä kyseisen aluksen tekijänä. Muilta osin perusteet vaatimuksille ovat jääneet pitkälti yksilöimättä ja rajoittuneet lähinnä muiden henkilöiden työn ohjaukseen ja yhteensovittamiseen. Näiltäkin osin on jäänyt näyttämättä, että Puukkoa olisi pidettävä aluksen tekijänä.

82. Puukko on edelleen kertonut tehneensä animaation, jossa kuuhunlaskeutumisaluksesta laskeutuvat alas presidentinvaaleja koskevat liput. Vuorensola on kertonut, että alus oli tavanomainen ja NASA-mallin mukainen ja erityistä olivat liput. Markkinaoikeus katsoo edellä kohdassa 32 todettu huomioon ottaen jääneen näyttämättä, että Puukkoa olisi pidettävä kyseisen aluksen tekijänä.

83. Puukko on vielä kertonut kuuaseman osalta mallintaneensa vain yhtä hissiä ja että hississä oli olemassa saksalaisen lavastussuunnittelijan piirustus, joka ei kuitenkaan tyydyttänyt, vaan häntä pyydettiin käyttämään mielikuvitusta ja tekemään toisenlainen tai sirompi. Markkinaoikeus katsoo jääneen näyttämättä, että kyseistä sisätiloja koskevan mallinnuksen perusteella Puukkoa olisi pidettävä kuuaseman tekijänä.

84. Näin ollen Puukon osalta kannevaatimus 2 on hylättävä.

*5 Ovatko henkilökantajat luovuttaneet mahdollisia tekijänoikeuksiaan*

85. Vahvistusvaatimuksella 3 on vaadittu vahvistettavaksi, että henkilökantajat eivät ole luovuttaneet oikeuksia luomiinsa vaatimuksissa 1 ja 2 tarkoitettuihin teoksiin laajemmin tai muutoin kuin käytettäväksi vaatimuksessa yksilöidyin tavoin Iron Sky -elokuvaan liittyen.

86. Tekijänoikeuslain 27 §:n 1 momentin mukaan tekijänoikeus voidaan, 3 §:n säännöksistä johtuvin rajoituksin, luovuttaa kokonaan tai osittain. Asiassa ei ole ilmennyt riitaisuutta tekijänoikeuslain 3 §:ssä säädetyistä niin sanotuista moraalisista oikeuksista. Asian luonne ja vaatimuksen tueksi esitetyt perusteet huomioon ottaen vaatimuksen on katsottava koskevan tekijänoikeuslain 2 §:ssä tarkoitettuja taloudellisia oikeuksia.

87. Edellä todetusti kannevaatimus 1 on hylättävä ja myös kannevaatimus 2 on hylättävä muutoin kuin siltä osin, että Barquinia on pidettävä Japanin edustajien aluksen tekijänä. Näin ollen kannevaatimusta 3 on tarpeen arvioida vain Barquinin mainitun teoksen osalta.

88. Tuotantoyhtiöiden asiakirjatodisteena 7 on esitetty Barquinin työsopimus, joka on koskenut aikaa 21.3.2011–31.10.2011. Barquin on kertonut, että hän aloitti työnsä Japanin edustajien aluksen tai Götterdämmerung-aluksen sisätilojen parissa. Markkinaoikeus katsoo näytetyksi, että Barquin on tehnyt Japanin edustajien aluksen mainitun sopimuksen puitteissa.

89. Kyseisessä sopimuksessa on mainittu "Project: Iron sky" ja kohdassa "Rights" on todettu seuraavaa:

> "The employee shall give the employer exclusive rights to any material created during work as well as the motion picture itself, including but not limited to unlimited rights to produce, distribute, perform and promote the film in any form, via any distribution method, in all countries. Such rights are transferable to a third party (such as Blind Spot Pictures) without hearing the employee. The compensation agreed on in this contract includes compensation for any such rights."

90. Markkinaoikeus toteaa mainitun sopimuksen sanamuodosta "any material created during work" ilmenevän, että sopimuksella Barquin on luovuttanut työnantajalle yksinoikeudella tekijänoikeuslain 2 §:ssä tarkoitetut oikeudet kaikkeen tekemäänsä aineistoon. Edelleen sanamuotonsa "including but not limited to unlimited rights to" perusteella markkinaoikeus katsoo, että oikeuksien luovutus on koskenut kaikkia hyödyntämismuotoja ja sopimuksessa erikseen luetellut hyödyntämismuodot ovat olleet vain esimerkinomaisia. Myös työnantajan oikeudesta luovuttaa oikeudet edelleen on sovittu nimenomaisesti.

