# EXHIBIT C

Machine Translated by Google

| | |
|---|---|
| **COPYRIGHT COUNCIL** | **STATEMENT 2018:12** |

**Thing**  Copyright protection of 3D animations and animated character

**Applicant** B

**Issued** on 18 December 2018

**Summary**

> *The five 3D animation videos referred to in the request for an opinion were film works in accordance with the Copyright Act. Just an abstract figure did not receive copyright protection as such. Its concrete forms of implementation, on the other hand, enjoy protection.*

**STATEMENT REQUEST**

1. B (the applicant) has requested the Copyright Council's opinion on the copyright protection of five short cartoon videos realized as 3D computer animation and the copyright protection of a 3D animated character. He has created a character named Trevi Tyger and five 3D animations called TreviTyger RockKat, TreviTyger Dance An-vil, TreviTyger Dance Jelly, TreviTyger Inflatable and TreviTyger Flamethrower, which he has attached to his request for a statement, as well as a handbook that provides information on how the character was created.

2. The applicant has requested that the Copyright Council confirm his rights to the mentioned works and confirm that he has exclusive rights to use the works in any way he wishes. In addition, he has requested that the logo and the TreviTyger figure be considered as objects receiving trademark legal protection, if this falls under the jurisdiction of the Copyright Council.

**STATEMENT OF THE COPYRIGHT BOARD**

3. According to Section 55 of the Copyright Act (404/61), the Copyright Council issues statements on the application of the Copyright Act. The nature of these statements is non-binding.

4. The person who has created a literary or artistic work has copyright to the work according to Section 1 of the Copyright Act (TekijäL, 404/1961).
The section contains an example list of the types of works that receive copyright protection. For example, fiction and explanatory

Machine Translated by Google

2

written and oral presentations, compositions, film works and photographic works and other visual art works. Copyright protects both the work as a whole and that part of the work that, viewed separately from the rest of the work, can be considered the original result of the author's creative work.

5. In its decision C-145/10 (Painer) issued on December 1, 2011, the Court of Justice of the European Union considered that a work can receive copyright protection if it is the result of the author's intellectual creative work in such a way that it reflects the author's personality and shows the author's free and creative responsibilities castles in the making. The task of the national court is to decide once and for all whether the act threshold has been exceeded.

6. The content of copyright is regulated in Section 2 and Section 3 of the Copyright Act. The economic rights of the author are regulated in Section 2 of the Copyright Act. According to it, copyright produces, with the restrictions stipulated in Chapter 2 of the Copyright Act, the exclusive right to dispose of the work by making copies of it and making it available to the public unaltered or altered, as a translation or variation, in another literary or artistic genre, or using another method of creation. According to section 2 subsection 3 of the Copyright Act, a work is made available to the public when it is performed publicly or when

a copy of it is offered for sale, rent or loan or is otherwise distributed to the public or publicly displayed. According to Section 2, subsection 2 of the Copyright Act, making a copy is also considered to be the transfer of the work to a device that can be used to reproduce it.

7. The author's moral rights are stipulated in Section 3 of the Copyright Act. According to it, the author's name must be indicated in accordance with good practice when copies are made of the work or the work is made available to the public in whole or in part. In addition, the regulation prohibits changing the work in a way that offends the author's literary or artistic value, or making the work available to the public in an offensive form or context.

**Copyright protection of 3D animations and character**

8. According to Article 2 of the Berne Convention, literary and artistic works receive copyright protection. This expression includes, among other things, film works, to which works expressed in a way comparable to filming are equated. According to the explanatory work of the Berne Convention, "in a manner comparable to filmmaking" refers not so much to the method of production of the work, but to the form of the resulting work, which is analogous to film. Therefore, the production method of a work that receives protection as a film does not have to be filming

BAYLIS_2

Machine Translated by Google

3

analogous to. (Guide to the Bern Convention, WIPO 1978, p. 15).

9. It appears from the explanatory work that the concept of film must be understood quite broadly. It covers all cinematographic works and works expressed in a way comparable to filming, regardless of their type, length, production method, technical process used, purpose or creator. (Guide to the Bern Convention, WIPO 1978, p. 15 - 16) In the edition revised in 2003, it is stated that film works are referred to in newer international and national standards and legal literature as "audiovisual works". However, this expression is not completely accurate in all cases, as exclusively visual works - without audio or sound elements - are also considered to belong to this category.

10. The concept of a film work has also been considered in the proposals of the Copyright Act. The copyright committee stated in its V part report that, in the copyright sense, works made of moving images or moving images and sound, as well as other works expressed in a manner comparable to cinematography, which exceed the threshold of copyright work, are considered to be cinematographic works. In addition to traditional films recorded on film, this definition covers, among other things, works broadcast on television, works recorded on video recordings and other works produced by cinematic means. In its report, the Copyright Committee did not specify what is meant by works produced by cinematic means. (Committee report 1990:31: Copying and distribution of audio recordings and audiovisual works, p. 31)

11. In addition to the previous one, the Copyright Committee's VI partial report stated the following about film works: "It is not necessary that the images in a film work be Figurative or that they form a sequence of images that are connected to each other when presented consecutively. Since most works of video art consist of moving images, they generally belong to the group of film works. In borderline cases, whether video works belong to a certain category must be resolved case by case."

