# EXHIBIT C

Machine Translated by Google

| | |
|---|---|
| **PIRKANMAA DISTRICT COURT 2nd department** | **JUDGMENT**    16/32463 |
| | **Given in the office** |
| District judge Oskar Kulmala | 21/10/2016    L 15/32468 |

**Carrier**

Bayliss, Trevor

c/o AA Antti Palo, Advocate Kailiala & Palo Oy

Tuureporinkatu 6

20100 TURKU

**Answering machine**

Troll VFX Oy

2454186-4

c/o VT Johanna Uusitalo, KPMG Oy Ab

Kauppakatu 6

33210 TAMPERE

**They hear**

The Unemployment Fund for White-collar Employees in Special Fields

Asemamiehenkatu 4

00520 HELSINKI

unemployment insurance fund

PO Box 191

00121 HELSINKI

Equality Commissioner

c/o Office of the Equality Commissioner

P.O. 24

00023 COUNCIL OF STATE

**Thing**    Termination/termination of employment

**Get started**    29/10/2015

**UNDISPUTED BACKGROUND OF THE CASE**

Baylis started as an intern in Iron Sky film production
Under the supervision of Tuotantohtiö Energia Oy (hereinafter also "Energia").
at the end of 2010. At that time, Samuli, the owner of the company, was his supervisor
Torssonen, who is currently one of the defendant company Troll VFX Oy
(hereinafter also "Troll") of the owners.

Baylis started working for Troll on February 6, 2012. The employment relationship is
decided by the employer on 22 February 2014. The reason was the defendant company
reported production and financial reasons. Baylis used to be
who requested a review of his salary after his dismissal. Baylis' salary was
upon termination of employment, 1,800 euros per month.

Machine Translated by Google

**COMPLAINT**

**Standard**            Baylis has demanded that the district court oblige Troll VFX Oy to pay him

1. as compensation for the unjustified termination of the employment contract, 45,000 euros equal to 15 months' salary with interest on late payment in accordance with the Interest Act from the date of service of the summons, i.e. 12 November 2015,

2. as damages due to the violation of the equal treatment provision, 28,800 euros with default interest in accordance with the Interest Act from 6 February 2012 to 22 February 2014, for 1,200 euros starting from the last day of each month,

3. as compensation in accordance with the Equality Act, 9,000 euros with late payment interest in accordance with the Interest Act, including the service of the summons, and

4. court costs with legal late payment interest starting one month after the judgment is handed down.

**Basic**

Termination of employment

The conditions for termination according to the Employment Contracts Act have not been met. Baylis' work had not diminished substantially, or even permanently. There had been no reduction at all in Troll's activities or operating conditions. About four months before Baylis' employment ended, the employer had hired a new employee, Mikko Monto, for the same duties as a 3D animator. After the termination of Baylis' employment, the employer has used a new independent entrepreneur and an intern in the same positions. The tasks of the 3D animator were exactly the tasks that Baylis had handled. If it is considered that the duties of Monto and Baylis were to some extent different from each other, in this situation Troll would have had a training obligation under the Employment Contracts Act to train Baylis for such duties.

A few weeks before his dismissal, Baylis had asked his employer to check his salary, because his salary had been clearly lower than that of other employees doing similar work at Troll. Shortly after this inquiry, his employment was terminated. Based on the temporal connection, it is completely clear that this was the reason for the dismissal.

Baylis has been working as a 3D animator since the 1980s. His first job was at a company in London called Lambie-Nairn. His job title there was "Studio Manager". Here he participated in making animated TV commercials, for example.

Baylis studied in London at the Metropolitan University and graduated from there

Machine Translated by Google

in 2006. The studies had also included 3D modeling and animation, for which he had received excellent grades.

Baylis also had his own company (Trevy), so he was able to manage customer contacts, manage schedules and guide other people.

Unequal treatment

By unjustifiably paying Baylis a significantly lower salary than other employees doing the same work at Troll, Troll had also violated the requirement of equal treatment according to Chapter 2, Section 2 of the Employment Contracts Act. Troll is obliged to compensate the employee for the damage it thus causes in accordance with Chapter 12 § 1 of the Employment Contracts Act.

Violation of the Equality Act

Troll has committed a violation of the Equality Act in both hiring and dismissal. Baylis had been discriminated against on the basis of origin, nationality and/ or language. Baylis' salary had been clearly lower than other Finnish employees doing the same work at Troll, and there was no acceptable reason for this. In addition, by terminating Baylis' employment because Baylis had demanded that his employer observe equal treatment between employees in the amount of salary, Troll had committed an act contrary to the prohibition of countermeasures in the Equality Act, which results in compensation liability according to the Equality Act.

Amount of compensation and refund

The amount of compensation caused by the unjustified termination of the employment relationship must be calculated according to Baylis' monthly salary of 3,000 euros. The employer's procedure in terminating the employment relationship had been highly reprehensible. The reason for the decision had only been Baylis' recourse to the available legal remedies when he had presented his wish for a salary increase, which must clearly be considered a factor that increases the compensation.

The damage caused to Baylis due to the violation of equal treatment had been 1,200 euros per month, as his salary should have been at least 3,000 euros per month according to the wage tables of the collective agreement for film and TV production. According to information received by Baylis, all other people doing similar work at Troll have had a higher salary than him, regardless of experience and skills.

In the case of Baylis, Troll's nonchalant attitude towards his act must be regarded as a factor increasing the compensation according to the Equality Act. The employment relationship was terminated almost immediately after Baylis made a completely reasonable demand for an increase in his salary.

Machine Translated by Google

4

**ANSWER**

**Standard**          Troll VFX Oy is

1. objected to the claims presented in the lawsuit, both in terms of grounds and amount, and demanded their rejection, and

2. demanded that Baylis be obliged to compensate Troll VFX Oy's court costs and party costs with interest in accordance with § 4 subsection 1 of the Interest Act after one month from the date of the district court's judgment.

**Basic**

Termination of employment

The employer has had a financial and production reason for terminating Baylis' employment contract as referred to in Chapter 7, Section 3 of the Employment Contracts Act. Troll's financial situation had suffered due to its customers' weak ability to pay, which had led to a large increase in the amount of trade receivables and liquidity problems. Due to the weak financial situation, Troll had to take general cost-saving measures aimed at personnel in order to restore profitability. Mainosala as a whole had also shrunk and was in trouble due to tough competition. The salary savings after Baylis' dismissal had been important for the company, and the number of permanent employees of the company had further decreased after the termination of Baylis' employment.

Baylis could not be placed or trained for other positions as stipulated in Chapter 7, Section 4 of the Employment Contracts Act, because the work that could be offered to him had decreased due to economic and production reasons and there were no open positions available. Troll also did not hire new employees for the same or similar tasks that Baylis had done before or after Baylis' dismissal.

The employer had the right to start subcontracting the work and that is irrelevant when evaluating the grounds for dismissal. The independent entrepreneur referred to by Baylis had been used in Troll for only one project, which lasted about 2-3 months. The entrepreneur's task in the project was mainly texturing (illustrating the surfaces of the models), which was not part of Baylis' main work tasks. In addition, the entrepreneur used programs in his work that Baylis had never used.

A person named Lauri Lempiäinen had been employed by Troll for a short time in an internship related to his education as a compositor. It hadn't been an employment relationship or even a similar task to what Baylis had done.

Mikko Monto had been hired by Troll as an animator for about four months

BAYLIS_4

Machine Translated by Google

5

before Baylis' employment ended. Hiring Monto at the time had been necessary, because Troll didn't have an actual animator. Several of the company's employees had done animation to some extent, but that does not mean that these employees were animators.

Animation refers to changing a static image into such a form that the image appears to be moving. An animator's main job is to animate characters and objects and acts as a photographer/cameraman who builds a picture narrative, i.e. turns pictures into a moving picture. In Finland, education only provides superficial skills for working as an animator. In practice, learning through work and self-learning is very important in the field. However, the role of the animator itself includes much more than animation work.

Monto was a senior level 3D artist whose job description included being in contact with customers, responding to given schedules, guiding other people and assigning tasks to others as well. Monto had been employed by previous employers in a supervisor role, meaning he had a responsible customer role and demanding tasks.

Baylis worked as a junior-level employee on the technical side and his job description did not include the aforementioned Monto tasks. The work of the junior-level employee was auxiliary work, i.e. he worked under the supervision of a more experienced supervisor-level animator, and he had no responsibility for the project or the clients. At Troll, Baylis worked under Juuso Kaare and Samuli Torssonen.

Baylis had no experience in vfx before 2011, when he was involved in making Iron Sky. Baylis had been a trainee at the time and focused on the technical side. He did almost no animation during the production of that film - only limited and strictly directed. When hiring Baylis, Troll wanted to expand his job description, which is why more tasks were mentioned in the employment contract. However, expanding the job description was not successful, so Baylis had to be directed from tasks related to animation to the technical side. In practice, Baylis therefore had no experience working as an animator, and he did not work as an animator at Troll either. Baylis could not be called an "animator" based on any work sample and experience.

So Monto's work was not the same or similar to what Baylis had done. Baylis's education, experience or professional skills would not have suited him for the task in question, nor could he have been trained for the task in question by reasonable means.

Alleged unequal treatment and violation of the Equality Act

The company had complied with the requirement of equal treatment and the prohibition of discrimination according to Chapter 2, Section 2 of the Employment Contracts Act, and the company had not acted in a manner contrary to equality.

Machine Translated by Google

6

Baylis was not paid a clearly lower salary than other employees doing the same work at Troll. The salary had been in line with the company's general salary level and had not radically deviated from it.

The salaries of employees at a similar level had been around 2,000 euros, depending on skills, experience and responsibility. Only the so-called supervisor-level employees had been paid the monthly salary of 3,000 euros presented by Baylis. Co. the tasks included the management of entire projects and their management, as well as customer care, which tasks and the job description had differed significantly from those of Baylis.

Baylis' salary had been in the salary bracket according to the collective agreement between 1,674.53 and 1,975.74 euros per month. His salary was agreed between the parties together at the beginning of the employment relationship. It had been usual and reasonable and Baylis had not previously demanded an increase during the employment relationship.

Baylis had not been paid less because of his origin, nationality or language, but had been paid fairly. Troll's attitude towards people with a foreign background was very positive and it had also previously employed workers from abroad. For example, in 2013, Troll had at least three foreign people working on a freelance contract (Susan Immonen, Jenni Meisner and Francesco Antonio Maggi)

With Baylis at the same time. At the time of the aforementioned film, about half of the most important employees were foreigners. The industry is very international and mobile, so in the future there is a very high probability that employees will have to be acquired from outside the borders of Finland.

When Baylis worked at Troll, English was always used as the working language in his presence.

There had been legal grounds for terminating Baylis' employment, and the employment had not been terminated because of his salary demands.

The dismissal process had already started before Baylis' demands for a salary increase.

Compensation amounts

Baylis' demands are considerably excessive in amount.

