# EXHIBIT F1

# Market Court
# Marknadsdomstolen

Front page »  Solutions  »  Intellectual property matters  »  2018  » MAO:79/18

# MAO:79/18

A > Sputnik Oy

copyright - work - jurisdiction of the market court
**Diary number(s):**
2017/63
**Date of issue:**
13.02.2018

**COMPLAINT**

**Standard**

A has requested that the Market Court

1. confirms that the copyright of the stage design work related to the film Beyond Hope belongs exclusively to A and he should therefore be mentioned alone as the film's stage designer;
2. alternatively confirms that even if A should not be considered the sole author of the stage design work, his copyright as an author has been infringed by incorrect crediting, which has occurred by mentioning as the authors of the stage design work persons or a person who should not be considered as the author of the stage design work;
3. orders the destruction of physical copies of the film Beyond Hope, in the final credits of which other persons (persons who should not be considered as the authors of the stage design work) are mentioned as stage designers in addition to A;
4. orders Sputnik Oy to pay him EUR 20,000 as compensation pursuant to Section 57 of the Copyright Act and EUR 5,000 as compensation, both amounts including default interest from 9 February 2017;
5. orders Sputnik Oy to reimburse him for the costs, up to a maximum of EUR 20,000, incurred in publishing the judgment in the case in whole or in part within one month of its becoming final.

In the event that copyright infringement is not found, A has alternatively demanded that the Market Court oblige Sputnik Oy to pay him 25,000 euros in return for the unjustified advantage.

In addition, A has demanded that the Market Court oblige Sputnik Oy to compensate his legal costs, including VAT, with EUR 179.95 for expenses and EUR 96,485.30 for fees, i.e. a total of EUR 96,665.25 including late payment interest.

**Basic**

*The plaintiff's exclusive right to the production work related to the film*

BAYLIS_I

The issue is whether the stage design can be protected as a work independent of the film. A has created the stage design work related to the film Beyond Hope alone. The stage design work in question is an independent work in a connected film work. In any case, it is an independent work of stage design protected by copyright. The copyright in the stage design work belongs exclusively to A.

The stage design is independent and original in a way that exceeds the so-called work threshold. The stage design appears as an artistic, distinctive and identifiable entity that is distinguishable from the rest of the film work. A has acquired props and supervised the construction of the stage design independently of the film director. B's participation in the stage design process has been minor and insignificant in terms of the authorship of the stage design. Nor has the work of C and D established their authorship status. The parties have agreed that A acts as the director of the stage design department, and that the work of C and D has not been comparable to A's contribution and responsibility for creating the stage design.

In the final credits of the film, the announcement of the artistically responsible persons who participated in its creation, i.e. the crediting, must be carried out in accordance with the Copyright Act, general practice in the industry and the commercial practice followed by the parties. In previous productions, Sputnik Oy has distinguished the actual set designers from the set builders. The names mentioned in the Set Design section are considered to be the authors of the work in accordance with the general commercial practice applied by the parties in the industry. In the final credits of the film, only A. must be stated in the Set Design section.

If, contrary to A's understanding, the Market Court were to consider that some other person should be considered the author of the staged work in addition to him, the crediting in such a situation must also be considered incorrect and infringing A's copyright insofar as persons who are not the authors of the staged work are stated as the authors.

The method of crediting implemented by Sputnik Oy in the film Beyond Hope would have required A's prior consent. Such consent has not been requested or received. The paternity rights referred to in Section 3 of the Copyright Act have not been transferable. With regard to the economic rights provided for in Section 2 of the Copyright Act, the conditions for the transfer of all rights in the employment contract and thus the transfer clause in question have expired. Invoking the contractual term is dishonorable and worthless, the contractual term leads to manifest unfairness and must be reconciled in the manner referred to in Section 29 of the Copyright Act. Sputnik Oy has therefore violated A's rights provided for in Sections 2 and 3 of the Copyright Act by making the film available to the public and by making copies of it with incorrect end credits.

A had reason to believe that he was acting as a set designer for the film production and that he alone bore the responsibility of the set designer and that Sputnik Oy's performance obligation had been understood to include crediting in accordance with general and customary business practices between the parties and good practice in the industry. Sputnik Oy could have influenced the above-mentioned matters and their implementation. In addition, Sputnik Oy is liable for the legal consequences of incorrect crediting. A would not have agreed to enter into the agreement if he had been aware of Sputnik Oy's intention to announce C and D as the authors of the set design work or at least to misleadingly equate C and D, who acted as set designers, with him. The announcement of the author's name also has considerable economic significance for the author. The announcement of additional names has also weakened A's merits as a distinguished author. The conditions of the agreement and thus the transfer of rights by agreement have lapsed.

*Consequences of infringement of exclusive rights*

The physical copies of the film distributed to the public must be destroyed to end the infringement and minimize the suffering and reputational damage caused to A, and the files in the digital distribution must be converted to the required format for the end credits.

BAYLIS_2

Sputnik Oy has infringed copyright and its performance has been of lesser value than agreed and required by A due to incorrect crediting. Sputnik Oy has also received an unjustified advantage at the expense of A. Taking into account the nature of the act and the intentional nature of the infringement, reasonable compensation for the infringement of paternity rights and economic rights must be considered to be EUR 20,000.

Sputnik Oy has, in violation of the transfer agreement and the Copyright Act, intentionally and after written prohibitions by A, used the transferred stage work as part of its professional business. The starting point in assessing the amount of compensation is the contractual compensation. In addition to the contractual compensation, A is entitled to the awards awarded for the stage work, which must be taken into account in assessing the amount of compensation. Sputnik Oy's intentional conduct has offended A as an artist and caused him suffering. The suffering has been increased by the intentional and contrary to the contract conduct, A's subordinate position in relation to Sputnik Oy and the trust in the trade practice that prevailed between the parties and the betrayal of trust, as well as the extensive international publicity received by the publication and distribution of the cinematographic work. On similar grounds, 5,000 euros must be considered reasonable compensation for the suffering together with the grounds for compensation. Sputnik Oy's conduct as an intentional act may also meet the characteristics of an act punishable as a copyright offence. This must be taken into account in the quantitative assessment of compensation for suffering as an aggravating factor regarding the quality of the insult. In addition, the recommendations of the Advisory Board on Personal Injury Matters on compensation for suffering caused by defamation can be used as a benchmark for assessing the amount of compensation for suffering.

Sputnik Oy shall be ordered to pay the costs incurred in publishing the judgment in the case. The judgment or parts thereof are intended to be published on key websites and at least ten websites offering film databases and news services, and also on the culture pages of a national newspaper in Great Britain, France, Germany, the Nordic countries, the United States and Japan. The proceedings have caused A considerable reputational damage, as well as financial losses and human suffering. Sputnik Oy has repeated perceptions that it knows to be incorrect in international contexts and at media events with significant information value. The publication of the judgment is of considerable importance in limiting the damage that has already been caused and will continue to be caused.

*Secondary claim and jurisdiction of the market court in the matter*

In the event that no infringement of copyright is found, Sputnik Oy has unjustly benefited at the expense of A and the benefit in question must be paid as a refund of the unjustified advantage in accordance with the facts established in connection with the compensation and indemnification. Sputnik Oy has unjustly benefited at the expense of A by paying A a substantially lower consideration for the transfer than A would have required if he had been aware that he would not be credited as the exclusive author of the staged work.

As regards A's primary claims, the matter concerns a dispute falling within the exclusive jurisdiction of the Market Court as referred to in Section 61 of the Copyright Act, in which, on the one hand, the claims regarding the rights and sanctions in question are based on the Copyright Act and, on the other hand, the issue concerns copyright. The choice of court agreement in the employment contract has no effect on the exclusive substantive jurisdiction of the Market Court or any other significance. A must be able to challenge Sputnik Oy's reliance on the employment contract without the matter becoming outside the jurisdiction of the Market Court. The Market Court may and must, if necessary, also deal with the interpretation of the contracts as a preliminary issue in the case of copyright infringement in order to determine which rights have been transferred by the contract and whether Sputnik Oy has used rights other than those transferred by the contract.

BAYLIS_3

The secondary claim for unjustified advantage is an ancillary claim that the Market Court has jurisdiction to handle in addition to the copyright claims within its jurisdiction. The penalties are similar and are included in the usage compensation referred to in Section 57 of the Copyright Act. The issue is not the interpretation of the employment contract, and the jurisdiction clause is not applicable to the case. The only issue to be assessed is the question of benefit, unfoundedness and the causal link to the loss suffered, which must be clarified through evidence.

Fragmentation of the case's handling into different courts would also not be appropriate or in line with the objectives of the legislation.

**ANSWER**

**Standard**

Sputnik Oy has requested that the Market Court dismiss the claim in respect of the secondary claim for the return of unjustified benefit and insofar as the claim concerns the rights provided for in Section 2 of the Copyright Act and, alternatively and in any event, dismiss the claim in respect of the other parts.

In addition, Sputnik Oy has demanded that the Market Court oblige A to compensate its legal costs excluding VAT in the amount of EUR 3,821.91 for expenses and EUR 82,942.50 for fees, i.e. a total of EUR 86,764.41, as well as the costs of the parties in the amount of EUR 1,377.41, both amounts including default interest.

**Basic**

The employment contract has agreed to transfer all of A's rights, in this case the economic rights referred to in Section 2 of the Copyright Act, to Sputnik Oy. The assessment of the unfairness of the term concerning the transfer of copyright agreed in the employment contract is a matter referred to in Chapter 10, Section 2 of the Employment Contracts Act. The employment contract has also agreed, by means of an express and clear jurisdiction clause included therein, that disputes shall be resolved in the Helsinki District Court. Also, the claim for the return of unjustified benefit, which is secondary to the confirmation of copyright infringement, is not a matter based on the Copyright Act, but a separate dispute, the action for which was brought by way of extension of the action at a different time than the original copyright dispute. The action does not arise from essentially the same grounds and there are no special reasons for handling such a separate dispute in the Market Court. The Market Court does not have jurisdiction in these respects. Sputnik Oy has made legal objections regarding these claims not included in the original claim after they were filed.

A has not planned and implemented the set design for the film On the Other Side of Hope alone. The visual whole of the film, including the staging of the film's scenes, has been based solely on the artistic pre-planning of director B, i.e. the film script prepared in more detail than usual by B, as well as the detailed instructions given on the filming locations on the filming days and in connection with the filming of the scenes, and, among other things, the set and color plans outlined for various surfaces and materials. It has been agreed with A that he will be responsible for erecting and manufacturing the set and studio structures together with D. C has later joined the work group. This technical work has been agreed to be the task based on B's plans and instructions, and the entire set design team has worked directly under him. A has worked according to the director's detailed instructions.

BAYLIS_4

Primarily, neither A nor anyone else has acquired an exclusive copyright in the film's set design that is separate or distinct from the film. Secondly, if it is considered that an independent work of set design has been created that is separate from the film, the copyright in the set design would belong exclusively to B, to whose artistic design the contributions of other persons have been subordinate. The contributions of A or other assistants have not been independent or original. Finally, if it is considered that an independent work of set design has been created that is separate from the film and A's contribution to the set design of the film exceeds the work threshold in this respect, this contribution cannot, however, be clearly distinguished from the contributions of others who substantially participated in the set design work and it would be a joint work between A, B, D and C.

The spelling of the film's end credits does not infringe on A's right to be acknowledged as the author in the manner required by good practice, i.e. the prevailing practice in the field. In an unclear situation, it is recommended that the author be mentioned for the sake of certainty. The order in which the authors are mentioned is partly within the scope of contractual practice and good practice. The end credits of a film may also mention persons who assisted in the making of the film, even if they are not the authors of the film as referred to in the Copyright Act. The credits for the production have been a list of those who substantially participated in the production, not the authors. Regardless of the assessment of the authorship and work threshold of the film's production, the credits for the end credits are in any case truthful and correspond to good practice, established practice and contractual arrangements between the parties. The use of the term "production" and the listing of the name in alphabetical order have been in accordance with the practice followed in previous films. The method of listing the film's end credits has not been agreed or stipulated by the employment contract or otherwise.

The employment contract's condition regarding the transfer of economic rights is effective, and there are no grounds for deviating from it, either on the basis of the alleged expiry of the terms of the contract, the alleged dishonourable and worthless conduct of Sputnik Oy, or the alleged unreasonableness of the employment contract. When deciding on the employment contract, a member of the working group does not have control over the method of crediting the end credits of a film, and such conditions are not even included in the employment contracts of the members of the working group. Sputnik Oy has not rightfully been, and based on its similar contracts or industry practices, must not have been, aware that the announcement of the names of other persons together with A in the end credits section has had a material impact on A's commitment to the contract and that he has had false perceptions in this regard. When deciding on the employment contract, the negotiations have focused solely on the amount of compensation A receives for his work. The condition included in the employment contract regarding the complete transfer of copyright, to the extent that it is possible under the Copyright Act, is fully consistent with the prevailing contractual practice in the industry and is customary, and there are no conditions for its mediation based on Chapter 10, Section 2 of the Employment Contracts Act.

There are also no grounds for the return of the unjustified benefit. A has not identified or justified the benefit that accrued to Sputnik Oy, i.e. the benefit in any other way than quantitative, the unjustification of the benefit, or the causal link between Sputnik Oy's alleged benefit and the loss that A simultaneously incurred. A has transferred his work contributions and economic copyrights to Sputnik Oy by means of an employment contract, which in turn has paid the consideration agreed and approved in the employment contract between the parties. The exchange purpose inherent in the contract has been fulfilled, and the return of the unjustified benefit is therefore out of the question. The claim that Sputnik Oy's unjustified benefit in the form of a financial benefit of EUR 25,000 is otherwise implausible, as this actually means that A's performance would be double in economic value and thus completely exceptional in the industry compared to what the parties have agreed between themselves and what A has committed to.

BAYLIS_5

A's claims are therefore unfounded and the claims for compensation and indemnification under the Copyright Act are also unexplained in their entirety and manifestly excessive in amount. According to case law, compensation under Section 57(1) of the Copyright Act does not include material under the law of damages (KKO 1989:87), and reasonable compensation must correspond in amount to the remuneration normally charged for the use of the work, i.e. the license fee.

(KKO 1998:91) and the infringement of moral rights as provided for in Section 3 of the Copyright Act does not entitle to compensation (KKO 2007:63, paragraph 4). In standard employment contracts concluded with set designers, the transfer of economic rights is only a small part of the total value of the contract, with the set designer's work being the most important part of the consideration under the contract. This has also been the case in this case, where the agreed consideration included advance, filming and demolition work as well as copyright compensation. Under no circumstances will copyright compensation constitute the now claimed 80 percent of the total compensation. In this respect, reasonable compensation is granted in the amount of EUR 1,000.

