# EXHIBIT K

# GUIDE
## to the
## BERNE  CONVENTION
### for the
### Protection of Literary
### and Artistic Works
### (Paris Act, 1971)



Published by the
World Intellectual Property Organization
GENEVA  1978

WIPO PUBLICATION
No. 615(E)

ISBN 92-805-0002-3

© WIPO 1978

# PREFACE

*Of all the international treaties whose administration is entrusted to the World Intellectual Property Organization, the oldest and the most renowned are the Paris Convention for the Protection of Industrial Property and the Berne Convention for the Protection of Literary and Artistic Works. The oldest because they were concluded at the close of the last century, in 1883 and 1886 respectively. The most renowned because they govern, at worldwide level, the relations between States as regards the protection of intellectual creations.*

*Throughout the changing circumstances of their existence, these Conventions governing intellectual property have known a permanence and a stability which few international agreements can match. Certainly, they have been revised a number of times to allow for political, economic and social changes, but their continuity has been a noteworthy feature. And now that the current concern of those responsible for determining relations between States is to set up a new international economic order, these Conventions ably demonstrate that intellectual property is not merely a matter of exchanges of goods and services, but that it has an outstanding part to play in the dialogue of nations through the contribution which the creations of the mind can make to the advancement of all peoples.*

*Copyright, for its part, constitutes an essential element in the development process. Experience has shown that the enrichment of the national cultural heritage depends directly on the level of protection afforded to literary and artistic works. The higher the level, the greater the encouragement for authors to create; the greater the number of a country's intellectual creations, the higher its renown; the greater the number of productions in literature and the arts, the more numerous their auxiliaries in the book, record and entertainment industries; and indeed, in the final analysis, encouragement of intellectual creation is one of the basic prerequisites of all social, economic and cultural development.*

*In 1976, the Conference of the World Intellectual Property Organization recognized the importance of cooperation activities related to copyright for strengthening the national potential of the developing countries through the production and dissemination of intellectual works and consequently decided*

to establish a Permanent Program in this field. The aims of the Program are, in particular, to promote the encouragement of intellectual creation, the dissemination of literary and artistic works, and the development of legislation and institutions in the fields of copyright and neighhoring rights in the developing countries.

In the latter connection, the Permanent Committee responsihle for keeping this Program under review noted with satisfaction that WIPO's activities included the preparation of a Guide to the Berne Convention for the authorities of developing countries.

· It would seem, in fact, that a useful purpose could he served hy presenting a commentary dealing, Article by Article, with this international instrument of universal vocation which to date constitutes the basis of copyright relations between more than 70 States.

This Guide is not, however, intended to he an authentic interpretation of the provisions of the Convention since such an interpretation is not within the competence of the International Bureau of WIPO, whose role is to be responsible for the administration of the Convention. The sole aim of this Guide is to present, as simply and clearly as possihle, the contents of the Berne Convention and to provide a numher of explanations as to its nature, aims and scope. It is for the authorities concerned, and interested circles, to form their owr opinions.

It is hoped that this Guide will help national legislators and administrators to understand the Berne Convention hetter and thereby to promote the protection of intellectual property throughout the world.

This Guide to the Berne Convention has been written hy Mr. Claude Masouyé, Director of the Copyright and Public Information Department of the International Bureau of WIPO. The English version has been established, on the basis of the original French text, by Mr. William Wallace, formerly Assistant Comptroller in the Industrial Property and Copyright Department at the Department of Trade of the United Kingdom.

Geneva, March 1978

**ARPAD BOGSCH**
Director General
World Intellectual Property Organization
(WIPO)

# INTRODUCTION

The Berne Convention for the Protection of Literary and Artistic Works was concluded on September 9, 1886.

It is the oldest of the international copyright treaties; it provides a high level of protection and gives authors the most comprehensive set of rights it is possible to give them.

The continual search for ever better means of exploiting copyright works and the development of cultural exchanges between countries make it vitally necessary to protect copyright not only nationally but internationally.

The Berne Convention pursues this aim by ensuring that, in each member country, works originating in the other member countries enjoy the same treatment as those of nationals, and that authors enjoy this national treatment and the Convention's minimum rights completely automatically, without the need to observe any formality whatsoever.

From the beginning, the Convention's provisions fell into two classes: those of substance, governing what is known as the material law, and those administrative and final clauses which cover matters of administration and structure.

The first class is often sub-divided into conventional rules and rules which refer back. The conventional rules are those which seek to resolve international copyright problems by imposing uniform solutions on each member country. To respect these, member countries must legislate or otherwise ensure that the rule in question forms part of their law. Those rules which refer back provide no solutions: they simply seek to achieve agreement by allowing each country where protection is claimed to provide its own answer, within such limits as may be laid down.

The rights for which the Convention provides are usually obligatory in the sense that, except where reservations are expressly allowed, each member country must grant them all. In a few exceptional cases, there are optional provisions which allow member countries either to refuse them altogether or to modify their effect.

In the latest text, Articles 1 to 21 and the Appendix contain the substantive provisions and Articles 22 to 38 those dealing with administration and structure. The Convention has been revised a number of times with a view to improving the international system of protection which it provides. Changes have been made with a view to the recognition of new rights, raising the level of protection, increasing the uniformity of treatment while maintaining the elasticity needed to meet special cases, and providing for a soundly based administrative system.

The Convention has gone through the following stages:

— September 9, 1886: Berne Convention (entry into force on December 5, 1887);
— May 4, 1896: Additional Act of Paris (entry into force on December 9, 1897);
— November 13, 1908: Berlin Revision (entry into force on September 9, 1910);
— March 20, 1914: Additional Protocol of Berne (entry into force on April 20, 1915);
— June 2, 1928: Rome Revision (entry into force on August 1, 1931);
— June 26, 1948: Brussels Revision (entry into force on August 1, 1951);
— July 14, 1967: Stockholm Revision (no entry into force of the substantive provisions since these were reviewed in the following Revision; entry into force of the administrative provisions in 1970);
— July 24, 1971: Paris Revision (entry into force on October 10, 1974).

The following analysis of the Convention's provisions is based on the latest text—that of the Paris Act (1971). But it also refers back to earlier texts when to do so helps to explain them.

This Guide was prepared mainly to assist the authorities in developing countries. It therefore contains a number of references to the Tunis Model Law which has the same object.

## Preamble

The countries of the Union, being equally animated by the desire to protect, in as effective and uniform a manner as possible, the rights of authors in their literary and artistic works,

Recognizing the importance of the work of the Revision Conference held at Stockholm in 1967,

Have resolved to revise the Act adopted by the Stockholm Conference, while maintaining without change Articles 1 to 20 and 22 to 26 of that Act.

Consequently, the undersigned Plenipotentiaries, having presented their full powers, recognized as in good and due form, have agreed as follows:

0.1.   The preambles to international instruments have normally no legal significance and scarcely call for commentary. Usually they merely indicate, by means of a few recitals, the objective of the Treaty.

0.2.   The preamble to the Berne Convention (hereinafter called "the Convention") follows this tradition. It underlines the desire of the countries bound by the Convention to protect, in a manner as effective and uniform as possible, the rights of authors in their literary and artistic works. Three points emerge as regards this protection: its effectiveness (the desire of those negotiating the Convention to provide a high level of protection), its uniformity (the goal of producing so far as possible the same regime for all who enjoy such protection) and its subject matter (namely copyright).

0.3.   The history of the Convention is marked by two additions and five revisions; the preamble has remained unchanged throughout, except that, at the last Revision Conference, in Paris in 1971, two paragraphs were added to mark the link with the preceding revision carried out in Stockholm in 1967. Their purpose was to pay tribute to the merits of this last revision as regards the substantive provisions (Articles 1 to 20) and the administrative clauses (Articles 22 to 26) which were left completely unchanged by the Paris Conference, and to the preparatory work done by the Stockholm Conference in seeking solutions to the problems of developing countries.

## ARTICLE 1

### *Formation of a Union*

**The countries to which this Convention applies constitute a Union for the protection of the rights of authors in their literary and artistic works.**

1.1.   This opening provision of the Convention establishes that the countries to which it applies form a single union.

1.2.   In present day language, the words "Country", "Territory", "Nation", "State" are often used synonymously. Generally "Country" corresponds more or less with "Territory"; as to "Nation", this is an assembly of peoples united by identity of origin and, with exceptions, language, and bound by a long community of interest and sentiment. The State is a political entity controlling a given territory, sometimes including more than one nation, but possessing a single autonomous jurisdiction, characterised by its government and institutions.  There is no doubt that, in the Berne Convention (as in the Paris Convention for the Protection of Industrial Property), the word "Country" must be understood as "State".

1.3.   The use of this expression is explained by historical considerations. At the time the Berne Convention was first negotiated, there existed a number of countries which were not fully autonomous, but to which it seemed right to apply the provisions of the Convention.  At the time, the word "Country" was apt to cover all the legal and factual situations. Since then, the world has changed, the ruling principle of public international law is that only States have the power to conclude conventions, treaties, etc. Nevertheless, the last Revision Conferences (Stockholm in 1967 and Paris in 1971) refused to overturn the drafting style of the Convention and preserved the word "Country". On the other hand, when in Stockholm in 1967 it was a matter of drafting a new international instrument, the Convention Establishing the World Intellectual Property Organization (WIPO), the modern concept of "State" was used.

1.4.   Given that the word "Country" corresponds to "State", what does the expression "Union" mean? Here again history helps one to understand.  When, during the second half of the nineteenth century, attempts at the international unification of copyright were first made, it became obvious that the mosaic of bilateral treaties which then existed and which contained the germ of a legal pattern accepted by more and more coun-

tries, was insufficient, and that there was a need to go further. The countries felt that, if intellectual creations were destined to be made known to all mankind, the conditions of their utilisation must be regulated internationally. Steps to this end were therefore taken, and diplomatic conferences convened which resulted in the conclusion of the Berne Convention in 1886.

1.5. By writing in an opening article laying down that the contracting countries constituted themselves into a single Union, the original draftsmen sought to underline that it was not a matter of merely negotiating a contractual agreement between a number of countries, the duration of which depended on the continuing participation of all the signatories, but one of creating a genuine "society" of states, able to go on existing even after the departure of one or more of them, open to all countries of the world and capable, by means of periodic revision, of keeping pace with juridical, technical and economic change.

1.6. The creation of such a Union is not without important consequences. In opening this international instrument to the world at large, the draftsmen of 1886 affirmed, from the beginning, the universal nature of their Convention. It is significant, in this respect, that during the discussions at the diplomatic conferences of 1884 to 1886, not only European States took part but also those from Africa (Liberia and Tunisia), from America (Argentina, Costa Rica, El Salvador, United States, Haiti, Honduras and Paraguay), and from Asia (Japan).

1.7. This opening to the world at large permitted no discrimination: the member countries of the Union did not have any possibility of refusing the accession or demanding the exclusion of any country on the ground that it did not protect copyright in a manner satisfactory to them. They are bound to treat authors of other Union countries as they treat their own; Union nationals receive unconditionally, in each member country, the same treatment as nationals of that country. True, the opportunity thus given to each and every country to join the Union may sometimes produce inequality in practice, since some States give authors of other countries a narrower or wider protection than that which their own nationals enjoy in the latter. But the creation of a single Union, based on the principle of the assimilation of foreigner to national, with certain minimum standards of protection, and capable, by means of revision, of meeting world changes, allows recently joined countries to have international relationships with all the Union countries including those not yet bound by the most recently revised text of the Convention.

1.8.   Another effect of this provision is that the Union forms, from the administrative and financial point of view, a single entity: it has one assembly, one executive committee and one budget.  The fact that the Convention has been revised on a number of occasions has not led to a separate administration for each text nor to separate accounts (although, on this last point, the amount of contributions may vary by reason of changes made in the number of the classes which determine the proportion in which expenses are borne).

1.9.   The Convention therefore creates a Union of countries (in the sense of States), a kind of association open to all those which wish to protect the rights of authors in their literary and artistic works.  For this reason one finds throughout the text the expressions "Union", "Country of the Union" and "Country outside the Union", and, in discussion, the words "Union National" are used to describe those authors who enjoy the benefits of the Convention.

1.10.   Article 1 points to the aim of the Union: "The protection of the rights of authors in their literary and artistic works", whereas the title of the Convention refers merely to "Protection of Literary and Artistic Works".

1.11.   Once again the preliminary drafts of 1884 to 1886 provide the explanation.  Various expressions were suggested by the draftsmen of the time and rejected for doctrinal reasons or difficulties of translation.  For example the expression "droit d'auteur" in the singular translates into English by "copyright" and into German by "Urheberrecht"; but if it is used in the plural the equivalent is "royalties" and "Tantiemen" respectively since it then has the meaning of the remuneration due to authors.  In the end, the only reference to the protection merely of "works" was reserved for the title of the Convention, it being understood, however, that it was a matter of providing for the protection of the rights of authors in their works.  Article 1 says so in terms.

1.12.   In fact, this Union for the protection of the rights of authors in their literary and artistic works is usually called the Berne Union just as the international document is the Berne Convention.  It is normal, in the field of intellectual property, as in other fields, to name conventions, treaties, agreements, etc., after the town in which they were concluded.

1.13   The purpose of Article 2 of the Convention is to define the expression "literary and artistic works"; but it is worth noting that nowhere is

there a definition of "copyright" in terms, notwithstanding that its world-wide protection is the Convention's main aim. There are two reasons.

1.14.   First, copyright consists of a number of rights enjoyed by the author and the protection of copyright means that, with some qualifications and limitations, the use of the work is not allowed except with the consent of the author or his successor in title. For these different rights, their recognition, their scope and the means of exercising them, the Convention lays down the minimum standard to be applied in the member countries.

1.15.   Secondly, the very concept of copyright from a philosophical, theoretical and pragmatic point of view differs country by country, since each has its own legal framework influenced by social and economic factors. To define it in a manner binding on all member countries would be difficult if not impossible.

1.16.   The Convention speaks of "the rights of authors in their works" but it does not specifically define the word "author" because on this point too, national laws diverge widely, some recognising only natural persons as authors, while others treat certain legal entities as copyright owners, some imposing conditions for the recognition of authorship which others do not accept.

## ARTICLE 2

*Protected Works*

### Paragraph (1)

*Definition*

> (1) The expression "literary and artistic works" shall include every production in the literary, scientific and artistic domain, whatever may be the mode or form of its expression, such as books, pamphlets and other writings; lectures, addresses, sermons and other works of the same nature; dramatic or dramatico-musical works; choreographic works and entertainments in dumb show; musical compositions with or without words; cinematographic works to which are assimilated works expressed by a process analogous to cinematography; works of drawing, painting, architecture, sculpture, engraving and lithography; photographic works to which are assimilated works expressed by a process analogous to photography, works of applied art; illustrations, maps, plans, sketches and three-dimensional works relative to geography, topography, architecture or science.

2.1.    The object of this paragraph is to define the expression "literary and artistic works". It does this in two ways: the wording envisages all productions in the literary, scientific and artistic domain, and permits of no limitation by reason of the mode or form of their expression.

2.2.    As regards the first, it is worth noting that it covers scientific works, even though these are not expressly mentioned in the Convention. The scientific work is protected by copyright not because of the scientific character of its contents: a medical textbook, a treatise on physics, a documentary on interplanetary space are protected not because they deal with medicine, physics, or the surface of the moon, but because they are books and films. The content of the work is never a condition of protection. In speaking of a domain not only literary and artistic, but also scientific, the Convention encompasses scientific works which are protected by reason of the form they assume.

2.3.    A fundamental point is that ideas, as such, are not protected by copyright. It is the patent rather than the copyright laws to which one must look for this protection. Subject, therefore, to patent protection, a person who has made his idea public has no means of stopping others using it. But once that idea has been elaborated and expressed, copyright protection exists for the words, notes, drawings, etc., in which it is clothed. In other words, it is the form of expression which is capable of protection and not the idea itself.

2.4.  The Convention thus asserts the principle of an all-embracing pro-
tection for the benefit of all productions in the literary, scientific and
artistic domain, and, in a second assertion, lays down that the mode or
form of expression of a work in no way affects its protection. In fact a
work may be made known to the public in any way, oral or written. The
method employed to make the work known is immaterial. It is generally
agreed that the value or merit of a work, essentially a subjective value
judgement, is also of no account; in trying a case, for example, the judge
does not have to appreciate the artistic merits or cultural advantages of a
work. The same is true of the work's purpose: it may be produced for
purely educational purposes or with a merely utilitarian or commercial
aim, without this making any difference to the protection it enjoys.

2.5.  Although paragraph (1) of Article 2 refers to literary and artistic
works, it must not be taken to intend a division into two mutually exclu-
sive categories. True, the genesis of an artistic work (drawing, painting,
sculpture, etc.) is rather different from that of the purely literary work.
The latter is expressed by its words: the writer conceives the plan of his
work and then makes it known; it is this expression which gives rise to
copyright. With an artistic work, the plan (mock-up, sketch, etc.) is
already, in itself, capable of protection, since from this moment, the idea
finds concrete form in lines and colours, with a more personal and direct
execution than in the case of writings: the painter makes his own brush
marks and the sculptor his statue, whereas it is of no importance whether
the novelist himself puts pen to paper or dictates his text to someone else.
As to musical works, they are at once artistic, with the exception that the
sounds replace the lines and colour, and literary, to the extent that words
accompany the melodies.

2.6.  But the wording of the Convention is intended to cover them all.
The expression "literary and artistic works" must be taken as including all
works capable of being protected. In order to illustrate this, paragraph
(1) of Article 2 gives an enumeration of the works. The use of the words
"such as" shows that the list is purely one of examples and not limitative:
it is a matter of providing a number of guides for the national law-
makers; in fact all the main categories of works are set out. The follow-
ing comments are worth making:

2.6.*(a)  books, pamphlets and other writings:* since the content of the
work makes no difference to the protection, this is, without doubt, the
biggest category, if not in numbers, by variety: novels, news, poems,
recitations, short stories whether fictional or not, pamphlets, treatises or
handbooks on philosophy, history and all other natural or physical

science, almanacs, year books, programmes, guides, etc., etc., irrespective
of their contents, their length, their purpose (entertainment, education,
information, discussion, advertisement, propaganda, etc.) and their form
(manuscript, typescript, printing).

2.6.*(b)   lectures, addresses, sermons, and other works of the same nature:*
this category is usually known as "oral works", that is to say those that
are not written down. However there are limits to the protection enjoyed
by this category of works by reason of news requirements, for example,
the reporting of political or legal speeches, and by the need to quote or
take extracts (see below).

2.6.*(c)   dramatic or dramatico-musical works:* this is a matter of pieces for
the theatre and, if they have a musical accompaniment, of operas grand
and light, operettas, musical comedies, etc.

2.6.*(d)   choreographic works and entertainments in dumb show:* in the
version prior to that of Stockholm, the Convention provided that, for
these works to enjoy protection, the acting form had to be fixed in writing
or otherwise. This condition was not an exception to the rule of protec-
tion without formality, but is explained by considerations of proof: it was
thought that only the ballet notation allowed one to appreciate the exact
shape of the dance. The arrival and spread of television has markedly
changed the baselines of the problem: there is a need to protect such a
work, diffused live by television, against someone filming it. Besides, the
requirement that the acting form must be fixed in writing could give rise
to difficulties, since it is difficult to describe precisely by words; again, the
requirements of proof may differ, country by country. Since the Conven-
tion now allows national laws to provide that fixation in some material
form is a general condition for protection (see below Article 2), this need
for fixation in writing of the acting form of choreographic works and
entertainments in dumb show was abolished in the Revision in 1967.

2.6.*(e)   musical compositions with or without words:* here one considers
music in its widest form, light (Palm Court or pop) or heavy (hymns,
choruses, symphonies), whether scored for a single instrument or several
(sonatas, chamber music, etc.) or for large orchestras, and whatever its popu-
lar appeal or its purpose (radio and TV advertising jingles as well as
symphonic works). Like the works mentioned in (d) above, musical
works, to enjoy protection, need only be fixed in a material form if the
national law so demands. On this point the Model Law of Tunis on
copyright for the use of developing countries (hereinafter called the Tunis
Model Law) leaves the choice of utilising the expressions "musical works
whether or not in written form" in order to make it clear that these works

need not be inscribed on a musical score in order to be protected. However the draftsmen felt that it would not in practice be possible to protect improvisations. On the other hand, variations are protected and also arrangements of pre-existing works, subject of course to the copyright, if any, in that work (see paragraph (3) of Article 2). Finally, the words "with or without words" in the Convention mean that any words accompanying the music are protected like the music itself.

2.6.*(f)* *cinematographic works to which are assimilated works expressed by a process analogous to cinematography:* here one is considering primarily films in the classic sense whether silent or "talkies", whatever their type (documentaries, newsreels, reports or feature films made to a script), whatever their length, whatever their method of making (films on location, films made in studios, cartoons, etc.), or the technical process used (films on celluloid, video tape, etc.) whatever they are intended for (showing in cinemas or television transmission) and finally whoever is their maker (commercial production companies, television organisations or mere amateurs).

But, side by side with these, the appearance of new technical means of communicating to the public has given birth to categories of works which are in some ways akin to cinematograph films though in the television and audiovisual domain.

Much discussion, both before and at the Stockholm Conference itself, was devoted to defining the assimilation in question, which raises the difficulty about fixation in some material form. It might seem strange at first that a cinematographic work can exist without being fixed. But television broadcasts, for example news bulletins, look the same to the viewer whether recorded on film or broadcast live by cameras on the spot. What appears on the screen should be protected in the same way in each case. In the end, after it was decided to leave the whole question of fixation to national laws (paragraph (2) of Article 2), the Convention was able to side-step the difficulty by providing that it was simply a matter of "works expressed by a process analogous to cinematography". It is not so much the process employed which is analogous as the effects, sound and visual, of such process.

Finally, the draftsmen of the revised text chose a general formula using the word "expressed" (and not "obtained" which had previously been in the Convention) in order to underline that what was at issue was the form of work and not the method of making it public.

This assimilation to cinematographic works of televisual and audiovisual works (in so far as the latter are expressed by a process analogous to cinematography) is of great importance, to the extent that it determines

the meaning of the legal regime applicable, according to the Convention, to cinematographic works. It is worth noting, besides, that the Convention does not specifically refer to "radiophonic works" in the list contained in the first paragraph of Article 2 since radiodiffusion is considered as a method of exploitation of works; the works which are broadcast may be dramatic, dramatico-musical, choreographic, musical, cinematographic, etc. It must be remembered that the word "broadcasting" covers both television and sound broadcasting. If the Tunis Model Law expressly mentions "radiophonic and audiovisual work" side by side with cinematographic works, this is because its draftsmen preferred to avoid any ambiguity. They therefore included them in a non-exclusive list of protected works and did not use the formula of assimilation which the Convention contains.

2.6.*(g) works of drawing, painting, architecture, sculpture, engraving and lithography:* this category covers virtually all artistic works whether in two dimensions (drawings, engravings, lithographs, etc.) or in three (sculptures, statues, works of architecture, monuments, etc.) independent of their nature (figurative or abstract) and their intention (pure or commercial art). It is worth noting that, in the Tunis Model Law, carpets are expressly mentioned in the list of protected works (itself based on the Convention) because of the special importance enjoyed by this type of artistic creation in some developing countries.

2.6.*(h) photographic works to which are assimilated works expressed by a process analogous to photography:* this covers all photography independent of subject (portraits, landscapes, current events, etc.) and purpose (amateur or professional photographs, artistry or advertising). The Convention speaks of an assimilation in the same terms as those used in the matter of cinematographic films in order to ensure protection when chemical or technical processes, now known or yet to be discovered, are used as well as traditional photographic methods. It should be remembered that the Convention leaves open the possibility of refusing protection to certain categories of photographs. It might be thought to go too far to confer copyright on all photographs, including for example passport photos made automatically by special means (photomatons). It is up to the legislators to resolve these difficulties; some laws demand that to enjoy protection photographic works must bear an artistic or documentary character.

2.6.*(i) works of applied art:* the Convention uses this general expression to cover the artistic contributions of the makers of knick-knacks, jewellery, gold and silverware, furniture, wallpaper, ornaments, clothing, etc.

However in this case national laws are allowed to choose the conditions of protection and the differences are considerable.

It is worth noting that the Tunis Model Law sets out two possible sources of works of applied art: those made by craftsmen, and those produced by an industrial process, the first occupying an important place in the developing countries.

2.6.*(j) illustrations, maps, plans, sketches and three-dimensional works relative to geography, topography, architecture or science:* this list is self-explanatory and completes the series of examples which the Convention gives in order to define the term "literary and artistic works"; it must always be remembered that this list in paragraph (1) of Article 2 is by no means exclusive.

2.7. By merely listing examples, the Convention allows member countries to go further and treat other productions in the literary, scientific and artistic domain as protected works. Thus for example in some countries where the Anglo-Saxon traditions prevail, the law gives protection to sound recordings (discs and tapes) in terms, over and above that enjoyed by the work, if any, recorded. The same thing is true of broadcasts. Recordings may be made not only of works protected by copyright but also of those in the public domain and of such things as bird songs. Of course, the fact that a country treats a sound recording as a work protected by copyright does not mean that other Berne Union countries have any obligation to do the same. There are separate conventions at the international level dealing with the mutual protection of sound recordings. The Rome Convention on neighboring rights is one and protects also performances and broadcasts.

2.8. Before leaving paragraph (1) of Article 2, it is worth noting that the Convention speaks of "works" but nowhere defines what is meant by the word. But it is clear from its general tone that these must be intellectual creations (the words appear in paragraph (5) of Article 2). For this reason many national laws, and the Tunis Model Law, provide that, to enjoy protection, the works must be original in the sense that they possess creativity. The Convention uses the expression "original works" later in this sense and to distinguish from those copied (Article 2(3)). But originality must never become confused with novelty; two artists, placing their easels on the same spot and each making a picture of the same landscape, each separately creates a work; the second painting is not novel, because the same subject has already been dealt with by the first painter, but it is original because it reflects the personality of its maker. Equally, two craftsmen carving the figure of an elephant in wood each creates an origi-

nal work even though the two elephants are indistinguishable and there is no question of novelty. Of course the question of originality, when prescribed, is a matter for the courts.

## Article 2, paragraph (2)

### *Possibility of Demanding Fixation*

> **(2) It shall, however, be a matter for legislation in the countries of the Union to prescribe that works in general or any specified categories of works shall not be protected unless they have been fixed in some material form.**

2.9.   This latitude given to the member countries has already been touched on in connection with choreographic works and films. Some laws require that fixation (not necessarily by the maker of the work) is necessary in order to identify the work and avoid confusion with the offerings of others. Fixation is not a formality within the meaning of Article 5(2) of the Convention, since this deals only with administrative requirements, e.g., registration of title; it proves the existence of the work.

2.10.   Others feel that fixation in a material form need not be a condition of copyright; even in the moving picture field there can be "unfixed" films which call for protection: for example, a series of images reproduced on the screen of a television set ought to be protected against their being taken by third parties with video-recording apparatus. In some laws, the moment of first fixation is chosen as the moment at which the work is made—comes into existence. Even in those cases in which fixation is demanded as a matter of proof, one school of thought believes that, if a lecture is given extempore, or a tune improvised on the piano, and another records it, the latter, by doing so, perfects the copyright in favour of the lecturer or pianist.

2.11.   Given these differences, and because member countries, remain free to protect only what they consider embodies intellectual creativity, the Convention takes no sides, offers no interpretation and leaves member countries free to make protection conditional on the work being fixed in some material form. This provision, which was first written in in Stockholm (in 1967), offers all the latitude necessary: the countries are free to demand such fixation either generally or for one or more categories of works.

2.12.  It is worth noting that the Tunis Model Law leaves open this
question though it rules out any possibility of demanding fixation for
works of folklore.  The draftsmen felt that the latter, which form part of a
nation's cultural heritage, are, by their very nature, handed on orally from
generation to generation or as dances whose steps are never recorded; to
demand that they be fixed, in order to enjoy protection, puts any such
protection in jeopardy and even risks giving the copyright to those who fix
them.

### Article 2, paragraph (3)

*Derivative Works*

**(3) Translations, adaptations, arrangements of music and other
alterations of a literary or artistic work shall be protected as original
works without prejudice to the copyright in the original work.**

2.13.  This paragraph deals with what are often called derivative works
i.e., those based on another, pre-existing, work.  The Convention provides
for their protection as original works since their creation calls for intellec-
tual effort.

2.14.  The translator works on someone else's text but brings his own
mind to bear on expressing that other's thoughts in a different language.
The translation is a work in itself; without the work translated it could
not exist, but it is different from the latter not only in language but by
expressions, phraseology, grammatical construction, style and often more.

2.15.  Adaptations also occupy an important place in the intellectual
property field, and the multiplicity of communications media offers them
an ever-wider forum.  Many novels, often unknown or forgotten, have
found their way to the stage, screen, radio or television, in the form of
plays, scripts and radio or TV serials.  The adaptation is a work in itself,
in a sense subordinate to the earlier work but with its own importance.
Adaptations may also be translations if the original work was in a dif-
ferent language.

2.16.  This paragraph also covers arrangements of music and generally
all other alterations of literary and artistic works.  Of course, the protec-
tion that these works enjoy is without prejudice to the copyright in the
originals: in other words, in order to translate, adapt, arrange or alter a
protected work, the consent of the author is needed, unless, of course, the
work is in the public domain.

2.17.   Thus, where both the original and the derivative work are protect-
ed, a double set of rights must be acknowledged.   To make use of a
translation, for example, one must obtain both the consent of the author
of the original work and that of the translator.   However, the latter may,
by contract, have been authorised by the author of the original to exploit
his work without reference back.

### Article 2, paragraph (4)

*Official Texts*

> (4) It shall be a matter for legislation in the countries of the Union
> to determine the protection to he granted to official texts of a legisla-
> tive, administrative and legal nature, and to official translations of
> such texts.

2.18.   This provision gives member countries the task of laying down the
conditions for protecting these documents.   At the Stockholm Revision
(of 1967) it was felt that this should apply not only to translations of texts
but to the texts themselves, and that it was only with regard to *official*
translations that this latitude was enjoyed.   Further it was agreed that the
reference to texts of an "administrative" nature did not allow member
countries to refuse protection to *all* Governmental publications (e.g.,
schoolbooks).   In practice it is normal for there to be no restriction on
reproducing statutes, administrative regulations and court judgments in
the original or in translation.

### Article 2, paragraph (5)

*Collections*

> (5) Collections of literary or artistic works such as encyclopaedias
> and anthologies which, by reason of the selection and arrangement of
> their contents, constitute intellectual creations shall he protected as
> such, without prejudice to the copyright in each of the works forming
> part of such collections.                     .

2.19.   Here is another category of so-called derivative works and is on all
fours with translations, adaptations, etc.   But here the Convention lays
down special conditions: the encyclopaedia, anthology or other collection
must, by reason of the selection or arrangement of its contents, be an
intellectual creation.   In other words, its maker must bring to bear an
element of creativity; merely listing the works or extracts without offering
any personal contribution is not enough.

## Article 2, paragraph (6)

*Obligation to Protect; Beneficiaries of Protection*

**(6) The works mentioned in this Article shall enjoy protection in all countries of the Union.  This protection shall operate for the benefit of the author and his successors in title.**

2.20.   This provision, introduced in its present form at the Brussels Revision (1948) bears, from the point of view of international law, some importance.  In the earlier texts, the Convention restricted itself to laying down that the countries of the Union were bound to make provision for the protection of works.  The new text provided for a protection directly founded on the Convention itself.  In almost all countries, the applicability of a treaty calls for its ratification and the promulgation, executive or legislative, thereof.

But once this has happened the Convention becomes part of that country's law: if therefore its wording is apt to confer rights directly, individuals may bring action based on the Convention itself to enforce them.  The Brussels wording (particularly in the French text—"jouissent") has this result.

2.21.   Other countries, notably those following the British legal tradition, treat Conventions as agreements between States.  Ratification does not, in itself, make any difference to individual rights enjoyed there.  The obligations imposed on such countries by the Convention must be met by legislation passed before ratification takes place (see Article 36).  It is that legislation, and not the Convention itself, that gives Convention nationals the right to sue in their courts.  The change in wording made in Brussels made no difference in such countries; the matter is governed by each country's constitutional rules.

2.22.   This paragraph also lays down that the protection is enjoyed, not only by the author, but also by his successors in title.  This term includes the heirs of the author and also those who, for whatever reason, become entitled to the copyright.

The right is not personal since it can be disposed of by contract.  The author may assign some or all of it and the assignee then enjoys the rights assigned as if he were the author.  This paragraph ensures that his heirs and assignees stand in his shoes.

### Article 2, paragraph (7)

*Works of Applied Art and Industrial Designs and Models*

> (7) Subject to the provisions of Article 7(4) of this Convention, it shall be a matter for legislation in the countries of the Union to determine the extent of the application of their laws to works of applied art and industrial designs and models, as well as the conditions under which such works, designs and models shall be protected. Works protected in the country of origin solely as designs and models shall be entitled in another country of the Union only to such special protection as is granted in that country to designs and models; however, if no such special protection is granted in that country, such works shall be protected as artistic works.

2.23.  Works of applied art appear in the non-exclusive list of protected works in the first paragraph of Article 2.  However, the Convention gives national laws the task of fixing the extent of the application of their law to such works and the conditions for their protection.

2.24.  But this latitude is limited.  In fact member countries are not given a completely free hand: they must observe a minimum term of protection for such works of applied art as they protect as artistic works (i.e., by their copyright law).  This minimum is twenty-five years from the making of the work (see paragraph (4) of Article 7).

2.25.  Reciprocity may, in this case, be demanded.  Works protected in their country of origin merely as designs or models (i.e., whose protection depends on registration) may only claim in the other countries, such protection as the latter give to their designs and models.  However—and this was a new provision in Stockholm (1967)—a country which has no special protection for designs and models must always protect works of applied art as artistic works, in other words by their copyright law, and without any formality.

### Article 2, paragraph (8)

*News of the Day and Miscellaneous Facts*

> (8) The protection of this Convention shall not apply to news of the day or to miscellaneous facts having the character of mere items of press information.

2.26.  The rationale of this provision is that the Convention does not set out to protect mere news or miscellaneous facts because such material

does not possess the qualifications necessary for it to be considered a work. On the other hand, the words used by reporters and other journalists reporting or commenting on the news are protected to the extent that they carry sufficient intellectual effort for them to be considered as literary and artistic works.

2.27.    In other words, the news and the facts themselves are not protected nor the simple telling of them, since matters of this kind lack the necessary conditions to be considered as falling into the category of literary and artistic works.  This exception merely confirms the general principle that, for a work to be protected, it must contain a sufficient element of intellectual creation.  It is a matter for the courts to judge, case by case, whether this element is sufficiently present and to decide whether the text is a story related with a measure of originality or a simple account, arid and impersonal, of news and miscellaneous facts.

2.28.    It is worth noting however that these, even if not protected by copyright, are not simply thrown to the wolves of theft and piracy.  Other means of defence may be brought into play against parasites: for example the laws of unfair competition allow for action against newspapers which filch their news from competitors rather than subscribe to news agencies.

## ARTICLE 2*bis*

*Power to Limit the Protection of Certain Works*

### Paragraph (1)

*Speeches*

(1) It shall be a matter for legislation in the countries of the Union to exclude, wholly or in part, from the protection provided by the preceding Article political speeches and speeches delivered in the course of legal proceedings.

2*bis*.1.   In Article 2*bis*, the Convention allows national laws to lay down the extent of the protection to be enjoyed by oral works.   In particular, it allows them to exclude, in whole or in part, political speeches and those made in courts of law by judges and counsel.   This provision was introduced at the Rome Revision (1928) and since then has remained unchanged.   Its justification is freedom of information.   On the other hand, the authors in question retain the exclusive right to make and publish collections of their works (see paragraph (3) of this Article).   Recent publications containing the speeches of statesmen and the pleas of eminent counsel are examples of such collections.

### Article 2*bis*, paragraph (2)

*Use of Lectures and Addresses*

(2) It shall also be a matter for legislation in the countries of the Union to determine the conditions under which lectures, addresses and other works of the same nature which are delivered in public may be reproduced by the press, broadcast, communicated to the public by wire and made the subject of public communication as envisaged in Article 11$^{bis}$(1) of this Convention, when such use is justified by the informatory purpose.

2*bis*.2.   This provision also leaves member countries free to lay down their own rules on the protection of these oral works.   Its scope was enlarged at the Stockholm Revision so as to take account not merely of the written press but also of radio and television news bulletins.   Since then lectures, addresses and other works of the same kind may be reproduced not only by the press but by other modern communications media.

2*bis*.3.   However, certain limitations are laid down: to be free, these works must have been delivered in public.   Further, the use must be

justified by the informatory purpose. The subject matter of the lecture, etc., need not itself be news, if the intention is to allow the public to be informed of what was said by the lecturer. For example, a broadcast talk about a great writer of the seventeenth century may fall within this paragraph even though its subject is no more. It is worth noting that sermons, which appear in the list in Article 2(1), were removed from the scope of this provision in Stockholm (1967).

2*bis*.4.   As with political and legal speeches, these lectures, addresses, etc., can only be printed in collection with their respective author's consent (see below).

### Article 2*bis*, paragraph (3)

*Collections*

**(3) Nevertheless, the author shall enjoy the exclusive right of making a collection of his works mentioned in the preceding paragraphs.**

2*bis*.5.   The reason for this provision is worth explaining. At the Brussels Revision (1948), the point was made that to give the authors of the works in question an exclusive right in no way hampered the reporting of political meetings and legal proceedings. To allow others to make and to publish collections of them was scarcely justified on the ground of freedom of information.

## ARTICLE 3

*Conditions for Protection; Points of Attachment*

3.1.   This Article contains the first of a number of provisions whose object is to lay down the points of attachment of the Convention, i.e., the conditions to be fulfilled if protection is to be enjoyed under it. A fundamental change was made in Stockholm in 1967: whereas the previous (Brussels) Act (1948) contained only the geographical criterion (place of first publication of a work), the 1967 Revision added a personal criterion (that of the nationality of the author or his habitual residence) for published works as well as for unpublished ones. The result is that from now on the Convention protects the works of authors who are nationals of the countries of the Union (or have their habitual residence in one of them), whether published or not and wherever first published—either in a Union country or elsewhere. Having made this general point one can consider the details.

### Article 3, paragraph (1)

*Nationality of the Author and Place of Publication of the Work*

(1) The protection of this Convention shall apply to:

(a) authors who are nationals of one of the countries of the Union, for their works, whether published or not;

(b) authors who are not nationals of one of the countries of the Union, for their works first published in one of those countries, or simultaneously in a country outside the Union and in a country of the Union.

3.2.   This paragraph gives the benefit of protection to:

(a) authors who are nationals of a country of the Union for their works, published or unpublished: the point of attachment is the nationality of the author (personal criterion):

(b) authors who are not nationals of a country of the Union but who publish their works for the first time in one of those countries or arrange that the publication of their works takes place simultaneously in a country outside the Union and in a Union country: the point of attachment is the place of first publication (geographical criterion).

3.3.   In the first case, only the nationality of the author counts; in the second, one must consider where the work was published for the first time.

### Article 3, paragraph (2)

*Residence of the Author*

> (2) Authors who are not nationals of one of the countries of the Union but who have their habitual residence in one of them shall, for the purposes of this Convention, be assimilated to nationals of that country.

3.4.   The personal criterion has two legs: nationality and habitual residence.  This provision assimilates to authors who are nationals of a Union country those who, not being such nationals, are nevertheless habitually resident in such a country.  The idea of habitual residence was preferred to that of domicile because ideas on the latter vary from country to country, whereas the former poses only a question of fact for the courts before which disputes come, namely the extent to which the author has lived in a certain place.  Note that this paragraph covers the special case of stateless persons and refugees.

### Article 3, paragraph (3)

*Definition of Published Works*

> (3) The expression "published works" means works published with the consent of their authors, whatever may be the means of manufacture of the copies, provided that the availability of such copies has been such as to satisfy the reasonable requirements of the public, having regard to the nature of the work.  The performance of a dramatic, dramatico-musical, cinematographic or musical work, the public recitation of a literary work, the communication by wire or the broadcasting of literary or artistic works, the exhibition of a work of art and the construction of a work of architecture shall not constitute publication.

3.5.   This definition of the expression "published works" was brought up to date at the Stockholm (1967) Conference. Two important changes were made, one concerning the way in which a work is brought to public notice and the other making it clear that the author's consent is required.

3.6.   The Brussels Act spoke of copies of the work being made available in sufficient quantities to the public.  Experience has shown that this wording was too restrictive: for example, cinematograph films are not, unlike books and magazines and papers, placed on sale.  The audience takes them in by means of their projection without ever having the cellu-

loid in their possession. Again the orchestral parts of symphonies, often printed in small numbers, are lent to and not bought by the concert impresarios. A more elastic formula was therefore adopted: the availability of the copies must be such as to satisfy the reasonable requirements of the public. But this wording does not go so far as to allow abuse: it is not enough to show, in the window of a single bookshop, a dozen copies of a book which has enjoyed massive success in some other country outside the Union. Again, a single copy of a cinematographic work sent to a festival to be shown before a restricted audience does not meet the conditions. In neither case are the reasonable requirements of the public satisfied.

3.7. The definition ends with the words "having regard to the nature of the work"; the purpose is to take account of the differences which exist between works intended to be bought in bookshops, magazines distributed to subscribers and films which, unlike commercial records, are not placed on public sale. It is enough that the latter should be placed by their makers at the disposal of the exhibitors. The copies need not be sold: the availability to the public may be by means of renting or loan, or even the free distribution of copies.

3.8. The second addition to this paragraph is the need for the consent of the author of the work, the purpose being to disregard any publication which is itself an infringement. If for example a stolen manuscript was published without consent it would not be right that this should have the effects which flow, according to the Convention, from the act of publication, including marking the country of publication as the country of origin of the work. Again, the need for the consent of the author allows one to refuse to consider as published a work of which the copies were made under a compulsory licence.

3.9. The paragraph specifically names certain acts which do not constitute publication, namely performance, public recitation, communication by wire, broadcasting, exhibition of a work of art, the construction of a work of architecture. These produce only a fleeting impression of the work, whereas publication involves the distribution of material things (books, discs, films, etc.). For a work to be published there must exist something tangible embodying it, as is clear from the mention, in this paragraph, of the means of manufacture of the copies, and these tangible things must, in principle, be something one can hold in one's hand.

## Article 3, paragraph (4)

### *Definition of Simultaneous Publication*

> **(4) A work shall be considered as having been published simultaneously in several countries if it has been published in two or more countries within thirty days of its first publication.**

3.10.   Since the first paragraph of Article 3 allows, in the geographical criterion (place of first publication of a work) for the case in which the work is simultaneously published in two countries of which one is a Union country, one has to define what is meant by "simultaneous". A liberal interpretation of this word was adopted at Brussels (1948). Later publications within thirty days of the first one are considered as having been made simultaneously with it for the purpose of Convention protection.

3.11.   These are the points of attachment provided for in Article 3, on the basis of a personal criterion and a geographical one. As regards the first it is worth remembering that both nationality and particularly habitual residence of an author may change from time to time, and the question may arise of the moment at which one applies this criterion if protection is to be accorded. Three obvious possibilities are: the date of making of the work; the date of its first being made available to the public; or the date on which protection is claimed. The Convention is silent. If national laws are equally silent, the courts must, if need arises, make their own choice.

## ARTICLE 4

*Subsidiary Criteria*

The protection of this Convention shall apply, even if the conditions of Article 3 are not fulfilled, to:

(a) authors of cinematographic works the maker of which has his headquarters or habitual residence in one of the countries of the Union;

(b) authors of works of architecture erected in a country of the Union or of other artistic works incorporated in a building or other structure located in a country of the Union.

4.1.  By using the opening formula "even if the conditions of Article 3 are not fulfilled" the Convention gives to these criteria a subsidiary character.

4.2.  This provision first covers cinematographic works which are not published, in the sense of Article 3, in a country of the Union, and of which the authors do not have the nationality of one of its countries nor habitual residence there. In this case it is enough that the maker, if a legal entity such as a film production company, has its headquarters, or, if an individual, has his habitual residence, in a country of the Union.

4.3.  It was stressed at the Stockholm Revision (1967) that, by adding the country of the maker as a supplementary point of attachment, more films were protected, and that this enlargement of the protection was in the interest of the authors as well as of the makers. Again, television broadcasts are only made available to the public by wireless waves, and are never published in the sense of Article 3, paragraph (3). Televisual work is therefore an unpublished work and only falls within the Convention if its authors are nationals of a Union country or have their habitual residence there. But this subsidiary point of protection allows such a work to enjoy the protection of the Convention.

4.4.  It is worth noting that paragraph *(a)* of Article 4 does not speak of the nationality of the maker or that of the producing company: it sticks only to habitual residence (and not domicile for the reasons given above) or the headquarters, in order to avoid all dispute about the nationality of legal entities, as well as to make it clear that the "maker" for this purpose may be such an entity.

4.5.  It has incidentally been agreed that, in the case of coproduction (common in the case of both cinema and television films), it is enough, for

the work to enjoy protection, that one of its makers has his habitual residence or headquarters in the Union country.

4.6.   Secondly, Article 4 deals with works of architecture and other artistic works which do not satisfy the conditions of Article 3 (that is to say whose authors are neither nationals of nor resident in a Union country and which have not been published there in the sense of that Article). They nevertheless fall to be protected under the Convention if, as to the first, they have been erected in a country of the Union or, as to the second, they have been incorporated in a building or other structure located in such a country.

4.7.   The point was made during the Stockholm Revision of 1967 that this subsidiary criterion of place only applies to the original of the work in question.  In other words no protection can be claimed if merely a copy of the work has been erected in a Union country and the original remains outside it.

## ARTICLE 5

*National Treatment; Automatic Protection;*
*Independent Protection; Country of Origin*

5.1.   This Article sets out the fundamental principles on which the Convention is based; these are the pillars which hold the building up and determine the structure of protection.

### Article 5, paragraph (1)

*Principle of National Treatment*

> **(1) Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this Convention.**

5.2.   This provision treats foreigners in the same way as nationals as regards the protection of their works.  In other words, works which have a country of origin (according to the definition given in paragraph (4) of Article 5) which is a Union country, benefit, in all other Union countries, from the same protection as the latter give to the works of their own nationals.  For example, if the copyright in a work by a Senegalese author, published for the first time in the Ivory Coast, is infringed in France, this author and his successors in title must be treated in France as if the work were one made by a French author and published on French territory.

5.3.   One must not misunderstand the meaning of this assimilation; it does not in itself mean identity of treatment in all member countries since the scope of protection varies from one country to another.  For example, many countries have no law protecting the artist's "droit de suite".  Artists who are nationals of countries recognising this right do not enjoy it in countries which do not.  However, with a view to narrowing the differences between national laws, paragraph (1) of Article 5 includes in the assimilation "the rights especially granted by this Convention".  That is to say the rules laid down according to the minima prescribed in the Convention.

5.4.   Authors who are Union nationals are promised protection in all Union countries and have a guarantee that they will enjoy all the rights

which the Convention expressly gives them. Over and above this, they must be treated in all Union countries at least as well as national authors.

### Article 5, paragraph (2)

*Automatic Protection and Independence of Protection*

(2) The enjoyment and the exercise of these rights shall not be subject to any formality; such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work. Consequently, apart from the provisions of this Convention, the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed.

5.5. Here appear the other fundamental principles of the Convention. First and foremost, protection may not be made conditional on the observance of any formality whatsoever. The word "formality" must be understood in the sense of a condition which is necessary for the right to exist—administrative obligations laid down by national laws, which, if not fulfilled, lead to loss of copyright. Examples are: the deposit of a copy of a work; its registration with some public or official body; the payment of registration fees, or one or more of these. If protection depends on observing any such formality, it is breach of the Convention. However, what is at issue here is the recognition and scope of protection and not the various possible ways of exploiting the rights given by the law. Member countries may, for example, prescribe model contracts governing the conditions of the utilisation of works without this being considered a formality. What one must look at is whether or not the rules laid down by the law concern the enjoyment and exercise of the rights.

5.6. The provision only relates to rights which are claimed by virtue of the Convention. This automatic protection, free of any formality whatsoever, exists independently of any protection that the work enjoys in its country of origin. In fact, such country remains absolutely free to subordinate the existence or exercise of the rights on that work in that country to such conditions or formalities as it thinks fit: it is purely a matter of domestic law. But, outside the country of origin, a Union author may demand protection throughout Union countries free of the need to comply with any formality there, and even without being obliged to prove compliance with any formalities demanded in the country of origin of his work.

5.7. The paragraph goes on to say that, apart from the specific provisions of the Convention (the Conventional minima), the extent of the

protection is governed exclusively by the laws of the country where pro-
tection is claimed. This calls for some explanation. As in the case of
formalities, what is envisaged is the enjoyment of the rights, their scope
and duration. True, the term of a contract or the method of remunera-
tion of the author may not necessarily be exactly that of the law of the
country where protection is claimed if the contracting parties agree that
some other law should apply. Again, when it comes to litigation, an
author suffering infringement usually picks a court in the country in
which his rights were infringed; but he may perhaps prefer to seek justice
in some other country by reason, for example, of the existence in that
country of assets belonging to the defendant, seizure of which would
allow him to satisfy any damages awarded. In such cases it would be a
matter for the courts to apply the appropriate provisions of private inter-
national law to resolve any conflict that arises.

### Article 5, paragraph (3)

*Protection in the Country of Origin*

> (3) Protection in the country of origin is governed by domestic
> law. However, when the author is not a national of the country of
> origin of the work for which he is protected under this Convention,
> he shall enjoy in that country the same rights as national authors.

5.8. This paragraph makes protection within the country of origin a
matter for the domestic law of that country. This is true whether the
author is a national of that country or not. In either case he must be
treated in the same way as a national of that country. It is possible for
example that the law of the place of first publication distinguishes between
those of its nationals who first publish within the country and those who
do not, and protects only the former category. Such discrimination can-
not be applied to a foreigner (he is not a national of the country of origin
of the work) who first publishes his work in that country (protection by
reason of Article 3(1)(b) of the Convention); the national law applies to
him; he must be treated like a national notwithstanding that the latter,
had *he* published abroad, would not have had the same advantage.

5.9. In short, the protection in the country of origin of a work where the
author is a national of that country is governed exclusively by the national
legislation; the Convention offers no protection whatsoever. So far as
other authors are concerned, these are assured of national treatment.

### Article 5, paragraph (4)

*Definition of the Country of Origin of a Work*

(4) The country of origin shall be considered to be:

*(a)* in the case of works first published in a country of the Union, that country; in the case of works published simultaneously in several countries of the Union which grant different terms of protection, the country whose legislation grants the shortest term of protection;

*(b)* in the case of works published simultaneously in a country outside the Union and in a country of the Union, the latter country;

*(c)* in the case of unpublished works or of works first published in a country outside the Union, without simultaneous publication in a country of the Union, the country of the Union of which the author is a national, provided that:

  (i) when these are cinematographic works the maker of which has his headquarters or his habitual residence in a country of the Union, the country of origin shall be that country, and

  (ii) when these are works of architecture erected in a country of the Union or other artistic works incorporated in a building or other structure located in a country of the Union, the country of origin shall be that country.

5.10.   This provision is the keystone which supports the fundamental principles under consideration.   Articles 3 and 4 of the Convention have set out the points of attachment, principal and subsidiary respectively. The first three paragraphs of Article 5 have laid down the consequences of attachment: national treatment free of formality and independence of protection.   Now come the paragraphs which determine the country of origin and which thus complete the rules governing entitlement to protection.

5.11.   Protection in the country of origin is, as one has seen, regulated by the law of that country: consider the case of a work published in India by an Indian author; no foreign element is involved.   It is natural that the Convention should not deal with this case since its sole purpose is to regulate international relations and resolve international difficulties which might arise between countries of the Union over the exploitation of works.

5.12.   As has been seen, there are a number of points of attachment. Some are easy to apply, for example works published by nationals of

countries of the Union, unpublished works whose authors are such nationals, works published by foreigners but in a country of the Union, etc. However it may happen that a work is protected by the Convention under several different heads concurrently: an author of British nationality who has his habitual residence in the Netherlands, publishes one of his works in the United States of America (a non-Union country). Thanks to the introduction in Stockholm (1967) of new points of attachment, the work is protected by the Convention both because of the author's nationality and of his habitual residence, whatever the place of first publication. Again, as to cinematographic works, those unable to claim protection on grounds of nationality or place of publication can nevertheless do so if the maker has his headquarters or his habitual residence in the Union.

5.13.   These extensions of the Convention's field of application have consequences as to the country of origin of works. This paragraph identifies three cases.

5.13.*(a)   works protected by the Convention by virtue of the geographical criterion (place of first publication) and published only within the Union*: country of origin is the country of the Union where the work was first published. Place of publication (geographical criterion) prevails over the nationality or the habitual residence (personal criteria): a Belgian author or one habitually resident in Belgium first publishes his work in the German Federal Republic; the country of origin is the latter country. The Convention also covers "simultaneous" publication i.e., within thirty days of the first. If the work is simultaneously published in several countries of the Union the country of origin is that whose legislation grants the shortest term of protection.

Note that the Convention assumes differing terms of protection in the two countries. It does not cover simultaneous publication in several countries each with the same term (the point is not academic since most countries have adopted the minimum laid down in Article 7). It seems that, here, courts must, if need be, decide, on the basis, for example, of the exact date of the various publications or perhaps the size of one edition as against the other. But the point may be only of academic importance in another sense. In the great majority of cases, the country of origin is only of importance to determine the term of protection, and, in the above hypothesis, all terms are the same.

5.13.*(b)   works protected by the Convention by virtue of the geographical criterion (place of first publication) and published simultaneously within and outside the Union:* in this case the country of the Union prevails over the other to decide which is the country of origin of the work.

5.13.*(c)    works protected by the Convention by virtue of the personal criterion* *(nationality or habitual residence) which are unpublished or first published* *outside the Union:* the Convention lays down that the country of origin is the country of the Union of which the author is a national. Note that this provision only takes into consideration the nationality of the author and not the other aspect of the personal criterion, that of habitual residence. Take the case of an author who, without being a national of a country of the Union, nevertheless habitually resides there. Should the same rule be applied here to decide the country of origin of his unpublished works as those first published in a country outside the Union without simultaneous publication within? It seems that the answer is yes, because this paragraph assimilates habitual residence to nationality for all purposes of the Convention, and one can therefore assume that the country of origin is that of his habitual residence when he is not a national of a Union country. Of course unpublished works of authors who are neither Union nationals nor residents remain outside the protection of the Convention altogether.

5.14.    Paragraph (4)*(c)* lays down two exceptions to the normal rules applicable to unpublished works or those first published outside the Union.

5.14.(i)    The first deals with cinematographic works and is the logical corollary to the new point of attachment introduced in the Stockholm Act (1967). The country of origin is determined by the headquarters or habitual residence of the maker; this general formula prevails over the other personal criterion, nationality or habitual residence of the author. The reason is that films by their nature are often works in which several authors collaborate; the use of a personal criterion would produce confusion if these had different nationalities or residence, as is often the case. Note, however, this only applies to unpublished works or those first published outside the Union. If the work is first, or simultaneously, published in a Union country the general rules of paragraphs (4)*(a)* and *(b)* apply. This exception merely recognises that films are often unpublished and, if the country of origin were to depend on the nationality of the many co-authors, this would give rise to legal confusion whereas basing this on the maker (as in the points of attachment) makes for much more clarity.

5.14.(ii)    The second exception is for works of architecture and other artistic works incorporated in a building. As with films, it concerns monuments, buildings, statues and frescoes which are unpublished or first published in a non-Union country. The nationality of the architect or artist (or his habitual residence) are immaterial; the country of origin is the Union country in which a work of architecture is erected or the other work located. In the unlikely event that publication, in the sense of Article 3(3),

has taken place in a Union country, the ordinary rules of paragraph (4)*(a)* and *(b)* apply.

5.15.   These are the rules whereby the Convention determines the country of origin of a work.  The matter is of importance when considering the term of protection (see paragraph (8) of Article 7).

.

## ARTICLE 6

*Possibility of restricting protection in the case of*
*works made by nationals of certain non-Union countries*

6.1. This provision allows Union countries to retaliate against non-Union countries. First added as a protocol in 1914, it was included in the Convention proper in the Rome Revision (1928). Since then its wording has remained unchanged except for some drafting changes in Stockholm (1967).

### Article 6, paragraph (1)

*In the country of first publication and in the other countries*

> (1) Where any country outside the Union fails to protect in an adequate manner the works of authors who are nationals of one of the countries of the Union, the latter country may restrict the protection given to the works of authors who are, at the date of the first publication thereof, nationals of the other country and are not habitually resident in one of the countries of the Union. If the country of first publication avails itself of this right, the other countries of the Union shall not be required to grant to works thus subjected to special treatment a wider protection than that granted to them in the country of first publication.

6.2. This is an attempt to preserve the unity of the field of application of the Convention and to this end to allow the taking of reprisals against a country outside the Union which does not give adequate protection to the works of Union authors. Its aim is to avoid, so far as possible, nationals of countries situated on the verge of the Union profiting from the fact that the Convention assimilates foreigners to nationals, by the device of publishing their works simultaneously in their own and in a Union country, where the protection offered by their own national law to Union authors is less than the minima laid down in the Convention or insufficient to offer reciprocity. The national treatment principle is thus, to this extent, modified by a condition of reciprocity.

6.3. For example a work is published in Spain by a national of a Latin-American country which is not a member of the Union and which does not protect in an adequate manner the works of Spanish nationals, and the author is resident neither in Spain nor any other Union country. In this case the Spanish Government may "restrict the protection" of works whose authors are nationals of that country. If it does so, the other

Union countries are not compelled to give such works any wider protection than they get in Spain.

6.4.    Obviously this is a delicate question since it is the country which takes the reprisals which decides whether the protection offered to its nationals is sufficient in the country discriminated against, both as to the scope of the protection and the results in practice.

6.5.    It is worth noting that this sanction permits only the *restriction* of protection and not its complete refusal.    A country therefore which refuses protection altogether goes further than the Convention allows.

### Article 6, paragraph (2)

#### *No Retroactivity*

> **(2) No restrictions introduced by virtue of the preceding paragraph shall affect the rights which an author may have acquired in respect of a work published in a country of the Union before such restrictions were put into force.**

6.6.    This optional restriction must respect rights acquired before it was applied.    It cannot be retroactive.

### Article 6, paragraph (3)

#### *Notification*

> **(3) The countries of the Union which restrict the grant of copyright in accordance with this Article shall give notice thereof to the Director General of the World Intellectual Property Organization (hereinafter designated as "the Director General") by a written declaration specifying the countries in regard to which protection is restricted, and the restrictions to which rights of authors who are nationals of those countries are subjected. The Director General shall immediately communicate this declaration to all the countries of the Union.**

6.7.    Given the effect that such reprisals may have on inter-Union relationships, it is natural for all Union countries to be informed.    The Convention therefore demands that a country which takes them must notify the Director General of WIPO who then alerts the other Union countries. The notice must specify the country or countries in question and the restrictions imposed on their nationals.

6.8.    So far, diplomatic niceties have prevented any Government from making use of this facility.    Nevertheless this legal weapon remains available to member countries.

## ARTICLE 6*bis*

### *Moral Right*

6*bis*.1.   This Article, introduced into the Convention in Rome (1928), is an important provision since it underlines that, in addition to pecuniary or economic benefits, copyright also includes rights of a moral kind. These stem from the fact that the work is a reflection of the personality of its creator, just as the economic rights reflect the author's need to keep body and soul together.

6*bis*.2.   The opening of Article 6*bis*, which has remained unchanged, apart from a slight drafting amendment in Brussels (1948), lays down that the Convention covers this "moral right" or rights.

### Article 6*bis*, paragraph (1)

### *Contents of the Moral Right*

> (1) Independently of the author's economic rights, and even after the transfer of the said rights, the author shall have the right to claim authorship of the work and to object to any distortion, mutilation or other modification of, or other derogatory action in relation to, the said work, which would be prejudicial to his honor or reputation.

6*bis*.3.   This provision enshrines two of the author's prerogatives: first and foremost, to claim the paternity of his work—to assert that he is its creator.  Usually he does so by placing his name on the copies (title pages or fly leaves, film subtitles, signatures on pictures, sculpture).  This right of paternity may be exercised by the author as he wishes; it can even be used in a negative way i.e., by publishing his work under a pseudonym or by keeping it anonymous, and he can, at any time, change his mind and reject his pseudonym or abandon his anonymity.  Under it, an author may refuse to have his name applied to a work that is not his; nor can anyone filch the name of another by adding it to a work the latter never created.  The right of paternity is exercisable even against those permitted by the Convention to reproduce the work or to take extracts from it; the author's name must be mentioned (see Article 10, paragraph (3)).

6*bis*.4.   The second prerogative is that of objecting to any distortion, mutilation or other modification of, or other derogatory action in relation to, the work which would be prejudicial to the author's honour or reputation. This is sometimes called the "right of respect". The formula is very elastic and leaves for a good deal of latitude to the courts.

6*bis*.5.   Generally speaking, a person permitted to make use of a work (for example by reproducing or publicly performing it) may not change it either by deletion or by making additions. A producer may not, on his own authority, delete several scenes from a play nor a publisher strike out chapters from a narrative. The problem becomes more delicate when it is a case of adaptation: for example when writing a play or making a film from a novel, one cannot insist that the adaptor sticks strictly to the text. Means of expression differ and the change to stage or screen calls for modifications. But the adaptor's freedom is not absolute; this "right of respect" allows the author to demand, for example, the preservation of his plot and the main features of his characters from changes which will alter the nature of the work or the author's basic message. The Convention speaks of prejudice to his honour or reputation. The formula is very general. The author must decide whether the fact that the text was, during its adaptation to the theatre or screen, given a slightly pornographic twist to meet the taste of some members of the audience, ruined his reputation as a serious author or, on the contrary, gave his work a flavour more suitable to meet the customs of a later age. But it remains, for all that, with the right of paternity, an important facet of the moral right.

6*bis*.6.   Note that the moral right exists "independently of the author's economic rights" and even "after the transfer of the said rights". This protects the author against himself and stops entrepreneurs from turning the moral right into an immoral one. Indeed some laws expressly lay down that the moral right cannot be assigned and that the author may not waive it. However, on this point, too, the courts have some freedom of action. At the Brussels Revision (1948) there was added in this first paragraph, the words "or other derogatory action in relation to the said work" to emphasize that it is not only distortion, mutilation or modification which may damage the author's honour or reputation.

6*bis*.7.   At the Rome Revision (1928) which introduced the moral right into the Convention, a proposal was made to add, in addition, "The right to decide whether the work shall be made public". This is generally known as "the right of divulgation" and was intended to lay down that the author has the sole right to decide whether, and in what form, his

work shall be presented to the public. This right of divulgation shields the author against, for example, creditors proceeding against him for non-payment of the rent of his apartment and levying execution on a manuscript in order to publish it. Again it allows a dramatist to try out his work in book form before submitting it to the glare of the footlights. Yet again, the composer of a symphony might wish to give his work exclusively to an orchestra of world-wide reputation before it is launched upon the sea of commercial records. However, since opinions differed, some laws recognising the right expressly while others left it to the courts, the proposal to add this to the Convention was dropped and later revisions have not revived it.

### Article 6*bis*, paragraph (2)

#### *The Moral Right after the Death of the Author*

(2) The rights granted to the author in accordance with the preceding paragraph shall, after his death, be maintained, at least until the expiry of the economic rights, and shall be exercisable by the persons or institutions authorized by the legislation of the country where protection is claimed. However, those countries whose legislation, at the moment of their ratification of or accession to this Act, does not provide for the protection after the death of the author of all the rights set out in the preceding paragraph may provide that some of these rights may, after his death, cease to be maintained.

6*bis*.8.    This provision, emerging in its present form from the discussions in Stockholm (1967), marks a profound change in the term of the protection given to the moral right from that in earlier Convention texts. The words "during his lifetime", which appeared in the Brussels (1948) Act, were deleted from paragraph (1) and thenceforth the moral right extended beyond the author's death and continued "at least until the expiry of the economic rights" (see paragraph (2)). Whereas in the version before 1967 this extension was merely a possibility it now became an obligation of the Convention. Moreover, the use of the words "at least", makes it clear that it is a minimum obligation and nothing stops national laws providing perpetual protection. However, the Convention, dealing as it does with private rights, does not go so far, since in a number of countries the protection and preservation of monuments, buildings and other articles of national culture is a matter of public law.

6*bis*.9.    Paragraph (2) of Article 6*bis* allows national legislation where protection is claimed to determine the persons or institutions which can exercise the rights under the moral right after the death of the author or the end of the economic rights.

6bis.10.   But the paragraph also includes an exception which is the result of a compromise come to during the Stockholm Revision of 1967.  This provides that those countries whose legislation at the moment of their ratification of, or accession to, the new text (now the Paris Act 1971, although, on this point, it is unchanged from Stockholm) does not provide for the protection, after the death of the author, of all the rights set out in paragraph (1) may provide that some of these rights may, after his death, cease to be maintained.  This provision takes account of the practice of member countries with an Anglo-Saxon legal tradition, according to which the protection of the moral right is mainly a matter for the common law, and, in particular the law of defamation.  This does not normally permit the bringing of an action after the death of the person defamed.

6bis.11.   For this reason, the Convention, though stipulating that a complete extinction of the moral rights on the death of the author is not permitted, allows the Union countries to permit one or other of the rights comprising the moral right to lapse, after this date.  For example, such a country may keep only the right of paternity, the other (that of forbidding modifications to the work) being left to the courts.  Although the general rule is thus weakened by an exception, the present Text of Article 6bis nevertheless represents a marked improvement over the pre-Brussels Act from the point of view of those upholding the moral right.  Under the earlier text, the latter countries of the Union had no obligation to protect any element of it beyond death of the author, whereas from now on they must do so, at least until the extinction of the economic rights.

### Article 6bis, paragraph (3)

*Means of Redress*

> (3) The means of redress for safeguarding the rights granted by this Article shall be governed by the legislation of the country where protection is claimed.

6bis.12.   This provision has not been changed since the Rome Revision (1928): it is the usual reference back to the legislation of the country where protection is claimed.  It deals with the means of redress (civil suits or criminal prosecutions) enjoyed by the author or his successors in title or by those persons or institutions to whom the law has given power to restrain breaches of the moral right.  Although the Convention does not say so, this national law will also determine the sanctions (seizure, damages, etc.).

# ARTICLE 7

*Term of Protection*

7.1. This Article, which was introduced at the Berlin Revision (1908) is one of the cornerstones of the Convention and offers, internationally, a compromise between the rights enjoyed by the author's successors in title and those of the public at large.

## Article 7, paragraph (1)

### General Rule

**(1) The term of protection granted by this Convention shall be the life of the author and fifty years after his death.**

7.2. This provision lays down a minimum binding on all countries of the Union, it was at Brussels (1948) that it became a Convention obligation. Nothing stops the member countries going further and extending for more than fifty years the period after the author's death. There have been moves in favour of such extensions; it started with the adoption, in some countries, of measures extending copyright to compensate for loss of the opportunity to exploit it during a period of hostilities (now known as "wartime extensions"). These differed from one country to another, and bilateral agreements were concluded between former enemies and countries which, although neutral, had felt the cold winds of the battlefields. This has however resulted in a hotch-potch of legal rules and factual situations and there therefore arose a widespread desire for a universally agreed extension of a permanent nature; it found its echo in the recommendation adopted at the Stockholm Conference (1967). After reciting that some countries already gave a term in excess of fifty years after the death of the author, and having noted the exceptional cases of extensions by means of bilateral agreements, this expressed the hope that negotiations leading to the conclusion of a multilateral arrangement on the prolongation of the term of protection should be pursued between the countries concerned. However this recommendation has not so far been followed up.

7.3. This minimum of fifty years after the death of the author remains the term adopted by the majority of countries, including one large country outside the Union (the United States of America) which, in the recent revision of its copyright laws, has abandoned the idea of making copy-

right depend on the period which ran from the date of publication in order to rally to this minimum standard. By computing the term of protection from the date of the author's death, the Convention binds the work to its creator. Honest men can differ on how long this should be: some feel it should be for ever since the nature of the work of the mind remains, throughout the ages, a reflection of the character of its creator. Like a fine piece of furniture, it gives pleasure to generation upon generation. But the particular nature of intellectual property, resulting in a need, in the interests of the public at large, for it to be made known without let or hindrance for the enrichment of culture, suggest some limit on the duration of the monopoly enjoyed by authors and their heirs in the exploitation of their works.

7.4.   It is not merely by chance that fifty years was chosen. Most countries have felt it fair and right that the average lifetime of an author and his direct descendants should be covered, i.e., three generations. Clearly the justice of the period varies; it depends always on the length of the author's life and the difference between cases in which he is cut off in his youth or becomes a centenarian cannot be avoided. But it is generally felt normal to add to the author's lifetime a period long enough to allow his heirs to profit from his work while they remember him. Experience has shown that, when an author is dead, his works sometimes fall into a sort of limbo from which they may or may not emerge some time later. In any case, apart, perhaps, from books and certain dramatico-musical works, modern means of exploiting works often make the length of the term of copyright of little financial importance to the users: the latter negotiate blanket licences with the authors' representatives to use large repertoires and normally the lapse into the public domain of any given work makes little difference to the amount they pay. For all these reasons, this minimum period laid down in the Convention seems to provide a fair balance between the interests of authors and the need for society to have free access to the cultural heritage which lasts far longer than those who contributed to it.

### Article 7, paragraph (2)

*Term of Protection for Cinematographic Works*

(2) However, in the case of cinematographic works, the countries of the Union may provide that the term of protection shall expire fifty years after the work has been made available to the public with the consent of the author, or, failing such an event within fifty years from the making of such a work, fifty years after the making.

7.5.  This paragraph is the first of a number of provisions regulating the term of protection for particular works. These provide a number of exceptions to the general rule. As regards cinematographic works the Stockholm Revision (1967) made an important change from the earlier Brussels Act (1948). According to Article 7(3) of the latter, the countries of the Union were free to fix this term as they wished, comparison being made in international relations between the law of the country of origin and that of the country where protection was claimed. It was stressed, during the preparatory work, that this was anomalous, since films are capable of preserving their value after quite long periods of time, and therefore call for a period of protection as long as works generally. As to the commencing date, it became clear that to use for this purpose the author's death (or rather that of the last surviving co-author since films are almost always works of collaboration) or even that of the copyright owner (where the maker of the film is so considered) is not without difficulty in practice.

7.6.  The Stockholm (1967) Revision and the later Paris (1971) Revision therefore, without changing the general principle of fifty years after the author's death, allowed member countries to provide that the term for cinematographic works should expire fifty years after they were made available to the public. Note that this idea of availability to the public is more restrictive than that of publication (Article 3(3)) since it includes not only the provision of copies of films for showing to the public but also the showing itself whether in cinemas or on television. This must be "with the consent of the author": it was thought wrong that a showing to which the author had never agreed should set the running of the term in motion.

7.7.  However, the Convention goes further: if a country dates protection from the moment of first making available to the public, it can also provide that, if this does not happen within fifty years of the making of the work, the copyright will then expire. The purpose is to avoid excessively long protection or even, in the unlikely event that the work is never shown in the cinema or on the television screen, a perpetual copyright.

### Article 7, paragraph (3)

*Term of Protection for Anonymous and Pseudonymous Works*

> (3) In the case of anonymous or pseudonymous works, the term of protection granted by this Convention shall expire fifty years after the work has been lawfully made available to the public. However, when the pseudonym adopted by the author leaves no doubt as to his identity, the term of protection shall be that provided in paragraph (1). If the author of an anonymous or pseudonymous work discloses his identity during the above-mentioned period, the term of protection applicable shall be that provided in paragraph (1). The countries of the Union shall not be required to protect anonymous or pseudonymous works in respect of which it is reasonable to presume that their author has been dead for fifty years.

7.8. The substance of this provision was in the Brussels Act (1948) but the Stockholm Revision (1967) added some clarifications which are worth noting. With anonymous and pseudonymous works, the author's identity is usually unknown and the term cannot therefore be sensibly based on the date of his death. In the earlier text it was the date of publication which was used. However, using the formula of the previous paragraph, the Stockholm Revision (1967) substituted the idea of making available to the public, using, however, the word "lawfully" instead of requiring the consent of the author. This was in order to include works of folklore which might be made publicly available by a public authority (see paragraph (4) of Article 15) whose action is clearly lawful even if not necessarily taken with the author's consent.

7.9. This paragraph however takes one back to the general principle of paragraph (1) (fifty years after the death of the author) in two cases: first, when the pseudonym adopted by the author leaves no doubt about his identity (a question of fact) and secondly when the author of an anonymous or pseudonymous work decides to reveal his identity within fifty years of the work being made public.

7.10. Finally this provision allows member countries to refuse protection to anonymous and pseudonymous works if it is reasonable to presume that their author has been dead for fifty years. This latitude, added in Stockholm (1967) avoids the need to grant a perpetual copyright to works which, being without a named or identifiable author, have never been made publicly available. By allowing for this eventuality, the Convention is no stumbling block to the publication of ancient manuscripts or works of art whose authors are unknown, provided there is good reason to suppose they have been dead for fifty years.

## Article 7, paragraph (4)

*Term of Protection for Photographs and Works of Applied Art*

> (4) It shall be a matter for legislation in the countries of the Union to determine the term of protection of photographic works and that of works of applied art in so far as they are protected as artistic works; however, this term shall last at least until the end of a period of twenty-five years from the making of such a work.

7.11.   This provision gives to national legislation the task of settling the term of protection for these two special categories of works: however, since the Stockholm Revision of 1967, it fixes a minimum: twenty-five years from the date of their making.   This term is the result of a compromise arising from the differences between Union countries as to those works of applied art which fall to be protected by copyright and those protected only as designs or models (usually by registration).   As to photographs, the doubts about whether they really merit being treated as works of art were stilled by the adoption of this same minimum for them.

## Article 7, paragraph (5)

*Starting Date for Terms of Protection*

> (5) The term of protection subsequent to the death of the author and the terms provided by paragraphs (2), (3) and (4) shall run from the date of death or of the event referred to in those paragraphs, but such terms shall always be deemed to begin on the first of January of the year following the death or such event.

7.12.   With a view to simplification, this provides that the various terms only commence to run on the first January of the year after that in which the author died or the event which sets the term running (making available to the public or making) taking place.   Clearly in extreme cases (the author dying on 2nd January) this may extend the duration by a whole year; but a uniform starting point is preferable, for practical reasons, to precise dates.

## Article 7, paragraph (6)

*Possibility of Longer Terms*

> (6) The countries of the Union may grant a term of protection in excess of those provided by the preceding paragraphs.

7.13.   This goes without saying; but it has the merit of underlining that the terms in the Convention are minima and any country may go further.

### Article 7, paragraph (7)

*Possibility of Shorter Terms*

> (7) Those countries of the Union bound by the Rome Act of this Convention which grant, in their national legislation in force at the time of signature of the present Act, shorter terms of protection than those provided for in the preceding paragraphs shall have the right to maintain such terms when ratifying or acceding to the present Act.

7.14.   This is an exception for a few Union countries. It was inserted in the Convention at the Stockholm Revision (1967), confirmed by the Paris Revision (1971), to allow them to accept the new text of Article 7. It covers not only the minimum in paragraph (1) but also the others in paragraphs (2) to (4). The relevant date for the national legislation in question is that on which the Paris Act was signed and not that on which the country in question ratifies or accedes to it.

### Article 7, paragraph (8)

*Applicable Law and Comparison of Terms*

> (8) In any case, the term shall be governed by the legislation of the country where protection is claimed; however, unless the legislation of that country otherwise provides, the term shall not exceed the term fixed in the country of origin of the work.

7.15.   In placing this provision at the end of Article 7 the Stockholm Revision (1967), which did little more than repeat, with a few improvements, the Berlin Act of 1908, intended its scope to be all-embracing: it is "in all cases" that the comparison between the law of the country of origin of the work and that of the country where protection is claimed may be made. In consequence, this applies to the relations between a country which gives a term of fifty years after the author's death (paragraph (1)) and a country which had gone further (for example between the United Kingdom and the German Federal Republic—where the term has been increased to seventy years). But it also applies to the relations between countries which take advantage of the opportunities offered by paragraphs (2) to (4) (for example between a country which gives works of applied art a period of twenty-five years from their making and one which gives them a full copyright term of fifty years after the author's death).

7.16.   The period is governed by the law of the country where protection is claimed but need not exceed that fixed in the country of origin; for example in the previous case, the British work enjoys in Federal Germany,

not the national term of seventy years, but the British term of fifty from the author's death. However this rule of comparison is not obligatory since the Convention says that the legislation of the country where protection is claimed may "otherwise provide": that is to say, apply its own term even if longer than that of the country of origin; i.e., to continue the example, Federal Germany is free to protect the British work for as long as it protects its own. It is worth noting that this comparison of terms is an exception to the general principle of national treatment.

## ARTICLE 7*bis*

*Term of Protection for Works of Joint Authorship*

**The provisions of the preceding Article shall also apply in the case of a work of joint authorship, provided that the terms measured from the death of the author shall be calculated from the death of the last surviving author.**

7*bis*.1.   This provision is an addition to Article 7.  It applies the general rule to works of joint ownership.  The Convention does not define "works of joint authorship" since the various laws of the Union countries differ widely on the question of how much collaboration there must be to make the contribution of one author indistinguishable from that of the others. The inclusion of definitions, although cutting down ambiguity, is a controversial exercise.  The courts can always rule on the point.

7*bis*.2.   The Convention lays down that, in computing the term, it is the date of death of the last surviving of the joint authors which governs.  It would not be practicable for a work of joint authorship to fall into the public domain piecemeal, according to the date of death of each co-author.  The work is and remains a joint one.  It would not be just to seek to separate their contributions according to how long each lived, and it would be too complicated to seek to do so.  On this point the Convention follows the line taken by most member countries, all of whom are equally influenced by the need for simplicity.

# ARTICLE 8

## *Right of Translation*

**Authors of literary and artistic works protected by this Convention shall enjoy the exclusive right of making and of authorizing the translation of their works throughout the term of protection of their rights in the original works.**

8.1.  This Article covers the first of a number of exclusive rights to be enjoyed by the author.  Modern means of communication between nations give translations an ever more important place in international relations.  This right, which has been in the Convention since its commencement, allows the author to translate the work himself (a rare case) or to entrust it to someone who, in another language, will do justice to the expression of his thinking, giving it a style and phraseology which allows the second language readers to take in as much as possible of the original.

8.2.  This exclusive right of translation has always been accepted in principle at successive Revision Conferences, but limits have been imposed on its scope (the so-called "ten-year" regime brought in by the Additional Act of 1896) and on its exercise (compulsory licences for developing countries in Article II of the Annex to the Convention).  These limitations are dealt with in this commentary where they appear.

8.3.  Another point came to light at the Stockholm Revision Conference (1967): do the exceptions to the right of reproduction and the compulsory licences to broadcast and make records include the right to use the work in its translated form as well as the original?  It was generally agreed that, as regards the exceptions (Articles 2*bis*(2), 9(2), 10(1) and (2)) this was so, provided that the demands of fair practice and respect for the moral right were observed.

8.4.  But differing views were expressed as regards the compulsory licences (Articles 11*bis* and 13), some thinking that the same was true of them, while others took the line that this power to use a work without the author's consent did not allow one to translate it as well.  The question remains open.

8.5.  It is to be noted that once the author authorises a translation, the translation enjoys protection as an original work (see Article 2, paragraph (3)).

## ARTICLE 9

*Right of Reproduction*

9.1.  Oddly enough this right, which is the very essence of copyright, did not appear in the Convention as one of the minima until as late as Stockholm (1967).  Though the right was recognised, in principle, by all member countries, the problem was to find a formula wide enough to cover all reasonable exceptions but not so wide as to make the right illusory.

### Article 9, paragraph (1)

*The Principle*

**(1) Authors of literary and artistic works protected by this Convention shall have the exclusive right of authorizing the reproduction of these works, in any manner or form.**

9.2.  This is self-explanatory.  The words "in any manner or form" are wide enough to cover all methods of reproduction: design, engraving, lithography, offset and all other printing processes, typewriting, photocopying, xerox, mechanical or magnetic recording (discs, cassettes, magnetic tape, films, microfilms, etc.), and all other processes known or yet to be discovered.  It is simply a matter of fixing the work in some material form.  It clearly includes the recording of both sounds and images (see paragraph (3) of this Article).

9.3.  Note that reproduction does not include public performance (Article 11): the dramatist, for example, who assigns to a publisher the right to print his play does not thereby give him the right to perform it.  Each of the Convention's rights may be exercised separately.

9.4.  Note that the Convention does not, in this Article, mention the right of distribution.  This may have been because for many countries there was uncertainty about what it meant, though it appears in the laws of others.  In practice it flows from the right of reproduction.  The author, when he has made a contract about the reproduction of his work, can lay down conditions governing the distribution of copies, for example as to number (although in practice it is usually the publisher who decides on the size of the edition) and as to the countries in which those copies may be sold.  But, apart from the book trade and its customs, the growth of new techniques for disseminating works (cable television for example)

might suggest the inclusion of this right in the list of those protected. If this were done, the users of works, whether publishers or broadcasting organisations, would probably negotiate payments on a basis different from at present, and pay separately for the distinct rights of reproducing and of distributing the work.

9.5.   The Convention only mentions the right of distribution and putting into circulation in relation to cinematographic works; this is by reason of their special character (see Article 14, paragraph (1)); it is silent as regards works in other categories.   For its part, the Tunis Model Law simply recognises a general right of reproduction.   If one were to add the right of distribution, in terms, to the Convention, one would have to make sure that the buyer of a book did not need the author/publisher's permission before lending it to a friend.

### Article 9, paragraph (2)

*Exceptions*

**(2) It shall be a matter for legislation in the countries of the Union to permit the reproduction of such works in certain special cases, provided that such reproduction does not conflict with a normal exploitation of the work and does not unreasonably prejudice the legitimate interests of the author.**

9.6.   This provision gives to member countries the power to cut down this exclusive right of reproduction and permit works to be reproduced "in certain special cases".   But the freedom allowed them is not total. The Convention adds two conditions in a formula, the drafting of which, in Stockholm (1967), led to prolonged debate, and the interpretation of which produces much difference of opinion.   It consists of two phrases which apply cumulatively: the reproduction must not conflict with a normal exploitation of the work and must not unreasonably prejudice the legitimate interests of the author.

9.7.   If the contemplated reproduction would be such as to conflict with a normal exploitation of the work it is not permitted at all.   Novels, schoolbooks, etc., are normally exploited by being printed and sold to the public. This Article does not permit member countries to allow this e.g., under compulsory licences, even if payment is made to the copyright owner.

9.8.   If the first condition is met (the reproduction does not conflict with the normal exploitation of the work) one must look and see whether the

second is satisfied. Note that it is not a question of prejudice or no: all copying is damaging in some degree; a single photocopy may mean one copy of the journal remaining unsold and, if the author had a share in the proceeds of publication he lost it. But was this prejudice unreasonable? Here, scarcely. It might be otherwise if a monograph, printed in limited numbers, were copied by a large firm and the copies distributed in their thousands to its correspondents throughout the world. Another example is that of a lecturer who, to support his theme, photocopies a short article from a specialist journal and reads it to his audience; clearly this scarcely prejudices the circulation of the review. It would be different if he had run off a large number of copies and handed them out, for this might seriously cut in on its sales. In cases where there would be serious loss of profit for the copyright owner, the law should provide him with some compensation (a system of compulsory licensing with equitable remuneration).

9.9.   Most countries allow a few photocopies to be made without payment especially for personal or scientific use, but expressions of this sort leave a lot of latitude to legislators and the courts.

9.10.   Laws, for example the Tunis Model Law, often allow the reproduction of a work for "the user's personal and private use". True, this expression is interpreted in different ways, but in principle it does not cover any collective use and it assumes that the reproduction is not done for profit. The usual example is that of the student who, for study or research purposes, copies a text. Manuscript copies have little impact; but with the arrival of new copying techniques the situation changes. It is a matter not only of photocopiers but also of tape-recorders.

9.11.   It is a little more than child's play to make high quality recordings of both sound and vision, either from discs or cassettes (re-recording) or off the air (television as well as radio). The idea of a limitation to private use becomes less effective when copies can be made privately in large numbers. If practical considerations do not offer copyright owners and their successors in title a chance to exercise their exclusive right of reproduction, it has been suggested that a global compensation might be provided for them, and that the money might be raised by imposing a levy on the material (tape, etc.) on which the sounds and images are fixed, as well as on the apparatus used for fixing. (A working group meeting in Geneva in February 1977 examined the legal problems arising from the use of videograms to make video-copies.)

9.12. Similar solutions (including the creation of collective mechanisms) are suggested in the field of reprography, where the problem is particularly acute because of the number of different users: libraries, archives, documentation centres, public research institutes whether established for profit or not, schools, government departments, etc. Reprography certainly makes a large contribution to the diffusion of knowledge; but it is no less certain that copying on a large scale seriously damages the interests of the copyright owners. These interests must therefore be reconciled with the needs of users. It rests with each country to make appropriate measures best adapted to its educational, cultural and social and economic development (see the conclusions of the sub-committee on reprographic reproduction which met in Washington in June 1975).

9.13. The legislator's task is not an easy one. This paragraph, with its two conditions, provides him with certain guidelines.

### Article 9, paragraph (3)

#### Sound and Visual Recordings

**(3) Any sound or visual recording shall be considered as a reproduction for the purposes of this Convention.**

9.14. For the avoidance of doubt, this provision was included during the Stockholm Revision (1967); it is really superfluous since paragraph (1) covers all reproduction "in any manner or form". This addition was made because of the deletion of the old paragraph (1) of Article 13, which provided, for authors of musical works, the exclusive right to authorise the recording of such works "by instruments capable of reproducing them mechanically". When the recording right became swept up with the right of reproduction generally and the latter found its place in Article 9, paragraph (1) of Article 13 lost its raison d'être. Since the new texts of Articles 11 (Right of Public Performance) and 11ter (Right of Recitation) refer to "any means or process", the draftsmen of 1967 thought it useful to harmonize the Convention's provisions, and to issue a reminder that all sound and visual recordings were also reproductions within its meaning. Obviously, the making of copies of a recording is also a reproduction forbidden by this Article.

## ARTICLE 10

### *Limited Freedom to Use Works*

10.1. This Article and the next carry limitations arising either from the Convention itself or from national laws, on the author's exclusive right to exploit his work; their aim is to meet the public's thirst for information.

### Article 10, paragraph (1)

#### *Quotations*

> **(1) It shall be permissible to make quotations from a work which has already been lawfully made available to the public, provided that their making is compatible with fair practice, and their extent does not exceed that justified by the purpose, including quotations from newspaper articles and periodicals in the form of press summaries.**

10.2. In the dictionary sense, a quotation is the repetition of what someone else has said or written; here it is used in the sense of including one or more passages from someone else's work in one's own. In other words, quotation consists of reproducing extracts from a work either to illustrate a theme or defend some proposition or to describe or criticize the work quoted from. The use of quotation is not confined to literature: it may be from a book, a newspaper, a review, a cinematographic film, a recording or a radio or television programme.

10.3. The Convention puts three limits on this licence to quote. In the first place the work from which the extract is taken must have been lawfully made available to the public. Unpublished manuscripts or even works printed for a private circle may not, it is felt, be freely quoted from; the quotation may only be made from a work intended for the public in general. It will be seen that the formula is the same as that used for anonymous and pseudonymous works (Article 7(3)); here, too, it is a matter of not excluding from the licence such works as folklore. It covers therefore not only works made available with the consent of their authors, but also those otherwise lawfully made public, e.g., by reason of a compulsory licence.

10.4. Secondly, quotation must be "compatible with fair practice". This concept, introduced at the Stockholm Revision (1967), appears a number of times in the Convention. It implies an objective appreciation of what is

normally considered admissible. The fairness or otherwise of what is done is ultimately a matter for the courts, who will no doubt consider such questions as the size of the extract in proportion both to the work from which it was taken and that in which it is used, and, particularly the extent to which, if any, the new work, by competing with the old, cuts in upon its sales and circulation, etc.

10.5. In the third place, the quotation must only be to the extent "justified by the purpose"; this is also a new idea appearing, since Stockholm (1967), in several places in the Convention, although it first saw the light of day in the text of 1948 (Article 10(2)). This too, like the last condition, is a matter for the courts to decide. For example, the writer of a work of literature or history who, as is usual in such cases, illustrates his theme with a few quotations cannot be blamed or sued; on the other hand if he seems to use the extracts from others' works in bad faith, and without any relevance to his subject, the court may decide that the quotation is not lawful.

10.6. It is worth noting that the adjective "short", which appeared in the Brussels Act of 1948, has now disappeared. This word was used to qualify "quotations". Neither in principle nor in practice is a quotation likely to be very long; but it is a question of proportion and there are cases where quite large extracts from articles or speeches fall to be quoted. The general wording of the paragraph seemed sufficiently restrictive to allow the word "short" to be dropped, leaving it to national legislation and the courts to look after the legality of quotations.

10.7. The paragraph expressly mentions "quotations from newspaper articles and periodicals in the form of press summaries". This is an echo of the past when quotations and press reviews were linked. The link seems rather a tenuous one since the role of such a review is to give a selection of extracts from a number of publications, leaving it to the reader, listener or viewer (since sound and television broadcasts also include press reviews) to form his own opinion. Quotation, on the other hand, is normally used to support or defeat an argument or illustrate a theme. In any case, the Convention now puts press reviews on the same footing as other works.

## Article 10, paragraph (2)

*Use of Works by Way of Illustration for Teaching*

> (2) It shall be a matter for legislation in the countries of the Union, and for special agreements existing or to be concluded between them, to permit the utilization, to the extent justified by the purpose, of literary or artistic works by way of illustration in publications, broadcasts or sound or visual recordings for teaching, provided such utilization is compatible with fair practice.

10.8.   This provision is one based on that introduced during the Brussels Revision of 1948 but contains some changes made in 1967. It is to meet teaching needs, and lays down the same conditions as exist for quotations.

10.9.   It is worth noting that since Stockholm (1967) the word "extracts" no longer appears: the paragraph refers generally to utilization, made by way of illustration, for teaching, subject to the two conditions already mentioned. It can therefore be reasonably maintained that the Convention allows national legislation to cut down the author's right to forbid the inclusion of his work in school broadcasts and sound and visual recordings made for teaching ends, always assuming fair practice and no greater use than is justified by the purpose. It is also agreed that, if the broadcasting itself is permitted, the same applies to a performance in public of that broadcast if done for teaching purposes. The Tunis Model Law allows the public performance of the broadcast of a work "for use in schools, education, universities and professional training".

10.10.   At the Stockholm Revision (1967), it was agreed that the word "teaching" included teaching at all levels—that is to say in educational institutes, municipal and state schools and private schools. From this, one can deduce that mere scientific research is not within the scope of the paragraph.

## Article 10, paragraph (3)

*Mention of the Source and the Author's Name*

> (3) Where use is made of works in accordance with the preceding paragraphs of this Article, mention shall be made of the source, and of the name of the author if it appears thereon.

10.11.   Here one of the moral rights is re-stated. Those who quote or otherwise use works in accordance with this Article must acknowledge the source and the author's name if this can be gathered from that source.

## ARTICLE 10*bis*

*Other Powers to Use Works*

### Paragraph (1)

*Articles in Newspapers or Broadcasts*

> **(1) It shall be a matter for legislation in the countries of the Union to permit the reproduction by the press, the broadcasting or the communication to the public by wire of articles published in newspapers or periodicals on current economic, political or religious topics, and of broadcast works of the same character, in cases in which the reproduction, broadcasting or such communication thereof is not expressly reserved. Nevertheless, the source must always be clearly indicated; the legal consequences of a breach of this obligation shall be determined by the legislation of the country where protection is claimed.**

10*bis*.1.    This provision is of great importance for the written and spoken news media.  A number of changes were made in Stockholm (1967). Whereas, under the earlier text, articles on current economic, political or religious topics could, according to the Convention, be freely reproduced in the absence of an express reservation, henceforth it is left to member countries to permit this if they wish.  The change increases the author's protection since the limitation, once general, is now merely optional; and if countries do adopt it they must respect any reservations (see the wording "in cases in which the reproduction of broadcasting or such communications thereof is not expressly reserved").

10*bis*.2.    Again, to take account of modern means of communication, there was included, in the scope of this paragraph, not only news articles published in newspapers and periodicals, but also those broadcast.  As a corollary it is not only newspapers who may take them but the broadcasting authorities as well. As in the case of Article 10, paragraph (2), it is agreed that this covers the secondary use of the work broadcast: for example, public performance by means of loudspeaker or on a TV screen. Given that the justification is keeping the public informed, it would be paradoxical if this power were limited to the act of broadcasting itself and did not include making that broadcast audible or visible to the public.

10*bis*.3.    The laws of many countries (and the Tunis Model Law) follow this paragraph and allow reproduction by the press and performance in public on the conditions laid down in the Convention, that is to say: the

articles must be current (they must be on a subject of topical interest); the question must be economic, political or religious; they must have been previously published in the press or broadcast; and finally their use must not be forbidden by their authors.

10*bis*.4.   Finally, this paragraph demands that, as with quotations and teaching (Article 10(3)), the source must be acknowledged, no doubt to protect the moral right.  National legislation is left to decide on the legal consequences of any breach.

### Article 10*bis*, paragraph (2)

*Reporting Current Events*

> (2) It shall also be a matter for legislation in the countries of the Union to determine the conditions under which, for the purpose of reporting current events by means of photography, cinematography, broadcasting or communication to the public by wire, literary or artistic works seen or heard in the course of the event may, to the extent justified by the informatory purpose, be reproduced and made available to the public.

10*bis*.5.   This is a matter of allowing the reporting of news, within reasonable limits.  It often happens that, during the reporting of current events by film or broadcast, protected works are seen or heard.  Their appearance is fortuitous and subsidiary to the report itself.  For example, military music and other tunes are played on the occasion of a State visit or a sporting event; a microphone cannot avoid picking them up, even if only part of the ceremony or event is covered.  It would be impossible to seek the composer's consent in advance.

10*bis*.6.   However, abuses must be guarded against.  The work must be seen or heard during the event itself; the subsequent addition of music to the film or broadcast would not be allowed.  Again, if, during the unveiling of a bust of a famous composer, extracts from his work were played, these may be included in the film or broadcast report without his heirs being consulted.  But the event does not allow a concert impresario to put on a concert of the dead man's works on the pretext of honouring his memory, since here there is no link with the ceremony.  Examples of works seen in the course of an event are a statue unveiled or pictures shown at the opening of an exhibition, while music performed during a ceremony would be an example of a work heard.

10*bis*.7.   The Convention imposes another limitation on this latitude: the extent of the inclusion must be justified by the informatory purpose.  This is the same condition as for oral works (Article 2*bis*(2)).  Obviously this leaves room for argument; but some examples may help interpretation.  The main object of a report of a current event is to give the public an impression of having taken part in it.  But to do so does not demand the reproduction of all the music played or all the pictures shown during the ceremony or exhibition.  Again, the broadcast of a sporting event allows the inclusion of a few bars from the military march which is played at half-time, and an interview with a celebrity in his house permits the incidental showing of the works of art he possesses.  A television broadcast of a current event may show the town hall in front of which the event takes place.  The reports could scarcely be made without doing so.  But it would be different if a whole concert were recorded or all the artistic works in an exhibition were shown in a film.  Further, the notion of current events must exclude films or broadcasts dealing only with the past.

10*bis*.8.   Note that this paragraph also mentions photography in order to take account of the many news photographs which appear in newspapers and periodicals.

10*bis*.9.   The latitude given to national laws is expressed differently in the two paragraphs: paragraph (1) allows them to "permit the reproduction, etc."; paragraph (2) speaks of "determine the conditions under which works may, for the purpose of reporting current events and to the extent justified by the informatory purpose, be reproduced, etc.".  The conditions in question may dispense with the need to seek prior permission, and, in some cases, the payment of a fair remuneration.  Many laws (including the Tunis Model Law) go no further than to free the user from the need to seek consent.  The Tunis Model Law also covers the case of works of art and architecture which are situated permanently in a public place (monuments and buildings are currently the subject of documentary films) and those whose inclusion in a film or broadcast is only by way of background or otherwise only incidental to the principal matters represented.  (A picture or a statuette forming part of the background to a television play and not separately featured.)

10*bis*.10.   Finally, note that speeches delivered in the course of current events are covered in Article 2*bis*(2) in the same way, i.e., with a reference to justification by reason of the informatory purpose.

## ARTICLE 11

### *Right of Public Performance*

11.1.  After the right of translation (Article 8) and the right of reproduction (Article 9) the Convention here lays down a third right going to make up the author's copyright: it is usually called the right of public performance.

### Article 11, paragraph (1)

### *Scope of the Right*

> (1) Authors of dramatic, dramatico-musical and musical works shall enjoy the exclusive right of authorizing:
>
> (i) the public performance of their works, including such public performance by any means or process;
> (ii) any communication to the public of the performance of their works.

11.2.  This provision covers only dramatic, dramatico-musical and musical works.  Its text, though in spirit going back to the beginning of the Convention, was drawn up at Berlin in 1908 and confirmed at Rome (1928), albeit in a form which led to ambiguities and needed clarification. The Brussels (1948) and Stockholm (1967) Revisions merely made a few minor changes.

11.3.  The paragraph splits the right into two.  The author has the exclusive right to authorise public performance of his work.  This covers, first and foremost, live performances given by actors and singers on the spot. Note that only public performance is covered.  Private performance calls for no authorisation.

11.4.  However, it goes on to speak of "including such public performance by any means or process", and this covers performance by means of recordings; there is no difference for this purpose between a dance hall with an orchestra playing the latest tune and the next-door discotheque where the customers use coins to choose their own music.  In both, public performance takes place.  The inclusion is general and covers all recordings (discs, cassettes, tapes, videograms, etc.) though public performance by means of cinematographic works is separately covered—see Article 14(1)(ii).

11.5.   The second leg of this right is the communication to the public of a performance of the work.   It covers all public communication except broadcasting which is dealt with in Article 11*bis*.   For example, a broadcasting organisation broadcasts a chamber concert.   Article 11*bis* applies. But if it or some other body diffuses the music by landline to subscribers, this is a matter for Article 11.

11.6.   It is in relation to this Article that the question of the "minor reservations" arises.   These cover such things as religious ceremonies and performances by military bands at public fêtes.   It was agreed at Brussels that these exceptions (which apply also to Articles 11*bis*, 11*ter*, 13 and 14) were valid.   At Stockholm (1967) it was again agreed that the Convention did not stop member countries from preserving their law on exceptions which come under this heading of "minor reservations".

### Article 11, paragraph (2)

*Public Performance of Translations*

**(2) Authors of dramatic or dramatico-musical works shall enjoy, during the full term of their rights in the original works, the same rights with respect to translations thereof.**

11.7.   This is the logical consequence of the right of translation (Article 8).   The author has the exclusive right to authorise the translation of his work and also the public performance of that translation.   For example, the libretto of an Italian opera is translated into French; the Italian author exercises his right of translation; if the French version is later performed on a Paris stage, the Italian may assert his right of public performance.   The right lasts only as long as the rights in the original. Once the latter is in public domain, the author's control over the public performance of the translation ceases (although the translator's separate copyright may last longer, according to which died first).

## ARTICLE 11*bis*

### *Right of Broadcasting*

11*bis*.1.   This provision is of particular importance in view of the place now taken by broadcasting (which, it must be remembered, includes both radio and television) in the world of information and entertainment. It is the fourth of the author's exclusive rights to be recognised by the Convention, the other three being those of translation, reproduction and public performance. The Rome Revision (1928) was the first to recognise the right "of authorising the communication of... works to the public by radio and television". Slightly muddled in its terms, the text was like broadcasting itself—in its infancy. It was in Brussels (1948) that the subject was more fully considered and the right broken down into its various facets in order to take account of the various ways and techniques by which it might be exploited. Neither Stockholm nor Paris made any change, other than to provide a more suitable translation in the newly authentic English text.

### Article 11*bis*, paragraph (1)

#### *Scope of the Right*

(1) Authors of literary and artistic works shall enjoy the exclusive right of authorizing:

(i) the broadcasting of their works or the communication thereof to the public by any other means of wireless diffusion of signs, sounds or images;

(ii) any communication to the public by wire or by rebroadcasting of the broadcast of the work, when this communication is made by an organization other than the original one;

(iii) the public communication by loudspeaker or any other analogous instrument transmitting, by signs, sounds or images, the broadcast of the work.

11*bis*.2.   This paragraph divides the right into three.

11*bis*.3.   The primary right is to authorise the broadcasting of a work and the communication thereof to the public by any other means of wireless diffusion of signs, sounds or images. It applies to both sound and television broadcasts. What matters is the emission of signals; it is immaterial whether or not they are in fact received.

11*bis*.4.   A secondary right is the subsequent use of this emission: the author has the exclusive right to authorise communication of the broadcast to the public, either by wire (a CATV system) or without, if the communication is made by an organisation other than the original one.

11*bis*.5.   Finally the third exclusive right is to authorise the public communication of the broadcast by loudspeaker or on a television screen.

11*bis*.6.   It must be underlined that, in each case, there must be a public element to the operation.  The meaning of broadcasting is found in the Radio-communications Regulations: it is a matter of transmissions intended to be received directly by the general public.  Broadcasting offers an infinite range of programmes from the highbrow to the frivolous.  If the listeners and viewers are displeased they have only to change the channel or switch off altogether.  The idea of transmission to the public is all important.  Amateur radio and telephone communications are excluded.

11*bis*.7.   Another characteristic of broadcasting is that there must be a receiver, without which it cannot be taken in by human eye or ear.  True, listening to discs or cassettes also needs an apparatus; but the difference is that the user can only watch or hear what he has chosen in advance when he bought the recording in question.  With broadcasting one can, by pressing a button, see and hear previously unthought of material.  Broadcasting offers such a variety of works of all kinds that it is no exaggeration to say it has revolutionised the whole problem of the access to knowledge and entertainment (and particularly with the use of space satellites).  Opinions differ on the question whether the transmission of a signal to a satellite intended, with the aid of an earth station, for public distribution constitutes broadcasting within the meaning of this Article.  In the field of communications via satellite, a new international instrument was recently concluded, namely the Convention Relating to the Distribution of Programme-Carrying Signals Transmitted by Satellite.

11*bis*.8.   Broadcasting involves the dispatch of signals by Herzian waves and includes all methods of doing so.  The essential point is that no intermediary body interposes between the emitting antennae and the aerial at the receiving point: the same programme may be transmitted on the usual wavelength and simultaneously by V.H.F.; what matters is that the whole operation is carried out by one and the same organisation.  If however non-Herzian means are used (the classic example is cable) it is a case of public communication by wire and falls under paragraph (1)(ii).  This is

usually done to a known public (subscribers and others) whereas, with broadcasting, anyone can pick up the signal, subject only to limits imposed by its strength and the capacity of the receiving set.

11*bis*.9.   In other words, this paragraph demands that the author shall enjoy the exclusive right to authorise the broadcasting of his work and, once broadcast, the communication to the public, whether by wire or not, if this is done by an organisation other than that which broadcast it. This act of wire diffusion differs from that covered in Article 11(1). The latter covers the case in which the wire diffusion company itself originates the programme, whereas Article 11*bis* deals with the diffusion of someone else's broadcast.

11*bis*.10.   For example, a company in a given country, usually for profit, receives the signals sent through the ether by a television station in the same or another country and relays them by wire to its subscribers. This is covered by Article 11*bis*(1)(ii). But if this company sends out programmes which it has itself originated, it is Article 11 which applies. What matters is whether or not a second organisation takes part in the distribution of the broadcast programmes to the public. (A working party which met in Paris in June 1977 considered the copyright and neighbouring rights problems caused by the distribution of television programmes by cable.) The task of distinguishing between such a practice and the mere reception of programmes by a community aerial was left to national laws.

11*bis*.11.   Finally, the third case dealt with in this paragraph is that in which the work which has been broadcast is publicly communicated e.g., by loudspeaker or otherwise, to the public. This case is becoming more common. In places where people gather (cafés, restaurants, tea-rooms, hotels, large shops, trains, aircraft, etc.) the practice is growing of providing broadcast programmes. There is also an increasing use of copyright works for advertising purposes in public places. The question is whether the licence given by the author to the broadcasting station covers, in addition, all the use made of the broadcast, which may or may not be for commercial ends.

11*bis*.12.   The Convention's answer is "no". Just as, in the case of a relay of a broadcast by wire, an additional audience is created (paragraph (1) (ii)), so, in this case too, the work is made perceptible to listeners (and perhaps viewers) other than those contemplated by the author when his permission was given. Although, by definition, the number of people receiving a broadcast cannot be ascertained with any certainty, the

author thinks of his licence to broadcast as covering only the direct audience receiving the signal within the family circle. Once this reception is done in order to entertain a wider circle, often for profit, an additional section of the public is enabled to enjoy the work and it ceases to be merely a matter of broadcasting. The author is given control over this new public performance of his work.

11*bis*.13.   Music has already been used as an example, but the right clearly covers all other works as well—plays, operettas, lectures and other oral works. Nor is it confined to entertainment; instruction is no less important. What matters is whether the work which has been broadcast is then publicly communicated by loudspeaker or by some analogous instrument e.g., a television screen.

11*bis*.14.   Note that the three parts of this right are not mutually exclusive but cumulative, and come into play in all the cases foreseen by the Convention.

### Article 11*bis*, paragraph (2)

*Compulsory Licences*

> (2) It shall be a matter for legislation in the countries of the Union to determine the conditions under which the rights mentioned in the preceding paragraph may be exercised, but these conditions shall apply only in the countries where they have been prescribed. They shall not in any circumstances be prejudicial to the moral rights of the author, nor to his right to obtain equitable remuneration which, in the absence of agreement, shall be fixed by competent authority.

11*bis*.15.  This provision allows member countries to substitute, for the author's exclusive right, a system of compulsory licences.  This was inserted at the Rome Revision (1928) when the right of broadcasting was first introduced.  But its scope was considerably widened at the Brussels (1948) Revision, in that, thereafter, it covered not only the broadcasting right but all the cases dealt with in paragraph (1).

11*bis*.16.  This was done in the interests of the public, but in limited terms.  First, any such licences only apply in the country which has provided for them.  Secondly, they may not prejudice the author's moral rights (Article 6*bis*). Thirdly (and perhaps most important), the author must be given a fair remuneration of an amount which, if not agreed, is settled by some competent authority.  This means that a Union country which makes use of this power must lay down a proper procedure, e.g., by fixing the level of compensation to the author or by setting up a tribunal to arbitrate on this point between the parties.

11*bis*.17.  This system is known as "compulsory licensing".  Most people feel that resort to such licences should be the exception rather than the rule and that they should only be granted if the author's representatives cannot agree with the broadcasting organisations on the terms of collective agreements regulating the use of works and payment for such use. The spirit of this paragraph is one of striking a fair balance between the conflicting interests, and the national lawmakers must decide on their own methods of providing one.  The growth of new technical methods of using works makes it increasingly difficult for authors to exercise exclusive rights, and may even make individual licences impossible in practice. Blanket licensing may therefore become a necessity in the area covered by Article 11*bis*, in order to give legal security over the use of large repertoires, and to ensure the author a proper payment either contractually or by means of compulsory licences.

### Article 11*bis*, paragraph (3)

*Ephemeral Recordings*

> (3) In the absence of any contrary stipulation, permission granted in accordance with paragraph (1) of this Article shall not imply permission to record, by means of instruments recording sounds or images, the work broadcast. It shall, however, be a matter for legislation in the countries of the Union to determine the regulations for ephemeral recordings made by a broadcasting organization by means of its own facilities and used for its own broadcasts. The preservation of these recordings in official archives may, on the ground of their exceptional documentary character, be authorized by such legislation.

11*bis*.18.   This paragraph contains two provisions, both important since nowadays, thanks to technical advances, the majority of broadcasts are made using either sound or video recordings.

11*bis*.19.   In its first sentence the paragraph distinguishes between broadcasting and recording, and lays down that the right to do the first does not automatically carry a right to do the second.

11*bis*.20.   According to one school of thought, since the rights of reproduction, public performance and broadcasting are each independent of the other, the author's permission is required for each. Another takes the view that prior permission is only needed when the work is communicated to a new public (e.g., when the author has been paid only for the making of a sound recording of his work but this is later publicly performed). When a broadcast is made, the public receiving it is the same whether the broadcast is live or deferred. The use of recordings depends on programming and time factors, and fortuitous reasons of this kind do not call for any additional remuneration.

11*bis*.21.   In practice, prior permission is no problem, since consents are now embodied in blanket agreements between the author's societies and those broadcasting. But, in any case, the Convention, since the Brussels Revision (1948), has made a compromise between these schools of thought by leaving it to national legislation to determine which recordings may be made by the broadcasting organisations. Thus the second sentence of this paragraph allows member countries to "determine the regulations for ephemeral recordings made by a broadcasting organisation by means of its own facilities and used for its own broadcast".

11*bis*.22.   Member countries may therefore decide whether or not the right to broadcast carries also the right to record for broadcasting. But although the Convention has delegated this task to national laws, it nevertheless lays down some guidelines which themselves give rise to a certain amount of argument.

11*bis*.23.   The recording right must be "ephemeral". National laws have interpreted this word differently (one month, three months, six months, sometimes a year). The Tunis Model Law has chosen six months from the making of the recording unless the parties have agreed upon some longer period. National laws have tended to make no distinction between recordings made in advance and those made in the course of the broadcasting itself.

11*bis*.24.   Secondly, so-called ephemeral recordings must be made by the broadcasting organisation's own facilities. They may not rely on some outside body to provide them.

11*bis*.25.   Thirdly, they must be for their own broadcast. Their use is confined to the organisation making them and they may not be given, let or sold to, or exchanged with, another broadcasting organisation. The Convention is silent on whether these recordings, made after all for the convenience of the broadcasters, are only permitted in the case of non-commercial stations. It is a matter for national consideration whether those broadcasting stations, which are exclusively commercial, and depend on advertising, should be denied this facility.

11*bis*.26.   Although the Convention does not say so in terms, the spirit of this provision demands that these recordings may only contain works which the broadcasting organisation, either by law or by contract, have the right to broadcast. As to cinematographic works, these cannot be the subject of ephemeral recordings since they are already fixed, although the case may arise of including isolated sequences extracted from films in television programmes.

11*bis*.27.   This latitude for member countries to lay down the rules for ephemeral recordings does not say anything about remuneration. On this point it is the same as the provision of Articles 2(4), 2*bis* and 10*bis*, and differs from the preceding paragraph which demands that remuneration be paid. Many laws treat these recordings as a technical matter and permit their making without payment.

11*bis*.28.   Finally the Convention, in the third sentence of this paragraph, allows national laws to permit the preservation of these recordings in official archives on the ground of their exceptional documentary character.  Usually one copy may be retained for historical reasons.

11*bis*.29.   To summarise, member countries may take advantage of the power given by paragraph (3) to allow the making and keeping for a short time of recordings by a broadcasting organisation by means of its own facilities and for its own broadcasts.  If member countries do not do so, it is the contract between the author and broadcasting organisation which determines whether recordings for this purpose may be made and, if so, whether they are to be merely ephemeral.  If the contract does not expressly or impliedly allow recording, the first sentence of paragraph (3) prevails: permission to broadcast does not imply permission to record.  But when member countries do take advantage of the second sentence, ephemeral recordings need no permission and normally entail no payment.

## ARTICLE 11*ter*

### *Public Recitation*

11*ter*.1.  This is the fifth right comprising copyright, but it covers only authors of literary works.  Some laws include it in the right of public performance, perhaps because it is not always easy to distinguish between drama and literature.  Under such laws, to read a work aloud in public is to perform it.

### Article 11*ter*, paragraph (1)

#### *Scope of the Right*

> (1) Authors of literary works shall enjoy the exclusive right of authorizing:
> (i) the public recitation of their works, including such public recitation by any means or process;
> (ii) any communication to the public of the recitation of their works.

11*ter*.2.  This provides for literary works what Article 11 does for dramatic and musical ones.  As in that Article, it divides the right into two parts. The author of a literary work has the sole right to authorise its reading in public, i.e., a public delivery which nevertheless falls short of acting.

11*ter*.3.  Although the Convention does not define the expression "literary work" it is taken as meaning any work other than a dramatic one which is capable of being delivered, by being read, or recited from memory, in public.

11*ter*.4.  The right was introduced into the Convention at the Brussels Revision (1948) and its wording was widened a little in Stockholm (1967) to bring the Article into line with Article 11.  It now uses the same words as that article—recitation "by any means or process" to make sure that public recitation by means of a record falls within the right.  Again, it gives the author the exclusive right to authorise any communication to the public of the recitation in question, thus covering all communication other than the broadcasting dealt with in Article 11*bis*.  As with the right of public performance, private recitation or communication remains outside its scope.

### Article 11*ter*, paragraph (2)

*Public Recitation of Translations*

> (2) Authors of literary works shall enjoy, during the full term of their rights in the original works, the same rights with respect to translations thereof.

11*ter*.5.  Again following Article 11, the Stockholm Revision (1967), confirmed by the Paris Revision (1971), added this paragraph to cover recitation of the work in translation as well as in the original.  The same comments as are made on Article 11 apply here.

## ARTICLE 12

*Right of Adaptation*

**Authors of literary or artistic works shall enjoy the exclusive right of authorizing adaptations, arrangements and other alterations of their works.**

12.1.   This is the sixth of the exclusive rights given by the Convention.  It is in quite general terms covering all works and all adaptations, arrangements, and other alterations of them.

12.2.   The words are the same as in Article 2(3), which gives these derivative works the same protection as is enjoyed by the original (pre-existing) ones, and it safeguards the rights of the authors of the latter.  The two provisions are therefore closely linked.

12.3.   It was in Brussels (1948) that the present text was drawn up.  The earlier text (of Berlin 1908) was in very narrow terms.  It forbade only the "unauthorised indirect appropriations" of works and gave, as examples, adaptations, musical arrangements, transformations of a novel, tale or piece of poetry into a dramatic piece and vice versa.  It went on to say that in order to fall within the prohibition of the article, these indirect appropriations must consist of only the reproduction of the work in the same form or another form without essential alterations, additions or abridgements, and without presenting the character of a new original work.  Since they were included in Article 2 (now, since Stockholm, Article 2(3)) the Convention treated them on the one hand as protected works, and on the other hand, i.e., from the point of view of the original works, as infringements.  Besides, it only referred to their appropriation in the form of reproduction, whereas there are other ways of exploiting works.

12.4.   It became common ground that, in general, the author enjoyed the Convention's rights not only for his work in its original form but also for all transformations of it.  These could not be used in public without his authority.

12.5. This article therefore gave the author the exclusive right of authorising their adaptation. It refrains from laying down what constitutes adaptation but it is agreed that this includes any new form of the substance of the work, marginal cases being left to the courts.

12.6. It is to be noted that once the author authorises adaptations, arrangements and other alterations, they enjoy protection as original works (see Article 2, paragraph (3)).

## ARTICLE 13

### *Right of Recording Musical Works*

13.1.  This Article, introduced in Berlin (1908) deals with what is known as the composer's "mechanical" rights.  Changes were made in Brussels (1948) and again in Stockholm (1967).

13.2.  Until this last Revision, it included a first paragraph expressly recognising the exclusive right to authorise (i) the recording of such works by instruments capable of reproducing them mechanically and (ii) the public performance by means of such instruments of works thus recorded. Since the Stockholm Revision for the first time included, in the Convention, a general right of reproduction (Article 9) and this included recording, and since the right of public performance was already included in Article 11, this paragraph became superfluous.  In Brussels (1948) the possibility of expressly adding the right of distribution of copies was discussed, but this was dropped since the author was able, by the contracts he made with the record-makers, to make terms governing the whole matter of production and sale of discs.  The Stockholm Revision (1967) made no change on this point, and Article 13 therefore includes only the three paragraphs mentioned below.

13.3.  This deletion of the first paragraph from the 1948 text has also made for clarification of another important point: it could have been argued, having regard to Articles 11 and 13, that the author could demand that the user took an additional licence to that required by Article 11.  In other words, that the author of a musical work enjoyed two rights of public performance, one for "live" performance, and a quite separate one for performance by means of a recording (old paragraph (1) of Article 13).  By placing the right of reproduction (including recording) in Article 9, and by leaving Article 11 to cover performance by any means, the Stockholm Act prevents this question from arising.  This is not without importance for the broadcasting of commercial records.

13.4.  The tendency of modern legislation has been to treat the author's licence to broadcast as including the right to do so by use of sound and visual recordings lawfully made.  It is felt that the broadcasting of a work by means of a commercial recording is no different from its broadcasting by means of an orchestra on the spot.  National laws are left to cover the point, and there is nothing in the Convention to stop them forbidding contractual terms which have the opposite result.

13.5.  Since Stockholm therefore, Article 13 has just two paragraphs, one on compulsory licences and the other transitional.

### Article 13, paragraph (1)

*Compulsory Licences*

> (1) Each country of the Union may impose for itself reservations and conditions on the exclusive right granted to the author of a musical work and to the author of any words, the recording of which together with the musical work has already been authorized by the latter, to authorize the sound recording of that musical work, together with such words, if any; but all such reservations and conditions shall apply only in the countries which have imposed them and shall not, in any circumstances, be prejudicial to the rights of these authors to obtain equitable remuneration which, in the absence of agreement, shall be fixed by competent authority.

13.6.  This allows member countries to provide for compulsory licences to record musical works.  It has been in the Convention, in more or less its present form, since Berlin (1908) though Stockholm (1967) made an important amendment.  Previously, there was power to provide for a system of compulsory licensing covering not only the recording but also public performance of the works in question by the use of such records.  It was thus possible for a record, made with the consent of the author of the work recorded, to be performed in public under compulsory licence.  It became clear, with the increasing public use of discs, and since public performance by this means was almost invariably covered by contract, that there was no longer any need for compulsion, and the scope of compulsory licensing could be confined to the act of recording.  This was done in Stockholm (1967) and confirmed at Paris (1971).

13.7.  Secondly, the licence to record may cover not only the music but also the accompanying words, if any.  Both are considered, for this purpose, one entity.  In the result, the licences may cover all musical and dramatico-musical works, with or without words.

13.8.  In the third place, the Convention lays down the precondition that the author (or authors) must earlier have consented to a recording of both words and music together.  Those Union countries which provide for compulsory licences in this field, do so on the basis that there has been an earlier recording and that it has been made with the prior consent of both lyric writer and composer (if they are not the same person).  Thereafter, under the compulsory system, other recording companies may enter the field and make their own recordings, without prior consent.

13.9.    The paragraph follows the pattern of Article 11*bis*(2) which covers compulsory licences to broadcast. The same restrictions are placed on the freedom of member countries: the licences only have effect in the country granting them, and the author must receive equitable remuneration fixed, in the absence of agreement, by a competent authority. But, here, there is no express reference to the author's moral right, perhaps because the making of records carries less risk of damage to this right than the making of broadcasts. In any case, Article 6*bis* is of general application.

### Article 13, paragraph (2)

*Transitional Provisions*

> (2) Recordings of musical works made in a country of the Union in accordance with Article 13(3) of the Conventions signed at Rome on June 2, 1928, and at Brussels on June 26, 1948, may be reproduced in that country without the permission of the author of the musical work until a date two years after that country becomes bound by this Act.

13.10.    This provision goes back into history. The present text was a result of the Stockholm Revision (1967) and is intended to put an end to a transitional regime which has lasted since Berlin (1908).

13.11.    In the Berlin Act it was provided that the newly created right given to the authors to control the recording of their works and their public performance by means of the records, was not retroactive. The right did not apply "in any country of the Union to works which have been lawfully adapted in that country to mechanical instruments before the coming into force of" the Berlin (1908) Act.

13.12.    A perhaps unforeseen result was that, over and above new pressings from old recordings, new recordings could be made without any payment, in countries in which the first recordings had been made. The idea apparently was to scotch any attempts by the large record producers to monopolise. But the effect was to preserve, in respect of already recorded works, the record producer's freedom to make records without permission which they had enjoyed before Berlin (1908). Furthermore, the provision was a source of controversy as to its exact meaning: for example did the "adaptation to instruments which can produce mechanically" (the expression then used) of only part of the work, for example the overture from an opera, allow the whole work to be later recorded free?

13.13. It was felt at Stockholm (1967) that the time had come to put an end to this; there was no longer any valid reason why a few works should be deprived of their royalties by the mere fact that they had once been recorded before 1908, perhaps by a long-extinct record company. In any case, many pre-1908 works were by then out of copyright.

13.14. The Convention had taken sufficient care to safeguard the interests of record producers and had already given them a reasonable time in which to produce records from their original recordings.

13.15. For these reasons paragraph (2) appears in its present restrictive form: it is no longer a question of making new recordings of works first recorded before 1908, but only one of making new pressings from existing recordings. And even this is only permitted for two years after the country in question "becomes bound by this Act". In 1967, this meant the Stockholm Act, but since Paris (1971) which made no change in this Article, it means the Paris Act. The same point arises on Article 7(7)—the exception allowing shorter terms of protection.

### Article 13, paragraph (3)

*Seizure of Imported Copies*

(3) Recordings made in accordance with paragraphs (1) and (2) of this Article and imported without permission from the parties concerned into a country where they are treated as infringing recordings shall be liable to seizure.

13.16. This paragraph has remained unchanged since its birth at the Berlin Revision (1908). Records made in accordance with this Article may not be exported to other Union countries on pain of seizure there.

13.17. The paragraph covers records made under compulsory licence and those made free under the transitional provision of paragraph (2). Member countries other than those in which the records were made are not obliged to accept their importation.

# ARTICLE 14

*Cinematographic Rights*

14.1.   In this Article and the next (14*bis*), the Convention lays down the rules governing cinematographic works; to see the complete picture one must also look at Article 2(1) (Protected Works), Article 4 (Points of Attachment), Article 5(4) (Country of Origin), Article 7(2) (Term of Protection) and Article 15(2) (Definition of the Maker).

14.2.   The rules were formulated at the Stockholm Revision (1967); they gave rise, both in Stockholm and during the preparatory meetings, to much discussion and protracted negotiations.   The result is Articles 14 and 14*bis*.

14.3.   Their objective is to facilitate the international circulation of films and, to this end, to seek to bring closer together, if not to unify, the legal theories on the subject in the various countries of the Union.   Basically there are three different legal systems.

14.3.(i)   The "film copyright" system in which only the maker is the first owner of the copyright in the film (and not the producer, director, cameraman, etc.), but in which the rights in those works which go to make up the film and which can enjoy an existence apart from the film (scenarios, script, music, etc.) belong without restriction, to their authors, from whom the film-maker must acquire them by contract, express or implied.   In other words these authors enjoy copyright in their respective contributions and grant the maker of the film permission to use them.   On the other hand, the latter owns all the copyright in the film itself and is therefore free, subject to any contractual stipulations to the c ntrary, to exploit it as he wishes.

14.3.(ii)   A system in which the film is treated as a work of joint authorship of a number of artistic contributors (sometimes, but not always, listed in the national law) from whom the maker must take assignments of their contributions in order to be able to exploit the film.

14.3.(iii)   The system called "legal assignment" which also treats the cinematographic work as one of joint authorship but where the national law presumes a contract with the maker, assigning the right to exploit the film.

14.4.   Since the Convention governs international situations, the problem was how to build a bridge between the systems without entirely ruling any

of them out; this was done in Stockholm (1967) by adding a rule covering the interpretation of contracts known as the "presumption of legitimation". This wedding of legal systems made a distinction between the author's pre-existing works (on which the film is based and from which it is adapted) and those of contributions which only come into existence during the making of the film. Article 14 governs the first and Article 14*bis* the second.

### Article 14, paragraph (1)

*The Cinematographic Rights of Authors of Pre-Existing Works*

> (1) Authors of literary or artistic works shall have the exclusive right of authorizing:
>
> (i) the cinematographic adaptation and reproduction of these works, and the distribution of the works thus adapted or reproduced;
>
> (ii) the public performance and communication to the public by wire of the works thus adapted or reproduced.

14.5.   As in Article 11 (Right of Public Performance) and Article 11*ter* (Right of Public Recitation), this right is split into two parts in order to meet the realities of the situation as regards film-making.

14.6.   The author of a work has the exclusive right to authorise its cinematographic adaptation, i.e., a filmscript cannot be made from a novel without the novelist's permission. But the adaptation is of little account unless a finished film results. Indeed no one is going to acquire the right to adapt without acquiring also the right to record the adaptation in a form in which it can be seen, and to distribute the finished article to cinemas. Hence the wording of paragraph 1(i).

14.7.   Films are of course made to be exhibited. The second part of this paragraph includes exhibition within the copyright enjoyed by the author of the adapted work. The Brussels Act (1948) did not cover wire diffusion but this means of exploiting a film was added to Stockholm (1967). To follow the example already given, the novelist, when agreeing to the incorporation of his work in a film, may restrict the countries in which it may be offered for exhibition (right of distribution) and refuse permission for it to be given to wire diffusion companies for showing to their subscribers. Contracts usually expressly govern matters of this sort.

14.8.   Note that there is no mention of broadcasting; this is because the whole question of the broadcasting of films, like that of other works, is dealt with in Article 11*bis*.

### Article 14, paragraph (2)

*Adaptation of Film Productions*

(2) The adaptation into any other artistic form of a cinemato-
graphic production derived from literary or artistic works shall,
without prejudice to the authorization of the author of the cinemato-
graphic production, remain subject to the authorization of the au-
thors of the original works.

14.9.   This paragraph covers all sorts of adaptations.  It means, for ex-
ample, that if a play finds its way on to the cinema screen and a novel is
made out of the film, permission is needed not only from the film-maker
but also from the original dramatist.  Again, an operetta made from a film
which was itself based on an earlier novel, cannot be performed without
the novelist's permission.  In a sense, the film is in this case a channel
through which the breath of the original work passes and in which its
spirit is preserved.  The fact that its author has agreed to its adaptation to
film does not allow all and sundry to steal his ideas, his plot and his
characters even though the change to film has resulted in a work of a
different kind.

### Article 14, paragraph (3)

*No Compulsory Licences for Musical Works*

(3) The provisions of Article 13(1) shall not apply.

14.10.   This provision lays down that films may not be made subject to a
regime of compulsory licences like that permitted for phonograms by
Article 13(1).  (It will be remembered that, once the composer has agreed
to his work being recorded, other recordings can be made under compul-
sory licence if member countries so provide.)  This paragraph makes it
clear, in case there is any doubt on the matter, that the same thing does
not apply to films.  Permission is always required.

## ARTICLE 14*bis*

### Rights of Artistic Contributors to Films

14*bis*.1.  Apart from the first paragraph which, with minor modifications repeats paragraph (2) of Article 14 in the Brussels Act (1948), this Article originated in Stockholm (1967) and is a compromise between the various legal systems in force in Union countries.

### Article 14*bis*, paragraph (1)

#### Protection for Cinematographic Works

**(1) Without prejudice to the copyright in any work which may have been adapted or reproduced, a cinematographic work shall be protected as an original work. The owner of copyright in a cinematographic work shall enjoy the same rights as the author of an original work, including the rights referred to in the preceding Article.**

14*bis*.2.  This provides that a cinematographic work, once made, is protected as an original work and the copyright owner enjoys the same rights as other authors of original works.  Note that it speaks of "the owner of the copyright".  This is to take account of the various legal systems mentioned above and to leave national laws free to decide who shall be that owner.

### Article 14*bis*, paragraph (2)*(a)*

#### Copyright Ownership

**(2)*(a)*  Ownership of copyright in a cinematographic work shall be a matter for legislation in the country where protection is claimed.**

14*bis*.3.  Here the Convention provides expressly that the ownership of copyright of the film is a matter for the country where protection is claimed.  This may be the maker in his own right, as under the "film copyright" system, or the maker by reason of a legal assignment, or it may be the various artistic contributors to the film. National legislation is free to adopt any of the systems.

14*bis*.4.  The reference to the law of the country where protection is claimed makes it clear that ownership depends on the law of the country of importation, whoever may be considered the owner of the copyright in the country of origin of the film.  For example, if protection is claimed in

the United Kingdom, it is the British law which governs ownership; if in France it is the law of that country.

### Article 14*bis*, paragraph (2)*(b)*

*Presumption of Legitimation*

> *(b)* However, in the countries of the Union which, by legislation, include among the owners of copyright in a cinematographic work authors who have brought contributions to the making of the work, such authors, if they have undertaken to bring such contributions, may not, in the absence of any contrary or special stipulation, object to the reproduction, distribution, public performance, communication to the public by wire, broadcasting or any other communication to the public, or to the subtitling or dubbing of texts, of the work.

14*bis*.5.   This provision only applies in countries other than those which have the "film copyright" or "legal licence" systems of law.  It provides that, in the absence of any contract to the contrary, those authors who have brought contributions to the making of a film (as distinct from those of pre-existing works—dealt with in Article 14) are, in effect, presumed to have agreed to certain ways in which the film may be exploited and which are listed below.

14*bis*.6.   It is emphasized that this "presumption of legitimation" only applies in countries in which the artistic contributors are recognised as owners of the copyright in the film, and then only if they have agreed to "bring their contributions" to the making of the film.  Who these contributors are is laid down later, particularly in paragraph (3).

14*bis*.7.   It is also emphasized that the presumption is governed by the fact that the author has consented, which is why it is not called a presumption of assignment but simply one of "legitimation", since it in no way interfered with the contractual relations between contributors and film-makers, but merely deems the latter to have acquired the permission necessary to exploit the film.

14*bis*.8.   The methods of exploitation in question are set out: reproduction (the synchronisation of the film), distribution (offer for exhibition), public performance (showing in cinemas), communication to the public by wire (cable distribution), broadcasting (including TV programmes), other public communication (e.g., public performance of a broadcast), sub-titling, dubbing of tapes (when the film is shown in a country where the language spoken differs from that of the original).

14*bis*.9.   As a result, unless the contract provides otherwise, makers have complete freedom to do everything needed to ensure the international circulation of their films.

### Article 14*bis*, paragraph (2)*(c)*

#### *Form of the Author's Consent*

> *(c)* **The question whether or not the form of the undertaking referred to above should, for the application of the preceding sub-paragraph *(b)*, be in a written agreement or a written act of the same effect shall be a matter for the legislation of the country where the maker of the cinematographic work has his headquarters or habitual residence. However, it shall be a matter for the legislation of the country of the Union where protection is claimed to provide that the said undertaking shall be in a written agreement or a written act of the same effect. The countries whose legislation so provides shall notify the Director General by means of a written declaration, which will be immediately communicated by him to all the other countries of the Union.**

14*bis*.10.   Under this sub-paragraph, the way in which the author's consent to the use of this work must be given if the presumption is to apply, is a matter for the country in which the maker has his habitual residence or his headquarters. But there is one exception: any country where protection is claimed may enact that the presumption has no effect unless this consent was in written form.

14*bis*.11.   In other words, the compromise arrived at in Stockholm between the various systems of law was as follows: the form of the author's agreement to have his work used in the film is a matter for the country of the maker of the film. This law decides whether or not it must be "in a written agreement or a written act of the same effect". This last expression means a legal instrument defining sufficiently adequately the conditions of engagement of persons bringing contributions to the making of the film, e.g., a collective employment contract or a general settlement to which those persons have agreed. But it is possible for one or more other countries to provide that the presumption shall have no effect unless some written document embodied the author's consent. If a country does so provide, it must inform the Director General of WIPO so that he may tell the other Union countries. This allows those concerned to know the countries in which the presumption depends on the "written" condition and to make their arrangements accordingly.

14*bis*.12.   By way of example, a film-maker resident in the Federal Republic of Germany (where a written consent is not required) may enjoy the benefit of this "presumption of legitimation"; if the film is exploited in Sweden (another country in which writing is not demanded) the presumption applies; but if it is exported to France, and if this country has made the notification to the Director General mentioned above, the presumption has no effect unless there was a written contract in the Federal Republic of Germany, even if not required under German law.   This makes it necessary for the maker, in his dealings with the various contributors to a film, to be aware of the legal situation in each country in which he hopes to exploit his film and, if necessary, to safeguard his position with a "written agreement or a written act of the same effect".

### Article 14*bis*, paragraph (2)*(d)*

#### *"Contrary or Special Stipulation"*

*(d)* By "contrary or special stipulation" is meant any restrictive condition which is relevant to the aforesaid undertaking.

14*bis*.13.   According to sub-paragraph *(b)* the presumption of legitimation only applies "in the absence of any contrary or special stipulation". This means any contractual term which is "restrictive" i.e., which conflicts with part or all of the presumption.   It might for example be a stipulation that the film shall not be shown on television or diffused by wire.

### Article 14*bis*, paragraph (3)

#### *Artistic Contributors to the Film*

(3) Unless the national legislation provides to the contrary, the provisions of paragraph (2)*(b)* above shall not be applicable to authors of scenarios, dialogues and musical works created for the making of the cinematographic work, or to the principal director thereof. However, those countries of the Union whose legislation does not contain rules providing for the application of the said paragraph (2)*(b)* to such director shall notify the Director General by means of a written declaration, which will be immediately communicated by him to all the other countries of the Union.

14*bis*.14.   The presumption does not, unless national legislation provides otherwise, apply to "authors of scenarios, dialogues and musical works created for the making of the cinematographic work, or to the principal director thereof".   However, if a country's law does not make the presumption binding on the principal director, it must notify the Director

General of WIPO, who informs the other Union countries. This restriction takes into account those countries which treat the director as merely another employee of the film company. Note that the paragraph speaks of the "principal director" since there may be other employees who can be so-called but to whom it is intended the presumption shall apply automatically.

14*bis*.15. This paragraph therefore limits the application of the presumption: it does not apply to those authors whose works (scenarios, scripts, music) can enjoy an existence other than in the film itself, nor to the principal director. But it does apply, under the conditions laid down, to assistant producers and directors, those responsible for decor, costumiers, cameramen and cutters, and also to the actors, to the extent that some countries treat them as co-authors of the film. It was agreed in Stockholm (1967) that no country in the Union which gives the copyright in films to the artistic contributors may adopt a law which does not allow for such a presumption of legitimation. In other words it is binding on all the countries concerned.

14*bis*.16. National legislation does however remain free to provide that authors must share in the proceeds of the exhibition or other exploitation of the films to which they contributed.

## ARTICLE 14*ter*

### *"Droit de Suite"*

14*ter*.1.   The principle of this right was introduced at the Brussels Revision (1948) which took up a resolution passed at the preceding Revision Conference in Rome (1928).  Since then it has remained unchanged.

14*ter*.2.   It is an attempt to look after the interests of artists and other makers of artistic works.  The painter or sculptor often sells his work cheaply in order to make ends meet.  The work may pass through a number of hands and, in doing so, may considerably increase in value.  It becomes a source of revenue for those engaged in sales (dealers, experts, art critics, etc.) and is often bought as a good investment.  This provision therefore allows the artist to follow the fortunes of his work and to profit from the increase in its value each time it changes hands.  Known as the "droit de suite", it appears in the laws of a number of countries, and also, in an optional form, in the Tunis Model Law.

### Article 14*ter*, paragraph (1)

#### *Scope of the Right*

> (1) The author, or after his death the persons or institutions authorized by national legislation, shall, with respect to original works of art and original manuscripts of writers and composers, enjoy the inalienable right to an interest in any sale of the work subsequent to the first transfer by the author of the work.

14*ter*.3.   This first paragraph explains what is meant by "droit de suite": an interest in any sale of the work after the first.  These are usually sales by public auction or through art dealers.  The Convention covers both works of art and original manuscripts of authors and composers although sales of the latter are seldom of major importance as producers of revenue.  On the other hand, it is by sale that works of art are usually exploited.  The Convention does not define "works of art"; but it is generally agreed that these consist of drawings, paintings, statues, engravings and lithographs, always provided that they are the originals, made by the artist himself.  The right does not apply to works of architecture or to applied art.  The Tunis Law says so expressly.

14*ter*.4.   The right is not assignable.  This is to prevent the artist, in order to make a living, being forced to part with it.  But it is not personal to

him, in the sense that it follows the normal rules of succession to property, and the artist's heirs or such institutions as those rules prescribe, may benefit from it.

### Article 14*ter*, paragraph (2)

#### *Applicable Law*

(2) The protection provided by the preceding paragraph may be claimed in a country of the Union only if legislation in the country to which the author belongs so permits, and to the extent permitted by the country where this protection is claimed.

14*ter*.5. Enjoyment of this right, unlike most other rights, depends however on reciprocity. It is optional in the sense that Union countries are free to decide whether or not to introduce it and it can only be claimed if, and to the extent that, it forms part of the law where it is claimed. If, for example, an artist from Czechoslovakia (where the right covers all sales) seeks to assert his rights in Italy (where the right only exists if the proceeds of the sale in question exceed those of the previous sale) these rights are governed by Italian law. Again, a British artist cannot claim rights under this Article in Belgium since British law does not recognise the "droit de suite". An author cannot claim the right in respect of his original manuscript even in a country which recognises such a right, if his own country's law does not. The principle of national treatment is here, exceptionally, subjected to a need for reciprocity. It is a matter for the courts to decide whether or not this reciprocity is present.

### Article 14*ter*, paragraph (3)

#### *Procedure*

(3) The procedure for collection and the amounts shall be matters for determination by national legislation.

14*ter*.6. The majority of the countries of the Union recognise the "droit de suite" and in those that do, the conditions vary. Usually its scope is confined to sale by public auction or through dealers, i.e., those sales which are reasonably simple to detect. It has been possible, without insuperable difficulty, to prescribe, in such cases, that the authors (often represented by a collecting society) receive a percentage (usually some 5%) of the sale price.

14*ter*.7.   Some laws only allow for the right if there is an increase in value, i.e., if the price paid is higher than that at the previous sale.   In such cases the percentage is calculated on the increase.

14*ter*.8.   Often the provisions dealing with the terms and conditions for exercise of the "droit de suite" are to be found in laws and administrative regulations other than those covering copyright generally.   The Tunis Model Law so suggests.

## ARTICLE 15

### *Presumptions of Authorship*

15.1.  This goes back to the Convention's beginning (text of 1886).  It deals with the persons who are entitled to bring copyright actions.  Two additions were made in Stockholm (1967), one as to the makers of films, and the other as to folklore.

### Article 15, paragraph (1)

### *General Rule*

> **(1) In order that the author of a literary or artistic work protected by this Convention shall, in the absence of proof to the contrary, be regarded as such, and consequently be entitled to institute infringement proceedings in the countries of the Union, it shall be sufficient for his name to appear on the work in the usual manner.  This paragraph shall be applicable even if this name is a pseudonym, where the pseudonym adopted by the author leaves no doubt as to his identity.**

15.2.  The Convention does not define "author" but establishes a presumption that it is he who is entitled to bring action to assert the copyright in the work.  It is enough for this purpose for his name to appear on the work in the usual manner.  The courts are left to give precise meaning to this general expression.  If an alleged infringer wishes to show that the author is not the copyright owner, he must prove it.

15.3.  The paragraph applies even to pseudonyms if they leave no doubt as to the authors' identities (compare Article 7(3)).  The question is one of fact for the courts.

15.4.  Note that the Convention merely says that, unless the contrary is proved, the author is the person whose name appears as such on the work.  It goes no further and thus leaves member countries free to make their own rules on the subject.  This is of some importance in connection with works made in the course of their creator's employment by someone else (whether an individual or a legal entity) and with commissioned works.  The Tunis Model Law offers solutions which take into account both Latin and Anglo-Saxon legal theories.

### Article 15, paragraph (2)

*Cinematographic Works*

> (2) The person or body corporate whose name appears on a cinematographic work in the usual manner shall, in the absence of proof to the contrary, be presumed to be the maker of the said work.

15.5. This provision, introduced during the Stockholm Revision (1967), completes the rules governing films. (See also Articles 2(1), 4, 5(4) (c), 7(2), 14 and 14*bis*.)

15.6. Note the words "whose name appears on" the work. This does not mean that the work must be fixed in some material form. By Article 2(2) the question of fixation is left an open one. This paragraph creates the presumption whether the film is fixed or not.

### Article 15, paragraph (3)

*Anonymous and Pseudonymous Works*

> (3) In the case of anonymous and pseudonymous works, other than those referred to in paragraph (1) above, the publisher whose name appears on the work shall, in the absence of proof to the contrary, be deemed to represent the author, and in this capacity he shall be entitled to protect and enforce the author's rights. The provisions of this paragraph shall cease to apply when the author reveals his identity and establishes his claim to authorship of the work.

15.7. This presumption in favour of the publisher does not go so far as to deem him the author; he is merely presumed to represent the author— to possess a kind of power of attorney to bring action to enforce rights in the work. Although the author's identity is, by definition, unknown, his copyright must be respected. The Convention charges the publisher with ensuring that respect.

15.8. The presumption of course ceases to operate when the author reveals his identity and himself asserts his rights.

## Article 15, paragraph (4)

### *Folklore*

> (4)(*a*) In the case of unpublished works where the identity of the author is unknown, but where there is every ground to presume that he is a national of a country of the Union, it shall be a matter for legislation in that country to designate the competent authority which shall represent the author and shall be entitled to protect and enforce his rights in the countries of the Union.
>
> (*b*) Countries of the Union which make such designation under the terms of this provision shall notify the Director General by means of a written declaration giving full information concerning the authority thus designated. The Director General shall at once communicate this declaration to all other countries of the Union.

15.9.   The main purpose of this provision is to cover works of what is called "folklore" although the expression, very difficult to define, is not used in the Convention. It is the second of the Stockholm (1967) additions, confirmed by the Paris Revision (1971).

15.10.   The paragraph lays down several conditions: (i) the work must be unpublished in the sense of Article 3(3); (ii) its author must be unknown: folklore is, by definition, attributable to no particular author. The names of those responsible for it are lost in the mists of time; (iii) there must nevertheless be every reason to believe this unknown author to be a national of a given Union country; the Convention creates a sort of presumption.

15.11.   If these three conditions are fulfilled, an authority appointed by the country in question may, like the publisher of an anonymous work (paragraph (3) above) bring action to enforce the copyright in all Union countries, including that of the work's presumed author. It is a matter for this authority to prove the case and satisfy any court before which an action is brought on such matters as the grounds for presuming that the author is or was a national of the country in question.

15.12.   The paragraph follows the usual pattern regarding notice: the country appointing such an authority must notify the Director General of WIPO giving full information. The latter passes the information on to all the other Union countries.

15.13.   It was agreed at Stockholm (1967) that works by unknown authors were a particular example of anonymous works. Thus, if the work

is published, it is the publisher who brings action and there is nothing to stop the legally appointed authority being such publisher. Term of protection is governed by Article 7(3).

15.14.  By applying the same principles to unpublished works by unknown authors, and by allowing for the bringing of actions by state-appointed authorities, the Convention offers to its members, and particularly to developing countries whose folklore is part of their heritage, a means to exploit it.

15.15.  It is to be noted that the Tunis Model Law contains provision for an adequate protection of folklore.

## ARTICLE 16

*Seizure of Infringing Copies*

**(1) Infringing copies of a work shall be liable to seizure in any country of the Union where the work enjoys legal protection.**

**(2) The provisions of the preceding paragraph shall also apply to reproductions coming from a country where the work is not protected, or has ceased to be protected.**

**(3) The seizure shall take place in accordance with the legislation of each country.**

16.1.  This provision appeared in the original text of the Convention. It was added to in Berlin (1908) and a few purely drafting amendments were made in Stockholm (1967). It allows the author (or his successor in title) to take steps to seize infringing copies of his work. Each country chooses its own conditions, and the provision only, of course, applies if the work in question is protected in the country concerned.

16.2.  The 1908 Revision added a second paragraph allowing for the seizure of reproductions coming from a country where the work is not protected or in which it has fallen into the public domain. If such copies are imported into a country where protection exists, they are infringing copies and liable to seizure.

16.3.  Member countries are free to decide on procedure e.g., to entrust it to the courts or to customs officers, and to lay down who may demand it.

16.4.  The Tunis Model Law contains provisions dealing with this matter. It allows for the seizure not only of infringing copies but also of receipts arising from acts of infringement and materials used to make the copies. Normally, only the owner of the copyright may demand seizure, but the authority charged with protecting folklore (Article 15(4)) may apply to the courts or to the customs officers for the seizure of works of that category made abroad without permission and imported. This Model Law also covers matters of proof. Under it, the courts will act on statements by police officers or "certified statements of the sworn agents of the organisations of authors". The conditions under which the latter's evidence is admissible is a matter for national legislation. It is clear that the part played by officers of the collecting societies makes a considerable contribution to the policing of copyright infringements.

16.5.   Although the Convention does not say so expressly except in relation to seizure, all sanctions on infringers are left to national legislation. Remedies may be civil, criminal or administrative: injunctions, damages, fines and/or prison sentences are examples.  The courts can usually be trusted to mitigate the punishment when lenience for the infringer is deserved.

## ARTICLE 17

*Power of Governments to Control the Circulation,*
*Performance and Exhibition of Works*

**The provisions of this Convention cannot in any way affect the right of the Government of each country of the Union to permit, to control, or to prohibit, by legislation or regulation, the circulation, presentation, or exhibition of any work or production in regard to which the competent authority may find it necessary to exercise that right.**

17.1.   This Article has remained almost unchanged from the beginning in 1886; but it gave rise in Stockholm to lively discussions.

17.2.   It covers the right of governments to take the necessary steps to maintain public order. On this point, the sovereignty of member countries is not affected by the rights given by the Convention. Authors may exercise their rights only if that exercise does not conflict with public order. The former must give way to the latter. The Article therefore gives Union countries certain powers of control.

17.3.   During the Stockholm discussions (1967) it was generally agreed that the Article dealt mainly with censorship and the powers to permit or prohibit the dissemination of the work were exercisable to that end. The Article did not allow the creation of a regime under which works might be disseminated by virtue of compulsory licences. Where the author's consent was required before a work is made publicly available, it should not be possible for a country to override that consent (except, for example, to allow the police to publish or broadcast a photograph of a wanted criminal).

17.4.   However, quite apart from these powers of censorship, it was unanimously agreed in Stockholm that questions of public policy should always be a matter for national legislation and that countries of the Union would therefore be able to take all necessary measures to restrict possible abuse of monopolies. Thus, the laws of some member countries with the Anglo-Saxon legal tradition have provided for tribunals which, under conditions laid down, act as a sort of arbitrator between the author's collecting societies and users of the works they control, and this avoids any question of abuse of the monopoly position the societies enjoy.

## ARTICLE 18

*Retroactive Effect of the Convention*

18.1.  This deals with the way in which the Convention applies to works already in existence when their country of origin first joins the Convention. Known as the Rule of Retroactivity, it has been in the Convention from the beginning.  Comparatively minor changes were made in Paris (1896) and Berlin (1908), but since then it has remained unchanged.

### Article 18, paragraph (1)

*General Principle*

**(1) This Convention shall apply to all works which, at the moment of its coming into force, have not yet fallen into the public domain in the country of origin through the expiry of the term of protection.**

18.2.  There is no obligation to protect works which, when their country of origin first becomes a Union country, are already in the public domain there.  (For the meaning of country of origin see Article 5(4).)  At the Berlin Revision (1908), it was provided that the lapse into the public domain must have been the result of the expiry of the term of protection: since then, the rules on comparison of term have applied (Article 7(8)). Take, for example, a newly joined country which gives protection for fifty years after the author's death (the Convention term) and one which goes further: the shorter term applies.

### Article 18, paragraph (2)

*Further Condition*

**(2) If, however, through the expiry of the term of protection which was previously granted, a work has fallen into the public domain of the country where protection is claimed, that work shall not be protected anew.**

18.3.  This makes it clear that if, in the country where protection is claimed, a work was once protected but that protection has lapsed because its term has come to an end, there is no obligation to protect it anew.  Other people may have made use of the work during the period in which they were free to do so, and to restore the copyright would prejudice their liberty to continue.

18.4.   As in paragraph (1), this paragraph speaks of works falling into the public domain "through the expiry of the term of protection". When the Additional Act of 1896 laid down that "the stipulations... shall apply equally to the exclusive right of translation", the question arose as regards this right, whether the "ten-year" regime (see below) applied, or the normal term set out in Article 7. There was, however, general agreement that for this purpose one must consider the work as a whole, and not each individual exclusive right, and Article 7 therefore applied.

## Article 18, paragraph (3)

### *Application*

(3) The application of this principle shall be subject to any provisions contained in special conventions to that effect existing or to be concluded between countries of the Union. In the absence of such provisions, the respective countries shall determine, each in so far as it is concerned, the conditions of application of this principle.

18.5.   Bilateral agreements may govern the way in which this principle is applied; if there is none, the Convention leaves member countries a great deal of latitude over what their law may contain. It seems scarcely necessary to say (as the paragraph does) that each country's laws apply only in the country concerned. In practice, considerable differences exist between member countries.

18.6.   This matter of retroactivity can be of considerable importance when a new country joins the Union since there may be, in such a country, many works in the public domain, not because of the expiry of the term of protection but, for example, by reason of the failure of their authors to observe the formalities demanded for their protection. That being so, thought must be given to those who have, quite properly, taken steps to exploit these works and who would be financially embarrassed, to say the least, if the authors suddenly acquired exclusive rights to control what they had been freely doing (publishing, performing, adapting, etc.). It is a matter therefore for each member country to decide on the limits of this retroactivity and, in litigation, for the courts to take into account these acquired rights.

### Article 18, paragraph (4)

*Particular Cases*

(4) The preceding provisions shall also apply in the case of new accessions to the Union and to cases in which protection is extended by the application of Article 7 or by the abandonment of reservations.

18.7.　This paragraph lists the events most likely to bring this Article into operation (new accessions to the Union, extension of term by reason of Article 7 and the abandonment of reservations). An example of the last might be giving up the ten-year reservation for translations. In all these cases, the provisions on retroactivity mentioned above apply.

## ARTICLE 19

*Effect on National Legislation*

**The provisions of this Convention shall not preclude the making of
a claim to the benefit of any greater protection which may be granted
by legislation in a country of the Union.**

19.1.  This Article, which was introduced into the Convention at the
Berlin Revision (1908) and slightly amended in Brussels (1948), means
that the rights laid down by the Convention are only minima.  Nothing in
the Convention stops an author claiming greater rights in a Convention
country if the law of that country so provides.

19.2.  The Brussels Revision (1948) made it clear that, in this case, the
national law prevails.  In other words, the minimum rights prescribed by
the Convention form the basis of the Union but if, under the national
laws of member countries, Convention nationals and their successors in
title can claim better copyright treatment, nothing stops them doing so.
This is simply another example of the rule that national treatment must be
accorded (Article 5(1)).

## ARTICLE 20

*Special Agreements*

**The Governments of the countries of the Union reserve the right to enter into special agreements among themselves, in so far as such agreements grant to authors more extensive rights than those granted by the Convention, or contain other provisions not contrary to this Convention. The provisions of existing agreements which satisfy these conditions shall remain applicable.**

20.1.   This provision, which was in the original text and, apart from minor drafting amendments in Berlin (1908), remains unchanged, deals with special agreements between the member countries.   At the time the Convention was first concluded, there existed a number of bilateral treaties between the founder members, some of which went further in protecting authors than the Convention itself.   It was felt both desirable and necessary to make it clear that there was nothing in the Convention which prevented their continuation.

20.2.   However any such agreement must satisfy one of two conditions: it must either grant to authors more extensive rights than the Convention does or include matters not covered by the Convention but, equally, not in conflict with it.   The countries concluding the agreements are the judges of whether these conditions are fulfilled.

20.3.   Recent examples of the first condition are the bilateral agreements to provide reciprocity in the matter of wartime extensions of the term of copyright and those which mutually extend the term of copyright beyond that laid down by Article 7(1) of the Convention.   The European Agreement of 1958 concerning programme exchanges by means of television films is an example of the second.

20.4.   Although there are comparatively few special agreements of this sort among Berne Union countries, there are many in the field of industrial property, falling within the equivalent Article 19 of the Paris Convention for the Protection of Industrial Property which is similar to this Article 20.

## ARTICLE 21

*Special Provisions for Developing Countries*

**(1) Special provisions regarding developing countries are included in the Appendix.**

**(2) Subject to the provisions of Article 28(1)***(b)***, the Appendix forms an integral part of this Act.**

21.1.  This Article introduces the Appendix drawn up in Paris (1971) which forms an integral part of the Convention, and contains special provisions permitting developing countries more latitude than is allowed by the Convention proper.

21.2.  Countries ratifying the Paris Act may confine this ratification to the administrative provisions of the Convention (see below), but Articles 1 to 21 and the Appendix form a single text no part of which may be ratified separately.  In other words, Articles 1 to 21 and the Appendix are the substantive provisions and all or none must be agreed to.

## ARTICLE 22

### *The Assembly*

22.1.  This is the first of the Articles dealing with what are usually called the administrative provisions of the Convention.  They establish the Union's policy-making bodies and its secretariat, determine how it is to be financed and lay down the tasks allocated to the Union's various organs.

22.2.  All this stemmed from the Stockholm Conference (1967) which made great administrative and structural changes in all the intellectual property unions.  The Paris Revision (1971), although making some changes in the final clauses, left this new structure untouched.

22.3.  The Articles (22 to 26) which cover these administrative matters are largely self-explanatory.  But reference must be made to the Convention which (also in 1967) set up the World Intellectual Property Organization (WIPO).  The latter Convention may include States which are not members of the Berne Union, but, so far as structure and administration are concerned, it provides the framework within which all the intellectual property Unions, including the Berne Union, operate.

22.4.  The creation of WIPO in 1967 was prompted by a wish to modernize and make more effective the administration of these Unions, whether then in existence or still to be set up, while still leaving the autonomy of each unaffected.  The general policy and course of action of the Organization (WIPO) is a matter for all the Member States; but each Union has its own organs, with power to regulate matters of interest to the Union concerned.  WIPO provides the roof under which all the Unions (Berne, Paris and others in the field of intellectual property) administered by that Organization, can co-operate on administrative matters of common concern.

> (1)*(a)*  The Union shall have an Assembly consisting of those countries of the Union which are bound by Articles 22 to 26.
> *(b)*  The Government of each country shall be represented by one delegate, who may be assisted by alternate delegates, advisors, and experts.
> *(c)*  The expenses of each delegation shall be borne by the Government which has appointed it.
> (2)*(a)*  The Assembly shall:
> (i)  deal with all matters concerning the maintenance and development of the Union and the implementation of this Convention;

(ii) give directions concerning the preparation for conferences of revision to the International Bureau of Intellectual Property (hereinafter designated as "the International Bureau") referred to in the Convention Establishing the World Intellectual Property Organization (hereinafter designated as "the Organization"), due account being taken of any comments made by those countries of the Union which are not bound by Articles 22 to 26;

(iii) review and approve the reports and activities of the Director General of the Organization concerning the Union, and give him all necessary instructions concerning matters within the competence of the Union;

(iv) elect the members of the Executive Committee of the Assembly;

(v) review and approve the reports and activities of its Executive Committee, and give instructions to such Committee;

(vi) determine the program and adopt the triennial budget of the Union, and approve its final accounts;

(vii) adopt the financial regulations of the Union;

(viii) establish such committees of experts and working groups as may be necessary for the work of the Union;

(ix) determine which countries not members of the Union and which intergovernmental and international non-governmental organizations shall be admitted to its meetings as observers;

(x) adopt amendments to Articles 22 to 26;

(xi) take any other appropriate action designed to further the objectives of the Union;

(xii) exercise such other functions as are appropriate under this Convention;

(xiii) subject to its acceptance, exercise such rights as are given to it in the Convention establishing the Organization.

*(b)* With respect to matters which are of interest also to other Unions administered by the Organization, the Assembly shall make its decisions after having heard the advice of the Coordination Committee of the Organization.

(3)*(a)* Each country member of the Assembly shall have one vote.

*(b)* One-half of the countries members of the Assembly shall constitute a quorum.

*(c)* Notwithstanding the provisions of subparagraph *(b)*, if, in any session, the number of countries represented is less than one-half but equal to or more than one-third of the countries members of the Assembly, the Assembly may make decisions but, with the exception of decisions concerning its own procedure, all such decisions shall take effect only if the following conditions are fulfilled. The International Bureau shall communicate the said decisions to the countries members of the Assembly which were not represented and shall invite them to express in writing their vote or abstention within a period of three months from the date of the communication. If, at the expiration of this period, the number of countries having thus expressed their vote or abstention attains the number of countries which was lacking for attaining the quorum in the session itself, such decisions

shall take effect provided that at the same time the required majority still obtains.

   *(d)* Subject to the provisions of Article 26(2), the decisions of the Assembly shall require two-thirds of the votes cast.

   *(e)* Abstentions shall not be considered as votes.

   *(f)* A delegate may represent, and vote in the name of, one country only.

   *(g)* Countries of the Union not members of the Assembly shall be admitted to its meetings as observers.

   **(4)***(a)* The Assembly shall meet once in every third calendar year in ordinary session upon convocation by the Director General and, in the absence of exceptional circumstances, during the same period and at the same place as the General Assembly of the Organization.

   *(b)* The Assembly shall meet in extraordinary session upon convocation by the Director General, at the request of the Executive Committee or at the request of one-fourth of the countries members of the Assembly.

   **(5)** The Assembly shall adopt its own rules of procedure.

22.5.   Paragraph (1) determines the Assembly's composition and paragraph (2) details its functions; paragraph (3) deals with voting procedures and paragraph (4) with its meetings.   Under paragraph (5) it makes its own rules of procedure.   These provisions are self-explanatory and need no comment.

22.6.   Before Stockholm (1967) there were no meetings of Union countries with decision-making powers except when, once every twenty years or so, diplomatic conferences took place.   The member countries therefore had no opportunity to discuss copyright matters and plan the changes required to bring the Convention up to date; certain bodies did, it is true, exist, but their role was a purely consultative one.   Now at least every three years, the Union countries are able to examine and approve the reports and the actions of the Director General of WIPO and give him instructions as regards matters within the Union's competence.   They determine the programme, adopt the budget and control the finances of the Union.

22.7.   Generally, the Assembly deals with all matters concerning the maintenance and development of the Union and the implementation of the Convention.   This last phrase does not mean its implementation by the governments or courts of the member countries.   The Assembly has no power to interfere in matters within the sole competence of sovereign States.   It merely means implementation, by the various organs of the Union (including the WIPO Secretariat), of those Convention provisions which impose duties on them.

22.8.   Finally, the Assembly gives, to the Secretariat, directions as to preparing Revision Conferences.  In the past, the preparations for such a Conference were a matter for the inviting country with the assistance of the Secretariat.  The 1967 Revision ensured that all member countries had a hand in this operation and were able to influence the preparations.  In giving directions on this point, the Assembly must take into account any comments made by Union countries not yet bound by Articles 22 to 26.  The fact that they have not yet accepted the administrative provisions drafted in Stockholm does not mean that they are any the less interested in possible changes in the Convention, whether administrative or substantive.  There is also provision (Article 24(7)*(b)* below) for the Secretariat to consult with governmental and international non-governmental organisations during the preparations for revision.  Experience has shown the value of such consultation with interested circles.

22.9.   The Assembly is the chief organ of the Union with all necessary powers to further its ends.  If questions arise which also concern other intellectual property unions administered by WIPO, the Assembly decides only after taking the advice of the Coordination Committee of the Organization.

## ARTICLE 23

*The Executive Committee*

(1) The Assembly shall have an Executive Committee.

(2)*(a)* The Executive Committee shall consist of countries elected by the Assembly from among countries members of the Assembly. Furthermore, the country on whose territory the Organization has its headquarters shall, subject to the provisions of Article 25(7)*(b)*, have an *ex officio* seat on the Committee.

*(b)* The Government of each country member of the Excutive Committee shall be represented by one delegate, who may be assisted by alternate delegates, advisors, and experts.

*(c)* The expenses of each delegation shall be borne by the Government which has appointed it.

(3) The number of countries members of the Executive Committee shall correspond to one-fourth of the number of countries members of the Assembly. In establishing the number of seats to be filled, remainders after division by four shall be disregarded.

(4) In electing the members of the Executive Committee, the Assembly shall have due regard to an equitable geographical distribution and to the need for countries party to the Special Agreements which might be established in relation with the Union to be among the countries constituting the Executive Committee.

(5)*(a)* Each member of the Executive Committee shall serve from the close of the session of the Assembly which elected it to the close of the next ordinary session of the Assembly.

*(b)* Members of the Executive Committee may be re-elected, but not more than two-thirds of them.

*(c)* The Assembly shall establish the details of the rules governing the election and possible re-election of the members of the Executive Committee.

(6)*(a)* The Executive Committee shall:

(i) prepare the draft agenda of the Assembly;

(ii) submit proposals to the Assembly respecting the draft program and triennial budget of the Union prepared by the Director General;

(iii) approve, within the limits of the program and the triennial budget, the specific yearly budgets and programs prepared by the Director General;

(iv) submit, with appropriate comments, to the Assembly the periodical reports of the Director General and the yearly audit reports on the accounts;

(v) in accordance with the decisions of the Assembly and having regard to circumstances arising between two ordinary sessions of the Assembly, take all necessary measures to ensure the execution of the program of the Union by the Director General;

(vi) perform such other functions as are allocated to it under this Convention.

*(h)* With respect to matters which are of interest also to other Unions administered by the Organization, the Executive Committee shall make its decisions after having heard the advice of the Coordination Committee of the Organization.

(7)*(a)* The Executive Committee shall meet once a year in ordinary session upon convocation by the Director General, preferably during the same period and at the same place as the Coordination Committee of the Organization.

*(b)* The Executive Committee shall meet in extraordinary session upon convocation by the Director General, either on his own initiative, or at the request of its Chairman or one-fourth of its members.

(8)*(a)* Each country member of the Executive Committee shall have one vote.

*(b)* One-half of the members of the Executive Committee shall constitute a quorum.

*(c)* Decisions shall be made by a simple majority of the votes cast.

*(d)* Abstentions shall not be considered as votes.

*(e)* A delegate may represent, and vote in the name of, one country only.

(9) Countries of the Union not members of the Executive Committee shall be admitted to its meetings as observers.

(10) The Executive Committee shall adopt its own rules of procedure.

23.1.   The ten paragraphs of this Article are also self-explanatory. The Executive Committee is constituted (paragraph (1)), composition and membership are dealt with in paragraphs (2) and (3). In electing the Committee, the Assembly must take two matters into account (paragraph (4)): an equitable geographical distribution and the need for countries members of special agreements within the Union to be represented on the Committee. This second matter is so far of practical importance only for the Paris Union. It is only in the field of industrial property that these special agreements exist. Paragraph (5) adds further provisions regarding membership.

23.2.   The important paragraph is No. 6, since it enumerates the Committee's functions: these can be summarized as preparing the Assembly's work and supervising the carrying out of its decisions. The Committee meets each year (paragraph (7)) in order to maintain continuity between Assembly sessions, and may meet more often in extraordinary session.

23.3.   Paragraph (8) deals with voting, and paragraph (9) provides for countries members of the Assembly but not of the Committee appearing as observers at its meetings. Under paragraph (10) the Committee makes its own rules.

## ARTICLE 24

### *The International Bureau of WIPO*

(1)(a) The administrative tasks with respect to the Union shall be performed by the International Bureau, which is a continuation of the Bureau of the Union united with the Bureau of the Union established by the International Convention for the Protection of Industrial Property.

(b) In particular, the International Bureau shall provide the secretariat of the various organs of the Union.

(c) The Director General of the Organization shall be the chief executive of the Union and shall represent the Union.

(2) The International Bureau shall assemble and publish information concerning the protection of copyright. Each country of the Union shall promptly communicate to the International Bureau all new laws and official texts concerning the protection of copyright.

(3) The International Bureau shall publish a monthly periodical.

(4) The International Bureau shall, on request, furnish information to any country of the Union on matters concerning the protection of copyright.

(5) The International Bureau shall conduct studies, and shall provide services, designed to facilitate the protection of copyright.

(6) The Director General and any staff member designated by him shall participate, without the right to vote, in all meetings of the Assembly, the Executive Committee and any other committee of experts or working group. The Director General, or a staff member designated by him, shall be *ex officio* secretary of these bodies.

(7)(a) The International Bureau shall, in accordance with the directions of the Assembly and in cooperation with the Executive Committee, make the preparations for the conferences of revision of the provisions of the Convention other than Articles 22 to 26.

(b) The International Bureau may consult with intergovernmental and international non-governmental organizations concerning preparations for conferences of revision.

(c) The Director General and persons designated by him shall take part, without the right to vote, in the discussions at these conferences.

(8) The International Bureau shall carry out any other tasks assigned to it.

24.1. From the beginning the Convention provided for an international secretariat with the French name "Bureau de l'Union Internationale pour la protection des œuvres littéraires et artistiques". The 1886 Text laid down that its expenses were to be borne by the countries of the Union and this Bureau was to be under the administrative and financial supervision

of the Swiss Government. Since the Paris Convention of 1883 had done the same thing for industrial property, the two Secretariats were, for reasons of economy, soon merged (in 1893). This merger gave rise to the title "Bureaux Internationaux Réunis pour la Protection de la Propriété Intellectuelle", and the abbreviation BIRPI. But this title was scarcely used before the early 1960's when the joint Secretariat moved to Geneva. Before then it had been located in Berne and had been generally known as the "Berne Bureau".

24.2.   The Stockholm Revision (1967), which gave birth to WIPO, slightly changed the system. It provided for the administration to be carried out by the International Bureau "which is a continuation of" BIRPI. Since the WIPO Convention (Article 4) entrusts that Organization with the administrative tasks of the Berne Union, and, in Article 9, provides for a Secretariat called the International Bureau, it is this Secretariat that is meant. In practice, although the old Bureaux continue, from a strictly legal point of view, to be the Secretariat for those Union countries which have not yet become bound by the 1967 changes, the new International Bureau has taken over the administration from BIRPI. But the tasks entrusted to the old and new Secretariats respectively differ hardly at all (see, for example, Article 22 of the Brussels Act (1948)), and the fusion has taken place without raising any problems. The Convention contains provisions allowing for the transition (Article 38(2) and (3) below).

24.3.   Article 24 restates the functions of the old Secretariat in a more logical and detailed form, and recites the functions of the International Bureau of WIPO in relation to the Union: perform the administrative tasks and provide the Secretariat of its various organs (paragraph (1)); assemble and publish information on copyright (paragraph (2)). Paragraph (3) provides for the publication of a monthly periodical. This is the review "Le Droit d'Auteur" and its English edition "Copyright". Under paragraph (4), the Bureau furnishes member countries, on request, with information on copyright matters. The Bureau must conduct studies and provide services (paragraph (5)) (examples are the publication of manuals and brochures). It may participate, in a consultative capacity, in all meetings of the organs of the Union (paragraph (6)) and has the task of preparing revisions of the Convention other than its Articles 22 to 26, which are a matter for the Assembly (although the Director General may make proposals to that body—see Article 26). Finally, it carries out any other tasks assigned to it (paragraph (8)), for example the establishment of official texts in accordance with Article 37.

24.4.  The International Bureau of WIPO is directed by a Director General.  He is its highest official and represents the Organization, and in the same way, the Union.  The provisions governing his nomination and functions, the composition of the Bureau and other matters of this kind are set out in Article 9 of the WIPO Convention.   For a complete picture, reference should also be made to that Article.

# ARTICLE 25

## *Finances*

(1)*(a)* The Union shall have a budget.

*(b)* The budget of the Union shall include the income and expenses proper to the Union, its contribution to the budget of expenses common to the Unions, and, where applicable, the sum made available to the budget of the Conference of the Organization.

*(c)* Expenses not attributable exclusively to the Union but also to one or more other Unions administered by the Organization shall be considered as expenses common to the Unions. The share of the Union in such common expenses shall be in proportion to the interest the Union has in them.

(2) The budget of the Union shall be established with due regard to the requirements of coordination with the budgets of the other Unions administered by the Organization.

(3) The budget of the Union shall be financed from the following sources:

(i) contributions of the countries of the Union;

(ii) fees and charges due for services performed by the International Bureau in relation to the Union;

(iii) sale of, or royalties on, the publications of the International Bureau concerning the Union;

(iv) gifts, bequests, and subventions;

(v) rents, interests, and other miscellaneous income.

(4)*(a)* For the purpose of establishing its contribution towards the budget, each country of the Union shall belong to a class, and shall pay its annual contributions on the basis of a number of units fixed as follows:

| | |
|---|---:|
| Class I | 25 |
| Class II | 20 |
| Class III | 15 |
| Class IV | 10 |
| Class V | 5 |
| Class VI | 3 |
| Class VII | 1 |

*(b)* Unless it has already done so, each country shall indicate, concurrently with depositing its instrument of ratification or accession, the class to which it wishes to belong. Any country may change class. If it chooses a lower class, the country must announce it to the Assembly at one of its ordinary sessions. Any such change shall take effect at the beginning of the calendar year following the session.

*(c)* The annual contribution of each country shall be an amount in the same proportion to the total sum to be contributed to the annual budget of the Union by all countries as the number of its units is to the total of the units of all contributing countries.

*(d)* Contributions shall become due on the first of January of each year.

*(e)* A country which is in arrears in the payment of its contributions shall have no vote in any of the organs of the Union of which it is a member if the amount of its arrears equals or exceeds the amount of the contributions due from it for the preceding two full years. However, any organ of the Union may allow such a country to continue to exercise its vote in that organ if, and as long as, it is satisfied that the delay in payment is due to exceptional and unavoidable circumstances.

*(f)* If the budget is not adopted before the beginning of a new financial period, it shall be at the same level as the budget of the previous year, in accordance with the financial regulations.

(5) The amount of the fees and charges due for services rendered by the International Bureau in relation to the Union shall be established, and shall be reported to the Assembly and the Executive Committee, by the Director General.

(6)*(a)* The Union shall have a working capital fund which shall be constituted by a single payment made by each country of the Union. If the fund becomes insufficient, an increase shall be decided by the Assembly.

*(b)* The amount of the initial payment of each country to the said fund or of its participation in the increase thereof shall be a proportion of the contribution of that country for the year in which the fund is established or the increase decided.

*(c)* The proportion and the terms of payment shall be fixed by the Assembly on the proposal of the Director General and after it has heard the advice of the Coordination Committee of the Organization.

(7)*(a)* In the headquarters agreement concluded with the country on the territory of which the Organization has its headquarters, it shall be provided that, whenever the working capital fund is insufficient, such country shall grant advances. The amount of these advances and the conditions on which they are granted shall be the subject of separate agreements, in each case, between such country and the Organization. As long as it remains under the obligation to grant advances, such country shall have an *ex officio* seat on the Executive Committee.

*(b)* The country referred to in subparagraph *(a)* and the Organization shall each have the right to denounce the obligation to grant advances, by written notification. Denunciation shall take effect three years after the end of the year in which it has been notified.

(8) The auditing of the accounts shall be effected by one or more of the countries of the Union or by external auditors, as provided in the financial regulations. They shall be designated, with their agreement, by the Assembly.

25.1.  This Article embodies another important element of the administrative Revision which took place in Stockholm (1967). Previously the   .

Convention merely fixed a ceiling for the expenses of the Bureau which were borne in common by the member countries in proportions fixed according to which of several classes each country chose. This ceiling could only be changed by a unanimous decision of the member countries.

25.2. Experience showed that expenses soon exceeded income and the ceiling became out of date as soon as it was fixed. Revision Conferences usually took place only once every twenty years or so. The Swiss Government, in its capacity as supervisory power, had to consult member countries; but unanimity was difficult to achieve and, since the necessary financial contributions were therefore often voluntary ones, their receipt could not be relied on. In other words, the system was not one calculated to meet the Union's financial needs, and only voluntary subscriptions kept the necessary work going. Nor were the Union countries able to settle the budget proposals, which cover not only work in progress but also commitments to future activities.

25.3. The Stockholm Revision (1967) provided for a budget (paragraph (1)). The same thing was done for the other intellectual property Unions (see WIPO Convention, Article 11).

25.4. In its other paragraphs, which are self-explanatory, this Article enumerates a number of financial rules: coordination with the budgets of other Unions (paragraph (2)); contributions to the budgets (paragraphs (3) and (4)); accounting by the International Bureau (paragraph (5)); working capital (paragraph (6)); advances by the host government (paragraph (7)) and auditing of the accounts (paragraph (8)).

25.5. The 1967 reforms made no changes in the system whereby Union countries paid their contributions in accordance with the class each was in. Unlike the system in some other Specialized Agencies of the United Nations and other inter-governmental organisations, the class for contribution purposes does not depend on population or national revenue per head of the inhabitants. Each country has a completely free choice of the class to which it shall belong. This was the original system of 1886. The Stockholm Revision (1967) added one class, the seventh, to widen the spread of the classes and to provide a wider differential between highest and lowest. For example, a country choosing the lowest class pays only i/25 of the amount paid by a country which has chosen the highest, thus taking the financial capacity of the less well-off countries into account. As has already been said, each country chooses its own class; the choice is usually dictated by economic and financial considerations and the impor-

tance attached by that country to copyright matters. But a country's influence in the affairs of the Union is in no way lessened by the amount of its annual contribution; each has the same rights, for example each has a single vote in the Assembly.

25.6.   It is important to stress that Union countries do not pay contributions to WIPO as such; there is no double payment. They contribute only to the Union of which they are members and it is the individual Unions which pay the common expenses, the amount of which is fixed by the Assembly of each Union taking into account the extent to which expenditure is undertaken in the interest of the Union in question.

25.7.   Paragraph (4) allows for changes in the class chosen for contribution purposes, lays down how contributions shall be calculated and when they are payable, and provides the sanctions for failure to do so.

25.8.   Details of the operation of these provisions are set out in financial rules made by the Assembly under powers given by Article 22(2)*(a)*(vii).

## ARTICLE 26

*Amendment of the Administrative Provisions*

(1) Proposals for the amendment of Articles 22, 23, 24, 25, and the present Article, may be initiated by any country member of the Assembly, by the Executive Committee, or by the Director General. Such proposals shall be communicated by the Director General to the member countries of the Assembly at least six months in advance of their consideration by the Assembly.

(2) Amendments to the Articles referred to in paragraph (1) shall be adopted by the Assembly. Adoption shall require three-fourths of the votes cast, provided that any amendment of Article 22, and of the present paragraph, shall require four-fifths of the votes cast.

(3) Any amendment to the Articles referred to in paragraph (1) shall enter into force one month after written notifications of acceptance, effected in accordance with their respective constitutional processes, have been received by the Director General from three-fourths of the countries members of the Assembly at the time it adopted the amendment. Any amendment to the said Articles thus accepted shall bind all the countries which are members of the Assembly at the time the amendment enters into force, or which become members thereof at a subsequent date, provided that any amendment increasing the financial obligations of countries of the Union shall bind only those countries which have notified their acceptance of such amendment.

26.1. This Article, introduced in Stockholm (1967), separates the administrative provisions (Articles 22 to 26) from the substantive provisions and the final clauses, so far as amendment is concerned. Changes in these Articles are a matter not for Revision Conferences but for the Assembly.

26.2. The normal method of making changes in the Convention (a diplomatic Conference of all member countries including those not bound by the text which is being revised; the need for unanimity before a new text can be adopted and the applicability of the new text only to countries which have ratified or acceded to it) appeared too rigid for the making of purely administrative changes. These have no effect on the ownership or scope of the copyrights protected by the Convention, and very little on the interests of member governments. Changes of this sort may become a matter of urgency. A more practical procedure was called for.

26.3. To mark the difference between the two methods of making changes in the text, the Convention uses a different word: here it is a

matter of "amendment"; for provisions other than those in Articles 22 to 26, it is a matter of "revision" (see Article 27).

26.4.   The procedure for this amendment needs no explanation.   Proposals are covered in paragraph (1), their adoption in paragraph (2) and entry into force in paragraph (3).

26.5.   Although normally the Assembly's decisions are taken by a two-third's majority (Article 22(3)*(d)*), a more substantial majority, usually three-quarters of the votes cast, is needed for changes in the administrative provisions.   For changes in Articles 22 and 26, an even larger majority is required.   Article 22 lays down the Assembly's powers and since these govern the administrative system as a whole they should not be changed lightly.   The Convention therefore demands a four-fifths majority.   It demands the same for an amendment of this Article, in order to stop a smaller majority amending this Article in order to amend, with the same majority, Article 22.

26.6.   Once the required majority has adopted an amendment, paragraph (3) provides for its entry into force.   This is normally one month after the adoption.   However, if its effect is to increase the financial obligations of member countries, a formal acceptance is required from each country before that country becomes bound by it.   Of course this only applies to existing member countries.   The obligations of those joining the Union for the first time are those in force at the time of joining.

26.7.   Since Stockholm (1967) there has in fact been no change in the administrative provisions.

## ARTICLE 27

*Revision of the Convention*

(1) This Convention shall be submitted to revision with a view to the introduction of amendments designed to improve the system of the Union.

(2) For this purpose, conferences shall be held successively in one of the countries of the Union among the delegates of the said countries.

(3) Subject to the provisions of Article 26 which apply to the amendment of Articles 22 to 26, any revision of this Act, including the Appendix, shall require the unanimity of the votes cast.

27.1.   The possibility of revising the Convention was foreseen from its beginning, and the 1886 Text of this Article has suffered only minor changes.

27.2.   Its founder members expected the Convention to evolve.  No instrument of this sort is perfect in its first form.  All international agreements need revising from time to time, to make their meaning clearer, to extend their geographical application, to meet world changes.  Experience has shown the value of this power to revise.  It has been used on no less than five occasions (in Berlin in 1908, in Rome in 1928, in Brussels in 1948, in Stockholm in 1967 and in Paris in 1971).

27.3.   The Article explains that the aim is the improvement of the system of the Union (paragraph (1)).  It provides for the Revision Conferences to take place in Union countries (paragraph (2)).  Finally it demands unanimity before any revision (other than of the Administrative Provisions—see Article 26 above) can take place (paragraph (3)).

27.4.   This unanimity rule, which gives each member country a right of veto, was unchallenged until Brussels (1948) when it gave rise to a good deal of discussion.  However, the principle survived and has not since been called into question.  A veto of course involves a positive contrary vote and does not include a mere abstention. This rule is felt by some to be a cornerstone of the Union's structure which safeguards the level of the copyright which it contains.

## ARTICLE 28

*Acceptance and Entry into Force for Union Countries*

28.1.  This Article is the first of a number dealing with acceptance of the Convention and its entry into force as regards Union countries (Article 28) and non-Union countries (Article 29).  By the Convention is meant the latest revised text, i.e., that which emerged from the discussions in Paris in 1971 and which is known as the Paris Act.

### Article 28, paragraph (1)

*Acceptance of the Paris Act (1971)*

> *(1)(a)*  **Any country of the Union which has signed this Act may ratify it, and, if it has not signed it, may accede to it.  Instruments of ratification or accession shall be deposited with the Director General.**
>
> *(b)*  **Any country of the Union may declare in its instrument of ratification or accession that its ratification or accession shall not apply to Articles 1 to 21 and the Appendix, provided that, if such country has previously made a declaration under Article VI(1) of the Appendix, then it may declare in the said instrument only that its ratification or accession shall not apply to Articles I to 20.**
>
> *(c)*  **Any country of the Union which, in accordance with subparagraph *(b)*, has excluded provisions therein referred to from the effects of its ratification or accession may at any later time declare that it extends the effects of its ratification or accession to those provisions.  Such declaration shall be deposited with the Director General.**

28.2.  Union countries may accept either by ratification or by accession. If a country has signed the text (either at the end of the Diplomatic Conference which adopted it or within the time limit laid down in Article 37(2)), it is a matter of ratification; if not, it is accession. However, these are only technical words and there is no difference whatsoever between the effect of ratification and that of accession.  The instruments of ratification or accession must be deposited with the Director General of WIPO.  Since Stockholm (1967) it is he who is given this function.

28.3.  It was a feature of the administrative and structural reform in Stockholm (1967) that member countries could accept this reform without necessarily at the same time accepting the substantive provisions.  It seemed that member countries, the great majority of which had taken part in drawing up this new regime, were ready to give it early acceptance,

especially since it involved no changes in their national domestic legislation. Acceptance of the new substantive provisions, on the other hand, might require amendment or a re-casting of the national law and call for a procedure (e.g., parliamentary) different from that required when it was merely a matter of agreeing to the new structure of an inter-governmental organisation (normally an executive decision). To have treated the new text as indivisible, for acceptance purposes, might well have postponed the operation of the new administrative scheme. Paragraph (1)*(b)* of this Article therefore permits Union countries, when ratifying or acceding, to exclude the substantive provisions (Articles 1 to 21 and the Appendix) and confined acceptance to the remainder of the Paris Act, namely Articles 22 to 26 and the final clauses. There is however the possibility of advance acceptance of the Appendix (see its Article VI).

28.4.   The Convention of course allows member countries a second opportunity: having originally accepted only Articles 22 to 38, to accept, at a later date, the substantive provisions. They do so by depositing their declaration to that effect with the Director General.

### Article 28, paragraph (2)

*Entry into Force of the Substantive Provisions*

(2)*(a)*  Articles 1 to 21 and the Appendix shall enter into force three months after both of the following two conditions are fulfilled:

(i)  at least five countries of the Union have ratified or acceded to this Act without making a declaration under paragraph (1)*(b)*.

(ii)  France, Spain, the United Kingdom of Great Britain and Northern Ireland, and the United States of America, have become bound by the Universal Copyright Convention as revised at Paris on July 24, 1971.

*(b)*  The entry into force referred to in subparagraph *(a)* shall apply to those countries of the Union which, at least three months before the said entry into force, have deposited instruments of ratification or accession not containing a declaration under paragraph (1)*(b)*.

*(c)*  With respect to any country of the Union not covered by subparagraph *(b)* and which ratifies or accedes to this Act without making a declaration under paragraph (1)*(b)*, Articles 1 to 21 and the Appendix shall enter into force three months after the date on which the Director General has notified the deposit of the relevant instrument of ratification or accession, unless a subsequent date has been indicated in the instrument deposited. In the latter case, Articles 1 to 21 and the Appendix shall enter into force with respect to that country on the date thus indicated.

*(d)*  The provisions of subparagraphs *(a)* to *(c)* do not affect the application of Article VI of the Appendix.

28.5.   Two conditions must be fulfilled: (i) at least five Union countries must have accepted the Paris Act (1971) without reserve, i.e., without having excluded the substantive provisions (Articles 1 to 21 and the Appendix); (ii) the four countries named must have accepted the Universal Copyright Convention as revised at Paris in 1971.


28.6.   This is the first time in the history of the Convention that the entry into force of one of its texts depended on named States becoming bound by another different international instrument.   (Three of the States in question were Union members in 1971.)   This link between the two treaties is explained by the fact that both were revised in parallel in Paris in 1971, to provide an international copyright settlement for the benefit of developing countries.   During the earlier preparatory meetings, an overall solution was agreed upon, whereby the Stockholm Protocol (1967) (which had encountered insuperable opposition) should be renegotiated, and at the same time the "safeguard clause" in the Universal Copyright Convention (Article XVII and the annexed Declaration in the 1952 Text) should be amended so as to cease to apply to developing countries.   (The effect of the safeguard clause is that, if a country leaves the Berne Union, it cannot claim protection in Berne Union countries by reason of their obligations to it under the Universal Convention.) It was important for the developing countries to avoid the risk that, on the one hand the Stockholm Protocol (which contained special provisions in their favour) should be abandoned, but, on the other, the revision of the other Convention should not be accepted, particularly by those countries whose works, both in the original and in translation, play an important part in the former countries' development.   It had been agreed, ever since the Recommendation of Washington of October 1969, that the revision of two Conventions should be "simultaneous" and this implied that the changes in both should so far as possible, come into force at the same time.


28.7.   In fact, since the 1971 provisions, the two Conventions contain almost identical provisions in favour of developing countries.   This being so, the change made in the "safeguard clause" seems to have lost much of its importance to them.


28.8.   The conditions in this paragraph have now been met.   The four countries in question have ratified the 1971 Text of the Universal Copyright Convention.   The latter entered into force on July 10, 1974, and the Paris Act of the Berne Convention three months later, namely on October 10, 1974.

28.9.   The other provision of paragraph (2) covers the entry into force of the substantive provisions in each Union country which accepts them. Normally, three months is allowed between the notification of acceptance by the Director General of WIPO and the coming into effect of that acceptance.  This ensures three clear months' notice of a new country joining, and allows the other countries whose law provides that protection for the new country's works depends on the taking of some administrative action, the necessary time to take it.  The same period appears in other treaties administered by the Organization.  In the WIPO Convention itself, the three months date from the deposit of the instrument and not from the notification of that deposit.

### Article 28, paragraph (3)

*Entry into Force of the Administrative and Final Clauses*

> **(3) With respect to any country of the Union which ratifies or accedes to this Act with or without a declaration made under paragraph (1)(h), Articles 22 to 38 shall enter into force three months after the date on which the Director General has notified the deposit of the relevant instrument of ratification or accession, unless a subsequent date has been indicated in the instrument deposited.  In the latter case, Articles 22 to 38 shall enter into force with respect to that country on the date thus indicated.**

28.10.   There is no reason to make the entry into force of Articles 22 to 38 depend on the same two conditions as govern the entry into force of the substantive provisions.  It is therefore only the three months' rule which applies in this case.

28.11.   In either case (paragraphs (2) or (3)) the Union country in question may indicate a date later than three months for its acceptance to become effective, in which case it is on this later date that entry into force takes place.

28.12.   Note that the Convention only permits a Union country to exclude the substantive provisions when accepting the remainder.  It does not permit the converse, that is to say acceptance of the substantive provisions but exclusion of the rest.  However it is difficult to envisage any case in which a country might wish to do so.

## ARTICLE 29

*Acceptance and Entry into Force for Non-Union Countries*

> **(1)** Any country outside the Union may accede to this Act and thereby become party to this Convention and a member of the Union. Instruments of accession shall be deposited with the Director General.
>
> **(2)**(*a*) Subject to subparagraph *(b)*, this Convention shall enter into force with respect to any country outside the Union three months after the date on which the Director General has notified the deposit of its instrument of accession, unless a subsequent date has been indicated in the instrument deposited. In the latter case, this Convention shall enter into force with respect to that country on the date thus indicated.
>
> *(b)* If the entry into force according to subparagraph *(a)* precedes the entry into force of Articles 1 to 21 and the Appendix according to Article 28(2)*(a)*, the said country shall, in the meantime, be bound, instead of by Articles 1 to 21 and the Appendix, by Articles 1 to 20 of the Brussels Act of this Convention.

29.1.   This Article deals with non-Union countries which wish to join. They can only accede (paragraph (1)) since signature followed by ratification can only be done by Union countries.

29.2.   The Convention, from its outset (1886), never imposed conditions for the admission of new member countries to the Union: it was an open Convention which any country might join (see Article 1).   All that is needed is an undertaking to adopt the measures necessary to ensure its application (see Article 36 below).

29.3.   The date of entry into force in respect of the country concerned is the usual one, i.e., three months after the Director General has notified the other member countries of its accession, unless some later date is indicated (paragraph (2)).

29.4.   The drafting was clarified at the Paris Revision (1971).

29.5.   Note that in this case there is no option to take part only of the Convention and reserve the rest.  A non-Union country must accede to the Paris Act as a whole.  The substantive provisions of the Convention are its essence—indeed the reason for its existence.  There would be no point in allowing a non-Union country to join the Union without accepting them.

29.6.  Sub-paragraph (b) of paragraph (2) provides for a transitional arrangement if a non-Union country accedes to the Paris Act (1971) before the entry into force of the substantive provisions (i.e., before October 10, 1974).  This is now of academic interest.

## ARTICLE 29*bis*

*Application of Article 14(2) of the WIPO Convention*

**Ratification of or accession to this Act by any country not bound by Articles 22 to 38 of the Stockholm Act of this Convention shall, for the sole purposes of Article 14(2) of the Convention establishing the Organization, amount to ratification of or accession to the said Stockholm Act with the limitation set forth in Article 28(1)(*b*)(i) thereof.**

29*bis*.1.    This Article was added in Paris (1971) to solve a problem relating to the Convention which in 1967 created WIPO. Article 14(2) of that Convention provided that no Union country could become a member of the Organization without having ratified or acceded to the administrative provisions of either the Stockholm Act of the Berne Convention or the Stockholm Act of the Paris Convention (Industrial Property).

29*bis*.2.    However, by reason of Article 34 of the present Convention (see below), the Stockholm Act became "closed" from the date of the entry into force of the substantive provisions (October 10, 1974). Since no Union country could, after that date, accept the Stockholm Act of the Berne Convention, it could not join the Organization. To avoid this obviously ridiculous result, the Paris Revision adopted a legal fiction: ratification of the Paris Act or accession to it amounted to acceptance of the administrative and final provisions of the Stockholm Act, for the purposes of the application of Article 14(2) of the WIPO Convention.

29*bis*.3.    The Article has relevance of course only for those Union countries which had not already accepted Articles 22 to 38 of the Stockholm Act (1967).

29*bis*.4.    In other words, Article 29*bis* means that when construing Article 14(2) of the WIPO Convention, one substitutes for the words "Stockholm Act" the words "Paris Act". The Diplomatic Conference in Paris (1971) had no power to change the WIPO Convention. It got round that difficulty by adopting this artifice.

## ARTICLE 30

### *Reservations*

30.1. This Article is, in essence, a product of the Stockholm Revision (1967). Minor drafting changes were made in Paris (1971). It amalgamates some earlier provisions (Articles 25(3) and 27(2) of the Brussels Act) and the so-called "ten-year regime" for translations (Texts of 1886 and 1896).

### Article 30, paragraph (1)

#### *Limited Possibility of Reservations*

(1) Subject to the exceptions permitted by paragraph (2) of this Article, by Article 28(1)*(b)*, by Article 33(2), and by the Appendix, ratification or accession shall automatically entail acceptance of all the provisions and admission to all the advantages of this Convention.

30.2. This Article mentions four cases in which it may be possible to make reservations:

(i) Article 30(2) which covers reservations already made;

(ii) Article 28(1)*(b)* which allows acceptance of the Paris Act by Union countries to be limited to the administrative provisions and final clauses;

(iii) Article 33(2) concerning the settlement of disputes between Union countries and

(iv) the Appendix which contains special rules for developing countries.

30.3. Apart from these four cases, no reservations are allowed: each country accepts all the advantages of the Convention and must equally accept all its obligations.

### Article 30, paragraph (2)

#### *Previous Reservations; Right of Translation;*
#### *Withdrawal of Reservations*

(2)*(a)* Any country of the Union ratifying or acceding to this Act may, subject to Article V(2) of the Appendix, retain the benefit of the reservations it has previously formulated on condition that it makes a declaration to that effect at the time of the deposit of its instrument of ratification or accession.

*(b)* Any country outside the Union may declare, in acceding to this Convention and subject to Article V(2) of the Appendix, that it intends to substitute, temporarily at least, for Article 8 of this Act

> concerning the right of translation, the provisions of Article 5 of the
> Union Convention of 1886, as completed at Paris in 1896, on the
> clear understanding that the said provisions are applicable only to
> translations into a language in general use in the said country. Sub-
> ject to Article 1(6)(h) of the Appendix, any country has the right to
> apply, in relation to the right of translation of works whose country
> of origin is a country availing itself of such a reservation, a protec-
> tion which is equivalent to the protection granted by the latter coun-
> try.
>
> (c) Any country may withdraw such reservations at any time by
> notification addressed to the Director General.

30.4. This paragraph is in three parts. In the first place it allows Union
countries to retain the benefit of reservations they have previously made,
under the authority of earlier texts. In fact very few have done so; but,
at a time when the possibility of new reservations was being offered,
particularly in relation to translations, it was difficult to repeal this provi-
sion. This power to retain old reservations is subject to Article V(2) of the
Appendix. That Article V offers developing countries an option between
the regime of compulsory licences to make and publish translations in
accordance with Article II of the Appendix, and the so-called "ten-year
regime" (see comments on the Appendix below). But a country cannot
subsequently change its mind. Having opted for Article II licences, it
cannot subsequently revert to the "ten-year regime" instead.

30.5. Secondly, this paragraph offers non-Union countries the opportu-
nity, on accession, of choosing, instead of the exclusive right of transla-
tion in Article 8, the provisions of the original Text of 1886 as amended in
1896. This provides that if, within ten years of the first publication of a
work, no authorised translation has appeared in the language (or one of
the languages) in general use in that particular country, the exclusive right
of translation ceases to exist in that country. There is, thereafter, no need
to seek the author's permission to make and publish translations in that
language there. This is known as the "ten-year regime". Its application is
general, in the sense that any country, whether developing or not, may, on
accession, take advantage of this facility, by making a declaration to that
effect. However, in its second sentence, the paragraph allows other coun-
tries to apply the same regime to works of which the country making the
reservation is the country of origin.

30.6. Finally, to emphasize the transitional nature of these reservations,
the paragraph allows for their withdrawal by notifying the Director
General of WIPO.

## ARTICLE 31

*Applicability of the Convention to Certain Territories*

(1) Any country may declare in its instrument of ratification or accession, or may inform the Director General by written notification at any time thereafter, that this Convention shall be applicable to all or part of those territories, designated in the declaration or notification, for the external relations of which it is responsible.

(2) Any country which has made such a declaration or given such a notification may, at any time, notify the Director General that this Convention shall cease to be applicable to all or part of such territories.

(3)(a) Any declaration made under paragraph (1) shall take effect on the same date as the ratification or accession in which it was included, and any notification given under that paragraph shall take effect three months after its notification by the Director General.

(b) Any notification given under paragraph (2) shall take effect twelve months after its receipt by the Director General.

(4) This Article shall in no way be understood as implying the recognition or tacit acceptance by a country of the Union of the factual situation concerning a territory to which this Convention is made applicable by another country of the Union by virtue of a declaration under paragraph (1).

31.1.   This Article sets out the conditions under which the Convention can be applied to territories whose external relations are the responsibility of another country. It is one of the Convention's original Articles and the changes have been mainly matters of drafting (see Article 26 of the Brussels Act). However, the grant of self-government to what had earlier been colonies has lessened its importance. In Paris (1971) a paragraph was added in order to make its acceptance by certain countries easier.

31.2.   The application of the Convention to some or all such territories is done by the Union country responsible for their external relations making a declaration to that effect (on ratification, accession or subsequently) (paragraph (1)). The declaration may be withdrawn (paragraph (2)). It takes effect on the same date as the ratification or accession which included it, or, if subsequent, three months after the notification by the Director General to the other Union countries. In the case of withdrawal, the period is longer—one year after its receipt by the Director General (paragraph (3)).

31.3.   Finally, paragraph (4) provides that acceptance of the Article in no way implies recognition or acceptance of the factual situation.  Several countries felt it anachronistic to speak of one country being responsible for the external relations of territories not included within its boundaries proper.  This paragraph was taken from Article 62(4) of the Patent Co-operation Treaty (1970).  Provisions of this sort have appeared in more recent agreements, for example the Phonograms Convention of October 1971 (Article 11).

# ARTICLE 32

*Applicability of the Paris and earlier Acts*

32.1.   This Article regulates the relations between Union countries bound by different texts of the Convention. The problem has existed since the first Revision in Berlin in 1908. True, the revised Text was intended to replace its predecessor (that of 1886 as amended by the Additional Act of 1896), but it could only become fully effective when all member countries had accepted it.  Since some countries might delay their ratification or accession or even prefer to stick to the earlier text, the Convention had to recognise this fact and provide for such a situation.  The more often the Convention is revised, the more complicated the problem becomes.  Each new text is known as an "Act" of the Convention, and is felt by some to be a new Convention in itself. (As has been seen, the Acts are usually called after the town in which the Diplomatic Conference took place.) Strictly speaking, although there is only one Union, there are a number of Acts governing its operation.

32.2.   The great advantage of the Union (see Article 1) and the main feature of its system is that international copyright relationships can exist between countries bound by different Acts of the Convention.  Since it is unrealistic to expect that, on any given date, all will be bound by the same Act, the Convention provides for a system which recognises the fact.  The point is one of particular importance for countries when they first join the Union. The solution contained in old Article 27 of the Berlin, Rome and Brussels Acts, was widely discussed during the Stockholm (1967) Revision from which this new Article is derived.  In Paris (1971) only drafting changes were made.

## Article 32, paragraph (1)

*Relations between Countries already Members*

> (1) This Act shall, as regards relations between the countries of the Union, and to the extent that it applies, replace the Berne Convention of September 9, 1886, and the subsequent Acts of revision. The Acts previously in force shall continue to be applicable, in their entirety or to the extent that this Act does not replace them by virtue of the preceding sentence, in relations with countries of the Union which do not ratify or accede to this Act.

32.3.   This paragraph is in two parts. The first stipulation is that the latest Act (that of Paris 1971) replaces all earlier Acts, "in so far as it

applies". These latter words are to cover the case of countries which ratify the Paris Act but reserve the substantive provisions (Articles 1 to 21 and the Appendix) which they are entitled to do under Article 28(1)(b). The second sentence governs the relations between the Union country which had become bound by the Paris Act (1971) and another Union country which has not. These relations are governed by the latest text which has been accepted by both.

32.4.    Take, by way of example as today, a country which has accepted the Paris Act (1971) in its entirety (Brazil) and one which has only accepted the administrative provisions and final clauses of that Act (India): their relations, so far as the substantive provisions are concerned, are governed by the Brussels Act (1948) since this, as regards substance, is the latest text accepted by both.

32.5.    Another example, going further back in time, is that of a country (the United Kingdom) which, so far as substance is concerned, is bound by the Brussels Act (1948), and another (Poland) which has not yet accepted any later Act than that of Rome (1928): in the relationship between these two countries, the Rome Act applies.

32.6.    Obviously, as more ratifications and accessions take place, the problem lessens. But since these are never simultaneous (except by coincidence) the scheme has the advantage that it decides which text applies on any given date. It might for example be necessary, in court proceedings, to decide what rights could be claimed in respect of a work whose country of origin was one bound by the Paris Act (1971) when it was exploited in a country which, at the moment of exploitation, was bound by the Brussels Act (1948), but had, by the date of the proceedings, also accepted the Paris Act.

### Article 32, paragraph (2)

*Relations between Existing Members and Countries Joining*

(2) Countries outside the Union which become party to this Act shall, subject to paragraph (3), apply it with respect to any country of the Union not bound by this Act or which, although bound by this Act, has made a declaration pursuant to Article 28(1)(b). Such countries recognize that the said country of the Union, in its relations with them:

(i) may apply the provisions of the most recent Act by which it is bound, and

(ii) subject to Article 1(6) of the Appendix, has the right to adapt the protection to the level provided for by this Act.

32.7. These relations are as follows: countries joining the Union must, subject to paragraph (3) which deals with the Appendix, apply the provisions of the Paris Act in their relations with *all* Union countries, including those not yet bound by that Act or bound only by its administrative and final provisions.

32.8. The obligations of the latter countries however towards countries joining for the first time are governed by the latest text by which they are bound, though they may, if they prefer, adapt the protection they give to the level of the Paris Act (1971).

32.9. In other words, a Union country which has not yet accepted the Paris Act (1971) nevertheless enjoys, in countries which have newly joined the Union, the protection of that Act. The protection it must give to the works of newly joined countries is that of the latest text by which it is bound or that of the Paris Act. Take for example a newly joined country (Egypt) and one (Belgium) which, so far as the substantive provisions are concerned, is still bound by the Brussels Act (1948). Belgian authors enjoy in Egypt the protection of the Paris Act (1971); Egyptian authors are given the protection prescribed by the Brussels Act, unless the Belgian authorities choose to apply the Paris Act to them.

32.10. Whether one considers each Act to be a different treaty or that there is a single convention expressed in successive Acts, the essential point is that every Union country has rights and obligations vis-à-vis every other Union country, whether or not bound by the same Act. Although the successive Acts contain more or less equivalent provisions, there are differences between them as regards the minimum rights they prescribe. It therefore seemed "reasonable and legally correct" to the draftsmen in Stockholm (1967) and Paris (1971) not to oblige existing member countries to apply an Act (the Stockholm Act now superseded by the Paris Act) which they had no wish to accept, or countries newly joining the Union to apply an earlier Act which did not offer the level of protection they wanted to give.

**Article 32, paragraph (3)**

*Relations between Developing Countries which take Advantage
of the Appendix to the Paris Act (1971)
and Union Countries not bound by that Act*

> **(3) Any country which has availed itself of any of the faculties
> provided for in the Appendix may apply the provisions of the Appen-
> dix relating to the faculty or faculties of which it has availed itself in
> its relations with any other country of the Union which is not bound
> by this Act, provided that the latter country has accepted the appli-
> cation of the said provisions.**

32.11.   This third paragraph deals with the relations between a develop-
ing country which has invoked the special provisions of the Appendix and
a Union country which has not yet accepted the Paris Act in which that
Appendix appears.  The developing country may not make use of those
provisions except with the consent of the other Union country, as regards
its works.  Without such consent, their relations are governed by the latest
Act which that other Union country has accepted.

32.12.   It was in order to hasten the operation of the Appendix, that the
device was adopted in Stockholm (1967) and later in Paris (1971) of
allowing countries still bound by an earlier text to agree to the provisions
of the Appendix being used in relation to their works.  For example, the
United Kingdom has not yet accepted the substantive provisions of the
Paris Act (1971).  It is the Brussels Act (1948) which applies to it.  Were
it not for the fact that, in accordance with Article VI of the Appendix, it
has accepted its provisions, developing countries could not have made use
of the Appendix to grant compulsory licences in relation to works of
which it was the country of origin.

32.13.   This paragraph does not lay down the procedure whereby a coun-
try notifies its acceptance of the application of the Appendix to its works.
It was felt more logical to include this in the Appendix itself (see Arti-
cle VI(2)).

# ARTICLE 33

## *Settlement of Disputes*

(1) Any dispute between two or more countries of the Union concerning the interpretation or application of this Convention, not settled by negotiation, may, by any one of the countries concerned, be brought before the International Court of Justice by application in conformity with the Statute of the Court, unless the countries concerned agree on some other method of settlement. The country bringing the dispute before the Court shall inform the International Bureau; the International Bureau shall bring the matter to the attention of the other countries of the Union.

(2) Each country may, at the time it signs this Act or deposits its instrument of ratification or accession, declare that it does not consider itself bound by the provisions of paragraph (1). With regard to any dispute between such country and any other country of the Union, the provisions of paragraph (1) shall not apply.

(3) Any country having made a declaration in accordance with the provisions of paragraph (2) may, at any time, withdraw its declaration by notification addressed to the Director General.

33.1.   This Article offers machinery for settlement of disputes between two or more member countries over the interpretation or application of the Convention. A clause of this nature was introduced in Brussels (1948)—see Article 27*bis* of the Brussels Act, but substantial changes were made in Stockholm (1967) and confirmed by the Paris Revision (1971).

33.2.   It is emphasized that the Article deals with differences between States and not litigation between natural or legal persons. It is only States which may bring proceedings before the International Court of Justice. The door is left open for negotiations. It is only disputes which cannot be settled in discussion which are referred to the International Court, and then only if the parties do not agree on some other means of settlement, e.g., an international arbitration.

33.3.   Under the Brussels Act (1948) this reference to the International Court of Justice was obligatory. The Stockholm Revision made it, in a sense, optional, in order to take account of those countries which, for constitutional or political reasons, do not admit the obligatory competence of that Court.

33.4.   A country referring a dispute to the Court must inform the International Bureau of WIPO which gives notice to the other member coun-

tries, presumably in order to allow them to take sides if they so desire and are so permitted. The reference does not necessarily mean that the other party to the dispute must accept it, since paragraph (2) allows a way out. Any Union country may deny the competence of the International Court by declaring, on ratification or accession, that it does not consider itself bound by paragraph (1). Of the countries which have accepted the Paris Act, a number have made such a declaration. Finally, the Convention provides (paragraph (3)) for the withdrawal of such a declaration.

33.5.  In the thirty years which have elapsed since this provision first appeared in the Convention, no dispute on its interpretation or application has ever been referred to The Hague Court. In any case, an adverse decision of the International Court carries no condemnation; the Court merely makes a finding as to the law and it is then a matter for the countries in question to solve by diplomatic or legislative means, as they wish.

## ARTICLE 34

*Closure of Earlier Acts*

> **(1) Subject to Article 29*bis*, no country may ratify or accede to earlier Acts of this Convention once Articles 1 to 21 and the Appendix have entered into force.**
>
> **(2) Once Articles 1 to 21 and the Appendix have entered into force, no country may make a declaration under Article 5 of the Protocol Regarding Developing Countries attached to the Stockholm Act.**

34.1.   The purpose of this provision is to close all Acts prior to that of Paris (1971) once its substantive provisions have entered into force (i.e., October 10, 1974).  It appeared in the Brussels Act (Article 28(3)) but was re-considered in Stockholm (1967) and again in Paris (1971).

34.2.   The latest text reflects the most up-to-date thinking on matters covered by the Convention.  It would be odd to allow non-Union countries to accede to earlier Acts which are, by definition, superseded.  So far as Union countries are concerned, it would be no less illogical to allow them to accede to any Act other than that containing the most recent thinking on copyright matters, once that latest Act is in force.  Thus, for example, a country bound by the Rome Act cannot, after October 10, 1974, accede to the Brussels Act.  Its options are either to remain bound by Rome or to join Paris.

34.3.   There is a difference between accession to earlier Acts and the application of such Acts.  Once the latest Act is in force, no country may become party to an earlier one; but, as has been seen in Article 32 above, older Acts can still apply to the relationships between Union countries.

34.4.   Paris added a second paragraph to Article 34 in order to close the Protocol which had been added to the Stockholm Act.  Union countries are no longer able to make use of this Protocol which has in fact been replaced by the Appendix (see below).

# ARTICLE 35

*Duration and Denunciation*

(1) This Convention shall remain in force without limitation as to time.

(2) Any country may denounce this Act by notification addressed to the Director General. Such denunciation shall constitute also denunciation of all earlier Acts and shall affect only the country making it, the Convention remaining in full force and effect as regards the other countries of the Union.

(3) Denunciation shall take effect one year after the day on which the Director General has received the notification.

(4) The right of denunciation provided by this Article shall not be exercised by any country before the expiration of five years from the date upon which it becomes a member of the Union.

35.1.   The Convention has, from the beginning (1886 Text, Article 20), been expressed as remaining in force indefinitely.   Denunciations affect only the country denouncing and the Convention remains in force as regards other Union countries.   Nor is it possible to denounce the latest text and rely on an earlier one.   Denunciation covers all Acts (paragraph (2)).

35.2.   Some changes in the Article were made in Brussels (1948) and Stockholm (1967).   Of these the most important was a provision that no country might denounce earlier than five years from the date it became a member of the Union (paragraph (4)).   Hasty decisions were to be avoided and some experience of the operation of the Convention called for.   Finally, the denunciation only takes effect one year after its notification to the Director General of WIPO (paragraph (3)).

# ARTICLE 36

### *Application of the Convention by the Provisions of Domestic Law*

(1) Any country party to this Convention undertakes to adopt, in accordance with its constitution, the measures necessary to ensure the application of this Convention.

(2) It is understood that, at the time a country becomes bound by this Convention, it will be in a position under its domestic law to give effect to the provisions of this Convention.

36.1. This Article was inserted in the Convention during the Stockholm Revision (1967). Its nearest equivalent in earlier texts appeared in the Article (e.g., Article 25 of the Brussels Act) dealing with the accession of countries outside the Union, where it was said that they may accede if they "make provision for the legal protection of the rights forming the object of the Convention".

36.2. It seemed desirable to say expressly in the Convention that *all* Union countries, not only those joining, must adopt the measures necessary to ensure its application (paragraph (1)). What those measures are depends on the constitution of the country in question: in some it becomes part of the law of the land; in others, parliament must pass laws to give effect to the Convention's obligations. The measures may therefore be legislative or administrative or a mixture of both, according to the constitutional law of the country concerned.

36.3. Secondly, this Article demands that a country which becomes bound must be in a position under the domestic law to give effect to the Convention's provisions (paragraph (2)). Since each country is bound to take the necessary steps to ensure the Convention's application, this might be thought to go without saying. But it seemed wise to say explicitly that the necessary legislation must already be in force by the time the obligations of the Convention were undertaken.

36.4. The wording follows a similar provision in the Rome Convention of 1961 on the so-called neighbouring rights (Article 26).

36.5. It was pointed out in Paris (1971) that, in countries according to the constitution of which treaties were self-executing, no separate legislation was necessary to implement those provisions of the Convention which, by their nature, were susceptible of direct application.

## ARTICLE 37

### *Final Clauses*

**(1)**(*a*) **This Act shall be signed in a single copy in the French and English languages and, subject to paragraph (2), shall be deposited with the Director General.**

(*b*) **Official texts shall be established by the Director General, after consultation with the interested Governments, in the Arabic, German, Italian, Portuguese and Spanish languages, and such other languages as the Assembly may designate.**

(*c*) **In case of differences of opinion on the interpretation of the various texts, the French text shall prevail.**

**(2) This Act shall remain open for signature until January 31, 1972. Until that date, the copy referred to in paragraph (1)(*a*) shall be deposited with the Government of the French Republic.**

**(3) The Director General shall certify and transmit two copies of the signed text of this Act to the Governments of all countries of the Union and, on request, to the Government of any other country.**

**(4) The Director General shall register this Act with the Secretariat of the United Nations.**

**(5) The Director General shall notify the Governments of all countries of the Union of signatures, deposits of instruments of ratification or accession and any declarations included in such instruments or made pursuant to Articles 28(1)(*c*), 30(2)(*a*) and (*b*), and 33(2), entry into force of any provisions of this Act, notifications of denunciation, and notifications pursuant to Articles 30(2)(*c*), 31(1) and (2), 33(3), and 38(1), as well as the Appendix.**

37.1.   This Article contains the final clauses which normally appear in Conventions and Treaties administered by WIPO. Its various provisions are largely self-explanatory.

37.2.   Paragraph (1) deals with languages. Both the English and French texts of the Paris Act are authentic; provision is made for the establishment of official texts in other languages; in case of disputes the . ench text prevails.

37.3.   Signature is covered in paragraph (2): as is the normal practice, the Paris Act, after signature at the end of the Diplomatic Conference, remained open for further signatures until January 31, 1972. Twenty-eight countries signed in Paris on July 24, 1971 and seven more before the time limit expired.

37.4.   **The** other provisions concern the sending of certified copies (paragraph (3)) and the registration of the Convention with the United Nations (paragraph (4)). Paragraph (5) lists the various notifications which the Director General of WIPO is called upon to make.

## ARTICLE 38

### *Transitional Provisions*

(1) Countries of the Union which have not ratified or acceded to this Act and which are not bound by Articles 22 to 26 of the Stockholm Act of this Convention may, until April 26, 1975, exercise, if they so desire, the rights provided under the said Articles as if they were bound by them. Any country desiring to exercise such rights shall give written notification to this effect to the Director General; this notification shall be effective on the date of its receipt. Such countries shall be deemed to be members of the Assembly until the said date.

(2) As long as all the countries of the Union have not become Members of the Organization, the International Bureau of the Organization shall also function as the Bureau of the Union, and the Director General as the Director of the said Bureau.

(3) Once all the countries of the Union have become Members of the Organization, the rights, obligations, and property, of the Bureau of the Union shall devolve on the International Bureau of the Organization.

38.1.   These provisions, which first appeared in the Stockholm Act (1967) were reviewed in Paris (1971) to take account of events which had happened in the meantime (the first Director General of WIPO taking office and the entry into force of the WIPO Convention on April 26, 1970).

38.2.   Paragraph (1) deals with what was known as "the five-year privilege". Since the deadline date is now passed, this is only of historic interest. It allowed a Union country, not yet bound by the new administrative provisions which emerged from Stockholm, to act as though it had accepted them e.g., to vote in the Assembly or serve on the Executive Committee. A few countries took advantage of this possibility during the period during which it was open.

38.3.   Paragraph (2) covers the interim role of the Secretariat. While there remain Union countries which have not yet joined WIPO, the individuals who serve on the Secretariat have a double legal capacity, first as the International Bureau of WIPO and second as the old Bureau of the Berne Union. This period is now approaching its end as more Union countries join WIPO. The WIPO Convention also contains transitional measures of this sort (Article 21). These complete the picture of the administrative mechanism.

38.4.   The third paragraph looks to the final demise of the old Bureau of the Union, established in 1886.   When, at the end of the transitional period, it ceases to exist, its rights, obligations and property devolve on the International Bureau of WIPO.

# APPENDIX

## *[Special Provisions for Developing Countries]*

A.1. This Appendix reflects the main work of the Diplomatic Conference in Paris in 1971. Its purpose is to allow certain Union countries, under the conditions specified therein, more latitude as regards the rights of translation and of reproduction than is normally permitted by the Convention proper. As has been seen, this Appendix is an integral part of the Convention (Article 21 above). It contains six Articles numbered in Roman numerals in order to avoid confusion with the Articles of the Convention proper.

A.2. The idea of including in the Convention a special regime in favour of young countries which had recently achieved independence was first put forward at an African Copyright Meeting in Brazzaville in 1963. It was pursued during the preparatory work for the Stockholm Revision. After prolonged discussion during these preparations and at the Stockholm Conference itself, there was added to the Convention a "protocol regarding developing countries" as an integral part of it. It was known as the Stockholm Protocol.

A.3. However, it soon became clear that the solution it proposed was unlikely to gain much acceptance among Union countries, particularly those whose works were likely to be made use of under the provisions of the Protocol. If the needs of the developing countries were to be met without too much delay, it seemed necessary to take a second look at the conditions under which translation and reproduction of the works of other countries might be made for purposes of education and scientific research.

A.4. It was for this purpose that the Paris Conference was convened. Its work was confined to provisions of interest to developing countries. These countries had earlier demanded that the Convention should offer them the same latitude as it was proposed to offer in another international instrument (see the Washington Recommendation and Article 28(2) as to the coming into force of the Paris Act).

A.5. The Appendix therefore augments the Convention's existing exceptions to the author's exclusive rights (e.g., Articles 2*bis*, 10(2), 10*bis* and, as regards translations, the ten-year regime—see Article 30). It replaces the Stockholm Protocol which no longer applies (Article 34(2)).

A.6.   Under the system laid down in the Appendix, a developing country which wishes to do so, may provide for a regime of non-exclusive, non-assignable compulsory licences carrying an obligation to make fair payment to the copyright owner, to translate and/or reproduce works protected by the Convention, exclusively for systematic instructional activities (or in some cases for teaching, scholarship or research).

A.7.   The rules as to compulsory licences follow the usual pattern.  The copyright owner enjoys a period in which to exercise his exclusive rights. . If he does so, no compulsory licence can be granted in the country in which he has exercised it for the use in question.  If a licence is granted, it covers only the country in question and export of copies made under it is forbidden.  Power to continue making copies under the licence ceases if and when equivalent copies are put on the market in that country by the copyright owner, though the compulsory licensees' stock-in-trade may be disposed of.  The payment to be made by the compulsory licensee must be consistent with standards of royalties normally operating on licences freely negotiated between persons in the two countries concerned and must be transmissible to the copyright owner, if necessary using "international machinery".

A.8.   These are the broad lines of the scheme.  The details follow.

### Article I of the Appendix

*Countries Entitled to Benefit*

### Paragraph (1)

*Method of doing so*

> (1) Any country regarded as a developing country in conformity with the established practice of the General Assembly of the United Nations which ratifies or accedes to this Act, of which this Appendix forms an integral part, and which, having regard to its economic situation and its social or cultural needs, does not consider itself immediately in a position to make provision for the protection of all the rights as provided for in this Act, may, by a notification deposited with the Director General at the time of depositing its instrument of ratification or accession or, subject to Article V(1)*(c)*, at any time thereafter, declare that it will avail itself of the faculty provided for in Article II, or of the faculty provided for in Article III, or of both of those faculties. It may, instead of availing itself of the faculty provided for in Article II, make a declaration according to Article V(1)*(a)*.

A.I.1.   This paragraph provides answers to the questions "who, how, when and as to what?".

A.I.2.   Who may take advantage of the Appendix? Two tests are imposed.   The first depends on the country itself: "having regard to its economic situation and its social or cultural needs, does not consider itself immediately in a position to make provision for the protection of all the rights as provided for in this Act" (i.e., the Paris Act (1971)).   As has been seen above (Article 36), member countries are bound to provide for such protection.   The "economic situation" and "social or cultural needs" are for the country concerned.

A.I.3.   The second test is more objective: "any country regarded as a developing country in conformity with the established practice of the General Assembly of the United Nations".   The same formula appeared in the Stockholm Protocol and was found preferable to other possible alternatives.   The qualification is not uniform because the lists vary as between the different United Nations organs e.g., the Intergovernmental Committee of the U.N. Development Programme (UNDP), the Council of UNCTAD and the U.N. Committee on Contributions.   It seemed best to refer to the practice of the General Assembly of the United Nations.   At the Paris Revision it was understood that the expression "country regarded as a developing country in conformity with the established practice of

the General Assembly of the United Nations'' did not allow for the draw-
ing up of a list of such countries which would not be susceptible to
changes in the future, not only because the stage of development of particu-
lar countries may change, but also because the practice of the General
Assembly may undergo revision in the sense that the criteria on which
such practice is based may alter. Whether any country is, at any given
time, a developing country for the purposes of the Appendix has to be
decided on the basis of the practice of the General Assembly prevailing at
the time relevant for deciding the question.

A.I.4.   The fact that a country is considered a developing country in no
way obliges it to make use of the licensing scheme in the Appendix. Each
country decides, in the light of its economic situation and its social and
cultural needs, whether or not it wishes to provide for such a scheme.

A.I.5.   How to do so? It is enough to deposit a notification or declara-
tion with the Director General of WIPO.

A.I.6.   When? Either on ratification or accession to the substantive pro-
visions of the Paris Act, *or at any time thereafter*, although bearing in
mind that a choice between the compulsory licences to translate and the
ten-year regime for translation, once made, is irrevocable (see Article V(1)
below).

A.I.7.   Finally as to what may these powers be exercised? The right of
translation (Article II or V), the right of reproduction (Article III) or both
together. The country in question must notify which.

### Article I, paragraph (2) of the Appendix

#### *Duration of the Effectiveness of the Notice or Declaration*

(2)*(a)* Any declaration under paragraph (1) notified before the
expiration of the period of ten years from the entry into force of
Articles 1 to 21 and this Appendix according to Article 28(2) shall be
effective until the expiration of the said period. Any such declara-
tion may be renewed in whole or in part for periods of ten years each
by a notification deposited with the Director General not more than
fifteen months and not less than three months before the expiration
of the ten-year period then running.

*(b)* Any declaration under paragraph (1) notified after the expira-
tion of the period of ten years from the entry into force of Articles 1
to 21 and this Appendix according to Article 28(2) shall be effective
until the expiration of the ten-year period then running. Any such
declaration may be renewed as provided for in the second sentence of
subparagraph *(a)*.

A.I.8.  This paragraph provides that any notice (or declaration) deposited with the Director General of WIPO is effective for ten years from the coming into force of the substantive provisions of the Paris Act, i.e., until October 10, 1984. But it can be renewed, in whole or in part (that is to say a country may, on renewal, decide that it needs only one of the two faculties it previously claimed), for further successive periods each of ten years.

A.I.9.  Renewal is however subject to a condition aimed at ensuring that those countries who have to suffer the impact of the Appendix on the works of their nationals are given reasonable notice. The deposit must be made between the fifteenth and the third month before the current ten year period expires. In fact, this means that all renewals must take place between July 10, 1983, and July 10, 1984. During that year, the developing countries which have opted for one or more of the provisions of the Appendix will have to decide their future course of action on the point.

A.1.10.  If a declaration is made after October 10, 1984, it is valid until the end of that ten-year period i.e., until October 10, 1994. Again renewal is possible.

### Article I, paragraph (3) of the Appendix

*Ceasing to be a Developing Country*

(3) Any country of the Union which has ceased to be regarded as a developing country as referred to in paragraph (1) shall no longer be entitled to renew its declaration as provided in paragraph (2), and, whether or not it formally withdraws its declaration, such country shall be precluded from availing itself of the faculties referred to in paragraph (1) from the expiration of the ten-year period then running or from the expiration of a period of three years after it has ceased to be regarded as a developing country, whichever period expires later.

A.1.11.  This provision envisages a future which it is hoped will shortly be upon us since it assumes progress. If a country ceases to be a developing country, renewal is no longer possible. After the end of the current ten-year period (or three years after the country ceased to be developing, if later), reproduction and/or translation under the compulsory licence must cease. The fact that the compulsory licensing powers do not cease immediately is explained by the fact that transition from under-development happens progressively and not all at once and the Convention must be sufficiently flexible to allow for this fact.

A.I.12. Note that there is no question of such a country taking formal steps to withdraw its declaration. Whether or not it does so, its right to make use of the Appendix ceases when the time limit expires.

### Article I, paragraph (4) of the Appendix

*Existing Stocks*

(4) Where, at the time when the declaration made under paragraph (1) or (2) ceases to be effective, there are copies in stock which were made under a license granted by virtue of this Appendix, such copies may continue to be distributed until their stock is exhausted.

A.I.13. This completes the provisions governing what happens when a country ceases to be able to make use of the Appendix. Copies which have, before that time, been made under compulsory licences may be sold or otherwise distributed until the stock runs out.

### Article I, paragraph (5) of the Appendix

*Declarations concerning certain Territories*

(5) Any country which is bound by the provisions of this Act and which has deposited a declaration or a notification in accordance with Article 31(1) with respect to the application of this Act to a particular territory, the situation of which can be regarded as analogous to that of the countries referred to in paragraph (1), may, in respect of such territory, make the declaration referred to in paragraph (1) and the notification of renewal referred to in paragraph (2). As long as such declaration or notification remains in effect, the provisions of this Appendix shall be applicable to the territory in respect of which it was made.

A.I.14. This provision is linked with Article 31 which covers dependent territories. If a country is responsible for the external relations of another territory and the situation in that territory is analogous to that of a developing country, the country may declare that the Appendix shall apply to that territory. It follows the usual procedure of paragraphs (1) and (2) above in the making of declarations and renewing them. Obviously the country in question must be one which is bound by the Paris Act (1971).

### Article I, paragraph (6) of the Appendix

*Limits to Reciprocity*

(6)*(a)* The fact that a country avails itself of any of the faculties referred to in paragraph (1) does not permit another country to give less protection to works of which the country of origin is the former country than it is obliged to grant under Articles 1 to 20.

*(b)* The right to apply reciprocal treatment provided for in Article 30(2)*(b)*, second sentence, shall not, until the date on which the period applicable under Article I(3) expires, be exercised in respect of works the country of origin of which is a country which has made a declaration according to Article V(1)*(a)*.

A.I.15. This provision, which forbids the application of reciprocity in the case of countries making use of the Appendix, is of some importance. A Union country whose nationals find their rights curtailed by compulsory licensing systems in developing countries may nevertheless take no reprisals against works coming from the countries concerned. They must give them all the protection called for by Articles 1 to 20.

A.I.16. In other words, although a developing country may accord less, in matters of translation and reproduction, than appears in the Convention proper, to the works of Union nationals, the countries from which these nationals come may not do the same.

A.I.17. At the Paris Revision (1971) it was however agreed that this sub-paragraph did not modify the right of any country to apply the so-called "comparison of terms" clause contained in Article 7(8).

A.I.18. Sub-paragraph *(b)* covers the case of a developing country which chooses, for translations, the "ten-year regime" (Additional Act of 1896). Other countries cannot apply reciprocity to its works. If however, on ceasing to be a developing country, it still wishes to make use of the ten-year regime (as is permitted by Article V(3) of the Appendix), the normal rules as to reciprocity apply.

## Article II of the Appendix

*The Right of Translation*

A.II.1.   As has been already said, the compulsory licences offered by the Appendix to developing countries cover translation (Article 8 of the Convention) and reproduction (Article 9).   Since the right of translation appears in the Convention before that of reproduction, the Appendix follows the same order.

## Article II, paragraph (1) of the Appendix

*Grant of Licences by a Competent Authority*

> **(1) Any country which has declared that it will avail itself of the faculty provided for in this Article shall be entitled, so far as works published in printed or analogous forms of reproduction are concerned, to substitute for the exclusive right of translation provided for in Article 8 a system of non-exclusive and non-transferable licenses, granted by the competent authority under the following conditions and subject to Article IV.**

A.II.2.   This expresses the principle.   The details are in the following paragraphs and questions of procedure are covered in Article IV.   It is a matter for each country which chooses to institute a compulsory licensing system for translation to decide which authority is competent to grant these licences.   This is a domestic matter.

A.II.3.   The Article only applies to works "published in printed or analogous forms of reproduction" (e.g., typewriting, offset-litho, etc.).   It seems that this formula would exclude such things as films and records.   The important thing is the purpose of the translation, namely teaching, scholarship or research (see paragraph (5) below).   Development is principally concerned with such things as encyclopaedias and anthologies, schoolbooks, manuals on physics, chemistry, engineering, space-exploration, etc., and not the latest song hit or the new London or Paris stage success. Note that the work must have been published in the sense of Article 3(3).

## Article II, paragraphs (2) to (4) of the Appendix

### Conditions under which Licences may be Granted

(2)(a) Subject to paragraph (3), if, after the expiration of a period of three years, or of any longer period determined by the national legislation of the said country, commencing on the date of the first publication of the work, a translation of such work has not been published in a language in general use in that country by the owner of the right of translation, or with his authorization, any national of such country may obtain a license to make a translation of the work in the said language and publish the translation in printed or anologous forms of reproduction.

(b) A license under the conditions provided for in this Article may also be granted if all the editions of the translation published in the language concerned are out of print.

(3)(a) In the case of translations into a language which is not in general use in one or more developed countries which are members of the Union, a period of one year shall be substituted for the period of three years referred to in paragraph (2)(a).

(b) Any country referred to in paragraph (1) may, with the unanimous agreement of the developed countries which are members of the Union and in which the same language is in general use, substitute, in the case of translations into that language, for the period of three years referred to in paragraph (2)(a) a shorter period as determined by such agreement but not less than one year. However, the provisions of the foregoing sentence shall not apply where the language in question is English, French or Spanish. The Director General shall be notified of any such agreement by the Governments which have concluded it.

(4)(a) No license obtainable after three years shall be granted under this Article until a further period of six months has elapsed, and no license obtainable after one year be granted under this Article until a further period of nine months has elapsed

(i) from the date on which the applicant complies with the requirements mentioned in Article IV(1), or

(ii) where the identity or the address of the owner of the right of translation is unknown, from the date on which the applicant sends, as provided for in Article IV(2), copies of his application submitted to the authority competent to grant the license.

(b) If, during the said period of six or nine months, a translation in the language in respect of which the application was made is published by the owner of the right of translation or with his authorization, no license under this Article shall be granted.

A.II.4. These paragraphs contain the details governing the grant of licences. Although they are largely self-explanatory, a few points are worth making.

A.II.5.   First, the person to whom a licence is granted must be a national of the developing country concerned.   It was agreed during the Paris Revision (1971) that the term "national of such country" also covered legal entities including the State itself, its national or local authorities, and enterprises owned by the State or such authorities.   The intention was to stop foreign firms cashing in on the compulsory licensing system.

A.II.6.   Secondly, the Convention makes a distinction between languages in general use in the developing country and those which are not in general use in one or more *developed* Union countries.   The copyright owner has a period running from the first publication of a work, in which to authorise a translation in the developing country.   The period is three years in the first case (paragraph (2)) and one year in the second (paragraph (3)).   The same idea of "a language in general use" is used in the Article (30(2)) dealing with the "ten-year regime".   It seemed best to use this expression rather than that of national language, since, in some developing countries there are languages which, although not recognised as national languages, are nevertheless in general use (for example English in India, and French in the countries of the Maghreb).   There may be several languages in general use in the same country.   In Paris it was agreed that the notion of "a language in general use" in a country included languages in general use by less than the totality of the country's population.   Thus, such a language could be a language in general use in a given geographic region of the country, the language of an ethnic group of the population, or a language generally used for particular purposes, such as government administration or education.

A.II.7.   This wording therefore permits a developing country to translate under compulsory licence from the language of one developed country into that of another.   For example, French-speaking African countries may wish to make use of textbooks written in English, or conversely English-speaking countries of Asia may feel a need for anthologies of French literature.   It would not be of much value to the former to have the work in English or the latter in French.   Licences simply to reproduce the work (Article III) would not go far enough.   This use of the expression "a language in general use" is therefore an advantage for such countries.

A.II.8.   As has been said, the period running from first publication during which no compulsory licence may be granted is reduced from three years to one if the translation is *into* a language *not* in general use in one or more developed countries (paragraph (3)*(a)*).   The reason is that the advance in teaching methods and scientific research means that textbooks

quickly become out of date, and developing countries wish to have access to them in purely local languages as soon as possible. Publishers in industrialised countries, e.g., Great Britain or France, are unlikely to sink capital into providing translations into these languages, dialects, etc., although they nevertheless have a year to do so if they wish. But the same language may be in general use in two countries, one developing and the other developed (paragraph (3)*(b)*): e.g., Portuguese, the language of a developed country, is also spoken in Brazil. The Convention allows the countries in which that language is in general use to agree that the period shall be one year instead of three. However this is not allowed if the language into which the translation is to be made is English, French or Spanish, perhaps because of the worldwide character of these languages and hence the size of the potential market. Finally, compulsory translation is allowed, notwithstanding that the copyright owner has published his own translation, if all editions are out of print (paragraph (2)*(b)*).

A.11.9.   Thirdly, the Appendix provides for one more time limit running from the date on which the applicant for the licence has sought a voluntary licence from the copyright owner. If the latter's identity or address is unknown, the period runs from the date on which the applicant sent his request to the publisher and to any national or international information centre which may have been designated.

A.11.10.   This period is six months in the case of a "three-year" licence and nine months in the case of a licence grantable after one year (paragraph (4)*(a)*). During the Paris Revision it was the majority view that the six or nine months' periods could not run concurrently with the three or one-year periods, since the application for a licence for translation could validly be presented only after the expiration of the three or one-year period, and because the sense of the word "further" was to bring out clearly that the six or nine months' period is necessarily subsequent to the three or one-year period. Finally, if before the end of the period, the copyright owner publishes his own translation, no compulsory licence may be granted.

### Article II, paragraph (5) of the Appendix

*Purposes for which Licences may be Granted*

(5) Any license under this Article shall be granted only for the purpose of teaching, scholarship or research.

A.11.11.   This provision is of prime importance, since it limits the purposes for which licences may be granted. During the Paris Revision

(1971), it was agreed that the words "teaching, scholarship (in French "scolaire et universitaire")" refer not only to instructional activities at all levels in tutorial institutions, primary and secondary schools, college, and universities, but also to a wide range of organised educational activities intended for participation at any age level and devoted to the study of any subject.

A.II.12.   As to research, this was to be understood in a restrictive sense. It cannot be interpreted to permit a translation of copyright works by industrial research institutes or by private corporations doing research for commercial purposes.

A.II.13.   Although the Convention does not say so expressly, the national law must take steps to control the circulation of copies of translations made under compulsory licence.   Since they are made for educational and research purposes, their use ought to be confined to teaching establishments.   They are not meant for the use of the public at large, although in practice it may be difficult to stop bookshops confining their sales to the students for whom they were intended.   It is up to national laws to take the necessary steps to ensure that conditions laid down in the Convention are observed.

### Article II, paragraph (6) of the Appendix

*Lapse of the Licence*

> **(6) If a translation of a work is published by the owner of the right of translation or with his authorization at a price reasonably related to that normally charged in the country for comparable works, any license granted under this Article shall terminate if such translation is in the same language and with substantially the same content as the translation published under the license.   Any copies already made before the license terminates may continue to be distributed until their stock is exhausted.**

A.II.14.   This provision allows the owner of the copyright to recover his exclusive right of translation by himself publishing a translation in the same language and with substantially the same content, if this is marketed at a price reasonably related to that charged for comparable works. When this happens, any compulsory licence terminates (though copies already made under it may continue to be sold).   As to the meaning of "substantially the same content" it was agreed in Paris (1971) that this condition would be satisfied not only when the content of the copyright owner's translation was identical, or almost so, with the content of the

translation made under licence, but also when the former contained certain improvements, as would be the case, for example, when the contents of a schoolbook are brought up to date.

A.II.15.   It was also agreed that the licensee should be given reasonable notice, by the owner of the right of translation, of the publication of a translation authorised by him, always assuming that the owner of the right was aware of the compulsory licence.

### Article II, paragraph (7) of the Appendix

*Works Composed mainly of Illustrations*

(7) For works which are composed mainly of illustrations, a license to make and publish a translation of the text and to reproduce and publish the illustrations may be granted only if the conditions of Article III are also fulfilled.

A.II.16.   In this special case, a licence to translate the text and reproduce the illustrations must meet the conditions both of Article II and of Article III, since both rights are involved.

### Article II, paragraph (8) of the Appendix

*Works withdrawn from Circulation*

(8) No license shall he granted under this Article when the author has withdrawn from circulation all copies of his work.

A.II.17.   This provision is intended to take care of one aspect of the moral right, namely the "right to re-consider" i.e., when an author decides to bear the cost of withdrawing from circulation all copies of his work. On this point the Appendix goes further than the Convention proper (see Article 6*bis*). In that Article, this right, which stems from the customary law of certain countries is not mentioned.  If the author does so withdraw, no licence may be granted.

### Article II, paragraph (9) of the Appendix

*Translation for Broadcasting*

(9)*(a)* A license to make a translation of a work which has been published in printed or analogous forms of reproduction may also he granted to any broadcasting organization having its headquarters in a country referred to in paragraph (1), upon an application made to

the competent authority of that country by the said organization, provided that all of the following conditions are met:

    (i) the translation is made from a copy made and acquired in accordance with the laws of the said country;

    (ii) the translation is only for use in broadcasts intended exclusively for teaching or for the dissemination of the results of specialized technical or scientific research to experts in a particular profession;

    (iii) the translation is used exclusively for the purposes referred to in condition (ii) through broadcasts made lawfully and intended for recipients on the territory of the said country, including broadcasts made through the medium of sound or visual recordings lawfully and exclusively made for the purpose of such broadcasts;

    (iv) all uses made of the translation are without any commercial purpose.

    *(b)* Sound or visual recordings of a translation which was made by a broadcasting organization under a license granted by virtue of this paragraph may, for the purposes and subject to the conditions referred to in subparagraph *(a)* and with the agreement of that organization, also be used by any other broadcasting organization having its headquarters in the country whose competent authority granted the license in question.

    *(c)* Provided that all of the criteria and conditions set out in subparagraph *(a)* are met, a license may also be granted to a broadcasting organization to translate any text incorporated in an audiovisual fixation where such fixation was itself prepared and published for the sole purpose of being used in connection with systematic instructional activities.

    *(d)* Subject to subparagraphs *(a)* to *(c)*, the provisions of the preceding paragraphs shall apply to the grant and exercise of any license granted under this paragraph.

A.II.18.   Broadcasting, which expression includes both radio and TV, plays an important part in education in developing countries, particularly in those where there is a shortage of school textbooks and teaching staff. School broadcasts have an ever-increasing role to fulfill. It was felt in Paris (in 1971) that in these countries, licences to translate for broadcasting purposes were at least as important as those for books.

A.II.19.   It was always intended that the Appendix provisions on this point should in no way affect those of Article 11*bis* of the Convention. This is not a case of authorising the broadcasting of a work in its translated form. This paragraph deals exclusively with the making of a translation for broacasting purposes. The normal rules of Article 11*bis* govern the broadcasting itself, e.g., matters like ephemeral recordings.

A.II.20.  The sub-paragraphs contain the conditions under which a broadcasting organisation may seek, from the competent authority in the country in which it has its headquarters, a licence to this end.  They are spelt out in detail and require little explanation.

A.II.21.  It was agreed in Paris (1971) that the condition according to which the translation must be made from "a copy made and acquired in accordance with the laws of" a country, meant that the copy must not be an infringing copy according to the laws of that country.  The sole purpose of the translation must be to broadcast and the sole purpose of the broadcast must be teaching or "a dissemination of the results of specialised technical or scientific research...".  Again, the broadcast must be intended for reception in the country concerned (although it obviously may be receivable beyond its borders).  Nor may the translation be used for any gainful purpose.  It cannot be sold or included in programmes which also contain commercial advertising.  Sound and visual recordings containing the translation may, if the licensee agrees, be used by other broadcasting organisations, always provided that they too have their headquarters in the same country.  Finally, licences may be granted, under the same conditions, to translate texts included in "audio-visual fixations" (i.e., films) always provided that the latter were themselves made for use solely in systematic instructional activities.

### Article III of the Appendix

*The Right of Reproduction*

#### Paragraph (1)

*Grant of Licences by a Competent Authority*

> (1) Any country which has declared that it will avail itself of the faculty provided for in this Article shall be entitled to substitute for the exclusive right of reproduction provided for in Article 9 a system of non-exclusive and non-transferable licenses, granted by the competent authority under the following conditions and subject to Article IV.

A.III.1.  As with the right of translation (Article II of the Appendix) this provision lays down the principle, leaving the details to subsequent paragraphs and question of procedure to Article IV.  However, unlike Article II, there is here a separate paragraph defining the works in respect of which a compulsory licence may be sought (see paragraph (7)).  Here, too, it is the national law which lays down who shall be the authority competent to grant licences.

#### Article III, paragraphs (2) to (5) of the Appendix

*Conditions under which Licences may be Granted*

> (2)*(a)* If, in relation to a work to which this Article applies by virtue of paragraph (7), after the expiration of
> > (i) the relevant period specified in paragraph (3), commencing on the date of first publication of a particular edition of the work, or
> > (ii) any longer period determined by national legislation of the country referred to in paragraph (1), commencing on the same date,
>
> copies of such edition have not been distributed in that country to the general public or in connection with systematic instructional activities, by the owner of the right of reproduction or with his authorization, at a price reasonably related to that normally charged in the country for comparable works, any national of such country may obtain a license to reproduce and publish such edition at that or a lower price for use in connection with systematic instructional activities.
>
> *(b)* A license to reproduce and publish an edition which has been distributed as described in subparagraph *(a)* may also be granted under the conditions provided for in this Article if, after the expiration of the applicable period, no authorized copies of that edition have been on sale for a period of six months in the country concerned to the general public or in connection with systematic instructional

activities at a price reasonably related to that normally charged in the country for comparable works.

(3) The period referred to in paragraph (2)(a)(i) shall be five years, except that

(i) for works of the natural and physical sciences, including mathematics, and of technology, the period shall be three years;

(ii) for works of fiction, poetry, drama and music, and for art books, the period shall be seven years.

(4)(a) No license obtainable after three years shall be granted under this Article until a period of six months has elapsed

(i) from the date on which the applicant complies with the requirements mentioned in Article IV(1), or

(ii) where the identity or the address of the owner of the right of reproduction is unknown, from the date on which the applicant sends, as provided for in Article IV(2), copies of his application submitted to the authority competent to grant the license.

(b) Where licenses are obtainable after other periods and Article IV(2) is applicable, no license shall be granted until a period of three months has elapsed from the date of the dispatch of the copies of the application.

(c) If, during the period of six or three months referred to in subparagraphs (a) and (b), a distribution as described in paragraph (2)(a) has taken place, no license shall be granted under this Article.

(d) No license shall be granted if the author has withdrawn from circulation all copies of the edition for the reproduction and publication of which the license has been applied for.

(5) A license to reproduce and publish a translation of a work shall not be granted under this Article in the following cases:

(i) where the translation was not published by the owner of the right of translation or with his authorization, or

(ii) where the translation is not in a language in general use in the country in which the license is applied for.

A.III.2.   Most of these conditions are self-explanatory but a few comments may be helpful.

A.III.3.   First, the licensee must be a national of the developing country in question. The comments on translation licences (Article II) apply equally here.

A.III.4.   Secondly, as with translations, the copyright owner enjoys a period of exclusivity during which no licences may be granted.   Here however there is no distinction on grounds of language, since this is a matter of simply reproducing the work in its original text. The distinction is made according to the nature of the work (paragraph (3)). The normal

period is five years from first publication (unless the developing country in question prescribes a longer term (paragraph (2)(a)(ii)). But there are two exceptions: for works of the natural and physical sciences, including mathematics and of technology, the term is shorter—namely three years. The pace of change in these matters justifies the reduction. On the other hand, the period is increased to seven years for works of fiction, poetry, drama and music. The French text speaks of "les œuvres qui appartiennent au domaine de l'imagination, telles que les romans, les œuvres poétiques, dramatiques et musicales". It was however agreed at the Paris Revision (1971) that the difference was merely one of form and its substance meant the same thing. This seven-year period also applies to art-books. These categories are usually of less importance for teaching purposes and hence the period can be longer. The normal delay (of five years) applies to such things as works of philosophy or sociology, law-books, collections of lectures, theses, etc. The term applicable to films (see paragraph (7) below) depends on which of the three groups they fall into.

A.III.5.   In the third place, no licence may be granted if during the relevant period the copyright owner has himself published in that country an edition at a price reasonably related to prices normally charged in that country for comparable works; copies made under any compulsory licence which is granted must be sold at such or a lower price. The purpose of any compulsory licence must be used in accordance with systematic instructional activities (paragraph (2)(a)). The French version speaks of "l'enseignement scolaire et universitaire". These same French words are used to describe the purpose for which translation licences may be granted under Article II, but there the English words used are "teaching and scholarship". As has been said above (Article II(5)), it was agreed in Paris (1971) that this must be understood in a wide sense as including not only activities connected with the formal and informal curriculum of an educational institution, but also systematic out of school education. It was also understood in Paris that the competent authority in the developing country to whom a request for a licence has been made would be under a duty to determine that the licence would fulfil the need of specified systematic instructional activities. A licence would necessarily be refused if such activities were in fact incidental to the actual purpose of the reproduction. The case is also covered where, after the expiry of the applicable period (three, five or seven years), authorised copies are no longer on sale. Once these have been off the market for six months, a compulsory licence may be granted (paragraph (2)(b)). Note that paragraph (2)(a) deals with a case where no authorised copies have ever been available at a reasonable price;

under paragraph (2)(b) copies have been on sale but are no longer available.

A.III.6.    Finally, as with translations, the Article prescribes a period in which to establish contractual relationships.  Where the period of exclusivity is three years, this negotiating period is six months and its starting date varies according to whether the identity of the copyright owner is known (paragraph (4)(a)(i), (ii)).  When the exclusivity period is five or seven years, the negotiating period is three months.  In this last case, knowledge of the identity or address of the copyright owner is immaterial.  The three-month period runs from the date on which copies of the licence application were sent to the publisher and the information centres (paragraph (4)(b)), but, unlike translation licences, these periods can start to run before the end of the basic term; here, they are (or may be) concurrent rather than consecutive (the words "further period" which appear in Article II are not to be found in Article III).  If during these periods the copyright owner himself arranges for the marketing of copies in the developing country at a reasonable price, no compulsory licence may be granted (paragraph (4)(c)).  As with translation licences, none can be granted if the author has exercised his "right to re-consider".

A.III.7.    Paragraph (5) covers the reproduction of translations and lays down two cases in which no licence to reproduce can be granted: when the translation in question was published without the copyright owner's permission; and when the translation is not in a language in general use in the country in which the licence is applied for.  Apart from these two cases, licences are possible under the usual conditions.  But since the reproduction of a translation affects two copyright owners—that of the original and that of the translator—it was agreed in Paris that before a compulsory licence can be granted, contractual licences must have been sought from both.

### Article III, paragraph (6) of the Appendix

*Lapse of the Licence*

(6)  If copies of an edition of a work are distributed in the country referred to in paragraph (1) to the general public or in connection with systematic instructional activities, by the owner of the right of reproduction or with his authorization, at a price reasonably related to that normally charged in the country for comparable works, any license granted under this Article shall terminate if such edition is in the same language and with substantially the same content as the edition which was published under the said license.  Any copies already made before the license terminates may continue to be distributed until their stock is exhausted.

A.III.8.   This provision, which enables the copyright owner to terminate the licence, has its parallel in Article II (see paragraph (6) of this Article). The same comments apply to both paragraphs.

### Article III, paragraph (7) of the Appendix

*Works which are not subject to Compulsory Licence*

(7)*(a)*  Subject to subparagraph *(b)*, the works to which this Article applies shall be limited to works published in printed or analogous forms of reproduction.

*(b)*  This Article shall also apply to the reproduction in audio-visual form of lawfully made audio-visual fixations including any protected works incorporated therein and to the translation of any incorporated text into a language in general use in the country in which the license is applied for, always provided that the audio-visual fixations in question were prepared and published for the sole purpose of being used in connection with systematic instructional activities.

A.III.9.   This provision restricts the area in which compulsory licences may be granted.  As with translation licences (Article II(1)) these may only be granted for works published in printed or analogous forms of reproduction (paragraph (7)(a)).  However, given the important part played by films for teaching purposes, paragraph (7)(b) extends the power to licence into the audio-visual field.  Licences may be granted to reproduce audio-visual fixations (i.e., films) (and to translate any texts incorporated therein into a language in general use in the country granting the licence). But there are a number of conditions.  The fixation, which must contain both sounds and images, must have been made lawfully in the country of its origin; it may be a work in itself or contain one or more protected works.  Finally, it must have been prepared and published with the sole purpose of being used in connection with systematic instructional activities.   Mere entertainment films are excluded.   The other conditions governing compulsory licences to reproduce must also be met.

**Article IV of the Appendix**

*Common Provisions*

A.IV.1.  This Article contains a number of provisions bearing both on licences to translate and on licences to reproduce.

**Article IV, paragraphs (1) and (2) of the Appendix**

*Licence Applications*

(1) A license under Article II or Article III may be granted only if the applicant, in accordance with the procedure of the country concerned, establishes either that he has requested, and has been denied, authorization by the owner of the right to make and publish the translation or to reproduce and publish the edition, as the case may be, or that, after due diligence on his part, he was unable to find the owner of the right.  At the same time as making the request, the applicant shall inform any national or international information center referred to in paragraph (2).

(2) If the owner of the right cannot be found, the applicant for a license shall send, by registered airmail, copies of his application, submitted to the authority competent to grant the license, to the publisher whose name appears on the work and to any national or international information center which may have been designated, in a notification to that effect deposited with the Director General, by the Government of the country in which the publisher is believed to have his principal place of business.

A.IV.2.  The rules governing applications for compulsory licences like the decision as to which authority shall be competent to grant them, are, generally speaking, a matter for the developing country which institutes the licensing system.  These two paragraphs, however, lay down certain matters which the national procedures must take account of.  In addition to what is said here, the different time limits must of course be observed.

A.IV.3.  At the Paris Revision (1971) it was agreed that the request for authorisation addressed to the owner of the right must indicate that, if such authorisation is denied, the denial might serve for a basis for applying the licence under the Appendix.  It was also agreed that, before the grant of a licence under Article II or III, the competent authority should take reasonable steps to ensure that the owner of the right has an opportunity to be aware of the application and to take such measures as may seem to him appropriate.

### Article IV, paragraph (3) of the Appendix

*Mention of Author's Name and Title*

(3) The name of the author shall be indicated on all copies of the translation or reproduction published under a license granted under Article II or Article III. The title of the work shall appear on all such copies. In the case of a translation, the original title of the work shall appear in any case on all the said copies.

A.IV.4.   This covers one aspect of the author's moral right (Article 6*bis*). It is self-explanatory.

### Article IV, paragraphs (4) and (5) of the Appendix

*No Export Permitted*

(4)*(a)* No license granted under Article II or Article III shall extend to the export of copies, and any such license shall be valid only for publication of the translation or of the reproduction, as the case may be, in the territory of the country in which it has been applied for.

*(b)* For the purposes of subparagraph *(a)*, the notion of export shall include the sending of copies from any territory to the country which, in respect of that territory, has made a declaration under Article I(5).

*(c)* Where a governmental or other public entity of a country which has granted a license to make a translation under Article II into a language other than English, French or Spanish sends copies of a translation published under such license to another country, such sending of copies shall not, for the purposes of subparagraph *(a)*, be considered to constitute export if all of the following conditions are met:

(i) the recipients are individuals who are nationals of the country whose competent authority has granted the license, or organizations grouping such individuals;

(ii) the copies are to be used only for the purpose of teaching, scholarship or research;

(iii) the sending of the copies and their subsequent distribution to recipients is without any commercial purpose; and

(iv) the country to which the copies have been sent has agreed with the country whose competent authority has granted the license to allow the receipt, or distribution, or both, and the Director General has been notified of the agreement by the Government of the country in which the license has been granted.

(5) All copies published under a license granted by virtue of Article II or Article III shall bear a notice in the appropriate language stating that the copies are available for distribution only in the country or territory to which the said license applies.

A.IV.5.   The provisions of the Appendix were inserted in the Convention to meet the educational needs of the developing countries concerned. They were not meant to permit publishers in developing countries to compete with the copyright owner in supplying foreign markets.  Hence, it is a fundamental principle that translation and reproduction licences only permit publication within the country granting the licence.  The export of copies made under the licence is forbidden (paragraph (4)(a)).  This ban on export means that no copies can be distributed except in the country (or territory—see paragraph (4)(b)) to which the licence applies.

A.IV.6.   One result of this could be that the compulsory licensee is not allowed to arrange for the printing or other reproduction to be carried out in any country other than the developing country granting the licence. The licence only operates within its territory.  This could be serious for some developing countries which do not yet have their own printing and publishing facilities.  The Paris Meeting therefore agreed that printing could take place outside the country in question, but only if a number of conditions were met.  The country granting the licence must have, within its territory, no printing or reproduction facilities or, if such facilities exist, they are incapable for economic or practical reasons of reproducing the copies.  The country where the work of reproduction is done must be a member of one of the two multilateral copyright conventions.   The printer must give a number of guarantees (that *all* copies will be sent to the licensee, and that the work of printing is lawful according to the copyright law of the place where it is done).   Finally, the printing establishment in question must not be one which has been specially created in order to reproduce works for which licences have been granted under the Appendix provisions.  All copies must bear the notice prescribed in paragraph (5).  These limitations mean that it will only be in exceptional cases that a licensee will arrange for an outside printer to do the work.  It was of course also understood in Paris that none of this compelled a country to permit what would otherwise be an infringement of copyright under its law.  The Tunis Model Law contains provisions on this point.

A.IV.7.   There was agreement in Paris (1971) on another point of construction of the Appendix: it was generally accepted that nothing in Article II, III or IV prohibited a compulsory licensee from employing a translator in another country, or other compulsory licensees, licensed to publish a translation in the same language in other countries, from using the same translation, assuming, of course, that the translation had not already been published.

A.IV.8.   The conception of what constitutes export is also slightly narrowed, but this time by the Convention itself.  By paragraph (4)(c), developing countries may send copies of translations made under compulsory licence to their nationals living abroad.  But here again a number of conditions must be satisfied: the language of the translation must not be English, French or Spanish; the copies must be sent for teaching, scholarship or research purposes; there must be no commercial purpose; and there must be an agreement, notified to the Director General of WIPO, between the country granting the licence and that to which the copies are sent.  As regards the expressions "commercial purpose", it was agreed in Paris (1971) that this did not mean that the governmental or other public entity carrying out the operation could not charge a price for each copy; what it meant was that the price, if any, could not include any profit or financial gain for the entity, but could merely enable it to recover its costs.

### Article IV, paragraph (6) of the Appendix

*Compensation for the Copyright Owner*

(6)*(a)*  Due provision shall be made at the national level to ensure

(i)  that the license provides, in favour of the owner of the right of translation or of reproduction, as the case may be, for just compensation that is consistent with standards of royalties normally operating on licenses freely negotiated between persons in the two countries concerned, and

(ii)  payment and transmittal of the compensation: should national currency regulations intervene, the competent authority shall make all efforts, by the use of international machinery, to ensure transmittal in internationally convertible currency or its equivalent.

*(b)*  Due provision shall be made by national legislation to ensure a correct translation of the work, or an accurate reproduction of the particular edition, as the case may be.

A.IV.9.   This provision gives member countries the task of ensuring that any compulsory licence which may be granted to translate and/or reproduce works protected by copyright carries a just compensation for the copyright owner.  The method of doing so is left to the country in question.  But two conditions must be fulfilled: the amount to be paid to the copyright owner must correspond with the sort of royalties which are prescribed in freely negotiated contracts between persons in the two countries in question; and steps must be taken to ensure payment. (Paragraph (6)(a).)

A.IV.10.  What is just compensation depends on the facts and circum-
stances of each case.  The Convention does not, and cannot, lay down any
minima but it says that the provision made at the national level should be
consistent with standards of royalties normally operating on licences freely
negotiated.  Naturally, it will not be possible for national legislation to
prescribe fixed scales or rigid rules, this being essentially a matter of
contract between parties.  For instance, there could be a general agreement
between a national society of authors and the publishers or even the
government of another country agreeing to receive a nominal royalty for
translations of certain categories of works.  The national law could well
provide that where there is any such general agreement compensation can
be on that basis.

A.IV.11.  Sub-paragraph (b) imposes an obligation to seek to ensure a
correct translation or accurate reproduction, as the case may be.  The
author's moral right must be respected.  This duty could be one for the
authority granting the licences or for a body specially qualified to judge
that a translation is correct or a copy a true one.  Remedies are matters
for the law of the country where protection is claimed (Article 6*bis*(3)) i.e.,
the country granting the licence.

### Article V of the Appendix

*The "Ten-Year Regime" for Translations*

(1)*(a)* Any country entitled to make a declaration that it will avail itself of the faculty provided for in Article II may, instead, at the time of ratifying or acceding to this Act:

(i) if it is a country to which Article 30(2)*(a)* applies, make a declaration under that provision as far as the right of translation is concerned;

(ii) if it is a country to which Article 30(2)*(a)* does not apply, and even if it is not a country outside the Union, make a declaration as provided for in Article 30(2)*(b)*, first sentence.

*(b)* In the case of a country which ceases to be regarded as a developing country as referred to in Article I(1), a declaration made according to this paragraph shall be effective until the date on which the period applicable under Article I(3) expires.

*(c)* Any country which has made a declaration according to this paragraph may not subsequently avail itself of the faculty provided for in Article II even if it withdraws the said declaration.

(2) Subject to paragraph (3), any country which has availed itself of the faculty provided for in Article II may not subsequently make a declaration according to paragraph (1).

(3) Any country which has ceased to be regarded as a developing country as referred to in Article I(1) may not, later than two years prior to the expiration of the period applicable under Article I(3), make a declaration to the effect provided for in Article 30(2)*(b)*, first sentence, notwithstanding the fact that it is not a country outside the Union. Such declaration shall take effect at the date on which the period applicable under Article I(3) expires.

A.V.1. This Article allows a developing country member of the Union to choose, for translations, instead of the complicated system for compulsory licences in Article II of the Appendix, the much simpler "ten-year regime" which appeared in the 1896 text of the Additional Act of Paris of that year. Under this regime, if, within ten years of the first publication of a work, no translation has been published in a language in general use in the country choosing the regime, the copyright owner loses his right of translation in that country so far as that language is concerned. In other words, the work thereafter falls into the public domain in that country so far as translation in that language is concerned, and can be translated freely.

A.V.2. The Article refers back to Article 30 of the Convention because that is the Article (paragraph (2)(a)) which allows Union countries which have already made a reservation on this point to maintain it. By paragraph (2)(b) non-Union countries may, on joining the Union, make such a reservation. If they do so, the same treatment may be accorded by other

Union countries to their works, unless they are developing countries, in which case no reciprocity may be applied (see Article I, paragraph (6)(b)).

A.V.3.  To summarize, when it comes to translations, Article V allows developing countries to choose the 1896 regime; there are two possible cases covered by paragraph (1)(a): first, a developing country already a member of the Union which has previously made this reservation (paragraph (1)(a)(i)). It may maintain the reservation instead of adopting a compulsory licensing system. Secondly, a developing country already a member of the Union but which has not previously made the reservation or a non-Union country (paragraph (1)(a)(ii)). Either may choose the ten-year regime of 1896 instead of Article II of the Appendix. If a country ceases to be a developing country, then, subject to paragraph (3)—see below—it loses the benefit of this regime when the current ten-year period comes to an end (the present one ends on October 10, 1984) or after three years, whichever is the longer.

A.V.4.  This choice is irrevocable: a country choosing the ten-year regime cannot later change its mind and institute a system of compulsory licences (paragraph (1)(c)). Conversely, having chosen a licensing system, it cannot subsequently revert to the 1896 provisions. This irrevocable choice must be made at the moment of ratifying or acceding to the Paris Act (paragraph (1)(a)).

A.V.5.  Finally, paragraph (3) covers the case of a country which ceases to be a developing country but wishes to adopt (or keep) the ten-year regime. Although it is not a country joining the Union for the first time, it may make the declaration under Article 32(2)(b) as if it were. But unlike when it was a developing country, other Union countries can thereafter apply reciprocity to its works. Paragraph (3) also prescribes when the declaration must be made and when it takes effect.

### Article VI of the Appendix

#### Advance Acceptance of the Appendix

(1) Any country of the Union may declare, as from the date of this Act, and at any time before becoming bound by Articles 1 to 21 and this Appendix:

(i) if it is a country which, were it bound by Articles 1 to 21 and this Appendix, would be entitled to avail itself of the faculties referred to in Article I(1), that it will apply the provisions of Article II or of Article III or of both to works whose country of origin is a country which, pursuant to (ii) below, admits the

application of those Articles to such works, or which is bound by Articles 1 to 21 and this Appendix; such declaration may, instead of referring to Article II, refer to Article V;

(ii) that it admits the application of this Appendix to works of which it is the country of origin by countries which have made a declaration under (i) above or a notification under Article I.

(2) Any declaration made under paragraph (1) shall be in writing and shall be deposited with the Director General. The declaration shall become effective from the date of its deposit.

A.VI.1.  Equivalent provisions featured in the Stockholm Act (1967). These were re-drafted in Paris (1971). Their purpose is to accelerate the coming into operation of the Appendix provisions in favour of developing countries, without waiting for the passage of national laws and the other processes necessary before ratification of, or accession to, the Paris Act can be accomplished.

A.VI.2.  This possibility of applying or accepting the application of the Appendix before becoming bound by it has existed since the date of the Paris Act, namely July 24, 1971.

A.VI.3.  Paragraph (1)(i) covers developing countries: they may declare that they will apply the compulsory licensing system for translations (Article II) and/or reproductions (Article III) or adopt the ten-year regime (Article V) to the works of countries which have accepted such application either expressly in advance or by ratifying or acceding to the substantive provisions of the Paris Act.

A.VI.4.  Paragraph (1)(ii) covers developped countries: they may declare that they accept the application of the Appendix to their works by developing countries who have announced their intention of applying the Appendix.

A.VI.5.  The declarations must be in writing and deposited with the Director General of WIPO. Given the urgency, they take effect immediately they are deposited.

A.9.   In short, this is what the Appendix offers to developing countries:

A.10.   First, so far as *translation* is concerned, these countries have a choice between the compulsory licensing system and that of the "ten-year regime". They cannot have both, and the choice once made is irrevocable.

A.11.   The ten-year regime means that the author's exclusive right ceases to exist as regards translations into a particular language in the country choosing this regime, after ten years from the first publication of the work, if during that period it has not been exercised. Thereafter the work can be freely translated for any purpose without permission and without payment.

A.12.   Under the other system, that of compulsory licences, nationals of the developing country may be granted licences to translate and publish the translation for the purposes of teaching, scholarship or research. Time limits must be observed: three years and six months for languages in general use, and one year and nine months for purely local languages. Licences can also be granted to use translations for educational broadcasts, and those disseminating scientific or technical information. The original works must have been published in printed form.

A.13.   Secondly, as regards *reproduction*, there is no choice. The only system available is that of compulsory licences. Again, the original must have been published in printed form (plus a limited amount of audiovisual material). Licences can only be granted for systematic instructional activities. Again, there are time limits varying according to the types of works: three, five or seven years.

A.14.   There are conditions attached to both kinds of licence, including the payment of fair compensation to copyright owners. Copies made under these licences may only be used within the country granting them; they may not be exported.

A.15.   The details as set out in the Appendix result in a somewhat complicated system. In practice licence applications, or the mere threat of such applications, will have two important results: in the first place, copyright owners (the authors and their publishers) will have the opportunity, during the prescribed time limits, to meet the demands of developing countries by themselves undertaking the publications these countries so badly need; secondly, these copyright owners and the nationals of deve-

loping countries will be in touch with each other, and this, in its turn, will lead to the conclusion of freely-negotiated contracts, without any need for reservations or compulsory licences.

A.16.   It is a matter for the governments of countries taking advantage of the Appendix to draw up the necessary rules of procedure.  In many cases the wording of the Convention is sufficiently detailed to be usable verbatim.  This was in fact done in the Tunis Model Law where the Articles covering translation and reproduction licences are taken direct from the Appendix.  It is worth noting that the Tunis Model Law also places these Articles in an Appendix, in order to emphasize their optional character. No country need adopt a compulsory licensing system (or the ten-year regime for translations) unless it wishes to do so.

Geneva, March, 1978

# Berne Convention
# for the Protection of Literary
# and Artistic Works

**of September 9, 1886,**
completed at PARIS on May 4, 1896, revised at BERLIN on November 13,
1908, completed at BERNE on March 20, 1914, and revised at ROME on
June 2, 1928, at BRUSSELS on June 26, 1948,
at STOCKHOLM on July 14, 1967,
and at PARIS on July 24, 1971

The countries of the Union, being equally animated by
the desire to protect, in as effective and uniform a manner
as possible, the rights of authors in their literary and artistic
works,

Recognizing the importance of the work of the Revision
Conference held at Stockholm in 1967,

Have resolved to revise the Act adopted by the Stockholm
Conference, while maintaining without change Articles 1 to
20 and 22 to 26 of that Act.

Consequently, the undersigned Plenipotentiaries, having
presented their full powers, recognized as in good and due
form, have agreed as follows:

## Article 1

The countries to which this Convention applies constitute
a Union for the protection of the rights of authors in their
literary and artistic works.

## Article 2

(1) The expression " literary and artistic works " shall
include every production in the literary, scientific and artistic
domain, whatever may be the mode or form of its expres-

sion, such as books, pamphlets and other writings; lectures, addresses, sermons and other works of the same nature; dramatic or dramatico-musical works; choreographic works and entertainments in dumb show; musical compositions with or without words; cinematographic works to which are assimilated works expressed by a process analogous to cinematography; works of drawing, painting, architecture, sculpture, engraving and lithography; photographic works to which are assimilated works expressed by a process analogous to photography; works of applied art; illustrations, maps, plans, sketches and three-dimensional works relative to geography, topography, architecture or science.

(2) It shall, however, be a matter for legislation in the countries of the Union to prescribe that works in general or any specified categories of works shall not be protected unless they have been fixed in some material form.

(3) Translations, adaptations, arrangements of music and other alterations of a literary or artistic work shall be protected as original works without prejudice to the copyright in the original work.

(4) It shall be a matter for legislation in the countries of the Union to determine the protection to be granted to official texts of a legislative, administrative and legal nature, and to official translations of such texts.

(5) Collections of literary or artistic works such as encyclopaedias and anthologies which, by reason of the selection and arrangement of their contents, constitute intellectual creations shall be protected as such, without prejudice to the copyright in each of the works forming part of such collections.

(6) The works mentioned in this Article shall enjoy protection in all countries of the Union. This protection shall operate for the benefit of the author and his successors in title.

(7) Subject to the provisions of Article 7(4) of this Convention, it shall be a matter for legislation in the countries of

the Union to determine the extent of the application of their laws to works of applied art and industrial designs and models, as well as the conditions under which such works, designs and models shall be protected. Works protected in the country of origin solely as designs and models shall be entitled in another country of the Union only to such special protection as is granted in that country to designs and models; however, if no such special protection is granted in that country, such works shall be protected as artistic works.

(8) The protection of this Convention shall not apply to news of the day or to miscellaneous facts having the character of mere items of press information.

### Article 2<sup>bis</sup>

(1) It shall be a matter for legislation in the countries of the Union to exclude, wholly or in part, from the protection provided by the preceding Article political speeches and speeches delivered in the course of legal proceedings.

(2) It shall also be a matter for legislation in the countries of the Union to determine the conditions under which lectures, addresses and other works of the same nature which are delivered in public may be reproduced by the press, broadcast, communicated to the public by wire and made the subject of public communication as envisaged in Article 11<sup>bis</sup>(1) of this Convention, when such use is justified by the informatory purpose.

(3) Nevertheless, the author shall enjoy the exclusive right of making a collection of his works mentioned in the preceding paragraphs.

### Article 3

(1) The protection of this Convention shall apply to:

(a) authors who are nationals of one of the countries of the Union, for their works, whether published or not;

(b) authors who are not nationals of one of the countries of the Union, for their works first published in one of those countries, or simultaneously in a country outside the Union and in a country of the Union.

(2) Authors who are not nationals of one of the countries of the Union but who have their habitual residence in one of them shall, for the purposes of this Convention, be assimilated to nationals of that country.

(3) The expression " published works " means works published with the consent of their authors, whatever may be the means of manufacture of the copies, provided that the availability of such copies has been such as to satisfy the reasonable requirements of the public, having regard to the nature of the work. The performance of a dramatic, dramatico-musical, cinematographic or musical work, the public recitation of a literary work, the communication by wire or the broadcasting of literary or artistic works, the exhibition of a work of art and the construction of a work of architecture shall not constitute publication.

(4) A work shall be considered as having been published simultaneously in several countries if it has been published in two or more countries within thirty days of its first publication.


## Article 4

The protection of this Convention shall apply, even if the conditions of Article 3 are not fulfilled, to:

(a) authors of cinematographic works the maker of which has his headquarters or habitual residence in one of the countries of the Union;

(b) authors of works of architecture erected in a country of the Union or of other artistic works incorporated in a building or other structure located in a country of the Union.

## Article 5

(1) Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this Convention.

(2) The enjoyment and the exercise of these rights shall not be subject to any formality; such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work. Consequently, apart from the provisions of this Convention, the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed.

(3) Protection in the country of origin is governed by domestic law. However, when the author is not a national of the country of origin of the work for which he is protected under this Convention, he shall enjoy in that country the same rights as national authors.

(4) The country of origin shall be considered to be:

(a) in the case of works first published in a country of the Union, that country; in the case of works published simultaneously in several countries of the Union which grant different terms of protection, the country whose legislation grants the shortest term of protection;

(b) in the case of works published simultaneously in a country outside the Union and in a country of the Union, the latter country;

(c) in the case of unpublished works or of works first published in a country outside the Union, without simultaneous publication in a country of the Union, the country of the Union of which the author is a national, provided that:

(i) when these are cinematographic works the maker of which has his headquarters or his habitual residence in a country of the Union, the country of origin shall be that country, and

(ii) when these are works of architecture erected in a country of the Union or other artistic works incorporated in a building or other structure located in a country of the Union, the country of origin shall be that country.

## Article 6

(1) Where any country outside the Union fails to protect in an adequate manner the works of authors who are nationals of one of the countries of the Union, the latter country may restrict the protection given to the works of authors who are, at the date of the first publication thereof, nationals of the other country and are not habitually resident in one of the countries of the Union. If the country of first publication avails itself of this right, the other countries of the Union shall not be required to grant to works thus subjected to special treatment a wider protection than that granted to them in the country of first publication.

(2) No restrictions introduced by virtue of the preceding paragraph shall affect the rights which an author may have acquired in respect of a work published in a country of the Union before such restrictions were put into force.

(3) The countries of the Union which restrict the grant of copyright in accordance with this Article shall give notice thereof to the Director General of the World Intellectual Property Organization (hereinafter designated as " the Director General ") by a written declaration specifying the countries in regard to which protection is restricted, and the restrictions to which rights of authors who are nationals of those countries are subjected. The Director General shall immediately communicate this declaration to all the countries of the Union.

### Article 6$^{bis}$

(1) Independently of the author's economic rights, and even after the transfer of the said rights, the author shall have the right to claim authorship of the work and to object to any distortion, mutilation or other modification of, or other derogatory action in relation to, the said work, which would be prejudicial to his honor or reputation.

(2) The rights granted to the author in accordance with the preceding paragraph shall, after his death, be maintained, at least until the expiry of the economic rights, and shall be exercisable by the persons or institutions authorized by the legislation of the country where protection is claimed. However, those countries whose legislation, at the moment of their ratification of or accession to this Act, does not provide for the protection after the death of the author of all the rights set out in the preceding paragraph may provide that some of these rights may, after his death, cease to be maintained.

(3) The means of redress for safeguarding the rights granted by this Article shall be governed by the legislation of the country where protection is claimed.

### Article 7

(1) The term of protection granted by this Convention shall be the life of the author and fifty years after his death.

(2) However, in the case of cinematographic works, the countries of the Union may provide that the term of protection shall expire fifty years after the work has been made available to the public with the consent of the author, or, failing such an event within fifty years from the making of such a work, fifty years after the making.

(3) In the case of anonymous or pseudonymous works, the term of protection granted by this Convention shall expire fifty years after the work has been lawfully made available

to the public. However, when the pseudonym adopted by the author leaves no doubt as to his identity, the term of protection shall be that provided in paragraph (1). If the author of an anonymous or pseudonymous work discloses his identity during the above-mentioned period, the term of protection applicable shall be that provided in paragraph (1). The countries of the Union shall not be required to protect anonymous or pseudonymous works in respect of which it is reasonable to presume that their author has been dead for fifty years.

(4) It shall be a matter for legislation in the countries of the Union to determine the term of protection of photographic works and that of works of applied art in so far as they are protected as artistic works; however, this term shall last at least until the end of a period of twenty-five years from the making of such a work.

(5) The term of protection subsequent to the death of the author and the terms provided by paragraphs (2), (3) and (4) shall run from the date of death or of the event referred to in those paragraphs, but such terms shall always be deemed to begin on the first of January of the year following the death or such event.

(6) The countries of the Union may grant a term of protection in excess of those provided by the preceding paragraphs.

(7) Those countries of the Union bound by the Rome Act of this Convention which grant, in their national legislation in force at the time of signature of the present Act, shorter terms of protection than those provided for in the preceding paragraphs shall have the right to maintain such terms when ratifying or acceding to the present Act.

(8) In any case, the term shall be governed by the legislation of the country where protection is claimed; however, unless the legislation of that country otherwise provides, the term shall not exceed the term fixed in the country of origin of the work.

### Article 7<sup>bis</sup>

The provisions of the preceding Article shall also apply
in the case of a work of joint authorship, provided that the
terms measured from the death of the author shall he calcu-
lated from the death of the last surviving author.

### Article 8

Authors of literary and artistic works protected hy this
Convention shall enjoy the exclusive right of making and of
authorizing the translation of their works throughout the
term of protection of their rights in the original works.

### Article 9

(1) Authors of literary and artistic works protected hy
this Convention shall have the exclusive right of authorizing
the reproduction of these works, in any manner or form.

(2) It shall he a matter for legislation in the countries
of the Union to permit the reproduction of such works in
certain special cases, provided that such reproduction doer
not conflict with a normal exploitation of the work and does
not unreasonahly prejudice the legitimate interests of the
author.

(3) Any sound or visual recording shall he considered as
a reproduction for the purposes of this Convention.

### Article 10

(1) It shall he permissihle to make quotations from a work
which has already heen lawfully made available to the puhlic,
provided that their making is compatihle with fair practice,
and their extent does not exceed that justified hy the purpose,
including quotations from newspaper articles and periodicals
in the form of press summaries.

(2) It shall be a matter for legislation in the countries of the Union, and for special agreements existing or to be concluded between them, to permit the utilization, to the extent justified by the purpose, of literary or artistic works by way of illustration in publications, broadcasts or sound or visual recordings for teaching, provided such utilization is compatible with fair practice.

(3) Where use is made of works in accordance with the preceding paragraphs of this Article, mention shall be made of the source, and of the name of the author if it appears thereon.

### Article 10bis

(1) It shall be a matter for legislation in the countries of the Union to permit the reproduction by the press, the broadcasting or the communication to the public by wire of articles published in newspapers or periodicals on current economic, political or religious topics, and of broadcast works of the same character, in cases in which the reproduction, broadcasting or such communication thereof is not expressly reserved. Nevertheless, the source must always be clearly indicated; the legal consequences of a breach of this obligation shall be determined by the legislation of the country where protection is claimed.

(2) It shall also be a matter for legislation in the countries of the Union to determine the conditions under which, for the purpose of reporting current events by means of photography, cinematography, broadcasting or communication to the public by wire, literary or artistic works seen or heard in the course of the event may, to the extent justified by the informatory purpose, be reproduced and made available to the public.

### Article 11

(1) Authors of dramatic, dramatico-musical and musical works shall enjoy the exclusive right of authorizing:

(i) the public performance of their works, including such public performance by any means or process;

(ii) any communication to the public of the performance of their works.

(2) Authors of dramatic or dramatico-musical works shall enjoy, during the full term of their rights in the original works, the same rights with respect to translations thereof.

## Article 11<sup>bis</sup>

(1) Authors of literary and artistic works shall enjoy the exclusive right of authorizing:

(i) the broadcasting of their works or the communication thereof to the public by any other means of wireless diffusion of signs, sounds or images;

(ii) any communication to the public by wire or by rebroadcasting of the broadcast of the work, when this communication is made by an organization other than the original one;

(iii) the public communication by loudspeaker or any other analogous instrument transmitting, by signs, sounds or images, the broadcast of the work.

(2) It shall be a matter for legislation in the countries of the Union to determine the conditions under which the rights mentioned in the preceding paragraph may be exercised, but these conditions shall apply only in the countries where they have been prescribed. They shall not in any circumstances be prejudicial to the moral rights of the author, nor to his right to obtain equitable remuneration which, in the absence of agreement, shall be fixed by competent authority.

(3) In the absence of any contrary stipulation, permission granted in accordance with paragraph (1) of this Article shall not imply permission to record, by means of instruments recording sounds or images, the work broadcast. It shall, however, be a matter for legislation in the countries of the Union

to determine the regulations for ephemeral recordings made by a broadcasting organization by means of its own facilities and used for its own broadcasts. The preservation of these recordings in official archives may, on the ground of their exceptional documentary character, be authorized by such legislation.

## Article 11ter

(1) Authors of literary works shall enjoy the exclusive right of authorizing:

  (i) the public recitation of their works, including such public recitation by any means or process;

  (ii) any communication to the public of the recitation of their works.

(2) Authors of literary works shall enjoy, during the full term of their rights in the original works, the same rights with respect to translations thereof.

## Article 12

Authors of literary or artistic works shall enjoy the exclusive right of authorizing adaptations, arrangements and other alterations of their works.

## Article 13

(1) Each country of the Union may impose for itself reservations and conditions on the exclusive right granted to the author of a musical work and to the author of any words, the recording of which together with the musical work has already been authorized by the latter, to authorize the sound recording of that musical work, together with such words, if any; but all such reservations and conditions shall apply only in the countries which have imposed them and shall not, in any circumstances, be prejudicial to the rights of these

authors to obtain equitable remuneration which, in the absence of agreement, shall be fixed by competent authority.

(2) Recordings of musical works made in a country of the Union in accordance with Article 13(3) of the Conventions signed at Rome on June 2, 1928, and at Brussels on June 26, 1948, may be reproduced in that country without the permission of the author of the musical work until a date two years after that country becomes bound by this Act.

(3) Recordings made in accordance with paragraphs (1) and (2) of this Article and imported without permission from the parties concerned into a country where they are treated as infringing recordings shall be liable to seizure.

## Article 14

(1) Authors of literary or artistic works shall have the exclusive right of authorizing:

(i) the cinematographic adaptation and reproduction of these works, and the distribution of the works thus adapted or reproduced;

(ii) the public performance and communication to the public by wire of the works thus adapted or reproduced.

(2) The adaptation into any other artistic form of a cinematographic production derived from literary or artistic works shall, without prejudice to the authorization of the author of the cinematographic production, remain subject to the authorization of the authors of the original works.

(3) The provisions of Article 13(1) shall not apply.

## Article 14bis

(1) Without prejudice to the copyright in any work which may have been adapted or reproduced, a cinematographic work shall be protected as an original work. The owner of copyright in a cinematographic work shall enjoy the same

rights as the author of an original work, including the rights referred to in the preceding Article.

(2) *(a)* Ownership of copyright in a cinematographic work shall be a matter for legislation in the country where protection is claimed.

*(b)* However, in the countries of the Union which, by legislation, include among the owners of copyright in a cinematographic work authors who have brought contributions to the making of the work, such authors, if they have undertaken to bring such contributions, may not, in the absence of any contrary or special stipulation, object to the reproduction, distribution, public performance, communication to the public by wire, broadcasting or any other communication to the public, or to the subtitling or dubbing of texts, of the work.

*(c)* The question whether or not the form of the undertaking referred to above should, for the application of the preceding subparagraph *(b)*, be in a written agreement or a written act of the same effect shall be a matter for the legislation of the country where the maker of the cinematographic work has his headquarters or habitual residence. However, it shall be a matter for the legislation of the country of the Union where protection is claimed to provide that the said undertaking shall be in a written agreement or a written act of the same effect. The countries whose legislation so provides shall notify the Director General by means of a written declaration, which will be immediately communicated by him to all the other countries of the Union.

*(d)* By "contrary or special stipulation" is meant any restrictive condition which is relevant to the aforesaid undertaking.

(3) Unless the national legislation provides to the contrary, the provisions of paragraph (2)*(b)* above shall not be applicable to authors of scenarios, dialogues and musical works created for the making of the cinematographic work, or to the principal director thereof. However, those countries

of the Union whose legislation does not contain rules providing for the application of the said paragraph (2)(b) to such director shall notify the Director General by means of a written declaration, which will be immediately communicated by him to all the other countries of the Union.

## Article 14ter

(1) The author, or after his death the persons or institutions authorized by national legislation, shall, with respect to original works of art and original manuscripts of writers and composers, enjoy the inalienable right to an interest in any sale of the work subsequent to the first transfer by the author of the work.

(2) The protection provided by the preceding paragraph may be claimed in a country of the Union only if legislation in the country to which the author belongs so permits, and to the extent permitted by the country where this protection is claimed.

(3) The procedure for collection and the amounts shall be matters for determination by national legislation.

## Article 15

(1) In order that the author of a literary or artistic work protected by this Convention shall, in the absence of proof to the contrary, be regarded as such, and consequently be entitled to institute infringement proceedings in the countries of the Union, it shall be sufficient for his name to appear on the work in the usual manner. This paragraph shall be applicable even if this name is a pseudonym, where the pseudonym adopted by the author leaves no doubt as to his identity.

(2) The person or body corporate whose name appears on a cinematographic work in the usual manner shall, in the absence of proof to the contrary, be presumed to be the maker of the said work.

(3) In the case of anonymous and pseudonymous works, other than those referred to in paragraph (1) above, the publisher whose name appears on the work shall, in the absence of proof to the contrary, be deemed to represent the author, and in this capacity he shall be entitled to protect and enforce the author's rights. The provisions of this paragraph shall cease to apply when the author reveals his identity and establishes his claim to authorship of the work.

(4) *(o)* In the case of unpublished works where the identity of the author is unknown, but where there is every ground to presume that he is a national of a country of the Union, it shall be a matter for legislation in that country to designate the competent authority which shall represent the author and shall be entitled to protect and enforce his rights in the countries of the Union.

*(b)* Countries of the Union which make such designation under the terms of this provision shall notify the Director General by means of a written declaration giving full information concerning the authority thus designated. The Director General shall at once communicate this declaration to all other countries of the Union.

## Article 16

(1) Infringing copies of a work shall be liable to seizure in any country of the Union where the work enjoys legal protection.

(2) The provisions of the preceding paragraph shall also apply to reproductions coming from a country where the work is not protected, or has ceased to be protected.

(3) The seizure shall take place in accordance with the legislation of each country.

## Article 17

The provisions of this Convention cannot in any way affect the right of the Government of each country of the Union to

permit, to control, or to prohibit, by legislation or regulation, the circulation, presentation, or exhibition of any work or production in regard to which the competent authority may find it necessary to exercise that right.

## Article 18

(1) This Convention shall apply to all works which, at the moment of its coming into force, have not yet fallen into the public domain in the country of origin through the expiry of the term of protection.

(2) If, however, through the expiry of the term of protection which was previously granted, a work has fallen into the public domain of the country where protection is claimed, that work shall not be protected anew.

(3) The application of this principle shall be subject to any provisions contained in special conventions to that effect existing or to be concluded between countries of the Union. In the absence of such provisions, the respective countries shall determine, each in so far as it is concerned, the conditions of application of this principle.

(4) The preceding provisions shall also apply in the case of new accessions to the Union and to cases in which protection is extended by the application of Article 7 or by the abandonment of reservations.

## Article 19

The provisions of this Convention shall not preclude the making of a claim to the benefit of any greater protection which may be granted by legislation in a country of the Union.

## Article 20

The Governments of the countries of the Union reserve the right to enter into special agreements among themselves,

in so far as such agreements grant to authors more extensive rights than those granted by the Convention, or contain other provisions not contrary to this Convention. The provisions of existing agreements which satisfy these conditions shall remain applicable.

### Article 21

(1) Special provisions regarding developing countries are included in the Appendix.

(2) Subject to the provisions of Article 28(1)*(b)*, the Appendix forms an integral part of this Act.

### Article 22

(1) *(a)* The Union shall have an Assembly consisting of those countries of the Union which are bound by Articles 22 to 26.

*(b)* The Government of each country shall be represented by one delegate, who may be assisted by alternate delegates, advisors, and experts.

*(c)* The expenses of each delegation shall be borne by the Government which has appointed it.

(2) *(a)* The Assembly shall:

(i) deal with all matters concerning the maintenance and development of the Union and the implementation of this Convention;

(ii) give directions concerning the preparation for conferences of revision to the International Bureau of Intellectual Property (hereinafter designated as " the International Bureau ") referred to in the Convention Establishing the World Intellectual Property Organization (hereinafter designated as " the Organization "), due account being taken of any comments made by those countries of the Union which are not bound by Articles 22 to 26;

(iii) review and approve the reports and activities of the Director General of the Organization concerning the Union, and give him all necessary instructions concerning matters within the competence of the Union;

(iv) elect the members of the Executive Committee of the Assembly;

(v) review and approve the reports and activities of its Executive Committee, and give instructions to such Committee;

(vi) determine the program and adopt the triennial budget of the Union, and approve its final accounts;

(vii) adopt the financial regulations of the Union;

(viii) establish such committees of experts and working groups as may be necessary for the work of the Union;

(ix) determine which countries not members of the Union and which intergovernmental and international non-governmental organizations shall be admitted to its meetings as observers;

(x) adopt amendments to Articles 22 to 26;

(xi) take any other appropriate action designed to further the objectives of the Union;

(xii) exercise such other functions as are appropriate under this Convention;

(xiii) subject to its acceptance, exercise such rights as are given to it in the Convention establishing the Organization.

*(b)* With respect to matters which are of interest also to other Unions administered by the Organization, the Assembly shall make its decisions after having heard the advice of the Coordination Committee of the Organization.

(3) *(a)* Each country member of the Assembly shall have one vote.

*(b)* One-half of the countries members of the Assembly shall constitute a quorum.

*(c)* Notwithstanding the provisions of subparagraph *(b),* if, in any session, the number of countries represented is less than one-half but equal to or more than one-third of the countries members of the Assembly, the Assembly may make decisions but, with the exception of decisions concerning its own procedure, all such decisions shall take effect only if the following conditions are fulfilled. The International Bureau shall communicate the said decisions to the countries members of the Assembly which were not represented and shall invite them to express in writing their vote or abstention within a period of three months from the date of the communication. If, at the expiration of this period, the number of countries having thus expressed their vote or abstention attains the number of countries which was lacking for attaining the quorum in the session itself, such decisions shall take effect provided that at the same time the required majority still obtains.

*(d)* Subject to the provisions of Article 26(2), the decisions of the Assembly shall require two-thirds of the votes cast.

*(e)* Abstentions shall not be considered as votes.

*(f)* A delegate may represent, and vote in the name of, one country only.

*(g)* Countries of the Union not members of the Assembly shall be admitted to its meetings as observers.

(4) *(a)* The Assembly shall meet once in every third calendar year in ordinary session upon convocation by the Director General and, in the absence of exceptional circumstances, during the same period and at the same place as the General Assembly of the Organization.

*(b)* The Assembly shall meet in extraordinary session upon convocation by the Director General, at the request of the Executive Committee or at the request of one-fourth of the countries members of the Assembly.

(5) The Assembly shall adopt its own rules of procedure.

## Article 23

(1) The Assembly shall have an Executive Committee.

(2) *(a)* The Executive Committee shall consist of countries elected by the Assembly from among countries members of the Assembly. Furthermore, the country on whose territory the Organization has its headquarters shall, subject to the provisions of Article 25(7)*(b)*, have an *ex officio* seat on the Committee.

*(b)* The Government of each country member of the Executive Committee shall be represented by one delegate, who may be assisted by alternate delegates, advisors, and experts.

*(c)* The expenses of each delegation shall be borne by the Government which has appointed it.

(3) The number of countries members of the Executive Committee shall correspond to one-fourth of the number of countries members of the Assembly. In establishing the number of seats to be filled, remainders after division by four shall be disregarded.

(4) In electing the members of the Executive Committee, the Assembly shall have due regard to an equitable geographical distribution and to the need for countries party to the Special Agreements which might be established in relation with the Union to be among the countries constituting the Executive Committee.

(5) *(a)* Each member of the Executive Committee shall serve from the close of the session of the Assembly which elected it to the close of the next ordinary session of the Assembly.

*(b)* Members of the Executive Committee may be re-elected, but not more than two-thirds of them.

*(c)* The Assembly shall establish the details of the rules governing the election and possible re-election of the members of the Executive Committee.

(6) *(a)* The Executive Committee shall:

(i) prepare the draft agenda of the Assembly;

(ii) submit proposals to the Assembly respecting the draft program and triennial budget of the Union prepared by the Director General;

(iii) approve, within the limits of the program and the triennial budget, the specific yearly budgets and programs prepared by the Director General;

(iv) submit, with appropriate comments, to the Assembly the periodical reports of the Director General and the yearly audit reports on the accounts;

(v) in accordance with the decisions of the Assembly and having regard to circumstances arising between two ordinary sessions of the Assembly, take all necessary measures to ensure the execution of the program of the Union by the Director General;

(vi) perform such other functions as are allocated to it under this Convention.

*(b)* With respect to matters which are of interest also to other Unions administered by the Organization, the Executive Committee shall make its decisions after having heard the advice of the Coordination Committee of the Organization.

(7) *(a)* The Executive Committee shall meet once a year in ordinary session upon convocation by the Director General, preferably during the same period and at the same place as the Coordination Committee of the Organization.

*(b)* The Executive Committee shall meet in extraordinary session upon convocation by the Director General, either on his own initiative, or at the request of its Chairman or one-fourth of its members.

(8) *(a)* Each country member of the Executive Committee shall have one vote.

*(b)* One-half of the members of the Executive Committee shall constitute a quorum.

*(c)* Decisions shall be made by a simple majority of the votes cast.

*(d)* Abstentions shall not be considered as votes.

*(e)* A delegate may represent, and vote in the name of, one country only.

(9) Countries of the Union not members of the Executive Committee shall be admitted to its meetings as observers.

(10) The Executive Committee shall adopt its own rules of procedure.

### Article 24

(1) *(a)* The administrative tasks with respect to the Union shall he performed by the International Bureau, which is a continuation of the Bureau of the Union united with the Bureau of the Union established by the International Convention for the Protection of Industrial Property.

*(b)* In particular, the International Bureau shall provide the secretariat of the various organs of the Union.

*(c)* The Director General of the Organization shall be the chief executive of the Union and shall represent the Union.

(2) The International Bureau shall assemble and publish information concerning the protection of copyright. Each country of the Union shall promptly communicate to the International Bureau all new laws and official texts concerning the protection of copyright.

(3) The International Bureau shall publish a monthly periodical.

(4) The International Bureau shall, on request, furnish information to any country of the Union on matters concerning the protection of copyright.

(5) The International Bureau shall conduct studies, and shall provide services, designed to facilitate the protection of copyright.

(6) The Director General and any staff member designated by him shall participate, without the right to vote, in all meetings of the Assembly, the Executive Committee and

any other committee of experts or working group. The Director General, or a staff member designated by him, shall be *ex officio* secretary of these bodies.

(7) *(a)* The International Bureau shall, in accordance with the directions of the Assembly and in cooperation with the Executive Committee, make the preparations for the conferences of revision of the provisions of the Convention other than Articles 22 to 26.

*(b)* The International Bureau may consult with intergovernmental and international non-governmental organizations concerning preparations for conferences of revision.

*(c)* The Director General and persons designated by him shall take part, without the right to vote, in the discussions at these conferences.

(8) The International Bureau shall carry out any other tasks assigned to it.


### Article 25

(1) *(a)* The Union shall have a budget.

*(b)* The budget of the Union shall include the income and expenses proper to the Union, its contribution to the budget of expenses common to the Unions, and, where applicable, the sum made available to the budget of the Conference of the Organization.

*(c)* Expenses not attributable exclusively to the Union but also to one or more other Unions administered by the Organization shall be considered as expenses common to the Unions. The share of the Union in such common expenses shall be in proportion to the interest the Union has in them.

(2) The budget of the Union shall be established with due regard to the requirements of coordination with the budgets of the other Unions administered by the Organization.

(3) The budget of the Union shall be financed from the following sources:

(i) contributions of the countries of the Union;

(ii) fees and charges due for services performed by the International Bureau in relation to the Union;

(iii) sale of, or royalties on, the publications of the International Bureau concerning the Union;

(iv) gifts, bequests, and subventions;

(v) rents, interests, and other miscellaneous income.

(4) *(a)* For the purpose of establishing its contribution towards the budget, each country of the Union shall belong to a class, and shall pay its annual contributions on the basis of a number of units fixed as follows:

|          |   |   |   |   |    |
|----------|---|---|---|---|----|
| Class I  | . | . | . | . | 25 |
| Class II | . | . | . | . | 20 |
| Class III| . | . | . | . | 15 |
| Class IV | . | . | . | . | 10 |
| Class V  | . | . | . | . | 5  |
| Class VI | . | . | . | . | 3  |
| Class VII| . | . | . | . | 1  |

*(b)* Unless it has already done so, each country shall indicate, concurrently with depositing its instrument of ratification or accession, the class to which it wishes to belong. Any country may change class. If it chooses a lower class, the country must announce it to the Assembly at one of its ordinary sessions. Any such change shall take effect at the beginning of the calendar year following the session.

*(c)* The annual contribution of each country shall be an amount in the same proportion to the total sum to be contributed to the annual budget of the Union by all countries as the number of its units is to the total of the units of all contributing countries.

*(d)* Contributions shall become due on the first of January of each year.

*(e)* A country which is in arrears in the payment of its contributions shall have no vote in any of the organs of the Union of which it is a member if the amount of its arrears

equals or exceeds the amount of the contributions due from it for the preceding two full years. However, any organ of the Union may allow such a country to continue to exercise its vote in that organ if, and as long as, it is satisfied that the delay in payment is due to exceptional and unavoidable circumstances.

*(f)* If the budget is not adopted before the beginning of a new financial period, it shall be at the same level as the budget of the previous year, in accordance with the financial regulations.

(5) The amount of the fees and charges due for services rendered by the International Bureau in relation to the Union shall be established, and shall be reported to the Assembly and the Executive Committee, by the Director General.

(6) *(a)* The Union shall have a working capital fund which shall be constituted by a single payment made by each country of the Union. If the fund becomes insufficient, an increase shall be decided by the Assembly.

*(b)* The amount of the initial payment of each country to the said fund or of its participation in the increase thereof shall be a proportion of the contribution of that country for the year in which the fund is established or the increase decided.

*(c)* The proportion and the terms of payment shall be fixed by the Assembly on the proposal of the Director General and after it has heard the advice of the Coordination Committee of the Organization.

(7) *(a)* In the headquarters agreement concluded with the country on the territory of which the Organization has its headquarters, it shall be provided that, whenever the working capital fund is insufficient, such country shall grant advances. The amount of these advances and the conditions on which they are granted shall be the subject of separate agreements, in each case, between such country and the Organization. As long as it remains under the obligation to grant advances,

such country shall have an *ex officio* seat on the Executive Committee.

*(b)* The country referred to in subparagraph *(a)* and the Organization shall each have the right to denounce the obligation to grant advances, by written notification. Denunciation shall take effect three years after the end of the year in which it has been notified.

(8) The auditing of the accounts shall be effected by one or more of the countries of the Union or by external auditors, as provided in the financial regulations. They shall be designated, with their agreement, by the Assembly.

## Article 26

(1) Proposals for the amendment of Articles 22, 23, 24, 25, and the present Article, may be initiated by any country member of the Assembly, by the Executive Committee, or by the Director General. Such proposals shall be communicated by the Director General to the member countries of the Assembly at least six months in advance of their consideration by the Assembly.

(2) Amendments to the Articles referred to in paragraph (1) shall be adopted by the Assembly. Adoption shall require three-fourths of the votes cast, provided that any amendment of Article 22, and of the present paragraph, shall require four-fifths of the votes cast.

(3) Any amendment to the Articles referred to in paragraph (1) shall enter into force one month after written notifications of acceptance, effected in accordance with their respective constitutional processes, have been received by the Director General from three-fourths of the countries members of the Assembly at the time it adopted the amendment. Any amendment to the said Articles thus accepted shall bind all the countries which are members of the Assembly at the time the amendment enters into force, or which become members thereof at a subsequent date, provided that any amendment

increasing the financial obligations of countries of the Union shall bind only those countries which have notified their acceptance of such amendment.


### Article 27

(1) This Convention shall be submitted to revision with a view to the introduction of amendments designed to improve the system of the Union.

(2) For this purpose, conferences shall be held successively in one of the countries of the Union among the delegates of the said countries.

(3) Subject to the provisions of Article 26 which apply to the amendment of Articles 22 to 26, any revision of this Act, including the Appendix, shall require the unanimity of the votes cast.


### Article 28

(1) *(a)* Any country of the Union which has signed this Act may ratify it, and, if it has not signed it, may accede to it. Instruments of ratification or accession shall be deposited with the Director General.

*(b)* Any country of the Union may declare in its instrument of ratification or accession that its ratification or accession shall not apply to Articles 1 to 21 and the Appendix, provided that, if such country has previously made a declaration under Article VI(1) of the Appendix, then it may declare in the said instrument only that its ratification or accession shall not apply to Articles 1 to 20.

*(c)* Any country of the Union which, in accordance with subparagraph *(b),* has excluded provisions therein referred to from the effects of its ratification or accession may at any later time declare that it extends the effects of its ratification or accession to those provisions. Such declaration shall be deposited with the Director General.

(2) *(a)* Articles 1 to 21 and the Appendix shall enter into force three months after both of the following two conditions are fulfilled:

(i) at least five countries of the Union have ratified or acceded to this Act without making a declaration under paragraph (1)*(b)*,

(ii) France, Spain, the United Kingdom of Great Britain and Northern Ireland, and the United States of America, have become bound by the Universal Copyright Convention as revised at Paris on July 24, 1971.

*(b)* The entry into force referred to in subparagraph *(a)* shall apply to those countries of the Union which, at least three months before the said entry into force, have deposited instruments of ratification or accession not containing a declaration under paragraph (1)*(b)*.

*(c)* With respect to any country of the Union not covered by subparagraph *(b)* and which ratifies or accedes to this Act without making a declaration under paragraph (1)*(b)*, Articles 1 to 21 and the Appendix shall enter into force three months after the date on which the Director General has notified the deposit of the relevant instrument of ratification or accession, unless a subsequent date has been indicated in the instrument deposited. In the latter case, Articles 1 to 21 and the Appendix shall enter into force with respect to that country on the date thus indicated.

*(d)* The provisions of subparagraphs *(a)* to *(c)* do not affect the application of Article VI of the Appendix.

(3) With respect to any country of the Union which ratifies or accedes to this Act with or without a declaration made under paragraph (1)*(b)*, Articles 22 to 38 shall enter into force three months after the date on which the Director General has notified the deposit of the relevant instrument of ratification or accession, unless a subsequent date has been indicated in the instrument deposited. In the latter case, Articles 22 to 38 shall enter into force with respect to that country on the date thus indicated.

## Article 29

(1) Any country outside the Union may accede to this Act and thereby become party to this Convention and a member of the Union. Instruments of accession shall be deposited with the Director General.

(2) *(a)* Subject to subparagraph *(b)*, this Convention shall enter into force with respect to any country outside the Union three months after the date on which the Director General has notified the deposit of its instrument of accession, unless a subsequent date has been indicated in the instrument deposited. In the latter case, this Convention shall enter into force with respect to that country on the date thus indicated.

*(b)* If the entry into force according to subparagraph *(a)* precedes the entry into force of Articles 1 to 21 and the Appendix according to Article 28(2)*(a)*, the said country shall, in the meantime, be bound, instead of by Articles 1 to 21 and the Appendix, by Articles 1 to 20 of the Brussels Act of this Convention.

## Article 29bis

Ratification of or accession to this Act by any country not bound by Articles 22 to 38 of the Stockholm Act of this Convention shall, for the sole purposes of Article 14(2) of the Convention establishing the Organization, amount to ratification of or accession to the said Stockholm Act with the limitation set forth in Article 28(1)*(b)*(i) thereof.

## Article 30

(1) Subject to the exceptions permitted by paragraph (2) of this Article, by Article 28(1)*(b)*, by Article 33(2), and by the Appendix, ratification or accession shall automatically entail acceptance of all the provisions and admission to all the advantages of this Convention.

(2) *(a)* Any country of the Union ratifying or acceding to this Act may, subject to Article V(2) of the Appendix, retain the benefit of the reservations it has previously formulated on condition that it makes a declaration to that effect at the time of the deposit of its instrument of ratification or accession.

*(b)* Any country outside the Union may declare, in acceding to this Convention and subject to Article V(2) of the Appendix, that it intends to substitute, temporarily at least, for Article 8 of this Act concerning the right of translation, the provisions of Article 5 of the Union Convention of 1886, as completed at Paris in 1896, on the clear understanding that the said provisions are applicable only to translations into a language in general use in the said country. Subject to Article I(6)*(b)* of the Appendix, any country has the right to apply, in relation to the right of translation of works whose country of origin is a country availing itself of such a reservation, a protection which is equivalent to the protection granted by the latter country.

*(c)* Any country may withdraw such reservations at any time by notification addressed to the Director General.

## Article 31

(1) Any country may declare in its instrument of ratification or accession, or may inform the Director General by written notification at any time thereafter, that this Convention shall be applicable to all or part of those territories, designated in the declaration or notification, for the external relations of which it is responsible.

(2) Any country which has made such a declaration or given such a notification may, at any time, notify the Director General that this Convention shall cease to be applicable to all or part of such territories.

(3) *(a)* Any declaration made under paragraph (1) shall take effect on the same date as the ratification or accession in which it was included, and any notification given under

that paragraph shall take effect three months after its notification by the Director General.

*(b)* Any notification given under paragraph (2) shall take effect twelve months after its receipt by the Director General.

(4) This Article shall in no way be understood as implying the recognition or tacit acceptance by a country of the Union of the factual situation concerning a territory to which this Convention is made applicable by another country of the Union by virtue of a declaration under paragraph (1).

### Article 32

(1) This Act shall, as regards relations between the countries of the Union, and to the extent that it applies, replace the Berne Convention of September 9, 1886, and the subsequent Acts of revision. The Acts previously in force shall continue to be applicable, in their entirety or to the extent that this Act does not replace them by virtue of the preceding sentence, in relations with countries of the Union which do not ratify or accede to this Act.

(2) Countries outside the Union which become party to this Act shall, subject to paragraph (3), apply it with respect to any country of the Union not bound by this Act or which, although bound by this Act, has made a declaration pursuant to Article 28(1)*(b).* Such countries recognize that the said country of the Union, in its relations with them:

(i) may apply the provisions of the most recent Act by which it is bound, and

(ii) subject to Article I(6) of the Appendix, has the right to adapt the protection to the level provided for by this Act.

(3) Any country which has availed itself of any of the faculties provided for in the Appendix may apply the provisions of the Appendix relating to the faculty or faculties of which it has availed itself in its relations with any other

country of the Union which is not bound by this Act, provided that the latter country has accepted the application of the said provisions.

## Article 33

(1) Any dispute between two or more countries of the Union concerning the interpretation or application of this Convention, not settled by negotiation, may, by any one of the countries concerned, be brought before the International Court of Justice by application in conformity with the Statute of the Court, unless the countries concerned agree on some other method of settlement. The country bringing the dispute before the Court shall inform the International Bureau; the International Bureau shall bring the matter to the attention of the other countries of the Union.

(2) Each country may, at the time it signs this Act or deposits its instrument of ratification or accession, declare that it does not consider itself bound by the provisions of paragraph (1). With regard to any dispute between such country and any other country of the Union, the provisions of paragraph (1) shall not apply.

(3) Any country having made a declaration in accordance with the provisions of paragraph (2) may, at any time, withdraw its declaration by notification addressed to the Director General.

## Article 34

(1) Subject to Article 29bis, no country may ratify or accede to earlier Acts of this Convention once Articles 1 to 21 and the Appendix have entered into force.

(2) Once Articles 1 to 21 and the Appendix have entered into force, no country may make a declaration under Article 5 of the Protocol Regarding Developing Countries attached to the Stockholm Act.

## Article 35

(1) This Convention shall remain in force without limitation as to time.

(2) Any country may denounce this Act by notification addressed to the Director General. Such denunciation shall constitute also denunciation of all earlier Acts and shall affect only the country making it, the Convention remaining in full force and effect as regards the other countries of the Union.

(3) Denunciation shall take effect one year after the day on which the Director General has received the notification.

(4) The right of denunciation provided by this Article shall not be exercised by any country before the expiration of five years from the date upon which it becomes a member of the Union.

## Article 36

(1) Any country party to this Convention undertakes to adopt, in accordance with its constitution, the measures necessary to ensure the application of this Convention.

(2) It is understood that, at the time a country becomes bound by this Convention, it will be in a position under its domestic law to give effect to the provisions of this Convention.

## Article 37

(1) *(a)* This Act shall be signed in a single copy in the French and English languages and, subject to paragraph (2), shall be deposited with the Director General.

*(b)* Official texts shall be established by the Director General, after consultation with the interested Governments, in the Arabic, German, Italian, Portuguese and Spanish languages, and such other languages as the Assembly may designate.

*(c)* In case of differences of opinion on the interpretation of the various texts, the French text shall prevail.

(2) This Act shall remain open for signature until January 31, 1972. Until that date, the copy referred to in paragraph (1)*(a)* shall be deposited with the Government of the French Republic.

(3) The Director General shall certify and transmit two copies of the signed text of this Act to the Governments of all countries of the Union and, on request, to the Government of any other country.

(4) The Director General shall register this Act with the Secretariat of the United Nations.

(5) The Director General shall notify the Governments of all countries of the Union of signatures, deposits of instruments of ratification or accession and any declarations included in such instruments or made pursuant to Articles 28(1)*(c)*, 30(2)*(a)* and *(b)*, and 33(2), entry into force of any provisions of this Act, notifications of denunciation, and notifications pursuant to Articles 30(2)*(c)*, 31(1) and (2), 33(3), and 38(1), as well as the Appendix.

## Article 38

(1) Countries of the Union which have not ratified or acceded to this Act and which are not bound by Articles 22 to 26 of the Stockholm Act of this Convention may, until April 26, 1975, exercise, if they so desire, the rights provided under the said Articles as if they were bound by them. Any country desiring to exercise such rights shall give written notification to this effect to the Director General; this notification shall be effective on the date of its receipt. Such countries shall be deemed to be members of the Assembly until the said date.

(2) As long as all the countries of the Union have not become Members of the Organization, the International Bu-

reau of the Organization shall also function as the Bureau of the Union, and the Director General as the Director of the said Bureau.

(3) Once all the countries of the Union have become Members of the Organization, the rights, obligations, and property, of the Bureau of the Union shall devolve on the International Bureau of the Organization.

# APPENDIX

## Article I

(1) Any country regarded as a developing country in conformity with the established practice of the General Assembly of the United Nations which ratifies or accedes to this Act, of which this Appendix forms an integral part, and which, having regard to its economic situation and its social or cultural needs, does not consider itself immediately in a position to make provision for the protection of all the rights as provided for in this Act, may, by a notification deposited with the Director General at the time of depositing its instrument of ratification or accession or, subject to Article V(1)*(c)*, at any time thereafter, declare that it will avail itself of the faculty provided for in Article II, or of the faculty provided for in Article III, or of both of those faculties. It may, instead of availing itself of the faculty provided for in Article II, make a declaration according to Article V(1)*(a)*.

(2) *(a)* Any declaration under paragraph (1) notified before the expiration of the period of ten years from the entry into force of Articles 1 to 21 and this Appendix according to Article 28(2) shall be effective until the expiration of the said period. Any such declaration may be renewed in whole or in part for periods of ten years each by a notification deposited with the Director General not more than fifteen months and not less than three months before the expiration of the ten-year period then running.

*(b)* Any declaration under paragraph (1) notified after the expiration of the period of ten years from the entry into force of Articles 1 to 21 and this Appendix according to Article 28(2) shall be effective until the expiration of the ten-year period then running. Any such declaration may be

renewed as provided for in the second sentence of subparagraph *(a)*.

(3) Any country of the Union which has ceased to be regarded as a developing country as referred to in paragraph (1) shall no longer be entitled to renew its declaration as provided in paragraph (2), and, whether or not it formally withdraws its declaration, such country shall be precluded from availing itself of the faculties referred to in paragraph (1) from the expiration of the ten-year period then running or from the expiration of a period of three years after it has ceased to be regarded as a developing country, whichever period expires later.

(4) Where, at the time when the declaration made under paragraph (1) or (2) ceases to be effective, there are copies in stock which were made under a license granted by virtue of this Appendix, such copies may continue to be distributed until their stock is exhausted.

(5) Any country which is bound by the provisions of this Act and which has deposited a declaration or a notification in accordance with Article 31(1) with respect to the application of this Act to a particular territory, the situation of which can be regarded as analogous to that of the countries referred to in paragraph (1), may, in respect of such territory, make the declaration referred to in paragraph (1) and the notification of renewal referred to in paragraph (2). As long as such declaration or notification remains in effect, the provisions of this Appendix shall be applicable to the territory in respect of which it was made.

(6) *(a)* The fact that a country avails itself of any of the faculties referred to in paragraph (1) does not permit another country to give less protection to works of which the country of origin is the former country than it is obliged to grant under Articles 1 to 20.

*(b)* The right to apply reciprocal treatment provided for in Article 30(2)*(b)*, second sentence, shall not, until the date

on which the period applicable under Article I(3) expires, be exercised in respect of works the country of origin of which is a country which has made a declaration according to Article V(1)*(a)*.

### Article II

(1) Any country which has declared that it will avail itself of the faculty provided for in this Article shall be entitled, so far as works published in printed or analogous forms of reproduction are concerned, to substitute for the exclusive right of translation provided for in Article 8 a system of non-exclusive and non-transferable licenses, granted by the competent authority under the following conditions and subject to Article IV.

(2) *(a)* Subject to paragraph (3), if, after the expiration of a period of three years, or of any longer period determined by the national legislation of the said country, commencing on the date of the first publication of the work, a translation of such work has not been published in a language in general use in that country by the owner of the right of translation, or with his authorization, any national of such country may obtain a license to make a translation of the work in the said language and publish the translation in printed or analogous forms of reproduction.

*(b)* A license under the conditions provided for in this Article may also be granted if all the editions of the translation published in the language concerned are out of print.

(3)*(a)* In the case of translations into a language which is not in general use in one or more developed countries which are members of the Union, a period of one year shall be substituted for the period of three years referred to in paragraph (2)*(a)*.

*(b)* Any country referred to in paragraph (1) may, with the unanimous agreement of the developed countries which are members of the Union and in which the same language is in general use, substitute, in the case of translations into that

' ˑˑguage, for the period of three years referred to in para-graph (2)*(a)* a shorter period as determined by such agreement but not less than one year. However, the provisions of the foregoing sentence shall not apply where the language in question is English, French or Spanish. The Director General shall be notified of any such agreement by the Governments which have concluded it.

(4) *(a)* No license obtainable after three years shall be granted under this Article until a further period of six months has elapsed, and no license obtainable after one year shall be granted under this Article until a further period of nine months has elapsed

  (i) from the date on which the applicant complies with the requirements mentioned in Article IV(1), or

  (ii) where the identity or the address of the owner of the right of translation is unknown, from the date on which the applicant sends, as provided for in Article IV(2), copies of his application submitted to the authority competent to grant the license.

*(b)* If, during the said period of six or nine months, a translation in the language in respect of which the application was made is published by the owner of the right of translation or with his authorization, no license under this Article shall be granted.

(5) Any license under this Article shall be granted only for the purpose of teaching, scholarship or research.

(6) If a translation of a work is published by the owner of the right of translation or with his authorization at a price reasonably related to that normally charged in the country for comparable works, any license granted under this Article shall terminate if such translation is in the same language and with substantially the same content as the translation published under the license. Any copies already made before the license terminates may continue to be distributed until their stock is exhausted.

(7) For works which are composed mainly of illustrations, a license to make and publish a translation of the text and to reproduce and publish the illustrations may be granted only if the conditions of Article III are also fulfilled.

(8) No license shall be granted under this Article when the author has withdrawn from circulation all copies of his work.

(9) *(a)* A license to make a translation of a work which has been published in printed or analogous forms of reproduction may also be granted to any broadcasting organization having its headquarters in a country referred to in paragraph (1), upon an application made to the competent authority of that country by the said organization, provided that all of the following conditions are met:

(i) the translation is made from a copy made and acquired in accordance with the laws of the said country;

(ii) the translation is only for use in broadcasts intended exclusively for teaching or for the dissemination of the results of specialized technical or scientific research to experts in a particular profession;

(iii) the translation is used exclusively for the purposes referred to in condition (ii) through broadcasts made lawfully and intended for recipients on the territory of the said country, including broadcasts made through the medium of sound or visual recordings lawfully and exclusively made for the purpose of such broadcasts;

(iv) all uses made of the translation are without any commercial purpose.

*(b)* Sound or visual recordings of a translation which was made by a broadcasting organization under a license granted by virtue of this paragraph may, for the purposes and subject to the conditions referred to in subparagraph *(a)* and with the agreement of that organization, also be used by any other broadcasting organization having its headquarters in the country whose competent authority granted the license in question.

*(c)* Provided that all of the criteria and conditions set out in subparagraph *(a)* are met, a license may also be granted to a broadcasting organization to translate any text incorporated in an audio-visual fixation where such fixation was itself prepared and published for the sole purpose of being used in connection with systematic instructional activities.

*(d)* Subject to subparagraphs *(a)* to *(c),* the provisions of the preceding paragraphs shall apply to the grant and exercise of any license granted under this paragraph.

### Article III

(1) Any country which has declared that it will avail itself of the faculty provided for in this Article shall be entitled to substitute for the exclusive right of reproduction provided for in Article 9 a system of non-exclusive and non-transferable licenses, granted by the competent authority under the following conditions and subject to Article IV.

(2) *(a)* If, in relation to a work to which this Article applies by virtue of paragraph (7), after the expiration of

(i) the relevant period specified in paragraph (3), commencing on the date of first publication of a particular edition of the work, or

(ii) any longer period determined by national legislation of the country referred to in paragraph (1), commencing on the same date,

copies of such edition have not been distributed in that country to the general public or in connection with systematic instructional activities, by the owner of the right of reproduction or with his authorization, at a price reasonably related to that normally charged in the country for comparable works, any national of such country may obtain a license to reproduce and publish such edition at that or a lower price for use in connection with systematic instructional activities.

*(b)* A license to reproduce and publish an edition which has been distributed as described in subparagraph *(a)* may

also be granted under the conditions provided for in this Article if, after the expiration of the applicable period, no authorized copies of that edition have been on sale for a period of six months in the country concerned to the general public or in connection with systematic instructional activities at a price reasonably related to that normally charged in the country for comparable works.

(3) The period referred to in paragraph (2)(a)(i) shall be five years, except that

(i) for works of the natural and physical sciences, including mathematics, and of technology, the period shall be three years;

(ii) for works of fiction, poetry, drama and music, and for art books, the period shall be seven years.

(4) (a) No license obtainable after three years shall be granted under this Article until a period of six months has elapsed

(i) from the date on which the applicant complies with the requirements mentioned in Article IV(1), or

(ii) where the identity or the address of the owner of the right of reproduction is unknown, from the date on which the applicant sends, as provided for in Article IV(2), copies of his application submitted to the authority competent to grant the license.

(b) Where licenses are obtainable after other periods and Article IV(2) is applicable, no license shall be granted until a period of three months has elapsed from the date of the dispatch of the copies of the application.

(c) If, during the period of six or three months referred to in subparagraphs (a) and (b), a distribution as described in paragraph (2)(a) has taken place, no license shall be granted under this Article.

(d) No license shall be granted if the author has withdrawn from circulation all copies of the edition for the reproduction and publication of which the license has been applied for.

(5) A license to reproduce and publish a translation of a work shall not be granted under this Article in the following cases:

(i) where the translation was not published by the owner of the right of translation or with his authorization, or

(ii) where the translation is not in a language in general use in the country in which the license is applied for.

(6) If copies of an edition of a work are distributed in the country referred to in paragraph (1) to the general public or in connection with systematic instructional activities, by the owner of the right of reproduction or with his authorization, at a price reasonably related to that normally charged in the country for comparable works, any license granted under this Article shall terminate if such edition is in the same language and with substantially the same content as the edition which was published under the said license. Any copies already made before the license terminates may continue to be distributed until their stock is exhausted.

(7) *(a)* Subject to subparagraph *(b)*, the works to which this Article applies shall be limited to works published in printed or analogous forms of reproduction.

*(b)* This Article shall also apply to the reproduction in audio-visual form of lawfully made audio-visual fixations including any protected works incorporated therein and to the translation of any incorporated text into a language in general use in the country in which the license is applied for, always provided that the audio-visual fixations in question were prepared and published for the sole purpose of being used in connection with systematic instructional activities.


### Article IV

(1) A license under Article II or Article III may be granted only if the applicant, in accordance with the procedure of the country concerned, establishes either that he has

requested, and has been denied, authorization by the owner of the right to make and publish the translation or to reproduce and publish the edition, as the case may be, or that, after due diligence on his part, he was unable to find the owner of the right. At the same time as making the request, the applicant shall inform any national or international information center referred to in paragraph (2).

(2) If the owner of the right cannot be found, the applicant for a license shall send, by registered airmail, copies of his application, submitted to the authority competent to grant the license, to the publisher whose name appears on the work and to any national or international information center which may have been designated, in a notification to that effect deposited with the Director General, by the Government of the country in which the publisher is believed to have his principal place of business.

(3) The name of the author shall be indicated on all copies of the translation or reproduction published under a license granted under Article II or Article III. The title of the work shall appear on all such copies. In the case of a translation, the original title of the work shall appear in any case on all the said copies.

(4) *(a)* No license granted under Article II or Article III shall extend to the export of copies, and any such license shall be valid only for publication of the translation or of the reproduction, as the case may be, in the territory of the country in which it has been applied for.

*(b)* For the purposes of subparagraph *(a)*, the notion of export shall include the sending of copies from any territory to the country which, in respect of that territory, has made a declaration under Article I(5).

*(c)* Where a governmental or other public entity of a country which has granted a license to make a translation under Article II into a language other than English, French or Spanish sends copies of a translation published under such license to another country, such sending of copies shall not,

for the purposes of suhparagraph *(a)*, be considered to constitute export if all of the following conditions are met:

   (i) the recipients are individuals who are nationals of the country whose competent authority has granted the license, or organizations grouping such individuals;

 (ii) the copies are to he used only for the purpose of teaching, scholarship or research;

(iii) the sending of the copies and their subsequent distrihution to recipients is without any commercial purpose; and

(iv) the country to which the copies have heen sent has agreed with the country whose competent authority has granted the license to allow the receipt, or distrihution, or hoth, and the Director General has heen notified of the agreement hy the Government of the country in which the license has heen granted.

   (5) All copies puhlished under a license granted by virtue of Article II or Article III shall hear a notice in the appropriate language stating that the copies are available for distrihution only in the country or territory to which the said license applies.

   (6) *(a)* Due provision shall be made at the national level to ensure

   (i) that the license provides, in favour of the owner of the right of translation or of reproduction, as the case may be, for just compensation that is consistent with standards of royalties normally operating on licenses freely negotiated between persons in the two countries concerned, and

 (ii) payment and transmittal of the compensation: should national currency regulations intervene, the competent authority shall make all efforts, by the use of international machinery, to ensure transmittal in internationally convertible currency or its equivalent.

*(b)* Due provision shall he made by national legislation to ensure a correct translation of the work, or an accurate reproduction of the particular edition, as the case may he.

## Article V

(1) *(a)* Any country entitled to make a declaration that it will avail itself of the faculty provided for in Article II may, instead, at the time of ratifying or acceding to this Act:

(i) if it is a country to which Article 30(2)*(a)* applies, make a declaration under that provision as far as the right of translation is concerned;

(ii) if it is a country to which Article 30(2)*(a)* does not apply, and even if it is not a country outside the Union, make a declaration as provided for in Article 30(2)*(b)*, first sentence.

*(b)* In the case of a country which ceases to he regarded as a developing country as referred to in Article I(1), a declaration made according to this paragraph shall be effective until the date on which the period applicahle under Article I(3) expires.

*(c)* Any country which has made a declaration according to this paragraph may not suhsequently avail itself of the faculty provided for in Article II even if it withdraws the said declaration.

(2) Subject to paragraph (3), any country which has availed itself of the faculty provided for in Article II may not subsequently make a declaration according to paragraph (1).

(3) Any country which has ceased to he regarded as a developing country as referred to in Article I(1) may, not later than two years prior to the expiration of the period applicahle under Article I(3), make a declaration to the effect provided for in Article 30(2)*(b)*, first sentence, notwithstanding the fact that it is not a country outside the Union. Such declaration shall take effect at the date on which the period applicahle under Article I(3) expires.

## Article VI

(1) Any country of the Union may declare, as from the date of this Act, and at any time before becoming bound by Articles 1 to 21 and this Appendix:

(i) if it is a country which, were it bound by Articles 1 to 21 and this Appendix, would be entitled to avail itself of the faculties referred to in Article I(1), that it will apply the provisions of Article II or of Article III or of both to works whose country of origin is a country which, pursuant to (ii) below, admits the application of those Articles to such works, or which is bound by Articles 1 to 21 and this Appendix; such declaration may, instead of referring to Article II, refer to Article V;

(ii) that it admits the application of this Appendix to works of which it is the country of origin by countries which have made a declaration under (i) above or a notification under Article I.

(2) Any declaration made under paragraph (1) shall be in writing and shall be deposited with the Director General. The declaration shall become effective from the date of its deposit.

----

## TABLE OF CONTENTS

| | Page |
|---|---|
| Preface by the Director General of WIPO . . . . . . . . . . . . . . | 3 |
| Introduction . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| Provisions of the Convention . . . . . . . . . . . . . . . . . | 7 |
| Preamble . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 |
| Article 1 — Formation of a Union* . . . . . . . . . . . . . . . | 8 |
| Article 2 — Protected Works . . . . . . . . . . . . . . . . . | 12 |
| paragraph (1) — Definition . . . . . . . . . . . . . . . | 12 |
| paragraph (2) — Possibility of Demanding Fixation . . . . . . . . | 18 |
| paragraph (3) — Derivative Works . . . . . . . . . . . . | 19 |
| paragraph (4) — Official Texts . . . . . . . . . . . . . . | 20 |
| paragraph (5) — Collections . . . . . . . . . . . . . . . | 20 |
| paragraph (6) — Obligation to Protect; Beneficiaries of Protection . . . . | 21 |
| paragraph (7) — Works of Applied Art and Industrial Designs and Models | 22 |
| paragraph (8) — News of the Day and Miscellaneous Facts . . . . . | 22 |
| Article 2bis — Power to Limit the Protection of Certain Works . . . . . . | 24 |
| paragraph (1) — Speeches . . . . . . . . . . . . . . . | 24 |
| paragraph (2) — Use of Lectures and Addresses . . . . . . . . . . | 24 |
| paragraph (3) — Collections . . . . . . . . . . . . . . . | 25 |
| Article 3 — Conditions for Protection; Points of Attachment . . . . . . . | 26 |
| paragraph (1) — Nationality of the Author and Place of Publication of the Work . . . . . . . . . . . . . . . . . . . . . . | 26 |
| paragraph (2) — Residence of the Author . . . . . . . . . . . . . | 27 |
| paragraph (3) — Definition of Published Works . . . . . . . . . . . | 27 |
| paragraph (4) — Definition of Simultaneous Publication . . . . . . . . | 29 |
| Article 4 — Subsidiary Criteria . . . . . . . . . . . . . . . . . | 30 |
| Article 5 — National Treatment; Automatic Protection; Independent Protection; Country of Origin . . . . . . . . . . . . . . . . | 32 |
| paragraph (1) — Principle of National Treatment . . . . . . . . . . | 32 |
| paragraph (2) — Automatic Protection and Independence of Protection . . | 33 |
| paragraph (3) — Protection in the Country of Origin . . . . . . . . | 34 |
| paragraph (4) — Definition of the Country of Origin of a Work . . . . . | 35 |

---

* Each Article of the Convention and of the Appendix has been given a title to facilitate its identification. The titles do not appear in the original text.

                                                                          Page
Article 6 — Possibility of restricting protection in the case of works made by
        nationals of certain non-Union countries . . . . . . . . . . . . .   39
    paragraph (1) — In the country of first publication and in the other countries   39
    paragraph (2) — No Retroactivity . . . . . . . . . . . . . . . . . .   40
    paragraph (3) — Notification . . . . . . . . . . . . . . . . . . .   40
Article 6bis — Moral Right . . . . . . . . . . . . . . . . . . . . . .   41
    paragraph (1) — Contents of the Moral Right . . . . . . . . . . . .   41
    paragraph (2) — The Moral Right after the Death of the Author . . . .   43
    paragraph (3) — Means of Redress . . . . . . . . . . . . . . . . .   44
Article 7 — Term of Protection . . . . . . . . . . . . . . . . . . . .   45
    paragraph (1) — General Rule . . . . . . . . . . . . . . . . . . .   45
    paragraph (2) — Term of Protection for Cinematographic Works . . . .   46
    paragraph (3) — Term of Protection for Anonymous and Pseudonymous
        Works . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48
    paragraph (4) — Term of Protection for Photographs and Works of Applied
        Art . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49
    paragraph (5) — Starting Date for Terms of Protection . . . . . . . .   49
    paragraph (6) — Possibility of Longer Terms . . . . . . . . . . . .   49
    paragraph (7) — Possibility of Shorter Terms . . . . . . . . . . . .   50
    paragraph (8) — Applicable Law and Comparison of Terms . . . . . .   50
Article 7bis — Term of Protection for Works of Joint Authorship . . . . .   52
Article 8 — Right of Translation . . . . . . . . . . . . . . . . . . .   53
Article 9 — Right of Reproduction . . . . . . . . . . . . . . . . . . .   54
    paragraph (1) — The Principle . . . . . . . . . . . . . . . . . . .   54
    paragraph (2) — Exceptions . . . . . . . . . . . . . . . . . . . .   55
    paragraph (3) — Sound and Visual Recordings . . . . . . . . . . . .   57
Article 10 — Limited Freedom to Use Works . . . . . . . . . . . . . .   58
    paragraph (1) — Quotations . . . . . . . . . . . . . . . . . . . .   58
    paragraph (2) — Use of Works by Way of Illustration for Teaching . . .   60
    paragraph (3) — Mention of the Source and the Author's Name . . . .   60
Article 10bis — Other Powers to Use Works . . . . . . . . . . . . . . .   61
    paragraph (1) — Articles in Newspapers or Broadcasts . . . . . . . .   61
    paragraph (2) — Reporting Current Events . . . . . . . . . . . . .   62
Article 11 — Right of Public Performance . . . . . . . . . . . . . . . .   64
    paragraph (1) — Scope of the Right . . . . . . . . . . . . . . . . .   64
    paragraph (2) — Public Performance of Translations . . . . . . . . .   65

Table of Contents        227

|  | Page |
|---|---|
| Article 11*bis* — Right of Broadcasting | 66 |
| paragraph (1) — Scope of the Right | 66 |
| paragraph (2) — Compulsory Licences | 70 |
| paragraph (3) — Ephemeral Recordings | 71 |
| Article 11*ter* — Public Recitation | 74 |
| paragraph (1) — Scope of the Right | 74 |
| paragraph (2) — Public Recitation of Translations | 75 |
| Article 12 — Right of Adaptation | 76 |
| Article 13 — Right of Recording Musical Works | 78 |
| paragraph (1) — Compulsory Licences | 79 |
| paragraph (2) — Transitional Provisions | 80 |
| paragraph (3) — Seizure of Imported Copies | 81 |
| Article 14 — Cinematographic Rights | 82 |
| paragraph (1) — The Cinematographic Rights of Authors of Pre-Existing Works | 83 |
| paragraph (2) — Adaptation of Film Productions | 84 |
| paragraph (3) — No Compulsory Licences for Musical Works | 84 |
| Article 14*bis* — Rights of Artistic Contributors to Films | 85 |
| paragraph (1) — Protection for Cinematographic Works | 85 |
| paragraph (2)*(a)* — Copyright Ownership | 85 |
| paragraph (2)*(b)* — Presumption of Legitimation | 86 |
| paragraph (2)*(c)* — Form of the Author's Consent | 87 |
| paragraph (2)*(d)* — "Contrary or Special Stipulation" | 88 |
| paragraph (3) — Artistic Contributors to the Film | 88 |
| Article 14*ter* — "Droit de Suite" | 90 |
| paragraph (1) — Scope of the Right | 90 |
| paragraph (2) — Applicable Law | 91 |
| paragraph (3) — Procedure | 91 |
| Article 15 — Presumptions of Authorship | 93 |
| paragraph (1) — General Rule | 93 |
| paragraph (2) — Cinematographic Works | 94 |
| paragraph (3) — Anonymous and Pseudonymous Works | 94 |
| paragraph (4) — Folklore | 95 |
| Article 16 — Seizure of Infringing Copies | 97 |
| Article 17 — Power of Governments to Control the Circulation, Performance and Exhibition of Works | 99 |

228 of 230

                                                                                    Page

Article 18 — Retroactive Effect of the Convention . . . . . . . . . . . .    100
    paragraph (1) — General Principle   . . . . . . . . . . . . . . .    100
    paragraph (2) — Further Condition . . . . . . . . . . . . . . . .    100
    paragraph (3) — Application . . . . . . . . . . . . . . . . . . .    101
    paragraph (4) — Particular Cases . . . . . . . . . . . . . . . . .    102

Article 19 — Effect on National Legislation . . . . . . . . . . . . . .    103

Article 20 — Special Agreements. . . . . . . . . . . . . . . . . . . .    104

Article 21 — Special Provisions for Developing Countries . . . . . . . .    105

Article 22 — The Assembly . . . . . . . . . . . . . . . . . . . . . .    106

Article 23 — The Executive Committee . . . . . . . . . . . . . . . . .    110

Article 24 — The International Bureau of WIPO . . . . . . . . . . . . .    112

Article 25 — Finances  . . . . . . . . . . . . . . . . . . . . . . . .    115

Article 26 — Amendment of the Administrative Provisions . . . . . . . .    119

Article 27 — Revision of the Convention . . . . . . . . . . . . . . . .    121

Article 28 — Acceptance and Entry into Force for Union Countries . . . .    122
    paragraph (1) — Acceptance of the Paris Act (1971) . . . . . . . . . .    122
    paragraph (2) — Entry into Force of the Substantive Provisions . . . . .    123
    paragraph (3) — Entry into Force of the Administrative and Final Clauses    125

Article 29 — Acceptance and Entry into Force for Non-Union Countries . .    126

Article 29*bis* — Application of Article 14(2) of the WIPO Convention . . . . ·  128

Article 30 — Reservations  . . . . . . . . . . . . . . . . . . . . . .    129
    paragraph (1) — Limited Possibility of Reservations . . . . . . . . . .    129
    paragraph (2) — Previous Reservations; Right of Translation; Withdrawal
      of Reservations . . . . . . . . . . . . . . . . . . . . . . . .    129

Article 31 — Applicability of the Convention to Certain Territories . . . .    131

Article 32 — Applicability of the Paris and earlier Acts . . . . . . . . .    133
    paragraph (1) — Relations between Countries already Members . . . . .    133
    paragraph (2) — Relations between Existing Members and Countries Join-
      ing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    134
    paragraph (3) — Relations between Developing Countries which take Ad-
      vantage of the Appendix to the Paris Act (1971) and Union Countries
      not bound by that Act . . . . . . . . . . . . . . . . . . . . .    136

Article 33 — Settlement of Disputes . . . . . . . . . . . . . . . . . .    137

Article 34 — Closure of Earlier Acts . . . . . . . . . . . . . . . . . .    139

## Table of Contents                                                    229

Page

Article 35 — Duration and Denunciation . . . . . . . . . . . . . . . .   140

Article 36 — Application of the Convention by the Provisions of Domestic
  Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   141

Article 37 — Final Clauses . . . . . . . . . . . . . . . . . . . . .   142

Article 38 — Transitional Provisions . . . . . . . . . . . . . . . .   144

Provisions of the Appendix . . . . . . . . . . . . . . . . . . . .   146

Article I of the Appendix — Countries Entitled to Benefit . . . . . . .   148
  paragraph (1) — Method of doing so . . . . . . . . . . . . . .   148
  paragraph (2) — Duration of the Effectiveness of the Notice or Declaration   149
  paragraph (3) — Ceasing to be a Developing Country . . . . . . .   150
  paragraph (4) — Existing Stocks . . . . . . . . . . . . . . . .   151
  paragraph (5) — Declarations concerning certain Territories . . . . .   151
  paragraph (6) — Limits to Reciprocity . . . . . . . . . . . . . .   152

Article II of the Appendix — The Right of Translation . . . . . . . . .   153
  paragraph (1) — Grant of Licences by a Competent Authority . . . . .   153
  paragraphs (2) to (4) — Conditions under which Licences may be Granted   154
  paragraph (5) — Purposes for which Licences may be Granted . . . . .   156
  paragraph (6) — Lapse of the Licence . . . . . . . . . . . . . .   157
  paragraph (7) — Works Composed mainly of Illustrations . . . . . . .   158
  paragraph (8) — Works withdrawn from Circulation . . . . . . . . .   158
  paragraph (9) — Translation for Broadcasting . . . . . . . . . . .   158

Article III of the Appendix — The Right of Reproduction . . . . . . . .   161
  paragraph (1) — Grant of Licences by a Competent Authority . . . . .   161
  paragraphs (2) to (5) — Conditions under which Licences may be Granted   161
  paragraph (6) — Lapse of the Licence . . . . . . . . . . . . . .   164
  paragraph (7) — Works which are not subject to Compulsory Licence . .   165

Article IV of the Appendix — Common Provisions . . . . . . . . . .   166
  paragraphs (1) and (2) — Licence Applications . . . . . . . . . . .   166
  paragraph (3) — Mention of Author's Name and Title . . . . . . . .   167
  paragraphs (4) and (5) — No Export Permitted . . . . . . . . . . .   167
  paragraph (6) — Compensation for the Copyright Owner . . . . . . .   169

Article V of the Appendix — The "Ten-Year Regime" for Translations . . .   171

Article VI of the Appendix — Advance Acceptance of the Appendix . . . .   172

Text of the Convention and of the Appendix . . . . . . . . . . . .   177

BAYLIS_I