91. Tekijänoikeuslain 28 §:n mukaan ellei toisin ole sovittu, ei se, jolle tekijänoikeus on luovutettu, saa muuttaa teosta eikä luovuttaa oikeutta toiselle.

92. Kyseisessä säännöksessä säädettyjen edelleenluovutus- ja muunteluoikeuksien osalta oikeuskirjallisuudessa (Harenko ym., Tekijänoikeus, 2016, s. 351) on esitetty, että jos osapuolten tarkoituksena on, että luovutus pitää sisällään myös muuntelu- tai edelleenluovutusoikeuden, on tämä mainittava nimenomaisesti luovutussopimuksessa. Maininnan puuttuminen ei toisaalta merkitse sitä, ettei luovutuksensaaja olisi voinut saada hyväkseen myös näitä oikeuksia. Oikeuskirjallisuudessa on myös todettu (Haarmann, Tekijänoikeus ja lähioikeudet, 2005, s. 309), että lainkohdassa tarkoitetun sopimuksen ei tarvitse olla nimenomainen; olosuhteista ja luovutuksen tarkoituksesta voidaan päätellä tiettyjen muutosten olevan sallittuja. Esimerkiksi lehden julkaisijan katsotaan olevan oikeutettu tekemään julkaistavakseen ottamiinsa kirjoituksiin niin sanottuja toimituksellisia muutoksia. Työsuhteen osalta viimeksi mainitussa teoksessa on todettu (s. 323), että yleisenä voitaneen nykyään pitää ajattelumallia, jonka mukaan työnantaja saa sopimusten puuttuessa työntekijänsä luomaan teokseen normaalin toimintansa edellyttämän käyttöoikeuden. Se oikeus, jonka työnantaja

kuvatun ajattelumallin mukaan sopimuksen puuttuessa työntekijänsä teoksen hyväksikäyttämiseen saa, on yleensä eksklusiivinen.

93. Markkinaoikeus toteaa, että käsillä olevassa asiassa työsopimuksessa ei ole nimenomaisesti erikseen mainittu muunteluoikeutta. Markkinaoikeus on kuitenkin edellä katsonut, että sopimuksella on luovutettu oikeudet kaikkeen työsuhteessa luotuun aineistoon ja luovutus koskee rajoituksetta kaikkia hyödyntämistapoja. Markkinaoikeus katsoo lisäksi, että elokuva-alalla työnantajan normaalin toiminnan edellyttämän käyttöoikeuden on tyypillisesti katsottava olevan varsin laajan ja sisältävän myös oikeuden tietynasteiseen muunteluun. Nyt käsillä olevassa asiassa alukset on teknisistä syistä ollut välttämätöntä luoda elokuvaa varten useissa eri perättäisissä työvaiheissa, joista yksi on ollut mallinnus. Työvaiheista ovat vastanneet osin eri henkilöt ja myös yksittäiseen työvaiheeseen, kuten mallinnukseen, on voinut osallistua samankin aluksen osalta useita henkilöitä. Markkinaoikeus katsoo, että elokuvan digitaaliset visuaaliset tehosteet alukset mukaan lukien ovat olleet sen luonteisia, että niitä on ollut tarpeen ja tarkoituskin vielä tarvittaessa muunnella ja että Barquinin on tullut ymmärtää tämä. Edellä todetun perusteella markkinaoikeus arvioi kokonaisuutena, että nyt käsillä olevassa asiassa Barquinin on katsottava joka tapauksessa luovuttaneen yksinoikeudella myös muunteluoikeuden.

94. Henkilökantajien mukaan asiassa tulee tarpeen mukaan ja soveltuvin osin soveltaa tekijänoikeuslain 29 §:ssä säädettyä sovittelusäännöstä ja tulkita mahdollisia sopimuksia suppeasti myös sen johdosta, että kantajien suorituksistaan saama korvaus on ollut olennaisen pieni.