(Committee report 1991:33: Fine art and copyright, p. 55).

12. In Directive 2006/115 on EC rental and lending rights and certain rights related to copyright in the field of intellectual property, the term "film" means a film with or without sound or an audiovisual work or a moving image (Article 2, paragraph 1 of the directive).

13. Animation is a technique in which a film is realized frame by frame, by shooting images with small changes. Along with the traditional drawing and the depiction of changing the physical model, animations realized with 3D graphics are also considered movies.

BAYLIS_3

Machine Translated by Google

4

14. In order to receive protection under copyright law, a film must be an original result of the creator's creative expression. In the legal literature, it has been considered that the concept of a film work protected by copyright today covers the majority of recordings made with cinematic methods, the appearance of which is at least somewhat original.

In literature, Salokannel has considered that "[…] it is impossible to set absolutely clear criteria and the creative contribution contained in each work must be examined on a case-by-case basis". In addition to this, he has stated that "[a] unique treatment of the subject and the organization of the content around a unified plot is sufficient usually to make the film into a te-copyrighted work." (Marjut Salokannel, Häviävät kinomu taitit, Helsinki 1990, p. 21). In the legal literature, it has been established that one cannot speak of a film work when the film is created automatically when the camera captures, for example, all the customers visiting the bank hall. (Haarmann, Pirkko-Liisa: Copyright & related rights, p. 64)

15. The Copyright Council has dealt with the protection of film works, for example, in its statements 1995:9, 1998:6, 2001:15 and 2002:16. Lausun-no 1995:9 was about a video recording, which consisted of recordings of the speeches of people who participated in a congress and the parts between the lectures of the lecturers, which included shots of, for example, landscapes, old archival films and photographs. The video also included plenty of music. The Copyright Council considered that the video recording in question was a cinematographic work. Statement 1998:6 also dealt with the copyright protection of video recordings. The recordings included, for example, a documentary program on the history of icebreakers, concert recordings and a kantele playing lesson. The Copyright Council considered that all the video recordings referred to in the request for an opinion could be considered as cinematographic works as a whole.

16. Statement 2001:15 dealt with the individual case without addressing the concept of film work more broadly. Statement 2002:16 was primarily about the right of quotation, but the three-minute long documentary film included in the material received protection as a film work. In statements TN 2015:7 and 8, the borrowing of computer games containing moving images without the copyright holder's permission was allowed because the games as a whole were not to be considered film works.

17. The Copyright Council has dealt with the copyright protection of cartoon characters, among other things, in its decision TN 2006:16. It stated that the copyright law as such does not provide protection for drawings, but for real-life drawings. If someone copies another drawing or if the new drawing must be considered a modification of the original so that it does not enjoy the independent copyright protection offered to the work, the use of such a drawing must be agreed upon initially

BAYLIS_4

with the copyright holder of the sketch. In the statement TN 1986:8, it was stated that the script and the film produced based on it, in which "The man portraying Villjoa" appeared, were works protected by copyright. Instead, using the character detached from the work was essentially using the idea presented in the work, and the character was not protected by copyright. In the statement TN 1993:25, the characters of Ohukainen and Paksukai-sen appearing in some film works were visually judged not to be so independent and original that they would have been protected by copyright.

**Conclusions on copyright protection of cinematographic works and characters**

18. The five 3D computer animations Trevi-Tyger RockKat, TreviTyger Dance Anvil, TreviTyger Dance Jelly,
TreviTyger Inflatable and TreviTyger Flamethrower are all less than a minute long, telling about the origins of the TreviTyger character.

19. In the animations in question now, the animations in question are not, for example, the duration of the animation, the professional level of content production evident from the video, or the quality of the image. The artistic quality or content of the animations are also not central criteria in terms of the work threshold.

20. The crucial thing is that all five animations reflect the author's personality and show the author's free and creative choices when making the work. The concrete, animated appearance of the character with its surroundings and the events in the animation embody these creative choices and their concrete implementation. The Copyright Council considers that all five animations are therefore cinematographic works in accordance with Section 1 of the Copyright Act. Copyright gives, among other things, the exclusive right to dispose of the work by making copies of it and making it available to the public, unaltered or altered, as mentioned above in section six, subject to the limitations set out in the law.

21. The mere abstract TreviTyger figure as such is not a copyrightable work. On the other hand, TreviTyger's concrete implementations, whether they are traditional or 3D graphics, and the animations are as a whole so independent and original and their expression reflects the author's personality to such an extent that they can cross the threshold of works.

22. Within the scope of its statutory mandate, the Copyright Council does not investigate the forms of protection included in other laws, such as the Trademark Act.

Machine Translated by Google

6

| | |
|---|---|
| Chairman | Marcus Norrgard |
| Secretary | Perttu Virtanen |

The statement has been discussed at the plenary session of the Copyright Council. Marcus Norrgård (chairman), Ulla-Maija Mylly, Rosa Maria Ballardini, Lottaliina Pokkinen, Sanna Nikula, Aku Toivonen, Antti Kotilainen, Martti Kivistö, Ismo Huhtanen, Timo En-roth, Maria Rehbinder, Tuula Hämäläinen and Asko Metsola.

BAYLIS_6

BAYLIS_7