The required sanctions are in no way related to the seriousness of the alleged act. Baylis has presented claims for compensation based on different laws, in which case these should be reconciled in any case, if Troll is considered liable for compensation. The short duration of the employment relationship should also be taken into account as a factor reducing the amount of compensation.

BAYLIS_6

Machine Translated by Google

7

**STATEMENTS OF LISTENERS**

**The Unemployment Fund for White-collar Employees in Special Fields**

The unemployment fund has paid Baylis unemployment allowance from 1 March 2014 to 14 October 2015 in total 25,977.83 euros gross. The amount does not include increases or expense reimbursements. Baylis does not have the right to unemployment allowance for the period corresponding to five full working days of the withheld deductible on 23.2. - 28 February 2014. Baylis was still unemployed at the time of the unemployment fund's statement on November 6, 2015.

**unemployment insurance fund**

*Standard*

The Unemployment Insurance Fund (TVR) has demanded that the district court oblige Troll to pay TVR:

1. The share according to TSL chapter 12, section 3, subsection 1, and

2. For the share awarded to TVR, interest on late payment in accordance with Section 4, subsection 1 of the Interest Act, starting from when one month has passed from the date of the judgment.

From the compensation determined on the basis of Chapter 12, Section 2 of the Employment Contracts Act, 75% of the earnings-related unemployment allowance paid to the employee referred to in the Unemployment Insurance Act (602/1984) must be deducted. The deduction is made to the extent that the damages are compensation for lost wages due to unemployment before the judgment is pronounced or given.

The review period refers to the period from which paid unemployment benefits are taken into account when calculating the share of the fund. Paid unemployment benefits are taken into account starting from the end of the employment relationship from the corresponding period from which the compensation-loss of wage benefits is judged. In this dispute, the calculated 15-month review period starting from the end of the employment relationship runs from February 23, 2014 to May 22, 2015. This review period is based on Baylis' claim.

According to the information provided by the ERTO unemployment fund, Baylis has been paid earnings-related unemployment benefits for the period of 15 months after the end of the employment relationship - a total of 19,646.22 euros.

According to the general rule of 75%, the share to be deducted by TVR from the possible compensation ordered to be paid by Troll is EUR 14,734.67, if the compensation is considered to be an amount equivalent to 15 months' salary as compensation for lost salary benefits. If compensation for the loss of salary benefits is awarded for a shorter period than required,

BAYLIS_7

Machine Translated by Google

8

the review period mentioned above will be shortened accordingly. In this case, TVR's share is also smaller than presented here.

**Equality Commissioner**

The district court of Pirkanmaa has reserved an opportunity for the equality commissioner to be heard. The commissioner has stated that he has no general level observations to make on the matter that should be commented on.

**ARGUMENT**

**Written evidence**

Baylis

Q1. Employment contract K2. Employment contract termination notice K3. CV K4 by Trevor Baylis. Mikko Monto CV

K5. Excerpt from the closing credits of the movie Iron Sky K6. E-mail message 23.12.2013 K7. (=V14) Message thread Baylis - Huhtamäki 10.8.2011 K8. Email message, Samuli Torssonen 16.1.2014 K9. Iron Sky - end credits K10. Instructions made by Baylis to other employees (sent 07/2011)

K11. (=V8) Animation compilation of Trevor Baylis' work (with memory stick)

K12. (=V21) Petri Nygård music video (https://www.youtube.com/watch?v=QBIppFCRvFY, duration 4:58 [referenced in main processing days])

K13. 3AsiaaAnimations video (https://www.youtube.com/watch?v=P80iCDPEL3o, duration 1:38 [referenced in main processing days])

K14. Iron Sky showreel video (https://www.youtube.com/watch?v=i3MSphdZO6A, duration 2:46 [referenced in main processing days])

K15. (=V22) www.trevityger.com (referenced on main processing days)

K16. Certificate of studies (London Metropolitan university)

K17. Certificate of grades (London Metropolitan university)

K18. (=V19) Work certificate Tuotantohtiö Energia Oy K19. (=V20)Work certificate Troll VFX K20. Maya files (flash drive)

K21.1. Maya files as far as the Hangar scene in the video Iron Sky showreel is concerned (in the video, time around 0:15 - 0:36)

K21.2. Maya files from the scene of Nokia's tires in "Mikko Monto's animation compilation"

Q21.3. Maya files as far as the Petri Nygård video K21.4 is concerned. Maya files as far as the Cherry Cream promotional video is concerned (K21.1-4 = V26)

K22. E-mail message 26/07/2011 K23. Photo from Samuli Torssonen's notice board K24. Two emails

Machine Translated by Google

Q25. Email messages K26.
Messages 4/4/2012 K27.

(=V25) Maya files (flash drive)
Q28. (=V23) Cream commercial video
(https://www.youtube.com/watch?v=VPN0lZVp_Xg, duration 0:25 [referred to in main processing days])
Q29. Printout1 of the meta data of the file K30.

Output2 of file meta data K31

IronSkyFilesMetaData video (https://www.youtube.com/watch?v=wy1jdRcYqW8) (referred to during main processing days 27-29 September 2016)
K32. Image from the movie Iron Sky
K33. Image from the program "The Lost Santa Claus"
K34. Troll VFX Oy's showreel at http://www.trollvfx.com/ (referenced on main processing date 27.9.2016)
K35. Article from page K36
above. Video at https://www.facebook.com/TrollVfx/posts/813261078719629 (cited on main hearing date 27/09/2016)

Troll VFX Oy

V1. Termination notice V2.
Mikko Monto's CV V3.

Animation compilation video of Mikko Monto's animation work (DVD)
V4. Animation compilation video of Trevor Baylis' work samples (DVD)
V5. Iron Sky teardown video with animation by Trevor Baylis (DVD)
V6. Mikko Monto animation compilation 2013-2016 (DVD)
V7. Iron Sky animation compilation (DVD)
V8. (= K11) Trevor Baylis Showreel, Iron Sky Invasion, Moon Nazi, GW Bush Weapons
(i.e. the entire contents of the memory stick)
V9. E-mail message on August 30, 2013, in which the defendant's inquiry V10 was answered. Inner Finland Police Department, investigation decision 7
October 2014 V11. Baylis' salary increase
request V12. Balance sheet of Troll VFX Oy
31.12.2013 V13. Account statements of Troll VFX Oy 07/2013 - 03/2014 *(to be kept secret)*
V14. (=K7) Message thread Baylis - Huhtamäki 10.8.2011 V15.
Message thread Samuli Torssonen - Timo Jalvanti (Pirkanmaa TE office)

V16. Employment contract Baylis - Tuotantohtiö Energia Oy
V17. Baylis' first e-mail messages to the Defendant, 27.9.2010 and 8.10.2010 V18.
Baylis's
report on the action of the weapon in the movie Iron Sky V19.
(=K18) Work certificate Tuotantohtiö Energia Oy V20. (=K19)
Work certificate Troll VFX Oy V21. (=K12) Petri
Nygård's music video V22. (=K15)
www.trevityger.com V23. (=K28)
Scheriproct cream commercial video V25. (=K27)
Maya files (memory stick)
V26. (=K21.1-4) Decision on editing requirement 11 August 2016, Maya files that
were the subject of the decision

Machine Translated by Google

10

**Identity proof**

| | |
|---|---|
| Baylis | 1. Trevor Baylis, for evidential purposes 2. witness Ismo Risto Petri Puukko 3. witness Toni Peter Mikael Kontio 4. witness Erkko Jirka Tapio Huhtamäki 5. witness Sebastian Alfredo Barquin 6. witness Sami Tapio Vaittinen 7. witness Pyry Jarno Johannes Parkkola 8. witness Janne Petteri Suhonen 9th witness Lauri Tuomas Kankola (also named by the defendant) |
| Troll VFX Oy | 1. Antti Kulmala, CEO of Troll, for evidentiary purposes 2. Samuli Torssonen, Troll board member, for evidential purposes 3. Jussi Lehtiniemi, Troll board member, for evidential purposes 4. witness Mikko Samuel Monto 5. witness Juuso Ilmari Kaari 6. witness Jussi-Petteri Kemppainen 7. witness Jani Petteri Lindblad 8. witness Timo Alexi Vuorensola |

**DECISION OF DISTRICT COURT**

**Display**

The interviewees and witnesses heard in the case have told the following about the parts that affect the decision of the case.

The plaintiff **Baylis** has said that he studied animation at the London Metropolitan University between 2002 and 2005. He was the best in his class and graduated with very good grades. At the university, he had used the Maya program, which had been used, among other things, in the Lord of the Rings film series. Baylis had been doing animation since he was a student, i.e. since 2002, and he has considered that he had a talent for it.

Regarding the use of Maya, Baylis has said that it is very challenging to use. First, modeling is done (modeling the figure and shape). After that, the model and shape are rigged (the geometry of the figure or shape is connected to the digital skeleton. It's like a tool to make the shape move). As examples, Baylis has illustrated rigging in such a way that it is like making a skeleton for a doll, after which the doll is made to move and that it corresponds to how a marionette doll is made to move with strings. The more complex the animation, the more complex the rigging behind it. Baylis has characterized the difference between rigging and animation as that they are like two pieces of the same whole – for the animation to work, the rigging must be in order. Animation is an illusion of something that can be realized with the help of rigging.

Baylis has demonstrated the use of the Maya program in court and, as an example, rigged "skeletons".

Machine Translated by Google

11

In addition, Baylis has said that after graduating, he worked in smaller offices in London, where animation was pretty much a new thing. However, 3d had been made there. He had come to Finland after meeting a Finnish woman, and here in 2011 he had found, according to his words, his "dream job" at Energia, where he was allowed to grow and develop and where he was given responsibility. He had become an intern at Energia when Torssonen had said that he did not know Baylis and that he had thought that Baylis also received unemployment benefits. In order to get to work, Baylis had no other choice but to come to work as an intern. He also had the impression that this is how things are done here in Finland in this field.

In the Iron Sky film project, he had first modelled, then rigged, then rigged more complex entities and also animated. The animation work in the Iron Sky film project was led by Risto Puukko. Soon after Puukko had discovered Baylis' skills, he had given him a lot of responsibility. Baylis has called himself Puuko's second man.

Baylis had done the animation for the film, among other things, for the George W. Bush Gun (hereafter "GWB-gun") and he had been responsible for the modeling and animation of the film's main Nazi ship Götterdämmerung.
The vessel in question had not even been rigged by others but him. Baylis had also done the animation for the scene of the destruction of the mentioned ship. He had also given rigging and modeling tasks to other employees in the project, also instructing the modelers (K10). Baylis also did the rigging and animations for the Hangar scene and the Engine room scene (See K14 scenes at 0:15 and 0.51 of the video). In the end, he had been the only animator left in the house, when everyone else had already left the project shortly before the film's release. Baylis has considered that he cannot consider Torsso and Kaart as his supervisors (work supervisors / advisors) in the Iron Sky film project, but Puukko, who had the competence for that.