In the case of the compensation claimed under Section 57(2) of the Copyright Act, the burden of proof of the amount of damage lies with the claimant. In this regard, no concrete explanation has been provided regarding the alleged suffering. Generally, the level of such compensation, which is assessed as a last resort under Chapter 17, Section 2(3) of the Code of Civil Procedure, has been comparatively low (for example, KKO 2005:43).

**ARGUMENT**

**Document verification**

*A*

1. Sputnik Oy's reply letter to A (30.1.2017)
2. A's employment contract for the set design of the film Hope on the Other Side (16.12.2016) (also Sputnik Oy's documentary evidence 4)
3. Production memo for the film Hope on the Other Side
4. Photo collage of the sets handed over for filming and their corresponding appearance in the film
5. D's employment contract for the film Hope on the Other Side (16.12.2016), the assignment agreement between Höyry Films Oy and Sputnik Oy (27.7.2016) and the agreement between Höyry Films Oy and C (27.7.2016) (partially kept secret)
6. Photo collage of the completion of the film's set design and the set design work appearing in the film combined with the script
7. European Film Academy's email to A (14.9.2017)
8. Emails B – A (27.3.2016)
9. Video excerpts of the opening and closing credits of the films "Toivon tuolla puolen", "Juha", "Mies vailla menneisyyttä", "Laitakaupungin valot", "Pidä huvistasi kiinni Tatjana", "Dogs have no hell", "Kauas pilvet karkaavaat"
10. Compilation of the crediting of the film "Toivon tuolla puolen" abroad
11. Compilation of the crediting of the previous joint films of the plaintiff and the defendant company abroad
12. Compilation of photographs of the subjects appearing in the defendant company's photo collage in the order of the scenes in the film
13. Agreement between the parties regarding the film "Mies vailla menneisyyttä" (13.3.2003) and "Actor/Author Transfer Paper"

*Sputnik Ltd.*

BAYLIS_6

1. Second, final version of the film script (26.7.2016)
2. A's letter to Sputnik Oy (31.1.2017)
3. Screenshots of the closing credits of five films produced by Sputnik Oy and directed by B
4. A's employment contract for the set design of the film Hope Over There (16.12.2016) (also A's documentary evidence 2)
5. Photo collage of the final set design of the film for certain scenes combined with the script

**Expert opinions**

*A*

1. AB, Professor of Film and Television Production (4.10.2017)
2. JP, Professor Emeritus of Architecture (29.9.2017)
3. AL, Film Screenwriter and Film Director (29.9.2017)
4. AN, Master of Arts (29.9.2017)

*Sputnik Ltd.*

1. ST, film scholar and non-fiction writer (20.9.2017)

**Identity proof**

*A*

1. A, for evidentiary purposes
2. B, CEO of Sputnik Oy, for evidentiary purposes
3. AB, professor of film and television production, as an expert
4. JP, professor emeritus of architecture, as an expert
5. KR, set painter, as a witness
6. TK, set builder, as a witness
7. C, entrepreneur, as a witness

*Sputnik Ltd.*

1. B, CEO of Sputnik Oy, for evidentiary purposes
2. ST, film researcher and non-fiction writer, as an expert
3. ML, film producer, as a witness
4. TS, filmmaker, as a witness
5. C, entrepreneur, as a witness
6. D, props maker, as a witness
7. MJ, producer, as a witness
8. JN, filming organizer, as a witness

**MARKET LAW SOLUTION**

**Reasoning**

*1 Arguments about the jurisdiction of the Market Court*

*1.1 Statements of the parties concerned*

BAYLIS_7

1. Sputnik Oy has submitted that the Market Court does not have jurisdiction to examine claims 1–5 insofar as they concern the so-called economic rights provided for in Section 2 of the Copyright Act. In this regard, Sputnik Oy has referred to the fact that the transfer of economic rights has been agreed between A and Sputnik Oy and that the agreement contains a jurisdiction clause according to which disputes must be resolved in the Helsinki District Court, and that the matter is a matter referred to in Chapter 10, Section 2 of the Employment Contracts Act.

2. Sputnik Oy has also submitted that the Market Court does not have jurisdiction to examine A's secondary claim for the restoration of unjustified benefit, because the claim was submitted at a different time than the original claim, it does not concern a matter based on the Copyright Act and the claim does not arise from essentially the same grounds, and because there are no special reasons for handling such a separate dispute in the Market Court.

3. A has, in turn, submitted that claims 1–5 are based on the Copyright Act and that the jurisdiction clause in the contract is irrelevant in the case. In addition, A has submitted that the Market Court has jurisdiction to examine the claim for the return of unjustified benefit as a so-called ancillary matter.

*1.2 Legal principles regarding the jurisdiction of market law*

4. According to Chapter 1, Section 4, Subsection 1, Point 15 of the Act on Legal Proceedings in the Market Court, the Market Court shall hear as intellectual property matters matters that are provided for in the Copyright Act. Chapter 1, Section 5 of the Act also provides for the jurisdiction of the Market Court in disputes relating to intellectual property matters. According to Subsection 1, the Market Court may also examine another dispute in connection with a dispute provided for in its jurisdiction if the plaintiff brings actions simultaneously against the same defendant or different defendants and the actions arise from essentially the same grounds. For a special reason, the Market Court may examine the other dispute mentioned, even if the action to that effect has not been brought simultaneously. Based on Subsection 3 of the latter section, what is provided for in Subsections 1 and 2 of the said section, however, requires that no other result be derived from an agreement between the parties on choice of court or the exclusive jurisdiction of another court.

5. According to Section 61(1) of the Copyright Act, disputes and applications based on this Act shall be handled in the Market Court. According to the preparatory work for the provision (HE 124/2012 vp p. 120), all disputes and applications based on the Copyright Act shall be handled in the future in the Market Court. According to the preparatory work, the expression "handled" used in the provision indicates that the Market Court has exclusive jurisdiction to handle the matters referred to in the section. The expression "disputes and applications based on this Act" is intended to refer to all matters in which a penalty based on the Copyright Act is requested or in which a matter based on the said Act is otherwise at issue. On the other hand, according to the preparatory work, the provision does not refer, for example, to matters in which a purely contractual dispute is involved, in which the provisions of the Copyright Act are not even alleged to have been violated.

BAYLIS_8

6. As is evident from, for example, the Supreme Court's decisions KKO 2017:84 (paragraph 23), KKO 2017:24 (paragraph 15) and KKO 2008:75 (paragraph 6), in determining the subject-matter jurisdiction of the court in a civil case, what is claimed in the claim and on what the claim is based is fundamentally decisive. The question of the subject-matter jurisdiction of the market court must also be assessed from these starting points. From the point of view of determining jurisdiction, it is crucial whether the Copyright Act will be applied when deciding the matter, taking into account the facts invoked by the parties. It is clear that when dealing with a matter falling within the jurisdiction of the Market Court, the Market Court may have to interpret the contract as a preliminary question (Harenko et al., Tekijänoikeus, 2016, p. 708) or, in accordance with general principles of legal procedure, otherwise take a position as a preliminary question on a matter the examination of which is not in principle within the jurisdiction of the Market Court (see KKO 2016:8, paragraph 18 and KKO 2011:70, paragraph 5). It is also clear that in a matter falling within the exclusive jurisdiction of the Market Court, the parties cannot agree that such disputes will be resolved in the District Court, because the District Court is not a competent court.

7. The preparatory work for Chapter 1, Section 5 of the Act on Proceedings in Market Court (HE 124/2012 vp p. 54) has stated that, similarly to the provisions of Chapter 18, Sections 1 and 2 of the Code of Civil Procedure, claims must be heard in the same proceedings when they arise from essentially the same grounds. The preparatory work for the provisions of the Code of Civil Procedure referred to (HE 15/1990 vp p. 120) has, in turn, stated that it is advantageous to join claims in the same context for hearing in which the same procedural material is partly or entirely present. In addition, legal literature (Frände et al., Prosessioikeus, 2017, p. 571) has stated that the prerequisite for joining cases referred to in Chapter 18, Section 1 of the Code of Civil Procedure is that there is a substantive connection between the cases. The common factor is usually either the same legal act or other event that gives the plaintiff grounds for multiple claims against the defendant.

8. Other disputes referred to in Chapter 1, Section 5 of the Act on Legal Proceedings in the Market Court may be examined in connection with a dispute that has been determined to fall within the jurisdiction of the Market Court, provided that the actions have been brought simultaneously. The Market Court may deviate from this requirement of concurrency for a special reason. In the preparatory work for the Act (LaVM 15/2012 vp pp. 8–9), the deviation from the requirement of concurrency of actions is justified by the fact that in individual cases the unconditionality of the claim could lead to an outcome that is inappropriate for the claimant and contrary to the objectives underlying the regulation.

*1.3 The conclusions of the Market Court in this case*

9. In support of the inadmissibility of the primary claims in the action, Sputnik Oy has, as stated above, relied on the agreement between the parties and the jurisdiction clause therein, as well as on the fact that the matter in question is a matter referred to in Chapter 10, Section 2 of the Employment Contracts Act. The Market Court states that the action is based on an allegation of infringement of A's copyright. The action has demanded sanctions based on the Copyright Act. It is therefore clear that the matter is based on the Copyright Act in the manner provided for in Section 61, Subsection 1 thereof. The matter is therefore a dispute falling within the exclusive jurisdiction of the Market Court, which the parties cannot agree to have handled in another court and which, if necessary, must be examined as a preliminary question as to what significance should be given to the parties' agreement and the allegations concerning it.

10. In support of the inadmissibility of the secondary claim for the return of an unjustified benefit, Sputnik Oy has relied, among other things, on the fact that the examination of the claim does not concern a matter based on the Copyright Act and that the claim was not presented when the action was brought. Instead, Sputnik Oy has not relied on the jurisdiction clause in the agreement between the parties in support of the inadmissibility of the claim.

BAYLIS_9

11. The Market Court considers that the claim for the return of an unjustified benefit in this case is essentially based on the same course of events as claims 1–5 and that the court documents concerning the claims are essentially the same. The claim was submitted in connection with the preparation of the case more than two months before the preparation of the case was concluded. Although this is not a case of a claim filed simultaneously within the meaning of Chapter 1, Section 5 of the Market Court Act, the claim, taking into account the grounds and evidence presented in support of it, nevertheless arises essentially from the same ground, and there is a special reason referred to in the provision to examine this secondary claim as well, if necessary.

12. Based on the above, the Market Court has jurisdiction to examine claims 1–5 in their entirety and, in addition, the claim secondary to these claims for the return of unjustified advantage, if examination of this claim is necessary.

*2 Background and questioning*

13. It is undisputed that Sputnik Oy produced the film Toivon tuolla puolen directed by B and hired A as the film's set designer under an employment contract. According to the employment contract, A was responsible for creating the set design and managing the set design work to the extent that is customary. Correspondingly, D was hired as a props designer and C as a set builder. The film's end credits mention D, C and A, in that order, in the section on set design. A had set painters and set builders working under him, who are mentioned in the film's end credits in the sections referring to these tasks.

14. In the written and oral preparation of the case, the Market Court has paid attention to the claims and grounds of action and, as a result, has asked the questions necessary for the clarification of the case. In the preparatory session and in its subsequent statement on the matter, A has arrived at the present formulation of claims 1 and 2 and their grounds and has also stated that it is not necessary to rule on claims 3–5 concerning sanctions if the first-mentioned claims are unsuccessful.

15. The Market Court states that it is apparent from Chapter 24, Section 3, Subsection 1 of the Code of Civil Procedure that the court may not rule otherwise or more than the party has claimed. In legal literature (Estonian, Material Procedure Management, 1988, p. 170), this so-called burden of proof has been stated to mean that the opposing party to the party who has filed a claim can trust that the court will stay within the scope of the claim presented in its decision, which allows the party to focus on what has been specifically claimed in the process. On the other hand, the rule of the other side means that the party is obliged to present all the claims that he or she wants the court to take into account in its decision. The party therefore runs the risk of having presented claims that are sufficient in both quality and quantity in the case.

16. According to Chapter 24, Section 3, Subsection 2 of the Code of Judicial Procedure, in a matter where settlement is permitted, a judgment may not be based on a fact that the party has not invoked in support of his claim or objection. It is clear from the Supreme Court's decision KKO 2016:47 (paragraph 16) that a fact refers to a fact that directly affects the decision from the point of view of legal consequences, i.e. a so-called legal fact. Invoking a fact, in turn, means that the party brings forward the fact specifically with the intention of having it serve as the basis for the decision. As is also clear from the aforementioned decision (paragraph 20), the provision in question concerning the so-called burden of proof is an expression of the so-called principle of determination to be followed in civil proceedings. This means, inter alia, that the parties to the proceedings determine the subject-matter of the proceedings and that it is for the claimant in the dispute to present the facts which constitute the direct basis of his claim and from which he considers the legal effect sought to flow directly. In his application, the claimant, in principle, defines in a manner binding on the court which facts are such (paragraph 21 of the abovementioned judgment).

BAYLIS_I0

17. The Market Court notes that the grounds and legal characterization of the claim have been presented as the fact that the staged work is an independent work in a connected cinematographic work or that it is in any case an independent work. Another ground has been presented, among other things, that the staged work appears as an artistic, distinctive and identifiable entity that is distinguishable from the rest of the cinematographic work. In addition, the submitted claims for confirmation 1 and 2, on which claims 3–5 are based, have been unambiguously formulated to concern the copyright or authorship of the staged work.

18. In view of the above, in the present case, in accordance with A's claims and grounds, the primary issue is the copyright in the independent stage design work related to the film Beyond Hope and allegedly separable from it. On the other hand, the issue is not whether the sets made before the filming of the film are protected as such under copyright law – although this may in itself be relevant to the above-mentioned issue under consideration – or whether the persons involved in the production of the film have copyright in the film in question. Similarly, the question of the incorrectness of the film's closing credits is, taking into account the grounds of action and claims 1–5, relevant when examining claims 1–5 only if an independent stage design work can be distinguished from the film.

19. In light of the above, the first thing to assess in this case is whether the film Beyond Hope is an independent stage work, as claimed by A.

*3 Market law assessment of a staged work*

*3.1 Legal basis*

20. According to Section 1(1) of the Copyright Act, the author of a literary or artistic work has copyright in the work, whether it is a work of fiction or an explanatory written or oral presentation, a composition or theatrical work, a cinematographic work, a photographic work or other work of visual art, a product of architecture, fine arts or industrial arts, or whether it is expressed in any other way.

21. In the case of cinematographic works, the preparatory works for the Copyright Act (Committee Report 1953:5, p. 45) have stated that in practice it can be difficult to determine to whom the copyright in a cinematographic work should be considered to belong. According to legal literature (Salokannel, Häviävät elikuvakan teikjut, 1990, p. 28), in defining the copyright holders of a film, Nordic legislative documents make a distinction between, on the one hand, those authors who have copyright in the entire cinematographic work and, on the other hand, those authors who have copyright only in the individual works or performances included in the film. Nordic legislative documents mention the persons who may have copyright in the entire cinematographic work, usually the screenwriter and the film director. Whether other persons who participate in the production of the film with artistic input have copyright in the entire film or only in their own contribution depends on the significance of their contribution to the film as a whole. Such factors may include, among others, the composer of film music, the cinematographer, the editor, the set designer, the architect and the choreographer.