95. Tekijänoikeuslain 29 §:n 1 momentin mukaan, jos teoksen alkuperäisen tekijän tekijänoikeuden luovutuksesta tekemän sopimuksen ehto on alalla vallitsevan hyvän sopimustavan vastaisella tavalla tai muutoin kohtuuton tai sen soveltaminen johtaisi kohtuuttomuuteen, ehtoa voidaan sovitella tai se voidaan jättää huomioon ottamatta. Pykälän 2 momentin mukaan kohtuuttomuutta arvioitaessa on otettava huomioon sopimuksen koko sisältö, osapuolten asema, sopimusta tehtäessä ja sen jälkeen vallinneet olosuhteet sekä muut seikat.

96. Barquin on kertonut työskennelleensä Rheingold-aluksen parissa aluksi Yhdistyneestä kuningaskunnasta käsin ilman korvausta, koska hän halusi työskennellä Iron Sky -elokuvassa ja tällöin koko ajan viestineensä haluavansa tulla projektiin, koska kysymyksessä oli hänen ensimmäinen elokuvansa. Barquin on niin ikään kertonut toivoneensa uutta uraa ja hyväksyneensä sopimuksen, vaikka olikin mielestään alipalkattu. Barquinin työsopimuksen mukainen palkka oli 2.200 euroa kuukaudessa.

97. Markkinaoikeus toteaa edellä mainitun oikeuksien luovutusta koskevan sopimuksen olevan sanamuodoltaan yksiselitteinen ja Barquinin tietoisesti hyväksyneen sopimuksen, eikä Barquinin kertomus huomioon ottaen asiassa ole ilmennyt perusteita tulkita sopimusta myöskään tekijänoikeuslain 29 §:n perusteella muutoin kuin edellä

kohdissa 90 ja 93 todetulla tavoin. Kannevaatimus 3 on näin ollen hylättävä myös Barquinin edellä mainituilta osin.

98. Koska tekijänoikeutta elokuvaan koskeva vahvistusvaatimus 1 on hylättävä ja tekijänoikeutta elokuvaa varten tehtyihin materiaaleihin koskeva vahvistusvaatimus 2 on pääosin hylättävä ja muilta osin materiaaleja koskevat luovutettavissa olleet tekijänoikeudet muunteluoikeus mukaan luettuna on luovutettu yksinoikeudella työnantajalle ja olleet luovutettavissa eteenpäin, eivät tuotantoyhtiöt ole voineet vahvistusvaatimuksessa 4 tarkoitetulla tavalla loukata henkilökantajien tekijänoikeutta ja siten kyseinen vaatimuskin on hylättävä. Niin ikään edellä mainittuihin vahvistusvaatimuksiin tai niiden menestymiseen perustuvat kieltovaatimukset 5 ja 6 on hylättävä.

*6 Tuotantoyhtiöiden vastakanteessa esittämät vaatimukset*

99. Vastakanteen vahvistusvaatimuksessa 1 on vaadittu vahvistettavaksi, että henkilökantajilla ei ole tekijänoikeuslain eräiden säännösten mukaista tekijänoikeutta Iron Sky -elokuvaan versioineen tai oikeutta mihinkään kyseisiin elokuviin tekemäänsä materiaaliin. Tuotantoyhtiöt ovat perustaneet vaatimuksen siihen, että henkilökantajat ovat luovuttaneet elokuviin ja niihin tekemiinsä materiaaleihin liittyvät mahdolliset tekijänoikeuslain 2 §:n mukaiset tekijänoikeutensa työnantajalleen yksinoikeudella.

100. Oikeudenkäymiskaaren 24 luvun 3 §:n 2 momentin mukaan asiassa, jossa sovinto on sallittu, tuomiota ei saa perustaa seikkaan, johon asianosainen ei ole vaatimuksensa tai vastustamisensa tueksi vedonnut. Henkilökantajat ovat vaatineet vaatimuksen tutkimatta jättämistä tai hylkäämistä vastustaen kyseistä vaatimusta ainoastaan sillä perusteella, ettei samasta kysymyksestä ole nostettavissa vastakannetta eikä vastakanteella olisi saavutettavissa parempaa tai laajempaa oikeussuojaa kuin vastustamalla pääkannetta. Markkinaoikeus on edellä kohdassa 13 katsonut, ettei kyseistä estettä vaatimuksen käsittelylle ole.