In relation to the aforementioned animations, Baylis has shown, for example, regarding Maya files K21, K27 and K28, which are evidence, that numerous and numerous files and meta-files have his name, i.e. he was the author of the animations.

Monton Baylis had met at Troll. According to Baylis, this was a really nice guy who was also fluent in English. Baylis had been instructed to guide Monto in using Maya, as Monto had been using a different animation program than Troll had started using.
He had been working together with Monto for four months. Baylis has not started commenting on Monto's work.

Regarding the Sotka duck (V4) that he animated, Baylis has considered that he does not see what is wrong with it. The work had come from Sami Vaittinen, who had started the work. He had gotten the job and not Monto, because he had known Maya.

Machine Translated by Google

12 Baylis had made a fully animated Disney-style rig that had made
the animation possible. Vaittinen, Puukko and also the customer had liked
it. Baylis had done the animation of the cream ad (K28/V23) in
collaboration with Monto. Since Monto had not known Maya and since she
had struggled with the animation, Baylis had finally made the cream ad
himself with the timing of the animation. For Petri Nygård's music
video (K12 and K13/V21), he had animated an alien modeled by Huhtamäki.
The end credits of the Iron Sky showreel video (K14) reveal
who had done what and what in that project.
The texts show (starting from section 2:36) e.g. that the final
modeling, rigging and animation was by Baylis, the art director was Jussi
Lehtiniemi and the CGI Supervisor Risto Puukko. Regarding evidence K15
(the only videos of which have been viewed in court are the RockRocKat
and TV Mix Candy Hat videos) Baylis has said that he made the
first mentioned in its entirety by himself and for the latter he had finished the
animation of the dripping candy bags. Baylis has said that he had never
received negative feedback about his work.

At Troll, he had received a monthly salary of 1,800 euros. According to the
information he received from Kankola, others, clearly more incompetent
than him, had received 500 to 800 euros more - Kankola himself received
2,400 euros per month. Baylis had thought, for one thing, that there was
nothing he could do about it. He had been abused. On the other hand, he had
been able to do work that he really liked. Baylis had also considered
that before his salary revision request he was in a good negotiating
position, owning the copyright to everything he did at Troll. He had sent
Kulmala messages about his salary increase until he got
bored, to which messages Kulmala had not responded.
At Troll, he hadn't been in contact with its customers, because he hadn't
even been able to speak Finnish.

Regarding the dismissal procedure, Baylis has said that when he had found
out that he was talking to the management about something at the
Plevna restaurant, he had guessed that good beer was not forthcoming. He
had been cornered in the restaurant. They said that for financial reasons he
had to be fired. His opinion had not been asked. Baylis had left immediately.

Baylis has also said that he doesn't remember any other foreigners working
at Troll - some interns had been there for a few weeks. At work, Baylis is
currently in London because there are no more opportunities for
him to get a job in Finland, while Torssonen tells the industry that he had not
done animation in Iron Sky.

Troll's CEO **Kulmala** has said that he was a producer at Energia.
When Troll was founded, he had become its CEO.
Baylis had also moved from Energia to Troll. When Troll was founded, it
was thought that the operation would start with as small a team as possible.
Baylis was supposed to come to Troll to continue what he had done with Energia.
According to the information he received, Baylis had had good
basic skills and that he had known how to use software (animation programs)

Machine Translated by Google

13

like Maya. Troll needed "hungry" workers. The job descriptions were made really broad, because it had been a small company.
The intention was that everyone did a little bit of everything, and then we would see how the employees develop in which areas.

Baylis had worked as a rigger and modeler, but not as an animator. This was not developed in that field. Since Baylis hadn't done the animation in the end, it wasn't recorded in his work certificate either.
Since Troll had needed an animator and a similar one, they had hired Monto, who had years of experience as an animator. Monto was responsible for the projects and their final products. Montoa was thus not hired for the same or similar duties as where Baylis had worked.

Regarding Troll's financial situation, Kulmala has said that the years 2013-2014 were generally difficult in the advertising industry.
It is usual for companies to receive their marketing budgets at the beginning of the year, which is why the workload of companies that make advertisements already in the spring, such as Troll, drops drastically.
In the summer, the production offices are closed and the new increase may not come until Christmas. The industry as a whole is generally stretching the penny and payment times from customers are around 90 days from the due date. At that time, the payment terms for larger productions to Troll had stretched to a year, before they had received all their money. This had been reflected in Troll's operation, as there had been no cash flow. Salaries were paid late and the payment times had been negotiated with the taxman.
Two big projects were also canceled, so the company had thought about the need to lay off people. Referring to evidence V9, Kulmala has said that in August 2013 Troll had consulted about the possibility of dismissal. At that time, the dismissal of Huhtamäki and Baylis was considered.

Later, a request for a salary increase came from Baylis. The situation had been awkward for the aforementioned reason, and it had been a miraculous coincidence. He had not responded to Baylis' messages, but had promised to get back to him. At the end of 2013, he had thought that Troll would not lay people off before Christmas and that they would still see how the next year starts. However, the beginning of 2014 had been miserable.

Baylis' salary had been in line with his skill level. Some other operators could have paid more, but in their company, Baylis' salary was in line with the salaries of other employees, whose salaries ranged between 2,000 euros per month. The salary development was partly determined based on the employee evaluation discussions held at Troll's meetings.

Wages were determined based on the employee's skill level, i.e. the employee's talent. According to Kulmala's recollection, Huhtamäki's salary had been 2,400 – 2,500 euros per month. Huhtamäki had done a lot of modeling and also the so-called print, i.e. picture/street advertising. Kulmala has not been able to say whether Huhtamäki had done rigging or animation. Huhtamäki had not been fired when the print side had gone better and Huhtamäki had been good at it.

Machine Translated by Google

14

Furthermore, Kulmala has said that Baylis could not have been trained for
Monto's duties, because Monto's level of competence requires years of work experience.
In the work of an animator, knowledge of the Finnish language is not important,
because the field is full of employees who do not know Finnish at all. In addition,
Troll also directs its operations abroad. The skill level difference between
Monto and Baylis was considerable. On the other hand, Kulmala has not been able
to tell what was bad about Baylis' work track record. According to Kulmala, he had
heard from many employees that Baylis' work had to be corrected by others
afterwards. Sometimes customers were lost if a junior level animator had contacted
the customers.

The restaurant Plevna was chosen as the place of dismissal because they had
wanted to do it in a neutral area and the company's premises had also been
cramped. They had told Baylis the situation, but Baylis had refused to accept
anything and had left the place.

**Torssonen,** a member of Troll's board , has said that he works at Troll as a
designer and supervisor. He participated in making the project budget, e.g.
how much time is needed, who is needed, etc. He had been the chairman of
Energia's board and one of the founders of Troll.

Torssonen has said that work samples made in the animation field mean
everything, not formal training in the field. When he looks at job applicants' CVs,
he only looks at showreels, i.e. work samples. There is also no program in the
field that is superior to others, e.g. Maya, but the animation program is just a
mechanical tool that the animator can use to do his work. There is no such big
company in Finland where rigging, animation and modeling are done by different
people, although it is a question of completely different tasks. An animator is, in a
way, an actor who creates the final piece of art that a live image / video will look like
in the end. A rigger, on the other hand, is someone who, in a technical sense, is able
to push buttons and create movement. If the riggaata doesn't have an idea and
an eye for what a good end result is, then you don't know if he can make
good animations.

Regarding Energia's Iron Sky film project, Torssonen has said that Baylis
worked as a modeler and rigger. The parts that Baylis has claimed to have
animated above were, however, ultimately animated by Torssonen. Baylis
had worked as a rigger in those scenes. In other words, Baylis had done, for example,
the rigging of the moving parts of the GWB gun and Götterdämmerung, i.e. their
mechanical movement, but how they had looked on the big screen was based on
Torssonen's timing, speed, camera use, lighting, and so on.

To the extent that Baylis had done the rigging, Baylis had done it under the close
supervision of the artistic director Lehtiniemi. In Iron Sky at all, Baylis had only
animated a few points. In connection with this, Torssonen has also stated that it
is not possible to determine from the Maya files who made the animated videos. If
Baylis had done someone first

Machine Translated by Google

15

animation or rigging, someone else might have fixed that work or modified it, and there was no trace of this change left in the file.

About the employees hired at Troll and their reasons, Torssonen has told the general outline like Kulmala. In addition, Torssonen has said that regarding the hiring of Baylis, he could have done rigging and a little bit of everything - in the case of Baylis, like others, it was hoped that these would develop into "golden grains" in his work. Regarding the job description in Baylis' employment contract, Torssonen had thought that we would include a bit of all the job descriptions in it, so that the employee would at least not refuse to work. Troll needed generalists, i.e. all-rounders. Therefore, job description entries in employment contracts were not thought through in more detail.

Baylis had tried to animate the candy bags in the TV Mix Candy Hat (K15/V22) advertising video from Troll's time, but Kaari had fixed them so that they had worked. Baylis had taken the negative feedback given to him seriously. For Nygård's music video (K12 and K13/V21), Baylis had only done the animation of the alien in it. They had wanted to give Baylis a chance to show his skills, but the end result of his work had been poor.

The camera angles and other animations were done by other people. The animation of the cream ad (K28/V23) was done by Monto with invisible gloves and cream with hexadecimal spirals. Baylis had only done a fluid simulation, which is not the job of an animator.
In summary, Torssonen has stated that Baylis was not given animation work at all during Troll, considering the bad screens.
However, Baylis' rigging had worked well.

About Monto's hiring at Troll, the reasons for it and Monto's job description at Troll, Torssonen has basically told the same thing as Kulmala.

During his hearing, Torssose was shown the following videos of Monto and Baylis' work presented as evidence: V3 Animation composite video of Mikko Monto's animation work; V6 Mikko Monto animation composition 2013-2016; V4 Animation composite video of Trevor Baylis' work samples and V8 (= K11), from which Trevor Baylis' Showreel. Because of these, Torssonen has praised Monto's work, including video camera animation, camera angles, camera movement, image timing and speed control. In addition, according to Torssonen, Monto's animation was pleasant to watch, and there were a lot of moving graphic elements, as well as character animations, for example the hologram ship in the Rolls-Royce advertisement. Furthermore, the storytelling and the whole of the videos animated by Monto were top class. Regarding Baylis's works, Torssonen has considered that the camera was still in place in all of them, meaning that camera animation was completely absent.

They looked like school projects and were not pleasant to look at. They laughed, but for the wrong reasons. Some of the videos didn't even understand what they wanted to show the viewer. In summary, Torssonen has stated that Baylis' animations as a whole are far from professional animation. In connection with this, Torssonen has said,

BAYLIS_15

Machine Translated by Google

16

that in the e-mail message sent to K8 Kulmala, Lehtiniemi and Karjaluodo, the expression "Jussi ja antti ni Trevor's animation school!" there was sarcasm.