22. The above-mentioned work further states (pp. 28 and 29) that the decisive issue in determining the rights holders of a film is the clarification of the boundary between creative work and technical skill. The (artistic) independence and original expression of the work have been considered to be the determining factors. In filmmaking, the independence of work is generally assessed on the basis of how independently the person works in relation to the film director. This refers to creative work that is considered independent according to artistic criteria. The artistic creative contribution of an individual author would thus be determined on the basis of the script and direction of each film work, and ultimately only in the practical production process.

23. Section 6 of the Copyright Act provides for a so-called joint work. According to the provision, if two or more persons have jointly created a work without their contributions constituting independent works, they shall have the copyright jointly. However, each of them shall have the right to bring claims for infringement.

BAYLIS_11

24. Legal literature and case law have also referred to so-called linked works. According to legal literature (Haarmann, Tekijänoikeus ja lähiioikeus, 2005, p. 105), linked works are those where the authors' contributions to the whole are distinguishable from each other. Examples of linked works include an operetta (KKO 1956 II 76), an opera and a written or illustrated work. Section 6 of the Copyright Act on joint works does not apply to these works. Similarly, legal literature (Harenko et al., Tekijänoikeus, 2016, p. 85) states that a linked work is a work created as a result of the work of more than one author, in which the contributions of different authors form independent works, unlike in a joint work. Examples of such interconnected works include an illustrated book in which the author and illustrator's contributions can be distinguished, an operetta in which the speech, dance and music parts can be distinguished, or a song in which the composer and lyricist's contributions are independent.

25. The Copyright Council's statement 2003:11 states that the distinction between a joint work and a linked work is not always entirely clear. A joint work and a linked work may be close to each other, depending on the way in which the work was created, i.e. what the process of creating the work was and how the persons who participated in creating the work worked when creating the work. Another important point in drawing this distinction is whether the contributions of the persons who participated in creating the work can be distinguished from the resulting work as a whole, so that one or more persons can be clearly identified as the authors of a part or part of the work. If a work is the result of close interaction between several persons, this supports the view that the work is a joint work within the meaning of Section 6 of the Copyright Act.

*3.2 A description of the film's set design and staging*

26. The Market Court first notes that the claim does not explicitly define what is meant by a set design or a set design work, and therefore what the claims for confirmation presented in the case specifically concern. Based on what is presented in the case, on the one hand, set design can be understood as the visual appearance of a film, which may also include, among other things, lighting or costumes. On the other hand, set design can also be understood, for example, as only applying to filming locations built or otherwise created for a film, with special props, which aim to give the impression of a realistic environment.

27. A has submitted that a staged work does not consist of individual sets made for scenes, i.e. so-called "sets", but of an ensemble, and that a propped-up filming location is not a staged work. According to A, the "coal piles" appearing in the film are also not staged works. On the other hand, A has also submitted that the decision of the set designer that a particular filming location does not require special staging is also an artistic choice in itself.

28. The Market Court considers that the setting refers to the background of a film against which the actors' performances are seen, especially when this scenery and objects have required substantial measures. The general visual appearance of the film has also been influenced by, for example, costumes, lighting and cinematography.

29. The explanation presented in the case regarding the staging of the film "Toivon tualla puolen" is, first of all, that director B has prepared the script for the film, which is evident from Sputnik Oy's documentary evidence 1. No explanation has been presented in the case that other relevant written plans for the staging were prepared.

30. The Market Court notes that the script in question describes a total of 65 scenes and the setting of the film, on the one hand in a laconic but evocative way and on the other hand in some detail. Based on the statements and accounts of experts and witnesses, the script has been more descriptive than usual regarding the set design, but it has not, however, exhaustively prescribed the set design in a way that is relevant to copyright law.

BAYLIS_12

31. The personal evidence has mostly consistently stated that in the summer of 2016 A, the cinematographer TS and partly or later the director B and some other persons have reviewed the locations proposed by the filming organizer JN and the production manager ML as well as other possible filming locations and discussed, among other things, their suitability for filming, the colors to be used and the set construction. The evidence has shown that B has made the final decisions regarding these. Also, based on the evidence, B has had a strong vision for the film, the realization of which he has sought to ensure by using comprehensive participation and control.

32. When questioned as a witness, A stated that props play a very central role in the set and that the set designer procures the majority of the props. He has done as much as possible in this regard. On the other hand, A has also stated that the prop designer has taken care of the so-called easy filming locations. Similarly, D stated when questioned as a witness that props are an intrinsic part of the set and are of great importance. The evidence has also shown quite consistently that B has made changes to the props and in particular has reduced the filming beforehand.

33. The evidence has shown that A has been directing the work of the set builders and painters and has been setting up the scenes since July 2016. The tasks of the set builders and painters have ended before filming began at the location in question. When questioned as witnesses, set builder TK and set painter KR have stated that they saw B at most occasionally during this work phase. Based on the evidence presented, A and B have also gone through the filming locations before filming began, where B has, among other things, requested changes to be made or stated that the location was good. A has also been involved in other tasks on filming days, where any changes deemed necessary at that stage have been implemented mainly by D and C, under B's instructions.

34. In addition to the fairly consistent evidence stated above, opposing arguments and abundant evidence have been presented regarding how substantial changes were made to the set structures and props completed by A himself during the filming phase. The Market Court notes that, as is apparent from the photographs from the set and screen captures of the film in A's documentary evidence 6, AL's expert opinion and personal evidence, the structures have not been substantially changed during the filming phase, but the changes have mainly focused on the removal, addition or rearrangement of props. Nor has it been specifically apparent from the personal evidence that, apart from individual exceptions, any very substantial changes were made to the set structures.

35. Based on the above, the Market Court concludes that the film's script, director B's working method, or the changes made to the sets or props after A's work were not such that the set design carried out by A could not have been associated with a creative work that is relevant to copyright law.

*3.3 Expert opinions and consultation regarding staging*

36. AB, a professor of film and television production, has stated in his expert opinion that a film is always a whole and a process, the parts of which are difficult to separate from each other. Parts of the set design, for example entire interiors or furniture or works of art built for the set, can of course also be presented as works separate from the film. Broadly speaking and in its most essential parts, set design is a process whose interfaces with other areas are not precise. For example, picture design, composition, lighting, the movement of actors, selected areas of focus, costumes and editing affect how the set is seen. The set designer cannot work successfully alone, but must adapt his work to the work of these other creative sectors and the people with the main artistic responsibility. AB, when questioned as an expert, has stated, among other things, that the purpose of set design is to support the whole and the narrative of the film and the aim is that parts cannot be separated from the whole.

BAYLIS_13

37. In his aforementioned expert opinion, AL, a film scriptwriter and director, has stated that the set design is an essential and central part of a film. The set design is part of the film and, in AL's opinion, has its own copyrights, which arise for the set designer. It is generally not intended that the set design should stand out visually from the rest of the film world, as the set design supports the overall narrative of the film. Professional work is often recognized by the fact that the film does not even attempt to present the set design as a set design, but as a credible environment for the film's narrative. A poor-quality set design can be distractingly striking. Even then, it is worth making a distinction between strikingness and distinguishableness. It may be possible to present the set design to the audience separately from the film, for example through a photo exhibition. In AL's view, every set design is intended to be original in some way.

38. Professor Emeritus of Architecture JP has stated in his expert opinion that paradoxically, a set design is strong and independent when it serves the artistic goals of the film as unobtrusively as possible. According to him, this paradox also crystallizes the responsibility and requirement of set design, and in the case of A's set design, the paradox is perfectly realized in the film at hand. Unlike film music, a set design cannot be presented separately from the film.

39. Film researcher and non-fiction writer ST has stated in his expert opinion that, as an auteur director, B's control over all the elements of his films is so indisputable and is already evident from the uniform look of the films that none of its separate elements, such as the set design, costumes or lighting, in this respect form a separate and independent entity distinct from the film. When he was heard as an expert, ST has also stated that the set design is one element in the visual look of the film and cannot be separated.

*3.4 Conclusions*

40. The Market Court states that it has been established in the case that a film is a visual entity, which is formed and mixed with specially created sets and props and other visual expression. As experts have stated, the set is generally not intended to stand out from the rest of the film, but to blend in as well as possible and support the narrative and overall feel of the film.

41. Based on the evidence presented in the case, the set design in the film Beyond Hope was created as a result of the interaction of several people at different stages. The most important people in this were A and director B, but other people also participated in the work with at least some creative input. Based on the above, the film in question cannot be considered a connected work as referred to in paragraph 24 of this judgment with regard to the set design.

42. Based on the evidence presented, significant intellectual creative work may have been involved in the production of the film. However, this does not necessarily mean that the production of the film is an independent work that can be separated from the film.

43. If the production design were to refer to the visual appearance of a film or the entire production of a film, as stated above, it would not be possible to distinguish an independent production design from a film. If, instead, the production design were to refer to only the measures taken for some scenes of the film, it would also be difficult or impossible to determine, in accordance with requirements 1 and 2, which parts of the film would be production designs as referred to in the requirements and to what extent A should be confirmed as having the rights.

BAYLIS_14

44. On the grounds stated above, the Market Court finds that the production design is a central part of the film at hand and that the film cannot be separated from the independent and original production design referred to in the claim. Accordingly, there are no conditions for accepting claims 1 or 2. As stated above, the question of the incorrectness of the film's closing credits is relevant, taking into account the grounds of action, only if an independent production design can be separated from the film. In view of the above, it is therefore not necessary to assess the alleged incorrectness of the film's closing credits in this context. Accordingly, claims 1 and 2, as well as claims 3–5 based on them, must be rejected.

*4 Market law assessment of the claim for the return of an unjustified advantage*

45. In light of the above, the secondary claim for the return of unjustified benefit still needs to be assessed in the case. According to A, Sputnik Oy has unjustifiably benefited at his expense by paying him substantially less consideration for the transfer of rights than he would have required if he had been aware that he would not be credited as the exclusive author of the staged work.

46. The Market Court notes that the claim and the grounds presented in support of it are more a question of reassessment of the services agreed upon in the employment contract or the invalidity or reasonableness of a legal act than of a general return of an unjustified advantage.

47. The Market Court finds that, based on the grounds and evidence presented in the case, it is not possible to conclude that the employment contract should be considered expired or invalid or that there are conditions for its reasonableness. Based on the presented explanation, it is also not possible to establish that Sputnik Oy has gained an unjustified advantage, i.e. the acquisition of new asset value or the reduction of debts or burdens, or that there was no valid legal basis for the alleged unjustified advantage, taking into account the employment contract between the parties and the payments made on the basis of it.

48. No unjustified advantage has been shown in the case which could be ordered to be recovered. Accordingly, the claim in question must be dismissed.

*5 Compensation for legal and party costs*

49. According to Chapter 21, Section 1 of the Code of Judicial Procedure, a party who loses a case is obliged to compensate all reasonable legal costs resulting from the necessary measures of the opposing party, unless otherwise provided for elsewhere in the law. According to Chapter 8, Section 1, compensation is also paid for the work caused to the party by the legal proceedings and for the loss directly related to the legal proceedings.

50. Sputnik Oy has won the case and is therefore entitled to full compensation for its reasonable legal costs resulting from the necessary measures. Sputnik Oy demanded that A compensate its legal costs excluding VAT of EUR 3,821.91 and its fees of EUR 82,942.50, i.e. a total of EUR 86,764.41, as well as the costs of the parties of EUR 1,377.41. A's claim for legal costs including VAT has been EUR 96,996.25.

51. A has increased Sputnik Oy's claim for compensation in excess of EUR 20,000, as well as costs and expenses of the parties in respect of foreign travel expenses. A has submitted, among other things, that the parties' actions have been aggravated by contradictory and unspecified claims and the prolongation of the proceedings.

52. According to Sputnik Oy, its measures have been in line with those of A and, conversely, A's actions in the preparation have caused costs. Sputnik Oy has also stated that B lives in Portugal and the reimbursement of the claimed travel expenses is at the discretion of the market court.

53. The Market Court notes that in this case, A has essentially defined the subject matter of the proceedings as described above. The scope of the proceedings has resulted in particular from the claims presented in the claim and the grounds presented in support of them. Sputnik Oy has had the right to oppose the claim in the manner it did, and the grounds for opposition have remained essentially the same throughout the proceedings. On the other hand, A's claims and grounds have changed during the proceedings, which has necessitated the need for Sputnik Oy to take measures. Sputnik Oy's objection to the proceedings, which was rejected, has not had a significant impact on the amount of the legal costs.

54. In the present circumstances, there are no grounds for suggesting that Sputnik Oy's measures were not necessary and that the resulting legal costs were reasonable in view of the nature and scope of the case. A must therefore be ordered to pay the legal costs in the amount claimed for the fee.

55. The costs claimed by Sputnik Oy were, as stated, incurred by B's travel from Portugal to be heard in the trial. A has also appointed B to be heard and required him to be heard in the main hearing after Sputnik Oy had announced that it would not hear B. The Market Court finds that the costs incurred by B's travel were a loss directly related to the trial for the party concerned, which A must be ordered to compensate.

56. A has also contested the claim for legal costs insofar as expenses have been incurred by the witness TS travelling to be heard at the trial, but TS has not claimed a fee or compensation for travel expenses in connection with his hearing. The Market Court states that this fact is not decisive in the liability for compensation between the parties. A has also contested the claim insofar as the agent of Sputnik Oy and the witness, MJ, who acted as the film's production manager, travelled to Portugal to meet B between 3 and 6 March 2017, i.e. after the service of the summons and before the deadline set for submitting a written response.

57. It has not been presented or emerged in the case that the above-mentioned travel expenses were not real or that they were not reasonable in themselves. The expenses incurred by the travel of Sputnik Oy's representative must, in the circumstances at hand, be considered as legal expenses incurred as a result of necessary measures. On the other hand, no further explanation has been presented as to why MJ's travel to Portugal was necessary. Due to the latter, the claim for costs must be rejected in respect of the 800 euros estimated by the Market Court. In other respects, A must also be ordered to compensate the expenses incurred by the travel in the amount claimed.

**Judgment**

The Market Court dismisses the claim.

The Market Court orders A to compensate Sputnik Oy for its legal costs of EUR 85,964.41 and the costs of the parties to the case of EUR 1,377.41, both amounts including default interest. Default interest must be paid in accordance with the interest rate referred to in Section 4, Subsection 1 of the Interest Act, starting from the date one month has passed since the Market Court issued its decision.

**APPEAL**

An appeal against this decision may be filed with the Supreme Court only if the Supreme Court grants leave to appeal on the specific grounds set out in the attached notice of appeal.

The deadline for requesting leave to appeal and filing an appeal ends on April 16, 2018.