101. Edellä pääkanteen vahvistusvaatimusten 1–3 osalta todetusti henkilökantajille ei ole katsottava syntyneen tekijänoikeutta kyseiseen elokuvaan eikä tekijänoikeutta heidän yksilöimiinsä aluksiin tai muihin väitettyihin teoksiin Barquinin Japanin edustajien alusta lukuun ottamatta, miltä osin tekijänoikeuslain 2 §:ssä tarkoitetut oikeudet on kuitenkin yksinoikeudella luovutettu. Henkilökantajat eivät ole vastustamisensa tueksi edes väittäneet, että he olisivat luoneet muita teoksia, vaan päinvastoin katsoneet, että vastakanteessa on kyse samasta kysymyksestä kuin pääkanteessa ja ettei vastakanteella ole saavutettavissa laajempaa oikeussuojaa kuin vastustamalla pääkannetta. Näin ollen henkilökantajilla ei ole katsottava olevan vahvistusvaatimuksessa 1 tarkoitettua tekijänoikeutta mihinkään materiaaliin.

102. Edellä kohdassa 16 todetusti vielä julkaisemattomaan elokuvaan Iron Sky: The Coming Race kohdistuva vahvistusvaatimus 2 on hylättävä ennenaikaisena.

103. Vastakanteen vahvistusvaatimuksessa 3 on vaadittu vahvistettavaksi, että henkilökantajilla ei ole oikeutta käyttää mitään tekemäänsä Iron Sky -elokuviin liittyvää materiaalia. Tuotantoyhtiöt ovat perustaneet vaatimuksen siihen, että vaikka henkilökantajille olisikin syntynyt tekijänoikeus, se olisi luovutettu kokonaisuudessaan yksinoikeudella, eikä henkilökantajille olisi jäänyt oikeutta käyttää materiaalia itse. Henkilökantajat ovat vastustaneet vaatimusta muun ohella yksilöimättömänä.

104. Markkinaoikeus toteaa, ettei vaatimuksessa tai sen tueksi esitetyissä perusteissa ole yksilöity sitä, millä tavoin henkilökantajat eivät saisi käyttää kyseisiä materiaaleja. Tuotantoyhtiöiden on katsottava vaatineen, että henkilökantajat eivät saisi käyttää materiaaleja missään olosuhteissa. Tuotantoyhtiöt ovat siten yleisluontoisella vahvistusvaatimuksellaan käytännössä vaatineet markkinaoikeutta ennakollisesti ratkaisemaan sen, että kaikenlainen materiaalin käyttö loukkaisi tuotantoyhtiöille siirtynyttä tekijänoikeutta. Henkilökantajien on katsottava vaatimuksen yksilöimättömyydellä tarkoittaneen sitä, ettei vahvistusvaatimusta voi sen yleisluonteisuuden vuoksi hyväksyä. Markkinaoikeus edellä todetun perusteella katsoo, että vahvistusvaatimus 3 on hylättävä.

105. Vastakanteen vaatimuksessa 4 on vaadittu, että markkinaoikeus kieltää Baylisiä ja Parkkolaa jatkamasta tuotantoyhtiöiden tekijänoikeuden loukkaamista ja määrää heidät sakon uhalla lopettamaan loukkaavan aineiston yleisön saataviin saattamisen. Tuotantoyhtiöt ovat perustaneet vaatimuksen siihen, että kyseiset henkilöt ovat käyttäneet tekijänoikeudella suojattua materiaalia pelituotantonsa markkinoinnissa ja Baylis on käyttänyt 3D-tulosteissa elokuvan kuvamateriaalia, eikä heillä ole tai ole jäänyt oikeutta käyttää materiaalia itse. Henkilökantajat ovat vastustaneet vaatimusta sillä perusteella, että vaatimus on yksilöimätön, perusteeton ja toteen näyttämätön ja että käyttö ei olisi ollut tekijänoikeudellisessa mielessä relevanttia.

106. Tuotantoyhtiöiden asiakirjatodisteista 8 ja 10 ilmenee kuva avaruusaluksesta ja malli kolmiulotteista tulostamista varten. Baylis on kertonut, että kyse on alusta alkaen uudelleen tehdystä ja muokatusta Valkyrie-aluksen mallista ja todisteen 8 kuva perustuu tähän malliin.