Referring to his animation comparison explained above, Torssonen has stated that there was no way Baylis could have been trained for Monto's tasks. According to Torssonen, this can already be seen from the fact that the first Baylis animations are from 2005 (V8) and the last from 2014 (V4) and that no development of any kind has occurred in the animation work. In connection with this, Torssonen has descriptively compared the difference between Monto and Baylis in the way that anyone can draw with a pen, but not everyone can draw well. Monto had been the responsible animator who had taken the projects from start to finish in a responsible position, while Baylis had been the technical assistant for the animations in his rigging. The fact that Monto had not known Maya when he came to Troll and that Baylis and many others had occasionally instructed Monto in the use of Maya, if necessary, does not affect the correctness of the above. Technically, using Maya is easy, and the most significant thing is what kind of end result it produces.

Baylis had done work under the responsibility of an intern, and not in the same way as, for example, Monto, who had done the customer's order from start to finish. Huhtamäki's salary had been a good 2,000 euros per month at the beginning, but Torssonen did not know where it had risen. Huhtamäki was a fast 3d modeler and really important to the company. This had also made a print.

Troll's board member **Jussi Lehtiniemi** has said that he is one of Troll's founding members. Lehtiniemi had also worked at Energia, and the artistic director of the Iron Sky film. Several of the models / spaceships seen in the film were his ideas. He was also at Troll artistically responsible for what Troll had released. If the projects had not had a director from outside the house, then he had also acted as a director. He had been the person in Troll who had communicated with customers. He had made a script for the clients and consulted with the animators about their implementation. Monto was already involved at an early stage, sharing ideas on how to develop animation further.

Like Torssonen, Lehtiniemi has told about the importance of studies and work samples in connection with hiring employees. In addition, Lehtiniemi has told, in agreement with Torssonen, why such a broad job description was included in Baylis' employment contract. Furthermore, Lehtiniemi has told about the parts affecting the resolution of the case in the same way as Torssonen about Baylis' job description in the Iron Sky film project, stating in addition that he had to guide Baylis' work by hand from time to time and that Baylis was not a creative employee. Lehtiniemi has also told, like Torssonen, about Monto's skills and that Monto was not hired for the same or similar tasks as Baylis and that Baylis could not have been trained for Monto's tasks.

It was also presented to Lehtiniemi in connection with his hearing above

Machine Translated by Google

17

the mentioned videos of Monto and Baylis' work V3, V6, V4 and V8 Trevor Baylis's Showreel, from which videos Lehtiniemi has drawn conclusions similar to Torssonen's.

Regarding the messages on 4/4/2012 (K26), Lehtiniemi has stated that he praised Baylis' rigging in the Iron Sky project, not the animation.

Witness **Monto** has said that he works for Troll as an animator. According to Monto, this basically means that everything that moves in Troll's productions is created by him.

Referring to his CV (V2), Monto has said that his career as an animator had already started in the second grade of high school in 1996, when he had gone to a multimedia company to make 2d animation. Later, he had gone to the University of Applied Sciences to study visual design, doing 3D animation there as well. In the second year of school, he had founded his own company, during which time he had done a lot of rigging and animation, among other things with character animations. After the school teacher left, his company had been ordered to teach at the University of Applied Sciences, so he had also taught these things. After school, he had also done animation for the Nokia company and finally ended up at Torssonen's company Energia (2008). Energia was a small company where everyone was a generalist, i.e. they all did everything (modelling, rigging, animation). With Energia, he had drawn up projects and worked as a 3D animator, also making a teaser (advertising piece) for the movie Iron Sky. When he was laid off at Energia, he had moved to Helsinki for financial reasons to work for a ten-person company called Rinki. In the ring, he had done about 80 percent of all the animation done there. However, because he had wanted to return to Tampere, he had come to work for Troll in October 2013.

Monto has said that rigging and animation are different tasks, illustrating that a rigger doing mechanical work makes a guitar, which the animator then plays. Rigging takes 3 to 4 days for big films and one and a half months for animation.

There are two different work phases in question, where the rigging has to be done first, but some of it has to be done in connection with the animation as well.

Monto has said that he had not used Maya himself before switching to Troll. However, it was only about the program that is used to do animation. He had studied the use of Maya independently at Troll. Torssonen had said to ask Baylis if he didn't know something. In practice, this had meant that he had asked Baylis, for example, where a feature he was already familiar with could be found in the Maya program.

Baylis had rigged Troll so that the animator could animate. Monto has not remembered that Baylis himself animated anything. In fact, he hadn't exactly formed a picture of what Baylis had done at Troll, at least not his duties.

Machine Translated by Google

18

In connection with his hearing, Monto was shown the above-mentioned videos of Monto and Baylis' work V3, V6, V4 and V8 Trevor Baylis' Showreel, from which Monto made the same conclusions as Torssonen, adding that he had made all the animations shown as his sample himself. Proof V3 The male figure in the Nokia tires ad was made by Baylis - this made the photos more three-dimensional. In the ad, the man doesn't move, but the camera used by Monto moves. Regarding the cream advertisement video (K28/ V23), Monto has said that he animated the eight-shaped trajectory of the cream at the end of the video practically himself - at what speed and in what way does it move.

Baylis had done the fluid simulation, but the animation was done by Monto. In V4, Huhtamäki had not been able to use the Sotka duck made by Baylis when making the advertising poster. Huhtamäki himself had not known riga at the production level, and he had not known how to use Maya.

Still related to these videos, Monto has said that camera animation was emphasized in his work. Sometimes he has felt that he is more of a cameraman than an animator. Character animation, on the other hand, is more challenging, because mistakes in its animation type are easy to spot. Monto has not been able to say whether Baylis would have been able to do camera animation, because he has not seen Baylis' work samples in this regard.

In addition, Monto has said that the projects, such as the advertising videos animated by him seen above, progress in relation to his work duties at Troll in general terms as follows. First, he gets a storyboard (script) about what kind of work should be done. On the basis of the storyboard, the video is outlined with simple elements and simple models, and we start looking for camera angles and other camera usage in the video. After that, we focus on the elements and their movement.

Many different versions are made to get the movement right. You don't always have to make the characters' backs look good if the camera doesn't show them. A more experienced artist draws the most important characters and the line artists draw the less important ones. The management of the project was and is at Troll such that the artistic director Lehtiniemi is in contact with the client first. In the process, this acts as a filter between the employee artists and the client. The artistic director decides what the final product will be like. Artists like him are not in contact with the client. On the other hand, he has often participated in customer meetings with the producer of Lehtiniemi and Troll, who is responsible for doing what has been agreed and nothing else.

Furthermore, Monto has basically told in the same way as Torssonen that Baylis could not have been trained for his tasks and that no conclusion can be made from the file name of the animation program as to who has animated in the work project and what. When he had come to work for Troll, his salary had been 2,500 euros per month and now it is 2,600 euros per month.

The witness **Kaari** has said that he was already working in visual animation before working at Troll. Nowadays he is an entrepreneur. He had been one of the founders of Troll and before this he had been in the Iron Sky film project as a second supervisor (work supervisor /

Machine Translated by Google

19

as an advisor). Kaari has considered his most important professional quality to
be that he knows enough about everything to be able to plan projects
from start to finish.

Like Torssonen and Monto, Kaari has talked about the differences between
animation and rigging, illustrating that the rigger makes a brush for
the animator, who paints the work. In addition, he has said that in a small
company the rigger often also animates, but in larger offices these are two
different jobs.

Kaari has told about the hiring of Baylis to Troll in the same way as Kulmala,
Torssonen and Lehtiniemi above.

In addition, Kaari has said that while he was at Troll, many of the animations
made by Baylis that were delivered to customers had to be corrected. He had
also had to repair Baylis' rigs. Among other things, evidence K15 (=V22) TV Mix
Candy Hat advertising video had been animated by Baylis in such a way that it had
not been possible to show it to the customer. For example, the bags of candy
falling on the couch in Baylis' video were falling unnaturally, and it was not nice
to watch. Kaari had fixed the animation himself. Baylis just hadn't succeeded in
his animations, which had made Kaare practically Troll's animator, even though
this shouldn't have been his job description in the company. He had
complained about this to CEO Kulmala, that this could not be the case, but
that Troll needed a new animator.

In connection with his hearing, Kaari has been shown the aforementioned
videos of Monto and Baylis' work V3, V6, V4 and V8 Trevor Baylis'
Showreel, from which Kaari has made similar conclusions as Torssonen,
Lehtiniemi and Monto above.

Kaari has also told, like Kulmala, Torssonen and Lehtiniemi above, about
Baylis' role in the Iron Sky film project; Monto's competence and the
fact that Monto had not been hired for the same or similar duties as
Baylis; that Baylis could not have been trained for Monto's tasks and that
no conclusion can be drawn from the name of the file of the animation program
as to who has animated in the work project and what.

The witness **Kemppainen** has said that he is currently working as a creative
engineer and his duties include animation and design.

Like Torssonen, Monto and Kaari, Kemppainen has told about the
differences between animation and rigging, illustrating that a rigger is like a
mechanic and an animator is like a rally driver. Also, it is not necessary that an
animator needs to know rigata and vice versa. In addition, Kemppainen
has stated that camera animation is a really demanding work phase. An
animator must understand how to move the camera and how the lenses work.
Character animation is the most demanding type of animation work, but
camera animation is not far behind.

It has been presented to Kemppainen in connection with his hearing above

Machine Translated by Google

20

the mentioned videos of Monto and Baylis's work V3, V6, V4 and V8 Trevor
Baylis's Showreel, from which videos Kemppainen has drawn the
same general conclusions as Torssonen, Lehtiniemi, Monto and Kaari above.

Kemppainen has also said, like Torssonen, Lehtiniemi and Monto above,
that Baylis could not have been trained as an animator like Monto
and that no conclusion can be made from the file name of the
animation program as to who has animated in the work project and what.

The witness **Vuorensola** has said that he is a film director (including Iron
Sky and Petri Nygård's music video presented as evidence), and that he is not
an expert in animation technology, but is only responsible for the content of
the final product. In connection with his hearing, Vuorensola was shown the
above-mentioned videos of Monto's and Baylis's works V3, V6 and V4,
from which Vuorensola has praised Monto's work and criticized Baylis' work.
In Petri Nygård's music video, he had liked the monsters designed
by Lehtiniemi, but their animation had not met what was desired. Vuorensola
has considered that Baylis could not have been trained as an animator on
Monto's level, even if he does not know the technology and that anyone can
create the name of the file of the animation program, although Vuorensola has
said on the other hand that he is unaware of the "naming problem".

The witness **Lindblad** has said that he is the art director at Discovery,
which includes, among others, the television channels TV5, TV6 and Frii. In
the company, he is responsible for all graphic material that is on
channels or in roadside advertisements on behalf of the company.
He has a long experience in the graphic field, working in design offices
and on the mobile side, among other things.