The case has been decided unanimously by Market Court judges Anne Ekblom-Wörlund, Pertti Lenkkeri and Pekka Savola.

**FORCE**

BAYLIS_16

31/08/2025, 11:56                              MAO:79/18 - Market Court

Legally binding.

BAYLIS_17

# Markkinaoikeus
# Marknadsdomstolen

Etusivu »  Ratkaisut »  Teollis- ja tekijänoikeudelliset asiat »  2018 » MAO:79/18

# MAO:79/18

A > Sputnik Oy

tekijänoikeus - teos - markkinaoikeuden toimivalta

**Diaarinumero(t):**
2017/63
**Antopäivä:**
13.02.2018


**KANNE**

**Vaatimukset**

A on vaatinut, että markkinaoikeus

1. vahvistaa, että Toivon tuolla puolen -elokuvaan liittyvän lavastusteoksen tekijänoikeus kuuluu yksinomaan A:lle ja hänet tulee siksi yksin mainita elokuvan lavastajana;
2. toissijaisesti vahvistaa, että siinäkin tapauksessa, että A:ta ei olisi pidettävä lavastusteoksen yksinomaisena tekijänä, hänelle tekijänä kuuluvaa tekijänoikeutta loukatun virheellisellä kreditoinnilla, joka on tapahtunut mainitsemalla lavastusteoksen tekijöinä henkilöitä tai henkilön, joita/jota ei ole pidettävä lavastusteoksen tekijänä;
3. määrää hävitettäväksi Toivon tuolla puolen -elokuvan fyysiset kopiot, joiden lopputeksteissä on A:n lisäksi mainittu lavastajina muita henkilöitä (sellaisia henkilöitä, joita ei ole pidettävä lavastusteoksen tekijöinä);
4. velvoittaa Sputnik Oy:n suorittamaan hänelle 20.000 euroa tekijänoikeuslain 57 §:n mukaisena hyvityksenä ja 5.000 euroa korvauksena, molemmat määrät viivästyskorkoineen 9.2.2017 lukien;
5. määrää Sputnik Oy:n korvaamaan hänelle ne enimmäismäärältään 20.000 euron kustannukset, jotka aiheutuvat asiassa annettavan tuomion julkistamisesta kokonaan tai osittain kuukauden kuluessa sen lainvoimaiseksi tulemisesta.

Siltä varalta, että tekijänoikeuden loukkausta ei todeta, A on toissijaisesti vaatinut, että markkinaoikeus velvoittaa Sputnik Oy:n suorittamaan hänelle 25.000 euroa perusteettoman edun palautuksena.

Lisäksi A on vaatinut, että markkinaoikeus velvoittaa Sputnik Oy:n korvaamaan hänen arvonlisäverolliset oikeudenkäyntikulut kulujen osalta 179,95 eurolla ja palkkion osalta 96.485,30 eurolla eli yhteensä 96.665,25 eurolla viivästyskorkoineen.

**Perusteet**

*Kantajan yksinoikeus elokuvaan liittyvään lavastusteokseen*

BAYLIS_18

Asiassa on kysymys siitä, voidaanko lavastusta suojata elokuvasta itsenäisenä teoksena. A on yksin luonut Toivon tuolla puolen elokuvaan liittyvän lavastusteoksen. Kyseinen lavastusteos on itsenäinen teos yhteenliitetyssä elokuvateoksessa. Joka tapauksessa kyse on itsenäisestä tekijänoikeudella suojatusta lavastusteoksesta. Tekijänoikeus lavastusteokseen kuuluu yksinomaan A:lle.

Lavastusteos on itsenäinen ja omaperäinen tavalla, joka ylittää niin sanotun teoskynnyksen. Lavastusteos ilmenee muusta elokuvateoksesta erotettavana taiteellisena, omaleimaisena ja tunnistettavissa olevana kokonaisuutena. A on hankkinut rekvisiittaa ja ohjannut lavastusteoksen rakentamistyötä elokuvan ohjaajasta itsenäisesti. B:n osallistuminen lavastusprosessiin on ollut vähäistä ja lavastusteoksen tekijyyden kannalta merkityksetöntä. Myöskään C:n ja D:n työskentely ei ole perustanut heille tekijäasemaa. Asianosaiset ovat sopineet, että A toimii lavastusosaston johtajana, eikä C:n ja D:n työntekö ole ollut verrannollista A:n panokseen ja vastuuseen lavastusteoksen luomiseksi.

Elokuvan lopputeksteissä sen tekemiseen osallistuneiden taiteellisesti päävastuullisten henkilöiden ilmoittaminen eli kreditointi on tullut suorittaa tekijänoikeuslain, alan yleisen käytännön ja osapuolten noudattaman kauppatavan mukaisesti. Aiemmissa tuotannoissa Sputnik Oy on erotellut varsinaiset lavastajat lavasterakentajista. Lavastus-kohdassa mainittavat nimet mielletään teoksen tekijöiksi osapuolten soveltamassa alan yleisessä kauppatavassa. Elokuvan lopputeksteissä kohdassa lavastus on tullut ilmoittaa vain A.

Jos vastoin A:n käsitystä markkinaoikeus katsoisi, että jotakin muuta henkilöä olisi hänen ohella pidettävä lavastusteoksen tekijänä, on kreditointia tällaisessakin tilanteessa pidettävä virheellisenä ja A:n tekijänoikeutta loukkaavana sikäli, kun tekijänä on ilmoitettu henkilöitä, jotka eivät ole lavastusteoksen tekijöitä.

Sputnik Oy:n elokuvassa Toivon tuolla puolen toteuttama kreditointitapa olisi edellyttänyt A:n etukäteistä suostumusta. Tällaista ei ole pyydetty eikä saatu. Tekijänoikeuslain 3 §:ssä tarkoitetut isyysoikeudet eivät ole olleet luovutettavissa. Tekijänoikeuslain 2 §:ssä säädettyjen taloudellisten oikeuksien osalta työsopimuksen kaikkien oikeuksien luovutuksen edellytykset ja siten kyseinen luovutuslauseke ovat rauenneet. Sopimusehtoon vetoaminen on kunnianvastaista ja arvotonta, sopimusehto johtaa ilmeiseen kohtuuttomuuteen ja sitä on soviteltava tekijänoikeuslain 29 §:ssä tarkoitetulla tavalla. Sputnik Oy on näin ollen loukannut A:n tekijänoikeuslain 2 ja 3 §:ssä säädettyjä oikeuksia saattaessaan elokuvan yleisön saataviin ja valmistaessaan siitä kappaleita virheellisin lopputekstein.

A:lla on ollut peruste luottaa siihen, että hän toimii elokuvatuotannon lavastajana ja kantaa yksin lavastajan vastuun ja että Sputnik Oy:n suoritusvelvollisuuteen on yhteisesti ymmärretysti sisältynyt yleisen ja osapuolten välisen kauppatavan alalla noudatettavan hyvän tavan mukainen kreditointi. Sputnik Oy on voinut vaikuttaa edellä mainittuihin seikkoihin ja niiden toteutumiseen. Lisäksi Sputnik Oy vastaa virheellisen kreditoinnin oikeudellisista seuraamuksista. A ei olisi suostunut tekemään sopimusta, jos hän olisi ollut tietoinen Sputnik Oy:n aikomuksesta ilmoittaa C ja D lavastusteoksen tekijöinä tai ainakin harhaanjohtavasti rinnastaa lavasterakentajina toimineet C ja D häneen. Tekijän nimen ilmoittamisella on myös huomattava taloudellinen merkitys tekijälle. Ylimääräisten nimien ilmoittaminen on lisäksi heikentänyt A:n meriittejä ansioituneena tekijänä. Sopimuksen edellytykset ja siten oikeuksien siirtäminen sopimuksella ovat rauenneet.

*Yksinoikeuden loukkauksen seuraamukset*

Elokuvan yleisölle välitetyt fyysiset teoskappaleet tulee hävittää oikeudenloukkauksen lopettamiseksi ja A:lle aiheutuvan kärsimyksen ja mainehaitan minimimoiseksi, ja digitaalisessa jakelussa olevat tiedostot tulee muuttaa lopputekstien osalta vaadittuun muotoon.

BAYLIS_19

Sputnik Oy on loukannut tekijänoikeutta ja sen suoritus on ollut virheellisen kreditoinnin vuoksi sovittua ja A:n edellyttämää vähäarvoisempi. Sputnik Oy on myös saanut perusteetonta etua A:n kustannuksella. Teon laatu ja loukkauksen tahallisuus huomioon ottaen kohtuullisena hyvityksenä isyysoikeuden ja taloudellisten oikeuksien loukkauksesta on pidettävä 20.000 euroa.

Sputnik Oy on luovutusta koskevan sopimuksen ja tekijänoikeuslain vastaisesti käyttänyt luovutettua lavastusteosta osana ammattimaista liiketoimintaansa tahallisesti ja A:n esittämien kirjallisten kieltojen jälkeen. Hyvityksen määrän arvioinnissa lähtökohtana on pidettävä sopimuskorvausta. Sopimuskorvauksen lisäksi A:lle kuuluvat lavastukselle myönnetyt palkinnot, mikä tulee ottaa huomioon hyvityksen määrän arvioinnissa. Sputnik Oy:n tahallinen menettely on loukannut A:ta taiteilijana ja aiheuttanut hänelle kärsimystä. Kärsimystä on lisännyt tahallinen ja sopimuksen vastainen menettely, A:n Sputnik Oy:öön nähden alisteinen asema ja luottamus asianosaisten välillä vallinneeseen kauppatapaan ja luottamuksen pettäminen sekä elokuvateoksen julkistamisen ja levityksen saama laaja kansainvälinen julkisuus. Vastaavilla perusteilla kohtuullisena korvauksena kärsimyksestä yhdessä korvausaiheiden kanssa on pidettävä 5.000 euroa. Sputnik Oy:n menettely tahallisena tekona saattaa täyttää myös tekijänoikeusrikoksena rangaistavaksi säädetyn teon tunnusmerkistön. Tämä on otettava huomioon kärsimyskorvauksen määrällisessä arvioinnissa loukkauksen laatua koskevana korottavana seikkana. Lisäksi kärsimyksestä tuomittavan korvauksen määrän arvioimiseksi mittapuuna voidaan käyttää Henkilövahinkoasiain neuvottelukunnan suosituksia kunnianloukkausten aiheuttamien kärsimysten korvaamisessa.

Sputnik Oy tulee määrätä korvaamaan kustannukset, jotka aiheutuvat asiassa annettavan tuomion julkistamisesta. Tuomio tai osia siitä on tarkoitus julkaista keskeisillä ja vähintään kymmenellä elokuva-alan tietokantoja ja uutispalveluita tarjoavilla internetsivustoilla ja lisäksi leviklitään maanlaajuisen sanomalehden kulttuurisivuilla Isossa-Britanniassa, Ranskassa, Saksassa, Pohjoismaissa, Yhdysvalloissa ja Japanissa. Menettely on aiheuttanut A:lle huomattavaa mainehaittaa sekä taloudellisia menetyksiä ja inhimillistä kärsimystä. Sputnik Oy on toistanut virheelliseksi tietämiään käsityksiä kansainvälisissä yhteyksissä ja huomattavaa tiedotusarvoa sisältävissä mediatilaisuuksissa. Tuomion julkistamisella on huomattavaa merkitystä jo aiheutuneen ja edelleen aiheutuvan vahingon rajoittamiseen.

*Toissijainen vaatimus ja markkinaoikeuden toimivalta asiassa*

Siinä tapauksessa, että tekijänoikeuden loukkausta ei todeta, Sputnik Oy on oikeudettomasti hyötynyt A:n kustannuksella ja kyseinen hyöty tulee suorittaa perusteettoman edun palautuksena hyvityksen ja korvauksen yhteydessä todettujen seikkojen mukaisesti. Sputnik Oy on hyötynyt perusteettomasti A:n kustannuksella maksamalla A:lle luovutuksesta olennaisesti vähäarvoisemman vastasuorituksen kuin A olisi edellyttänyt, mikäli hän olisi ollut tietoinen, ettei häntä tulla kreditoimaan lavastusteoksen yksinomaisena tekijänä.

A:n ensisijaisten vaatimusten osalta asiassa on kysymys tekijänoikeuslain 61 §:ssä tarkoitetusta markkinaoikeuden yksinomaiseen toimivaltaan kuuluvasta riita-asiasta, jossa yhtäältä vaatimukset kyseisten oikeuksien ja seuraamusten osalta perustuvat tekijänoikeuslakiin ja jossa on toisaalta kysymys tekijänoikeudesta. Työsopimuksen oikeuspaikkasopimuksella ei ole vaikutusta markkinaoikeuden yksinomaiseen asialliseen toimivaltaan tai ole muutakaan merkitystä. A:n tulee voida riitauttaa Sputnik Oy:n työsopimukseen vetoaminen ilman, että asia muuttuisi markkinaoikeuden toimivaltaan kuulumattomaksi. Markkinaoikeus voi ja sen tulee tarvittaessa tekijänoikeuden loukkauksen esikysymyksenä käsitellä myös sopimusten tulkintaa sen selvittämiseksi, mitä oikeuksia sopimuksella on siirretty ja onko Sputnik Oy käyttänyt muita kuin sopimuksella luovutettuja oikeuksia.

BAYLIS_20

Toissijaisen perusteetonta etua koskevan vaatimuksen osalta kysymys on liitännäisvaatimuksesta, jonka markkinaoikeus on toimivaltainen käsittelemään toimivaltaansa kuuluvien tekijänoikeudellisten vaatimusten ohella. Seuraamukset ovat samankaltaisia ja sisältyvät tekijänoikeuslain 57 §:ssä tarkoitettuun käyttökorvaukseen. Kysymys ei ole työsopimuksen tulkinnasta, eikä oikeuspaikkalauseke sovellu asiaan. Arvioitavaksi tulee vain todistelun kautta selvitettävä kysymys hyötymisestä, perusteettomuudesta sekä syy-yhteydestä koituneeseen menetykseen.

Asian käsittelyn sirpaloituminen eri tuomioistuimiin ei myöskään olisi tarkoituksenmukaista tai lainsäädännön tavoitteiden mukaista.

**VASTAUS**

**Vaatimukset**

Sputnik Oy on vaatinut, että markkinaoikeus jättää kanteen tutkimatta perusteettoman edun palautusta koskevan toissijaisen vaatimuksen osalta ja siltä osin kuin kanne koskee tekijänoikeuslain 2 §:ssä säädettyjä oikeuksia ja toissijaisesti ja joka tapauksessa muilta osin hylkää kanteen.

Lisäksi Sputnik Oy on vaatinut, että markkinaoikeus velvoittaa A:n korvaamaan sen arvonlisäverottomat oikeudenkäyntikulut kulujen osalta 3.821,91 eurolla ja palkkion osalta 82.942,50 eurolla eli yhteensä 86.764,41 eurolla sekä asianosaiskulut 1.377,41 eurolla, molemmat määrät viivästyskorkoineen.