107. Tuotantoyhtiöiden vaatimus on perustunut elokuvan kuvamateriaalin luvattomaan käyttöön, mutta yksilöimättä on muun ohella jäänyt, mihin teokseen liittyvää tekijänoikeutta ja miten sitä on kyseisellä menettelyllä väitetty loukatun. Markkinaoikeus katsoo yhtäältä jääneen näyttämättä, että kyseisillä kuvilla olisi loukattu tuotantoyhtiöiden tekijänoikeutta Iron Sky -elokuvateokseen. Toisaalta vaatimuksella on mahdollisesti tarkoitettu sitä, että elokuvaa varten tehdystä tekijänoikeuslailla suojatusta Valkyrie-aluksesta on tällä tavoin valmistettu kappaleita tai saatettu sitä yleisön saataviin.

108. Edellä todetusti Baylisille ja Parkkolalle ei ole katsottu syntyneen tekijänoikeutta Valkyrie-alukseen. Tuotantoyhtiöt eivät ole kuitenkaan

väittäneet tai esittäneet sellaista selvitystä, jonka perusteella olisi todettavissa kenelle, jos kenellekään, tekijänoikeus kyseiseen alukseen olisi syntynyt ja onko tätä koskeva tekijänoikeus siirtynyt yksinoikeudella tuotantoyhtiöille taikka esittäneet muitakaan perusteita sille, miten Baylisin ja Parkkolan menettely olisi loukannut niiden tekijänoikeuksia. Markkinaoikeus katsoo, että kyseinen tekijänoikeuden loukkaus on jäänyt näyttämättä eikä menettelystä ole tarpeen enemmälti lausua. Näin ollen edellytyksiä vaaditun kiellon ja loukkauksen lopettamisen määräämiselle ei ole ja kieltovaatimus 4 on hylättävä.

## 7 Oikeudenkäynti- ja asianosaiskulut

109. Oikeudenkäymiskaaren 21 luvun 1 §:n mukaan asianosainen, joka häviää asian, on velvollinen korvaamaan kaikki vastapuolensa tarpeellisista toimenpiteistä johtuvat kohtuulliset oikeudenkäyntikulut, jollei muualla laissa toisin säädetä. Luvun 3 §:n 1 momentin mukaan, jos samassa asiassa on esitetty useita vaatimuksia, joista osa ratkaistaan toisen ja osa toisen hyväksi, he saavat pitää oikeudenkäyntikulunsa vahinkonaan, jollei ole syytä velvoittaa asianosaista korvaamaan niitä osaksi vastapuolelle. Jos sillä, minkä asianosainen on hävinnyt, on vain vähäinen merkitys asiassa, hänen tulee saada täysi korvaus kuluistaan.

110. Pääkanteen osalta tuotantoyhtiöt ovat voittaneet asian lukuun ottamatta kokonaisuuden kannalta hyvin vähäiseksi jäänyttä osuutta Barquinin tekijänoikeuden syntymisestä yhteen alukseen, miltä osin tekijänoikeus on kuitenkin katsottu luovutetuksi yksinoikeudella. Markkinaoikeus katsoo, että tuotantoyhtiöillä on näin ollen lähtökohtaisesti oikeus saada täysi korvaus tarpeellisista toimenpiteistä johtuneista kohtuullisista oikeudenkäyntikuluistaan.

111. Vastakanteen osalta tuotantoyhtiöiden vahvistusvaatimus 1 on menestynyt, mutta muut vaatimukset on hylätty henkilökantajien pääosin vaatiman tutkimatta jättämisen asemesta. Markkinaoikeus toteaa, että yhtäältä vastakanteen vaatimukset ja niiden tueksi esitetyt perusteet ovat jääneet osin varsin epätäsmällisiksi ja toisaalta vastustamisen tueksi esitetyt perusteet varsin ohuiksi. Tämän perusteella pelkästään vastakannetta koskevat tosiasiassa aiheutuneet oikeudenkäyntikulut on katsottava määrältään puolin ja toisin pääkanteeseen verrattuna varsin vähäisiksi. Näissä olosuhteissa markkinaoikeus katsoo, että asianosaiset saavat pitää vastakanteesta aiheutuneet oikeudenkäyntikulut vahinkonaan. Asiaa ei ole syytä arvioida henkilökantajien esittämin tavoin toisin oikeudenkäymiskaaren 21 luvun 4 tai 5 §:ssä säädetyn perusteella.