Like Torssonen, Monto, Kaari and Kemppainen, Lindblad has talked
about the differences between animation and rigging above, illustrating that
the rigger is a technical engineer, while the animator's task is to create a story
for the animation. In addition, Lindblad has said, like Torssonen,
Lehtiniemi, Monto and Kemppainen above, that no conclusion can be
made from the name of the file of the animation program as to who has
animated in the work project and what.

In connection with his hearing, Lindblad has been shown the above-mentioned
videos of Monto and Baylis' work V3, V6 and V8 Trevor Baylis' Showreel, from
which videos Lindblad has drawn conclusions similar to those of
Torssonen, Lehtiniemi, Monto, Kaari and Kemppainen above, stating
based on these samples that Baylis was not could be trained for Monto's
duties. As for Baylis's samples, they lack wide-ranging animation
samples.

The witness **Puukko** has said that he currently works at Framestore Ltd, a
large animation industry company founded in London in 1986
employing 800 employees, with the title of senior effects technical director.
He has worked with 3D animation already

Machine Translated by Google

Starting from the 1980s, e.g. doing related research work at VTT, teaching at Aalto University and also working as a freelancer.

For Energia, he had come to work on the Iron Sky film project. In the project, he had been a CGI supervisor and e.g. Baylis technical supervisor. Together with Vaittinen, he had insisted that the film's animation work be done with Maya, which had practically become the standard animation program in the world.

About Baylis's part in the Iron Sky film project, Puukko has said the same thing as Baylis. Puukko has described Baylis as a brilliant colleague who read horribly, who in the end managed the tasks assigned to him independently in the project and who, in Puukko's opinion, was even more talented at learning new things than him. GWB-Gun was done by Baylis from start to finish. Puukko had delegated tasks to Baylis that weren't too difficult, but which he hadn't had time to do himself. Lehtiniemi, who had been Baylis' artistic supervisor, had occasionally given additional instructions as artistic director on how to make the animations, and the animation side had acted accordingly. As for Götterdämmerung, Bayli had finally become a supervisor because Puukko had his hands full elsewhere and because Puukko had finally crossed paths with Lehtiniemi.
In that case, Torssonen had suggested that Baylis take over the job. All the modeling of Götterdämmerung eventually went through Baylis and Baylis had made all the moving parts for it. The management of the film had also asked Baylis to act as an instructor for the models, because Puukko had received feedback that Puukko would not have been able to shepherd these "junks" so hard. According to Puukko's point of view, Huhtamäki, among others, had done a lot of "rubbish" about the models, which Puukko had told him directly and for this reason had to be interviewed, that the feelings of young "artists" should not be hurt.

VFX Supervisor Puukko has considered the title of Kaare's Iron Sky project just a title, because he, like Torssonen, would not have been able to evaluate anything technically complex. The artistic side, yes, but they didn't have the substantive knowledge.

Puukko has described the relationship between rigging and animation as moving hand in hand: for the animation to be good, the rig must also be good. However, a bad rig can be covered up in the final film. After making the rig, the so-called lace tying, i.e. the animation section, which can take significantly longer than making the rig. On a practical level, the same guy does both the rig and the animation. In the "big world", these parts are always made by a different guy, but not in my home Finland, when there is no film industry here, but film hobby.

In connection with his hearing, Puukko was shown the above-mentioned videos of Monto and Baylis' work V3, V6, V4 and V8 Trevor Baylis's Showreel. Puukko has not considered the productions of either of them to be good, acknowledging, however, that the modeling and animation of some of Monto's animations were successful, and that the average viewer will certainly be satisfied with them. Also, regarding Monto's animations, Puukl

Machine Translated by Google

22

acknowledged the fact that, considering the small funds generally budgeted for commercial videos, their animations cannot be expected to be particularly successful. Regarding the videos animated by Baylis, Puukko has commented positively on, for example, the V8 test animation, which shows that mass and shape were well thought out in them. According to Puuko, the test video (Sotka-ankka) serves the needs for which it was designed.

According to Puuko, it is difficult to compare the works of Monto and Baylis. In animation, the main thing is how mass and shape work, and that the animator understands the meaning of movement. Compared to this, lighting, movement and effects are secondary. Puukko has also considered it justified that the camera does not move in Baylis's animation, because when doing character movement tests and focusing on the character, the camera should not move under any circumstances.

Puukko has not had any information about the animator's role in, for example, the advertising project Troll. It is usual, however, that first the screenwriter makes a script that the client approves. After this, we start building and rigging the models, often at the same time. It also depends on the company whether the animator is responsible for what the final result will be. What the final output looks like ultimately depends on the animation company and the client. Usually it is a supervisor who is the representative of the animator company outside of it. Of course, according to Puuko, there can be such a great guy who does all of the above himself from start to finish.

Puukko has also seen no obstacle to Baylis not knowing how to make the camera animations evident in Monto's V3 and V6 videos. According to Puukko's observations, this was due to the realized camera angles. In the end, it's about what kind of work the supervisor or instructor approves. The aforementioned understanding of the meaning of mass and shape and movement is the most important skill of an animator.

Puukko has talked about the importance of work samples and formal qualifications in the work of an animator, as Torssonen did above - only the completed work shows whether there is talent or not. Regarding this dispute between Baylis and Troll, Puukko has considered, taking into account the talent he saw in Baylis, that there had been a problem of silence, a problem between the employer's demand and the employee's supply.

The witness **Kontio** has said that he studied as a 3D graphic designer at the University of Applied Sciences from 2008 to 2012. He had been an intern at Energia, e.g. In the Iron Sky film project and after that I worked in Troll for approx. 2 months mainly as a model. In Iron Sky, he had certainly done modeling in Maya the most in the entire project. When the big phase of creating the Götterdämmerung ship had begun in Iron Sky, Baylis helped him in the beginning and directed the whole thing. Drawings had come from Lehtniemi, and Baylis had shown how the technical side was done. He had received Baylis' written written instructions (K10) on how to make the Götterdämmerung models. At the time of the Iron Sky project, he had seen when Baylis had rigged and animated at his own workstation. He wasn't on the troll

Machine Translated by Google

23

in the same projects with Baylis. At least this was rigged there.
At Troll, Konti's salary had been 1,600 euros per month.

The witness **Huhtamäki** has said that he was an intern in the Iron Sky film
project. He had modeled and textured (illustrated the surfaces of the
models). He had also done print advertising with Troll. He hadn't done any
rigging, but a little animation with Troll. Baylis had been the "lead artist"
of the Götterdämmerung ship, which he had been responsible for
completing. He himself had been the lead artist of GWB-Gun. Baylis had
modeled the gun for it, but Huhtamäki didn't know if he had rigged or
animated it. Huhtamäki has remembered that Baylis made written
instructions for the modelers at Iron Sky. Baylis had modeled a lot and
rigged too. From the Troll days, Huhtamäki didn't really know what Baylis
had done - everyone was focused on their own things. Baylis had
first tried to animate a short film called Ghost Train, but when it was not
successful, he had animated the rest. Huhtamäki had also been involved
in the Sotka project, which Baylis the duck had created. Baylis had
modeled and rigged the Sotka duck, which he had refined and
improved when Baylis's creation had not looked good.

According to Huhtamäki, Monto had come to Troll as a rigger and animator
- the same job as Baylis. However, it had been about a different
level of employee - one that Troll specifically needed. In view of this,
according to Huhtamäki, Baylis could not have been trained to
Monto's level in a short time, but years of experience are required to
reach Monto's level.

In connection with his hearing, Huhtamäki was shown the above-mentioned
videos of Monto and Baylis' works V6 and V4, from which Huhtamäki has
drawn conclusions similar to those of Torssonen, Lehtiniemi, Monto,
Kaari, Kemppainen and Lindblad above. In addition, Huhtamäki has
said, like Torssonen, Monto and Lindblad above, that no conclusion can
be made from the name of the file of the animation program as to who
has animated in the work project and what.

Huhtamäki has also said that he does not remember exactly what his
starting salary at Troll was, probably around 2,000 euros per month.
When I left, it had been 2,500 euros per month. The salary had increased
according to the more responsibility he had received.

The witness **Vaittinen** has said that he has a long experience
with 3D animation. He had already gotten to know Torssose in the 1990s.
He had finally ended up working for Energia on the Iron Sky film project,
from which he had left after the first contract for personal
reasons and after founding his own company. In that project, according
to Vaittinen, Baylis was the best of the guys who had come to work there -
"company man", that is, he had always tried to do his best. Baylis had
animated the project. Sometimes even rigging has such elements
that it is animation.
Vaittinen had not been aware of the Götterdämmerung process, as he
was not involved in it. When he had visited Energia in the last week

Machine Translated by Google

24

before the end of the film production, of the animators and other people, only Baylis was there, who was doing the "last pictures".

Witness **Barquin** has said that he started working with website design until he moved to visual effects at London companies. He had finally come to Tampere to work on the Iron Sky film project. He had been a modeler on the project, and he had also done some texturing. Barquin had not rigged or animated.
He had been working together with Baylis, who had already been involved in the project when he arrived at it. Baylis' part in creating and animating the Götterdämmerung ship has been described by Barquin as Kontio above. In addition, Barquin has said that Baylis rigged and animated the GWB-Gun and Engine room scenes in addition to Götterdämmerung. Barquin couldn't remember his salary at Energia, but it was definitely less than 2,000 euros per month.

Witness **Parkkola** has said that he founded a gaming company after the Iron Sky movie. He has formal 3D training, but in practice the field is self-study. He had come to Iron Sky through an internship. He had only been working at Troll for about three weeks. In the Iron Sky project, he had worked mainly as a modeler for Götterdämmerung and GWB-Gun. His part had not involved rigging or animating. Parkkola had felt that Baylis had been higher than him in the project, probably because he himself had been an intern. The rigging and animation of GWB-Gun was done by Baylis.
As for Götterdämmerung, Baylis had at least rigged it and acted as the main architect of its modeling. In the final phase, Baylis had even taken on the duties of modeling supervisor, although Lehtiniemi had previously been the chief advisor. Troll himself had been so busy that he didn't know what Baylis had been doing there. Parkkola's salary at Energia had increased from 800 euros for training, or 1,500 euros per month during the film's production. In the last year, his salary had been 1,800 euros per month.

More recently, witness **Suhonen ,** who works in the game industry , has said that he was involved in the effects in the Iron Sky project. He hadn't rigged or animated. According to Suhonen's understanding, the main rigger in the project had been Puukko, who had also animated with Baylis. His salary had been 1,250 euros per month in the beginning, and 2,000 euros per month at the end of 2011 after I finished washing.

Witness **Kankola** has said that he is currently working for Troll.
He has ten years of work experience in the field. Work samples are significantly more important in the field than formal training.
Kankola has spoken about the following points in line with Torssonen's story: the difference between rigging and animation, the role of Monto and Baylis in Troll, the impossibility of Baylis to train Monto for tasks, and the differences in work samples between Monto and Baylis. He himself does not do rigging or animation at all, although he does camera animation.

Machine Translated by Google

The district court has processed **written evidence** when evaluating the evidence and drawing conclusions to the extent that it has been deemed to be important in resolving the case.