**Perusteet**

Työsopimuksessa on sovittu A:n kaikkien oikeuksien, tässä tapauksessa tekijänoikeuslain 2 §:ssä tarkoitettujen taloudellisten oikeuksien, luovuttamisesta Sputnik Oy:lle. Työsopimuksessa sovitun tekijänoikeuden luovutusta koskevan ehdon kohtuuttomuuden arvioinnissa on kysymys työsopimuslain 10 luvun 2 §:ssä tarkoitetusta asiasta. Työsopimuksessa on myös sovittu siihen sisältyvällä nimenomaisella ja selvällä oikeuspaikkalausekkeella erimielisyyksien ratkaisemisesta Helsingin käräjäoikeudessa. Myöskään tekijänoikeuden loukkaamisen vahvistamiseen nähden toissijainen vaatimus perusteettoman edun palautuksesta ei ole tekijänoikeuslakiin perustuva asia, vaan muu riita-asia, jota koskeva kanne on kanteenlaajennuksin nostettu eri aikaan kuin alkuperäinen tekijänoikeudellisen riita-asian kanne. Kanne ei johdu olennaisesti samasta perusteesta eikä käsillä ole erityisiä syitä tällaisen muun riita-asian käsittelyyn markkinaoikeudessa. Näiltä osin markkinaoikeus ei ole toimivaltainen. Sputnik Oy on tehnyt näitä alkuperäiseen kanteeseen sisältymättömiä vaatimuksia koskevat oikeudenkäyntiväitteet niiden esittämisen jälkeen.

A ei ole yksin suunnitellut ja toteuttanut lavastusta Toivon tuolla puolen -elokuvaan. Elokuvan visuaalinen kokonaisuus, mukaan lukien elokuvan kohtausten näyttämöllepano, on perustunut yksinomaan ohjaaja B:n taiteelliseen ennakkosuunnitteluun, eli B:n tavanomaista yksityiskohtaisemmin laatimaan elokuvakäsikirjoitukseen sekä kuvauspaikoilla kuvauspäivinä ja kohtausten kuvausten yhteydessä yksityiskohtaisesti antamiin ohjeisiin ja muun muassa erilaisille pinnoille ja materiaaleille hahmoteltuihin lavastus- ja värisuunnitelmiin. A:n kanssa on sovittu siitä, että hänen vastuulleen kuuluu lavastus- ja studiorakennelmien pystyttäminen ja valmistaminen yhdessä D:n kanssa. Myöhemmin työryhmään on liittynyt C. Tämä tekninen työ on sovittu tehtävän B:n suunnitelmien ja ohjeiden pohjalta, ja koko lavastustyöryhmä on toiminut suoraan hänen alaisuudessaan. A on toiminut ohjaajan yksityiskohtaisten ohjeistusten mukaan.

BAYLIS_21

Ensisijaisesti A:lla tai kenellekään muullekaan ei ole syntynyt yksinomaista elokuvateoksesta erotettavaa tai erottuvaa tekijänoikeutta elokuvan lavastukseen. Toissijaisesti, jos katsotaan syntyneen itsenäinen elokuvateoksesta erottuva lavastusteos, lavastuksen tekijänoikeus kuuluisi yksinomaan B:lle, jonka taiteelliselle suunnittelulle muiden henkilöiden panos on ollut alisteista. A:n tai muiden avustajien panokset eivät ole olleet itsenäisiä tai omaperäisiä. Viimesijaisesti, mikäli katsottaisiin syntyneen itsenäinen elokuvateoksesta erottuva lavastusteos ja A:n panos elokuvan lavastuksessa ylittäisi tältä osin teoskynnyksen, tätä panosta ei kuitenkaan voida selkeästi erottaa muiden lavastustyöhön olennaisesti osallistuneiden panoksista ja kysymys olisi yhteisteoksesta A:n, B:n, D:n ja C kesken.

Elokuvan lopputekstien kirjoitusasu ei loukkaa A:n oikeutta tulla ilmoitetuksi tekijänä sillä tavoin kuin hyvä tapa eli alalla vallitseva käytäntö vaatii. Epäselvässä tilanteessa on suositeltavaa, että tekijä varmuuden vuoksi mainitaan. Tekijöiden ilmoittamisjärjestys kuuluu osaltaan sopimuskäytännön ja hyvän tavan piiriin. Elokuvan lopputeksteissä voidaan mainita myös elokuvan teossa avustaneet henkilöt, vaikka he eivät olisikaan tekijänoikeuslaissa tarkoitettuja elokuvan tekijöitä. Lavastusta koskeva kreditointi on ollut lavastukseen oleellisesti osallistuneiden, ei tekijöiden luettelo. Elokuvan lavastuksen tekijyys- ja teoskynnysarvioinnista riippumatta lopputekstien kreditointi on kuitenkin joka tapauksessa totuudenmukainen ja hyvää tapaa, vakiintunutta käytäntöä ja osapuolten välisiä sopimusjärjestelyjä vastaava. Lavastus-käsitteen käyttäminen ja nimen ilmoittaminen aakkosjärjestyksessä on ollut aiemmissa elokuvissa noudatetun käytännön mukainen. Työsopimuksella tai muutoinkaan ei ole sovittu tai määrätty elokuvan lopputekstien ilmoittamistavasta.

Työsopimuksen taloudellisten oikeuksien luovutusta koskeva ehto on tehokas, eikä siitä poikkeamiselle ole edellytyksiä sen paremmin sopimuksen edellytysten väitetyn raukeamisen, Sputnik Oy:n väitetyn kunnianvastaisen ja arvottoman menettelyn saatikka työsopimuksen väitetyn kohtuuttomuuden perusteella. Työryhmän jäsenellä ei tämän työsopimuksesta päätettäessä ole määräysvaltaa elokuvateoksen lopputekstien kreditointitavasta, eikä tällaisia ehtoja edes sisällytetä työryhmän jäsenten työsopimuksiin. Sputnik Oy ei perustellusti ole ollut eikä sen vastaavien sopimuksien tai alan käytäntöjen perusteella ole täytynytkään olla tietoinen siitä, että muiden henkilöiden nimien ilmoittamisella yhdessä A:n kanssa lopputekstien kohdassa lavastus on ollut A:lle olennainen vaikutus sopimukseen sitoutumisessa ja että hänellä on tämän suhteen ollut vääränsisältöisiä käsityksiä. Työsopimuksesta päätettäessä neuvottelut ovat kohdistuneet ainoastaan A:n työstään saaman vastikkeen määrään. Työsopimuksen sisältyvä tekijänoikeuden kokonaisluovutusta, siltä osin kuin se on tekijänoikeuslain osalta mahdollista, koskeva ehto on täysin alalla vallitsevaa sopimuskäytäntöä vastaava ja tavanomainen, eikä sen sovitteluun työsopimuslain 10 luvun 2 §:n perusteella ole edellytyksiä.

Myöskään perusteettoman edun palautukselle ei ole perusteita. A ei ole yksilöinyt tai perustellut Sputnik Oy:n hyväksi koitunutta etua eli hyötyä muutoin kuin määrällisesti, hyödyn perusteettomuutta taikka Sputnik Oy:n väitetyn hyödyn ja A:lle samanaikaisesti koituneen tappion välistä syy-yhteyttä. A on työsopimuksella luovuttanut työpanoksensa ja taloudelliset tekijänoikeutensa Sputnik Oy:lle, joka puolestaan on suorittanut osapuolten työsopimuksessa sovitun ja hyväksytyn vastikkeen. Sopimukselle ominainen vaihtotarkoitus on toteutunut, eikä perusteettoman edun palautus siten tule kysymykseen. Väite Sputnik Oy:n perusteettomasta edusta 25.000 euron suuruisena taloudellisena hyötynä on muutoinkin epäuskottava tämän tarkoittaessa tosiasiassa sitä, että A:n suoritus olisi taloudelliselta arvoltaan kaksinkertainen ja siten alalla täysin poikkeuksellinen siihen nähden, mistä osapuolet ovat välillään sopineet ja mihin A on sitoutunut.

A:n vaatimukset ovat näin ollen perusteettomia ja tekijänoikeuslain mukaiset hyvitys- ja korvausvaatimukset myös kokonaisuudessaan selvittämättömiä ja määrältään ilmeisen ylimitoitettuja. Oikeuskäytännön mukaisesti tekijänoikeuslain 57 §:n 1 momentin mukaiseen hyvitykseen ei sisälly vahingonkorvausoikeudellista ainesta (KKO 1989:87), kohtuullisen hyvityksen tulee määrältään vastata teoksen käytöstä tavanomaisesti perittävää käyttökorvausta eli lisenssimaksua

BAYLIS_22

(KKO 1998:91) ja tekijänoikeuslain 3 §:ssä säädettyjen moraalisten oikeuksien loukkaus ei oikeuta hyvitykseen (KKO 2007:63, kohta 4). Tavanomaisissa työsopimuksissa, joita lavastajien kanssa laaditaan, taloudellisten oikeuksien luovutus on ainoastaan pieni osa sopimuksen kokonaisarvoa lavastajan työpanoksen ollessa keskeisin osa sopimuksen mukaista vastiketta. Näin on ollut myös tässä tapauksessa, jossa sovittuun vastikkeeseen on sisältynyt ennakko-, kuvaus- ja purkutyö sekä tekijänoikeuskorvaus. Tekijänoikeuskorvaus ei missään olosuhteissa muodosta nyt vaadittua 80 prosenttia kokonaiskorvauksesta. Tältä osin myönnetään kohtuullisena hyvityksenä määrällisesti 1.000 euroa.

Vaaditun tekijänoikeuslain 57 §:n 2 momentin mukaisen korvauksen osalta näyttövelvollisuus vahingon määrästä on korvausta vaativalla. Tältä osin väitetyn kärsimysvahingon osalta ei ole osoitettu mitään konkreettista selvitystä. Yleisesti tällaisen viime sijassa oikeudenkäymiskaaren 17 luvun 2 §:n 3 momentin nojalla arvioitavan korvauksen taso on ollut verrattain matala (esimerkiksi KKO 2005:43).

**TODISTELU**

**Asiakirjatodistelu**

*A*

1. Sputnik Oy:n vastauskirje A:lle (30.1.2017)
2. A:n työsopimus Toivon tuolla puolen -elokuvan lavastuksesta (16.12.2016) (myös Sputnik Oy:n asiakirjatodiste 4)
3. Toivon tuolla puolen -elokuvan tuotantomuistio
4. Valokuvakollaasi kuvauksiin luovutetuista lavastuksista ja niiden vastaavasta ilmenemisestä elokuvassa
5. D:n työsopimus Toivon tuolla puolen -elokuvasta (16.12.2016), Höyry Films Oy:n ja Sputnik Oy:n toimeksiantosopimus (27.7.2016) sekä Höyry Films Oy:n ja C:n välinen sopimus (27.7.2016) (osittain salassa pidettäviä)
6. Valokuvakollaasi elokuvan lavastuksen valmistumisesta ja elokuvassa ilmenevästä lavastusteoksesta yhdistettynä käsikirjoitukseen
7. European Film Academyn sähköposti A:lle (14.9.2017)
8. Sähköpostit B – A (27.3.2016)
9. Elokuvien "Toivon tuolla puolen", "Juha", "Mies vailla menneisyyttä", "Laitakaupungin valot", "Pidä huivistasi kiinni Tatjana", "Dogs have no hell", "Kauas pilvet karkaavat" alku- ja lopputekstien video-otteet
10. Kooste elokuvan "Toivon tuolla puolen" kreditoinnista ulkomailla
11. Kooste kantajan ja vastaajayhtiön aiempien yhteisten elokuvien kreditoinnista ulkomailla
12. Vastaajayhtiön valokuvakollaasissa esiintyvien kohteiden valokuvista muodostettu kooste elokuvan kohtausjärjestystä noudattaen
13. Asianosaisten välinen sopimus elokuvasta "Mies vailla menneisyyttä" (13.3.2003) ja "Näyttelijä/Tekijä luovutuspaperi"

*Sputnik Oy*

1. Elokuvakäsikirjoituksen toinen, lopullinen versio (26.7.2016)
2. A:n kirje Sputnik Oy:lle (31.1.2017)
3. Kuvakaappaukset viiden Sputnik Oy:n tuottaman ja B:n ohjaaman elokuvan lopputeksteistä
4. A:n työsopimus Toivon tuolla puolen -elokuvan lavastuksesta (16.12.2016) (myös A:n asiakirjatodiste 2)
5. Valokuvakollaasi elokuvan lopullisesta lavastuksesta tiettyjen kohtausten osalta yhdistettynä käsikirjoitukseen

**Asiantuntijalausunnot**

*A*

BAYLIS_23

1. AB, elokuva- ja televisiotuotannon professori (4.10.2017)
2. JP, arkkitehtuurin professori emeritus (29.9.2017)
3. AL, elokuvakäsikirjoittaja ja elokuvaohjaaja (29.9.2017)
4. AN, taiteen maisteri (29.9.2017)

*Sputnik Oy*

1. ST, elokuvantutkija ja tietokirjailija (20.9.2017)

**Henkilötodistelu**

*A*

1. A, todistelutarkoituksessa
2. B, Sputnik Oy:n toimitusjohtaja, todistelutarkoituksessa
3. AB, elokuva- ja televisiotuotannon professori, asiantuntijana
4. JP, arkkitehtuurin professori emeritus, asiantuntijana
5. KR, lavastemaalari, todistajana
6. TK, lavasterakentaja, todistajana
7. C, yrittäjä, todistajana

*Sputnik Oy*

1. B, Sputnik Oy:n toimitusjohtaja, todistelutarkoituksessa
2. ST, elokuvantutkija ja tietokirjailija, asiantuntijana
3. ML, elokuvatuottaja, todistajana
4. TS, elokuvaaja, todistajana
5. C, yrittäjä, todistajana
6. D, rekvisitööri, todistajana
7. MJ, tuottaja, todistajana
8. JN, kuvausjärjestäjä, todistajana

**MARKKINAOIKEUDEN RATKAISU**

**Perustelut**

*1 Väitteet markkinaoikeuden toimivallasta*

*1.1 Asianosaisten kannanotot*

1. Sputnik Oy on esittänyt, ettei markkinaoikeus ole toimivaltainen tutkimaan kannevaatimuksia 1–5 siltä osin kuin ne koskevat tekijänoikeuslain 2 §:ssä säädettyjä niin sanottuja taloudellisia oikeuksia. Tältä osin Sputnik Oy on viitannut siihen, että taloudellisten oikeuksien luovutuksesta on sovittu A:n ja Sputnik Oy:n kesken ja sopimuksessa on oikeuspaikkalauseke, jonka mukaan erimielisyydet on ratkaistava Helsingin käräjäoikeudessa sekä siihen, että kysymys on työsopimuslain 10 luvun 2 §:ssä tarkoitetusta asiasta.