112. Pääkanteen osalta tuotantoyhtiöiden arvonlisäveroton oikeudenkäyntikuluvaatimus on ollut kulujen osalta määrältään 2.050 euroa ja palkkion osalta 54.000 euroa eli yhteensä 56.050 euroa sekä asianosaiskulujen osalta 10.500 euroa. Pääkanteen osalta henkilökantajien oikeudenkäyntikuluvaatimukseksi on puolestaan ilmoitettu yhteensä 50.144,80 euroa, johon on heidän mukaan vielä tullut lisätä arvonlisäveron määrä.

113. Pääkanteen osalta henkilökantajat ovat paljoksuneet tuotantoyhtiöiden palkkiovaatimusta 100 tuntia ylittäviltä osin ja esittäneet, että heillä on ollut näyttötaakka ja lähtökohtaisesti enemmän toimenpiteitä vaativa asema prosessissa. Tuotantoyhtiöiden palkkiovaatimus pääkanteen osalta on käsittänyt toimenpiteitä noin 277 tunnilta, kun taas henkilökantajien osalta tämä on ollut noin 175 tuntia.

114. Tuotantoyhtiöt ovat esittäneet muun ohella, että ne ovat joutuneet käyttämään paljon aikaa haastehakemuksen epämääräisiin ja yksilöimättömiin vaatimuksiin ja niihin löyhästi liittyviin perusteluihin sekä virheellisyyksiin. Henkilökantajat ovat vasta oikeudenkäynnin loppuvaiheessa luopuneet vielä julkaisemattomaan elokuvaan liittyvästä loukkausväitteestään ja kohdistaneet sen vain elokuvan markkinointiin. Tuotantoyhtiöiden toimenpiteiden määrä on ollut asiaan nähden tarpeellinen.

115. Markkinaoikeus toteaa, että henkilökantajat ovat pääkanteen osalta määrittäneet oikeudenkäynnin kohteen sellaiseksi kuin se on ollut. Vaatimukset ja niiden tueksi esitetyt perusteet ovat olleet monilta osin varsin väljät ja asia on konkretisoitunut vasta vähitellen ja osittain vasta todistelussa. Markkinaoikeus katsoo, että näissä olosuhteissa ei ole ilmennyt perusteita sille, että tuotantoyhtiöiden toimenpiteet eivät olisi olleet tarpeellisia ja niistä aiheutuneet oikeudenkäyntikulut asian laatuun ja laajuuteen nähden kohtuullisia. Pääkanteesta johtuvien kulujen osalta ei ole esitetty huomautuksia. Henkilökantajat on näin ollen velvoitettava korvaamaan pääkanteen oikeudenkäyntikulut vaaditun määräisinä.

116. Oikeudenkäymiskaaren 21 luvun 8 §:n 1 momentin mukaan korvausta suoritetaan myös oikeudenkäynnin asianosaiselle aiheuttamasta työstä ja oikeudenkäyntiin välittömästi liittyvästä menetyksestä. Säännöksen esitöiden (HE 107/1998 vp s. 18) mukaan asianosaiselle itselleen suoritettavan oikeudenkäyntikulujen korvauksen tulee olla poikkeuksellista. Se ei saa olla korvaus oikeudenkäyntiin osallistumisesta tai siihen valmistautumisesta aiheutuvasta tavanomaisesta vaivannäöstä. Asianosaiselle itselleen työstä määrättävä korvaus tulee rajoittaa lähinnä tilanteisiin, joissa asianosainen itse on ammattitaitonsa tai erityisosaamisensa perusteella tehnyt sellaisia oikeudenkäynnin kannalta välttämättömiä paljon aikaa vaatineita toimenpiteitä, jotka jonkun muun suorittamina olisivat myös asiamiehen tai avustajan laskuttamia kulueriä.