**Screen evaluation and conclusions**

<u>I Unjustified termination of the employment relationship</u>

*Legal instructions*

According to the general clause of chapter 7, section 3, subsection 1 of the Employment Contracts Act on Economic and Production Grounds for Termination, the employer may terminate the employment contract when the available work has been substantially and permanently reduced due to economic, production or restructuring of the employer's operations. However, the employment contract may not be terminated if the employee can be placed or trained for other tasks as stipulated in § 4. According to subsection 2 of the provision, there is no ground for dismissal, at least when, for example, the employer has taken on a new employee for similar duties either before or after the dismissal, even though his operating conditions have not changed during the corresponding period. According to Section 1 of the Employment Contracts Act on Grounds for Termination, the employer may terminate an employment contract that is valid for the time being only for a valid and compelling reason.

The conditions for termination stipulated in Chapter 7 § 1, § 3 and § 4 of the Employment Contracts Act form a whole. The work on offer must have simultaneously decreased in both quantity and time as referred to in Chapter 7 § 3 of the Employment Contracts Act. In addition, in accordance with Chapter 7 § 4 of the Employment Contracts Act, the employer has to find out and state that no other work or training can be arranged. The basis must also be factual and weighty as intended by Chapter 7 § 1 of the Employment Contracts Act.

The purpose of the regulation placed in different sections for technical reasons is to prevent apparent dismissals due to production, financial or restructuring reasons. If all the requirements set for the grounds for dismissal in the above-mentioned sections are not met, the employer does not have a legal basis for dismissal provided by law.

*Has Baylis worked as an animator before joining Troll and was Baylis hired as an animator for Troll?*

Monto was hired by Troll in October 2013 as an animator. Troll has claimed that Monto was a senior-level 3D artist whose job description included communicating with customers, responding to given schedules, guiding other people and assigning tasks to others as well. According to Troll, Monto had been employed by previous employers in a supervisor role, meaning he had a responsible customer role and demanding tasks. According to the company, Baylis was a junior-level employee on the technical side and his job description did not include the above-mentioned tasks of Monto. The work of a junior-level employee is auxiliary work, i.e. he works under the supervision of a more experienced supervisor-level animator,

Machine Translated by Google

26

and he has no responsibility for the project or the clients. Troll has also claimed that Baylis has had no practical experience of working as an animator, and that he did not work as an animator for his employer either. Baylis could not be called an "animator" based on any work sample and experience.

Based on the screen presented, the district court states that it is not possible to determine from the names of the Maya files or even from the meta files who animated the final videos / movie scenes in their entirety. Based on the explanation presented, the animation process is a question of coordinating many different factors and work shares, so the name of the file does not reflect the work input of the people involved in the entire process or even what each one has done. It has also been undisputed that Baylis has, for his part, contributed to the implementation of scenes called Götterdämmerung, GWB-Gun, Hangar scene and Engine room scene. Therefore, it is natural that his identification information has been found in the file names.
However, these facts do not have an effect that speaks for or against Baylis' wor

The following facts speak instead for the fact that Baylis worked as an animator before moving to Troll and that he was hired there in accordance with his employment contract. Baylis has unquestionably rigged the Iron Sky project, which he has exemplarily demonstrated with Maya in court. According to the basis of Troll's answer, Baylis had animated in the Iron Sky film, although only in a limited and strictly controlled manner. Puukko, who in the same project was responsible for the technical implementation of the film, has said that Baylis also did his work involving animation independently and that Baylis had been given more responsibility as the project progressed, as he was responsible for the modeling and animation of the entire Götterdämmerung, among other things, and no one else had even started from that beginning other than Baylis.

Puukko's story has been very believable considering that he has criticized Baylis' productions V4 and V8 quite harshly, which shows his impartiality. In addition, Puukko's expertise and his position in the Iron Sky film project give him the best ability to assess what Baylis was. done in the film project. Furthermore, Puuko's story has coincided with Baylis's story, for example that, in addition to Götterdämmerung, Baylis had done rigging and animation for GWB-Gun, scenes called Hangar and Engine Room, as well as the explosion scene in Götterdämmerung, among other things.

In addition, Baylis' work as an animator in the Iron Sky film is supported by Konti, Vaittinen, Barquin, Parkkola and Suhonen's consistent accounts, at least to the extent that Baylis animated Iron Sky in the film. Even when it is stated that Baylis' title in the film is written as "3D modeller / animator", in the light of the screen shown, one cannot come to any other conclusion than that Baylis had worked as an animator before his employment with Troll in the Iron Sky film project. In this respect, the district court also states that no

Machine Translated by Google

anyone else's who participated in the film, who have been consulted in this matter to an increasing extent, it has even been claimed that the title was incorrectly recorded in the end credits of the film - so why would this have happened only for Baylis.

Torssonen's and Lehtiniemi's stories, according to which Baylis had been mainly a rigger in the film project, would seem to speak against the above-mentioned conclusion, for example when Torssonen did the actual final animations. According to the district court's view, this, like the statement below about the similarity of Monto's and Baylis' work, seems to be related to the difference of opinion between the plaintiff and the defendant about the nature/definition of animation and the animator's work. On Baylis' side, it has been considered that animation is meant, as Troll has also expressed it when responding to the lawsuit, "...changing a static image into such a form that the image appears to be moving. An animator's main job is to animate characters and objects and acts as a photographer/cameraman who builds a picture narrative, i.e. turns pictures into a moving image." According to the report received by the district court, Baylis has clearly been such an animator.

On the troll's side, the animator's job description has, on the basis of the screen shown, attached a lot of elements that are not related to the core of the animator's job description or to it at all. The finishing work done by Torssonen and Lehtimäki after the animation work, for example, in the Iron Sky movie, should be considered as such tasks, because the final product of the movie looks good as a whole.
Based on Lehtimäki's and Monto's stories, contrary to Troll's claim, it has appeared that the work mentioned above, as well as the planning work of the entire scene before animation, belong to the duties of the art director/director or film director, not the animator. If there are shortcomings in the implementation, these parties instruct the animators, among other things, to correct the work as desired.

In addition, it has been claimed by Troll that a senior-level 3D artist includes, as Monto's job description would have included, being in contact with customers, responding to schedules, guiding other people and assigning tasks to others as well. However, the stories of Monto or Lehtiniemi, who told about the matter, and who have mostly been responsible for this process at Troll, do not speak in favor of the claim. Taking care of project schedules and communicating with customers has been part of the duties of the artistic director and producer at Troll. Based on the mentioned stories, Monto has again done the animation work, which has also been part of Baylis' duties as an animator, including guiding the modelers.

The fact that Baylis has not worked as an animator at Energia is undermined by the fact that the employment certificates given to Baylis by Energia and Troll (V19 and V20) do not show that he worked as an animator, or that Baylis has not described himself as an animator in his salary increase request (V11). The certificates were drawn up by Troll, the employer side, and by persons closely connected to Troll in the case of Energia, and are in clear contradiction with what is considered to have been shown above by Baylis

Machine Translated by Google

Made with energy.

Even when it is stated that in Baylis' employment contract, his job title is written among other things as *"3d animator"*, it must be considered clear that Baylis has been hired by Troll as a 3D animator.

*Has Monto been hired for positions similar to where Baylis has been?*

Troll has announced that it has hired Monto as an animator for the company. As such, Troll had previously hired Monto Baylis. Monto is undisputedly hired as an animator in a situation where Troll has considered itself to be in financial distress, at least in such a way that it has considered it necessary to reduce its staff on economic grounds (V10 and V12). In other words, Troll has hired Monto as a new employee for similar tasks at a time when there have been no changes in its operating conditions. To the extent that Monto's tasks have been considered to be more extensive than Baylis's, according to Troll, the district court refers to its statement above that this has not actually been the case and that they have not otherwise been related to the animator's tasks, at least not the core tasks.

In addition, the district court considers that it has been shown that, in accordance with his employment contract, Baylis has also done animation at Troll, thus as the animator's tasks are defined above and what tasks Monto has actually done at Troll as well. Among other things, Kaari has said that he animated Baylis with Troll, although he was not satisfied with his work. Huhtamäki also said the same thing, according to which Monto had come to work at Troll even for the same job as Baylis.

The district court believes Torsso that in the message according to evidence K8 "Jussi and antti now to Trevor's animation school!" it had been about his sarcasm, considering Torssonen's attitude towards Baylis' skills in general. However, this fact has not been important now. when solving the question.

The District Court has made similar findings to the videos presented as evidence of Monto and Baylis's work (V3 Animation composite video of Mikko Monto's animation works; V6 Mikko Monto animation composite 2013-2016; V4 Animation composite video of Trevor Baylis' work samples and V8 (= K11), from which Trevor Baylis's Showreel) observations similar to those of Torssonen and Lehtiniemi, among others . Based on this evidence, as well as the experience shown in Monto's narrative and CV, Monto must be considered a more wide-ranging and well-rounded animator than Baylis. This is despite the fact that comparing the mentioned videos with each other is not completely fair: in the case of Monto's videos, it is about the final products delivered to customers and presented to the public, while in the case of Baylis's videos, it has mainly been about the character animations and test animations he made for school work. Since it remains unclear what Baylis' contribution to the final version of the Iron Sky film was in terms of his animation, it cannot be concluded from the scenes shown in the film

Machine Translated by Google

a comparison of Monto's and Baylis' skills. On the other hand, these facts are not important when evaluating the grounds for dismissal, as the grounds for Baylis's dismissal have been based on economic and production reasons, not personal reasons.

Based on these grounds, the district court considers that Monto has been hired at Troll for tasks similar to where Baylis has been. Having stated this, the district court has no reason to rule on whether Troll has also hired other persons for similar tasks.

*Other than cited economic and production termination grounds*

The district court states that Troll's report on the general bad state of the advertising industry, the company's cash deficit and the delay in the payment time of customers, which was presented only by the report of the company's managing director, is not a sufficient report on the substantial and permanent reduction of the available work within the meaning of Chapter 7, Section 3, Subsection 1 of the Employment Contracts Act way. This is the case, especially considering that Troll hired Monton at the same time at a clearly higher salary than Baylis. No explanation has been given that Troll made reductions in the number of permanent employees after the termination of Baylis' employment. No evidence, which can be considered a sufficient explanation, has been presented for the fact that the savings that have been obtained with the dismissal of Baylis would have been of actual importance in improving the profitability of Troll's business.

*Summary*

Based on the aforementioned grounds, the district court considers that the employer Troll has had no economic or production reasons to terminate Baylis' employment contract. Baylis' employment has been terminated in violation of the Employment Contracts Act. He is therefore entitled to compensation for unjustified termination of the employment contract pursuant to Chapter 12 § 2 of the Employment Contracts Act.