2. Sputnik Oy on lisäksi esittänyt, ettei markkinaoikeus ole toimivaltainen tutkimaan A:n toissijaista vaatimusta perusteettoman edun palauttamiseksi, koska vaatimus on esitetty eri aikaan kuin alkuperäinen kanne, siinä ei ole kysymys tekijänoikeuslakiin perustuvasta asiasta eikä kanne johdu olennaisesti samasta perusteesta ja koska käsillä ei ole erityisiä syitä tällaisen muun riita-asian käsittelyyn markkinaoikeudessa.

3. A on puolestaan esittänyt, että vaatimukset 1–5 perustuvat tekijänoikeuslakiin eikä sopimuksessa olevalla oikeuspaikkalausekkeella ole merkitystä asiassa. Lisäksi A on esittänyt, että markkinaoikeus on toimivaltainen tutkimaan perusteettoman edun palautusta koskevan vaatimuksen niin sanottuna liitännäisasiana.

BAYLIS_24

*1.2 Markkinaoikeuden toimivaltaa koskevat oikeudelliset lähtökohdat*

4. Oikeudenkäynnistä markkinaoikeudessa annetun lain 1 luvun 4 §:n 1 momentin 15 kohdan mukaan markkinaoikeus käsittelee teollis- ja tekijänoikeudellisina asioina asiat, jotka säädetään sen toimivaltaan kuuluviksi tekijänoikeuslaissa. Lain 1 luvun 5 §:ssä säädetään lisäksi markkinaoikeuden toimivallasta teollis- ja tekijänoikeudelliseen asiaan liittyvässä riita-asiassa. Pykälän 1 momentin mukaan markkinaoikeus voi sen toimivaltaan kuuluvaksi säädetyn riita-asian yhteydessä tutkia myös muun riita-asian, jos kantaja nostaa kanteet samanaikaisesti samaa vastaajaa tai eri vastaajia vastaan ja kanteet johtuvat olennaisesti samasta perusteesta. Erityisestä syystä markkinaoikeus voi tutkia mainitun muun riita-asian, vaikka sitä tarkoittavaa kannetta ei ole nostettu samanaikaisesti. Viimeksi mainitun pykälän 3 momentin perusteella, mitä kyseisen pykälän 1 ja 2 momentissa säädetään, edellyttää kuitenkin, ettei asianosaisten oikeuspaikkasopimuksesta tai muun tuomioistuimen yksinomaisesta toimivallasta muuta johdu.

5. Tekijänoikeuslain 61 §:n 1 momentin mukaan tähän lakiin perustuvat riita- ja hakemusasiat käsitellään markkinaoikeudessa. Säännöksen esitöiden (HE 124/2012 vp s. 120) mukaan kaikki tekijänoikeuslakiin perustuvat riita- ja hakemusasiat käsitellään vastaisuudessa markkinaoikeudessa. Esitöiden mukaan säännöksessä käytettävä ilmaisu "käsitellään" osoittaa, että markkinaoikeus on yksinomaisesti toimivaltainen käsittelemään lainkohdassa tarkoitetut asiat. Käytettävällä ilmaisulla "tähän lakiin perustuvat riita- ja hakemusasiat" tarkoitetaan viitata kaikkiin asioihin, joissa vaaditaan tekijänoikeuslakiin perustuvaa seuraamusta tai joissa muutoin on kysymys mainittuun lakiin perustuvasta asiasta. Sen sijaan säännös ei esitöiden mukaan tarkoita esimerkiksi asioita, joissa on kysymys puhtaasti sopimusoikeudellisesta riidasta, jossa ei edes väitetä loukatun tekijänoikeuslain säännöksiä.

6. Kuten esimerkiksi korkeimman oikeuden ratkaisuista KKO 2017:84 (kohta 23), KKO 2017:24 (kohta 15) ja KKO 2008:75 (kohta 6) ilmenee, riita-asiassa tuomioistuimen asiallisen toimivallan määräytymisessä on lähtökohtaisesti ratkaisevaa, mitä kanteessa on vaadittu ja mihin kannevaatimus perustuu. Myös kysymystä markkinaoikeuden asiallisesta toimivallasta on arvioitava näistä lähtökohdista. Toimivallan määräytymisen kannalta keskeistä on, tuleeko asiaa ratkaistaessa asianosaisten vetoamat seikat huomioon ottaen sovellettavaksi tekijänoikeuslaki. On selvää, että markkinaoikeuden toimivaltaan kuuluvaa asiaa käsitellessään markkinaoikeus voi joutua esikysymyksenä tulkitsemaan sopimusta (Harenko ym., Tekijänoikeus, 2016, s. 708) tai yleisten oikeudenkäyntiä koskevien periaatteiden mukaisesti ottaa esikysymyksenä muutoinkin kantaa seikkaan, jonka tutkiminen ei lähtökohtaisesti kuulu markkinaoikeuden toimivaltaan (ks. KKO 2016:8, kohta 18 ja KKO 2011:70, kohta 5). Selvää on niin ikään, että markkinaoikeuden yksinomaiseen toimivaltaan kuuluvassa asiassa asiaosaiset eivät voi sopia, että tällaiset riidat ratkaistaan käräjäoikeudessa, koska käräjäoikeus ei ole toimivaltainen tuomioistuin.

7. Oikeudenkäynnistä markkinaoikeudessa annetun lain 1 luvun 5 §:n esitöissä (HE 124/2012 vp s. 54) on todettu, että vastaavasti kuin oikeudenkäymiskaaren 18 luvun 1 ja 2 §:ssä säädetään, kanteet on käsiteltävä samassa oikeudenkäynnissä, kun ne johtuvat olennaisesti samasta perusteesta. Viitattujen oikeudenkäymiskaaren säännösten esitöissä (HE 15/1990 vp s. 120) on puolestaan todettu olevan edullista yhdistää sellaiset kanteet samassa yhteydessä käsiteltäviksi, joissa on osittain tai kokonaan sama oikeudenkäyntiaineisto. Lisäksi oikeuskirjallisuudessa (Frände ym., Prosessioikeus, 2017, s. 571) on todettu, että oikeudenkäymiskaaren 18 luvun 1 §:ssä tarkoitetun asioiden yhdistämisen edellytyksenä on se, että asioiden välillä vallitsee aineellisoikeudellinen yhteys. Yhteisenä tekijänä on tavallisesti joko sama oikeustoimi tai muu tapahtuma, joka antaa kantajalle aiheen useampiin vaatimuksiin vastaajaa vastaan.

8. Oikeudenkäynnistä markkinaoikeudessa annetun lain 1 luvun 5 §:ssä tarkoitettu muu riita-asia voidaan tutkia markkinaoikeuden toimivaltaan kuuluvaksi säädetyn riita-asian yhteydessä edellyttäen lisäksi, että kanteet on nostettu samanaikaisesti. Kyseisestä samanaikaisuusvaatimuksesta markkinaoikeus voi poiketa erityisestä syystä. Lain esitöissä (LaVM 15/2012 vp s. 8–9) kanteiden samanaikaisuusvaatimuksesta poikkeamista on perusteltu sillä, että yksittäistapauksissa vaatimuksen ehdottomuus voisi johtaa kantajan kannalta epätarkoituksenmukaiseen ja sääntelyn taustalla olevien tavoitteiden vastaiseen lopputulokseen.

BAYLIS_25

*1.3 Markkinaoikeuden johtopäätökset tässä asiassa*

9. Kanteen ensisijaisten vaatimusten tutkimatta jättämisen tueksi Sputnik Oy on edellä todetulla tavalla vedonnut osapuolten väliseen sopimukseen ja siinä olevaan oikeuspaikkalausekkeeseen sekä siihen, että kysymys on työsopimuslain 10 luvun 2 §:ssä tarkoitetusta asiasta. Markkinaoikeus toteaa kanteen perustuvan väitteeseen A:n tekijänoikeuden loukkauksesta. Kanteessa on vaadittu tekijänoikeuslakiin perustuvia seuraamuksia. On siten selvää, että asia perustuu tekijänoikeuslakiin sen 61 §:n 1 momentissa säädetyllä tavalla. Asiassa on siten kysymys markkinaoikeuden yksinomaiseen toimivaltaan kuuluvasta riita-asiasta, jota asianosaiset eivät voi sopia käsiteltäväksi muussa tuomioistuimessa ja jossa on tarvittaessa esikysymyksenä tarkasteltava sitä, mikä merkitys on annettava osapuolten sopimukselle ja sitä koskeville väitteille.

10. Perusteettoman edun palautusta koskevan toissijaisen vaatimuksen tutkimatta jättämisen tueksi Sputnik Oy on vedonnut muun ohella siihen, ettei vaatimuksen tutkimisessa ole kysymys tekijänoikeuslakiin perustuvasta asiasta eikä vaatimusta ole esitetty kannetta nostettaessa. Sen sijaan Sputnik Oy ei ole vaatimuksen tutkimatta jättämisen tueksi vedonnut osapuolten välisessä sopimuksessa olevaan oikeuspaikkalausekkeeseen.

11. Markkinaoikeus katsoo, että perusteettoman edun palautusta koskeva vaatimus perustuu tässä tapauksessa keskeisesti samaan tapahtumainkulkuun kuin vaatimukset 1–5 ja vaatimuksia koskeva oikeudenkäyntiaineisto on keskeisiltä osin yhteinen. Vaatimus on esitetty asian valmistelun yhteydessä yli kaksi kuukautta ennen asian valmistelun päättämistä. Vaikka kysymys ei ole oikeudenkäynnistä markkinaoikeudessa annetun lain 1 luvun 5 §:ssä tarkoitetulla tavalla samanaikaisesti nostetusta kanteesta, vaatimus sen tueksi esitetyt perusteet ja todistelu huomioon ottaen johtuu kuitenkin olennaisesti samasta perusteesta, ja käsillä on säännöksessä tarkoitettu erityinen syy tutkia tarvittaessa myös tämä toissijainen vaatimus.

12. Edellä todetun perusteella markkinaoikeus on toimivaltainen tutkimaan kannevaatimukset 1–5 kokonaisuudessaan ja lisäksi näihin vaatimuksiin nähden toissijaisen vaatimuksen perusteettoman edun palautuksesta, mikäli tämän vaatimuksen tutkiminen on tarpeen.

*2 Asian tausta ja kysymyksenasettelu*

13. Asiassa on riidatonta, että Sputnik Oy on tuottanut B:n ohjaaman Toivon tuolla puolen -elokuvan ja palkannut A:n työsopimuksella elokuvan lavastajaksi. Työsopimuksen mukaan A:n vastuulla on ollut lavastussuunnitelman luominen ja lavastustyön johtaminen sen osalta, mikä on tapana. Vastaavasti D on palkattu rekvisiittööriksi ja C:n lavaserakentajaksi. Elokuvan lopputeksteissä on kohdassa lavastus mainittu D, C ja A, tässä järjestyksessä. A:n alaisuudessa on toiminut lavastemaalareita ja lavaserakentajia, jotka on mainittu elokuvan lopputeksteissä näitä tehtäviä tarkoittavissa kohdissa.

14. Markkinaoikeus on asian kirjallisessa ja suullisessa valmistelussa kiinnittänyt huomiota kannevaatimuksiin ja -perusteisiin ja tämän johdosta esittänyt asian selvittämistä varten tarpeelliset kysymykset. A on valmisteluistunnossa ja sen jälkeen asiasta lausuessaan päätynyt käsillä olevaan vaatimusten 1 ja 2 sekä niiden perusteiden muotoiluun ja lisäksi todennut, ettei seuraamuksia koskevista vaatimuksista 3–5 ole tarpeen lausua, mikäli ensiksi mainitut vaatimukset eivät menesty.

15. Markkinaoikeus toteaa oikeudenkäymiskaaren 24 luvun 3 §:n 1 momentista ilmenevän, ettei tuomioistuin saa tuomita muuta tai enempää kuin asianosainen on vaatinut. Oikeuskirjallisuudessa (Virolainen, Materiaalinen prosessinjohto, 1988, s. 170) tästä niin sanotusta vaatimistaakasta on tuotu esiin, että vaatimuksen esittäneen asianosaisen vastapuoli voi luottaa siihen, että tuomioistuin tulee ratkaisussaan pysyttelemään esitetyn vaatimuksen sisällä, jolloin hän voi keskittyä prosessissa siihen, mitä on nimenomaan vaadittu. Toiselta puolen sääntö merkitsee sitä, että asianosaisen on pakko esittää itse kaikki ne vaatimukset, jotka hän haluaa tuomioistuimen ratkaisussaan ottavan huomioon. Asianosaisella on siis riski siitä, että hän on esittänyt jutussa sekä laadultaan että määrältään riittävät vaatimukset.

BAYLIS_26

16. Oikeudenkäymiskaaren 24 luvun 3 §:n 2 momentin mukaan asiassa, jossa sovinto on sallittu, tuomiota ei saa perustaa seikkaan, johon asianosainen ei ole vaatimuksensa tai vastustamisensa tueksi vedonnut. Korkeimman oikeuden ratkaisusta KKO 2016:47 (kohta 16) ilmenee, että seikalla tarkoitetaan oikeusseuraamuksen kannalta välittömästi ratkaisuun vaikuttavaa tosiasiaa eli niin sanottua oikeustosiseikkaa. Seikkaan vetoamisella tarkoitetaan puolestaan sitä, että asianosainen tuo seikan esiin nimenomaan tarkoituksin saada se ratkaisun perusteeksi. Kuten mainitusta ratkaisusta myös ilmenee (kohta 20), kyseinen niin sanottua väittämistaakkaa koskeva säännös on ilmaus riita-asian oikeudenkäynnissä noudatettavasta niin sanotusta määräämisperiaatteesta. Se merkitsee muun muassa sitä, että oikeudenkäynnin asianosaiset määrittävät oikeudenkäynnin kohteen ja että kantajan asiana on riita-asiassa esittää ne kanteensa välittöminä perusteina olevat tosiseikat, joista kantaja katsoo vaatimansa oikeusseuraamuksen suoraan seuraavan. Kantaja määrittelee kanteessaan lähtökohtaisesti tuomioistuinta sitovasti, mitkä seikat ovat tällaisia (edellä mainitun ratkaisun kohta 21).

17. Markkinaoikeus toteaa, että kanteen perusteina ja oikeudellisena luonnehdintana on esitetty, että lavastuseos on itsenäinen teos yhteenliitetyssä elokuvateoksessa tai että se on joka tapauksessa itsenäinen teos. Niin ikään perusteeksi on muun ohella esitetty, että lavastuseos ilmenee muusta elokuvateoksesta erotettavana taiteellisena, omaleimaisena ja tunnistettavissa olevana kokonaisuutena. Lisäksi esitetyt vahvistusvaatimukset 1 ja 2, joihin vaatimukset 3–5 perustuvat, on yksiselitteisesti muotoiltu koskemaan tekijänoikeutta tai tekijyyttä lavastusteokseen.