117. Asianosaiskuluja on vaadittu korvattavaksi 14.500 eurolla, sisältäen Kaukomaalta 150 tuntia, Vuorensolalta 100 tuntia ja Leppäseltä 20 tuntia 50 euron tuntiveloituksella sekä Kaukomaan matkakuluina 1.000 euroa, joista pääkanteen erittelemätön osuus on ollut 10.500 euroa. Kyseisistä kuluista tai niiden perusteista ei ole esitetty tarkempaa selvitystä. Henkilökantajat ovat tältä osin esittäneet, että asianosaiskulujen korvaamiseen ei ole erityisiä syitä, lukuun ottamatta Vuorensolan ja Kaukomaan henkilökohtaisen kuulemisen osalta 1,5 tunnilta 30 euron tuntitaksan mukaisesti, eli yhteensä 90 euroa. Tuotantoyhtiöt ovat tästä puolestaan lausuneet, että asianosaiskulujen osalta Kaukomaa on ollut erityisesti tekemisissä vastaajayhtiöiden liiketoiminnan ja lisensoinnin

kanssa ja Vuorensolan rooli ohjaajana on ollut keskeinen ja hänen erityisosaamisensa on ollut tärkeää. Myös Leppäsen läsnäolo on ollut tarpeen. Asianosaiskuluna vaadittu tuntiveloitus on ollut tavanomainen.

118. Markkinaoikeus toteaa, että asian laatu ja todistelun laajuus ja yksityiskohtaisuus huomioon ottaen tuotantoyhtiöille on voinut aiheutua menetystä Kaukomaan ja Vuorensolan erityisosaamisensa puitteissa tekemistä paljon aikaa vaativista toimenpiteistä. Tarkemman selvityksen puuttuessa markkinaoikeus harkitsee kohtuulliseksi korvaukseksi Kaukomaan osalta 1.500 euroa ja Vuorensolan osalta 1.000 euroa. Kaukomaan matkakuluista tai Leppäsen osalta asianosaiskuluista ei ole esitetty sellaista selvitystä, että kuluja voitaisiin määrätä korvattaviksi.

**Tuomiolauselma**

Markkinaoikeus vahvistaa, että Sebastian Barquinille on syntynyt tekijänoikeus Iron Sky -elokuvassa käytettyyn Japanin edustajien alukseen.

Markkinaoikeus vahvistaa, että Trevor Baylisillä, Kelly Myersilla, Risto Puukolla, Pyry Parkkolalla tai Sebastian Barquinilla ei ole tekijänoikeuslain 2 §:n, 6 §:n tai 46 a §:n mukaista tekijänoikeutta Iron Sky tai Iron Sky Director's tai Dictator's Cut -elokuvaan taikka mihinkään kyseisiin elokuviin tekemäänsä materiaaliin.

Markkinaoikeus velvoittaa Trevor Baylisin, Kelly Myersin, Risto Puukon, Pyry Parkkolan ja Sebastian Barquinin yhteisvastuullisesti korvaamaan Blind Spot Pictures Oy:n ja Iron Sky Universe Oy:n oikeudenkäyntikulut kulujen osalta 2.050 eurolla ja palkkion osalta 54.000 eurolla eli yhteensä 56.050 eurolla sekä asianosaiskulut 2.500 eurolla, molemmat määrät viivästyskorkoineen. Viivästyskorkoa on maksettava korkolain 4 §:n 1 momentissa säädetyn korkokannan mukaisesti siitä lukien, kun kuukausi on kulunut tämän tuomion antamisesta.

Markkinaoikeus hylkää muilta osin kanteen ja vastakanteen sekä vaatimukset oikeudenkäynti- ja asianosaiskulujen korvaamisesta.

**MUUTOKSENHAKU**

Muutosta tähän ratkaisuun saa hakea korkeimmalta oikeudelta valittamalla vain, jos korkein oikeus niillä erityisillä perusteilla, jotka ilmenevät oheisesta valitusosoituksesta, myöntää valitusluvan.

Määräaika valitusluvan pyytämiseen ja valituksen tekemiseen päättyy 30.7.2018.


Puheenjohtaja                    Anne Ebklom-Wörlund

Asian ovat yksimielisesti ratkaisseet markkinaoikeustuomarit Anne Ekblom-Wörlund, Markus Mattila ja Pekka Savola.


**JAKELU**                    Sebastian Barquin ym.; oikeudenkäyntimaksu 500 euroa
                         Blind Spot Pictures Oy ym.; oikeudenkäyntimaksu 2.000 euroa

# VALITUSOSOITUS

Markkinaoikeuden ratkaisuun saa hakea muutosta valittamalla **korkeimpaan oikeuteen** kirjallisella valituksella, jos korkein oikeus oikeudenkäymiskaaren 30 luvun 3 §:n nojalla myöntää valitusluvan.