*Amount of compensation*

It follows from Chapter 12, Section 2, Subsection 1 of the Employment Contracts Act, that the amount of compensation awarded for unjustified termination of an employment contract is at least three and at most 24 months' salary. According to subsection 2 of the provision, when determining the amount of compensation, the loss of earnings, the duration of the employment relationship, the age of the employee and his possibility of getting a job corresponding to his profession or education, the employer's procedure when terminating the employment contract, the reason given by the employee himself for terminating the employment contract, the circumstances of the employee and the employer in general, and other things comparable to these are taken into account the facts. When determining compensation, possible compensation awarded for the same act under the Equality Act must be taken into account.

Since the compensation ordered to be paid to Baylis below was not based on discrimination in dismissal, but in hiring, it is not the same act referred to in the above-mentioned provision, so the compensation does not have to be taken into account when determining compensation for unjustified termination of the employment contract. Otherwise, the district court states that the determination of the compensation is based on an overall assessment based on the criteria laid down in the regulation.

Machine Translated by Google

Among the criteria mentioned above, the only factor that lowers the compensation would seem to be the duration of Baylis' employment, i.e. just over two years.

The following points, on the other hand, talk about increasing the compensation. Baylis' loss of earnings has been quite long. He only got a job in the fall of 2016, i.e. about two and a half years after his dismissal. He also got this job in London, and not in Finland, as he had hoped. There have been no collective reasons for the dismissal, but it has been based solely on Baylis's person, which increases the offensiveness of the act. Based on the evidence presented, Baylis himself has not given any grounds for terminating the employment contract. There has been no explanation of the current financial condition of the employer Troll or Baylis, but it is clear, at least for Baylis, that the long unemployment that continued until the fall of 2016 has affected his financial situation.

After fully evaluating the factors affecting the amount of the compensation, the district court considers the amount corresponding to the 15 months' salary demanded by Baylis to be a reasonable compensation for the unjustified termination of the employment relationship. When it has been established below that Baylis' salary at the time of termination should have been 2,500 euros per month, the compensation amount must be confirmed at 37,500 euros.

*Matching compensation with unemployment allowance*

The grounds for the dismissal have actually been the facts related to the dismissed person: the employee had demanded equal pay from the employer, the employer had hired a new employee for the same position in place of the dismissed person, and partly the employer had unjustifiably underestimated the skills and professionalism of the dismissed person. Taking these factors into account, the district court considers the position presented by Baylis to be justified in that half of the amount caused by the unjustified termination of the employment contract is non-material damage and half is material. Therefore, pursuant to Chapter 12, Section 3 of the Employment Contracts Act, half of the amount claimed by TVR must be deducted as material damage from the compensation established above, so that Troll is obliged to pay 7,367.34 euros of the said 37,500 euros to TVR and the rest, i.e. 30,132.66 euros, to Baylis, to both with required interest.

II Compensation for non-compliance with equal treatment

*Legal instructions*        It follows from chapter 2, section 2, subsection 3 of the Employment Contracts Act (55/2001), which was in force during Baylis' employment, that the employer must treat employees equally, unless the deviation from this is justified considering the employees' tasks and status.

According to the preliminary works of the law that led to the enactment of the provision (HE 157/2000, detailed justifications chapter 2 § 2), the starting point of the principle of equal treatment is that employees who are comparable to each other are treated equally in similar situations. The principle thus requires consistent actions or solutions from the employer

Machine Translated by Google

31

in relation to its employees. However, according to the mentioned preliminary
works, the regulation does not aim to prevent employees from being placed
in a different position if there is an objectively acceptable reason for this. The
requirement of equal treatment would not be violated, for example, if there was an
acceptable reason for placing an employee in a different position due to the nature
of his work or working conditions (justified according to the Labor and Equality
Committee's report 13/2000 and the leading term of the law ) .

In the legal preparations mentioned above, it is stated that if the employee considers
that the employer's conduct has, among other things, been in conflict with the
requirement of equal treatment, he should present probable grounds or reasons
for the fact that the employer has placed him in a different position for the reasons
mentioned in the section. The employer must then demonstrate that he had an
acceptable reason for his action.

Pursuant to Chapter 12, Section 1, Subsection 1 of the Employment Contracts
Act, which concerns the employer's general obligation to compensate for damages,
the employer must compensate the employee for the damage he has caused
if, for example, he has acted contrary to the requirement of equal treatment
intentionally or through negligence.

According to the legal guidelines given by the Supreme Court in its decision 2004:103
and subsequently generally followed in jurisprudence, the requirement of
equal treatment of employees in terms of pay benefits primarily means that employees
doing the same or equivalent work are entitled to equal pay.

*Has Troll breached his duty of equal treatment?*

In the matter, it is undisputed that Troll has paid Baylis a salary of 1,800 euros
per month in accordance with the wage category of the auxiliary work of
the Collective Agreement for Film and TV Production throughout this employment
relationship. Monto, who was hired for similar duties to him, had a starting salary of
2,500 euros per month. Based on this fact alone, the above-explained presumption
in the law of unfair treatment has arisen in the case. However, different treatment may
be justified for a justified reason. It is up to the defendant company Troll to prove
this in court.

In hiring Baylis, Troll has relied on the fact that the salaries of employees at a similar
level had been around 2,000 euros, depending on skills, experience and
responsibility. According to Trolli, the 3,000 euro monthly salary presented by
Baylis had only been paid for the so-called for supervisor-level employees, whose
duties had included the management of entire projects and their management, as well
as customer care, which duties and job description had differed significantly from those
of Baylis.

As a demonstration for equal treatment, Troll has named Kulmala and

Machine Translated by Google

32

For the evidentiary purpose of Torssonen's hearing. They have told that the
salaries of those at Baylis' level had been around 2,000 euros and that
Monto's duties were not the same as Baylis's, so Baylis was not entitled
to Monto's salary. The first-mentioned claim is unspecified, and as
such is not sufficient to demonstrate equal pay. Regarding the latter
argument, the district court refers to its statement above, that is, that
Monto's and Baylis' duties were not exactly different. No other evidence
from Troll's side has been presented, even if it could have been presented
quite easily. Huhtamäki's, Monto's and Kontio's salary information has
come up in the plaintiff's court after inquiring about it from them.

On the one hand, a justified reason for the salary differences could be,
among other things, the points about competence and work experience
invoked by Troll. The district court has stated above that Monto was a
broader and more experienced animator than Baylis. He also
had more work experience than Baylis. These facts would seem to
support Troll's claim of equal treatment.

On the other hand, it has emerged in the case that the salary of Huhtamäki,
who worked at Troll, was a good 2,000 euros per month at the
beginning, and 2,500 euros per month when he left the company.
Regarding salary development, Huhtamäki has said that his salary
increased as his responsibilities at Troll increased, without however
specifying how the salary or responsibilities had increased. Troll's CEO
Kulmala's account does not reveal this reason for salary development either,
as he remembered that Huhtamäki did a lot of modeling and also
image/streetside advertising, i.e. so-called print. Kulmala has not even
remembered whether Huhtamäki had rigged or animated Troll. Torssonen has
told about the matter in parallel with Kulmala, stating that
Huhtamäki was really important to the company, without further explaining
why. The fact that, based on Kulmala's report, Huhtamäki was the second
person at Troll in August 2013 whose dismissal was being considered speaks
somewhat against the latter claim.

The above-mentioned points speak strongly against equal treatment.
In addition, based on Puukko's account heard as a witness, Baylis had
clearly been a more experienced animation employee at Energia than
Huhtamäki. Despite that, Huhtamäki's salary has already been
clearly better than Baylis' salary at Troll at the beginning of the employment
relationship. In addition, based on Kulmala's report and the conclusion
the district court has reached above regarding Baylis' duties at Troll,
Baylis' job description has clearly been more extensive than Huhtamäki's job descri
Due to the similar salary of Monto and Huhtamäki, the District Court
has formed the impression that, according to the accounts of its
representatives, Troll has mainly hired generalists, i.e. so-called
generalists, and that the same salary has been observed between
these employees. However, Baylis has not been able to participate in
this salary treatment. These facts also speak against Baylis' equal
pay treatment. In this regard, with regard to Konti, who was heard as a
witness, it must be stated that his monthly salary of 1,600 euros cannot

Machine Translated by Google

33

lead now for solving the question of equal pay treatment, because his experience and duties at Troll (as well as earlier at Energia) were clearly less than Baylis and also Huhtamäki.

When all the above-mentioned factors are evaluated as a whole, the district court considers that Troll has not presented an acceptable reason for why Baylis has been paid a clearly lower salary than Troll employees doing the same work or less demanding work, such as Huhtamäki. Troll has breached its obligation to be fair and is therefore obliged to compensate Baylis for the damage it has caused, pursuant to Chapter 12 § 1 of the Employment Contracts Act.

*Amount of compensation*

In the matter, it has remained unclear when, for example, Huhtamäki's salary has increased. In an unclear situation, Troll, who is obliged to provide evidence, will suffer harmful sanctions for not presenting that explanation.
On the other hand, in the light of the presented report, Baylis would also have had some kind of salary development. Thus, even in a situation of equal treatment, he would not have received Monto's current salary and Huhtamäki's final monthly salary of approximately 2,500 euros right at the beginning of the employment relationship.
Therefore, it would not be reasonable to oblige Troll to pay damages based on a monthly salary of 2,500 euros for the entire period of employment.

In this unclear situation, the district court considers that Baylis's salary according to equal treatment must be assessed based on Chapter 17, Section 2, Subsection 3 of the Code of Judicial Conduct. The district court estimated 2,200 euros per month for the period 6 February 2012 – 31 December 2012 and 2,500 euros per month for the period 1 January 2013 – 22 February 2014 as a reasonable salary in accordance with Baylis's equal treatment. Thus, the damage caused to Baylis for full months is 400 euros per month for the first mentioned period and 700 euros per month for the last mentioned period.

However, based on the duration of the employment relationship, the damage for the first month (February 6 – February 29, 2012) was approximately EUR 330, and for the last month (February 1 – February 22, 2014) approximately EUR 550.

III Compensation demanded for violation of the Equality Act

*Has Troll violated Section 8 of the Equality Act regarding the prohibition of countermeasures?*

According to Section 8 of the Equality Act regarding the prohibition of countermeasures, no one may be put in a disadvantageous position or treated in such a way that negative consequences apply to them because they have complained or taken measures to secure equality.

In the drafts of the law that led to the enactment of the provision (HE 44/2003: Detailed justifications), it is stated, among other things, that the measures referred to in the section to ensure equality would require that they could have harmful legal or factual sanctions for the person who is allegedly guilty of discrimination.

Thus, for example, a mere publicized intention to take legal action, neither in employment relationships nor outside of them, would give rise in this section

Machine Translated by Google

34

intended protection.

In the e-mail sent by Baylis to Troll on 23 December 2013, it is about a salary increase request with reasons. It is therefore not a question of a measure intended by the law to secure equality. In addition, based on Kulmala's report, Troll had already planned layoffs in the summer of 2013. The reliability of Kulmala's report in this regard is supported by the e-mail message presented as written evidence on August 30, 2013 (V9), in which an employee of Administer Oy says that he asked Kulmala for help in terminating the employee. Based on the evidence explained above, Baylis' dismissal was strongly related to the fact that, in their opinion, they wanted a better employee to replace Baylis, and for this reason they no longer wanted to keep Baylis in the employment relationship.