18. Edellä todettu huomioon ottaen käsillä olevassa asiassa on A:n vaatimusten ja perusteiden mukaisesti ensi sijassa kysymys tekijänoikeudesta Toivon tuolla puolen -elokuvaan liittyvään ja siitä väitetysti erotettavissa olevaan itsenäiseen lavastusteokseen. Asiassa ei sen sijaan ole varsinaisesti kysymys siitä, ovatko ennen elokuvan kuvaamista tehdyt lavasteet sellaisenaan tekijänoikeuslaissa suojattuja – vaikka tällä voi sinänsä olla merkitystä edellä mainitussa tarkasteltavassa kysymyksessä – tai siitä, onko elokuvan lavastukseen osallistuneilla henkilöillä tekijänoikeus kyseiseen elokuvaan. Niin ikään kysymys elokuvan lopputekstien virheellisyydestä on kanneperusteet huomioon ottaen vaatimuksia 1–5 tarkasteltaessa merkityksellinen vain, jos elokuvasta voidaan erottaa itsenäinen lavastusteos.

19. Edellä todetun myötä asiassa on ensin arvioitava sitä, liittyykö Toivon tuolla puolen -elokuvaan A:n väittämällä tavalla itsenäinen lavastusteos.

*3 Markkinaoikeuden arviointi lavastusteoksesta*

*3.1 Oikeudelliset lähtökohdat*

20. Tekijänoikeuslain 1 §:n 1 momentin mukaan sillä, joka on luonut kirjallisen tai taiteellisen teoksen, on tekijänoikeus teokseen, olkoonpa se kaunokirjallinen tahi selittävä kirjallinen tai suullinen esitys, sävellys- tai näyttämöteos, elokuvateos, valokuvateos tai muu kuvataiteen teos, rakennustaiteen, taidekäsityön tai taideteollisuuden tuote taikka ilmetköönpä se muulla tavalla.

21. Elokuvateosten osalta tekijänoikeuslain esitöissä (Komiteanmietintö 1953:5, s. 45) on todettu, että käytännössä voi olla vaikeata todeta, kenelle tekijänoikeuden elokuvateokseen on katsottava kuuluvan. Oikeuskirjallisuuden (Salokannel, Häviävät elokuvan tekijät, 1990, s. 28) mukaan pohjoismaisissa lainvalmisteluasiakirjoissa tehdään elokuvan tekijänoikeuden haltijoiden määrittelyssä ero toisaalta niiden tekijöiden välillä, joilla on tekijänoikeus koko elokuvateokseen ja toisaalta niiden tekijöiden välillä, joilla on tekijänoikeus ainoastaan sisältyviin yksittäisiin teoksiin tai suorituksiin. Pohjoismaisissa lainvalmisteluasiakirjoissa mainitaan henkilöistä, joille voi syntyä tekijänoikeus koko elokuvateokseen, yleensä käsikirjoittaja ja elokuvan ohjaaja. Syntyykö muille elokuvan valmistukseen taiteellisella panoksella osallistuville henkilöille tekijänoikeus koko elokuvaan vai vain omaan osuuteensa, riippuu heidän osuutensa merkityksestä elokuvalle kokonaisuutena. Tällaisia tekijöitä voivat olla muun muassa elokuvamusiikin tekijä, kuvaaja, leikkaaja, lavastaja, arkkitehti ja koreografi.

BAYLIS_27

22. Edellä mainitussa teoksessa on edelleen todettu (s. 28 ja 29), että elokuvan oikeudenhaltijoiden määrittelyssä on ratkaisevaksi kysymykseksi muodostunut luovan työn ja teknisen taidon välisen rajan selvittäminen. Määräävinä seikkoina on pidetty työn (taiteellista) itsenäisyyttä ja omaperäistä ilmaisua. Työn itsenäisyyttä arvostellaan elokuvan tekemisessä yleensä sen perusteella, kuinka itsenäisesti henkilö työskentelee suhteessa elokuvan ohjaajaan. Tällä tarkoitetaan taiteellisin kriteerein itsenäiseksi katsottavaa luovaa työtä. Yksittäisen tekijän taiteellinen luova panos määräytyisi näin kunkin elokuvateoksen käsikirjoituksen ja ohjauksen perusteella, ja viime kädessä vasta käytännön valmistusprosessissa.

23. Tekijänoikeuslain 6 §:ssä säädetään niin sanotusta yhteisteoksesta. Säännöksen mukaan jos kaksi tai useammat ovat yhdessä luoneet teoksen heidän osuuksiensa muodostamatta itsenäisiä teoksia, on tekijänoikeus heillä yhteisesti. Kullakin heistä on kuitenkin valta vaatimusten esittämiseen oikeuden loukkauksen johdosta.

24. Oikeuskirjallisuudessa ja oikeuskäytännössä on puhuttu myös niin sanotuista yhteenliitetyistä teoksista. Oikeuskirjallisuudessa (Haarmann, Tekijänoikeus ja lähioikeudet, 2005, s. 105) esitetyn mukaan yhteenliitetyistä teoksista on kysymys silloin, kun tekijöiden panokset kokonaisuudesta ovat toisistaan erotettavissa. Esimerkkejä yhteenliitetyistä teoksista ovat operetti (KKO 1956 II 76), ooppera ja kirjallinen, kuvitettu teos. Yhteisteosta koskevaa tekijänoikeuslain 6 §:ää ei sovelleta näihin teoksiin. Vastaavasti oikeuskirjallisuudesta (Harenko ym., Tekijänoikeus, 2016, s. 85) ilmenee, että yhteenliitetty teos on useamman kuin yhden tekijän työn tuloksena syntynyt teos, jossa eri tekijöiden panokset muodostavat itsenäisiä teoksia, toisin kuin yhteisteoksessa. Esimerkkejä tällaisista yhteenliitetyistä teoksista ovat kuvitettu kirja, jossa kirjailijan ja kuvittajan osuudet voidaan erottaa, operetti, jossa on erotettavissa puhe-, tanssi- ja musiikkiosuudet, tai laulu, jossa säveltäjän ja sanoittajan osuudet ovat itsenäisiä.

25. Tekijänoikeusneuvoston lausunnossa 2003:11 on todettu, että rajanveto yhteisteoksen ja yhteenliitetyn teoksen välillä ei aina ole täysin selvä. Yhteisteos ja yhteenliitetty teos voivat olla lähelläkin toisiaan riippuen siitä, millä tavalla teos on syntynyt eli mikä on ollut teoksen luomisprosessi ja millä tavalla teokseen luomiseen osallistuneet henkilöt ovat teosta luodessaan työskennelleet. Merkitystä tässä rajanvedossa on myös sillä, ovatko teoksen luomiseen osallistuneiden henkilöiden panokset erotettavissa lopputuloksena olevasta teoskokonaisuudesta siten, että joku tai jotkut henkilöt voidaan selvästi osoittaa teoksen jonkin osan tai osuuden tekijöiksi. Jos teos on syntynyt useiden henkilöiden tiiviin vuorovaikutuksen tuloksena, tämä puoltaa teoksen katsomista tekijänoikeuslain 6 §:ssä tarkoitetuksi yhteisteokseksi.

*3.2 Elokuvan lavastuksesta ja lavastamisesta esitetty selvitys*

26. Markkinaoikeus toteaa aluksi, että kanteessa ei ole nimenomaisesti määritelty, mitä lavastuksella tai lavastusteoksella on tarkoitettu, ja näin ollen sitä, mitä asiassa esitetyt vahvistusvaatimukset tarkalleen ottaen koskevat. Asiassa esitetyn perusteella lavastus voidaan yhtäältä ymmärtää elokuvan visuaaliseksi ilmeeksi, mikä saattaa sisältää myös muun ohella valaistuksen tai puvustuksen. Lavastus voidaan toisaalta ymmärtää myös esimerkiksi siten, että se koskee vain sellaisia elokuvaa varten rakennettuja tai muutoin luotuja kuvauspaikkoja erityisine rekvisiittoineen, joilla pyritään vaikutelmaan todenmukaisesta ympäristöstä.

27. A on esittänyt, että lavastusteos ei muodostu yksittäisistä kohtauksia varten tehdyistä lavastuksista eli niin sanotuista "seteistä", vaan kokonaisuudesta, eikä rekvisitoitu kuvauspaikka ole lavastusteos. A:n mukaan myöskään elokuvassa ilmenevät "hiilikasat" eivät ole lavastusteoksia. Toisaalta A on myös tuonut esiin, että lavastajan päätös, että tietty kuvauspaikka ei edellytä erityistä lavastamista on myös sinänsä taiteellinen valinta.

28. Markkinaoikeus katsoo, että lavastuksella on tarkoitettu elokuvan taustaa, jota vasten näyttelijöiden suoritukset näkyvät erityisesti silloin, kun tämä maisema ja esineistö on edellyttänyt olennaisia toimenpiteitä. Elokuvassa näkyvään yleiseen visuaaliseen ilmeeseen ovat puolestaan vaikuttaneet myös esimerkiksi puvustus, valaistus ja kuvaus.

BAYLIS_28

29. Toivon tuolla puolen -elokuvan lavastamisesta on esitetty selvityksenä asiassa ensinnäkin, että ohjaaja B on laatinut Sputnik Oy:n asiakirjatodisteesta 1 ilmenevän elokuvan käsikirjoituksen. Asiassa ei ole esitetty selvitystä, että lavastuksesta olisi laadittu muita merkityksellisiä kirjallisia suunnitelmia.

30. Markkinaoikeus toteaa, että kyseisessä käsikirjoituksessa kuvaillaan yhteensä 65 kohtausta ja elokuvan tapahtumaympäristöä yhtäältä osin lakonisesti mutta mielikuvia herättävästi ja toisaalta paikoin yksityiskohtaisesti. Asiantuntijoiden ja todistajien lausuntojen ja kertoman perusteella käsikirjoitus on ollut lavastuksen osalta tavanomaista kuvailevampi, mutta se ei ole kuitenkaan tekijänoikeudellisesti merkityksellisellä tavalla tyhjentävästi määrännyt lavastuksesta.

31. Henkilötodistelussa on pääosin yhdenmukaisesti kerrottu siitä, että kesällä 2016 A, kuvaaja TS ja osin tai myöhemmin ohjaaja B ja eräät muut henkilöt ovat käyneet läpi kuvausjärjestäjä JN:n ja tuotantopäällikkö ML:n esittämiä sekä muita mahdollisia kuvauspaikkoja ja keskustelleet muun ohella niiden soveltuvuudesta kuvauksiin, käytettävistä väreistä ja lavasterakentamisesta. Todistelusta on ilmennyt, että B on tehnyt näitä koskevat lopulliset ratkaisut. Niin ikään todistelun perusteella B:llä on ollut elokuvasta vahva näkemys, jonka toteutumisen hän on kokonaisvaltaista osallistumista ja määräysvaltaa käyttäen pyrkinyt varmistamaan.

32. A on häntä todistelutarkoituksessa kuultaessa kertonut, että rekvisiitalla on erittäin keskeinen osa lavastuksessa ja että lavastaja hankkii valtaosan rekvisiitasta. Hän on tehnyt tältä osin niin paljon kuin mahdollista. Toisaalta A on myös kertonut, että kuvausrekvisitööri on hoitanut niin sanottuja helppoja kuvauspaikkoja. Niin ikään D on häntä todistajana kuultaessa kertonut, että rekvisiitta on lavastuksen sisäinen osa ja sillä on suuri merkitys. Todistelusta on käynyt myös varsin yhdenmukaisesti ilmi, että B on tehnyt muutoksia rekvisiittaan ja erityisesti karsinut sitä ennen kuvauksia.

33. Todistelusta on ilmennyt, että A on lavasterakentajien ja maalareiden työtä johtaen toteuttanut kohtausten lavastamisen heinäkuusta 2016 alkaen. Lavasterakentajien ja maalareiden tehtävät ovat päättyneet ennen kuvausten alkamista kyseisessä kohteessa. Lavasterakentaja TK ja lavastemaalari KR ovat heitä todistajina kuultaessa kertoneet nähneensä tämän työvaiheen aikana B:tä korkeintaan satunnaisesti. Esitetyn todistelun perusteella A ja B ovat lisäksi käyneet läpi kuvauspaikkoja ennen kuvausten alkamista, jolloin B on muun ohella pyytänyt muutoksia tehtäviksi tai todennut kohteen olevan hyvä. Niin ikään A on ollut muissa tehtävissä kuvauspäivinä, jolloin siinä vaiheessa tarpeelliseksi havaittuja muutoksia ovat B:n ohjeistamina toteuttaneet lähinnä D ja C.

34. Edellä todetun varsin yhdenmukaisen todistelun lisäksi on sen sijaan esitetty vastakkaisia väitteitä ja runsaasti todistelua siitä, kuinka olennaisia muutoksia A:n omasta puolestaan valmiiksi saattamiin lavasterakennelmiin ja rekvisitointeihin on tehty kuvausvaiheessa. Markkinaoikeus toteaa, että kuten A:n asiakirjatodisteesta 6 ilmenevistä lavastusaikaisista valokuvista ja elokuvan kuvaruutukaappauksista, AL:n asiantuntijalausunnosta ja henkilötodistelusta on ilmennyt, rakenteita ei ole enää kuvausvaiheessa muutettu olennaisesti vaan muutokset ovat kohdistuneet lähinnä rekvisiitan poistoon, lisäämiseen tai uudelleenjärjestelyihin. Myöskään henkilötodistelusta ei ole käynyt yksilöidysti ilmi, että lavasterakenteisiin olisi tehty yksittäisiä poikkeuksia lukuun ottamatta kovin olennaisia muutoksia.

35. Markkinaoikeus toteaa edellä lausutun perusteella kokoavasti, että elokuvan käsikirjoitus, ohjaaja B:n työskentelytapa tai A:n työvaiheen jälkeen lavasteisiin tai rekvisiittaan tehdyt muutokset eivät ole olleet sellaisia, että A:n toteuttamaan lavastukseen ei olisi voinut liittyä tekijänoikeudellisesti merkityksellistä luomistyötä.

*3.3 Lavastusta koskevat asiantuntijalausunnot ja kuuleminen*

BAYLIS_29

36. Elokuva- ja televisiotuotannon professori AB on asiantuntijalausunnossaan todennut, että elokuva on aina kokonaisuus ja prosessi, jonka osia on vaikea erottaa toisistaan. Osia lavastuksesta, esimerkiksi kokonaiset interiöörit tai lavastusta varten rakennetut huonekalut tai taideteokset, voidaan tietenkin elokuvasta erilläänkin esittää teoksina. Laajasti ottaen ja olennaisimmilta osiltaan lavastus on prosessi, jonka rajapinnat toisiin osa-alueisiin eivät ole täsmällisiä. Esimerkiksi kuvasuunnittelu, sommittelu, valaisu, näyttelijöiden liikkuminen, valitut teräyysalueet, puvustus ja leikkaus vaikuttavat siihen, miten lavastus näkyy. Lavastaja ei voi toimia menestyksellisesti yksin, vaan hänen on sovitettava työnsä näiden toisten luovien sektoreiden ja taiteellisesti päävastuullisten henkilöiden työhön. AB on häntä asiantuntijana kuultaessa kertonut muun ohella, että lavastustaiteen tarkoituksena on tukea kokonaisuutta ja elokuvan kerrontaa ja pyrkimyksenä on, ettei kokonaisuudesta voida erottaa osia.