## Valitusluvan myöntämisen perusteet

Valituslupa voidaan myöntää ainoastaan
- jos lain soveltamisen kannalta muissa samanlaisissa tapauksissa tai oikeuskäytännön yhtenäisyyden vuoksi on tärkeää saattaa asia korkeimman oikeuden ratkaistavaksi, tai
- jos siihen on erityistä aihetta asiassa tapahtuneen sellaisen oikeudenkäynti- tai muun virheen takia, jonka perusteella ratkaisu olisi purettava tai poistettava, tai
- jos valitusluvan myöntämiseen on muu painava syy.

## Määräaika valitusluvan pyytämiseen ja valituksen tekemiseen

Korkeimmalle oikeudelle osoitettu muutoksenhakukirjelmä, joka sisältää valituslupahakemuksen ja valituksen, on toimitettava markkinaoikeuteen **60 päivän** kuluessa siitä päivästä, jona markkinaoikeuden ratkaisu annettiin.

## Muutoksenhakukirjelmän toimittaminen

Muutoksenhakukirjelmä voidaan toimittaa **markkinaoikeuteen** henkilökohtaisesti, asiamiestä käyttäen, lähetin välityksellä, postitse, faksilla tai sähköpostilla. Muutoksenhakukirjelmän on oltava perillä määräajan viimeisenä päivänä ennen tuomioistuimen aukioloajan päättymistä. Aukiolo päättyy kello 16.15.

Markkinaoikeuden osoite:

Radanrakentajantie 5
00520 Helsinki
Faksi         029 564 3314
Sähköposti    markkinaoikeus@oikeus.fi

## Muutoksenhakukirjelmän sisältö ja allekirjoittaminen

Valituslupahakemuksessa on mainittava
- markkinaoikeuden ratkaisu, johon haetaan muutosta
- se peruste, jolla valituslupaa haetaan
- syyt, joiden nojalla muutoksenhakija katsoo, että valitusluvan myöntämiseen on laissa tarkoitettu valitusluvan myöntämisen peruste.

Valituksessa on ilmoitettava
- miltä kohdin markkinaoikeuden ratkaisuun haetaan muutosta
- mitä muutoksia markkinaoikeuden ratkaisuun vaaditaan tehtäväksi
- perusteet, joilla muutosta vaaditaan.

Muutoksenhakukirjelmässä on lisäksi mainittava
- hakijan nimi ja kotikunta
- hakijan tai hänen asiamiehensä yhteystiedot, joihin asian käsittelyä koskevat ilmoitukset hakijalle voidaan toimittaa.

Mikäli edellä mainituissa yhteystiedoissa tapahtuu muutoksia, uudet yhteystiedot on toimitettava kirjallisesti korkeimman oikeuden kirjaamoon.

Muutoksenhakukirjelmä on hakijan tai, jollei hän itse ole sitä laatinut, sen laatijan allekirjoitettava. Kirjelmän laatijan on samalla ilmoitettava nimensä ja kotikuntansa.

**Muutoksenhakukirjelmän liitteet**

Muutoksenhakukirjelmään on liitettävä
- markkinaoikeuden ratkaisu alkuperäisenä tai jäljennöksenä,
- ne asiakirjat, joista ilmeneviin seikkoihin hakija viittaa perusteinaan,
- asiamiehen valtakirja, jollei asiamies ole asianajaja tai julkinen oikeusavustaja taikka luvan saanut oikeudenkäyntiavustaja.

Muutoksenhakija ei saa vedota muihin seikkoihin ja todisteisiin kuin niihin, jotka on esitetty markkinaoikeudessa, paitsi milloin hakija saattaa todennäköiseksi, ettei hän ole voinut vedota seikkaan tai todisteeseen markkinaoikeudessa tai että hänellä muuten on ollut pätevä aihe olla tekemättä niin.

Jos hakija haluaa esittää muutoksenhakemuksensa tueksi uusia todisteita, hänen on ne ilmoitettava ja lisäksi mainittava, mitkä seikat hän tahtoo näyttää toteen ja mistä syystä todistetta ei ole aiemmin esitetty.

**Maksut**

Muutoksenhakuasian käsittelystä korkeimmassa oikeudessa peritään oikeudenkäyntimaksu sen mukaan kuin laissa tarkemmin säädetään.