On the grounds mentioned, the district court considers that Troll has not violated the prohibition of countermeasures arising from Section 8 of the Equality Act.

*Has Troll violated Section 6 of the Equality Act regarding the prohibition of discrimination?*

*Legal instructions*

According to Section 6, subsection 1 of the Equality Act on the Prohibition of Discrimination (21/2004), which was in force during Baylis' employment, no one may be discriminated against, for example, on the basis of ethnic or national origin, citizenship or language. According to paragraph 2, point 1 of the provision, direct discrimination means that someone is treated less favorably than someone else is treated, has been treated or would be treated in a comparable situation. It follows from Section 17 of the Act that if someone who considers himself to have been the subject of a procedure in violation of Section 6 presents a matter referred to in the Equality Act in court when processing a report on the basis of which it can be assumed that the prohibition laid down in the said section has been violated, the defendant must demonstrate that the prohibition is not not be violated.

In the drafts of the law that led to the enactment of the regulations (HE 44/2003: Detailed justifications), it is stated with regard to Section 6 that, in terms of direct discrimination, it would be irrelevant whether the placement in a different position is based on a discriminatory purpose or not. There would be a question of direct discrimination even if the perpetrator did not believe that he acted discriminatory on the prohibited basis referred to in subsection 1, if the procedure must be objectively considered as discrimination.

In the same preliminary works, with regard to § 17, it is stated that shifting the burden of proof to the defendant would require that the plaintiff has presented probable facts in favor of the fact that there is a case of discrimination in question. The plaintiff should present concrete facts, on the basis of which the court could assume that there is a prohibited discrimination situation referred to in § 6. However, full proof would not be required, but it would be sufficient for the court or other competent authority to have a presumption of discrimination. Since discrimination would require objectivity, in the regulation

Machine Translated by Google

35

the passive form of the expression "may be assumed" would be used. In the case of direct
discrimination, the claimant should show that he was treated less favorably than
someone else. In addition to this, the plaintiff should demonstrate the comparability of the
situation, even if imaginary.
The lawsuit should include an allegation that the treatment was based on a prohibited
ground of discrimination.

Furthermore, in the justifications of the last-mentioned provision, it is stated that when the
presumption of discrimination has arisen, the burden of proof would shift to the defendant.
The defendant's option would be to firstly refute the evidence presented by the plaintiff or
weaken it so that the evidence falls below the evidence threshold. If the defendant did not
succeed in rebutting the presumption of discrimination, he could present evidence that the
prohibition of discrimination laid down in Section 6 has not been violated.
With regard to direct discrimination, the defendant could, for example, try to present evidence
that the treatment has not taken place on a prohibited basis, that the treatment has not been
less favorable than others, or that the situation has not been comparable.

*The district court's conclusions*

Baylis is English, his mother tongue is English, and he hardly speaks Finnish. The lawsuit is
based on the claim, on the one hand, that Troll has committed a procedure against the
Equality Act in hiring, in that Baylis had been discriminated against on the basis of origin,
citizenship and/or language.

What has been explained above about Troll's unequal treatment of Baylis has given
rise to the presumption of discrimination in Baylis' hiring. In this respect, the district
court emphasizes that, for example, no acceptable justification has been presented for the
salary difference between Baylis and Huhtamäki, even though Baylis has been found
to be clearly more experienced and more meritorious than Huhtamäki even after they both
moved to work for Troll. Consequently, the burden of proof that Baylis has not been
discriminated against has shifted to the employer Troll.

The indisputable fact that in 2013 Troll has employed three foreign people on a freelance
contract speaks for Troll not having discriminated against Baylis in hiring based on his
origin, citizenship or language. In addition, Troll's claim that when Baylis was working at Troll,
English was used as the working language in his presence speaks against discrimination. In light
of this, Kulmala's story has been believable, that Baylis' lack of knowledge of the Finnish
language has not mattered in the international field where Troll operates and where many do
not speak Finnish at all.

On the other hand, Troll has not presented any explanation about the salary conditions of
the foreign freelancers who worked for it, for example in relation to its Finnish employees, or
even about the salary conditions of its Finnish employees, as stated above in the section
on the violation of equal treatment. Such a display would have been quite easy to
present.

Machine Translated by Google

36

In addition, the district court, referring to the above-mentioned legal guidelines, states that it is not important in terms of direct discrimination whether the different treatment is based on a discriminatory purpose or not, nor is it too much whether the perpetrator believed that he acted in a discriminatory manner, but the perpetrator's conduct must be evaluated objectively. In light of the evidence presented, the district court considers that it has not been shown that Baylis was not discriminated against. Therefore, Troll must be considered to have violated the prohibition of discrimination according to Section 6 of the Equality Act in hiring Baylis.

*Credit*

According to section 9 subsection 1 of the Equality Act on compensation, among other things, a job provider who has violated the provision of section 6 on the above-mentioned basis is obliged to pay compensation for the violation to the person who has been discriminated against. Depending on the nature of the violation, a maximum of 15,000 euros must be paid as compensation. According to paragraph 2 of the regulation, when determining the amount of compensation, the quality and extent of the discrimination and its duration, the attitude of the person who violated the provisions of § 6 towards his act, the settlement reached between the parties, the restoration of an equal legal status, the perpetrator's economic status and other circumstances, and the offense against a person under another law for the same act are taken into account convicted or ordered to pay a financial penalty. Compensation can be waived if it is reasonable considering the circumstances. The maximum compensation amount can be exceeded for special reasons, when it is justified taking into account the duration, severity and other circumstances of the discrimination. In addition, according to paragraph 3 of the provision, the payment of compensation does not prevent the injured party from demanding compensation for financial loss according to the Damages Compensation Act or other law.

Pay discrimination against Baylis has been long-standing. It has started right at the beginning of the employment relationship and escalated towards its end. Troll had not done anything to remedy the situation, when, for example, Huhtämäi, another person who was planned to be fired, had a clear salary development in the company. These factors increase the amount of the refund. No explanation has been presented about Troll's financial position, therefore it cannot be taken into account when evaluating the amount of compensation. Taking into account these and other matters referred to in the provision, the district court considers the fair and reasonable compensation amount to be 6,000 euros, which amount Troll is obliged to pay to Baylis with the required interest.

The compensation ordered to be paid was based on discrimination in hiring, not dismissal. Therefore, based on the unjustified termination of the employment contract, the part of the non-material compensation ordered to be paid to Baylis has not been taken into account when determining the amount of compensation. This has also not been done to the extent that Troll is obliged to pay compensation for the duration of the employment contract based on unequal treatment, as it has been based on Baylis' loss of salary, i.e. material damage. Therefore, according to Troll's demand, the compensation does not have to be reconciled based on compensations ordered to be paid by Troll to Baylis.

Machine Translated by Google

37

**Court costs** according to Chapter 21, Section 3, Subsection 1 of the Code of Litigation, if
in the same case, several claims have been made, some of which are decided
in favor of one and some in favor of the other, they may keep their legal costs
as their own damage, unless there is a reason to oblige the parties involved to
partially compensate the opposing party. If what the party has lost is only of minor
importance in the case, he should be fully compensated for his expenses.
Paragraph 2 of the provision states, among other things, that what is
stipulated in paragraph 1 must be applied accordingly when the
party's claim is accepted only in part.

The central subject of the trial has been the lawsuit regarding
unjustified termination of the employment relationship, which Baylis has won.
In relation to the above-mentioned case, only a small number of lawsuits regarding
equal treatment and violation of the Equality Act have been processed.
Even for the last mentioned, the trial has focused on the basis of the claims,
not their amounts. Taking these facts into account, what Troll has won in
terms of the amount of claims has had only a minor importance in the case.
Consequently, Troll is obliged to fully compensate Baylis for reasonable and
necessary legal costs.

In addition to the main case, Troll's request for a ban on the use of Baylis's
written evidence and Baylis's edit request against Troll to present written evidence
have been resolved as part of the lawsuit. Both claims have been settled in
favor of Baylis.
Considering these factors and the quality and scope of the case, the district
court considers Baylis' legal expenses to be all reasonable and due to
necessary measures.

**Result**          Based on these grounds, the district court has, mostly rejecting all the demands
presented in the case, resolved the case in the manner evident from the
sentence.

Machine Translated by Google

**JUDGMENT** Troll VFX Oy is ordered to pay Trevor Baylis:

1. as compensation for the unjustified termination of the employment contract, EUR 30,132.66 with interest in accordance with Section 4, subsection 1 of the Interest Act, starting from 11/12/2015;

2. as damages due to the violation of the equal treatment provision, 13,980 euros, of which late payment interest in accordance with Section 4 of the Interest Act: 330 euros from 29.2.2012 onwards, 400 euros from 31.3.2012 onwards, 400 euros from 30.4.2012 onwards, 400 euros from 31.5.2012 onwards, 400 to the euro From 30.6.2012, for 400 euros from 31.7.2012, for 400 euros from 31.8.2012, for 400 euros from 30.9.2012, for 400 euros from 31.10.2012, for 400 euros from 30.11.2012, for 400 euros from 31.12.2012 , for 700 euros on 31.1 .from 2013, for 700 euros from 28.2.2013, for 700 euros from 31.3.2013, for 700 euros from 30.4.2013, for 700 euros from 31.5.2013, for 700 euros from 30.6.2013, for 700 euros from 31.7.2013, for 700 euros 31.8. from 2013 onwards, for 700 euros from 30.9.2013 onwards, for 700 euros from 31.10.2013 onwards, for 700 euros from 30.11.2013 onwards, for 700 euros from 31.12.2013 onwards, for 700 euros from 31.1.2014 onwards and for 550 euros from 28.2.2014 onwards;

3. as compensation according to the Equality Act, EUR 6,000 with interest according to Section 4, subsection 1 of the Interest Act starting from 12.11.2015 and

4. as compensation for court costs EUR 40,833.66 with default interest in accordance with § 4 subsection 1 of the Interest Act starting from when one month has passed from the date of the district court judgment.

5. In addition, Troll VFX Oy is obliged to pay the Unemployment Insurance Fund EUR 7,367.34, including interest on late payment in accordance with Section 4, subsection 1 of the Interest Act, starting when one month has passed from the date of the district court's judgment.
Unemployment insurance fund account: FI60 2001 1800 1235 91.

**Legal points**          Those mentioned in the justifications.

**REQUEST FOR AMENDMENT** This decision may be appealed by appealing to the Court of Appeal of Turku in accordance with Chapter 25 of the Code of Judicial Procedure or by filing a preliminary ruling appeal with the Supreme Court as provided for in Chapter 30 a of the Code of Judicial Procedure.

District Judge          Oskar Kulmala