37. Elokuvakäsikirjoittaja ja -ohjaaja AL on edellä mainitussa asiantuntijalausunnossaan todennut, että lavastus on olennainen ja keskeinen osa elokuvateosta. Lavastus on osa elokuvaa ja sillä on AL:n mielestä omat tekijänoikeutensa, jotka syntyvät lavastajalle. Yleensä ei ole tarkoituskaan, että lavastus erottuisi visuaalisesti muusta elokuvan maailmasta, sillä lavastus tukee elokuvan kokonaiskerrontaa. Ammattilaisen työn tunnistaa usein siitä, että elokuvassa lavastusta ei edes pyritä esittelemään lavastuksena vaan uskottavana ympäristönä elokuvan kertomukselle. Tasoltaan huono lavastus voi olla häiritsevällä tavalla silmiinpistävä. Tällöinkin on syytä tehdä ero silmiinpistävyyden ja erotettavuuden välillä. Lavastusta voi olla mahdollista esitellä yleisölle elokuvasta erillään esimerkiksi valokuvanäyttelyn avulla. AL:n näkemyksen mukaan jokaisen lavastuksen on tarkoitus olla jollain tavalla omaperäinen.

38. Arkkitehtuurin professori emeritus JP on asiantuntijalausunnossaan todennut, että paradoksaalisesti lavastuksen on vahva ja itsenäinen silloin, kun se mahdollisimman huomaamattomasti palvelee elokuvan taiteellisia päämääriä. Hänen mukaansa tästä paradoksiosa kiteytyy myös lavastesuunnittelun vastuu ja vaatimus, ja A:n lavastusteoksen osalta paradoksi toteutui täydellisesti käsillä olevassa elokuvassa. Toisin kuin elokuvamusiikkia, lavastusta ei voi esittää erillään elokuvasta.

39. Elokuvantutkija ja tietokirjailija ST on asiantuntijalausunnossaan todennut, että auteur-ohjaajana B:n kontrolli kaikkiin elokuviensa osatekijöihin on siinä määrin kiistatonta ja jo elokuvien yhtenäisestä ilmeestä välittyvää, että mitkään sen erilliset elementit, kuten lavastus, puvustus tai valaistus, eivät tässä suhteessa muodosta yksinään omaa ja itsenäistä elokuvasta erottuvaa osakokonaisuutta. ST on häntä asiantuntijana kuultaessa todennut niin ikään, että lavastus on yksi osatekijä elokuvan visuaalisessa ilmeessä, eikä sitä voi erottaa.

*3.4 Johtopäätökset*

40. Markkinaoikeus toteaa asiassa tulleen selvitetyksi, että elokuva on visuaalisilta osiltaan kokonaisuus, jonka muodostavat ja jossa sekoittuvat sitä varten erityisesti luodut lavasteet ja rekvisiitta sekä muu visuaalinen ilme. Asiantuntijoiden toteamin tavoin lavastuksen ei yleensä ole tarkoitus erottua muusta elokuvasta vaan mahdollisimman hyvin sulautua ja tukea elokuvan kerrontaa ja kokonaisuutta.

41. Asiassa esitetyn todistelun perusteella Toivon tuolla puolen elokuvassa esiintyvä lavastus on syntynyt useiden henkilöiden eri vaiheissa tapahtuneen vuorovaikutuksen seurauksena. Tässä keskeisimmät henkilöt ovat olleet A ja ohjaaja B, mutta työskentelyyn on osallistunut ainakin jonkinasteisella luovalla panoksella muitakin henkilöitä. Edellä todetun perusteella kyseistä elokuvaa ei voida pitää lavastuksen osalta tämän tuomion kohdassa 24 tarkoitettuna yhteenliitettynä teoksena.

42. Esitetyn todistelun perusteella elokuvan lavastukseen on voinut liittyä merkittäväänkin henkistä luomistyötä. Tästä ei kuitenkaan sellaisenaan ja välttämättä seuraa, että elokuvan lavastus olisi elokuvasta erotettavissa oleva itsenäinen teos.

BAYLIS_30

43. Jos lavastusteoksella tarkoitettaisiin elokuvan visuaalista ilmettä tai kaikkea elokuvan lavastusta, elokuvasta ei olisi edellä todetusti erottavissa itsenäistä lavastusteosta. Jos sen sijaan lavastusteoksella tarkoitettaisiin vain elokuvan joitakin kohtauksia varten tehtyjä toimenpiteitä, esitetyn perusteella olisi lisäksi vaikeaa tai mahdotonta määritellä vaatimusten 1 ja 2 mukaisesti sitä, mitkä osat elokuvasta olisivat vaatimuksissa tarkoitettuja lavastusteoksia ja miltä osin oikeudet A:lle tulisi vahvistaa kuuluvan.

44. Edellä todetuilla perusteilla markkinaoikeus katsoo, että lavastus on keskeinen osa käsillä olevaa elokuvaa eikä elokuvasta ole erotettavissa kanteessa tarkoitettua itsenäistä ja omaperäistä lavastusteosta. Näin ollen vahvistusvaatimusten 1 tai 2 hyväksymiselle ei ole edellytyksiä. Edellä todetulla tavalla kysymys elokuvan lopputekstien virheellisyydestä on kanneperusteet huomioon ottaen merkityksellinen vain, jos elokuvasta voidaan erottaa itsenäinen lavastusteos. Edellä todettuun nähden elokuvan lopputekstien väitettyä virheellisyyttä ei siten ole tarpeen arvioida tässä yhteydessä. Näin ollen vaatimukset 1 ja 2 samoin kuin niihin perustetut vaatimukset 3–5 on hylättävä.

*4 Markkinaoikeuden arviointi perusteettoman edun palautusta koskevasta vaatimuksesta*

45. Edellä todetun myötä asiassa on vielä arvioitava toissijaista vaatimusta perusteettoman edun palautuksesta. A:n mukaan Sputnik Oy on hyötynyt perusteettomasti hänen kustannuksella maksamalla hänelle oikeuksien luovutuksesta olennaisesti vähäarvoisemman vastasuorituksen kuin hän olisi edellyttänyt, mikäli hän olisi ollut tietoinen, ettei häntä tulla kreditoimaan lavastusteoksen yksinomaisena tekijänä.

46. Markkinaoikeus toteaa, että vaatimuksessa ja sen tueksi esitetyissä perusteissa on pikemminkin kysymys työsopimuksessa sovittujen suoritusten uudelleenarvioinnista tai oikeustoimen pätemättömyydestä tai kohtuullistamisesta kuin yleisestä perusteettoman edun palautuksesta.

47. Markkinaoikeus katsoo, että asiassa esitettyjen perusteiden ja todistelun perusteella ei ole ensinnäkään tehtävissä johtopäätöstä, että työsopimusta olisi pidettävä rauenneena tai pätemättömänä taikka että sen kohtuullistamiselle olisi edellytyksiä. Esitetyn selvityksen perusteella asiassa ei ole myöskään todettavissa, että Sputnik Oy:lle olisi syntynyt perusteetonta etua eli uuden varallisuusarvon saamista tai velkojen tai rasitusten keventymistä tai että väitetylle perusteettomalle edulle ei olisi ollut pätevää oikeusperustetta asianosaisten välinen työsopimus ja sen perusteella tapahtuneet suoritukset huomioon ottaen.

48. Asiassa ei ole tullut ilmi sellaista perusteetonta etua, joka voitaisiin määrätä palautettavaksi. Näin ollen kyseinen vaatimus on hylättävä.

*5 Oikeudenkäynti- ja asianosaiskulujen korvaaminen*

49. Oikeudenkäymiskaaren 21 luvun 1 §:n mukaan asianosainen, joka häviää asian, on velvollinen korvaamaan kaikki vastapuolensa tarpeellisista toimenpiteistä johtuvat kohtuulliset oikeudenkäyntikulut, jollei muualla laissa toisin säädetä. Luvun 8 §:n 1 momentin mukaan korvausta suoritetaan myös oikeudenkäynnin asianosaiselle aiheuttamasta työstä ja oikeudenkäyntiin välittömästi liittyvästä menetyksestä.

50. Sputnik Oy on voittanut asian ja sillä on näin ollen lähtökohtaisesti oikeus saada täysi korvaus tarpeellisista toimenpiteistä johtuneista kohtuullisista oikeudenkäyntikuluistaan. Sputnik Oy on vaatinut A:ta korvaamaan sen arvonlisäverottomat oikeudenkäyntikulut kulujen osalta 3.821,91 eurolla ja palkkion osalta 82.942,50 eurolla eli yhteensä 86.764,41 eurolla sekä asianosaiskulut 1.377,41 eurolla. A:n arvonlisäverollinen oikeudenkäyntikuluvaatimus on puolestaan ollut 96.996,25 euroa.

51. A on paljoksunut Sputnik Oy:n palkkiovaatimusta 20.000 euroa ylittäviltä osin sekä kuluja ja asianosaiskuluja ulkomaan matkakulujen osalta. A on esittänyt muun ohella, että asianosaisten toimenpiteitä ovat lisänneet ristiriitaiset ja yksilöimättömät väitteet ja oikeudenkäynnin pitkittäminen.

BAYLIS_31

52. Sputnik Oy:n mukaan sen toimenpiteet ovat olleet samansuuntaisia kuin A:lla ja päinvastoin A:n toiminta valmistelussa on aiheuttanut kustannuksia. Sputnik Oy on todennut myös, että B asuu Portugalissa ja vaadittujen matkakulujen korvaaminen jää markkinaoikeuden harkintaan.

53. Markkinaoikeus toteaa, että tässä tapauksessa lähinnä A on määrittänyt oikeudenkäynnin kohteen edellä kuvatuksi. Oikeudenkäynnin laajuus on johtunut erityisesti kanteessa esitetyistä vaatimuksista ja niiden tueksi esitetyistä perusteista. Sputnik Oy:llä on ollut oikeus vastustaa kannetta tekemällään tavalla, ja vastustamisen perusteet ovat pysyneet olennaisilta osin samoina oikeudenkäynnin ajan. Sen sijaan A:n vaatimukset ja perusteet ovat muuttuneet oikeudenkäynnin kuluessa, mistä Sputnik Oy:lle on aiheutunut tarve toimenpiteiden tekemiselle. Sputnik Oy:n hylätyksi tulleella oikeudenkäyntiväitteellä ei ole ollut merkittävää vaikutusta oikeudenkäyntikulujen määrään.

54. Käsillä olevissa olosuhteissa ei ole ilmennyt perusteita sille, että Sputnik Oy:n toimenpiteet eivät olisi olleet tarpeellisia ja niistä johtuvat oikeudenkäyntikulut asian laatuun ja laajuuteen nähden kohtuullisia. A on näin ollen velvoitettava korvaamaan oikeudenkäyntikulut palkkion osalta vaaditun määräisinä.

55. Sputnik Oy:n vaatimat asianosaiskulut ovat esitetyn mukaan aiheutuneet B:n matkustamisesta Portugalista kuultavaksi oikeudenkäyntiin. Myös A on nimennyt B:n kuultavaksi ja edellyttänyt hänen kuulemista pääkäsittelyssä sen jälkeen, kun Sputnik Oy oli ilmoittanut luopuvansa B:n kuulemisesta. Markkinaoikeus katsoo, että B:n matkustamisesta johtuneissa kuluissa on ollut kysymys sellaisesta asianosaisen oikeudenkäyntiin välittömästi liittyvästä menetyksestä, jonka A on velvoitettava korvaamaan.

56. A on kiistänyt oikeudenkäyntikuluvaatimuksen myös siltä osin kuin kuluja on aiheutunut todistaja TS:n matkustamisesta kuultavaksi oikeudenkäyntiin, mutta TS ei ole kuulemisensa yhteydessä vaatinut palkkiota tai korvausta matkakuluista. Markkinaoikeus toteaa, ettei kyseinen seikka ole asianosaisten välisessä korvausvelvollisuudessa ratkaiseva. A on kiistänyt vaatimuksen myös siltä osin kuin Sputnik Oy:n asiamies sekä todistaja, elokuvan tuotantopäällikkönä toiminut MJ ovat 3.–6.3.2017 eli haasteen tiedoksiannon jälkeen ja ennen kirjallisen vastauksen antamiselle asetettua määräpäivää matkustaneet Portugaliin tapaamaan B:tä.

57. Asiassa ei ole esitetty tai käynyt ilmi, että edellä mainitut matkakulut eivät olisi olleet todellisia tai että ne eivät olisi olleet sinänsä kohtuullisia. Sputnik Oy:n asiamiehen matkustamisesta aiheutuneita kuluja on käsillä olleissa olosuhteissa pidettävä tarpeellisista toimenpiteistä aiheutuvina oikeudenkäyntikuluina. Sen sijaan MJ:n osalta ei ole esitetty tarkempaa selvitystä siitä, miksi matkustaminen Portugaliin on ollut tarpeellista. Viimeksi mainitun johdosta kuluvaatimus on hylättävä markkinaoikeuden arvioiman 800 euron osalta. Muilta osin A on määrättävä korvaamaan myös matkustamisesta aiheutuneet kulut vaaditun määräisinä.

**Tuomiolauselma**

Markkinaoikeus hylkää kanteen.

Markkinaoikeus velvoittaa A:n korvaamaan Sputnik Oy:n oikeudenkäyntikulut 85.964,41 eurolla ja asianosaiskulut 1.377,41 eurolla, molemmat määrät viivästyskorkoineen. Viivästyskorkoa on maksettava korkolain 4 §:n 1 momentissa tarkoitetun korkokannan mukaisesti siitä lukien, kun kuukausi on kulunut markkinaoikeuden ratkaisun antamisesta.

**MUUTOKSENHAKU**

Muutosta tähän ratkaisuun saa hakea korkeimmalta oikeudelta valittamalla vain, jos korkein oikeus niillä erityisillä perusteilla, jotka ilmenevät oheisesta valitusosoituksesta, myöntää valitusluvan.

Määräaika valitusluvan pyytämiseen ja valituksen tekemiseen päättyy 16.4.2018.

BAYLIS_32

Asian ovat yksimielisesti ratkaisseet markkinaoikeustuomarit Anne Ekblom-Wörlund, Pertti Lenkkeri ja Pekka Savola.

**LAINVOIMAISUUS**

Lainvoimainen.

BAYLIS_33